UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON
CASE NO. 2:11-CV-00165-WOB-JGW

ORIGINAL

ROBERT LEHMAN                              PLAINTIFF


VS              DEPOSITION FOR DEFENDANT


ST. ELIZABETH HEALTHCARE            DEFENDANT




DATE:           MAY 18, 2012

DEPONENT:       ROBERT LEHMAN







TERRI PORTER - REPORTER
CJV REPORTING COMPANY
130 DUDLEY ROAD, SUITE 170
EDGEWOOD, KENTUCKY  41017
(859) 581-9794
FAX (859) 581-6899
TOLL FREE 1-800-315-9687

1              The deposition of ROBERT LEHMAN, taken

2       on discovery, pursuant to Notice, at the offices

3       of Freking & Betz, 525 Vine Street, Cincinnati,

4       Hamilton County, Ohio on May 18, 2012 at 9:00

5       a.m., upon oral examination and to be used in

6       accordance with the Federal Rules of Civil

7       Procedure.

8                    A P P E A R A N C E S

9       FOR THE PLAINTIFF:

10                      KATHERINE DAUGHTREY NEFF., ESQ.

11      FOR THE DEFENDANT:

12                      KELLY A. SCHOENING, ESQ.

13      ALSO PRESENT:

14                      ROXANN PLATEK
                        ALEX TIEMAN

15

16

17

18

19

20

21

22              ROBERT LEHMAN, called on behalf of the

23      Defendant, after having been first duly sworn,

24      was examined and deposed as follows:

1                    INDEX OF EXAMINATIONS

2

3        CROSS-EXAMINATION BY:            MS. SCHOENING

4                        PAGES  4 - 109

5

6                      INDEX OF EXHIBITS

7

8        DEFENDANT'S EXHIBIT NO.  1 ----------  19

9        DEFENDANT'S EXHIBIT NO.  2 ----------  21

10       DEFENDANT'S EXHIBIT NO.  3 ----------  41

11       DEFENDANT'S EXHIBIT NO.  4 ----------  43

12       DEFENDANT'S EXHIBIT NO.  5 ----------  45

13       DEFENDANT'S EXHIBIT NO.  6 ----------  58

14       DEFENDANT'S EXHIBIT NO.  7 ----------  62

15       DEFENDANT'S EXHIBIT NO.  8 ----------  94

16       DEFENDANT'S EXHIBIT NO.  9 ----------  95

17       DEFENDANT'S EXHIBIT NO. 10 ----------  96

18       DEFENDANT'S EXHIBIT NO. 11 ----------  99

19       DEFENDANT'S EXHIBIT NO. 12 ---------- 100

20       DEFENDANT'S EXHIBIT NO. 13 ---------- 101

21       DEFENDANT'S EXHIBIT NO. 14 ---------- 103

22       DEFENDANT'S EXHIBIT NO. 15 ---------- 105

23       DEFENDANT'S EXHIBIT NO. 16 ---------- 107

24

1                          CROSS-EXAMINATION

2      BY MS. SCHOENING:

3                  Q          Mr. Lehman, we met prior to

4      the deposition, my name is Kelly Schoening and I

5      represent St. Elizabeth Medical Center in the

6      lawsuit that you filed against them.  Have you

7      ever had your deposition taken before?

8                  A          No, ma'am.

9                  Q          Let me give you some quick

10     ground rules.  I'll be asking you questions, if

11     at any time you do not understand my question

12     please ask me to rephrase it, clarify it, I am

13     happy to do so.  If you need to take a break at

14     any time just let us know and we'll go off the

15     record and take a break.  You know, if you have

16     any questions you're free to ask those, but we'll

17     proceed forward.

18                 Can you state your name for the record,

19     please?

20                 A          Robert William Lehman.

21                 Q          And can you state your home

22     address?

23                 A          5890 Calmhaven Drive,

24     Cincinnati, Ohio.

1          Q          Do you have any relatives

2     that live in Northern Kentucky?

3          A          Yes.

4          Q          And who, anyone over the age

5     of 18?

6          A          Yes.

7          Q          Can you just state their

8     names?  And I'll tell you the reason I ask that

9     is just for jury selection purposes.

10          A          Okay.  There would be Ralph

11     Thoss, Karen Thoss.  Jack J. Dooley, Kevin

12     Dooley.  There would be Brian Thoss.  There would

13     be Meg and Dennis Losby.  As far as I can

14     remember that's every one of them.

15          Q          Okay, that's fine.  Thank

16     you.  Did you review any documents prior to your

17     deposition today?

18          A          Yes.

19          Q          And do you recall what those

20     were?

21          A          Are you asking for specific

22     documents or are you --

23          Q          Right, just what documents

24     you recall reviewing.

1          A          I was reviewing the documents

2     provided by the hospital, the things that I can

3     remember doing.

4          Q          Do you recall any of the

5     specific documents?

6          A          Yes.

7          Q          And what were those?

8          A          E-mails and policies and my

9     work history, or personnel file.

10          Q          Other than the documents that

11     the hospital produced in this litigation did you

12     review anything else?

13          A          Are you asking for, could you

14     give me a time period are you talking?

15          Q          Just to prepare for today's

16     deposition.

17          A          Yes.

18          Q          And what were those

19     documents?

20          A          I reviewed my Complaint.

21          Q          Okay.

22          A          Best I remember right now

23     that's what I can remember.

24

1          Q          Is there anything that would

2     prevent you from testifying honestly and

3     truthfully today?

4          A          No.

5          Q          And are you taking any

6     medications currently?

7          A          Yes.

8          Q          And what are you taking?

9          A          Medication, are you talking

10    my regular, what are you --

11         Q          Right --

12         A          Oh.

13         Q          -- regular medications?

14         A          Prescription medications.

15         Q          And what are those

16    prescriptions?

17         A          You want the whole list?

18         Q          Yes, sir.

19         A          I could give you the whole

20    list if I knew we had, we had, it's in the

21    medical records, you'd have to get that.  I

22    couldn't spell them off or pronounce them.

23         Q          Do you remember anything that

24    you're taking?

1          A          Lisinopril.

2          Q          Okay?

3          A          That's about what I can

4    remember at this time but they're in my medical

5    records.

6          Q          Do you keep any type of

7    journal or diary?

8          A          For what?

9          Q          I don't, for whatever reason

10   do you keep a journal?

11         A          Define journal, I'm not sure

12   of the question.  What's a journal?  Do you --

13         Q          A diary.  I mean do you write

14   down events that happen during the day?

15         A          I mean, yes, I guess.  I

16   don't know how to answer that.

17         Q          During part of this

18   litigation we had asked your attorney to produce

19   any journals or diaries that you would have kept

20   that pertain to the complaints in your lawsuit

21   and nothing was produced.  So do you have any

22   notes or anything that you personally kept about

23   what you're complaining about?

24

1            A        I can't remember at this time

2    but there could be.  There's a possibility there

3    could be, I just can't remember offhand right

4    now.

5                      MS. SCHOENING:  Okay, I just

6            would make a request that if he has

7            anything --

8                      MS. NEFF:  Sure.

9                      MS. SCHOENING:  -- to

10           produce, please?

11           Q        Do you recall sending any

12   e-mails about your termination at St. Elizabeth

13   to anybody?

14           A        Could you specify e-mails,

15   personal or from work or where, what are you

16   talking?

17           Q        Well, let's take them one at

18   a time.  Did you send any e-mails from your St.

19   Elizabeth account about your termination of

20   employment?

21           A        I don't believe so.  But I'm,

22   I don't believe that I did but if, if you're

23   defining it, if, could you define, what do you

24   mean sending, is that business related, personal,

1          what, what are you defining that as?

2                    Q              Either.  Any e-mails that you

3          would have sent that would have related to the

4          circumstances of your termination?

5                    A              I would say yes.

6                    Q              And do you recall who you

7          sent an e-mail to?

8                    A              There was e-mails between

9          Roxann, myself, human resources, those type

10         e-mails.

11                   Q              Do you currently have a

12         Facebook account?

13                   A              No.

14                   Q              Do you participate in any

15         what I'll define as social media, Twitter,

16         MySpace, assuming that that's the ones, I don't

17         even know?

18                   A              Do I pay in to those, is that

19         what you said, I'm sorry?

20                   Q              Do you use any of those?

21                   A              I believe, no.  I had one at

22         one time long time ago, but I don't use them.

23                   Q              You had a Facebook account?

24

1          A          Yes, I believe I did, yes.

2     But I can't remember now if I did or didn't have

3     those.

4          Q          Do you have a personal e-mail

5     account that you use?

6          A          Yes.

7          Q          Who is your provider for

8     that?

9          A          That would be Netscape.com.

10          Q          Have you ever been arrested?

11          A          No.

12          Q          I will tell you that I don't

13     want to know about any conversations you've had

14     with your lawyers, so any questions I ask you

15     just keep that in mind.  But other than your

16     lawyers have you discussed the claims in your

17     lawsuit with anyone else?

18          A          Yes.

19          Q          And who have you discussed it

20     with?

21          A          Could you define the period

22     you're talking, I'm not sure what you're asking.

23     Are you asking related to human resources people

24     or --

1          Q          After you filed the lawsuit

2     in Federal Court --

3          A          Oh, okay.

4          Q          -- would you have discussed

5     it with anybody?

6          A          Yes.

7          Q          And who would that have been?

8          A          My wife.  Probably my family

9     members.  Can't at this time remember everybody

10    that I talked to.

11         Q          And it looked like from your

12    personnel file you graduated from Oak Hills High

13    School, is that correct?

14         A          Yes.

15         Q          And you went to college at

16    the University of Cincinnati, is that correct?

17         A          Yes.

18         Q          And you earned an associate's

19    degree?

20         A          Yes.

21         Q          And that was in law

22    enforcement?

23         A          Yes.

24

1              Q          In 1974, would that be

2      correct?

3              A          The approximately date would

4      be '76.  '70, yeah, '76.

5              Q          And at one point you'd worked

6      as a Cincinnati police officer, is that correct?

7              A          I was a Cincinnati police

8      cadet for three years, hired as a police officer

9      and laid off.

10             Q          How long did you work as a

11     police officer?

12             A          I would say maybe eight

13     hours.

14             Q          Oh, okay.  Did you ever apply

15     at any other police departments?

16             A          Yes.

17             Q          Did you ever receive a job

18     offer as a police officer other than the ones in

19     Cincinnati?

20             A          Yes.

21             Q          And who was that with?

22             A          Delhi Township Police.  Union

23     Township Police in Butler County.

24

```
1                  Q         Did you decline all three of

2       those offers?

3                  A         No, ma'am.

4                  Q         Did you work for any of those

5       police departments?

6                  A         Both.

7                  Q         Delhi and Union Township?

8                  A         Yes, ma'am.

9                  Q         Did you work there prior to

10      being employed at St. Elizabeth?

11                 A         Yes.  Well, I need to correct

12      that.

13                 Q         Okay, go ahead.

14                 A         I worked at, I worked at --

15      Let me think about this a minute.  I worked at

16      Union Township and St. Elizabeth both at the same

17      time.  That's the correction on that.

18                 Q         Okay.  In questions that we

19      had submitted to your lawyer, in those questions

20      you stated you had talked about the allegations

21      in your lawsuit with Jack Denham, D-e-n-h-a-m.

22      When did you talk to Jack, do you recall?

23                 A         When I was terminated.

24
```

1          Q          And what did you talk to Jack

2     about?

