Case: 2:11-cv-00165-WOB-JGW   Doc #: 27   Filed: 10/16/12   Page: 1 of 29 - Page ID#: 260

Lehman vs. St. Elizabeth          BLANK                    7/25/2012

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

NORTHERN DIVISION AT COVINGTON


----------------------------------
                                    :
ROBERT LEHMAN,                      :
                                    :
            Plaintiff,              :
                                    :
        vs.                         :   CASE NO.
                                    :   2:11-cv-00165
ST. ELIZABETH HEALTHCARE,           :
                                    :
            Defendant.              :
                                    :
----------------------------------


        DEPOSITION OF:   LISA BLANK
        TAKEN:           By the Plaintiff
        DATE:            July 25, 2012
        TIME:            Commencing at 9:00 a.m.
        PLACE:           Offices of:
                         Freking & Betz
                         525 Vine Street
                         Sixth Floor
                         Cincinnati, Ohio  45202
        BEFORE:          Raymond E. Simonson
                         Registered Merit Reporter
                         Notary Public-State of Ohio

Lehman vs. St. Elizabeth                    BLANK                        7/25/2012

Page 2

1    APPEARANCES:
2       On behalf of the Plaintiff:
3          KATHERINE DAUGHTREY NEFF, ESQ.
              of
4          Freking & Betz
           525 Vine Street
5          Sixth Floor
           Cincinnati, Ohio  45202
6          Telephone:  (513) 721-1975
           Email:  kneff@frekingandbetz.com
7
        On behalf of the Defendant:
8
           KELLY A. SCHOENING, ESQ.
9             of
           Dressman Benzinger LaVelle psc
10         207 Thomas More Parkway
           Crestview Hills, Kentucky  41017
11         Telephone:  (513) 357-5284
           Email:  kschoening@dbllaw.com
12
        Also present:  Robert Lehman
13
                    - - -
14
15
16
17
18
19
20
21
22
23
24

Page 3

1                I N D E X
2    LISA BLANK                              PAGE
3    CROSS-EXAMINATION BY MS. DAUGHTREY NEFF      4
4    EXAMINATION BY MS. SCHOENING                96
5    FURTHER CROSS-EXAMINATION BY MS. DAUGHTREY NEFF    98
6          CONFIDENTIAL MATERIAL
           SUBJECT TO PROTECTIVE ORDER
7                Page 88
8            E X H I B I T S
9    Blank Exhibit Number       Marked     Referenced
10        1             30        97
11        2             37        62
12        3             39        -
13        4             47        -
14        5             50        70
15        6             57        97
16        7             60        77
17        8             68        -
18        9             69        71
19   Kraft Exhibit Number       Marked     Referenced
20        3             -         24
21        4             -         53
22   Oscadal Exhibit Number     Marked     Referenced
23        6             -         56
24        2             -         61

Page 4

1                LISA BLANK
2    of lawful age, a witness herein, being first duly sworn
3    as hereinafter certified, was examined and deposed as
4    follows:
5                CROSS-EXAMINATION
6    BY MS. DAUGHTREY NEFF:
7        Q.    Lisa, could you please state your full
8    name for the record?
9        A.    Lisa Blank.
10       Q.    Okay.  Obviously, you have been present
11   for the majority of the depositions in this case, so
12   I'm not going to go through the ground rules, other
13   than one, because I don't think I had addressed this
14   previously.  If you don't understand my question,
15   please let me know.  Otherwise, I'm going to go ahead
16   and assume you understand.  Okay?
17       A.    Okay.
18       Q.    All right.
19       A.    If I go "um-hmm" or I shake, please remind
20   me.
21       Q.    All right.  I will.
22       A.    Because I'm horrible at that.
23       Q.    I will.  I will.
24       A.    All right.

Page 5

1        Q.    Did you do anything to prepare for your
2    deposition?
3        A.    I had a meeting with Kelly on Monday and,
4    of course, I've sat through all these.
5        Q.    During your meeting with Kelly on Monday,
6    did you review any documents?
7        A.    Yes, I did.  But to be honest with you, I
8    have seen so many documents over the course of these
9    things, I couldn't tell you specifically what I looked
10   at.
11       Q.    Can you remember what you looked at during
12   your meeting on Monday?  Was anything different than
13   the exhibits we've looked at in this case?
14       A.    We looked at the letter that Bob had
15   written that none of us had seen.  We looked at -- I
16   don't even know if we looked at that.  We looked at the
17   notes that Roxann had written for the term, because I
18   was with Mike first, and then me.  That's really all I
19   can think of specifically that I hadn't already seen
20   before.
21       Q.    Okay.  And the letter from Bob, is that
22   the one written to Doug Chambers?
23       A.    Yes, ma'am.
24       Q.    Other than potentially attending some of

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Case: 2:11-cv-00165-WOB-JGW    Doc #: 27    Filed: 10/16/12    Page: 3 of 29 - Page ID#: 262

Lehman vs. St. Elizabeth                    BLANK                    7/25/2012

Page 6

1  the meetings with Ms. Schoening and participating in
2  those with some of the other witnesses, have you spoken
3  with anyone else besides counsel or with those folks
4  during those meetings --
5      A.   No, ma'am.
6      Q.   -- about your deposition?
7      A.   No, ma'am.
8      Q.   And outside of the presence of counsel,
9  have you discussed the testimony of any of the
10 witnesses that you have seen in the last three weeks --
11     A.   No, ma'am.
12     Q.   -- with those folks?
13     A.   No, ma'am.
14     Q.   All right.  What is your current address?
15     A.   ████████████████████████████
16 -- and that's one word -- ██████ Hebron, Kentucky,
17 41048.
18     Q.   How long have you lived at that address?
19     A.   One year.
20     Q.   When were you hired by St. Elizabeth?
21     A.   That's a loaded question.  I've worked
22 there several times. The first time was in 1985.
23     Q.   How long were you employed there after
24 '85?

Page 7

1      A.   Till '88.
2      Q.   In what position?
3      A.   I was a Registered Nurse.  I have a
4  Bachelor's in nursing.
5      Q.   Okay.  So from 1985 until 1988, you were a
6  Registered Nurse for them?
7      A.   I was.
8      Q.   What facility?
9      A.   Edgewood.
10     Q.   And then when did you return to St.
11 Elizabeth?
12     A.   In '88 to '91, I went to UC and worked in
13 their ER, did some light nursing, did some trauma
14 transport, and then, in '91, came back and worked in
15 Cardiac Surgery till '95.
16     Q.   As an RN?
17     A.   Um-hmm (nodding head affirmatively).
18     Q.   Okay.
19     A.   And during that time I did house
20 supervision too, and then took a Nurse Manager position
21 at the Critical Care Units from '95 to -- or '94,
22 roughly, to '97, and then, in '97, was recruited by the
23 Director of HR to go to HR.  So I became a Generalist
24 in '97 and stayed until 2002 and was recruited by the

Page 8

1  Greater Cincinnati Health Council, which is like the
2  chamber of commerce of hospitals.  I was the Workforce
3  Director, looking at strategies to get people to
4  engage, recruit, and retain healthcare associates into
5  healthcare.  I worked with other workforce strategists
6  throughout the country -- it was actually a real fun
7  job -- talked to hospital associations in states, and
8  we worked on strategies.  And then I was recruited back
9  to St. Elizabeth in January -- actually, December of
10 2004, but I started in January of 2005, and have been
11 there ever since as a Director.
12     Q.   So in January of '80, you became a
13 Director?
14     A.   Yes, ma'am.  I maybe gave you more
15 information than you wanted, but that's the history.
16     Q.   I want to make sure I've got this
17 straight.  So from 1991 until 2002, you worked for St.
18 Elizabeth; is that correct?
19     A.   Yes.
20     Q.   And then you also, from '85 to '88, worked
21 there, and then came back, and so you've been there
22 since January of 2005?
23     A.   Yes, ma'am.
24     Q.   Now, have you ever left your employment,

Page 9

1  either with St. Elizabeth -- or the other facilities or
2  companies that you worked for -- have you ever left
3  involuntarily?
4      A.   No, ma'am.
5      Q.   As a Nurse Manager, did you have any
6  responsibility for hiring employees?
7      A.   Yes, ma'am.
8      Q.   And would you receive applications from
9  employees for positions?
10     A.   It was a paper process back then, but yes.
11     Q.   And then you would interview that
12 employee?
13     A.   Yes, ma'am.
14     Q.   If you received an application from an
15 employee who had been fired from their previous
16 employment, would you consider that a positive or a
17 negative for that candidate?
18     A.   Circumstances.  It would depend on the
19 circumstances and what HR found and told me at the
20 point of the interview.
21     Q.   If you had learned that they had been
22 fired for sleeping at their previous position, would
23 that be a positive or a negative?
24         MS. SCHOENING:  Objection.

3 (Pages 6 to 9)

Lehman vs. St. Elizabeth                    BLANK                         7/25/2012

---

Page 10

1       A.      That would be --
2               MS. SCHOENING:  Go ahead and answer.
3       A.      That would be a negative.
4       Q.      What job responsibilities did you have as
5   an HR Generalist?
6       A.      Recruitment, retention, turnover
7   strategies, advice to employees, advocacy, job fairs,
8   compensation, determining pay rates, experience
9   calculating, any employee relations.
10      Q.      Does St. Elizabeth still have HR
11  Generalists?
12      A.      Yes, ma'am.
13      Q.      Do you have HR Generalists that report to
14  you?
15      A.      I have ten spots.  One of them is vacant.
16  Her husband got transferred to Texas.  But the rest --
17  I do have nine others.
18      Q.      The HR Generalists that report to you, are
19  their job responsibilities similar to what yours were
20  when you were an HR Generalist?
21      A.      Yes, ma'am.
22      Q.      Roxann Platek, is she considered an HR
23  Generalist?
24      A.      Yes, ma'am.

---

Page 11

1       Q.      And she testified in this case that one
2   area of her responsibility includes the Security and
3   Safety Department; is that correct?
4       A.      Yes, ma'am.
5       Q.      I think there was testimony by Marty
6   Oscadal that there were three HR Generalists who split
7   Nursing; is that right?
8       A.      No, ma'am.
9       Q.      Okay.
10      A.      There's ten total.  Five of them are
11  designated to Nursing.
12      Q.      Okay.
13      A.      The other -- one, two, three -- five would
14  be designated to Allied.  Two of them job share.  So
15  I've got three at Edgewood, but they're all -- their
16  assignments are by service line.  So for example, if
17  Roxann has Security at Edgewood, she has it at
18  Florence, Fort Thomas, Covington.  So their
19  responsibilities are by service line.
20      Q.      Okay.
21      A.      So right now, I have four Advisors in
22  Nursing, because I have a vacancy, and I'm hoping to
23  fill it next week.  And then I have two job-shares in
24  Allied and two others that are full time.

---

Page 12

1       Q.      And who are your four Advisors in Nursing?
2       A.      Shauna Dynes, Kerry Kleisinger, Peggy
3   Essert, and Barbara Estes.
4       Q.      I'm sorry.  Who was before Barbara?
5       A.      Peggy Essert.
6       Q.      Peggy.  Thanks.  Did you hire Shauna,
7   Kerry, Barbara, and Peggy?
8       A.      I did not hire Barbara.  She came over
9   with the merger.  I hired the rest of them.
10      Q.      And if one of your Advisors learns about a
11  potential serious disciplinary problem -- when I say
12  that, I mean something that an employee has done or
13  been accused of that could result in either a Level III
14  or a termination -- would you expect that Advisor to
15  come to you and talk to you about it?
16      A.      Yes, ma'am.
17      Q.      And is it your experience that the
18  Advisors that report to you are aware that that is your
19  expectation and they do come to you?
20      A.      Yes, ma'am.
21      Q.      You have heard, I know, throughout the
22  testimony and questioning over the last several weeks
23  the name of Ken Rasor.  Are you familiar with the name
24  Ken Rasor?

---

Page 13

1       A.      Yes, ma'am.
2       Q.      How long have you known Ken?
3       A.      I knew of Ken.  I didn't personally know
4   Ken until I got involved with meetings after Mike Kraft
5   started.  Mike -- previous leadership in Security and
6   likewise at senior levels, we didn't have a lot of
7   accountability.  So when Mike Kraft started, he gave an
8   evaluation.  I do think even Bob gave input into that
9   evaluation, if I remember.  And Ken was not happy with
10  the eval, and went to Doug.  So my meetings started
11  with Doug well before the meetings started, as you
12  know, with Roxann.  I had meetings with Doug --
13  probably a series of three or four with Doug and Ken to
14  discuss Ken's issues and give him feedback related to
15  how his evaluation was and his dissatisfaction with his
16  eval.  As a result of those meetings, then we put a
17  work-improvement plan, a communication plan, in place,
18  and those work-improvement plans and follow-up meetings
19  were done by Roxann.
20      Q.      I believe Mike Kraft testified yesterday
21  that he started with St. Elizabeth in around July of
22  2008.
23      A.      If that's what he said, I'm assuming.  I
24  don't know offhand.

