Case: 2:11-cv-00165-WOB-JGW    Doc #: 28    Filed: 10/16/12    Page: 1 of 22 - Page ID#: 289

Lehman vs. St. Elizabeth                    CHAMBERS                          7/10/2012

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

-----------------------------------
                                    :
ROBERT LEHMAN,                      :
                                    :
            Plaintiff,              :
                                    :
        vs.                         :    CASE NO.
                                    :    2:11-cv-00165
ST. ELIZABETH HEALTHCARE,           :
                                    :
            Defendant.              :
                                    :
-----------------------------------

        DEPOSITION OF:    DOUGLAS CHAMBERS

        TAKEN:           By the Plaintiff

        DATE:            July 10, 2012

        TIME:            Commencing at 10:01 a.m.

        PLACE:           Offices of:
                         DRESSMAN, BENZINGER,
                         LaVELLE, PSC
                         207 Thomas More Parkway
                         Crestview Hills, KY  41017

        BEFORE:          Barbara A. Thacker, RPR
                         Notary Public-State of Ohio
                        (Jurisdiction of Notary Waived.

Lehman vs. St. Elizabeth                    CHAMBERS                           7/10/2012

---

Page 2

1   APPEARANCES:
2       On behalf of the Plaintiff:
3           KATHERINE DAUGHTREY NEFF, ESQ
                of
4           Freking & Betz, LLC
            525 Vine Street
5           Sixth Floor
            Cincinnati, Ohio 45202
6           Email: kneff@frekingandbetz.com
7       On behalf of the Defendant:
8           KELLY A. SCHOENING, ESQ.
                of
9           Dressman, Benzinger, LaVelle, PSC
            207 Thomas More Parkway
10          Crestview Hills, KY 41017
            Email: kschoening@dbllaw.com
11
        Also Present:  Robert Lehman
12          Lisa Blank (St. E. Rep)
            Sierra Williams (Law Clerk)
13
                - - -
14
15
16
17
18
19
20
21
22
23
24

---

Page 3

1                   I N D E X
2   DOUGLAS CHAMBERS                          PAGE
3   CROSS-EXAMINATION BY MS. NEFF               4
4   EXAMINATION BY MS. SCHOENING               68
5
6                   * * * *
7           CONFIDENTIAL MATERIAL
8           UNDER SEPARATE SEAL
9       PURSUANT TO AGREEMENT OF COUNSEL
10              PAGE 17
11                  * * * *
12
13
14                E X H I B I T S
15  LEHMAN EXHIBITS      MARKED      REFERENCED
16      1           30
17      2           51
18
19
20
21
22
23
24

---

Page 4

1                   DOUGLAS CHAMBERS
2   of lawful age, a witness herein, being first duly sworn
3   as hereinafter certified, was examined and deposed as
4   follows:
5                   CROSS-EXAMINATION
6   BY MS. NEFF:
7       Q.    Good morning.
8       A.    Good morning.
9       Q.    I know I have just introduced myself, but
10  my name is Kati Neff.  I represent Bob Lehman in his
11  lawsuit against St. Elizabeth.  Could you please state
12  your full name, for the record?
13      A.    Douglas M. Chambers.
14      Q.    Mr. Chambers, have you ever been deposed
15  before?
16      A.    Yes, I have.
17      Q.    And approximately how many times have you
18  been deposed?
19      A.    Two or three, maybe.
20      Q.    Two or three?  And were those depositions
21  related to a personal matter or something to do with
22  your employment?
23      A.    Employment.
24      Q.    And were any of them while you were

---

Page 5

1   working for St. Elizabeth?
2       A.    Yes.
3       Q.    Were all of them during that time?
4       A.    I don't recall.
5       Q.    Okay.  Did any of the lawsuits have to do
6   with a claim of employment discrimination?
7       A.    I don't recall.  We're talking about 20
8   years of employment.  I don't think so.
9       Q.    When was the last time you had your
10  deposition taken?
11      A.    Maybe it was ten or 15 years ago.
12      Q.    Okay.  Well, today we'll probably be
13  fairly consistent with what you remember, and I'm sure
14  Ms. Schoening has explained to you how today will go,
15  but before we get started, I would like to run through
16  sort of some ground rules for the deposition.
17          First, is that you make sure to respond to
18  my question with a verbal response.  So "yes" or "no,"
19  as opposed to "um-hmm" or "huh-uh" or nodding your
20  head.  That way, Barb can record what you're testifying
21  to accurately.  Okay?
22      A.    Okay.
23      Q.    If you do not understand my question, let
24  me know.  Otherwise, I'm going to go ahead and assume

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    CHAMBERS                    7/10/2012

---

Page 6

1  that you understand the question that I'm asking.
2  Okay?
3      A.    Okay.
4      Q.    If there comes a time where you need a
5  break -- which, hopefully, you won't need too much of
6  today, because we won't be here for too long -- but
7  just let me know that you need a break.  I just ask
8  that if there is a question pending, you go ahead and
9  answer the question before we take a break.  All right?
10     A.    Okay.
11     Q.    The other thing that may come up,
12 Ms. Schoening may object from time to time.  If she
13 does, unless she instructs you not to answer the
14 question, you can go ahead and answer the question.  If
15 you need the question repeated, we can ask Barb to
16 repeat it for you.  All right?
17     A.    Yes.
18     Q.    Did you do anything to prepare for your
19 deposition today?
20     A.    Yes.
21     Q.    What did you do?
22     A.    Met with Kelly Schoening and Lisa Blank.
23     Q.    Okay.  And when was that meeting?
24     A.    Last week.

---

Page 7

1      Q.    And when you say you met with Kelly and
2  Lisa, was that at the same time?
3      A.    Yes.
4      Q.    Okay.  How long was your meeting?
5      A.    Half an hour.
6      Q.    Okay.  Did you review any documents during
7  your meeting?
8      A.    Some, yes.
9      Q.    What documents did you review?
10     A.    One that I wrote, and one that I was
11 questioned if I had seen or not --
12     Q.    Okay.
13     A.    -- that Bob wrote.  And I had not seen it.
14     Q.    Okay.  The document that Bob wrote, you
15 said you hadn't seen before?
16     A.    Correct.
17     Q.    Was it a letter addressed to you?
18     A.    Yes.
19     Q.    And then the other document you said was
20 one that you wrote.  What can you remember from that
21 document?
22     A.    The document I wrote during a grievance
23 process when Bob wanted to grieve the decision.
24     Q.    Was it just you notifying Bob of your

---

Page 8

1  decision?
2      A.    Correct.
3      Q.    Any other documents that you reviewed in
4  preparation for your deposition?
5      A.    No.
6      Q.    Okay.  Other than meeting with Kelly and
7  Lisa for half-an-hour last week, did you do anything
8  else on your own to prepare for your deposition today?
9      A.    No.
10     Q.    And have you spoken about your deposition
11 with anyone other than Kelly and Lisa?
12     A.    No.
13     Q.    All right.  Are you currently employed by
14 St. Elizabeth?
15     A.    Yes.
16     Q.    And I understand St. Elizabeth has
17 multiple locations.  Where do you work for
18 St. Elizabeth?
19     A.    Edgewood.  Edgewood is where my office
20 resides.
21     Q.    What is your current position?
22     A.    Senior Vice-President of Facilities.
23     Q.    How long have you been the Senior
24 Vice-President of Facilities?

---

Page 9

1      A.    I was made -- I've been there 20 years.  I
2  was made Vice-President in 2003, and Senior
3  Vice-President in 2007.
4      Q.    When you were Vice-President in 2003, was
5  that of Facilities?
6      A.    Correct.
7      Q.    Okay.  And just in case you leave your
8  employment, for any reason, before we go to trial in
9  this case, could you provide us with your home address,
10 please?
11     A.    Sure.  ███████████████ Union
12 Kentucky, 41091.
13     Q.    And when were you hired by St. Elizabeth?
14     A.    In June of '92.
15     Q.    And what is your date of birth?
16     A.    ███ /57.
17     Q.    You said that you became the
18 Vice-President of Facilities in 2003.  What position
19 did you hold with St. Elizabeth prior to that --
20 directly prior to that?
21     A.    I believe I was promoted three times.
22 Design Manager, Director of Project Management, and one
23 other which I can't recall.
24     Q.    Do you remember what time period you were

3 (Pages 6 to 9)