3          A          Are you asking -- I, I can't

4     remember the whole conversation but --

5          Q          You can just tell me what you

6     can remember.

7          A          I remember telling him I was

8     terminated.

9          Q          Do you recall telling him

10    anything else?

11         A          That's what I can remember

12    telling him.

13         Q          You also stated you talked to

14    Charles Johnson?

15         A          Yes.

16         Q          Is that correct?

17         A          Yes.

18         Q          And what did you talk to Mr.

19    Johnson about?

20         A          That I was terminated.

21    That's what I can remember.

22         Q          And you don't recall anything

23    else in that conversation?

24

1          A          No, ma'am.  But I, like best

2     I can remember I was telling him about the, that

3     I was terminated.

4          Q          Did you tell him why you were

5     terminated?

6          A          Yes.

7          Q          And what did you tell him?

8          A          Reasons given I believe is

9     what I told him, was reasons given to me.

10          Q          And what were those reasons?

11          A          Sleeping at work I believe I

12     told them and not doing my job as a supervisor.

13          Q          You also had listed Kim

14     DiFillipo, which is D-i-f-i-l-l-i-p-o.  Do you

15     recall talking with Ms. DiFillipo?

16          A          Yes.

17          Q          And did you talk to her after

18     your termination?

19          A          Yes.

20          Q          What did you tell her?

21          A          Again, that I was terminated.

22          Q          Did you tell her the reasons

23     why?

24          A          Yes.

1       Q       Do you recall any comment

2   that Ms. DiFillipo had made back to you in that

3   conversation?

4       A       Other than I believe she

5   expressed her sorrow at saying this, I believe.

6   I can't really remember at this time the whole

7   conversations, it's been a while.

8       Q       Did you have any type of

9   employment contract with St. Elizabeth saying you

10  would be employed for a certain length of time?

11      A       I believe that I was being

12  kept employed for as long as I wanted to be

13  there.

14      Q       Did you have any written type

15  of agreement saying that you were employed for a

16  specific time?

17      A       In my mind I believed that

18  receiving outstanding reviews every year and

19  continuing to receive them for all the 30, almost

20  34 years, plus the 25 years, each year receiving

21  the highest evaluation as a supervisor, that they

22  were telling me I was going to be continued

23  employed there, yes.  That's my mind I believe I

24  was and that --

1          Q          So other than the evaluations

2     you don't know of any other type of document that

3     says you would be employed for a specific length

4     of time?

5          A          That's what I believed and

6     they were telling me that every time I got an

7     evaluation that was, I was being told by

8     supervisors above me and I was being told that

9     constantly every year.

10         Q          Being told what?

11         A          I was doing a good job and

12    that I should keep up the good work and et

13    cetera.

14         Q          Did you understand that if

15    you wanted to resign from St. Elizabeth any time

16    that you were free to do that?

17         A          No, I don't believe that.

18         Q          And why is that?

19         A          I needed to give notice and a

20    reasonable notice that was required.

21         Q          But if you wanted to, let's

22    say for instance, retire, go to another place of

23    employment, you could give notice and leave, is

24    that correct?

1           A           I'd have to follow company

2      policy.  I'm not sure that it allowed me just to

3      walk out the door and I'm not sure that that

4      would be true.

5           Q           No, I understand, and that's

6      why I'm saying that if you gave notice that you,

7      you were free to leave, correct?

8           A           If I followed the policy I

9      would say yes.

10           Q           I'm going to show you a

11      document we're going to mark as Defendant's

12      Exhibit One.  Do you recall ever seeing a copy of

13      this particular document?

14           A           I don't understand that,

15      what, are you asking about this particular

16      document?

17           Q           Yes, sir.

18           A           No.

19                       (A one-page document was
                        marked Defendant's Exhibit
20                       No. 1 for identification.)

21           Q           Are you familiar with

22      Compliance 360?

23           A           Yes.

24

CJV REPORTING COMPANY - ROBERT LEHMAN 5/18/12

1          Q          Did you ever look in

2     Compliance 360?

3          A          Yes.

4          Q          Do you ever recall seeing

5     this page in Compliance 360?

6          A          This particular page --

7          Q          Yes.

8          A          -- Counselor?

9          Q          Yes.

10         A          I'm confused again, you're

11    talking about this particular page?

12         Q          Yes.

13         A          No.

14         Q          How long were you a

15    supervisor at St. Elizabeth?

16         A          Twenty-five, about

17    approximately 25 years.

18         Q          Do you understand what

19    employment-at-will doctrine is?

20         A          I understand the concept that

21    they describe.

22         Q          Okay.  And what is your

23    understanding of employment at will?

24

1          A          I understand what they, and

2     I'm not an attorney, of course, but I --

3          Q          No, I understand.

4          A          -- understand what they say,

5     that they give to me the reasons that they gave

6     to me.

7          Q          I don't really understand

8     that answer.  When you say the reasons they gave

9     to you, you mean St. Elizabeth?

10         A          Yes.

11         Q          I'm going to show you what

12    I'm going to mark as Defendant's Exhibit Two.  Is

13    that your signature on that document, sir?

14         A          It appears to be my

15    signature.

16                     (A one-page document was
                       marked Defendant's Exhibit
17                     No. 2 for identification.)

18         Q          And according to this

19    acknowledgement you had received a copy of the

20    policies and code of conduct of the St. Elizabeth

21    Healthcare Security Department, do you recall

22    receiving those documents?

23         A          I can't remember if they

24    were, if copies were given.  I honestly can't

1    remember if it was copies given out to individual

2    people and how it was done at this time.

3            Q        Were there copies of the

4    policies in the department that you had access

5    to?

6            A        I believe there were copies

7    available, I do.

8            Q        One of the allegations in

9    your lawsuit is that you believe age was a reason

10   for your termination.  Can you tell me why you

11   believe that age was a factor in the decision to

12   terminate your employment?

13           A        I believe age was a part, was

14   response for it due to the fact that I observed

15   many eliminations of older long-term employees

16   being let go by the hospital and replaced with

17   younger department heads, younger supervisors.

18   Our vice-president was younger and put over our

19   division.

20           Q        And who was that?

21           A        Mr. Chambers, Doug Chambers.

22           Q        And do you know how old Mr.

23   Chambers is?

24           A        No, ma'am, I do not.

1          Q          And who did Mr. Chambers

2     replace?

3          A          Mr. Len Puthoff who was our

4     vice-president for 26, I think approximately 26

5     years.

6          Q          And do you know why Mr.

7     Puthoff left the hospital?

8          A          No.

9          Q          Do you know if he retired?

10         A          No.

11         Q          And, I'm sorry, I interrupted

12    you, who else do you believe left the hospital

13    and was replaced by someone younger?

14         A          Mr. Greg Popham, our director

15    of security.  He was let go from, and replaced by

16    Mr. Mike Kraft, our, and made director of

17    security and safety over the whole, all

18    locations.

19         Q          Do you know the circumstances

20    of Mr. Popham leaving?

21         A          The, when the, when Mr.

22    Popham left and when I -- I'll complete the

23    answer, Counselor, if it's okay with you.

24         Q          That's fine.

1              A              Because it all is together.

2      The removal of, or the removal when Mr. Popham

3      left and replaced with Mr. Mike Kraft, there was

4      a motion made of a long-term older employee at

5      the, and this is at the time of the merger, the

6      St. Luke's thing, it demoted a older, long-term

7      director of security at that, the St. Luke

8      location in Fort Thomas, made him an assistant

9      director.  Demotion was made actually from the

10     director's position to manager of a long-term

11     director of security, George Miller, who was at

12     the North Unit, and a younger, a manager was

13     hired at the Covington location.

14             The, I observed younger employees,

15     nurses and, and employees of other departments

16     who were sleeping in lobby areas and nursing

17     stations and, obviously, they hadn't been

18     discharged because I'd seen them on several

19     occasions, other times work and what have you.

20             I believe that age was part of it due

21     to the fact that when I was given a Level I from,

22     Mike was going to give me a Level I and it went

23     to a rapid change in the same day to a Level III.

24     The other time after that was due to the fact

1    that it was mentioned about my diabetes may be

2    involved in it.

3            No investigation as far as I was given,

4    no investigation was even, no one ever asked me

5    anything about the issue about the enforcement of

6    the policy, the disputed policy, which I dispute

7    the policy that clearly said I was supposed to do

8    a certain thing for enforcing the sleeping

9    policy.  They didn't ask me who it was.  I was

10   never asked who it was, never asked where, never,

11   none of the circumstances was asked.

12           And I also believe that my age was

13   involved in it because they were creating an

14   atmosphere and continued to create an atmosphere

15   with the older long-term employees being

16   eliminated in order to replace them with lower

17   paid younger employees.  I believe that is the

18   atmosphere that's, and it also influenced my

19   termination.

20           Q        Do you know who made the

21   decision to terminate your employment?

22           A        Specifically who?

23           Q        Yes.

24           A        No, ma'am.

1          Q          Do you know who made the
2     decision to terminate Mr. Popham?
3          A          No, ma'am.
4          Q          Do you know who made the
5     decision to put Mr. Kraft in a position and
6     demote other employees?
7          A          No, ma'am.
8          Q          You made a comment that you
9     had seen younger employees sleeping and they were
10    not discharged, do you recall who any of those
11    employees were?
12         A          Couldn't give you specific
13    names at this time.
14         Q          Did you ever report some of
15    those employees you saw sleeping?
16         A          Yes.
17         Q          And who did you report those
18    to?
19         A          Lisa Blank.
20         Q          And when was that?
21         A          When we had the discussion.
22         Q          On your termination?
23         A          Uh-huh.  Yes.
24

CJV REPORTING COMPANY - ROBERT LEHMAN 5/18/12

1          Q          Did you give Lisa names of
2     employees?
3          A          Couldn't identify them at
4     that, at this time I can't identify them.
5          Q          At the time that you saw them
6     sleeping did you report them to anybody?
7          A          I can't remember doing it,
8     no.  It was going for quite a long time.
9          Q          Do you know how long ago this
10    was?
11         A          No, ma'am.
12         Q          Any idea, I mean was it
13    within a year of your termination, ten years of
14    your termination?
15         A          At this time I can't remember
16    exactly.
17         Q          Did anyone ever make a
18    comment to you about your age at work?
19         A          I, would you clarify that for
20    me, are you talking supervision or people or --
21         Q          What about a supervisor,
22    someone who was above you, did they ever make a
23    comment about your age?
24

1              A              I offhand cannot remember at
2     this time anyone.
3              Q              Were there occasions where
4     you did fall asleep while you were at work?
5              A              Yes.
6              Q              Do you have any idea how
7     often that occurred?
8              A              Could you clarify that for
9     me, are you talking numbers?
10             Q              Yes.
11             A              Counts?
12             Q              Numbers.
13             A              No, I cannot tell you.
14             Q              Do you think it was more than
15    one time a week, less?
16             A              Did not keep a count, I can't
17    answer that.
18             Q              Do you know how long you
19    would fall asleep at work?
20             A              Again, are you talking what?
21             Q              Like if you fell asleep did
22    you fall asleep for ten minutes, five minutes, a
23    minute, do you have any idea?
24             A              It was my break times.