---

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    BLANK                        7/25/2012

Page 14

1      Q.     Do you know how soon after he came onboard
2   when the evaluation was done that Ken was not happy
3   with?
4      A.     I think it was overnight.  We do them --
5   at that time I can't remember if we went to the same
6   annual review time, because we switched at some point
7   during that time.  We used to do it on their hire date,
8   and then we switched to having it done at the same time
9   every year.  So if I remember correctly, he got it in
10  the early part of the year, which would have been like
11  an annual, because we started those meetings with Doug
12  right after that, which was like March or April.
13     Q.     When you say March or April, you think
14  that would have been '09?
15     A.     I believe so.
16     Q.     In your current position as HR Director --
17  that's the correct title, right?
18     A.     Director of Recruitment and Employee
19  Relations.
20     Q.     Got it.  In your position as the Director
21  of Recruitment and Employee Relations, do you have any
22  responsibility for training managers on St. Elizabeth's
23  anti-discrimination policies?
24     A.     Yes, ma'am.

Page 15

1      Q.     And what do you do or how do you train
2   them?
3      A.     We have computer-based learning modules.
4   We have a program called SkillSoft that we actually
5   just developed this year, so it really wasn't relevant
6   at the time bob was there.  But it was a -- it's a
7   computer-based program where we've developed modules.
8   And managers, directors, and supervisors are expected
9   to complete them.  You get orientation, and there is
10  education imbedded in the orientation.  And then we
11  would do spot educational trainings as needed.
12     Q.     So the SkillSoft, you said, was something
13  that you said was developed this year?
14     A.     I think it was either '10 or '11.
15     Q.     And prior to implementing SkillSoft --
16     A.     You still have computer-based learning.
17     Q.     Okay.
18     A.     Sorry.  I cut you off.  But you still have
19  that computer-based learning module.
20     Q.     And that computer-based learning, would
21  that cover the St. Elizabeth's anti-discrimination
22  policies?
23     A.     It does.  In 2008, we did put a program in
24  place called Pathways, and that was right after the

Page 16

1   merger.  And everyone had to go through that again,
2   because it was the new policies, it was the new
3   policies related to discrimination, harassment,
4   employee relations, disciplinary action.  That all had
5   to be reviewed in 2008 by every associate, and it was
6   called Pathways, and that still exists.
7      Q.     You said the merger happened in '08?
8      A.     Yes.
9      Q.     When the merger occurred, did St.
10  Elizabeth create a new disciplinary policy?
11     A.     No, ma'am.
12     Q.     Okay.
13     A.     We looked at every policy, but we actually
14  adopted the one we have.
15     Q.     Did St. Elizabeth change its
16  anti-discrimination policy?
17     A.     No, ma'am.
18     Q.     Is it appropriate for a supervisor who
19  witnesses an employee engaging in some poor performance
20  conduct -- is it appropriate for that supervisor to
21  alert his manager to that conduct?
22     A.     Yes, ma'am.
23     Q.     What would you expect that manager to do?
24     A.     Take action as needed.

Page 17

1      Q.     If the manager wasn't sure on what action
2   to take, could they go to HR?
3      A.     They call Human Resources.
4      Q.     The disciplinary policy that was in place
5   at the time of Mr. Lehman's termination, according to
6   your testimony, was the same policy that was in place
7   in '08, when Mike Kraft started with the company; is
8   that correct?
9      A.     Yes, ma'am.  Now, it was changed -- any
10  time we looked at the guidelines and there was
11  something we needed to address -- for example, I think
12  it was changed in '10, early '10.  It was for the
13  social media aspect, because that was becoming a big
14  issue, and we added that.  And any time that goes to
15  People Matters, and we have that issue, then there
16  would be an additional change.
17     Q.     What was the social media issue?
18     A.     We were seeing people use their cell
19  phones inappropriately at work and get on the computer
20  inappropriately and those kind of things.
21     Q.     Is HR involved in all levels of
22  discipline?
23     A.     No, ma'am.
24     Q.     Is there a particular level when HR should

5 (Pages 14 to 17)

Lehman vs. St. Elizabeth                    BLANK                        7/25/2012

Page 18

1  be involved?
2      A.    Level IIs and up.  They will call us and
3  ask for advice, but we don't get formally involved in
4  writing the discipline until a Level II.
5      Q.    And generally, the hospital uses
6  progressive discipline; is that correct?
7      A.    We have a progressive discipline policy.
8      Q.    So if the employee is on a Level I and
9  engages in the same conduct that put them on a Level I,
10  should the employee receive a Level II?
11      A.    The policy does give leeway to look at
12  that and address that by circumstance and issue based
13  on what we need to do by severity.  But yes,
14  traditionally, we try to follow the progressive
15  disciplinary policy.
16      Q.    And if an employee is on a Level II and
17  engages in conduct that the guidelines say could be
18  Level III or termination, what would typically happen
19  in that situation?
20      A.    If the employee was -- it would depend on
21  the circumstances.
22      Q.    Should an employee be placed on a
23  Level III twice in the same year?
24      A.    We have a a policy on that.  I believe

Page 19

1  two.  No, you can't.
2      Q.    Okay.
3      A.    If you get a Level III and you get any
4  other discipline in the preceding -- postceding 12
5  months, you would be terminated.
6      Q.    Okay.  And it doesn't matter --
7      A.    It's a final notice, is what it is.
8      Q.    Okay.
9      A.    Sorry.
10      Q.    That's okay.  So it doesn't matter if you
11  engage in the same conduct again; it's any conduct,
12  right?
13      A.    Yes.
14      Q.    And that has been consistent with St.
15  Elizabeth's disciplinary policy at least since '08?
16      A.    Well, before that, but yes.
17      Q.    The policy, the disciplinary policy,
18  including the guidelines, at the time that Mr. Lehman
19  was terminated, indicated that, for the first offense
20  of sleeping, an employee should receive a Level III; is
21  that correct?
22      A.    That was the guidelines, yes.
23      Q.    And then there's been testimony that those
24  guidelines have been changed; is that correct?

Page 20

1      A.    Yes, ma'am.
2      Q.    And there has been testimony that it
3  changed, I think, sometime between December of '10 and
4  early 2011.  Do you know when it changed?
5      A.    I do not.  The practice went into place
6  immediately.
7      Q.    Okay.
8      A.    But the policy officially, in Compliance,
9  changed as soon as it went to People Matters for a
10  final approval.
11      Q.    And you don't know when that was?
12      A.    I don't know.
13      Q.    So if the practice went into effect
14  immediately, how were the employees notified about
15  that?
16      A.    Well, the sleeping issue was automatically
17  a Level III.  The policy itself never changed.
18      Q.    Okay.
19      A.    So there was always language in the policy
20  to address the severity of the issue, whether or not
21  the guidelines were strictly met as guidelines.  So the
22  decision was made at the time the circumstances were
23  reviewed and the guidelines were used, but because our
24  CEO felt so strongly about employees sleeping on paid

Page 21

1  time, that practice went into place immediately.
2      Q.    You're referring to John Dubis?
3      A.    Yes, ma'am.
4      Q.    All right.  Do you have any involvement in
5  the decision whether or not to accommodate an employee?
6      A.    Yes, ma'am.
7      Q.    And have you been involved in any
8  circumstances in which an employee has requested an
9  accommodation and you've been involved in the decision?
10      A.    Yes, ma'am.
11      Q.    What is your general practice for looking
12  at that situation and how you come up to your
13  resolution?
14      A.    It can come several ways.  It can come
15  from a notice by mouth, so it's a verbal, to Employee
16  Health.  It can come in writing.  It can come from
17  Employee Health following the employee confidentially
18  for their medical reason, and a doctor producing a note
19  saying they need restrictions, and then Employee Health
20  calls us and says, "Can you accommodate?"  And it's an
21  interactive process with the associate and Employee
22  Health and the manager to see what we can do in terms
23  of accommodation.
24      We have a 90-day light-duty policy, so if

Lehman vs. St. Elizabeth                    BLANK                        7/25/2012

Page 22

1   we can accommodate somebody for 90 days in a light-duty
2   assignment, we will.  And then it becomes interactive
3   after that.  We've gone so far as to move someone from
4   another position because they could no longer do the
5   position they were in after a stroke.  So we just have
6   to be asked.  If they need an accommodation, they ask
7   us for one.
8       Q.    And if the employee asks -- well, strike
9   that.  Would you expect a manager to come to either you
10  in HR, or to Employee Health, if they learned that
11  their employee might need an accommodation?
12      A.    I think the manager has to be put on
13  notice that the employee is requesting one.
14      Q.    Right.
15      A.    It could come to the manager.  It could
16  come to Employee Health.  It could come several routes.
17  The important thing is we get notified that there is a
18  need for one or we get asked for one.
19      Q.    Did any of the computer-based training or
20  any materials discussed with employees during
21  orientation -- do any of those things cover
22  accommodations?
23      A.    Yes.
24      Q.    And does St. Elizabeth have a written

Page 23

1   policy that addresses accommodations?
2       A.    In terms of light duty and notification,
3   yes, we do.
4       Q.    And where is that policy located?
5       A.    It's either in the LOA, FMLA -- it's in
6   one of those policies, but I'm not for sure which one.
7       Q.    Is that available to employees on the
8   Intranet?
9       A.    Yeah.
10      Q.    And is it "intra"?
11      A.    "Intra," yes.
12      Q.    Okay.  Have you been involved in any
13  situations in which an employee was denied the
14  accommodation request?
15      A.    Not in Bob's time, but yes, one.
16      Q.    So sometime in December of 2010?
17      A.    Yes.
18      Q.    What was the accommodation requested?
19      A.    He could only work two hours at a time,
20  and he was a nurse, and we couldn't accommodate the
21  assignments.
22      Q.    Okay.
23      A.    Two or three hours -- he couldn't work
24  enough in the shift to get the work done.

Page 24

1       Q.    All right.  When you first saw Roxann's
2   email regarding her conversation with Ken, are you
3   aware -- and I can get that if you need to see it
4   again.  I think it's in here.
5       A.    The email regarding his complaint that he
6   saw Bob sleeping?
7       Q.    Okay.
8       A.    That one?
9             (Reference to previously-marked Kraft
10            Exhibit No. 3.)
11      Q.    I'm going to hand you what was previously
12  marked as Kraft Exhibit No. 3.
13      A.    Okay.
14      Q.    And I think it's the email starting on the
15  third page.
16      A.    Third page.  (Witness reviewing document).
17  Yes.
18      Q.    When you first saw that email, what
19  reaction did you have?
20      A.    Not surprised.
21      Q.    What were you surprised about?
22      A.    I wasn't surprised about anything.  I had
23  dealt with Ken, and we were making him accountable, and
24  he was not happy with that process.

Page 25

1       Q.    And you think eventually -- I don't know
2   if you responded right away, but you responded pretty
3   quickly to Roxann's email; is that correct?
4       A.    Yes, ma'am.
5       Q.    And in your response, you focused, I
6   believe, primarily on his allegation about Bob
7   sleeping?
8       A.    No.
9       Q.    Is that correct?
10      A.    No.  On this one, we talked about what the
11  meetings with Roxann were intended to be.  And Ken
12  wasn't happy with the process that we put in place, and
13  Ken -- Ken was not a good employee in terms of his
14  behavior.  So we were addressing that behavior, getting
15  a paper trail.  We had the meetings with Doug.  We
16  intended to increase those to a work-improvement plan,
17  communication plan, and the ongoing monthly meetings
18  between HR and his supervisor, which was Mike -- and I
19  think Bob got involved in those too -- primarily to
20  foster the relationship so that they could develop some
21  trust between them.  I think it was pretty well known
22  that Bob and Ken didn't like each other.  I don't think
23  Mike had a lot of respect for Ken either.  And Mike was
24  new to the organization, and, you know, was pretty

7 (Pages 22 to 25)

Lehman vs. St. Elizabeth                    BLANK                            7/25/2012

Page 26

1  frustrated by Ken. So we had to put that paper trail
2  together and make him accountable, and that's what we
3  were doing. And this response back was in lieu of what
4  those meetings were intended to be.
5      Q.    Okay. And did you do anything to
6  investigate Ken's claim that Mike and Bob were either
7  bullying him or harassing him?
8      A.    We did that investigation early on, when
9  he first complained about harassment, because his
10 performance eval was low. So at that time we
11 determined, because I had already been through that
12 once with him, that that was not occurring, and we
13 basically told him that. He didn't agree with us, but
14 we felt like there was no harassment from either Ken or
15 Bob -- or Bob or Mike towards Ken at any time. They
16 were making him accountable.
17     Q.    So in your response, you addressed the
18 meetings and what the purpose of the meetings were, and
19 then you also addressed that, or stated that you worry
20 about the sleeping complaint and then noted that "We
21 need to document that we looked into that." Why did
22 you feel like you needed to document that you looked
23 into that?
24     A.    So that Ken wouldn't have anything to lay

Page 27

1  his hat on, and that what he told us we took seriously
2  in the spirit of, "Okay, we will look into that," and
3  that's what we did.
4      Q.    Obviously, you received Mike Kraft's
5  response --
6      A.    Um-hmm (nodding head affirmatively).
7      Q.    -- indicating that Bob had been completing
8  his duties in a timely manner and he had assigned him
9  some additional responsibilities and he essentially had
10 no concerns with Bob's performance; is that correct?
11     A.    Yes, ma'am.
12     Q.    But you still felt like there needed to be
13 some kind of investigation; is that correct?
14     A.    We needed to cover it, yes.
15     Q.    Now, what was your role in the
16 investigation?
17     A.    I did not have a role.
18     Q.    Did you assign a role to anyone?
19     A.    Roxann had that responsibility because
20 that was her service line.
21     Q.    And did you and Roxann discuss how she
22 should go about looking into this issue?
23     A.    She's a professional, and she knows her
24 position, and she handled it.