Lehman vs. St. Elizabeth                    CHAMBERS                    7/10/2012

| Page 10 | Page 12 |
|---|---|

**Page 10**

1  Design Manager?
2      A.    That was probably the first job I had as I
3  was hired in '92.
4      Q.    And how long did you remain in that
5  position, approximately?
6      A.    Several years.
7      Q.    Okay.  And then, what period of time were
8  you Director for Project Management?
9      A.    That was close to -- before being promoted
10  to Vice-President.  So I was probably there maybe three
11  or four years.  I was responsible for the tower.  We
12  built one of the major projects at the facility, and I
13  was responsible for the tower.  It was a $64M project.
14      Q.    What are your job responsibilities as a
15  Senior Vice-President of Facilities?
16      A.    I'm responsible for:  Security, Safety,
17  Biomedical Engineering, Real Estate, Facilities
18  Modifications, Nutrition Services, and Plant
19  Engineering.
20      Q.    What was the responsibility prior to Plant
21  Engineering?  I have Facilities Modifications, and then
22  I missed one.
23      A.    Nutrition Services.
24      Q.    Do you have managers that report directly

**Page 11**

1  to you from each of those areas?
2      A.    Directors, yes.
3      Q.    Who is the Security Director that reports
4  to you?
5      A.    Mike Kraft.
6      Q.    Were you involved at all in the hiring of
7  Mike Kraft?
8      A.    I was.
9      Q.    Okay.  And who is the Safety Director that
10  reports to you?
11      A.    Safety Director reports to Mike Kraft and
12  that's Tim Wiest.
13      Q.    Were you involved in the hiring of Tim
14  Wiest?
15      A.    I was.
16      Q.    And does the Biomedical Director report
17  directly to you?
18      A.    Yes.
19      Q.    Who is that?
20      A.    Terry Teipel.
21      Q.    Is that a male or female?
22      A.    Male.
23      Q.    What was the last name?
24      A.    Teipel, T-E-I-P-E-L.

**Page 12**

1      Q.    Were you involved in the decision to hire
2  Terry?
3      A.    I was.
4      Q.    And then, you also mentioned Real Estate.
5  Is there a Real Estate Director that reports to you?
6      A.    Yes.
7      Q.    Who is that?
8      A.    Chris Mangeot, M-A-N-G-E-O-T.
9      Q.    Is that a male as well?
10      A.    It is.
11      Q.    And were you involved in the hiring
12  decision for Chris?
13      A.    Yes.
14      Q.    Is there a Facilities Modification
15  Director that reports to you?
16      A.    Yes.
17      Q.    Who is that?
18      A.    That is Mike Dittar, D-I-T-T-A-R.
19      Q.    And were you involved in the decision to
20  hire Mike?
21      A.    No.  I was responsible for putting him in
22  that position, but he was hired by a previous VP.
23      Q.    Who was the previous VP?
24      A.    I'm thinking.  Just a minute.  I'm drawing

**Page 13**

1  a blank.  Mark Krahe, K-R-A-H-E.
2      Q.    Do you have a Director of Nutrition
3  Services that reports to you?
4      A.    Yes.
5      Q.    Who is that?
6      A.    Helene Ruber.
7      Q.    Were you involved in the hiring decision
8  for Helene?
9      A.    No.
10      Q.    Do you have a Plant Engineering Director
11  that reports to you?
12      A.    Yes.
13      Q.    Who is that?
14      A.    Matt Greis, G-R-E-I-S.
15      Q.    Were you involved in the decision to hire
16  Matt?
17      A.    Yes.
18      Q.    Do you have any other direct reports?
19      A.    No.
20      Q.    In terms of the Security Department, what
21  responsibilities would you have, related to that
22  department?
23      A.    I am responsible for the organization as a
24  whole.  So anything that would occur, as it relates to

Lehman vs. St. Elizabeth                         CHAMBERS                          7/10/2012

---

Page 14

1   safety and security for patients, for visitors, for
2   associates, all directly are my responsibility.
3        Q.    Okay.  Are you involved at all in the
4   hiring decisions for Security Officers?
5        A.    I am.
6        Q.    Okay.  And would Mike Kraft, obviously, be
7   involved in that with you as well?
8        A.    He would.  He would be the real person
9   managing that and making those recommendations to me.
10       Q.    Okay.  Is anyone else involved, besides
11  yourself and Mike Kraft, in hiring decisions for
12  Security?
13       A.    Absolutely.  HR.
14       Q.    Is there a particular HR person that
15  assists the Security Department?
16       A.    Yes.
17       Q.    Who is that?
18       A.    Roxann Platek.
19       Q.    What is Roxann's title?
20       A.    I don't know.
21       Q.    Okay.  Is Roxann the primary HR person
22  that you would go to for the other departments that you
23  manage as well?
24       A.    Not all of them, no.

---

Page 15

1        Q.    Approximately how long has Mike Kraft
2   reported to you as the Safety Director?
3        A.    Since I hired him, when he replaced Greg
4   Popham.
5        Q.    Were you involved in the decision to let
6   Greg Popham go?
7        A.    Greg resigned.
8        Q.    Okay.  Voluntarily?
9        A.    No.
10       Q.    He was asked to resign?
11       A.    Yes.
12       Q.    Were you involved in the decision to ask
13  him to resign?
14       A.    Yes, I was.
15       Q.    And why was he asked to resign?
16            MS. SCHOENING:  I'm just going to note an
17       objection.  There is a confidential settlement
18       with regard to that.  So any of these questions
19       are going to be related to that confidential
20       settlement.  And to me, it's all irrelevant to
21       Mr. Lehman's claims.
22            MS. NEFF:  What we can do, if you are okay
23       with it, we can ask this part of the deposition
24       be separate, under seal, and that way, if we need

---

Page 16

1   to use it, we'll file it under seal.  If we
2   don't, then we won't.  Okay?
3            MS. SCHOENING:  Okay.
4                    * * * *
5            CONFIDENTIAL MATERIAL
6            UNDER SEPARATE SEAL
7   PURSUANT TO AGREEMENT OF COUNSEL
8            PAGE 17
9                    * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 18

1                    * * * *
2       CONFIDENTIAL MATERIAL EXCERPTED.
3            PAGE 17
4                    * * * *
5        Q.    Do you know approximately how long
6   Mr. Popham had worked for St. Elizabeth at the time of
7   his resignation?
8        A.    It was a long time.  It might have been 15
9   years.  I'm not really sure.  I would really be
10  guessing.
11       Q.    Do you know approximately how old
12  Mr. Popham was at the time of his resignation?
13       A.    I have no idea.
14       Q.    Could you tell whether or not he was under
15  the age of 40?
16       A.    He was probably a little older than 40,
17  but I would say not much, if I was guessing.
18       Q.    Okay.  So I believe, when I asked you
19  before, how long Mike Kraft had been the Security
20  Director, you said since you hired him.  Approximately
21  when did you hire him?
22       A.    Maybe two years ago.
23       Q.    Okay.  You mentioned that you assist in
24  making the hiring decisions for the Security

---

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    CHAMBERS                    7/10/2012

---

Page 19

1  Department.  Do you also assist in making termination
2  decisions?
3      A.    Yes.
4      Q.    Would you say that you are the final say
5  on termination decisions in the Security Department?
6      A.    No.
7      Q.    Were you involved in the decision to
8  terminate Bob Lehman?
9      A.    Yes.
10     Q.    And who would you say was the final
11 decision-maker on that?
12     A.    I don't know if there is any one person.
13 I think it was a collective response from HR and myself
14 and the Manager, Mike Kraft.
15     Q.    HR.  Was that Roxann?
16     A.    It would have been Marty Oscadal.
17     Q.    And the Manager, Mike Kraft?
18     A.    Um-hmm (nodding head affirmatively).
19 Roxann also would have had an opinion -- would have
20 been involved.
21     Q.    Anyone else involved in the decision to
22 terminate Mr. Lehman besides Marty Oscadal, Roxann,
23 Mike Kraft, and yourself?
24     A.    My understanding is the conversation went

Page 20

1  as far as the CEO.
2      Q.    Who is the CEO?
3      A.    John DuBis.
4      Q.    Did you have any conversation with John
5  DuBis about the termination decision?
6      A.    No, I did not.
7      Q.    Who do you think had the conversation with
8  John?
9      A.    Marty.
10     Q.    What is Marty's position?
11     A.    He is the Senior Vice-President of Human
12 Resources.
13     Q.    Does St. Elizabeth have any kind of
14 disciplinary policy, that you're aware of?
15     A.    Yes.
16     Q.    Could you generally just describe what
17 their disciplinary policy is?
18     A.    Well, it has a series of discipline levels
19 for issues that arise as employees may do incorrectly
20 or, you know, do something that you can't tolerate.
21 There are levels of discipline and it escalates from
22 one, two, three all the way up and including
23 termination.  The policy also gives us the authority to
24 basically determine the significance of that

Page 21

1  interaction, whether it's listed or not, in the policy.
2      Q.    Where is the disciplinary policy located?
3      A.    In an electronic format, and it's called
4  360.
5      Q.    And is it available to all St. Elizabeth
6  employees?
7      A.    Yes.
8      Q.    Okay.  As far as you know?
9      A.    Yeah.  The managers -- everybody knows
10 where 360 is, and that's where the policies are.  If
11 there's any question, anybody can get access to it and
12 take a look at the policy.
13     Q.    You mentioned with respect to Mr. Lehman's
14 termination decision that HR was involved.  Is it your
15 policy or practice to make sure that HR is involved in
16 any of the termination decisions for your departments?
17     A.    Absolutely.
18     Q.    And why is that?
19     A.    Consistency.  There may be things outside
20 of my department that I'm unaware of, that I couldn't
21 possibly be aware of, and HR is responsible for making
22 sure that our practice is consistent across the
23 organization.  That's why it's a collaboration.
24     Q.    Why is consistency important?