1          Q          Did you have set break times
2     in the security department?
3          A          Set meaning?
4          Q          For instance, was there a
5     schedule that you, for instance, would take a
6     break from ten o'clock to 10:10?
7          A          No.
8          Q          Were you free to set the
9     break times yourself?
10         A          Yes.
11         Q          Were there any issues with
12    making sure that things were covered in the
13    security department and not, for instance, not
14    have everyone go on the same break times?
15         A          Yes.
16         Q          And who would do that, who
17    would decide what time people would take their
18    breaks?
19         A          Both the security officers,
20    security staff or the supervisors both.
21         Q          As a supervisor you never set
22    a break time for your employees?
23         A          It would be -- No, would be
24    the answer.

1          Q          What about lunch breaks, were

2     those set for the employees in the department?

3          A          Yes.

4          Q          And as a supervisor did you

5     set breaks, lunch breaks?

6          A          No.

7          Q          Did the staff do that

8     themselves?

9          A          No.

10         Q          Who would set the lunch

11    breaks then?

12         A          The hours that the cafeteria

13    were open.

14         Q          Was there anyone that made

15    sure that not all the security guards were on

16    lunch break at the same time?

17         A          Yes.

18         Q          And who did that?

19         A          Myself.

20         Q          So when you say that you

21    slept on your breaks, were those primarily lunch

22    breaks that you slept?

23         A          No.

24         Q          Were they ten-minute breaks?

1              A        It was the policy breaks,

2     both 15 and the lunch break.

3              Q        If you worked an eight-hour

4     shift how many 15-minutes breaks did you get?

5              A        That the policy provided in

6     most of the, which the policy provided was, was

7     what I, I used.

8              Q        And where did you take your

9     breaks?

10             A        In my office.

11             Q        Did you have an office with a

12    door?

13             A        Yes.

14             Q        Did you ever ask anyone in

15    supervision if it was permissible to sleep while

16    on break at work?

17             A        Can you give me a time frame

18    you're talking?

19             Q        Let's say within five years

20    prior to your termination.

21             A        No.

22             Q        Was Mr. Popham your direct

23    supervisor before Mr. Kraft?

24             A        Yes.

1          Q          Did you ever have a

2     discussion with Mr. Popham about if it was okay

3     for you to sleep while on breaks?

4          A          I can't remember at this time

5     if we did.

6          Q          What about with Mr. Kraft,

7     did you ever have a discussion with Mr. Kraft as

8     to whether or not it was okay for you to sleep

9     while on breaks?

10          A          Again, could you give me a

11     clarification on, give me a frame of time?

12          Q          How long was Mr. Kraft your

13     supervisor?

14          A          Exactly, I'd have to

15     approximate the time.

16          Q          A few years?

17          A          Can I give you an

18     approximation?  I could guess at it if you would

19     like me to answer a guess.

20          Q          No, that's okay.  Just ever

21     during your employment with Mr. Kraft when he was

22     at St. Elizabeth, did you ever talk to him about

23     if it was okay for you to sleep while at work?

24          A          Yes.

1          Q          When was that?

2          A          When he told me about a

3     complaint that was made.

4          Q          And that was around the time

5     of your termination of employment?

6          A          That was that, the week that

7     I learned of the complaint.

8          Q          And what was your discussion

9     with Mr. Kraft?

10          A          He advised me that it was, a

11     complaint was made against him that he authorized

12     me to sleep at work.

13          Q          And what did you tell him?

14          A          I advised him that I, and he

15     asked if I had done this and I said yes, on my

16     breaks and my lunch break.  I then asked him if

17     this was against policy and he did not know.

18          Q          And did you have a subsequent

19     conversation with Lisa Blank about sleeping at

20     work?

21          A          In, yes.

22          Q          And what did Lisa tell you?

23          A          This is, I'm confused, what

24     did she tell me about --

1          Q          Yes.

2          A          -- the policy?

3          Q          Right.  What did Ms., did you

4     have a discussion with Ms. Blank about the policy

5     at St. Elizabeth with regard to sleeping?

6          A          I had, no, I didn't.  Well,

7     I'm confused.  Could you narrow it down because

8     there was a discussion but it was specifically

9     not limited to that.

10         Q          Okay?

11         A          So was it, are you wanting me

12    to limit my answer specifically to did we discuss

13    that, the policy?

14         Q          Let's start there, did you

15    and Lisa have a specific discussion about whether

16    or not it was okay for you to sleep while at

17    work?

18         A          Yes.

19         Q          And what did Lisa tell you?

20         A          No.

21         Q          Were there times that you

22    felt fatigued while at work?

23         A          Yes.

24

CJV REPORTING COMPANY - ROBERT LEHMAN 5/18/12

1          Q          And at the time of your
2    termination you were working the first shift, is
3    that correct?
4          A          Yes.
5          Q          Do you know how many years
6    you'd worked first shift prior to your
7    termination?
8          A          I would have to guess at the
9    amount of time again.  Are you asking me prior to
10   my termination for the whole, my whole career?
11         Q          No, just right prior to your
12   termination how long had you been working first
13   shift, a year, two years?
14         A          Again, it would have been, I
15   did work first shift in my career --
16         Q          Okay?
17         A          -- prior to my termination
18   before I got on to day shift as a permanent
19   assignment.  Are you asking me --
20         Q          How long were you on the
21   permanent assignment --
22         A          I gotcha.
23         Q          -- first shift?
24

1          A          Okay.  That was approximately

2     a year and a half.

3          Q          Prior to that permanent

4     assignment what shift were you working?

5          A          Mostly second shift.

6          Q          Was your fatigue greater when

7     you switched to first shift or was it about the

8     same?

9          A          Again, you'll have to give me

10    a time frame on the fatigue issue.

11         Q          Well, when you went from

12    second shift to first shift did you find it

13    harder to stay awake at work or was it just

14    didn't make a difference that you were working

15    first shift?

16         A          Are you ask, again, are the,

17    is the question moving to day shift, did it make

18    me more fatigued?

19         Q          Correct, that's the question.

20         A          No, I don't believe so.

21         Q          After your termination of

22    employment you filed a grievance about your

23    termination, is that correct?

24         A          It was a, yes.

1          Q          And as part of that grievance

2     you met with several individuals at St.

3     Elizabeth, correct?

4               A          Yes.

5               Q          You met with Mr. Chambers,

6     correct?

7               A          Yes.

8               Q          Do you recall telling Mr.

9     Chambers that you made a mistake, that when your

10    fatigue became a problem you didn't either go to

11    Mike Kraft or seek help from employee health?

12              A          I remember saying something,

13    a statement like that, yes.

14              Q          And what did you mean by you

15    made a mistake by not getting some assistance?

16              A          After being made aware by

17    Gerald Hynko that the ADA covers diabetes, my

18    disability, and after my belief that this was a

19    part of, this was a factor in my termination, I

20    believe my mistake was not going to management or

21    going to employee health and asking for an

22    accommodation.  That was my mistake.

23              Q          Prior to your termination of

24    employment had you talked to any of your

1      physicians about your general fatigue being a

2      problem with work?

3              A          Yes.

4              Q          And who were the physicians

5      you talked to?

6              A          Every one of my physicians I

7      talked to.  Would you like the, are you asking

8      for a list?

9              Q          If you can recall who those

10     were.

11             A          Dr. Nancy Metzger is my

12     primary physician.  I believe I talked to Dr.

13     Michael Caños was, was the first endocrinologist

14     I had.  I talked to Dr. Eilerman who is my

15     current endocrinologist.  I can't remember if

16     there might have been another doctor in between

17     there.  Might have been, I, I think, at this time

18     I can't remember if there was another doctor but

19     I had talked to those doctors about my fatigue.

20     Oh, I'm sorry, could I correct --

21             Q          That's fine?

22             A          -- that answer?  I believe

23     there was Dr. Brent Haskell also I talked to

24     about it.

1          Q          And Dr. Haskell is one of the

2    St. Elizabeth employee physicians, correct?

3          A          Correct.

4          Q          And did you talk to him

5    during the fitness-for-duty process?

6          A          Yes, ma'am.

7          Q          Do you recall telling Dr.

8    Haskell that you had noticed your fatigue

9    increased after you changed to day shift?

10         A          I, I cannot recall making

11   that statement at this time.

12         Q          Do you recall telling Dr.

13   Haskell that you consistently were only getting

14   four-and-a-half to five hours of sleep per night?

15         A          Yes, I believe I did say

16   that.

17         Q          Is that an accurate

18   statement, that at least at that time in

19   September of 2010 you were only getting

20   four-and-a-half to five hours sleep at night?

21         A          Yes, I believe that was

22   accurate at the time.

23                MS. NEFF:  Bob, just for the

24         assistance of the court reporter please

1               make sure if you're going to trail off

2               to speak a little louder.

3                         MR. LEHMAN:  I apologize.

4                         MS. NEFF:  And speak toward

5               her so she can hear what you're saying.

6                         MR. LEHMAN:  I'm sorry.

7                         MS. NEFF:  I keep seeing her

8               straining.

9               Q         Do you currently get more

10    than five hours sleep at night?

11              A         No, I don't believe so.

12              Q         Do you still get fatigued

13    during the day?

14              A         Yes.

15              Q         And are you currently doing

16    anything to address that issue?

17              A         Yes.

18              Q         And what are you doing?

19              A         Taking naps during the

20    morning.

21              Q         How long do you generally

22    nap?

23              A         It varies.

24

1          Q          The document I handed you

2    marked Defendant's Exhibit Number Three, had you

3    seen that document prior to today?

4          A          No.

5                      (A two-page document was
                       marked Defendant's Exhibit
6                      No. 3 for identification.)

7          Q          And you had met with Dr.

8    Brent Haskell as part of the fitness-for-duty

9    process, is that correct?

10         A          Yes.

11         Q          I know you took a couple

12   minutes to read it, if you need more time feel

13   free to take it, but is there anything in that

14   document that you disagree with?

15         A          Could I correct my last

16   answer, please?

17         Q          Sure, that's fine.

18         A          It is possible I saw this in

19   documents that were supplied by the hospital so I

20   may have reviewed this document.

21         Q          Okay, I --

22         A          As to this -- I'm sorry.

23         Q          That's okay, go ahead.

24

1          A          To answer disagreement, I'm

2     not a doctor so, therefore, I can say yes, I

3     probably disagree with something on here but I

4     don't have the medical expertise to do that.

5          Q          Okay?

6          A          Okay.

7          Q          And I understand that.  I

8     mean I'm just asking you, some of this is a

9     history that he is saying you gave to him and

10    typed in here so I'm just, I'm trying to clarify,

11    is there anything in here that Dr. Haskell put in

12    that you don't think is entirely accurate?

13         A          If you give me a specific

14    question, Counselor, I'll, I'll answer yes or no

15    on it but.

16         Q          He states, for instance, that

17    you have, you noted increased fatigue over the

18    last year after a change to day shift.  Do you

19    agree with that statement?

20         A          As of now I can't remember

21    saying it.

22         Q          Okay?

23         A          As of now I cannot.

24

CJV REPORTING COMPANY - ROBERT LEHMAN 5/18/12

1          Q          That's fair.  He also states

2     that you told him you noticed fatigue between

3     nine and eleven o'clock a.m.  Do you agree with

4     that?

5          A          Yes.

6          Q          I'll just show you a document

7     I'll mark as Defendant's Exhibit Number Four and

8     ask you if you've ever seen that document before

9     today?  Had you ever seen that document before I

10    handed it to you?

11         A          Yes.

12                     (A one-page document was
                       marked Defendant's Exhibit
13                     No. 4 for identification.)