Page 28

1      Q.    Okay. So that would be no, you did not
2  discuss that?
3      A.    I did not discuss it. I didn't need to.
4      Q.    All right. Who did Roxann interview as a
5  part of her investigation?
6      A.    I think the interview actually started
7  between Mike and Kim, and then she talked to Kim, but
8  we didn't see the need to talk to anyone else after
9  that, because Ken saw it, Kim saw it, and Bob admitted
10 it. So we didn't feel like we needed to go beyond
11 that. And we're really sensitive to the fact of
12 getting more employees involved than need to be related
13 to the confidentiality of each associate's issues.
14     Q.    So Mike first spoke with Kim, and then
15 Roxann eventually followed up with Kim; is that
16 correct?
17     A.    She did.
18     Q.    And Kim told Roxann that Mike Boarman and
19 Ken Rasor had alerted her to Bob sleeping, is that
20 correct, on three occasions?
21     A.    I don't know if they alerted her or she
22 saw it too, because she testified she saw it too.
23     Q.    She also said that she wasn't sure if Bob
24 was on a break at the time?

Page 29

1      A.    (Nodding head affirmatively).
2      Q.    Is that correct?
3      A.    I think so.
4      Q.    Okay. Do you know if anyone, whether it
5  was Ken Rasor or Bob or Kim, specifically said that Bob
6  was sleeping when he was not on a break?
7      A.    I know Mike originally said that Bob did
8  not tell him that he was sleeping during a break. He
9  did tell me he slept during a break. But regardless,
10 whether it was the old policy or the new policy, a
11 break is paid time, and you cannot sleep on paid time.
12     Q.    Now, could he have been referring to his
13 lunch break?
14     A.    That's not how it was presented, and
15 that's not what I got from that. I didn't -- I don't
16 know.
17     Q.    How was it presented to you?
18     A.    He was sleeping on his break.
19     Q.    That's all he said?
20     A.    Yes.
21     Q.    All right.
22     A.    And we call breaks, breaks and lunch,
23 lunch, so a break, I assume, is the 15-minute break in
24 the morning.

8 (Pages 26 to 29)

Lehman vs. St. Elizabeth                BLANK                          7/25/2012

---

Page 30

1      Q.     So Mike Kraft had a conversation with Bob
2   to address the sleeping issue; is that correct?
3      A.     Yes.
4      Q.     Did Roxann ever follow up with Bob to
5   specifically interview him, to get his responses to
6   questions regarding whether or not he was sleeping,
7   when he was sleeping?
8      A.     I had the meeting with Bob because Bob was
9   so angry after Mike talked to him the second time about
10  a fitness-for-duty after he claimed it was his
11  diabetes. She didn't do that because Mike did that.
12     Q.     Okay. Did you ask Mike to record in any
13  way what he and Bob had discussed?
14     A.     He took notes, I believe.
15     Q.     He did?
16     A.     Yes. Now, I will go back and say I don't
17  know if those notes were the notes from the meeting
18  with me and Bob, or they were notes of the meeting with
19  Bob. I don't know. I don't remember seeing them.
20  I've looked at so many documents.
21         MS. DAUGHTREY NEFF: Let's mark this.
22         (Blank Exhibit No. 1 was marked for
23         identification.)
24     A.     (Witness reviewing document). These are

---

Page 31

1   my notes.
2      Q.     That's what I was going to ask you.
3      A.     Yes.
4      Q.     So these are your notes?
5      A.     Yes.
6      Q.     And this is from your meeting with Bob, in
7   which Mike Kraft is present; is that correct?
8      A.     Yes, ma'am.
9      Q.     And is it an accurate statement that you
10  and Bob did most of the talking?
11     A.     Yes, pretty much of the talking. I will
12  say that Bob and Mike were both very angry.
13     Q.     Okay.
14     A.     They both apologized later.
15     Q.     Did you ask Bob specifically whether or
16  not he had ever seen any other employee sleeping?
17     A.     I think I did, because he said he had
18  found Charlie and Mike sleeping, and he felt like he
19  had the ability on whether he needed to act on that or
20  not.
21     Q.     Did he indicate to you when he saw Charlie
22  and Mike sleeping?
23     A.     I don't know, but it was my -- from my
24  conversations with Mike, Mike Kraft, that it was not

---

Page 32

1   current. It was during the previous Director or
2   previous management time.
3      Q.     And did you also learn from Mike Kraft
4   that Bob had actually shared what he had witnessed with
5   his supervisor? I think it's Greg Popham.
6      A.     I don't think we got into that
7   conversation. I think Bob was so angry at the time
8   that he was more yelling about some of this stuff about
9   if he had the discretion to act on it or not. And I
10  will say I respect Bob very much. And we've known each
11  other a very long time. And I was really sad for him
12  that we were in this situation. And I believe I told
13  him that. And he responded back in kind.
14         So we had a good relationship previously.
15  We didn't see each other a lot, but we had a good
16  relationship. And he did calm down, and he apologized,
17  and he agreed to go to the fitness-for-duty by the end
18  of it, because I was concerned, because our
19  fitness-for-duty policy says that if there is a medical
20  reason that you present, then we have to determine that
21  you're safe to do your role, and it's grounds for
22  termination if you don't. And that's what I explained
23  to him during this meeting, and he changed his mind and
24  said he would?

---

Page 33

1      Q.     It's grounds for termination if you don't
2   go through?
3      A.     A fitness-for-duty.
4      Q.     Okay. You have a fitness-for-duty policy?
5      A.     We do.
6      Q.     Where is that located?
7      A.     In Compliance 360.
8         MS. DAUGHTREY NEFF: I don't have all of
9   the policies memorized, but I don't know if we
10  got that one.
11         MS. SCHOENING: I don't know without
12  looking through my documents.
13         MS. DAUGHTREY NEFF: I know. Yeah. I
14  don't know. I mean, I know we just kind of asked
15  generally for policies that might be relevant.
16  Obviously, that one might be. So maybe we can
17  check after the deposition. I'll check to make
18  sure, see if we have it, and if we don't, then
19  I'll make a request.
20         MS. SCHOENING: Okay.
21     Q.     All right. So also during this meeting
22  with Bob, you told him that sleeping at work was a
23  Level III discipline by policy, correct?
24     A.     Correct.

---

AMS DEPO
(513) 941-9464     amsdepo@fuse.net     Cincinnati, Ohio

Lehman vs. St. Elizabeth                    BLANK                    7/25/2012

Page 34

1    Q.    Part of Bob's anger or frustration during
2    the meeting was related to the fact that, when Mike
3    first told him that he was going to be disciplined, he
4    told him that he was going to get a Level I; is that
5    correct?
6    A.    Is that what Mike told you, or is that
7    what Bob told you?
8    Q.    No, that's what I'm asking you.  Did Bob
9    express that part of his frustration was because he
10   thought it was a Level I and now he's being told it's a
11   Level III and he has to go to a fit-for-duty?
12   A.    I don't remember that piece.  I do know
13   that Mike called me from his office with Bob, saying
14   that he had Bob with him at that time, and Bob was very
15   angry, because I think Mike had called me about the
16   diabetes issue, and I said we need to do a
17   fitness-for-duty.  I don't remember that Level I or
18   Level III, but I told him it would minimally be a
19   Level III.
20   Q.    Well, according to your notes, you told
21   him sleeping at work is a Level III discipline by
22   policy, right?
23   A.    Other disciplines in-house have received a
24   minimum of a Level III discipline for sleeping at work.

Page 35

1    He is not an exception to that.
2    Q.    And the sentence --
3    A.    Oh, yes, sleeping at work is a Level III
4    discipline, that's true.
5    Q.    All right.  And did you tell him during
6    that meeting that he may be terminated?
7    A.    I'm sorry.  Did I write it?  I don't
8    remember if I told him that.  I did say, "Failure to
9    cooperate with the fitness-for-duty would be a
10   terminable offense."
11   Q.    The last sentence before the italicized
12   portion says, "Human Resources have been working with
13   Ken and Mike is aware of those interactions."  Were you
14   saying Mike Kraft was aware of those interactions?
15   A.    Yes.
16   Q.    All right.  And then you have a note from
17   August 23rd that you learned that Bob had gone to
18   Employee Health; is that correct?
19   A.    Yes.
20   Q.    And that he's on suspension for
21   fitness-for-duty until disposition by Employee Health,
22   so until they've completed their review; is that
23   correct?
24   A.    Right.

Page 36

1    Q.    All right.
2    A.    And I think we put him on medical leave.
3    So he got STD.  He got short-term disability after his
4    40 hours of PTO, if he had any, but I think he was
5    short on time.  And then he had his vacation in there
6    somewhere.
7    Q.    And was it Gerald Hynko who put him on
8    STD?
9    A.    Employee Health -- I don't know if it was
10   Gerald, but Employee Health handles that.  They put
11   everyone on STD, and then they return them.
12   Q.    Now, at the time that you referred Bob to
13   a fit-for-duty exam, you were aware that there had been
14   some -- strike that.  At the time that Bob was going
15   through the fit-for-duty process, you were aware that
16   there was some other employees who were similarly going
17   through the fit-for-duty process for sleeping; is that
18   correct?
19   A.    There was one other.  And I don't remember
20   the timing, but I believe it was the nurse who fell
21   asleep at the Mayo stand.  The Mayo is a tray next to
22   the OR table, and I believe it was her.  It took a long
23   time because there were issues, but I don't remember.
24   Q.    Now, when you first spoke to Mike Kraft

Page 37

1    before your meeting with Bob and Mike, he's the one who
2    told you that Bob had indicated his diabetes might be
3    the cause of his sleeping; is that correct?
4    A.    Correct.
5    Q.    Bob didn't mention he also had sleep
6    apnea; is that correct?
7    A.    I wasn't aware of that.
8    Q.    You became aware that he also had sleep
9    apnea during the fit-for-duty process; is that correct?
10   A.    I don't think I even knew that because I
11   never saw the occupational exam.  The only thing that I
12   think I heard when I got the report from Gerald was
13   that sleep apnea was not a reason.  So I guess you
14   could make the assumption he would have heard that, and
15   that the only acceptable reason for sleeping at work
16   was narcolepsy.  Sleep apnea infers that you go to
17   sleep and you stop breathing while you're sleeping.
18   Q.    Right.  And if you have severe sleep
19   apnea, it can certainly limit how much sleep you're
20   actually getting; is that correct?
21   A.    It could, yes.
22   (Blank Exhibit No. 2 was marked for
23   identification.)
24   Q.    All right.  Lisa, you've been handed what

10 (Pages 34 to 37)

Lehman vs. St. Elizabeth                    BLANK                    7/25/2012

Page 38

1    has been marked as Exhibit No. 2 to your deposition.
2         A.    Yes.  (Witness reviewing document).
3         Q.    So I want you to focus on your email to
4    Roxann and Marty dated September 15, 2010 at 9:20 a.m.,
5    where you state, "Well, based on what Gerald said, Dr.
6    Haskell said sleep apnea is not going to be considered
7    a valid medical excuse for sleeping on the job and only
8    narcolepsy would be something you would have to look
9    at."  So based on your previous testimony, are you
10   indicating that you were not told that Bob had sleep
11   apnea?
12        A.    I was when Gerald called me, but I didn't
13   know it at the time that you asked me.
14        Q.    So by September 15th, 2010, you became
15   aware that he also had sleep apnea?
16        A.    (Nodding head affirmatively).
17        Q.    And that was based on what Gerald had told
18   you?
19        A.    Yes.
20        Q.    What do you remember from your
21   conversation with Gerald?
22        A.    Just that -- I don't remember if Bob was
23   completed with his fitness-for-duty, but that Dr.
24   Haskell was going to give his final recommendations.