Page 22

1      A.    So that we are fair --
2      Q.    Okay.
3      A.    -- in all decisions, and meet the law --
4  requirements of the law, et cetera.
5      Q.    Obviously, you've been involved in -- as
6  the Senior Vice-President of Facilities, you've been
7  involved in termination decisions other than Bob
8  Lehman, right?
9      A.    I have, yes.
10     Q.    And could you just describe what process
11 you take in reviewing potential recommendations by your
12 manager to terminate an employee?  What you go through?
13     A.    Typically, the manager will make a
14 recommendation.  It is done electronically.  Before we
15 get to the e-mail process, they make their
16 recommendation, then there's some investigation on my
17 part to determine the information they have been given
18 or that they were looking at, I agree with.  At that
19 point, they will then make the recommendation to
20 terminate.  HR then will respond, and I must respond
21 before that actually will carry out.
22     Q.    And do you respond electronically via
23 e-mail?
24     A.    Yes.

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    CHAMBERS                    7/10/2012

---

Page 23

1      Q.      So if a manager comes to you and, you
2  know, says I've done this investigation.  I found this
3  and this and this.  I've got some statements from
4  employees.  Do you read those statements or do you go
5  back and actually talk to the employees?
6      A.      It depends.
7      Q.      Okay.
8      A.      It depends.  If it looks like it warrants
9  more investigation, I will also go back and talk to HR.
10  They typically will do an investigation on their own.
11  And I will rely heavily on what they tell me, and
12  collectively, we make a decision.
13      Q.      Do you typically review the employee's
14  work history?
15      A.      Yes.
16      Q.      Past performance?
17      A.      Yes.
18      Q.      And then, in terms of -- you already
19  mentioned before that you like to confer with HR to
20  determine consistency.  So if somebody hasn't been
21  terminated for this kind of offense in your department,
22  prior to this manager bringing this issue to you, you
23  would look to HR to see how HR has handled it in other
24  departments in the hospital; is that correct?

---

Page 24

1      A.      That's fair.
2      Q.      And would you expect a manager to be aware
3  of all of St. Elizabeth's policies and procedures?
4      A.      I would.
5      Q.      Okay.  You would expect Mike Kraft to know
6  what form of discipline an employee should receive for
7  a particular offense?
8      A.      Now, you're asking a very specific
9  question.  I believe -- it depends, again, would be my
10  answer, on the situation.  The way one interprets those
11  policies can be, at times, different from one manager
12  to the next.  Again, that's why we have HR.
13      Q.      Okay.  How much day-to-day interaction
14  would you have with the Security Officers that report
15  to Mike?
16      A.      Not nearly as much as Mike would.  But
17  occasionally, depending on -- as issues arise, as
18  things come about.  Certainly, the managerial staff I
19  have more interaction with, but primarily, most of my
20  interactions are with Mike.
21      Q.      Approximately how many Security Officers
22  are in your department?
23      A.      Across the system?
24      Q.      Sure.  Because you're in charge of the

---

Page 25

1  whole system, right?
2      A.      Yes, I am.  I know there's roughly 13 to
3  15 at Edgewood.  I would say 20, 22, maybe, across the
4  system.
5      Q.      And Mike Kraft is the direct supervisor
6  for all of the Security Officers outside of Edgewood,
7  right?
8      A.      He will have a much more accurate number.
9      Q.      Are Security Officers permitted to take
10  breaks?
11      A.      Yes.
12      Q.      Are they typically hourly or salary?
13      A.      Typically, they are hourly.
14      Q.      And how many breaks do they typically get
15  in a day?
16      A.      I think there are two 15 minute breaks per
17  day.
18      Q.      Do they get a lunch break, too?
19      A.      Um-hmm (nodding head affirmatively).
20      Q.      I'm sorry?
21      A.      Yes.
22      Q.      Thank you.  And are they permitted to
23  leave the facility during their lunch break?
24      A.      With permission, from the manager.

---

Page 26

1      Q.      And when you say "manager," are you
2  talking about Mike Kraft?
3      A.      Yes.
4      Q.      There are some supervisors as well; is
5  that correct?
6      A.      That's correct.
7      Q.      Who are the current supervisors?
8      A.      I'm not going to be able to name them all.
9  I know Rick Denim is the one at -- if I have got that
10  right -- Edgewood.  I'm not going to be able to name
11  them all.
12      Q.      Do you know Rick's last name?
13      A.      I think it's Denim.
14      Q.      Denim?
15      A.      I think I have that wrong, though.  I'm
16  confused.  Like I said, I know his first name is Rick.
17  I don't know his last name.
18      Q.      Okay.  But you believe Rick is the
19  Security Supervisor at Edgewood?
20      A.      He is.
21      Q.      Okay.  Is there only one supervisor at
22  Edgewood?
23      A.      There is.
24      Q.      What are the other St. Elizabeth

---

7 (Pages 23 to 26)

Lehman vs. St. Elizabeth                    CHAMBERS                    7/10/2012

Page 27

1  facilities besides Edgewood?
2       A.    Ft. Thomas, Florence, Covington, Grant.
3  There are no Security Officers at Falmouth, and there's
4  one Security Officer at the North Unit, that goes there
5  from Covington.
6       Q.    So there are -- do you believe that there
7  are Security Officer Supervisors at Ft. Thomas,
8  Florence, Covington, and Grant?
9       A.    Yes, there are.  Site managers.
10      Q.    Okay.
11      A.    The System Director at Edgewood doesn't
12  necessarily have a site manager.  But the other
13  facilities have site managers, that are large enough
14  and warrant that.
15      Q.    Okay.
16      A.    That's why I was drawing a blank on
17  supervisors.  George Miller would be the Site Manager
18  for Florence.  There would be Bill Mauer is the Site
19  Manager for Covington, and at Ft. Thomas, we have an
20  Assistant Director, whose name is -- I'll think of it
21  in a minute.
22      Q.    Okay.  You mentioned that if a Security
23  Officer needed to leave the premises on his lunch
24  break, he would need to ask for permission?

Page 28

1       A.    They have to clock out.  So they have to
2  have permission to -- basically, the Director would
3  need to know that they had clocked out, and when they
4  are coming back, approximate time they are coming back.
5  They can stack their breaks together with lunch with
6  permission.
7       Q.    Would a Security Officer need to clock out
8  if they were just going to lunch in the cafeteria?
9       A.    No.
10      Q.    So they get paid for their time that they
11  are taking lunch?
12      A.    No.  I'm sorry, they would.  I'm not as
13  familiar, exactly, with those details as Mike would be.
14      Q.    Okay.  Obviously, for the 15 minute --
15  well, do you know whether they get paid for the 15
16  minute breaks?
17      A.    Yes.  Most of my direct reports are
18  salary.
19      Q.    Okay.
20      A.    Different rules.
21      Q.    Do you know whether a -- well, strike
22  that.  Is there a place for people to go if they want
23  to smoke at the Edgewood location?
24      A.    No.

Page 29

1       Q.    Could they go to their car to smoke?
2       A.    No, not on our property.  They must leave
3  the property.  That's fairly new.
4       Q.    How long has that been around?
5       A.    We adopted that this past year.  We went
6  smoke free on the campus in 2012.
7       Q.    Prior to 2012, what did people do if they
8  wanted to smoke?
9       A.    There were smoke huts for the associates.
10      Q.    Where were they?
11      A.    One was outside the cafeteria, on the
12  lower level -- actually, no.  I apologize.  It's
13  outside of the BHC courtyard.  That's where the
14  employee smoking hut was located.  Some would also
15  smoke outside of the cafeteria as well.  You know, it
16  was outside, and we allowed it.  So prior to that time,
17  we did.  So January 1, 2012, simply, you must leave the
18  property, period.
19      Q.    Do you have any understanding of St.
20  Elizabeth's disciplinary policy as it relates to
21  sleeping at work?
22      A.    Yes.
23      Q.    And has that policy changed?
24      A.    It has.