14         Q          Did you see this before you

15    were terminated from your employment at St.

16    Elizabeth?

17         A          No.

18         Q          Did you see it after it was

19    produced in the litigation do you think?

20         A          No.  No.

21         Q          According to this document

22    there's a statement that says I do not feel his

23    daytime somnolence is caused by diabetes, maybe

24    hypothyroidism, I'm not really sure what that

1          last word is --

2                              MR. TIEMAN:  Hypogonadism.

3                    Q          Gonadism.  Had anyone ever

4     told you that before or given you that opinion,

5     that they didn't think your diabetes caused your

6     sleepiness?

7                    A          Again, could you clarify,

8     when you say anyone?

9                    Q          Had any physician.

10                   A          None that I can recall.

11                   Q          And you had mentioned a Dr.

12    Caños previously, and that is a sleep expert

13    physician, is that correct?

14                   A          No.

15                   Q          Okay, what is Dr. Caños?

16                   A          He was an endocrinologist.

17                   Q          You know what, I apologize,

18    you saw Dr. Patricia Miles --

19                   A          Yes.

20                   Q          For your sleep issues, is

21    that correct?

22                   A          Yes.

23                   Q          And were you recommended by

24    another physician to see Dr. Miles?

1          A          Yes.

2          Q          Who was that?

3          A          Dr. Caños.

4          Q          Okay.  And Caños is an

5     endocrinologist?

6          A          Yes.

7          Q          And it looks like in looking

8     at your medical records that you did have some

9     sleep studies done, correct?

10         A          Yes.

11         Q          I'll show you a letter that

12    we marked as Exhibit Five.  This was produced by,

13    I believe produced by the hospital.  At the time

14    this report was done in 2008 did you receive a

15    copy of it?

16         A          I can't recall getting it.

17                    (A two-page document was
                      marked Defendant's Exhibit
18                    No. 5 for identification.)

19         Q          Do you recall reviewing these

20    results with Dr. Miles?

21         A          I, at this time I can't

22    recall getting, reviewing those.  I, I can't

23    recall those.

24

1          Q          I just noticed that your

2    weight is 73 pounds, may be a typo.  The first

3    paragraph of this report states that you have

4    excessive daytime sleepiness and hypertension.

5    Would you agree that in 2008 you were having

6    excessive daytime sleepiness?

7          A          I, I can't answer that

8    because that was the doctor's opinion and not

9    mine.  I can't answer that.

10          Q          Well, according to the letter

11    it says that you had a history of witnessed

12    apneas.  Do you know what that means?

13          A          No, ma'am.

14          Q          A history of snoring, did you

15    have a history of snoring?

16          A          I can't answer that because

17    I'm sleeping at that time.

18          Q          What about restless sleep, do

19    you agree you had restless sleep?

20          A          Yes.

21          Q          And you don't recall if you

22    had daytime sleepiness in 2008?

23          A          Define, this, this was her

24    report, I don't know how she acquired those

1        results other than --

2                Q        Well, according to the letter

3        it's a history that it appears you gave to the

4        physician.  Do you recall telling the physician

5        at all that you had some problems staying awake

6        during the day?

7                A        Possibly.  I mean I could

8        have, maybe I could have told, I don't know if I

9        told Dr. Miles or --

10               Q        Or Dr. Caños?

11               A        I do not remember.

12               Q        But do you agree that you

13       were having some excessive daytime sleepiness in

14       2008?

15               A        No, I don't agree.

16               Q        For some reason you went to

17       the Sleep Management Institute.  Why, why did you

18       go there?

19               A        Dr. Caños sent me.

20               Q        And why did Dr. Caños think

21       that you needed to go there, do you know?

22               A        It was, at the time we

23       discussed my blood sugars, the problem I was

24       having, and then the fatigue.  So then he

1    suggested I go be checked by the endo, or by the

2    sleep study.

3              Q         Were you complaining to Dr.

4    Caños about your inability to get good sleep?

5              A         I was complaining to him

6    about the fatigue, yes.

7              Q         Dr. Miles also notes that you

8    scored a 19 on a Beck Depression Inventory which

9    indicates mild to moderate depressive symptoms.

10   Do you recall taking that inventory?

11             A         No, I don't.

12             Q         Do you agree that you had

13   some mild to moderate depressive symptoms?

14             A         I'm, again, I'm not a doctor,

15   I don't know how the conclusions were drawn.  But

16   I guess, I don't know, I can't at this time

17   answer, I don't know how those were acquired.

18             Q         Had you been seeking any

19   treatment for depression?

20             A         No.

21             Q         So in 2008 you were not

22   seeking any treatment for depression?

23             A         Clarify treatment for me

24   again.

1          Q          Talking to a physician.  Did

2     you talk to any of your physicians about feelings

3     of depression?

4          A          Specifically which doctor, a

5     psychiatrist, a --

6          Q          Any of your physicians?

7          A          And the time period we were

8     talking about?

9          Q          2008.

10          A          It was, it's possible, yes.

11     It's possible.

12          Q          Do you know if you were

13     taking any medication specific for depression?

14          A          Yes.

15          Q          Do you recall what you were

16     taking?

17          A          It's in my medical records.

18     Again, I don't, can't recall their names.

19          Q          Do you recall taking Zoloft?

20          A          I think that is what I was

21     taking at the time.  They're all generic stuff,

22     everybody switches to generic, so I believe

23     Zoloft was it.

24

1          Q          Are you currently taking any

2     medication to treat depression?

3          A          Yes.

4          Q          Do you know what you're

5     currently taking?

6          A          I believe it's, well, again,

7     it would be in the medical records.  I, I don't

8     want to hazard a guess at what, I think it's

9     sertraline, sertraline, but I, I, I'm not sure.

10          Q          Have you ever seen a

11     psychiatrist?

12          A          Time frame again, please?

13          Q          Any time in your life?

14          A          Yes.

15          Q          And when was that?

16          A          Oh, when I was having marital

17     problems with my first wife.

18          Q          How long ago was that?

19          A          I couldn't, I'd have to

20     estimate the date, I can't remember.

21          Q          Well, just approximately, was

22     it 20 years ago?

23          A          Oh, more than that.  It was

24     way more than that, years ago.

1          Q          Any time within the past five

2    years have you seen --

3          A          No.

4          Q          -- a psychiatrist?

5          A          No.

6          Q          What about a psychologist?

7          A          No.

8          Q          Or a social worker?

9          A          No.

10          Q          As a security supervisor do

11    you recall just approximately how many employees

12    were under your supervision?

13          A          It would depend on your

14    definition of supervision.

15          Q          How would you define that?

16          A          I would, it would depend on

17    how you would define it.  But I, sometime, I mean

18    direct supervision would be the shift guys, would

19    be the three security officers on my shift.  But

20    then I also assigned prn security staff members

21    on a schedule which could be anywhere to, we were

22    up to about 29 security officers.  I also

23    assigned shifts to other locations, details,

24    which is like eight or ten men.  So, again, it

1          would be your definition of supervision.

2                  Q          Did you perform evaluations

3          on any employees?

4                  A          Yes.

5                  Q          And how many evaluations

6          let's say in the last year you were employed,

7          2009, did you perform evaluations on?

8                  A          Have to guess again.  I would

9          guess three that, for sure on the shift.  And

10         then the prn staff, I got allotted some of them,

11         eight, maybe nine.  That would be a guess.

12                 Q          And as a supervisor were you

13         responsible for enforcing the St. Elizabeth

14         policies with the men you supervised?

15                 A          Yes.

16                 Q          Were you ever responsible for

17         hiring employees?

18                 A          No.

19                 Q          Who did the hiring?

20                 A          For?

21                 Q          For security officers the

22         last year you were employed?

23                 A          I don't know specifically who

24         did the hiring.

1          Q          As a supervisor were you also

2     required to perform the duties of a security

3     officer while at work?

4          A          Again, it would depend.

5          Q          On what?

6          A          On what I was doing at the

7     particular time.

8          Q          Well, let me see if I can

9     clarify my question.  I guess my question is you,

10    you didn't just come to work and do strictly

11    managerial duties, there were times where you

12    came to work and you also acted as a security

13    officer, is that correct?  For instance, did you

14    go on patrols?

15         A          Sometimes.

16         Q          Did you watch the monitors?

17         A          Sometimes.

18         Q          And when you say sometimes

19    what would that depend on?

20         A          It would depend on how many

21    men were working and what projects I was doing.

22         Q          So were there times that you

23    would come to work and you would not do any of

24    the duties of a security officer who supervised,

1          you would do other management type duties?

2                    A          Yes.

3                    Q          Did you work 40 hours a week?

4                    A          Yes.

5                    Q          Was that five days?

6                    A          Yes.

7                    Q          Can you estimate for me out

8          of the five days a week how many days you did not

9          perform the duties of your security officers?

10                   A          Could you give me a time

11         frame again, please, are you talking --

12                   Q          Let's say the last year you

13         were employed.

14                   A          The last year?

15                   Q          Uh-huh.

16                   A          It increased significantly

17         the last year and a half.  So I'd have to, I can

18         guess at it again but I would estimate and guess

19         probably four days out of the week probably.

20                   Q          That you worked on projects?

21                   A          Uh-huh.  Yes, ma'am.

22                   Q          And who assigned those

23         projects?

24

1          A          It was a combination from

2     Mike Kraft and I was working on projects that I

3     had developed and he was aware of that I was

4     working on for him and all locations of the

5     security office, the security department.

6          Q          And what were the types of

7     projects, can you just give me an example?

8          A          The logging, the staff

9     logging of calls.  The, it was the dispatch log,

10    it was computerized.  I designed the program and

11    implemented it.  The case report logs for all

12    locations, I designed it and implemented it.

13    Those are just two of the projects I worked on.

14         Q          If an emergency arose and you

15    were needed to act as a security officer did you

16    occasionally have to do that?

17         A          Yes.

18         Q          And would you agree with me

19    that the role of the security department is to

20    keep the staff, visitors and patients safe?

21         A          Yes.  Can I correct the

22    question prior to that, can I --

23         Q          Absolutely.

24

1          A          -- modify the answer?  When

2     you say I would respond to emergency situations,

3     that would depend also because we, we increased

4     the staff levels so that we had, we were never in

5     a situation where we had only two or one security

6     officer besides myself working.  We would carry a

7     total complement where there was a minimum of two

8     security officers on the floor plus one in the

9     monitor room plus a supervisor.  So I would

10    respond to emergencies if I felt that there was

11    something that might need my supervision or if

12    they called me to the call.

13         Q          And just for clarification,

14    when you say there were two officers, one

15    watching a monitor and one supervisor, is that at

16    the Edgewood facility?

17         A          Yes.

18         Q          And then you had additional

19    staff at the other St. Elizabeth facilities,

20    correct?

21         A          Yes.

22         Q          Did you always work at

23    Edgewood.

24         A          Yeah.  Well, yes.

```
 1              Q          Were there occasions --

 2              A          I was --

 3              Q          -- where maybe you filled in

 4      at another facility?

 5              A          I want to clarify that answer

 6      again.

 7              Q          Sure.

 8              A          I worked at the North Unit

 9      originally.

10              Q          Okay?

11              A          And then when the Edgewood

12      Unit was, I moved to the Edgewood Unit.

13              Q          When you started working for

14      St. Elizabeth Edgewood was not built, is that

15      correct?

16              A          It was, yeah, correct, it was

17      under construction.

18              Q          Do you know Rick Smith?

19              A          Yes.

20              Q          Do you know Mr. Smith

21      replaced you in your position?

22              A          I'm sorry, what was the

23      question?

24
```

1            Q        Did Mr. Smith replace you in

2    your position after you left St. Elizabeth?