Page 39

1    And recommendations for medical conditions and whether
2    we should have restrictions or if the employee has
3    restrictions comes from Dr. Haskell, not Gerald.
4         Q.    Okay.
5         A.    Gerald does not and should not give
6    advice, because he doesn't make the decisions, Dr.
7    Haskell does.  So Dr. -- I guess we were waiting on Dr.
8    Haskell to finally get the final report on whether or
9    not it was a valid reason for sleeping at work.  This
10   is the first one we've had.
11        Q.    The first one you've had of what?
12        A.    Of sleep apnea, versus narcolepsy, versus
13   review that I can remember.
14              (Blank Exhibit No. 3 was marked for
15              identification.)
16        Q.    All right.  Lisa, you've been handed what
17   has been marked as Exhibit 3 to your deposition, which
18   appears to be an email from Roxann to you and to Marty
19   dated September 14th, 2010.  Do you remember receiving
20   this email?
21        A.    Yes.
22        Q.    Do you believe you had already spoken with
23   Gerald by September 14th?
24        A.    He may have called Roxann first.  I don't

Page 40

1    remember.
2         Q.    And according to Roxann's email, Gerald
3    met with Dr. Haskell to discuss Lehman and other
4    situations, and it appears that they'll be recommending
5    that no medical excuse will be acceptable for falling
6    asleep on the job except narcolepsy.  So at least,
7    according to this, it appears that Gerald is indicating
8    that both he and Dr. Haskell will be recommending; is
9    that accurate?
10        A.    I do.  Gerald doesn't have that power.
11        Q.    In parenthesis it says "to discuss Lehman
12   and other similar situations."  Is the other similar
13   situation the RN who fell asleep at the Mayo stand?
14        A.    I believe so.  That was happening around
15   the same time.  I don't know what the time was with
16   Kruthoffer, so I don't really know.  We don't get
17   audited by the EEOC, so I don't know what that means.
18        Q.    All right.  So you were referring to the
19   last sentence that says, "Gerald said the actual duties
20   would overrule the job description, even if not
21   current, if we are being audited by the EEOC"?
22        A.    I don't even know what that is.  We have
23   never been audited by the EEOC, so I'm not even sure
24   what that is.

Page 41

1         Q.    Are you aware of any employees filing EEOC
2    charges?
3         A.    We've had some.
4         Q.    And when an employee files an EEOC charge,
5    current or former employee files an EEOC charge, does
6    the EEOC request some information from you?
7              MS. SCHOENING:  Objection.  Go ahead and
8         answer.
9         A.    Yes, usually.
10        Q.    And typically, the EEOC would like a
11   position statement, the position of the organization,
12   defending itself on the charges; is that correct?
13        A.    Correct.
14              MS. SCHOENING:  Objection.
15        Q.    Does the EEOC also ask for information
16   about other employees who are in similar situations?
17              MS. SCHOENING:  Objection.  Answer it if
18        you can.
19        A.    I don't remember that we've ever produced
20   huge documents of anybody.
21        Q.    Is it possible that Gerald was just
22   referring to "audited by EEOC," meaning if Bob or other
23   employees filed EEOC charges?
24              MS. SCHOENING:  Objection.

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    BLANK                    7/25/2012

Page 42

1       A.    I don't even know what that means.
2       Q.    Okay.
3       A.    We've never been audited by the EEOC, so
4   I'm not sure what an audit is.
5       Q.    Did you ever ask Gerald what he was
6   talking about?
7       A.    I didn't.  Primarily, Gerald shouldn't
8   have done that, and I -- that's Gerald's way, so (did
9   not finish response) --
10      Q.    What do you mean "Gerald shouldn't have
11  done that"?
12      A.    He doesn't give us advice on -- he doesn't
13  make the decisions.  HR, the employer side, makes the
14  decisions.  He was Employee Health.  That was his role.
15  So he needed to make sure that the employees go through
16  the process.  Dr. Haskell is the determining decision.
17      Q.    And Gerald actually, after first meeting
18  with Bob, recommended that he be accommodated; is that
19  correct?
20      A.    It was my knowledge no accommodation was
21  asked for.  He never asked that of me, and I was not
22  made aware ever that he asked for accommodation.  I
23  don't know what Gerald meant by that statement, because
24  he never notified me that he asked for any

Page 43

1   accommodation.
2       Q.    Well, Bob could have requested an
3   accommodation through Gerald; isn't that correct?
4       A.    He could have, I guess.
5       Q.    And you didn't interpret Bob's statement
6   that his fatigue was caused by his diabetes as an
7   essential request for accommodation?
8       A.    I did not.
9       Q.    You don't expect your employees to be
10  experts on using magic words to request an
11  accommodation, do you?
12      A.    I don't, but I do expect them not to
13  violate the policies that are in existence.
14      Q.    Okay.
15      A.    The infraction had already occurred.
16      Q.    So what was the purpose of the
17  fit-for-duty exam, then?
18      A.    To determine if there was really a medical
19  reason for him sleeping at work.  Sleeping infers
20  purposeful, "I went to sleep at work."  So we needed to
21  make sure that there wasn't a medical reason that he
22  uncontrollably was falling asleep.
23      Q.    Did you tell Bob that, even if his
24  sleeping had been caused by his medical condition, that

Page 44

1   he would still be disciplined?
2       A.    I don't know.  I don't know.  And I
3   honestly didn't write it after the meeting.  I was
4   hopeful that it would work out okay.  I just couldn't
5   guarantee it at that time, and I didn't want to promise
6   that all was going to be clear, because I just didn't
7   know what it would show.  And I did encourage him to
8   cooperate with the process and throughout the process.
9       Q.    Which he did?
10      A.    He did.
11      Q.    After you met with Bob and Mike Kraft on
12  August 20th, did you have any further conversations
13  with any employee of St. Elizabeth about investigating
14  or what to do with Bob Lehman?
15      A.    I did not.
16      Q.    At some point did you alert Marty Oscadal
17  to the allegation?
18      A.    Yes, ma'am.
19      Q.    And why did you alert him?
20      A.    I keep him involved in what was going on.
21      Q.    Do you alert Marty any time you have a
22  potential Level III disciplinary action?
23      A.    It varies on the significance.
24      Q.    Did you make a conscious decision to alert

Page 45

1   Marty to this particular situation?
2       A.    It was a timing issues, I think.  He had
3   already talked to John after that date.  I don't know
4   what the date was, and I don't know when the
5   conversation occurred.  So when he came to me and asked
6   me about it, I said yes, this was going on.  I made him
7   aware that Bob was undergoing a fitness-for-duty.
8       Q.    Your recollection is that Marty came to
9   you after already speaking with John Dubis?
10      A.    Yes.  I think that occurred around or
11  after the 25th.
12      Q.    Did Marty tell you anything about his
13  conversation with John Dubis?
14      A.    At that time, around the 25th.
15      Q.    What did he tell you?
16      A.    That John was very intolerant of anyone
17  sleeping on paid time.  He didn't feel like any
18  employee should be sleeping on paid time, no matter
19  what the reason.
20      Q.    Anything else that you can remember
21  Marty relaying to you from his conversation with
22  John?
23      A.    No, because I only remember that as an
24  issue because of Rickey, so that's why the date is in

12 (Pages 42 to 45)

Lehman vs. St. Elizabeth                    BLANK                         7/25/2012

Page 46

1    my brain.
2         Q.    Rickey?
3         A.    Made to Rickey.
4         Q.    Amanda Rickey had been disciplined for
5    sleeping; is that correct?
6         A.    Correct.
7         Q.    And she had actually first received a
8    Level III?
9         A.    Correct.
10        Q.    Had you spoken with Marty Oscadal about
11   her Level III?
12        A.    I did not, and I didn't know the
13   conversation had occurred with John.  So that's why she
14   got the Level III.  Her circumstances were a little
15   different, in that she went to her supervisor and told
16   her she wasn't feeling well and wanted to lay down.
17   The Supervisor or Charge Nurse at night got mad, called
18   the House Supervisor.  The House Supervisor came in and
19   said she can't sleep at night.  But she was feeling
20   ill.  She decided to stay the shift, I believe, but she
21   got a Level III.  And this was before knowing how John
22   felt about it -- we had a new COO -- what his feelings
23   were on it, and I was notified later that a Level III
24   was given.

Page 47

1              (Blank Exhibit No. 4 was marked for
2              identification.)
3         A.    (Witness reviewing document).  This is
4    what I was referring to.
5         Q.    Now, according to Blank Exhibit No. 4,
6    according to this document, it states that Amanda
7    Rickey was observed sleeping during her scheduled shift
8    on Saturday, August 21st, at 12:40 a.m. and that
9    "witnesses stated that she was sleeping in an empty
10   patient room and that the House Supervisor had to come
11   in and wake her up."  It doesn't say anything about her
12   being ill or asking another supervisor to lay down or
13   anything like that.
14        A.    She didn't put it in there, but that was
15   the circumstances of what happened that night.
16        Q.    Did Amanda have to go through a
17   fit-for-duty exam?
18        A.    No.  She was ill that night.  And she
19   didn't ask for any medical accommodations.  And we
20   didn't know of any other reason.  She just didn't feel
21   good.
22        Q.    Who prepared this memorandum?
23        A.    Shauna Dynes.
24        Q.    And it's dated August 25th, 2010.

Page 48

1         A.    Um-hmm (nodding head affirmatively).
2         Q.    After you spoke with Marty, did you do
3    anything to alert Shauna or Sandra McCormick of John
4    Dubis' feeling about sleeping?
5         A.    It was already done.  This was already
6    done before Marty told me.  I didn't even know these
7    conversations had gone on until after this was done.
8         Q.    Was Amanda asked to sign this?
9         A.    Yes.
10        Q.    And did you guys maintain a signed copy of
11   this memorandum?
12        A.    Probably so.  We probably printed this off
13   the computer because we log them so we don't lose them,
14   because when you get a Level III like this, you lose
15   Gainsharing and other things.  So I'm sure there is a
16   signed copy.
17        Q.    Do you believe that she was actually given
18   a copy of this on August 25th --
19        A.    Yes.
20        Q.    -- or do you know?
21        A.    She would have had a copy.  We make three
22   copies when we give disciplines formally like this.
23        Q.    And do you know if she got it on the 25th
24   or some other date?

Page 49

1         A.    I don't know.
2         Q.    Okay.
3         A.    I think it was the 25th.
4         Q.    Amanda was a Registered Nurse; is that
5    correct?
6         A.    Correct.
7         Q.    And Amanda was -- was she on an actual
8    break at the time?
9         A.    I don't know.  I think she was ill and
10   told her Charge Nurse that she was going to go lay
11   down, and the Charge Nurse got mad about it and called
12   the supervisor.  But I don't know if it was her break
13   or if she told her it was her break.
14        Q.    Amanda was caught sleeping a few months
15   after that; is that correct?
16        A.    Correct.
17        Q.    And in fact, when she was caught sleeping,
18   she also smelled of alcohol?
19        A.    Yes.
20        Q.    And she went through a fit-for-duty, and
21   there was alcohol in her system?
22        A.    Yes.
23        Q.    Is that correct?  Any employee who has
24   alcohol in their system, is that grounds for immediate

13 (Pages 46 to 49)

Lehman vs. St. Elizabeth                    BLANK                         7/25/2012

Page 50

1  termination?
2      A.    It is.
3      Q.    So even if she hadn't been found
4  sleeping --
5      A.    She would have been terminated.
6      Q.    She would have been terminated for the
7  alcohol, correct?
8      A.    Yes, ma'am.
9      Q.    However, at the time Amanda was on a
10 Level III --
11     A.    Yes.
12     Q.    -- right?  And she was actually terminated
13 in early 2011, so this would have been after the policy
14 change for sleeping; is that correct?
15     A.    Yes.
16     Q.    So she had a lot of strikes against her?
17     A.    She did.
18           MS. DAUGHTREY NEFF:  Mark this.
19           (Blank Exhibit No. 5 was marked for
20           identification.)
21     Q.    All right.  Lisa, you've been handed what
22 has been marked as Exhibit 5 to your deposition.
23     A.    (Witness reviewing document).
24     Q.    Did you create this document?