Page 30

1       Q.    Do you know when it changed?
2       A.    No, I don't.
3       Q.    Okay.  How did you find out that it
4  changed?
5       A.    There was some discussion about it
6  relative -- later on, to -- I was aware of some of the
7  other terminations that had taken place in the
8  organization, but it changed, relatively, I think, this
9  past year.
10      Q.    Okay.  And what is the new policy as it
11  relates to sleeping?
12      A.    First offense, termination.
13      Q.    What was the policy prior to the change?
14      A.    First offense was Level 3, but the policy
15  also gave us permission to make a determination if the
16  sleeping was -- make a determination whether or not we
17  could override the Level 3 and terminate if we chose
18  to.
19           (Chambers Deposition Exhibit No. 1 was
20           marked for identification.)
21      Q.    Mr. Chambers, you've been handed what has
22  been marked as Exhibit 1 to your deposition.  I would
23  like for you to let me know whether or not this appears
24  to be an accurate copy of the disciplinary policy of

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    CHAMBERS                        7/10/2012

---

Page 31

1    St. Elizabeth, as of 2010?
2        A.    It does.
3        Q.    Okay.  And as you described earlier, there
4    is what we tend to call progressive discipline here,
5    where it outlines Level 1 -- it starts on Page 3 --
6    Level 2 and Level 3, right?
7        A.    Correct.
8        Q.    And generally -- I believe you testified
9    that, generally, the practice is to follow this policy;
10   however, it allows for you to make individual
11   determinations, depending on the offense; is that
12   correct?
13       A.    That's correct.
14       Q.    On the last couple pages here, starting
15   with -- if you look at the bottom, it says BL 000246?
16       A.    Um-hmm (nodding head affirmatively).
17       Q.    "Guidelines for Determining Appropriate
18   Level of Discipline?"
19       A.    Yes.
20       Q.    It lists certain offenses here and what
21   the recommendation is, in terms of whether the employee
22   should receive a Level 3 or discharge; is that correct?
23       A.    That's correct.
24       Q.    Or Level 2 or Level 1, in some cases.  If

---

Page 32

1    you turn to the next page, there's a reference to
2    unauthorized sleeping on work time?
3        A.    Yes.
4        Q.    And the recommendation is for the first
5    offense to be a Level 3, correct?
6        A.    That's correct.
7        Q.    The second offense, a discharge?
8        A.    That's correct.
9        Q.    Do you know what the purpose was of giving
10   an employee a Level 3 for the first offense, when this
11   policy was in place?
12       A.    No.
13       Q.    Okay.  On the first page of the policy, it
14   lists Marty Oscadal, which you mentioned earlier,
15   Senior Vice-President of Human Resources, and
16   references Joseph Gross, President and CEO.  Was he the
17   President and CEO before --
18       A.    Before John DuBis.
19       Q.    -- John DuBis?
20       A.    Yes, he was.
21       Q.    This date is February 25 2010.  Mr. DuBis
22   was already in place before 2010; is that correct?
23       A.    Correct.
24       Q.    Were you involved at all in -- I think you

---

Page 33

1    mentioned there were some discussions about changing
2    the policy with respect to the disciplinary action for
3    an employee who is caught sleeping from a Level 3 to an
4    automatic termination.  Were you involved in those
5    discussions, like weighing in on whether it should be
6    changed?
7        A.    No.
8        Q.    Okay.  Did anyone explain to you why the
9    decision was made to change it from a Level 3 to
10   automatic termination?
11       A.    No.
12       Q.    Is it your belief that Human Resources
13   and/or the CEO were involved in that decision?
14       A.    Yes.
15       Q.    Were you involved at all in the decision
16   to discipline William Joe Edelbroich,
17   E-D-E-L-B-R-O-I-C-H?
18       A.    No.
19       Q.    Do you know him?
20       A.    No.
21       Q.    Do you know a Security Officer by the name
22   of Robert Landers?
23       A.    Landers?  You're going to test my memory
24   on every one of the names of these gentlemen.  I have

---

Page 34

1    over 300 associates -- 400 associates reporting up
2    through me.  So, no.
3        Q.    Okay.  How about Andrew Cappel?
4        A.    No.  The name sounds familiar.  I
5    recognize it.  But you have to tell me more about it
6    before I would understand who they are or who they
7    were.
8        Q.    Okay.  Were you aware that Andrew Cappel
9    was a Security Officer in Florence, who was found
10   sleeping?
11       A.    Yes.  Now, that jogs my memory, yes.
12       Q.    Okay.  Were you aware that Andrew Cappel
13   was found sleeping while in the security truck?
14       A.    Yes.
15       Q.    You have some familiarity with the
16   Security Officers responsibilities?
17       A.    Yes.
18       Q.    And at some point, the Security Officer is
19   supposed to do, like, a patrol in the security truck in
20   the parking lot; is that correct?
21       A.    Correct.  It's one of their duties to
22   patrol, be seen, to be moving around.  I don't expect
23   them to sit anywhere for any long period of time.  My
24   expectation is they move around.

9 (Pages 31 to 34)

Lehman vs. St. Elizabeth                    CHAMBERS                         7/10/2012

---

Page 35

1      Q.      Security truck, is that something that's
2   owned by St. Elizabeth?
3      A.      Yes.
4      Q.      And is it your understanding that
5   Mr. Cappel was sitting in the security truck for
6   approximately an hour without it moving?
7      A.      That's my understanding.
8      Q.      And a couple eyewitnesses saw him, what?
9   He appeared to be sleeping?
10     A.      That's my understanding, yes.
11     Q.      Mr. Cappel denied that, right?
12     A.      I don't recall.
13     Q.      Do you know if he grieved his termination?
14     A.      I don't remember it being grieved.  It
15   didn't come to me.
16     Q.      Would it generally come to you if somebody
17   was grieving their termination?
18     A.      It depends.  They could grieve and move it
19   up through HR and go to the manager and agree with the
20   decision at that point, or they could take it all the
21   way to the CEO, if they chose.
22     Q.      If they decided to go all the way to the
23   CEO, would you have been involved at --
24     A.      Yes.

---

Page 36

1      Q.      -- some point in that process?
2      A.      Yes.
3          MS. SCHOENING:  Just let her finish the
4   question.
5          MS. NEFF:  Sorry.  That's one of the
6   things I didn't mention before.  And you're doing
7   a pretty good job.
8          MS. SCHOENING:  He's doing really good.
9          MS. NEFF:  Just make sure you and I aren't
10   talking over one another.  If I cut you off, you
11   let me know.  It's not my intention to cut you
12   off.  Similarly, make sure you let me finish my
13   question.  That way, you're answering the correct
14   question.  Okay?
15     A.      Okay.
16     Q.      You said that you had become aware that
17   there had been other terminations for sleeping in other
18   organizations.  How did you become aware of that?
19     A.      Through HR.
20     Q.      Was that after Mr. Lehman's termination?
21     A.      Yes.
22     Q.      And these were in the discussions when you
23   were learning that they were changing the policy?
24     A.      Yes.

---

Page 37

1      Q.      I'm going to go back to William Joe
2   Edelbroich.
3      A.      I remembered something else.
4      Q.      Okay.
5      A.      You asked me earlier if I had any
6   involvement in the changing of the policy, and I said,
7   "No."  That is incorrect.  I am sitting on -- I sit on
8   a committee called "People Matters," and as a result of
9   that, as an executive, I have the opportunity to speak
10   to, to respond to, to disagree or agree with any policy
11   changes that relate to HR.  And so I did have the
12   opportunity to review that policy, now that I recall,
13   and offered up no -- I agreed with it.
14     Q.      Why did you agree with it?
15     A.      Because I don't support anyone sleeping at
16   work without permission.  They are hired to do a job.
17   They need to be doing that job.
18     Q.      Are there employees of St. Elizabeth that
19   sleep with permission?
20     A.      A nurse can be given permission if they
21   are on several lengthy shifts.  My understanding is,
22   they can ask, or there may be extenuating circumstances
23   that I'm not aware of that -- with permission.  That is
24   possible if it is discussed and agreed to in advance.