3            A        Yes, I believe he got hired.

4            Q        Do you know if Mr. Smith has

5    any disabilities?

6            A        Do not know.

7            Q        Do you know what Mr. Smith's

8    age is?

9            A        I don't know.

10           Q        Do you know if he's over age

11   40?

12           A        No, do not know.

13           Q        I'm going to show you a copy

14   of your job description that we'll mark as

15   Defendant's Exhibit Number Six.  Take a minute to

16   read that, please.

17                    (A ten-page document was
                      marked Defendant's Exhibit
18                    No. 6 for identification.)

19           Q        Do you recognize Defendant's

20   Exhibit Number Six as a copy of your job

21   description as security supervisor?

22           A        Yes.

23           Q        And if you'll look on page

24   three, major activities and end results, do you

1        see the list with six different points there?

2                    A          Referring to the percentage

3        areas?

4                    Q          Right, right here.

5                    A          Okay, yes.

6                    Q          In your role did you

7        supervise performance of security officers in

8        order to ensure the security and safety of the

9        patients, visitors and staff?

10                   A          Yes.

11                   Q          And it looks like the weight

12       percentage on that is 30 percent, is that

13       accurate of what you did?

14                   A          I believe it's, again, it's

15       close.

16                   Q          Okay.

17                   A          Close.

18                   Q          The second point states that

19       you'll perform duties of the security officer as

20       needed while on shift, and the weight to that is

21       about 25 percent.  Is that accurate with how you

22       worked?

23                   A          Give me a time frame, please.

24

1          Q          The last year you were

2     employed?

3          A          I would say probably not.

4          Q          Do you think it's less or

5     more?

6          A          I would say that I was less,

7     performing less duties as such, more, those, both

8     those categories would have to be adjusted, would

9     have to have been adjusted.

10         Q          Had that changed from the

11    time you were originally hired as the supervisor?

12         A          Oh, these, I, these weights

13    and these forms and everything I believe have

14    changed over the years.

15         Q          When you were first appointed

16    as the security supervisor did you perform more

17    duties as a security officer or less?

18         A          Oh, I'd say -- When I was

19    first hired, you're talking 25 years ago?

20         Q          Right.

21         A          I believe more.

22         Q          Okay?

23                     MS. SCHOENING:  Do you want

24              to take a quick break?

CJV REPORTING COMPANY - ROBERT LEHMAN 5/18/12

60

1                           MS. NEFF:  Sure.

2                           MS. SCHOENING:  We've been

3               going about an hour and a half so if we

4               need a break we can do that.

5                   (A RECESS WAS TAKEN.)

6                   Q           (MS. SCHOENING.)  You ready

7       to start again?

8                   A           Yes, ma'am.

9                   Q           Okay.  You had made a comment

10      that your disability is diabetes?

11                  A           Yes, ma'am.

12                  Q           Correct?  Do you have any

13      other disabilities that you're aware of?

14                  A           I can't remember.  Not that

15      I'm aware of.

16                  Q           As part of this process you

17      have filed a complaint with the Equal Employment

18      Opportunity Commission, do you recall that?

19                  A           Yes, ma'am.

20                  Q           I'm going to show you a copy

21      of what I'll mark as Defendant's Exhibit Seven,

22      that's the charge of discrimination that you had

23      filed.  Is that your signature on the bottom of

24      that document, sir?

1          A          It appears to be my

2     signature.

3                     (A one-page document was
                      marked Defendant's Exhibit
4                     No. 7 for identification.)

5          Q          You state here that you're a

6     56-year-old person with a real or perceived

7     disability.  What, do you know what is meant by

8     perceived disability?

9                     MS. NEFF:  Objection insofar

10               as it calls for a legal conclusion.

11               You can answer.

12         A          I, so I was thinking.  What

13    was the question, please?

14         Q          Do you know what it means

15    when you state that you have a perceived

16    disability?

17         A          Yes.

18         Q          And what does that mean?

19         A          That I view myself as being

20    disabled.

21         Q          And that's because of your

22    diabetes?

23         A          I believe it causes

24    disability, yes.

1          Q          The second allegation you've

2     made in this lawsuit is that you believe you were

3     fired because of your disability.  Who do you

4     think fired you because of your disability?

5          A          Specifically who --

6          Q          Yes.

7          A          -- Counselor?  I believe St.

8     Elizabeth Healthcare.

9          Q          Do you know what individual

10    at St. Elizabeth fired you because of your

11    disability?

12         A          Specifically, no.

13         Q          And why do you believe that

14    your disability was a reason for your

15    termination?

16         A          When initially I found out

17    that, I had a conversation because of Mr. Kraft

18    calling me to his office and told me there was a

19    complaint made and tell me the complaint was

20    against, in reference to my sleeping on duty.

21    During this conversation about this complaint Mr.

22    Kraft told me that, or asked me whether he, I

23    thought it was related to my diabetes.  I told

24    him that I thought it possibly was due to the

1    fact that I've been having problems with my

2    diabetes, with my blood sugars going up and down.

3            During the discussion Mr. Kraft told me

4    that he was going to give me a Level I and then

5    he was going to call human resources.  I asked

6    him if it was permitted.  I, he, when he asked

7    me, he said did you actually do this and I said,

8    yes, on my breaks, lunch break.  I asked him if

9    this was permitted because I couldn't find any

10   policy that prohibited it.  He said he didn't

11   know but he would call human resources and then

12   tell them that he was going to give me a Level I.

13           I went back to my office and

14   approximately three, or about two or three,

15   estimating, two or three hours later he called me

16   back to his office.  I went over to sign the

17   Level I.  He told me that human resources could

18   not give me a Level I, that I had to get a Level

19   III.  Nothing occurred in between that time other

20   than the fact that him and I discussed my

21   diabetes.

22           And I was disturbed because that was a

23   rapid increase in a disciplinary from the Level I

24   to a Level III so I asked for a meeting with Mrs.

1    Blank, Lisa Blank in human resources.  Went, we

2    went over, we met with her the same day.  We went

3    over and had the discussion about this.  Mrs.

4    Blank said that the reasons, that first of all,

5    that it was not permitted to sleep on your breaks

6    or lunch break.

7         And then she asked me if I'd ever seen

8    anybody, others, others sleeping.  I said yes.

9    And she asked where and I told her nurses

10   stations, lobby areas, et cetera.  And she asked

11   if I'd seen any other individuals in the security

12   department and I said yes.  And she asked me what

13   I was, what I'd done about it.  And I said I told

14   them don't do that, it looks bad.

15        She told me in this discussion that the

16   reason I was getting a Level III also was due to

17   the fact that four previous employees got a Level

18   III because of this.  I, I accepted the Level

19   III.  And she stated that due to my, that I said

20   it was my diabetes may be the reason that I'd

21   have to go to a fit-for-duty exam.  This

22   concerned me and I expressed my concern and

23   wanted to know, well, if it is my diabetes or if

24   it is my health what happens to the Level III,

1    because a Level III is a, the next step is you're

2    out the door.  And I felt, you know, that this

3    was extreme.  And she replied to me and told me

4    that I would get a Level III anyway.

5         So then I expressed my other concern

6    and that was after a long service of almost 34

7    years with St. Elizabeth and not being written up

8    and having a stellar career with that, that, and

9    now they were giving me a Level III which the

10   next step was out the door that I felt, you

11   know -- I asked her, I said, well, if I get a

12   Level III that I wouldn't be eligible for any

13   future promotional possibilities.  She replied

14   that that would be up to Mike Kraft who was also

15   in this meeting with us.  So I said okay.  And I

16   wanted to know what steps to be, had to be taken

17   for the fit for duty and she told me that Mike

18   had to set this up.

19        So when I went and left and, I left

20   that day, it was on Friday.  The following Monday

21   came in to work and then went down to employee

22   health.  I believe that the reason I was sent to

23   the fit for duty, I'd already received a Level

24   III, I believe that was confirmed by the fact

1    that while I asked about the promotional

2    opportunity that Lisa confirmed I was getting a

3    Level III anyway, that I've got the Level III,

4    only reason I believe that I was sent to the

5    employee health was so that they could look over

6    my medical records and find an excuse.

7            But I went through the, I went through

8    the fit for duty. I reported Monday to my, to

9    work at my regular time and about two hours later

10   or so I went down to see, and this was on the

11   25th of August, I went down and seen Gerald Hynko

12   who was the director of employee health.

13           Q        Uh-huh?

14           A        He asked me some medical

15   questions. And I said to him it doesn't really

16   matter because I'm going to get a Level III

17   anyway. And he then said, no, that was not true,

18   that in fact the federal government has

19   protections under the ADA that apply, allow for

20   accommodations, and diabetes is one of the

21   protections. I told him I did, I, this is the

22   first I'd heard of it. But, again, I repeated

23   what Lisa had said, I was getting a Level III

24   anyway.

1            I completed the testing and I was

2     required to give a waiver so that all my medical

3     records, every one of them, was now open to the

4     medical center.  All my history and everything

5     was given to them.  I finished the fit for duty.

6     I had talked to Mike Kraft, I had pre-scheduled a

7     two-week vacation and that was at the end of the

8     week.  And I asked them prior to leaving employee

9     health, should I go on vacation.  They said okay.

10    He said that it was fine, everything was going to

11    be fine, go on vacation, enjoy myself.  So I went

12    on vacation.

13            While I was on my vacation I called

14    repeatedly to Mike Kraft asking him is there any

15    further information, is there anything.  He told

16    me that he couldn't tell me anything because

17    human resources said it was a medical situation

18    and a FEMA situation, that he, they couldn't

19    divulge any FMLA information to him and couldn't

20    give it to him.  So they wouldn't give it to him.

21            So when I returned -- They couldn't get

22    me in to an appointment on the week when I left

23    initially, couldn't give me an appointment.  We

24    had tried, Gerald, to get in that week before I

1    left on vacation, we couldn't.  So I called him

2    the second week on my vacation to get an

3    appointment.  September 23rd, I'm sorry,

4    September 23rd I met with Dr. Brent Haskell, we

5    discussed our medical, my medical conditions.

6         And I said to him again, said, Doc, it

7    doesn't really matter, I'm getting a Level III

8    anyway.  And I told him what Lisa said.  He again

9    disputed her and said, no, there's a federal

10   protection, if it turns out to be medical it'll

11   be -- So I again said, okay, Doc, but I'm telling

12   you I'm getting a Level III anyway, it doesn't

13   matter.

14        When I was called in on September 22nd

15   with Mr. Kraft and I was told, with Ms. Platek

16   and Mr. Kraft, they told me they were terminating

17   me.  And the way they did it was they explained,

18   Mrs. Platek explained to me, the reasons given to

19   me was there was no acceptable reason for falling

20   asleep at work other than narcolepsy and because

21   you didn't do your job as a supervisor we're

22   terminating you.  I was taken aback by it for two

23   reasons and a number of reasons.  And one would

24   be I firmly believed I was getting a Level III

1     and I was coming to sign my Level III to go back

2     to work.  I also believe that they used the fit

3     for duty as an excuse to get my medical records

4     to find a particular disease or whatever that I

5     didn't have in order to put me, to give

6     narcolepsy as a reason so that I would, could be

7     terminated.