Page 51

1      A.    I did.
2      Q.    And what information did you use to create
3  it?
4      A.    PeopleSoft.
5      Q.    Okay.  Do the termination forms get
6  entered into PeopleSoft?
7      A.    Yes.
8      Q.    Like the information that's on the
9  termination form?
10     A.    (Nodding head affirmatively).
11     Q.    Okay.  Sorry.  Go ahead.
12     A.    No, I'm thinking.  There might be a
13 comment section or something that we don't have room
14 for, but we try to keep the paper copy now.
15     Q.    Okay.
16     A.    But we're trying to go as paperless as we
17 can.
18     Q.    The Cynda Carman, should that be October
19 19th, 2010?
20     A.    (Witness reviewing document).  Okay.  It
21 should.  I'm sorry.
22     Q.    That's okay.
23     A.    That's a typo.
24     Q.    She was a Registered Nurse.  Was she the

Page 52

1  other nurse who fell asleep at the Mayo?
2      A.    Yes, ma'am.
3      Q.    And was that during a surgery?
4      A.    During a case, yes.
5      Q.    Donald Kannady is also a Registered Nurse;
6  is that correct?
7      A.    Yes, ma'am.
8      Q.    And he's listed as "Unauthorized
9  sleeping/unsatisfactory performance."  Did Donald have
10 a Level II disciplinary action at the time that he was
11 found sleeping?
12     A.    I don't remember.
13     Q.    Okay.
14     A.    He was a Grant County nurse.  I don't
15 remember.
16     Q.    Bob Lehman is listed as "Job
17 Performance/Requested by Medical Center."  Why is "job
18 performance" on there?
19     A.    He was a supervisor.  But I don't -- that
20 could have -- this is not PeopleSoft right here.  I
21 should clarify that.
22     Q.    Okay.
23     A.    These were my own notes that I kept on an
24 Excel sheet on my computer for people who were

Page 53

1  sleeping.  All of this came from PeopleSoft, every bit
2  of this (indicating).  This (indicating) did not.
3      Q.    For the record --
4      A.    Yeah, the "Issue" side.
5      Q.    The "Issue" section is not from
6  PeopleSoft?
7      A.    Right.
8      Q.    You think that's from your own notes?
9      A.    I think it's from my Excel sheet from my
10 computer.
11     Q.    You have an Excel sheet for people
12 sleeping?
13     A.    This is it.
14     Q.    When did you create it?
15     A.    I created it at the request of Kelly.
16     Q.    So it was after the lawsuit had been
17 filed?
18     A.    I don't remember the timing.  There's no
19 date on it.  I don't remember.  It's ongoing.  It's a
20 living document.
21           (Reference to previously-marked Kraft
22           Exhibit No. 4.)
23     Q.    I'm going to show what you has been marked
24 as Kraft Exhibit No. 4.

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    BLANK                          7/25/2012

Page 54

1      A.    Yeah.  (Witness reviewing document).
2      Q.    On Kraft Exhibit No. 4, it references Mr.
3   Lehman's job performance under several categories; is
4   that correct?
5      A.    Yes.
6      Q.    All right.  And did he get anything below
7   expectations on any of the categories?
8      A.    He did not.
9      Q.    Robert Gordon Landers, was he terminated
10   on the same day, September 22nd, 2010?
11      A.    I think so.  I think it occurred around
12   the same time.
13      Q.    And the issue there, it says, "Requested
14   by medical center."  Mr. Landers was a Security Officer
15   in Florence; is that correct?
16      A.    I think so.  I mean, we have a lot of
17   employees, so I don't want to say yes if I'm not for
18   sure.  But yeah, I think so.
19      Q.    Okay.  And --
20      A.    And I can tell you why it said that.  If
21   you look at the reasons on this sheet, in PeopleSoft,
22   we only have so many drop-down boxes, so we don't have
23   "unauthorized sleeping" as a reason, even though it
24   falls under a disciplinary policy, so we use "requested

Page 55

1   by the medical center" for a lot.
2      Q.    All right.  So is it possible that Mr.
3   Landers did not actually go for a fit-for-duty exam?
4      A.    I don't know if he did or didn't.
5      Q.    Did you have any conversations with John
6   Dubis about Bob Lehman?
7      A.    I did not.
8      Q.    Did you have any conversations with John
9   Dubis about Amanda Rickey?
10      A.    I did not.
11      Q.    How about Cynda Carman?
12      A.    No.
13      Q.    Donald Kannady?
14      A.    No, ma'am.
15      Q.    Robert Gordon Landers?
16      A.    No, ma'am.
17      Q.    Teresa Porter?
18      A.    I'm saying no, I didn't.  Marty may have.
19      Q.    Okay.  I'm just asking about you.
20      A.    Yeah.
21      Q.    Emily Seibel, did you have any
22   conversations with John Dubis about Emily?
23      A.    I did not.
24      Q.    Were you aware of or involved in, in some

Page 56

1   way, the terminations of all of those employees that I
2   just listed?
3      A.    I reviewed all of them.
4      Q.    Okay.  Were you aware that Emily Seibel
5   was on a Level III when she was caught sleeping during
6   a meeting?
7      A.    No, I was not.  I don't remember it.  I
8   may have then.  I don't now.
9      Q.    Okay.  What is a "Chart Management Tech"
10      A.    They work in HIM, Health Information
11   Management, so they do chart reviews, audits, process
12   medical records, histories, HMPs, those kind of things.
13            (Reference to previously-marked Oscadal
14            Exhibit No. 6.)
15      Q.    Okay.  I'm going to hand you what has
16   previously been marked as Oscadal Exhibit No. 6.
17      A.    (Witness reviewing document).
18      Q.    We were talking about Cynda Carman
19   earlier.  According to this document -- Kerry
20   Kleisinger is somebody who reports to you, correct?
21      A.    Yes, ma'am.
22      Q.    And according to this document, Cynda was
23   found sleeping on August 25th, and as you said before,
24   she was falling asleep at the Mayo, and she was unable

Page 57

1   to give the surgeon what he needed.  She was sent
2   through a fit-for-duty because she said that she was
3   being treated for several medical conditions; is that
4   correct?
5      A.    Yes.
6      Q.    Who are Nancy and Carol Ansari?
7      A.    Nurses in the OR, managers.
8      Q.    Okay.
9      A.    This is the one that took so long.
10      Q.    Do you know why it took so long?
11      A.    She didn't cooperate.  She couldn't get an
12   appointment set.  I think there were several
13   outstanding issues with her.  I don't remember exactly
14   what they were.  I just know it took a long time.
15      Q.    Did she remain on a leave of absence
16   between August 25th and October 11th?
17      A.    Yes, ma'am.
18      Q.    All right.  As of October 11th, 2010, you
19   had already received notification from Gerald Hynko
20   that narcolepsy was the only justified reason for
21   sleeping; is that correct?
22      A.    Correct.
23            (Blank Exhibit No. 6 was marked for
24            identification.)

15 (Pages 54 to 57)

Lehman vs. St. Elizabeth                    BLANK                    7/25/2012

Page 58

1    Q.    I think I asked you earlier, Lisa, if you
2 remembered whether or not Emily was on a Level III at
3 the time she was caught sleeping.  Does Exhibit No. 6
4 help refresh your recollection --
5    A.    Yes.
6    Q.    -- that she was?
7    A.    Sorry.  Yes.
8    Q.    If you look at the email from Coree Sipp,
9 the second-to-last sentence, where she states, "Based
10 on recent directive, unauthorized sleeping during work
11 hours is grounds for termination," what was she
12 referring to?
13    A.    That's a he.
14    Q.    I'm sorry.
15    A.    And based on the fact that we were not
16 going to permit any unauthorized sleeping, and it was
17 termination first offense.
18    Q.    And that was John Dubis' directive?
19    A.    Marty's to me, which I directed to my
20 Advisors.
21    Q.    Okay.  When did you direct that to your
22 Advisors?
23    A.    As soon as I was aware.
24    Q.    Was it the same day?

Page 59

1    A.    No, same --
2    Q.    As Marty told you?
3    A.    Yeah.
4    Q.    So --
5    A.    That would have been early.  That would
6 have been the end of August, beginning of September.
7    Q.    So at the end of August, the beginning of
8 September, you told your team that the recent directive
9 that unauthorized sleeping during work hours was
10 grounds for termination?
11    A.    Yes, ma'am.
12    Q.    If that was a recent directive, there
13 would be no way for Bob Lehman to have known that; is
14 that correct?
15    A.    Correct.  But he should have known that he
16 couldn't sleep on paid time.
17    Q.    Why does St. Elizabeth have a disciplinary
18 policy?
19    A.    For consistency of interpretation on
20 guidelines, basic guidelines on how to handle
21 situations.
22    Q.    And do the guidelines help both the
23 managers as well as the employees?
24    A.    It does.

Page 60

1    Q.    And would you expect that employees could
2 rely on the disciplinary policy and those guidelines?
3    A.    They could rely on the policy.  Guidelines
4 are guidelines.  So guidelines give us a starting
5 point.  But yes, they can rely on the policies.
6    Q.    Just like an employee should be able to
7 rely on St. Elizabeth's anti-discrimination policy; is
8 that correct?
9    A.    Correct.
10          (Blank Exhibit No. 7 was marked for
11          identification.)
12    A.    (Witness reviewing document).
13    Q.    All right.  Lisa, you've been handed
14 Exhibit 7 to your deposition.  The only reason I'm
15 asking you is just to clarify your earlier testimony.
16          Does Exhibit 7 help refresh your
17 recollection that Don Kannady was on a Level II for job
18 performance at the time he was found sleeping?
19    A.    Let me read it.
20    Q.    Sure.
21    A.    (Witness reviewing document).  Yes.
22          MS. DAUGHTREY NEFF:  Let's take a quick
23 break.
24          (At which time, a recess was taken from

Page 61

1 10:21 a.m. until 10:35 a.m.)
2          (Reference to previously-marked Oscadal
3          Exhibit No. 2.)
4    Q.    Lisa, I'm going to show you what has been
5 previously marked as Oscadal Exhibit No. 2.
6    A.    (Witness reviewing document).  Okay.
7    Q.    What I would like to ask you is whether or
8 not you and Marty spoke with Gerald following up on
9 that email where Marty indicates, "Lisa, you and I need
10 to talk to him"?
11    A.    I don't think so.
12    Q.    You did talk to him at some point, but you
13 don't believe it was immediately after getting that?
14    A.    I do not.
15    Q.    At the time that you spoke to him, you
16 believe he was indicating to you that Dr. Haskell was
17 recommending that narcolepsy be the only justifiable
18 reason?
19    A.    I don't know what the context of the rest
20 of these emails are since it says he does not have all
21 the medical records he needs on Bob.  I don't know.
22    Q.    Well, I think, in -- I'm sorry.  Can I see
23 your exhibits?
24    A.    Yeah.  Mine?

16 (Pages 58 to 61)

Lehman vs. St. Elizabeth                    BLANK                    7/25/2012

---

Page 62

1    Q.    All of them.
2    A.    All of them?
3    Q.    I can't remember which one it was.  I'm
4    sorry.
5    A.    (Exhibits handed to Ms. Daughtrey Neff.)
6          (Reference to previously-marked Blank
7          Exhibit No. 2.)
8    Q.    Okay.  In Blank Exhibit 2, I believe when
9    you were testifying about that, you had indicated that
10   you think you had already spoken with Gerald before
11   September 15th.
12   A.    Yes, I may have.
13   Q.    Okay.
14   A.    This was the 9th.
15   Q.    Right.
16   A.    I don't know when that call came.
17   Q.    Okay.
18   A.    And I don't know if he made it to Roxann
19   first or me.
20   Q.    Okay.  All right.  At any time between
21   August 20th and September 22nd, when Bob was
22   terminated, did you ask Bob what he meant by "sleeping
23   on breaks"?
24   A.    I did not.

---

Page 63

1    Q.    Did you tell Marty Oscadal that Bob had
2    indicated that he was sleeping on breaks?
3    A.    I may have told him there was an
4    inconsistency, because he told -- he didn't tell Mike
5    that, but he told me that when I met with him with
6    Mike.
7    Q.    And you met with him this same day that
8    Mike had addressed the issue with Bob; is that correct?
9    A.    Yes.  I think so.
10   Q.    You're aware that Bob filed a grievance
11   following his termination?
12   A.    Dispute, yes.
13   Q.    Or a dispute resolution?
14   A.    Yes.
15   Q.    You said that, in preparation for your
16   deposition, you reviewed a letter that Bob had
17   addressed to Doug Chambers, and it was a letter that
18   you had never seen before.  Do you remember that
19   testimony?
20   A.    Correct.
21   Q.    In Bob's letter to Doug Chambers, he
22   indicated that he had told Bob -- or sorry.  He had
23   told Mike Kraft that he had been sleeping on breaks and
24   lunchtime.  Do you remember that from the letter?