---

Page 38

1      Q.      So St. Elizabeth tolerates some level of
2   sleeping, as long as the employee gets permission?
3      A.      That was my understanding.  HR would have
4   a better knowledge of that occurring or not.
5      Q.      Okay.  We were talking earlier about
6   Andrew Cappel and him being accused of sleeping in the
7   security truck.  That was in 2012; is that correct?
8      A.      Yes.
9      Q.      Do you believe that was after the policy
10   changed to first offense and you're terminated?
11     A.      I can't speak to that.
12     Q.      Okay.  Even if it had -- let's assume it
13   was prior to the policy change.  Okay?
14     A.      Okay.
15     Q.      Would you find a Security Officer sleeping
16   in a security truck, owned by St. Elizabeth, while he's
17   supposed to be patrolling, would you find that to be a
18   pretty serious offense?
19     A.      Yes.
20     Q.      Would it concern you if the Security
21   Officer lied about sleeping while he was in the truck?
22     A.      Yes.
23     Q.      Would that -- if you were involved in that
24   decision to terminate that employee -- again, let's say

---

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    CHAMBERS                    7/10/2012

Page 39

1   it's prior to the change in the policy, would those
2   types of things factor into your decision to -- whether
3   to terminate or issue a Level 3 discipline?
4       A.    Yes.
5       Q.    All right.  I asked you earlier about
6   William Joe Edelbroich -- I don't know how to pronounce
7   his last name.  You mentioned you weren't sure who he
8   was.  If I told you he was a Security Officer at
9   Florence, who was also found sleeping by a coworker,
10  does that ring a bell at all?
11      A.    Yes.  I'm as not as familiar with the details
12  on that particular individual, more with Cappel, but
13  yes.
14      Q.    Do you remember anything from, you know,
15  just going back to what you can remember, about whether
16  or not you learned that William Joe had failed to
17  respond to certain security calls for a period of time?
18      A.    I do recall that.
19      Q.    Okay.  And not responding to calls on a
20  Security Officer's radio is a pretty serious offense;
21  isn't that correct?
22      A.    It is.
23      Q.    Because something could happen?
24      A.    That's correct.

Page 40

1       Q.    Do you have any recollection as to whether
2   or not William Joe Edelbroich admitted to sleeping or
3   not?
4       A.    He denied it, as I recall.
5       Q.    Do you know if he grieved his termination?
6       A.    I do not.
7       Q.    How often would you say that you end up
8   getting involved in the grievance process after an
9   employee has been terminated?
10      A.    Not very often, but it does happen.  I've
11  been there before.
12      Q.    Like ten, 20 percent of the time?
13      A.    I'd says less.
14      Q.    Less than that?
15      A.    Yes.
16      Q.    Have you ever reversed a termination as a
17  result of the employee's grievance?
18      A.    No.
19      Q.    All right.  I think I asked you earlier
20  about Robert Landers, as well.  Let me see if I can
21  find out more about him.
22            He was a Security Officer at Florence and
23  was found sleeping while in the security truck.  Does
24  that sound familiar at all?

Page 41

1       A.    It does.
2       Q.    And does it -- is it your understanding
3   that Mike Kraft, after learning that Mr. Landers had
4   apparently been sleeping, actually went to the Florence
5   office and caught him sleeping?
6       A.    Yes.
7       Q.    Do you know whether Mr. Landers admitted
8   to sleeping?
9       A.    I do not.
10      Q.    Okay.  At the time of his termination, do
11  you know approximately how long he had been working for
12  St. Elizabeth?
13      A.    I do not.
14      Q.    Have you ever met Robert Landers before,
15  as far as you know?
16      A.    I believe I have.
17      Q.    Okay.
18      A.    I have met all of the officers.
19      Q.    Do you have any recollection as to his
20  approximate age?
21      A.    No, I don't.
22      Q.    Have you -- if you've met all the
23  officers, do you remember Andrew Cappel's age?
24      A.    No, I don't.

Page 42

1       Q.    And then, do you remember William Joe
2   Edelbroich's age?
3       A.    No.
4       Q.    Prior to his termination, you had met Bob
5   Lehman; is that correct?
6       A.    Yes.
7       Q.    And you're aware that at the time of his
8   termination, he had worked for St. Elizabeth for a
9   fairly lengthy period of time, right?
10      A.    Yes, I was aware of that.
11      Q.    And how was his job performance prior to
12  his termination, as far as you know?
13      A.    Very good, as I recall.
14      Q.    You were first notified, at least via
15  e-mail at some point, that there had been accusations
16  that Mr. Lehman was sleeping in his office; is that
17  correct?
18      A.    Yes.
19      Q.    And is it your understanding that at that
20  time, Mike Kraft didn't believe that he could possibly
21  be sleeping in his office?
22      A.    Yes.
23      Q.    And that was, in part, because Bob had
24  quite a bit of job responsibilities at that time and

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    CHAMBERS                    7/10/2012

---

Page 43

1  had been completing them all right?
2      A.    Correct.
3      Q.    He also had a -- his office was in an area
4  that was easily visible, right?
5      A.    Correct.
6      Q.    After the initial complaints had been
7  made, what's your understanding of what happened to
8  investigate whether or not he was sleeping?
9      A.    Could you repeat the question?
10     Q.    Yeah.  After the initial complaints had
11  been made that he had been sleeping, what is your
12  understanding of what steps the company took to
13  investigate?
14     A.    At that point, I believe HR was notified,
15  and HR began their own investigation.
16     Q.    Okay.  Now, did you perform any type of
17  investigation into the allegations against Bob Lehman?
18     A.    I did.  I talked to -- I had extensive
19  conversations with Mike Kraft regarding the issue.  And
20  then spoke to -- and also talked to HR regarding their
21  findings.
22     Q.    Okay.  And HR, would that have been
23  Roxann?
24     A.    Yes.

---

Page 44

1      Q.    And what is your understanding of what
2  Roxann's findings were?
3      A.    That Bob was sleeping, and admitted to
4  doing so.  Bob also claimed, at the time, that there
5  was some physical reason for his inability to do so.
6  So I understood that HRS required a fitness-for-duty.
7  And the response I received back from that was there
8  was no physical evidence causing him to sleep.
9          I learned, at that time, as well, through
10  Bob, I believe, or someone told me, that he had
11  diabetes.
12     Q.    Okay.
13     A.    I did not know that prior.
14     Q.    Did you have any direct conversation with
15  Mr. Hynko about Mr. Lehman's physical condition?
16     A.    Are you talking about Gerald Hynko?
17     Q.    Yes.
18     A.    No.
19     Q.    What is Gerald's position?
20     A.    Director of -- I'm not sure of the title
21  of that department.  They typically do fitness for
22  duty.  And Gerald is no longer with the organization.
23     Q.    Do all employees have to go through
24  fitness for duty exams?

---

Page 45

1      A.    No.  It would depend on the circumstances
2  of the situation, and if an employee is claiming that,
3  you know, the reason they were doing something, which
4  is serious, that the request would come from HR or
5  anyone else who would -- if the employee was claiming,
6  you know, it was because of physical health, the reason
7  they couldn't perform their duties.  That would be the
8  obvious next step.
9      Q.    Is it your understanding that Mr. Lehman
10  said he was sleeping while on either breaks or at
11  lunch?
12     A.    That is my understanding.
13     Q.    Okay.  Do you know -- did you do any
14  investigation to determine whether or not that was
15  true?
16     A.    I did not.  I received enough information
17  from HR to inform me that the witnesses had informed HR
18  that they had seen Bob sleeping, and Bob admitted it
19  himself.  That was enough for me.
20     Q.    Did the witnesses state whether or not
21  they knew if he was on a break or at lunch?
22     A.    I don't recall.  You would have to ask HR.
23     Q.    Okay.  Did it make a difference to you
24  whether or not he was on a break or at lunch?

---

Page 46

1      A.    No.
2      Q.    Why not?
3      A.    I am responsible for the security and
4  safety of all patients and visitors that are on that
5  facility.  I have a gun locker for Code Silver, in the
6  event that someone might show up as a shooter, which
7  Robert is trained on, with a handgun -- a weapon, and
8  permitted to use deadly force, if need be.  I also have
9  a UL-listed fire room station at Edgewood, at which Bob
10  has done his time to fire watch for the entire system.
11  It's a pretty serious and significant responsibility
12  for me.  And I would expect any officer who is on break
13  or anywhere in the perimeter, if anything was to occur,
14  I would expect them to show up, and respond
15  immediately.
16     Q.    Did he miss any security calls?
17     A.    Not to my knowledge.
18     Q.    Did his ability to perform his job
19  responsibility suffer at all?
20     A.    If he was sleeping, yes.
21     Q.    How?
22     A.    He couldn't respond.  If I had a call in
23  the facility, a shooter or some serious event showed
24  up, of which I have plenty, where, you know, the

---

12 (Pages 43 to 46)

Lehman vs. St. Elizabeth                    CHAMBERS                    7/10/2012

---

Page 47

1  Security Officers are actually dealing with violent
2  patients, behavioral health patients.  That's why the
3  Security office is next door to the ER.  I have a
4  significant amount of violence that shows up in the ER
5  and other locations, and my expectation is these
6  officers should respond immediately, whenever there is
7  a code for that type of behavior, or something going
8  on.  Who knows what it could be?  So that's my
9  expectation.
10      Q.    A Security Officer couldn't respond
11  immediately, if they were in the bathroom at the time
12  of some kind of disturbance; is that correct?
13      A.    They can move pretty quickly and move out
14  if they needed to.  If they were asleep, they wouldn't
15  know anything was occurring.
16      Q.    You're just assuming that, right?
17      A.    That is my position.
18      Q.    Okay.  Do you know whether Mr. Lehman made
19  sure that there was enough coverage while he took his
20  break?
21      A.    Again, irrelevant to me.  If you're
22  sleeping, you can't respond.
23      Q.    Okay.  Do you know whether he did?
24      A.    No, I don't.