8              I also believe that this, it's a

9     disputable policy, that enforcement of the policy

10    concerning sleeping is a disputable policy

11    because and, and they used that, saying I didn't

12    do anything, or didn't do my job as a supervisor,

13    A, the policy doesn't say I have to tell

14    everybody, I'm not responsible for the employees

15    who go in the nursing station nor are they, am I

16    responsible for employees in the lobby, that's

17    not my chain of responsibility.

18              Second, it says in the policy that they

19    provided that you counsel.  And for 25 years as a

20    supervisor, and which I was told I was doing a

21    good job as a supervisor, I'd always talk to the

22    people first and counsel with them.  And this has

23    been approved by human resources.  So I did my

24    job as a supervisor.

1          I feel that the narcolepsy was found,

2     and after reviewing e-mails from, that were

3     provided by the medical center I believe that

4     the, there was discussions on how to pigeonhole

5     and how to do this in order to find a narcolepsy

6     in order that it was, in order that I could be

7     terminated.

8          And when you put two questionable

9     policies together, this I believe is

10    discrimination and I believe they discriminated

11    me for that reason to get rid of me and to use

12    my, my health, my diabetes as a reason to get rid

13    of me.  And that's why I went and, went to an

14    attorney and filed a lawsuit against them.

15          Q          Okay.  Had you talked to Mr.

16    Kraft in the past about your diabetes?

17          A          Yes.

18          Q          And do you recall what you

19    had told Mr. Kraft?

20          A          Yes.

21          Q          What was that?

22          A          I told him that if he noticed

23    me sitting or standing and dripping wet that it

24    is probably related to my blood sugars going up

1    and down, or if I was acting goofy that this was

2    related to my blood sugars I was having trouble

3    with and because I was excessively perspiring and

4    I was having trouble with my blood sugars.

5              Q         And was there ever an

6    occasion at work that you had to take a break to

7    fix your blood sugars?

8              A         Yes.

9              Q         And did St. Elizabeth allow

10   you to do that; were you able to take care of

11   your medical issue?

12             A         Yes.

13             Q         This discussion you had with

14   Mr. Kraft, do you know how long prior to your

15   termination of employment you had that discussion

16   with him?

17             A         I'd have to guess again, but

18   this would have been within, he'd been there

19   about, would have been, have to be at least after

20   a year that he's been there.

21             Q         Okay?

22             A         When him and I had gotten

23   into a pretty good rapport and communications

24   between us.

1          Q          Did you ever catch yourself

2     falling asleep when you were not on break at St.

3     Elizabeth?

4          A          As I recall, and I'm almost

5     positive that every time I did that I was on

6     break.

7          Q          You made a comment that you

8     looked for a policy and could not find a policy

9     regarding sleeping.  When did you do that?

10          A          That was prior to my taking

11     these breaks.  Like I had reviewed utilizing my

12     breaks in that fashion.

13          Q          So this would have been prior

14     to any of the events leading up to your

15     termination?

16          A          Yes, ma'am.

17          Q          Did you ever sign a Level III

18     discipline?

19          A          Meaning from --

20          Q          From St. Elizabeth?

21          A          No.

22          Q          Do you know who received

23     copies of your medical records during this

24     fitness-for-duty process?

```
1              A        No.

2              Q        Do you know if anyone in HR

3    actually received a copy of your medical records?

4              A        No.

5              Q        Did you ever witness another

6    security officer falling asleep at work?

7              A        Yes.

8              Q        Who was that, do you recall?

9              A        Ben Harney.

10             Q        Did he receive any

11   discipline?

12             A        Yes.

13             Q        What discipline did he

14   receive?

15             A        I counseled him.

16             Q        Verbally?

17             A        Verbally, yes.

18             Q        Were there any other security

19   officers you saw sleeping?

20             A        Yes.

21             Q        Who else?

22             A        Mike Borman.

23             Q        Did he receive any

24   discipline?
```

```
 1              A        I verbally counseled him as

 2      well.

 3              Q        Anyone else?

 4              A        Offhand I can't remember at

 5      this time anybody else.

 6              Q        Are you currently employed?

 7              A        No, ma'am.

 8              Q        Have you been looking for

 9      employment?

10              A        Yes, ma'am.

11              Q        Have you had any employment

12      since you left St. Elizabeth?

13              A        No, ma'am.

14              Q        Are there activities in your

15      life that you cannot do because of your diabetes?

16              A        There are, it limits your, it

17      does limit, depending on what it is that you're

18      attempting to do, yes, because you're physically,

19      you have tingling in your legs, your hands, you

20      can't go barefoot, you can't -- This is what you

21      want to --

22              Q        Uh-huh.

23              A        You can't, you got to watch

24      what you eat, you got to, you can't drink like
```

CJV REPORTING COMPANY - ROBERT LEHMAN 5/18/12

1    you used to do anymore.  You've got to constantly

2    be aware of your blood sugars and carry around

3    all your equipment with you which, you know,

4    aggravates people that you're partying with.  Is

5    this, these are the types of things that you're

6    interested in?

7              Q         Yeah, that's fine?

8              A         Okay.  Your, your fatigue

9    comes in play too because you don't, you don't

10    want to sometimes participate in things because

11    you may be finding yourself tired.  Your feet,

12    your feet, shoes that you want to buy for

13    particular sports you can't participate in

14    because of your feet deteriorating because of the

15    circulation problems and what have you that you

16    have.  Eventually it becomes problem, your read,

17    your eyesight becomes problematic, you can't do

18    certain things.

19              Q         Are you currently having any

20    problems with your eyes?

21              A         So far I only need to use

22    cheaters for reading.  But if I don't keep, if I

23    don't keep trying to get my blood sugars under

24    control then eventually I'll have problems with

1      that.

2                  Q          Are you able to drive?

3                  A          Yes.

4                  Q          And are you currently

5      physically able to work?

6                  A          Yes.

7                  Q          I'm going to go back to

8      something.  Do you recall a time frame that you

9      would have counseled Mike Borman, just a year

10     maybe?

11                 A          That would have been, the

12     year would have been 2010.

13                 Q          And what about Ben Harney,

14     when did you counsel him?

15                 A          That would have been, I have

16     to approximate that one, six or seven maybe years

17     prior to my termination probably.  Could have

18     been even more than that.

19                 Q          And would you agree with me

20     that staying awake is necessary for the position

21     of a security guard?

22                 A          When performing his duties,

23     yes.

24

1          Q          And that security guards have

2     to be aware of the activity going on within the

3     hospital just in general, would you agree with

4     that?

5          A          When not on breaks, yes.

6          Q          And is there a monitor room

7     at St. Elizabeth?

8          A          Yes.

9          Q          And are there cameras

10    throughout the hospital the security guards are

11    responsible for watching those?

12         A          Yes.

13         Q          Have there been incidents in

14    your employment with St. Elizabeth where

15    something is seen on a monitor that a security

16    guard has to go handle?

17         A          Yes.

18         Q          During your years of

19    employment did you encounter any what you would

20    define as an emergency situation?

21         A          Yes.

22         Q          Have you ever been required

23    to call the local police department?

24         A          Yes.

1          Q          Have there ever been
2    occasions where staff has been threatened by a
3    patient?
4          A          Yes.
5          Q          And those are the security
6    officer's job, to help fix that situation where a
7    staff member is threatened?
8          A          Yes.
9          Q          Have there ever been
10   situations where a patient has been threatened?
11         A          Yes.
12         Q          And would you agree that
13   those situations require the security department
14   to act very quickly?
15         A          Yes.
16         Q          Do you know an Amanda Richie,
17   or Rickey, R-i-c-k-e-y?
18         A          The name does not sound
19   familiar.
20         Q          What about Cinda Carmen?
21         A          Again, does not sound
22   familiar.
23         Q          What about Donald Kannady?
24         A          No, ma'am.

1          Q          Did you know Robert Landers?

2          A          The name doesn't sound

3     familiar.

4          Q          What about Teresa Porter?

5          A          No, ma'am.

6          Q          What about Emily Seibel?

7          A          Doesn't sound familiar,

8     ma'am.

9          Q          Were you aware that there

10    were other employees at St. Elizabeth that were

11    fired about the same time you were fired for

12    sleeping on the job?

13         A          The only reference was Lisa

14    Blank saying that four prior employees got a

15    Level III, was the only reference to that.

16         Q          Did you know Laura

17    Krethoffer?

18         A          Again, the name does not

19    sound familiar.

20         Q          What about Connie Smoot?

21         A          No, ma'am.

22         Q          Andrew Cappel?

23         A          No, ma'am.

24

1        Q        During your grievance process

2    do you recall meeting with Mr. John Dubis?

3        A        Yes, ma'am.

4        Q        Do you recall telling Mr.

5    Dubis that you felt you allowed your fatigue to

6    interfere with your job?

7        A        It may have been taken out of

8    context, it might have been in part, part of a

9    conversation.  I may have said something similar

10   to that.  It sounds familiar but I'm not exactly

11   sure.

12       Q        Okay.  Do you recall telling

13   Mr. Dubis you felt you did not take proper steps

14   to alleviate your fatigue?

15       A        I'm sorry, would you repeat

16   that, please?

17       Q        Sure.  Absolutely.  Do you

18   recall telling Mr. Dubis that you felt you did

19   not take proper steps to alleviate your fatigue?

20       A        No, ma'am, I don't recall

21   that.

22       Q        Do you feel that you didn't

23   take proper steps to alleviate your fatigue?

24       A        No, I do not believe that.

CJV REPORTING COMPANY - ROBERT LEHMAN 5/18/12

1          Q          Do you feel you did
2     everything you could to not be fatigued at work?
3          A          I feel I was taking steps to
4     try to remedy that with going to my physicians
5     and attempting to remedy that.
6          Q          Do you recall Mr. Dubis
7     telling you that the security staff is held to a
8     higher standard?
9          A          I do.
10         Q          Do you agree with that or
11    disagree with that statement?
12         A          Do I disagree that he said it
13    or disagree with the statement itself?
14         Q          With the statement itself.
15         A          I disagree with the statement
16    itself.
17         Q          And why is that?
18         A          You can't discriminate
19    against people.
20         Q          So you don't think security
21    should be held to a higher standard than let's
22    say housekeeping when it comes to sleeping?
23         A          I do not.
24

1          Q          Do you, do you disagree that

2     security is responsible for the safety of

3     patients?

4          A          Yes.

5          Q          Do you think housekeeping is

6     responsible for the safety of patients?

7          A          Yes.

8          Q          And why is that?

9          A          That's what we're told.

10          Q          So if a housekeeper is

11     sleeping you find that to be the exact same as if

12     a security officer is sleeping?

13          A          I find that if you're

14     singling out or holding people to higher

15     standards for safety you are again discriminating

16     against particular individuals or a group and I

17     believe that the medical center has to not

18     discriminate against people, which I believe in

19     this case they did.  So I don't agree with the

20     statement that you hold someone out to a, it's,

21     individual to a higher standard or any different

22     standard.  When you're treating people you should

23     treat them fairly and not discriminate.

24

1      Q        Are you aware of any other

2   employees at St. Elizabeth who were fired about

3   the time you were fired for sleeping?

4      A        They will not give

5   information like that out so I have no way of

6   knowing.

7      Q        Okay?

8      A        Information such as that.

9      Q        Do you think as a supervisor

10   you're held to a higher standard than to those

11   employees you supervise?