---

Page 64

1    A.    I don't, but I didn't read it in detail.
2    Q.    Okay.  If Bob's recollection is that he
3    did in fact tell Mike Kraft that he had been sleeping
4    on breaks and lunchtime, is it possible that Mike just
5    didn't remember that?
6    A.    I don't know.
7    Q.    Did you feel like -- other than his
8    initial anger about having to go through the
9    fit-for-duty exam, did you feel that Bob was being
10   honest and willing to go through the process?
11   A.    I don't determine anybody's honesty.  But
12   he calmed down, he cooperated, and I believed he was
13   sincere in wanting to go through the process.
14   Q.    There have been some other Security
15   Officers who have been accused of sleeping -- I know
16   Robert Landers was one who was -- in the 2010
17   timeframe, and there have been some in 2012; is that
18   correct?
19   A.    I believe so.
20   Q.    And those Security Officers have denied
21   sleeping; is that correct?
22   A.    I'd have to look at the notes.  I don't
23   remember.
24   Q.    Do you feel like -- did you appreciate at

---

Page 65

1    all the fact that Bob wasn't trying to hide that he was
2    sleeping?
3    A.    I did.
4    Q.    In fact, you were aware that the times
5    that he had been seen sleeping by Kim, he was in his
6    office with the door open; is that correct?
7    A.    That's a report, I believe.
8    Q.    But there is no indication from any other
9    employee that he was attempting to hide somewhere?
10   A.    Correct.
11   Q.    When Bob was terminated, he was not
12   offered any severance; is that correct?
13   A.    Correct.
14   Q.    And following his termination, you were
15   aware that he applied for Unemployment benefits?
16   A.    I believe so.
17   Q.    And were you aware that the St. Elizabeth
18   Hospital contested his application for Unemployment?
19   A.    We respond to all Unemployment claims.  We
20   don't consider it a contest.  We respond.  It's our
21   process.
22   Q.    Were you aware that St. Elizabeth hired
23   Kelly Schoening to represent the hospital at the
24   Unemployment hearing?

---

17 (Pages 62 to 65)

Lehman vs. St. Elizabeth                    BLANK                          7/25/2012

| Page 66 | Page 68 |
|---|---|

**Page 66**

1  A.   We would do that if we felt like there was
2  going to be an attorney on the other side.
3  Q.   So were you aware that she was hired to
4  attend the hearing?
5  A.   I don't remember.
6  Q.   Did you attend the hearing?
7  A.   I did not.
8  Q.   Mike Kraft attended the hearing; is that
9  correct?
10  A.   I believe so.  I only know that from the
11  testimony yesterday.
12  Q.   How do you find out when an employee has
13  applied for Unemployment?
14  A.   We get notice.
15  Q.   Is that something that you think the Human
16  Resources Department gets notice of?
17  A.   Yes, ma'am.  We actually encourage
18  employees to apply.  It's not up to us if the decision
19  is made if they get it or not.
20  Q.   Did you provide counsel with any exhibits
21  to use for the Unemployment hearing?
22  A.   I didn't do it, so I can't -- I can't say
23  that.  I wasn't involved.
24  Q.   Do you know if Roxann did?

**Page 67**

1  A.   I do not.  I have not read the
2  transcripts.  I saw them for the first time yesterday.
3  Q.   So when you heard from Marty Oscadal that
4  John Dubis was intolerant of sleeping on paid time no
5  matter what the reason, did he indicate to you at that
6  time that John felt Security Officers should be held to
7  a higher standard?
8  A.   He did.
9  Q.   So he said John is intolerant of sleeping
10  on paid time no matter what the reason, and Security
11  Officers should be held to a higher standard?
12  A.   That's not a quote.  It's just that that
13  was the context of what I understood.
14  Q.   Did he also say Registered Nurses should
15  be held to a higher standard?
16  A.   I don't remember that part, but it's all
17  employees, and that's what we've done consistently
18  since that time.
19  Q.   So all employees are subject to the
20  disciplinary policy; is that correct?
21  A.   Correct.
22  Q.   Now, when Marty told you this, you said it
23  was on August 25th?
24  A.   At or around.  I really don't know.  I

**Page 68**

1  just know that we had already given the Level III to
2  Amanda Rickey.
3  Q.   And you said that you alerted the Advisors
4  that reported to you of this directive from John Dubis
5  that you got from Marty; is that correct?
6  A.   Yes.
7  Q.   Did you discuss specifically anything with
8  Roxann Platek at that time about anything else that she
9  should do to look into the allegations against Bob?
10  A.   No.
11  Q.   Were you aware that she did not interview
12  Kim Difilippo, I think, until after August 25th?
13  A.   I was not because I knew Mike had done it.
14  Q.   Did you feel like there was any reason to
15  interview Kim after Mike had already talked to her?
16  A.   I did not.  I mean, Bob admitted he was
17  sleeping, so I did not.
18  (Blank Exhibit No. 8 was marked for
19  identification.)
20  Q.   Lisa, did you create Exhibit 8?
21  A.   (Witness reviewing document).  I guess I
22  did.  I probably did.
23  Q.   And this is this another Excel
24  spreadsheet?

**Page 69**

1  A.   Yes.
2  Q.   And after several names, you note, "Policy
3  changed to unauthorized sleeping term effective."
4  There's no date.  Does this refresh your recollection
5  when it was effective?
6  A.   It does not.  This sheet is the same sheet
7  as this is (indicating).  But I think when Kelly asked
8  for the sheet, I created this issue so I would
9  remember.  But I don't remember when this was created.
10  It's the same sheet.  It's got the same information on
11  it.
12  (Blank Exhibit No. 9 was marked for
13  identification.)
14  Q.   Lisa, you've been handed what has been
15  marked as Exhibit 9 to your deposition.  What I would
16  like you to do is turn to the last page of Exhibit 9.
17  A.   Okay.  (Witness reviewing document).
18  Q.   And can you confirm that is your signature
19  at the top?
20  A.   Yes.
21  Q.   Did you review this position statement
22  prior to it being submitted to the EEOC?
23  A.   I believe I did.
24  Q.   And it looks like your signature is

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    BLANK                        7/25/2012

Page 70

1    actually notarized; is that correct?
2        A.    Correct.
3        Q.    Did you believe at the time that you
4    signed that document that everything in the position
5    statement was accurate?
6        A.    I believe that.
7        Q.    On the fourth page, which is, at the
8    bottom, BLOOOO56, there is a little chart under
9    "Application of Policy."
10       A.    All right.
11       Q.    I think the EEOC's standard practice is to
12   redact names from -- although I don't know that they're
13   always good about it.  Sometimes they do.  Sometimes
14   they don't.  Under the chart, the first job title
15   listed is "Registered Nurse," "Date of termination" is
16   February 2011, and "Date of birth is ████78."  And if
17   you look at Exhibit 8, does that appear to be -- or
18   actually, the earlier exhibit might be better.  I think
19   it has the term date.
20            (Reference to previously-marked Blank
21            Exhibit No. 5.)
22       Q.    Exhibit 5.
23       A.    (Witness reviewing document).  Okay.
24       Q.    Does that appear to be Amanda Rickey based

Page 71

1    on the date of birth?
2        A.    Yes, it does.
3        Q.    And it doesn't list, at least on this
4    chart, that she had actually received a Level III first
5    in August of 2010; is that correct?
6        A.    That's correct.  It wouldn't be relevant,
7    I guess.
8        Q.    Did you make the decision that that
9    wouldn't be relevant?
10       A.    Well, "sleeping" at that time was a term
11   on the first offense.  It wouldn't have mattered what
12   level of discipline she would have had before.
13       Q.    As of 2011?
14       A.    Correct.
15       Q.    Is that what you're saying?
16       A.    Correct.
17            (Reference to previously-marked Blank
18            Exhibit No. 9.)
19       Q.    If you look above the chart, it says,
20   "About the same time as charging party's employment was
21   terminated, SEHC terminated the employment of six other
22   associates for the same offense of sleeping.  Two of
23   those individuals were under the age of 40."
24       A.    (Witness reviewing document).

Page 72

1        Q.    So do you not feel like it would be
2    relevant to tell the EEOC that Amanda Rickey was
3    actually given a Level III on August 25th, 2010, before
4    she was terminated for the same thing in February?
5            MS. SCHOENING:  Objection.  Answer if you
6    can.
7        A.    I don't know.  I don't know if it's
8    relevant or not.  It didn't matter if they had a Level
9    II or a Level I.  They were sleeping at work.
10       Q.    Right.  The remaining employees -- before
11   we get to the Marketing employee -- were ages 46, 56,
12   68, and 58; is that correct?
13       A.    Correct.
14       Q.    And then the Marketing employee we looked
15   at earlier was Emily Seibel?
16       A.    Yes.
17       Q.    And as we looked at earlier, she was on a
18   Level III at the time that she was found sleeping; is
19   that correct?
20       A.    Yes.
21       Q.    I understand that you did not receive the
22   actual report of Dr. Haskell's --
23       A.    I did not.
24       Q.    -- before Bob was terminated; is that

Page 73

1    correct?
2        A.    Correct.
3        Q.    And you knew from Gerald that narcolepsy
4    was the only justifiable reason for uncontrollable
5    sleeping?
6        A.    According to Dr. Haskell, correct.
7        Q.    And you knew that before Bob was
8    terminated, correct?
9        A.    Yes.
10       Q.    Did you know that Dr. Haskell had
11   determined that Bob's medical conditions did not cause
12   uncontrollable sleeping?
13       A.    Say that again.  I'm sorry.
14       Q.    Prior to Bob being terminated --
15       A.    Yes.
16       Q.    -- did you know that Dr. Haskell believed
17   that Bob's medical conditions did not cause
18   uncontrollable sleeping?
19       A.    Yes.
20       Q.    Okay.  Because, as far as you knew, he
21   didn't have narcolepsy; is that correct?
22       A.    Correct.
23       Q.    Do you know why uncontrollable sleeping
24   was what Dr. Haskell was looking at?

19 (Pages 70 to 73)

Lehman vs. St. Elizabeth                    BLANK                          7/25/2012

---

Page 74

1    A.    In terms of narcolepsy?
2    Q.    No.  I mean, obviously, there are
3  potential other medical conditions that could
4  contribute to being fatigued and sleeping, right?
5    A.    Being fatigued.  Sleeping is a choice.
6    Q.    Why did St. Elizabeth try to determine
7  what would cause uncontrollable sleeping?
8    A.    To determine if it's beyond the
9  associate's control.  Narcolepsy is being unable to
10 stay awake, and there is no choice there by the
11 employee or the person.  It's an uncontrollable
12 condition where you suddenly fall asleep in the middle
13 of the daytime.  And so if that was the reason that was
14 causing the sleeping, then, more than likely, there
15 would have been no discipline.
16   Q.    Could a Security Officer perform his
17 duties if he had narcolepsy?
18   A.    I don't know.  It's never come up.  I
19 honestly don't know.
20   Q.    Do you know if a Registered Nurse could
21 perform his or her duties if she had narcolepsy?
22   A.    Professional opinion, no.  As a nurse, I
23 would think not, but we have not had that issue, so I
24 couldn't give you an independent opinion.  HR hasn't

---

Page 75

1  had that.
2    Q.    One of the employees accused of
3  sleeping -- and I'm sure one of them is in my little
4  pile here.  But one of the employees accused of
5  sleeping was a therapist who was sleeping during
6  physical therapy with patients; is that correct?
7    A.    No.
8    Q.    Was there an employee accused of sleeping
9  during physical therapy with patients?
10   A.    She was a psychologist.
11   Q.    Oh, okay.
12   A.    So she was doing therapy.
13   Q.    Therapy?
14   A.    Therapy.
15   Q.    Not "physical therapy"?
16   A.    No.
17   Q.    Just "therapy"?
18   A.    Yes.
19   Q.    In terms of patient safety and patient
20 care, is that a significant concern that you would
21 have, for a therapist sleeping during therapy?
22   A.    Yes.
23   Q.    Would that therapist be able to, or would
24 you -- strike that.  Would you say that that therapist

---

Page 76

1  was unable to perform his or her duties during the time
2  that she was sleeping --
3    A.    Yes.
4    Q.    -- during the therapy sessions?
5    A.    Yes.
6    Q.    Okay.  All right.  At some point the
7  decision was made to terminate Bob's employment instead
8  of giving him a Level III; is that correct?
9    A.    Yes.
10   Q.    And when was that decision made?
11   A.    When the information came back from
12 Employee Health and Marty made the call.
13   Q.    Okay.  Would you say that Marty was the
14 ultimate decision-maker?
15   A.    I would.
16   Q.    Okay.
17   A.    He and Doug.
18   Q.    Did you have any conversations with Doug
19 about what form of discipline to give Bob?
20   A.    I don't believe so.
21   Q.    Did you give your opinion as to whether or
22 not Bob should be terminated?
23   A.    Yes.
24   Q.    And what was your opinion?