---

Page 48

1      Q.    If he were to take a standard lunch break,
2  would it be important for him to assure that there's
3  enough security coverage?
4      A.    Yes.
5      Q.    Just like if any of his employees were
6  taking one, he would want to make sure there's
7  coverage?
8      A.    Right.
9      Q.    So they could respond to an incident as
10  you described?
11      A.    Yes.
12      Q.    What witnesses saw Bob sleeping?
13      A.    I don't recall.  It's been a while.
14      Q.    And you didn't speak to them directly?
15      A.    I did not.
16      Q.    As far as you know, from what you reviewed
17  prior to making the termination decision, was
18  Mr. Lehman hiding the fact that he was taking naps
19  during breaks or lunch?
20      A.    No.  He admitted it.
21      Q.    Is it your understanding that he would
22  keep the door open to his office?
23      A.    That, I'm unclear on.
24      Q.    You didn't see any kind of security

---

Page 49

1  surveillance video of Mr. Lehman sleeping; did you?
2      A.    No, I did not.
3      Q.    Do you know whether any existed?
4      A.    No, I do not.
5      Q.    And you ultimately -- strike that.  Did
6  Mr. Kraft recommend to you that Mr. Lehman be
7  terminated?
8      A.    After about a week's worth of discussion,
9  yes.
10      Q.    Okay.  And what can you remember from
11  those discussions?
12      A.    During that week of time, due to the fact
13  that Bob was a good employee, we took that into
14  consideration.  A long-time performance, it was a
15  difficult decision.  As Michael dug into it further,
16  talked to HR, talked to HR's investigator, all of us
17  collectively concluded that sleeping on the job by a
18  supervisor, particularly a supervisor and manager as a
19  role model, and also being absent from a potential risk
20  to the people on that campus, the decision was made to
21  terminate him.
22      Q.    So in terms of discussions, you believe HR
23  was involved in those discussions, as well, with you
24  and Mike Kraft?

---

Page 50

1      A.    Yes, they were.
2      Q.    And during that week, was that while
3  Mr. Lehman was suspended?
4      A.    Yes.
5      Q.    And was that before or after he went
6  through the fitness for duty?
7      A.    I don't recall.
8      Q.    Did you ever hear anything from either HR
9  or Mike Kraft that the only justifiable reason for
10  sleeping is narcolepsy, in terms of a medical
11  condition?
12      A.    I did hear that.
13      Q.    Okay.  Did you have any conversations with
14  Bob prior to -- regarding this issue, prior to making
15  the decision to terminate his employment?
16      A.    I don't recall any.
17      Q.    Okay.  Were you present for the
18  termination meeting?
19      A.    I was not.
20      Q.    You subsequently had some conversation
21  with Bob, once he filed a grievance; is that correct?
22      A.    That's correct.
23      Q.    Approximately how long was that
24  conversation?

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                CHAMBERS                        7/10/2012

|  | Page 51 |
|---|---|

1      A.    About half an hour.

2      Q.    Did you learn from HR that Mr. Lehman had

3  reported seeing other employees sleeping?

4      A.    I heard that.  It could have been either

5  from Mike or HR.  I'm not sure which.

6      Q.    Did that impact your decision at all?

7      A.    No.

8      Q.    So why did you feel like this justified a

9  termination, as opposed to a Level 3?

10     A.    He's a supervisor.  He's a role model.

11  And I was not convinced -- in his grievance discussion,

12  he did not convince me after I asked him if there were

13  any other facts in the matter.  There were none.  He

14  admitted to sleeping.  And I asked him if there were

15  any way -- how he would avoid that in the future.  And

16  he mentioned some devices that he would pick up.  It

17  did not give me any comfort that I was going to be able

18  to count on him to be there in the event of an

19  emergency, simply put.  As I wrote in my letter, I

20  believe I wrote it exactly the same way.

21           (Chambers Deposition Exhibit No. 2 was

22           marked for identification.)

23     Q.    Just for the record, Mr. Chambers.  When

24  you're saying, as you wrote in the letter, is this the

|  | Page 52 |
|---|---|

1  letter that you were referring to?

2      A.    That's correct.

3      Q.    Now, you mentioned -- if you look at the

4  third paragraph there.  In the last part, you state

5  "and failed to enforce the policy with others."  Do you

6  see that?

7      A.    I do.

8      Q.    Who did Bob fail to enforce the policy

9  with?

10     A.    Bob had mentioned that there were others

11  in the department sleeping, and that nothing was -- he

12  did not take any further -- he was not even aware of

13  the policy, which is an expectation of supervision and

14  management, that he know policy existed.  He didn't

15  know what it was.

16     Q.    And did Mr. Lehman explain to you that he

17  went to his boss at the time about those people

18  sleeping, who was Greg Popham?

19     A.    I think he mentioned that in our

20  discussion.

21     Q.    And what can you remember Greg telling him

22  to do?

23     A.    Again, I don't have the benefit of that

24  information.  Greg is no longer with us.  I don't know.

|  | Page 53 |
|---|---|

1      Q.    Okay.

2      A.    The past is what it is.

3      Q.    Why does St. Elizabeth have a disciplinary

4  policy that's located on the intranet, called 360, for

5  employees to look at?

6      A.    So that they are kept in an orderly

7  fashion.  They are retrievable, accessible, et cetera.

8      Q.    You want employees to be able to access

9  information about how their employment might be

10  terminated, right?

11     A.    In particular, managers.  Managers

12  certainly are expected to be very familiar with

13  retrieving and accepting and documenting and talking to

14  employees throughout the system.  So managers certainly

15  should be aware of that system and where the policies

16  are located, yes.

17     Q.    Are you aware that Mike Kraft initially

18  told Bob Lehman that he would be receiving a Level 1

19  disciplinary action?

20     A.    I remember some conversation about that.

21  There was a lot of confusion during the time period

22  through which this was being investigated.  Mike is

23  also a new employee.

24     Q.    Mike is a Director, right?

|  | Page 54 |
|---|---|

1      A.    He's a Director.  He's not been with the

2  organization very long.

3      Q.    As a Director, you would expect him to be

4  aware of the policies?

5      A.    I am.  Correct.

6      Q.    Was he disciplined for that?

7      A.    No.

8      Q.    One of the reasons why -- other than just

9  having it available for managers and employees to

10  access, one reason why you want to make the

11  disciplinary policy accessible to employees is to make

12  sure that they understand their expectations, right?

13     A.    That's correct.

14     Q.    Did you make the decision -- obviously, I

15  know it wasn't solely your decision.  But did you make

16  the decision to terminate Mr. Lehman after you had

17  received word that whatever physical condition he was

18  complaining about had not impacted his ability to stay

19  awake at work?

20     A.    It was one of the factors.

21     Q.    You didn't make the decision prior to

22  that, right?

23     A.    No.  It all happened during that week.

24     Q.    Level 3 disciplinary action, that's like a

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    CHAMBERS                    7/10/2012

Page 55

1    final written warning?
2        A.    It is.
3        Q.    If you screw up one more time you're out
4    the door, right?
5        A.    That's correct.  Pretty serious.
6        Q.    And is it for a year?  You can't get any
7    other discipline for a year; is that right?
8        A.    It's a rolling year, I believe, yes.
9        Q.    Did you ever tell Mike Kraft that you felt
10   like even giving Mr. Lehman a Level 3 was an extreme
11   punishment?
12       A.    I don't recall saying that.
13       Q.    Okay.  Were you involved in the decision
14   to replace Mr. Lehman with Rick?
15       A.    Yes.
16       Q.    Do you have a disability?
17       A.    No.
18       Q.    Do you know whether Rick has a disability?
19       A.    No, I do not.
20       Q.    I understand that Rick was working for
21   another St. Elizabeth facility?
22       A.    Yes.  Promoted from within.
23       Q.    Did you fill his position once it was
24   vacant, Rick's?