12      A        In which way again, in which

13   way?

14      Q        As far as making sure that

15   you're following the policies as a supervisor?

16      A        Yes, I've heard, I believe,

17   but all employees should, you know, as best they

18   can.

19      Q        Did Mr. Kraft tell you that

20   he argued with the vice-president of human

21   resources that he felt a Level III was too harsh

22   of a punishment for you?

23      A        Yes.

24

1          Q          And when did Mr. Kraft tell

2     you that, do you recall?

3          A          I believe it was, I can't

4     remember exactly, it was probably during that

5     week or whatever when I was on vacation or

6     something maybe, I'm not exactly sure.

7          Q          Mr. Dubis denied your

8     grievance, is that correct?

9          A          Yes.

10          Q          I probably should clarify,

11     St. Elizabeth process is called a dispute

12     resolution procedure, is that correct?

13          A          Yes.

14          Q          And your dispute was also

15     denied by Mr. Chambers, is that correct?

16          A          Yes.

17          Q          And by Mr. Kraft, correct?

18          A          Yes.

19          Q          Did you meet individually

20     with Mr. Dubis, Mr. Chambers and Mr. Kraft?

21          A          Yes.

22          Q          Have you ever filed a lawsuit

23     prior to this one?

24          A          Yes.

1              Q          And what was that?

2              A          It was filed against the City

3      of Cincinnati and it was, I can't, back in the

4      '70s or '80s.  It was a breach of contract, I

5      believe is what it was called.

6              Q          How did that lawsuit resolve?

7              A          It was, we withdrew when the

8      ruling came back about midway through the

9      lawsuit.

10             Q          Were you a union member?

11             A          No.

12             Q          Were there other plaintiffs

13     besides yourself?

14             A          Yes.

15             Q          Other than the claim you

16     filed against St. Elizabeth have you filed any

17     other claims with the Equal Employment

18     Opportunity Commission?

19             A          No.

20             Q          Do you currently have any

21     source of income personally?

22             A          Unemployment.

23             Q          Are you still receiving

24     benefits?

1          A          Yes.

2          Q          Are you still filing job

3     applications looking for a job?

4          A          Yes.

5          Q          Have you had any job

6     interviews?

7          A          No.

8          Q          About how many hours a week

9     do you think you spend looking for a job?

10         A          A guesstimate again, at least

11    three to four hours a week.

12         Q          Have you had any job offers?

13         A          It's got to be with a caveat

14    because I have talked to a individual from River

15    Downs, human resources manager, and we discussed

16    the position.  He did not make an offer but it

17    was over the phone and it was basically he didn't

18    feel he could pay me enough, so it wasn't like an

19    actual interview.  And that was about it.

20         Q          Any other offers that you've

21    had?

22         A          No.

23         Q          You're making a claim for

24    emotional distress damages in this lawsuit, is

1           that correct?

2                   A           I'm sorry, please>

3                   Q           That's fine.  You're making a

4           claim for emotional distress damages in this

5           lawsuit, is that correct?

6                   A           Yes, ma'am.

7                   Q           Have you sought any type of

8           counseling since being terminated from St.

9           Elizabeth?

10                  A           No, ma'am.

11                  Q           Have you had an increase in

12          any medication as a result of your termination

13          from St. Elizabeth?

14                  A           Yes, ma'am.

15                  Q           And what type of changes?

16                  A           Increased them in like

17          Cymbalta I believe it was.

18                  Q           Is that for depression?

19                  A           I believe it is.  I think it

20          is, yes, ma'am.

21                  Q           Can you just describe for me

22          what type of emotional distress you suffered as a

23          result of the termination?

24

1      A      I'll try to get through this.

2  After dedicating your life to a particular

3  employer, almost 34 years, after priding yourself

4  and identifying yourself with a particular

5  employer, after receiving such high compliments

6  and after receiving high evaluations and told,

7  being told what a good job you're doing, to have

8  this employer turn you in to an enemy and abandon

9  you, and people that were, you thought were your

10  friends and your co-workers and people that

11  understood you, have them to do that and to throw

12  you in to a atmosphere and employment picture,

13  historically the highest unemployment picture

14  that we've ever had in this country, to seek a

15  job at my age, to deny me the opportunity to walk

16  away from a career that I prided myself in and

17  that I worked hard with, strikes to the core of

18  everything that I personally believed in.

19      I have a code, yes, I do live by.  And

20  I believe that they also would believe in that

21  but they proved differently.  And so emotionally

22  I went to, what it did was it impacted my life

23  with my wife.  If it wasn't for the wife that I

24  have, if it wasn't for her understanding, the

1    anger, the depression, the arguments, the money,

2    if it wasn't for her sticking with me I'd have

3    never made it through.

4            We, we both work, worked at St.

5    Elizabeth, we both grew up through this company.

6    We believed in what they taught us all along

7    about respecting each other, we were family with

8    each other, you treat each other with respect and

9    that's how you handle each other.  I believed

10   that also.  I look at my sons who are now having

11   their own families, I'm embarrassed, I've never

12   been fired from, from a job and I'm embarrassed

13   to try to tell them the work ethic, dedicate

14   yourself, give yourself a hundred percent to your

15   job because that's the way it is.

16           After what happened to me I basically

17   locked myself in my house for a year because I

18   was too embarrassed to go out.  And I, and I felt

19   like I was, that I had nothing I could do.  So

20   these are the kind of things that you experience

21   at my age and these are the kind of things you

22   experience when you go through this type of

23   thing.  I, I don't know how to express it any

24   other way.

1           Q           Okay.  Does your wife still

2    work for St. Elizabeth?

3           A           Yes, ma'am.

4           Q           And where does she work in

5    the hospital?

6           A           She's a nurse practitioner

7    with the cardiology group up on Thomas More

8    Parkway.

9           Q           Have you applied for security

10   positions with other area hospitals?

11          A           Yes, ma'am.

12          Q           Do you feel as time has

13   passed it's been easier to deal with your

14   termination?

15          A           Yes and no.  That's the only

16   answer I can honestly give you.

17          Q           That's fine.

18          A           I, yes and no, that's all I

19   can say.

20          Q           Prior to your termination

21   from St. Elizabeth did you do any type of

22   volunteer activities?

23          A           I imagine I did but I never

24   keep track of it, I --

1          Q          Have you done any volunteer

2     activities since your termination?

3          A          No, ma'am, I did not.  I

4     can't, again, I, it's hard, it's hard to describe

5     what it is that you go through.  You just can't,

6     you can't, you lose your friends, you know, your

7     people that you, you've, your co-workers and your

8     group of people that you worked with who are your

9     friends and people that you work with are your

10    friends.  And then you lose, you can, you know,

11    you just lose everything that you made contact

12    with and you have nothing.

13         Q          Some of the medical records

14    that your attorney has provided through this

15    lawsuit indicated that you have chronic back

16    pain.  Are you still having chronic back pain?

17         A          Yeah, off and on, yes, ma'am.

18         Q          Do you know what the cause of

19    the back pain is?

20         A          It would be, it was, what was

21    it, it's a disc problem, slipped disc.  And I

22    think it's now spinal stenosis as well.

23         Q          And do you receive treatment

24    for that?

1          A          Yes.

2          Q          About how long have you had

3     that back pain?

4          A          Two years.  I'd just, I'd

5     have to guess on that again too.  It would be in

6     my medical records, I don't --

7          Q          Did you have it while you

8     were still employed by St. Elizabeth?

9          A          Yeah, I believe I did, yes.

10          Q          Let me show you a document I

11     marked as Defendant's Exhibit Eight.  The first

12     three pages of Defendant's Exhibit Eight, is this

13     a document that you had prepared?

14          A          That I had prepared?

15          Q          Right, did you prepare this?

16          A          Yes.

17          Q          And did you submit this as

18     part of the dispute resolution process?

19          A          No.

20          Q          Why did you prepare this

21     document?

22          A          It was a confidential memo to

23     my attorney.

24          Q          Is this something --

1          MS. NEFF:  Let's take a quick

2     break.

3          MS. SCHOENING:  Okay.

4          MS. NEFF:  I want to talk to

5     him about that.

6          MS. SCHOENING:  Okay.

7          MS. NEFF:  I think we talked

8     to him before but I just want to make

9     sure.

10          MS. SCHOENING:  Okay.  You

11     know what, I'm going to, you don't have

12     to go off the record, the last page of

13     that, let's rip that off and make that

14     a separate exhibit.  I do want to use

15     it but it's confusing, it shouldn't be

16     stapled to it.  You can keep that, I'll

17     just mark it separately.

18               (A three-page document was
                 marked Defendant's Exhibit
19               No. 8 for identification.)

20          (A RECESS WAS TAKEN.)

21          Q          (MS. SCHOENING.)  All right,

22     so let's go back on the record.  Defendant's

23     Exhibit Eight, do you recall why you prepared

24     this document?

1          A          Yes, ma'am.  I prepared this

2     in anticipation of seeking attorney, an attorney

3     and keeping the thoughts in place so that they

4     could go over with what I, the main points.

5          Q          This is not something that

6     you submitted to St. Elizabeth, is that correct?

7          A          No, ma'am.

8          Q          And let me show you what I

9     already marked as Exhibit Nine?

10          A          Okay.

11                     (A one-page document was
                       marked Defendant's Exhibit
12                     No. 9 for identification.)

13          Q          Do you recall receiving a

14     copy of this letter from Mr. Dubis?

15          A          Yes, ma'am.

16          Q          And according to this letter

17     he had met with you and considered your comments

18     but then he had denied your attempted dispute

19     resolution, correct?

20          A          Yes, ma'am.

21          Q          As part of that dispute

22     resolution process were you seeking reinstatement

23     of your employment?

24          A          I believe, yes, ma'am.

1          Q          I'm going to show you what

2     looks like a letter that you wrote to Mr.

3     Chambers that I marked as Exhibit Ten.  You wrote

4     this letter, is that correct?

5          A          Yes, ma'am.

6          Q          And you submitted this to Mr.

7     Chambers as part of the dispute resolution

8     process?

9          A          No, ma'am.

10                     (A four-page document was
                       marked Defendant's Exhibit
11                     No. 10 for identification.)

12         Q          Why did you submit this to

13    Mr. Chambers?

14         A          I did not submit this to Mr.

15    Chambers.

16         Q          Okay, who did you submit it

17    to?

18         A          No one.

19         Q          Did you give it to anybody at

20    St. Elizabeth?

21         A          No, ma'am.

22         Q          Then why does it have Mr.

23    Chambers' name on it?

24

1          A          My intentions were to send it

2     to Mr. Chambers but I did not sent it to Mr.

3     Chambers.

4          Q          Okay, why did you decide not

5     to send it?

6          A          Because I decided that a face

7     to face would better serve, that I'd just go over

8     it and not have a, to read or not to do a pre

9     type of situation, just to talk to him.

10         Q          On page three, the very last

11    paragraph, do you see the sentence that starts

12    with the mistake I made?

13         A          Yes.

14         Q          And you state the mistake I

15    made was when my fatigue became a problem I did

16    not go to Mike Kraft and tell him or seek help

17    from employee health.  I was pursuing this with

18    my regular doctors and I was losing this battle.

19    What do you mean that you were losing this

20    battle?

21         A          That my blood sugars, my

22    fatigue I believe was related to the blood

23    sugars.  That's what I was referring to.

24

1          Q          And did you feel that the

2    fatigue was becoming a problem or interfering

3    with your ability to do your work at St.