---

Page 77

1    A.    I did not want to see Bob terminated.  The
2  hospital had every right by policy to do what they did,
3  but the personal side of me, because I respect Bob so
4  much, I did not want to see him terminated.
5    Q.    You're aware that Bob had been employed by
6  the hospital for over 30 years at the time of his
7  termination?
8    A.    Yes, ma'am.
9    Q.    And were you familiar with his --
10 generally familiar with his performance history?
11   A.    I was not.
12   Q.    Does HR have the ability to look up an
13 employee's past performance reviews?
14   A.    Yes.
15   Q.    Would that be in PeopleSoft?
16   A.    It's in a system called SuccessFactors.
17   Q.    Okay.
18   A.    It's an electronic database of performance
19 evals.  But we have 7,000 employees, so we don't go
20 into each employee's file to look it up.  We just make
21 sure we're compliant in getting them.
22   Q.    You were not aware of any performance
23 concerns that either Mike Kraft or Greg Popham had
24 about Bob's performance?

20 (Pages 74 to 77)

Lehman vs. St. Elizabeth                    BLANK                        7/25/2012

---

Page 78

1      A.    I never talked to Greg Popham about Bob.
2      Q.    And you weren't aware of anything from
3   Mike Kraft either; is that right?
4      A.    I was not.
5      Q.    And Doug Chambers hadn't raised any
6   concerns about Bob's performance to you?
7      A.    Not to me.
8      Q.    Were you aware of him raising any concerns
9   to anyone else?
10     A.    I was not.
11     Q.    Do you know whether Marty had any kind of
12   subsequent conversation with John Dubis following his
13   communication to him in late August, maybe early
14   September, where Marty relayed to you that John said he
15   was intolerant of sleeping?
16     A.    I don't know. I couldn't speak to his
17   meetings with John.
18     Q.    But you believe he met with Doug Chambers?
19     A.    I think he may have talked with him. I
20   don't know if it was a meeting.
21     Q.    Did he ever he relay anything to you about
22   his communication with Doug?
23     A.    No, ma'am.
24     Q.    After you learned from Marty that the

---

Page 79

1   decision was being made to terminate Bob, did you
2   apprise anybody of that information?
3      A.    Roxann.
4      Q.    Did you give her any advice on what to do
5   after that?
6      A.    I just wanted to make sure she reviewed
7   all the specifics at the end of termination and gave
8   him his dispute rights.
9      Q.    And that is standard procedure --
10     A.    It is.
11     Q.    -- for the employee being terminated?
12     A.    I'm sorry. It is.
13     Q.    Bob was only allowed to file an
14   administrative dispute; is that correct?
15     A.    Yes, ma'am.
16     Q.    And why is that?
17     A.    We have a policy in place for dispute
18   resolution that has been formalized in -- I believe it
19   was '08. It shows two branches, two routes for
20   employees to take, but there is language in the policy
21   that allows for people who have direct reports, and
22   because he had more than -- I think the policy says
23   "more than two direct reports," he can go the
24   Administrative Pathway.

---

Page 80

1      Q.    And he cannot go the Peer Review Pathway?
2      A.    He cannot go to Peer Review. And
3   actually, the policy mimicked the Health Alliance
4   policy. And it is not a legal proceeding. We have no
5   attorneys there. The associate can't either.
6      Q.    Right. If an employee goes through the
7   administrative process for grieving their termination,
8   does each level of administration receive a binder or
9   some documents of the investigation that led to the
10   employee's termination?
11     A.    It depends on how detailed it is and what
12   they need. But usually, I know from my experience, the
13   Vice Presidents really want to hear from the employee.
14   So they want to hear the voice of the employee, and
15   it's really the employee's time to really voice their
16   issue. It was -- I mean, Bob admitted to sleeping on
17   breaks. Breaks is paid time. So if he did admit to
18   sleeping on paid time, then it was up to him to talk to
19   that person and sway them to change their mind or
20   recommendation.
21     Q.    Was Bob terminated simply because he was
22   sleeping?
23     A.    Sleeping was the primary reason. But as a
24   supervisor -- I think from what I was told, he was a

---

Page 81

1   supervisor and should have known that he could not have
2   done that.
3      Q.    What about the fact that he didn't
4   discipline the employees that he saw sleeping? Do you
5   know whether that factored into the termination?
6      A.    I don't know. I know he said he saw
7   others sleeping and he thought it was at his discretion
8   to do it or not, which is what he told me when I met
9   with him. But it was old; it wasn't current sleeping
10   issues. So I don't know.
11     Q.    Why would that have been something that
12   was raised in his termination meeting by Mike Kraft and
13   Roxann Platek?
14     A.    I don't know.
15     Q.    Was it something that you told Roxann?
16     A.    No. But I know that -- I want to clarify
17   that. I know that Marty said to me that supervisors
18   should be held to a higher level, and John Dubis felt
19   the same way. So I may have told her that.
20     Q.    And you didn't do anything to investigate
21   the other people that he said he saw sleeping?
22     A.    No. It was not current.
23     Q.    Would Bob have been able to access any
24   documents in the possession of St. Elizabeth after his

---

21 (Pages 78 to 81)

Lehman vs. St. Elizabeth                    BLANK                        7/25/2012

Page 82

1   termination to use during the grievance process?
2        A.    Policies, yes.
3        Q.    But if he wanted to get access to the --
4   I'm looking for the name -- the dispatch log that was
5   maintained in the Security office, he would not have
6   access to that; is that correct?
7        A.    He could have asked us for it.
8        Q.    He asked for Dr. Haskell's report; isn't
9   that correct?
10       A.    I don't know.  We wouldn't have access to
11  that, so I don't know if he did or not.  Did he?
12       Q.    You don't remember him asking Roxann
13  Platek for Dr. Haskell's report?
14       A.    I don't know.  I don't remember.
15       Q.    Could Roxann have facilitated him getting
16  a copy of that without seeing it herself?
17       A.    When associates want their medical
18  records, we refer them to Employee Health, so I feel
19  confident that he could have gone down there to get it,
20  but we wouldn't keep medical records in HR.
21       Q.    Have you attended termination meetings
22  before?
23       A.    Yes, I've done that.
24       Q.    And is it your typical practice to outline

Page 83

1   points that you think the manager should cover during
2   the termination meeting?
3        A.    Roxann does.
4        Q.    Is that not your typical practice?
5        A.    No, ma'am.
6        Q.    Is there any reason why you don't
7   typically do that with managers?
8        A.    Roxann does talking points.  There is
9   another form that I use basically, and it's an HR form
10  that just has a check-off list to talk about benefits,
11  termination, dispute, timelines, what we would say on
12  MedVerify, those kind of things.
13       Q.    Does St. Elizabeth use MedVerify?
14       A.    Yes.
15       Q.    Do you have access to the information that
16  is included on MedVerify for Bob?
17       A.    If I looked it up, yes.
18       Q.    Do you know what it says?
19       A.    I do not.  It should match PeopleSoft
20  because it's a feed.
21       Q.    It is a "fee," you said?
22       A.    A "feed."
23       Q.    Oh, a "feed."
24       A.    Like an electronic feed.

Page 84

1        Q.    What does PeopleSoft say?
2        A.    I'm assuming it says "Requested by the
3   medical center."
4        Q.    Okay.  MedVerify also includes things like
5   "Eligible for rehire;" is that correct?
6        A.    It's marked "Deferred."  We don't say
7   "yes" or "no."
8        Q.    And then MedVerify also, I think, has
9   something about whether or not the employee met their
10  "Quality or quantity of work"?
11       A.    We don't fill that out.
12       Q.    So what information does get filled out?
13       A.    "Term Reason," Date of Hire," Hours," I
14  believe, and "Rehire Status" is "Deferred."
15       Q.    When the hospital is hiring employees, do
16  you get MedVerify information on the employees?
17       A.    We do.
18       Q.    Potential employees?
19       A.    (Nodding head affirmatively).
20       Q.    And when you see something like "Eligible
21  for rehire deferred," is that a negative or a positive
22  for that candidate?
23       A.    It's neutral.  It means at the time of
24  reapplication we'll re-evaluate.

Page 85

1        Q.    And if the employee's "Quantity or quality
2   of work" is not filled out, how does that impact that
3   candidate?
4        A.    It doesn't.
5        Q.    Okay.
6        A.    Some hospitals elect to do it.  Some
7   don't.
8        Q.    So for any employee, you don't fill that
9   out?
10       A.    We do not.
11       Q.    And had that been filled out for Bob, what
12  would it have been?  Would it have been based on that
13  termination report?
14       A.    Yes, ma'am.
15       Q.    So it would have been like "Satisfactory"?
16       A.    Yes, it would.
17       Q.    At the time of his termination, did you
18  know approximately how old Bob was?
19       A.    I did not.
20       Q.    Did you believe he may have been in his
21  50s?
22            MS. SCHOENING:  Objection.  Go ahead and
23  answer.
24       A.    He looks younger than that, so I'm not a

22 (Pages 82 to 85)

Lehman vs. St. Elizabeth                    BLANK                    7/25/2012

|  |  |
|---|---|
| Page 86 | Page 89 |

Page 86

1  good judge of age.
2      Q.    You knew he had been with St. Elizabeth
3  for over 30 years, correct?
4      A.    I knew it was a long time.
5      Q.    Does St. Elizabeth hire Security Officers
6  under the age of 18?
7      A.    No.
8      Q.    Were you aware that Bob had first gone
9  through the Police Academy prior to working for St.
10  Elizabeth?
11      A.    I did not know his history.
12      Q.    Are you aware that Bob has not found
13  employment since his termination?
14      A.    I was not.
15      Q.    Do you know whether the hospital took into
16  consideration the fact that Bob was a 30-plus-year
17  employee and he was getting terminated at a time when
18  the economy wasn't doing so well, that it might be
19  difficult for him to find another job?
20          MS. SCHOENING:  Objection.
21      A.    I know Marty knew that.
22      Q.    Did you discuss with Marty whether or not
23  the hospital would consider providing -- giving Bob a
24  severance?

Page 87

1      A.    We did not discuss severance.
2      Q.    Ken Rasor was terminated by the hospital
3  for falsification of timecard, correct?
4      A.    Correct.
5      Q.    Was Ken given a severance?
6      A.    He was not.
7      Q.    Were you involved at all in the decision
8  to --
9          MS. DAUGHTREY NEFF:  If we need to go
10      off -- we'll do this sealed, I think.  I think
11      this is testimony we sealed before.
12          CONFIDENTIAL MATERIAL
          SUBJECT TO PROTECTIVE ORDER
13              Page 88
14
15
16
17
18
19
20
21
22
23
24

Page 89

1      Q.    When Bob told you during the meeting on
2  August 20th that he had seen Mike sleeping, was he
3  referring to Mike Boarman?
4      A.    I made the assumption, yes.
5      Q.    And are you aware of Mike Boarman having
6  any disabilities?
7      A.    I am not.
8      Q.    And then he also mentioned Charlie.  Do
9  you believe he was referring to Charlie Johnson?
10      A.    I do.
11      Q.    And are you aware of any disabilities that
12  Charlie has?
13      A.    No.
14      Q.    Okay.  Prior to Amanda Rickey being
15  accused of sleeping, were you aware of any other St.
16  Elizabeth employees who had been accused of sleeping
17  prior to Amanda?
18      A.    Not that I can recall.
19      Q.    So you believe the first employee accused
20  of sleeping was Amanda Rickey under your --
21      A.    I believe there's more.  There's probably
22  more before that.  I just can't recall anyone, any
23  particular situation, at least disciplined.  I don't
24  know.

Page 90

1      Q.    You mentioned that you put together the
2  charts, I think, that are included in Exhibits 2 and --
3  I'm sorry 5 and 8.
4      A.    Yes.
5      Q.    Were you the primary person responsible
6  for providing documents to counsel in this case?
7      A.    Yes.
8      Q.    Did you do anything to look in your
9  records to determine whether or not there were any
10  employees prior to Amanda Rickey who were found
11  sleeping?
12      A.    I did not.
13      Q.    I apologize if I asked you this earlier.
14  What were the problems that the Security Department had
15  with Ken Rasor's performance?
16      A.    Sloppy reports, if I remember rightly, and
17  attitude.
18      Q.    Through, at least, the investigation into
19  the allegations against Bob, you became aware that Kim
20  felt threatened by Ken Rasor; is that correct?
21      A.    Threatened in a sense of he was a
22  backstabber.
23      Q.    Okay.
24      A.    So Ken had an attitude, and no one in my

23 (Pages 86 to 90)

Lehman vs. St. Elizabeth                    BLANK                         7/25/2012

---

Page 91

1  whole time, even when we started the meetings with
2  Doug, ever said he was physically threatening to
3  anyone.
4       Q.    But she felt like she had actually
5  witnessed him attempt to get people fired if they went
6  against him; is that correct?
7       A.    It was all passive-aggressive things.
8       Q.    That's a pretty serious allegation, isn't
9  it, that he has attempted to get people fired in the
10  past?
11      A.    Not all personalities are easy to deal
12  with, and every one of us are different, and Ken was no
13  exception to that rule.  He was a very different
14  personality.  Personally, I didn't like the man either,
15  but we had to make him accountable.  And he had a new
16  Director who was doing that.  And when he got that
17  first performance eval, he was not happy, and he showed
18  it right to Doug because he thought he could.  So we
19  had those meetings with Doug to address those concerns
20  and put him on the accountability list, that you have
21  to change your behavior, your attitude, your
22  performance, and that work-improvement plan issues and
23  those meetings resulted with Roxann as a result for
24  follow-up.