Page 56

1        A.    I don't recall.
2              MS. NEFF:  All right.  Let's take a quick
3        break.
4              THE WITNESS:  Okay.
5              (At which time, a recess was taken from
6        11:16 a.m. until 11:31 a.m.)
7              MS. NEFF:  Let's go back on the record.
8        Q.    You mentioned earlier that one of your
9    concerns with respect to Mr. Lehman sleeping related
10   to -- I think you mentioned a gun or some kind of gun
11   that could be used?
12       A.    Correct.  Gun locker.
13       Q.    The gun locker is located in the Security
14   Supervisor's office; is that correct?
15       A.    That's correct.
16       Q.    Is it your understanding that at all
17   times, reported by witnesses and by Mr. Lehman, if he
18   were sleeping, it was always in his office; is that
19   correct?
20       A.    Could you repeat the question again?  I'm
21   not sure I understand what you're asking.
22       Q.    Sure.  Is it your understanding that the
23   witnesses only reported seeing Mr. Lehman sleeping in
24   his office?

Page 57

1        A.    Yes.
2        Q.    Is it your understanding that Mr. Lehman
3    only admitted to sleeping in his office?
4        A.    Yes.
5        Q.    At the time that -- I think you also
6    testified earlier that you had no assurances from
7    Mr. Lehman that he could prevent sleeping in the
8    future.  At the time of the grievance meeting,
9    Mr. Lehman had told you that he had already purchased
10   the truck driver's alarm thing, right?
11       A.    As I recall, he mentioned that that's what
12   he would attempt to use to keep him from sleeping.  I
13   don't recall him saying he already purchased them, but
14   I do remember him saying that was what he identified to
15   help him from keeping from sleeping.  I do know there's
16   some device for truck drivers, yes.
17       Q.    He also said he was prepared to meet with
18   his own physicians to talk about if there was anything
19   they could do to help him?
20       A.    I don't recall that.
21       Q.    Okay.  He told you that he would work with
22   Employee Health?
23       A.    I believe so.  There was a really good
24   record written up by Roxann of the conversation going

Page 58

1    back and forth.  She really took very good notes.  I
2    read the document.  It's been a while.
3        Q.    You read it after Roxann wrote it up?
4        A.    That's correct.
5        Q.    And you looked at it and said, "This is
6    exactly what I remember?"
7        A.    That's correct.
8        Q.    I think you testified earlier, you said --
9    correct me if I'm wrong -- that one of your concerns
10   was that Mr. Lehman was not aware that what he was
11   doing could result in termination; is that correct?
12       A.    He was part of the discussion, as I
13   recall.  It had to do with supervision of other people
14   and he seemed to be unaware that sleeping was a serious
15   offense and a policy of any kind.
16       Q.    Did he assure you, in any way, that now
17   that he was aware of the policy, that that would impact
18   him sleeping while on breaks?
19       A.    Sure.  He said that.
20       Q.    But that didn't persuade you?
21       A.    No, it did not.
22       Q.    Okay.  I'm going to ask you about a couple
23   names.  I'm sorry to test your memory again.  And some
24   of these people may have been let go before you became

15 (Pages 55 to 58)

Lehman vs. St. Elizabeth                    CHAMBERS                    7/10/2012

Page 59

1  the Vice-President of Facilities.  There's no date on
2  here, so I'm not sure.
3       Actually, there are dates on here.  Were
4  you involved at all in the decision to terminate Paul
5  Anderson?
6       A.    Can you -- no, I don't believe so.  Can
7  you give me -- tell me who he is?  Where he is?
8       Q.    He's a Security Officer.  I don't know
9  where he is.
10      A.    Any Security Officer -- any particular
11 individual in the department that is recommended to be
12 termed by the manager would come for my signature.  And
13 I would have some -- I would vote on that particular
14 issue at the time.  But, you know, I don't know when
15 or, you know, at what time.
16      Q.    So we'll assume, then, that you were
17 involved in the termination decisions of all of the
18 Security Officers --
19      A.    Anybody within my division, yes.
20      Q.    -- after 2007?
21      A.    Yes.  I was made the Vice-President in
22 2003.  I did not have the assignment of Security until
23 2005.  That was assigned to me --
24      Q.    Okay.

Page 60

1       A.    -- in 2005.  After Mr. Puthoff retired.
2       Q.    Mr. Puthoff retired in '05?
3       A.    I believe that's the date.  Roughly
4  thereabouts.  So, yes, anybody in my division in
5  Security that was recommended to be terminated that
6  would come from manager to me and also HR would weigh
7  in.  And that's how that works.
8       Q.    Let me just ask you this then.  If you
9  could remember anything about any of these people I'm
10 going to list for you -- they are terminations -- as to
11 why they were terminated.
12      A.    Okay.
13      Q.    So Paul Anderson, I assume, you don't
14 remember why?
15      A.    I don't.
16      Q.    Robert Bayer, B-A-Y-E-R?
17      A.    No.
18      Q.    John Joseph Tuemler, Jr.?
19      A.    No.  I remember Joe.  I remember Joe
20 Tuemler, but it's been too long.  I don't remember, no.
21      Q.    John Beuerle, B-E-U-E-R-L-E?
22      A.    No.
23      Q.    Ryan Schmidt?
24      A.    No.

Page 61

1       Q.    Mark Tanner?
2       A.    No.
3       Q.    Steve Hensley?
4       A.    No.
5       Q.    Aldin Eugene Casson?
6       A.    No.
7       Q.    Danny Bridges?
8       A.    No.
9       Q.    Robert Oswald?
10      A.    No.
11      Q.    Allen Johnson?
12      A.    No.
13      Q.    Mark Dwain Jump?
14      A.    No.
15      Q.    Ralph --
16      A.    Can you tell me where all these employees
17 are?
18      Q.    I only know them as Security Officers.
19      A.    All of them are Security Officers you're
20 reading to me?
21      Q.    Yeah.
22      A.    Since 2005?
23      Q.    2008.
24      A.    Sometimes I have to have orientation of

Page 62

1  the site and the discussion around the individual.  If
2  you're just talking the individual names, no.
3       Q.    Ralph Schawe, S-C-H-A-W-E?
4       A.    No.
5       Q.    Richard Sturgeon?
6       A.    No.
7       Q.    Theodore Joseph Edgington?
8       A.    No.
9       Q.    Bobby Wince?
10      A.    No.
11      Q.    Patrick Joseph Noll?
12      A.    No.
13      Q.    Joyce Marie Hetzel?
14      A.    No.
15      Q.    James Allen Jackson?
16      A.    No.
17      Q.    Ken Rasor?
18      A.    Yes.
19      Q.    Why was Ken terminated?
20      A.    He attempted to falsify his time.  He was
21 underneath an action plan at the time.  He left the
22 discussion with myself and HR.  He was angry.  He went
23 downstairs -- he was to be there until 4:30, and he
24 advised his secretary in the area, to clock him out at

16 (Pages 59 to 62)

Lehman vs. St. Elizabeth                              CHAMBERS                                7/10/2012

Page 63

1    4:30.  He was trying to falsify the time that he was on
2    the property, and we had -- that was why he was
3    terminated.
4         Q.    You said you and HR were already meeting
5    with him about something else?
6         A.    Yes.
7         Q.    What were you meeting with him about?
8         A.    Performance.
9              MS. SCHOENING:  I'm just going to object
10    to the relevancy to this line of questioning, but
11    you can answer.
12         Q.    Okay.  So when you were meeting with him,
13    his employment was not going to be terminated at that
14    time?
15         A.    No.
16         Q.    When he falsified his time, that's what
17    ultimately led to the termination?
18         A.    That's what happened.
19         Q.    Ryan Schmidt?
20         A.    I know the name, but I can't place him.
21         Q.    James Gregory Coots?
22         A.    No.
23         Q.    Gary Hatter?
24

Page 64

1         A.    No.
2         Q.    Nathan Travis Rettig?
3         A.    No.
4         Q.    Christopher Dees?
5         A.    No.
6         Q.    Roy Brian Capps?
7         A.    No.
8         Q.    Was Mike Kraft in the meeting with you,
9    HR, and Ken?
10         A.    Yes.
11         Q.    Okay.  Who from HR?  Was it Roxann?
12         A.    Yes.  And the meeting I'm talking about
13    that he left?  No, Mike was not present at that
14    meeting.  But Mike had him under an action plan of
15    which all of us were supervising and looking at.  I
16    believe Ken was meeting with me on a grievance because
17    he had been issued another level of discipline.  That's
18    what the meeting was for.  I believe when he realized
19    he was going to get nowhere from his grievance that he
20    left angrily and tried to falsify his time clock as he
21    left.
22         Q.    Had Bob Lehman ever notified you of
23    concerns with Ken Rasor's performance?
24         A.    Yes.  Indirectly.  I'm not sure -- I don't