4    Elizabeth?

5          A          I believe that on breaks when

6    I was taking breaks and taking, when it was

7    happening that I was all right, it wasn't

8    interfering.

9          Q          And how was your fatigue

10   becoming a problem?

11         A          Again, it just related to my

12   blood sugars and all that going on at the same

13   time.

14         Q          So when you say it was

15   becoming a problem you do not think it was

16   becoming a problem at work?

17         A          I was referring, this

18   particular, I can't, I can't remember what was

19   going through my mind exactly when I made this

20   up.  This was a, this was something that I was

21   going to send him but I didn't send him and I was

22   putting stuff through my mind at the time and I

23   honestly can't remember what was going through my

24   mind exactly at the time, because I never sent

1    it.  This was proposed, what was in my mind, I

2    don't remember what was going through.

3           Q       Let me show you what I'll

4    mark as Defendant's Exhibit 11.  Do you recall

5    receiving this memo from Mr. Chambers?

6           A       Yes, ma'am.

7                 (A one-page document was
                   marked Defendant's Exhibit

8                 No. 11 for identification.)

9           Q       And this was in response to

10    your dispute resolution, is that correct?

11           A       Yes, ma'am.

12           Q       And Mr. Chambers stated that

13    you had shared with him that you were, that there

14    were others that were sleeping in the past, you

15    discussed it but failed to discipline them.  Do

16    you agree with that statement?

17           A       I'm sorry, that he?

18           Q       That's fine.  And I'm sorry,

19    I didn't mean to ask an unclear question.  The

20    second paragraph, the second sentence?

21           A       No, ma'am, I did not say

22    that.

23           Q       Did you feel that you had

24    disciplined employees because you verbally

1        counseled them?

2               A        Yes, ma'am.

3               Q        And do you disagree with Mr.

4        Chambers' statement that you failed to enforce

5        the policy as a supervisor?

6               A        Yes, ma'am.

7               Q        Mr. Chambers also stated that

8        you told him you believed after 34 years you've

9        earned another chance.  Was that a true

10       statement?

11              A        Yes, ma'am.

12              Q        I'll show you what we'll mark

13       as Defendant's Exhibit 12.  Do you recall

14       receiving a copy of this memorandum from Mr.

15       Kraft?

16              A        Yes, ma'am.

17                       (A one-page document was
                         marked Defendant's Exhibit
18                       No. 12 for identification.)

19              Q        And this was part of your

20       dispute resolution, is that correct?

21              A        It was a response, yes.

22              Q        Prior to this incident

23       involving you were you aware that there was a

24       disciplinary policy at St. Elizabeth that called

1    for a Level III discipline if an employee was

2    caught sleeping?

3              A         No, ma'am.

4              Q         Did your job as a security

5    supervisor require much walking during the day?

6              A         It would depend, some.  And

7    lot depends on the definition.

8              Q         Did any of your medical

9    conditions interfere with your ability to handle

10   the physical aspects of the job?

11             A         I don't believe so.

12             Q         I'm going to show you what

13   I've marked as Defendant's Exhibit 13.  This

14   appears to be a therapy note from St. Elizabeth.

15   What type of therapy were you in at St.

16   Elizabeth?

17             A         Physical therapy.

18             Q         And what was the physical

19   therapy for?

20             A         Lower back.

21                       (A one-page document was
                         marked Defendant's Exhibit
22                       No. 13 for identification.)

23             Q         And that's the back pain we

24   talked about before?

1           A           Yes, ma'am.

2           Q           In the middle of the page

3     under the title subjective it states that you

4     were verbalizing about family stressors, your

5     brother was ill.  He's, I guess it means continue

6     to use the gym but unable to do secondary to

7     brother's illness.  I assume your brother had

8     some type of illness that was causing a stress in

9     your life, is that true?

10          A           Oh, that is incorrect.

11          Q           Your brother did not have any

12    type of illness?

13          A           No, ma'am.

14          Q           As part of your therapy were

15    you supposed to be going to the gym?

16          A           I was at the gym.

17          Q           Okay.

18          A           So I don't, no, ma'am.

19          Q           Part of your therapy was

20    going to the gym through St. Elizabeth, is

21    that --

22          A           I was, the therapy department

23    had the gym and I was working out at that gym so

24    I'm not --

1    Q        Okay?

2    A        I didn't, that's where I was

3    doing the therapy.

4    Q        Okay, that's what I was

5    asking.

6    A        Yes.

7    Q        I'd like to show you a copy

8    of another medical record.  This is part of a

9    record that your attorney produced to us.

10            MS. NEFF:  Just for the

11            record, this probably should be marked

12            confidential.  I'm not sure why the

13            other one wasn't.

14            MS. SCHOENING:  Okay.

15    Q        This came from Dr. Metzger's

16    medical records, it appears the date is

17    3/18/2011.  According to Dr. Metzger's note she

18    stated that you were more irritable, depressed

19    and not motivated.  Would you agree with that

20    assessment in March of 2011?

21    A        No.

22            (A one-page document was
               marked Defendant's Exhibit
23            No. 14 for identification.)

24

1          Q          Okay, and why would you not

2     agree with that?

3          A          It's related to the back

4     pain.

5          Q          Okay?

6          A          I wouldn't call myself

7     depressed, I was upset about the back pain, it

8     was hurting.

9          Q          Okay?

10         A          I don't know.

11         Q          Dr. Metzger states that

12    you've been on Zoloft for many years.  Do you

13    agree with that?

14         A          Yes, I guess.

15         Q          And you had been on Zoloft

16    prior to your termination from St. Elizabeth,

17    correct?

18         A          Yes.

19         Q          And do you know why you were

20    suffering from depression prior to your

21    termination from St. Elizabeth?

22         A          Exactly, no.

23         Q          Had you ever sought any

24    treatment to try to figure out what the source of

1        that depression was?

2                    A        I guess when -- No, I can't,

3        I don't, didn't get any professional help.

4                    Q        And doctor, looks like Dr.

5        Metzger had recommended Cymbalta?

6                    A        Yes.

7                    Q        Did you switch to Cymbalta at

8        that time?

9                    A        Yes.

10                   Q        Did Cymbalta control your

11       depression --

12                   A        Yes.

13                   Q        -- better than Zoloft?

14                   A        Yes.

15                   Q        I'm going to show you a

16       document that we received from your attorney

17       marked Exhibit 15.  This appears to be a letter

18       from Dr. Courtade to Nancy Metzger.  Were you

19       seeing Dr. Courtade due to heart issues?

20                   A        Yes.

21                            (A two-page document was
                              marked Defendant's Exhibit
22                            No. 15 for identification.)

23                   Q        According to the letter, it

24       states that you were feeling somewhat dysphoric,

1  do you even know what that means?

2              A        No, ma'am.

3              Q        I was just saying I didn't

4  either, I looked it up.  According to what I

5  looked up, says the definition of it is the

6  opposite of euphoria.  And apathetic, an affect

7  he apparently has had in the past.  So assuming

8  my definition is correct and it means depression,

9  would you agree in 2004 that you were feeling

10  some, or had some feelings of depression and

11  apathy?

12              A        Apathy, yes.

13              Q        It also states that you had

14  been having some increasing difficulty at work.

15  Do you recall what that was at that time?

16              A        At this time I cannot recall

17  specifically what it was.

18              Q        Do you recall, prior to the

19  termination do you recall any point at St.

20  Elizabeth having any significant problems at

21  work?

22              A        No, I cannot recall, honestly

23  cannot recall at this time what it was.

24

```
 1              Q           I'd like to show you what
 2      I'll mark as Defendant's Exhibit 16.
 3                      MS. NEFF:  Again, I'd just
 4              like this marked --
 5                      MS. SCHOENING:  Confidential.
 6                      MS. NEFF:  Yes, thank you.
 7              Q           I'll represent to you your
 8      attorney produced this to us.
 9              A           Okay.
10              Q           And it's a page from Dr.
11      Metzger's medical chart?
12              A           Okay.
13                      (A one-page document was
                        marked Defendant's Exhibit
14                      No. 16 for identification.)
15              Q           And it appears that the date
16      of service was 4/18/2008 and that your complaints
17      were sinus infection, muscle spasms lower back,
18      and depression.  Do you recall seeing Dr. Metzger
19      for those various symptoms?
20              A           I don't recall but I have
21      seen her for those type --
22              Q           Okay.  There's also a note in
23      the middle that says not a happy person, a
24      hundred milligrams of Zoloft?
```

1         A        Yes.

2         Q        Do you recall ever telling

3    Dr. Metzger that you did not feel like you were a

4    happy person?

5         A        Yes.

6         Q        And do you have any idea what

7    would be the source of you having those feelings?

8         A        There was, I would have to

9    guess, it would be strictly a guess on a lot of

10   things.  My brother-in-law having found out he

11   had cancer, lot of frustrating things were going

12   on at the time.  That would be a guess.  I can't,

13   I can't recall specifically.  Physically, you

14   know, I don't, I just cannot recall at this time.

15                 MS. SCHOENING:  Let me take a

16        short break and talk to my client.

17                 MS. NEFF:  Sure.

18                 MS. SCHOENING:  And we might

19        be about finished.

20        (A RECESS WAS TAKEN.)

21                 MS. SCHOENING:  Mr. Lehman, I

22        am finished with my questions for the

23        day.  So I appreciate your cooperation.

24

CJV REPORTING COMPANY - ROBERT LEHMAN 5/18/12

108

1              MS. NEFF:  I don't have any

2        questions.

3              THE REPORTER:  Signature?

4              MS. NEFF:  Yes, please.

5        (CONCLUSION OF DEPOSITION.)

6

7

8        _____  6-7-12

9        ROBERT LEHMAN                    DATE

10

11

12

13

14        ORIGINAL

15

16

17

18

19

20

21

22

23

24

CJV REPORTING COMPANY - ROBERT LEHMAN 5/18/12

109

1   **ERRATA SHEET**

2   TO THE REPORTER:  I have read the entire
    transcript of my deposition or the same has been
3   read to me.  I request that the following changes
    be entered upon the record for the reasons
4   indicated.  I have signed my name to the
    signature page and authorize you to attach the
5   following changes to the original transcript.

6       PLEASE DO NOT WRITE IN THE TRANSCRIPT

7   PAGE    LINE    CORRECTION (REASON)

8   2/(5)    11   "Jack J. Dooley", Not correct should be "Jennie Dooley"

9   2/(5)    13   "LOSBY" Not Spelled correct Should Be "LusBy"

10  6/(24)    4   "motion" should Read "A Demotion"

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____
                                        6-7-12

COMMONWEALTH OF KENTUCKY

STATE        AT        LARGE

        I, THERESA PORTER, a Notary Public within and for the Commonwealth of Kentucky, do hereby certify that the foregoing deposition of:

        ROBERT LEHMAN

was taken before me at the time and place and for the purpose in the caption stated; that the witness was first duly sworn to tell the truth, the whole truth and nothing but the truth; that the deposition was reduced to shorthand writing in the presence of the witness; that the foregoing is a full, true and correct transcript of the said deposition so given; that there was a request that the witness read and sign the deposition; and that the appearances were as stated in the caption.

WITNESS MY SIGNATURE
THIS 21ST DAY OF MAY, 2012

My Commission Expires:  February 8, 2013


_____
**Theresa Porter - Notary Public**
**COMMONWEALTH OF KENTUCKY**