---

Page 92

1       Q.    Why wasn't he fired for his performance
2  and attitude?
3       A.    I don't know that it was addressed before,
4  which was a little bit of Greg Popham's problem, I
5  think.
6       Q.    Do you know, did Bob supervise Ken prior
7  to Mike Kraft coming onboard?
8       A.    I don't know.
9            MS. DAUGHTREY NEFF:  All right.  Let's
10  take a quick break.  I want to review my stuff
11  and talk to him to make sure I have everything.
12           (At which time, a recess was taken from
13  11:21 a.m. until 11:37 a.m.)
14      Q.    A Marketing employee who is sleeping
15  during a meeting after she's been placed on a Level III
16  for job performance, is she doing her job?
17      A.    No.
18      Q.    How about a Registered Nurse who is
19  already on a Level II for performance and he's sleeping
20  at the nurse's station, is he doing his job?
21      A.    Well, Level II is irrelevant, but they're
22  sleeping at work.
23      Q.    Well, the Registered Nurse who was on a
24  Level II already knew that he had some performance

---

Page 93

1  issues and should have been a little bit more careful
2  about what he was doing; is that correct?
3       A.    But another level of discipline may not
4  have gotten him terminated.  Sleeping would have,
5  because you wouldn't get terminated on a first offense
6  on a Level II if it was related to job, unless we
7  looked at the circumstances and determined that it was
8  worse.
9       Q.    Right.  It is possible that that person
10  would be placed on a Level III, right?
11      A.    Correct.
12      Q.    And when you're on a Level III, it's
13  pretty much a final warning; is that correct?
14      A.    It is.  It is.
15      Q.    And Level IIIs, you can also potentially
16  get suspended; is that correct?
17      A.    No.
18      Q.    Okay.  You can't?
19      A.    It's not part of the Level III by itself.
20  If we're doing an investigation, you might get
21  suspended, or if it was for duty.
22      Q.    Okay.  Roxann Platek was the HR individual
23  who handled Bob's dispute process; is that correct?
24      A.    Correct.

---

Page 94

1       Q.    Did she keep you apprised of each meeting
2  that he had?
3       A.    She did.
4       Q.    And were you aware that she took notes
5  during those meetings?
6       A.    I was.
7       Q.    And did you review any of those notes at
8  the time that she drafted them up?
9       A.    I did not.
10      Q.    Did you review those notes in preparation
11  for your deposition?
12      A.    I did not.
13      Q.    Had you reviewed those notes at any time
14  prior to today?
15      A.    I can't remember.  If I did, it was a long
16  time ago.
17      Q.    Have you been involved in the dispute
18  process before?
19      A.    Yes.  I wrote the policy.
20      Q.    And do you think it is a good habit to
21  have, for an HR person to keep a record of what is
22  discussed during the dispute process?
23      A.    Yes.
24      Q.    And you said that you wrote the policy.

---

24 (Pages 91 to 94)

Lehman vs. St. Elizabeth                    BLANK                          7/25/2012

| Page 95 | Page 97 |
|---|---|

**Page 95**

1    Do you also train your HR employees on that policy?
2        A.    Yes.
3        Q.    Should an HR Advisor who is assisting with
4    the policy provide his or her opinion to either the
5    Peer Group or the Administrator?
6        A.    Their role is to be an advocate for the
7    process.  They're not to take either side, and they're
8    to make sure the process is followed and that timely
9    responses are given back.  They do not write the
10    response.  Each level along the Pathway writes the
11    response, including the Peer Review Panel, who writes
12    their response.  And in that response, it's his or her
13    role to deliver that to the employee, to ascertain
14    whether they want to go to the next step, to have the
15    notes available in case the VP or COO or CEO wants to
16    refer back to them about what was discussed.
17        Q.    Do you have any knowledge as to whether
18    Doug Chambers requested to review the notes from the
19    meeting with Mike Kraft?
20        A.    I do not.
21        Q.    Do you know whether John Dubis requested
22    the notes from either Doug Chambers' or Mike Kraft's
23    meeting?
24        A.    I do not have knowledge.

**Page 96**

1        Q.    If an administrator does not request the
2    notes, does HR automatically provide it to him?
3        A.    No.
4        MS. DAUGHTREY NEFF:  All right.  I don't
5        have any other questions.
6        MS. SCHOENING:  I just have a few
7        follow-up questions.
8        MS. DAUGHTREY NEFF:  Okay.
9        (Reference to previously-marked Blank
10        Exhibit No. 7.)
11        EXAMINATION
12    BY MS. SCHOENING:
13        Q.    Lisa, if you could look at Exhibit 7.
14        MS. DAUGHTREY NEFF:  To her deposition?
15        MS. SCHOENING:  Yes, Blank Exhibit 7.
16        A.    Okay.  Way back there.  (Witness reviewing
17    document).
18        Q.    Do you recall if Mr. Kannady had admitted
19    to sleeping when he was confronted with the allegation?
20        A.    He did according to the write-up.
21        Q.    Even though Mr. Kannady admitted it, was
22    he still terminated for sleeping at work?
23        A.    Yes, he was.
24        Q.    Do you recall if Cynda Carman was on any

**Page 97**

1    prior discipline before she was terminated for sleeping
2    at work?
3        (Reference to previously-marked Blank
4        Exhibit No. 6.)
5        A.    Is that 6?
6        Q.    Yes.
7        A.    She was not on any formal disciplinary
8    action.
9        Q.    Since September 2010, have there been any
10    employees who have been caught sleeping at work who
11    have not been terminated from St. Elizabeth?
12        A.    No.
13        Q.    Is that true even if sleeping is their
14    first offense?
15        A.    Yes.
16        (Reference to previously-marked Blank
17        Exhibit No. 1.)
18        Q.    If you look at Blank Exhibit 1, your notes
19    from the meeting with Mr. Lehman.
20        A.    Yes.  (Witness reviewing document).
21        Q.    Do you recall if Mr. Lehman told you that
22    he was aware of the policy about sleeping at work?
23        A.    He states he was not aware of the policy
24    regarding sleeping at work, and he thought the hospital

**Page 98**

1    could and has been flexible in the past about how the
2    policies were interpreted.
3        Q.    Was it a concern that a supervisor was not
4    aware of the policy about sleeping at work at St.
5    Elizabeth?
6        A.    Yes.  He should have read it in '08 at a
7    minimum.
8        Q.    Would you expect a supervisor to, not only
9    know the policy, but to communicate that to staff and
10    enforce it among his staff?
11        A.    Yes.
12        MS. SCHOENING:  That's all the questions I
13        have.
14        FURTHER CROSS-EXAMINATION
15    BY MS. DAUGHTREY NEFF:
16        Q.    Do you know if Mike Kraft communicated the
17    policy regarding sleeping to his staff in 2008?
18        A.    All employees are supposed to go through
19    the Pathway, so she would have gotten it there.
20        Q.    Do you know if Mike Kraft took any
21    additional steps to ensure that his employees were
22    familiar with the policy?
23        A.    Oh, I know he has.  I just don't know
24    about the timeline.

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    BLANK                         7/25/2012

Page 99

1      Q.     Do you think he did it after Bob's
2  termination?
3      A.     At or around as a reminder.
4      Q.     And the policy with respect to sleeping,
5  the only reference in the disciplinary policy to
6  sleeping is in the guideline part; is that correct?
7      A.     Correct.
8      Q.     And you're aware that Mike Kraft had to
9  contact HR to find out what the correct disciplinary
10 action would be for an employee who was sleeping; is
11 that correct?
12     A.     He knew sleeping wasn't allowed.  But yes,
13 he contacted Roxann.
14         MS. DAUGHTREY NEFF:  Okay.  That's all the
15     questions I have.
16         MS. SCHOENING:  Nothing further.
17
18         _____

           LISA BLANK
19
20              - - -
21      DEPOSITION CONCLUDED AT 11:46 A.M.
22              - - -
23
24

Page 100

1          C E R T I F I C A T E
2  STATE OF OHIO      :
                      : ss
3  COUNTY OF HAMILTON    :
4          I, Raymond E. Simonson, RMR, the
5  undersigned, a duly qualified and commissioned notary
6  public within and for the State of Ohio, do hereby
7  certify that, before giving of the aforesaid
8  deposition, LISA BLANK, was by me first duly sworn to
9  depose the truth, the whole truth, and nothing  but the
10 truth; that the foregoing is the deposition given at
11 said time and place by LISA BLANK; that said deposition
12 was taken in all respects pursuant to stipulations of
13 counsel hereinbefore set forth; that I am neither a
14 relative of nor employee of any of their counsel, and
15 have no interest whatever in the result of the action.
16         I further certify that I am not, nor is
17 the court reporting firm with which I am affiliated,
18 under a contract as defined in Civil Rule 28(D).
19         IN WITNESS WHEREOF, I hereunto set my hand
20 and official seal of office at Cincinnati, Ohio, this
21 _____ day of _____, 2012.
22         _____

   My commission expires:    RAYMOND E. SIMONSON, RMR
23 June 22, 2013          Notary Public - State of Ohio
24

                                            26 (Pages 99 to 100)

# ADDENDUM

TO THE REPORTER: I have read the entire transcript of my deposition taken on the 25th day of _July_, 2 012, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|---|---|---|
| 7 | 13 | flight nursing |
| 8 | 12 | Jan of 2005 |
| 14 | 4 | – Not sure what the first sentence is – I would strike it |
| 23 | 19 | three hours at a time |
| 98 | 19 | they Not she |

8/2/12
**(Date)**
**ROBERT LEHMAN vs ST. ELIZABETH HEALTHCARE**

_(Signature of Deponent)_
**LISA BLANK      7-25-12      RS**

ORIGINAL

AMS DEPO
P.O. Box 58641 · Cincinnati, Ohio 45258-8641
(513) 941-9464

Lehman vs. St. Elizabeth                    BLANK                    7/25/2012

Page 99

1         Q.      Do you think he did it after Bob's
2    termination?
3         A.      At or around as a reminder.
4         Q.      And the policy with respect to sleeping,
5    the only reference in the disciplinary policy to
6    sleeping is in the guideline part; is that correct?
7         A.      Correct.
8         Q.      And you're aware that Mike Kraft had to
9    contact HR to find out what the correct disciplinary
10   action would be for an employee who was sleeping; is
11   that correct?
12        A.      He knew sleeping wasn't allowed.  But yes,
13   he contacted Roxann.
14             MS. DAUGHTREY NEFF:  Okay.  That's all the
15             questions I have.
16             MS. SCHOENING:  Nothing further.
17
18                        _____
                                LISA BLANK
19
20                        - - -
21             DEPOSITION CONCLUDED AT 11:46 A.M.
22                        - - -
23
24

ORIGINAL

Lehman vs. St. Elizabeth                    BLANK                    7/25/2012

Page 100

```
 1                        C E R T I F I C A T E

 2      STATE OF OHIO        :
                             :  ss
 3      COUNTY OF HAMILTON   :

 4              I, Raymond E. Simonson, RMR, the

 5      undersigned, a duly qualified and commissioned notary

 6      public within and for the State of Ohio, do hereby

 7      certify that, before giving of the aforesaid

 8      deposition, LISA BLANK, was by me first duly sworn to

 9      depose the truth, the whole truth, and nothing  but the

10      truth; that the foregoing is the deposition given at

11      said time and place by LISA BLANK; that said deposition

12      was taken in all respects pursuant to stipulations of

13      counsel hereinbefore set forth; that I am neither a

14      relative of nor employee of any of their counsel, and

15      have no interest whatever in the result of the action.

16              I further certify that I am not, nor is

17      the court reporting firm with which I am affiliated,

18      under a contract as defined in Civil Rule 28(D).

19              IN WITNESS WHEREOF, I hereunto set my hand

20      and official seal of office at Cincinnati, Ohio, this

21      30th day of _____July_____, 2012.

22                              Raymond E. Simonson, RMR

23      My commission expires:  RAYMOND E. SIMONSON, RMR
        June 22, 2013          Notary Public - State of Ohio

24
```

**AMS DEPO**
**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

ORIGINAL