Page 65

1    remember if we talked directly about it.  We probably
2    did on several occasions.  Ken was an issue in the
3    department.
4         Q.    Do you know whether Ken Rasor has any kind
5    of disability?
6         A.    No.
7         Q.    Have you received any training from
8    St. Elizabeth on discrimination?
9         A.    In what way?
10         Q.    Just any type.  Either in-person training,
11    on the computer training, about things to look for to
12    prevent discrimination?
13         A.    Definitely, over the years, I've been a
14    trainer.  There have been CBLs.  There have been
15    discussions about that.  So I would say, yes.
16         Q.    You have been a trainer?
17         A.    For an older program, many years ago.  I
18    don't recall the name of the program.  I wouldn't say in
19    that particular place, you know.  There was all kinds
20    of CBLs and documentation.
21         Q.    What is "CBL?"
22         A.    Computer-based Learning.
23         Q.    Thank you.  Do you have any materials that
24    you used either to train or that you received in

Page 66

1    training?
2         A.    No.  This is years ago.
3         Q.    Okay.  In terms of the grievance process,
4    obviously, you testified that you met with Bob.  Is
5    there anything else that you do in the grievance
6    process, other than just meeting with the grievant?
7         A.    Again, it would depend.  If the grievant
8    is admitting to doing exactly the issue at hand, I
9    don't see any reason to do a lot of investigation.  If
10    there is a dispute about the particular issue, and I'm
11    concerned about "he said/she said," then I will look
12    into it.  I will ask -- I have talked to other
13    individuals in the department.  And I've done so in
14    Security.
15         Q.    Can a grievant have somebody else review
16    their termination outside of the decision-making chain?
17         A.    It's structured, and it moves up through
18    administration, all the way from senior level all the
19    way to the CEO's office, if the grievant chooses to
20    take it that far.  Once that has been determined, once
21    everyone has had a chance to look at the process, and
22    they have made the determination, that's the end of the
23    discussion.
24

17 (Pages 63 to 66)

Lehman vs. St. Elizabeth                    CHAMBERS                          7/10/2012

---

Page 67

1    Q.    Okay.  And it's your understanding that
2  John DuBis was involved -- at some point, involved in
3  the decision to actually terminate Bob?
4    A.    Yes.
5    Q.    And employees are not allowed to use legal
6  representation during the grievance process; is that
7  correct?
8    A.    They use trained personnel by HR that help
9  them move through the process, if necessary.  The
10 people on the committee are trained by HR.
11   Q.    Okay.  When you say "people on the
12 committee," you're referring to --
13   A.    The decision-making body, yes.
14   Q.    So you -- in this case, it would be you,
15 Mike Kraft, and John DuBis?
16   A.    HR represents the individual --
17   Q.    Okay.
18   A.    -- through the process.
19   Q.    Do you know which HR representative was
20 representing Bob Lehman?
21   A.    It would have been Roxann.  And they are
22 representing the process for HR.  That's what they do.
23 They coordinate the process.
24   Q.    Did you ever have any conversations with

---

Page 68

1  Dr. Pastel (phonetic) about his findings on the
2  fitness-for-duty?
3    A.    That would be illegal, no.
4    Q.    Were you also made aware at some point,
5  either during the grievance process or prior to the
6  termination, that in addition to diabetes, Mr. Lehman
7  also has sleep apnea?
8    A.    I am not aware of that.
9          MS. NEFF:  I don't have any other
10 questions.
11         MS. SCHOENING:  I have a couple quick
12 questions.
13         EXAMINATION
14 BY MS. SCHOENING:
15   Q.    Mr. Chambers, you testified that Mike
16 Kraft was not disciplined over the policy.  Can you
17 explain why Mike Kraft wasn't disciplined?
18   A.    Sure.  He made a mistake.  And he recalled
19 that there was something -- there was discipline as it
20 related to a policy to sleep, and that it was -- that
21 it was in the policy.  So he spoke from memory
22 incorrectly.  But he did the right thing by going to HR
23 to get their involvement and to determine what level of
24 seriousness it actually was.

---

Page 69

1          So that's why he wasn't disciplined.  He
2  spoke from memory and reacted immediately.  Not
3  surprising, due to the fact that Bob was a good
4  employee.  And that would be his first response.  It
5  was very understood.
6          Unlike, you know, Bob claimed he had --
7  that other people were doing it.  He was unaware of any
8  policy that had any kind of -- that it was any kind of
9  issue at all.
10   Q.    Did you ever see any of Mr. Lehman's
11 medical records?
12   A.    No.
13   Q.    Did anyone ever tell you what was in
14 Mr. Lehman's medical records?
15   A.    No.
16   Q.    Was Mr. Lehman's age a factor in your
17 decision to terminate his employment?
18   A.    No.
19   Q.    Were any medical conditions that Mr.
20 Lehman had a factor in your decision to terminate his
21 employment?
22   A.    No.
23
24

---

Page 70

1          MS. SCHOENING:  That's all the questions I
2  have.
3          MS. NEFF:  I don't have any follow-up.
4
5
6
7          _____
                  DOUGLAS CHAMBERS
8
9          (DEPOSITION CONCLUDED AT 11:50 A.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

18 (Pages 67 to 70)

Lehman vs. St. Elizabeth                          CHAMBERS                          7/10/2012

Page 71

```
 1            C E R T I F I C A T E
 2   STATE OF OHIO          :
                            : ss
 3   COUNTY OF HAMILTON     :
 4          I, Barbara A. Thacker, RPR, the
 5   undersigned, a duly qualified and commissioned notary
 6   public within and for the State of Ohio, do hereby
 7   certify that, before giving of the aforesaid
 8   deposition, DOUGLAS CHAMBERS, was by me first duly
 9   sworn to depose the truth, the whole truth, and nothing
10   but the truth; that the foregoing is the deposition
11   given at said time and place by DOUGLAS CHAMBERS; that
12   said deposition was taken in all respects pursuant to
13   stipulations of counsel hereinbefore set forth; that I
14   am neither a relative of nor employee of any of their
15   counsel, and have no interest whatever in the result of
16   the action.  I further certify that I am not, nor is
17   the court reporting firm with which I am affiliated,
18   under a contract as defined in Civil Rule 28(D).
19          IN WITNESS WHEREOF, I hereunto set my hand
20   and official seal of office at Cincinnati, Ohio, this
21   _____ day of _____, 2012.
22
             _____
23   My Commission Expires:  BARBARA A. THACKER, RPR
     May 17, 2013          Notary Public - State of Ohio
24
```

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

# ADDENDUM

TO THE REPORTER: I have read the entire transcript of my deposition taken on the ___10___<sup>th</sup> day of ___July___, 2012 or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| ✗ | | |
| 12 | 18 | MIKE DITTMER |
| 13 | 6 | HELENE GRUBER |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

_____
(Date)
**ROBERT LEHMAN vs ST. ELIZABETH**

_____
(Signature of Deponent)
**DOUGLAS CHAMBERS    7-10-12        BT**

ORIGINAL

AMS DEPO
P.O. Box 58641 · Cincinnati, Ohio  45258-8641
(513) 941-9464

Lehman vs. St. Elizabeth                CHAMBERS                        7/10/2012

Page 70

1          MS. SCHOENING:  That's all the questions I

2     have.

3          MS. NEFF:  I don't have any follow-up.

4

5

6

7     _____
         DOUGLAS CHAMBERS

8

9          (DEPOSITION CONCLUDED AT 11:50 A.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Lehman vs. St. Elizabeth**　　　　　　**CHAMBERS**　　　　　　**7/10/2012**

Page 71

```
 1                    C E R T I F I C A T E
 2    STATE OF OHIO        :
                           :  ss
 3    COUNTY OF HAMILTON   :
 4              I, Barbara A. Thacker, RPR, the
 5    undersigned, a duly qualified and commissioned notary
 6    public within and for the State of Ohio, do hereby
 7    certify that, before giving of the aforesaid
 8    deposition, DOUGLAS CHAMBERS, was by me first duly
 9    sworn to depose the truth, the whole truth, and nothing
10    but the truth; that the foregoing is the deposition
11    given at said time and place by DOUGLAS CHAMBERS; that
12    said deposition was taken in all respects pursuant to
13    stipulations of counsel hereinbefore set forth; that I
14    am neither a relative of nor employee of any of their
15    counsel, and have no interest whatever in the result of
16    the action.  I further certify that I am not, nor is
17    the court reporting firm with which I am affiliated,
18    under a contract as defined in Civil Rule 28(D).
19              IN WITNESS WHEREOF, I hereunto set my hand
20    and official seal of office at Cincinnati, Ohio, this
21    23rd day of July, 2012.
22                              Barbara A. Thacker
23    My Commission Expires:    BARBARA A. THACKER, RPR
24    May 17, 2013              Notary Public - State of Ohio
```

**AMS DEPO**
**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

ORIGINAL