Case: 2:11-cv-00165-WOB-JGW    Doc #: 29    Filed: 10/16/12    Page: 1 of 24 - Page ID#: 323

Lehman vs. St. Elizabeth          DUBIS                    7/13/2012

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

NORTHERN DIVISION AT COVINGTON


----------------------------------
                                    :
ROBERT LEHMAN,                      :
                                    :
              Plaintiff,            :
                                    :
         vs.                        :   CASE NO.
                                    :   2:11-cv-00165
ST. ELIZABETH HEALTHCARE,           :
                                    :
              Defendant.            :
                                    :
----------------------------------


         DEPOSITION OF:   JOHN S. DUBIS
         TAKEN:           By the Plaintiff
         DATE:            July 13, 2012
         TIME:            Commencing at 9:00 a.m.
         PLACE:           Offices of:
                          Dressman Benzinger LaVelle
                          207 Thomas More Parkway
                          Crestview Hills, Kentucky  41017


         BEFORE:          Raymond E. Simonson
                          Registered Merit Reporter
                          Notary Public-State of Ohio

Lehman vs. St. Elizabeth      DUBIS      7/13/2012

---

Page 2

```
 1   APPEARANCES:
 2     On behalf of the Plaintiff:
 3         KATHERINE DAUGHTREY NEFF, ESQ.
              of
 4         Freking & Betz
           525 Vine Street
 5         Sixth Floor
           Cincinnati, Ohio  45202
 6         Telephone:  (513) 721-1975
           Email:  kneff@frekingandbetz.com
 7
       On behalf of the Defendant:
 8
           KELLY A. SCHOENING, ESQ.
 9             of
           Dressman Benzinger LaVelle psc
10         207 Thomas More Parkway
           Crestview Hills, Kentucky  41017
11         Telephone:  (513) 357-5284
           Email:  kschoening@dbllaw.com
12
       Also present:  Robert Lehman
13                     Lisa Blank
                       Jeff Marshall
14
                        - - -
15
16
17
18
19
20
21
22
23
24
```

---

Page 3

```
 1                 I N D E X
 2   JOHN S. DUBIS                           PAGE
```
```
 3   CROSS-EXAMINATION BY MS. DAUGHTREY NEFF    4
 4   EXAMINATION BY MS. SCHOENING              77
```
```
 5
 6
 7               E X H I B I T S
 8   Dubis Exhibit Number      Marked   Referenced
 9         1            38          -
10
11
12   Chambers Exhibit Number    Marked   Referenced
13         1             -          43
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 4

```
 1                  JOHN S. DUBIS
 2   of lawful age, a witness herein, being first duly sworn
 3   as hereinafter certified, was examined and deposed as
 4   follows:
 5                 CROSS-EXAMINATION
 6   BY MS. DAUGHTREY NEFF:
 7        Q.    Good morning.  Could you state your full
 8   name for the record?
 9        A.    John Steve Dubis.
10        Q.    Mr. Dubis, my name is Kati Neff.  I know I
11   just introduced myself to you, but I represent Bob
12   Lehman in his lawsuit against St. Elizabeth.
13        A.    Um-hmm (nodding head affirmatively).
14        Q.    Do you mind if I call you "John"?
15        A.    Absolutely not.
16        Q.    You can call me "Kati" if you need to.
17        A.    Good.
18        Q.    Have you ever been deposed before, John?
19        A.    Yes.
20        Q.    And how many times have you been deposed,
21   approximately?
22        A.    Maybe a dozen.
23        Q.    And have those depositions related to
24   employment matters?
```

---

Page 5

```
 1        A.    No.
 2        Q.    Were any of those depositions personal
 3   matters?
 4        A.    No.
 5        Q.    How many of those depositions did you have
 6   to give while you were employed by St. Elizabeth?
 7        A.    One comes to mind.  I don't think there
 8   was more than one.
 9        Q.    And that one deposition that you gave
10   didn't involve an employee suing the company?
11        A.    No.  It was a contractual dispute.
12        Q.    Okay.  Well, since you have done this a
13   few times, I'm going to keep the ground rules fairly
14   short and sweet.  Obviously, you've been doing great
15   already.  Make sure you give verbal answers, which
16   you're doing.  If for some reason you don't understand
17   my question, it's very important for you to let me
18   know.  Otherwise, I'm going to assume that you
19   understand it.  Okay?
20        A.    Yes.
21        Q.    And the only other thing that might come
22   up is that, while I'm asking a question, please make
23   sure I'm finished before you start to answer.  That way
24   you and I are not talking over one another.  It's
```

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

Page 6

1  difficult for Ray to record testimony accurately if
2  that happens.  And if you are not finished with your
3  answer and I start to ask another question, let me know
4  you're not finished, and we'll all stop, and you can
5  finish your answer, and I'll go ahead and ask my
6  question after that.  Okay?
7      A.    Understood.
8      Q.    Did you do anything to prepare for your
9  deposition today?
10     A.    I met with my counsel and the Director of
11 Human Resources.
12     Q.    Okay.  And the Director of Human Resources
13 is?
14     A.    Lisa Blank.
15     Q.    That's Lisa.  Okay.  When did you meet
16 with Ms. Schoening and Ms. Blank?
17     A.    Yesterday.
18     Q.    How long was your meeting?
19     A.    Approximately an hour.
20     Q.    Did you review any documents?
21     A.    One.
22     Q.    And what was that document?
23     A.    The notes from -- I apologize for not
24 remembering her name, but the HR assistant that met

Page 7

1  with Bob Lehman and myself.
2      Q.    Was that Roxann Platek?
3      A.    Roxann.  Thank you.
4      Q.    Was that during the grievance --
5      A.    Process.
6      Q.    -- meeting?
7      A.    Yes.
8      Q.    Other than speaking with Ms. Schoening and
9  Ms. Blank during your meeting yesterday, have you
10 spoken with anyone else about your deposition today?
11     A.    No.
12     Q.    And other than reviewing the notes from
13 Ms. Platek yesterday, have you reviewed any other
14 documents to prepare for your deposition?
15     A.    No.
16     Q.    Could you please state your current
17 address?
18     A.    Personal address?
19     Q.    Yes.
20     A.    ██████████████████████,
21 Union, Kentucky, 41091.
22     Q.    How long have you lived at that address?
23     A.    Four years.
24     Q.    According to your business card, you are

Page 8

1  the President and Chief Executive Officer of
2  St. Elizabeth Hospital?
3      A.    Yes.
4      Q.    How long have you been in that position?
5      A.    Since January, 2011.
6      Q.    Did you work for St. Elizabeth prior to
7  January 2011?
8      A.    Yes.
9      Q.    When were you initially hired?
10     A.    December 10th, 2007.
11     Q.    What position were you hired for in
12 December of 2007?
13     A.    As the Chief Operating Officer.
14     Q.    Did you remain in that position until you
15 became President and CEO?
16     A.    Yes.
17     Q.    What is your date of birth?
18     A.    ███████ 1954.
19     Q.    When you became the President and CEO, who
20 filled that position immediately prior to you?
21     A.    Joseph Gross.
22     Q.    And was Mr. Gross your supervisor?
23     A.    Yes.
24     Q.    Did you have any other managers besides

Page 9

1  Joseph Gross during the time that you were the Chief
2  Operating Officer?
3      A.    I'm sorry.  I don't understand.
4      Q.    Did you have any other managers besides
5  Joseph Gross?
6      A.    Reporting to me or me reporting to someone
7  else?
8      Q.    I'm sorry.  People who managed you.
9      A.    No.
10     Q.    All right.  Could you just describe what
11 your -- I know, obviously, being the President and CEO,
12 you probably have a ton of different responsibilities,
13 but could you just generally describe what your
14 day-to-day responsibilities are?
15     A.    As the Chief Executive Officer of the
16 system, I have major responsibilities, primarily
17 related to the strategic direction of the organization,
18 community relations, interactions with the medical
19 staff, high-level interactions with the business
20 community, insurance business partners and other
21 business ventures with other companies, individuals in
22 the marketplace.
23     Q.    How many locations does St. Elizabeth
24 have?

3 (Pages 6 to 9)

Lehman vs. St. Elizabeth                DUBIS                    7/13/2012

---

Page 10

1      A.    We have six major facilities.  We have
2  half-a-dozen other ambulatory sites, and we also have
3  approximately 60 physician office locations throughout
4  our market area, through St. Elizabeth Physicians,
5  which is our employee physician group.
6      Q.    Where are the six major facilities
7  located?
8      A.    One is in Covington, Edgewood, Florence,
9  Fort Thomas, Grant County, and Falmouth.
10     Q.    Do you have a main office?
11     A.    It would be Edgewood.
12     Q.    Edgewood.  Is that the largest facility?
13     A.    Yes.
14     Q.    Approximately how many employees are at
15  the Edgewood facility?
16     A.    Probably around 4,000.
17     Q.    Do you know approximately how many
18  employees St. Elizabeth has in total?
19     A.    Approximately 7300.
20     Q.    How often would you say that you're
21  involved in termination decisions for your employees?
22     A.    In my current position, hardly at all.
23     Q.    How about in your Chief Operating Officer
24  position?

---

Page 11

1      A.    I would be involved in discussions about
2  terminations, particularly those that would have had
3  some significance in terms of potential negative
4  implications to the organization.
5      Q.    What do you mean by "some significance"?
6      A.    Things including whether there were
7  violation of patient care, safety issues not being
8  addressed properly, thefts, stealing, things of that
9  that nature.
10     Q.    Would there be typically one person or a
11  certain organization that would get you involved?
12     A.    Typically, it would come from our Senior
13  Vice President of Human Resources, Marty Oscadal.
14     Q.    Has Mr. Oscadal been the Senior Vice
15  President of Human Resources ever since you've been
16  hired with St. Elizabeth?
17     A.    Prior to the merger, his title was Vice
18  President, but he's been in that same role since the
19  time I was there and was elevated to Senior Vice
20  President after the merger with St. Luke's Hospitals.
21     Q.    Was that merger approximately in January
22  of 2011?
23     A.    No, it was October 2008.
24     Q.    And is St. Elizabeth a non-profit

---

Page 12

1  hospital?
2      A.    It is.
3      Q.    Could you just describe generally what
4  that means?
5      A.    In general, it means that any economic
6  benefit that comes as a result of the hospital's
7  operations does not go to shareholders as it would in
8  any normal for-profit business, that all those funds
9  and resources are re-invested into the organization for
10  patient care and our mission activities.
11     Q.    Do you get any funding outside of just
12  what you receive from either patients or insurance
13  companies?
14     A.    We may have some business ventures, but
15  those sums are insignificant in terms of where the real
16  resources come for the organization.
17     Q.    Do you receive any government grants or
18  anything like that?
19     A.    We would through some of our educational
20  and research programs.
21     Q.    Does St. Elizabeth have some kind of
22  financial report or some kind of report that shows
23  where your income is coming in and what you're putting
24  the income back into?

---

Page 13

1      A.    Yes.
2      Q.    Does it have a specific title?
3      A.    It would be our -- well, it could be a
4  variety of reports.  It could be from a balance sheet,
5  it could be profit-and-loss statements, through our
6  investment portfolios, a variety of sources.
7           MS. SCHOENING:  I'm just going to enter an
8      objection as to this line of questioning as to
9      the relevance to Bob Lehman's termination.
10     Q.    John, obviously, from time to time, Ms.
11  Schoening may object.  Unless she instructs you not to
12  answer the question, you can go ahead and answer the
13  question, which you already have.
14          Are you familiar at all with
15  St. Elizabeth's disciplinary policies?
16     A.    Yes.
17     Q.    Could you just describe generally what
18  St. Elizabeth's philosophy is with respect to
19  disciplining its employees?
20     A.    It's a general progressive disciplinary
21  policy that's, frankly, been in every organization that
22  I've ever been in, similar format, progressive type of
23  disciplinary activity, depending upon the severity or
24  the importance of whatever action may have occurred

---

4 (Pages 10 to 13)

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

| Page 14 | Page 16 |
|---|---|

**Page 14**

1 that was negative to the organization or to the
2 employee's performance expectations.
3      Q.    And the disciplinary policy is available
4 to employees so they can review it; is that correct?
5      A.    Yes.
6      Q.    And is it important to allow employees to
7 review that so they know what the expectations of the
8 hospital are?
9      A.    We offer it to all employees, so they do
10 have an understanding of what the general guidelines
11 are for the disciplinary process, yes.
12      Q.    Are you involved at all in recommending
13 changes to the policy?
14      A.    Yes.
15      Q.    Is there a committee that meets to discuss
16 changes to the disciplinary policy?
17      A.    There is.
18      Q.    Are you a member of that committee?
19      A.    I had been until I was made Chief
20 Executive Officer.
21      Q.    So as Chief Operating Officer, you are a
22 member of that committee?
23      A.    Yes.
24      Q.    Would you discuss other policies aside

**Page 16**

1 So it goes through every management individual.  But
2 there's also information shared with the general
3 employees about these types of issues as well.
4      Q.    And for a manager, would that be something
5 that they would receive just one time or on a yearly
6 basis or quarterly basis?
7      A.    I can't tell you exactly what the
8 frequency is on a formal basis annually.  But whenever
9 the policy is modified or changed, it is sent to all
10 managers, as well as being discussed typically at our
11 management meetings, so that it can be communicated
12 both verbally and afterwards in writing.
13      Q.    Who has the responsibility for showing
14 that St. Elizabeth's policies are consistently
15 enforced?
16      A.    Well, the Human Resources Department is
17 the one that provides the general information to the
18 senior management group in terms of what the
19 expectations are for the organization.  And then after
20 that process, interacting with Human Resources and with
21 the senior management group, decisions are made about
22 what is the appropriate action to take with regard to
23 any policy deviation.
24      Q.    Are there Human Resources employees at

| Page 15 | Page 17 |
|---|---|

**Page 15**

1 from the disciplinary policy?
2      A.    Yes.
3      Q.    What other types of policies does
4 St. Elizabeth have besides the disciplinary policy
5 you've been discussing?
6      A.    There are numerous.  I mean, I'm not
7 sure what you're  -- if you're asking for something
8 specific, we have numerous policies covering patient
9 care, covering employee performance and behaviors,
10 relating to customer service, just numerous policies.
11      Q.    Okay.  And do you have any kind of
12 anti-discrimination policy?
13      A.    Yes.
14      Q.    Where is that located?
15      A.    Well, it's located in our policy manuals
16 that are in our HR office and available also to our
17 employees if they like to see what those are.
18      Q.    Does St. Elizabeth train any of its
19 managers on the anti-discrimination policy?
20      A.    Yes.
21      Q.    And when do managers receive that
22 training?
23      A.    Initially, upon employment.  I myself went
24 through that when I was employed by the organization.

**Page 17**

1 each St. Elizabeth facility?
2      A.    I believe so, yes.
3      Q.    Okay.
4      A.    I wouldn't say at certain of our
5 facilities.  I don't think -- at our Falmouth facility
6 and our Covington facility, there are not, I don't
7 believe.
8      Q.    Are there Security Officers at each of the
9 major facilities?
10      A.    Yes.
11      Q.    You said earlier that St. Elizabeth uses a
12 sort of progressive discipline policy which is similar
13 to what you've seen from other organizations you've
14 worked at in the past?
15      A.    Um-hmm (nodding head affirmatively).
16      Q.    Do you think it's important for
17 St. Elizabeth to utilize progressive discipline with
18 its employees?
19      A.    I think it's important to have a
20 progressive disciplinary policy.  But as I said
21 earlier, there are always issues that arise that would
22 deviate from the normal step progress that would occur.
23      Q.    And St. Elizabeth's disciplinary policy
24 actually defines some of those infractions which would

5 (Pages 14 to 17)

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

Page 18

1 allow a manager or Human Resources to deviate from
2 progressive discipline, doesn't it?
3     A.    Yes.
4     Q.    And in your experience, is Human Resources
5 always involved in disciplinary decisions?
6     A.    To the best of my knowledge.
7     Q.    And that doesn't matter whether it's a
8 Level I, Level II, Level III, or discharge?
9     A.    I can't sit here and say that it's 100
10 percent of the time, because Level I transgressions may
11 not go to that level, but certainly anything
12 significant would go to the HR Department for review.
13    Q.    Are you familiar with -- I know it may be
14 called something different, but are you familiar with
15 St. Elizabeth's grievance process?
16    A.    Grievance process.
17    Q.    When can an employee file a grievance?
18    A.    You know, I can't tell you the specifics
19 in terms of when, but there is a step-by-step process
20 that's in place that is very specific, and is followed
21 very clearly during any grievance request.
22    Q.    When an employee files a grievance, are
23 they allowed to eventually get to you --
24    A.    Yes.

Page 19

1     Q.    -- to review the grievance?
2     A.    Sorry.  Yes.
3     Q.    And how often would you say that, in the
4 time that you've been the CEO, you have had a chance to
5 review grievances?
6     A.    As a CEO?
7     Q.    Yes.
8     A.    None that I can recall.
9     Q.    How about as the Chief Operating Officer?
10 Were you also in line to review grievances?
11    A.    Yes.
12    Q.    And how often would you say you reviewed
13 grievances during that period of time?
14    A.    Perhaps four or five times.
15    Q.    Okay.
16    A.    I can't be exact about it.
17    Q.    And those four or five times that you
18 reviewed grievances, did you ever overturn the
19 decision?
20    A.    Yes.
21    Q.    When did that happen?
22    A.    It was early in my arrival.  Frankly, I
23 cannot tell you the exact specifics of the case.  But I
24 remember reversing it because I felt things were not

Page 20

1 evaluated as appropriately as they should have been.
2     Q.    Was it a termination decision?
3     A.    I cannot recall.
4     Q.    Do you recall what organization the
5 employee was with or what department?
6     A.    No. I'm sorry. I can't.
7     Q.    That's okay.  Do you remember anything
8 about what level the employee was?  Whether the
9 employee was a manager level or lower than a manager
10 level?
11    A.    It would have been a staff individual.
12    Q.    Okay.
13    A.    Management employees are not entitled to
14 the grievance process per se.
15    Q.    And typically, Human Resources is also
16 involved in the grievance process; is that correct?
17    A.    Oh, intimately, yes.
18    Q.    And you mentioned earlier that Roxann
19 Platek, you believe, was the Human Resources employee
20 who was present for your grievance meeting with Mr.
21 Lehman?
22    A.    Yes.
23    Q.    Do you remember the HR employee who you
24 were working with on the grievance that you overturned?

Page 21

1     A.    No. I'm sorry. I cannot.
2     Q.    And you said you believe it was early in
3 your career with St. Elizabeth?
4     A.    Yes.
5     Q.    Do you believe there are any documents
6 that you can review that would help refresh your
7 recollection as to who that employee was?
8     A.    None that I have in my possession.
9     Q.    Do you have any knowledge as to whether
10 the HR Department keeps any kind of records about the
11 different employees who file grievances?
12    A.    Typically, they would.
13    Q.    Do you have any folks who report directly
14 to you right now?
15    A.    Yes.
16    Q.    And who reports directly to you?
17    A.    Would you like them by name or title or
18 both?
19    Q.    Both.
20    A.    Nathan VanLaningham, who is the Chief
21 Financial Officer; Garren Colvin, who is the Chief
22 Operating Officer; Marty Oscadal, who is the Senior
23 Vice President of Human Resources; Sarah Giolando, who
24 is the Senior Vice President for Strategic Planning and

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

---

Page 22

1  Business Development; Dr. Glenn Loomis, who is the
2  President and CEO of St. Elizabeth Physicians Group;
3  and Joseph Bozzelli, who is the Director of Pastoral
4  Care for the organization; as well as my assistant,
5  Barbara Krohman.
6      Q.    You said Joseph, I'm sorry, was the
7  Director of what?
8      A.    Pastoral Care.
9      Q.    Pastoral Care.  And do you have to
10  review -- do you need to take it?
11          (At which time, a cell phone rang in the
12          conference room.)
13          (Off-the-record discussion.)
14     Q.    Okay.  Do you have to rate or do
15  performance reviews for any of the employees that
16  report directly to you?
17     A.    All of them.
18     Q.    Do you have any responsibility for
19  reviewing any performance reviews that these folks
20  conduct for the employees that report to them?
21     A.    Not usually, no.
22     Q.    Do you know whether -- well, strike that.
23  Are the employees that report to you evaluated on
24  whether they have enforced St. Elizabeth's policies

Page 23

1  consistently?
2      A.    There is not a specific criterion in the
3  evaluation process, but it would be part of any
4  information that I would be made aware of during the
5  course of the year.
6      Q.    You mentioned earlier that the
7  disciplinary policy was available for employees to
8  review.  Would you expect the managers and supervisors
9  within St. Elizabeth to be aware of those policies?
10     A.    Yes.
11     Q.    You mentioned that St. Elizabeth does have
12  an anti-discrimination policy.  Is there any particular
13  person or department that is charged with enforcing
14  those policies?
15     A.    The Human Resources Department.
16     Q.    With respect to the Human Resources
17  Department, are there different divisions within Human
18  Resources?
19     A.    Yes.
20     Q.    And there's a department called Employee
21  Health; is that correct?
22     A.    It's not part of the Human Resources
23  Department.
24     Q.    It's a separate department?

Page 24

1      A.    Yes.
2      Q.    And the Employee Health Department, I know
3  at a minimum, is responsible for performing
4  fitness-for-duty exams; is that correct?
5      A.    Yes.
6      Q.    Does the Employee Health Department have
7  any other responsibilities?
8      A.    No.  That's the Employee Health
9  Department.
10     Q.    Okay.
11     A.    The same staff may be utilized for
12  Business Health customers, but it is separate, just for
13  employee health.
14     Q.    Do you remember a St. Elizabeth employee
15  by the same of Gerald Hynko?
16     A.    I do.
17     Q.    What was Mr. Hynko's position?
18     A.    He was a Director of the Employee Health
19  Department.
20     Q.    And he is no longer with St. Elizabeth?
21     A.    He is not.
22     Q.    Who is the current Director of Employee
23  Health?
24     A.    I cannot tell you that.  I'm not

Page 25

1  completely aware, because, again, it's an area that
2  does not report to me.
3      Q.    Okay.
4      A.    There are over 300 managers at
5  St. Elizabeth, and it's not possible to keep track of
6  all of them.
7      Q.    Okay.  Do you have any understanding as to
8  whether the Human Resources Department is responsible
9  for assisting employees with requests for reasonable
10  accommodations?
11     A.    Yes.
12     Q.    Is there a particular division within
13  Human Resources that addresses that?
14     A.    I'm not aware of the division, but I know
15  it is from the Human Resources Department.
16     Q.    Does St. Elizabeth have any policy related
17  specifically to accommodating employees with
18  disabilities?
19     A.    I am personally not aware of the policy,
20  but I know that those type of accommodations are made.
21  I am aware that accommodations are made for
22  individuals.
23     Q.    Have you ever been involved in a decision
24  as to whether or not to accommodate a particular

7 (Pages 22 to 25)

Lehman vs. St. Elizabeth                    DUBIS                      7/13/2012

Page 26

1    individual?
2         A.    No.
3         Q.    Other than meeting with Mr. Lehman as you
4    described earlier during the grievance meeting, have
5    you ever met Mr. Lehman?
6         A.    I believe so.
7         Q.    And you are aware he was a Security
8    Officer at the Edgewood facility?
9         A.    Supervisor of the Edgewood facility, yes.
10        Q.    Which is the facility you worked at,
11   correct?
12        A.    Where my office is located.
13        Q.    Were you involved at all in the decision
14   to terminate Mr. Lehman's employment?
15        A.    Yes.
16        Q.    How were you involved?
17        A.    At the final step of the grievance
18   process.
19        Q.    Were you involved at any time prior to
20   that?
21        A.    Marty Oscadal had reviewed with me the
22   case, and Roxann had also collectively reviewed with me
23   the case, to understand where the managers and the
24   Senior Vice President's positions were on what had

Page 27

1    transpired prior to my meeting with Mr. Lehman.  So I
2    understood the hospital's perspective in terms of where
3    the issues lied, and it was the opportunity for Mr.
4    Lehman, then, at the final grievance hearing with me to
5    explain his position on the matter.
6         Q.    You said that both Marty Oscadal and
7    Roxann had reviewed the case with you.  Was that
8    immediately prior to your meeting with Mr. Lehman?  You
9    knew the meeting was coming when they reviewed that
10   with you?
11        A.    I knew the meeting had been scheduled,
12   yes.
13        Q.    And was that the same time that Marty and
14   Roxann were --
15        A.    No.  I think I spoke with Marty first and
16   then with Roxann at a different time.
17        Q.    At that point when you met with Mr.
18   Lehman, he had already been terminated by
19   St. Elizabeth, right?
20        A.    That was the initial decision, yes.
21        Q.    And were you aware that that decision had
22   been made somewhere around -- or relayed to Mr. Lehman
23   somewhere around December 22nd?
24        A.    I do not know the date.

Page 28

1         Q.    Do you know if you had any involvement
2    prior to December 22nd, assuming that is the date of
3    his termination, in the decision to terminate his
4    employment?
5         A.    Yes.
6         Q.    And what can you remember from that?
7         A.    Marty had met with me prior to the
8    decision being made.  He just advised me of what was
9    transpiring.
10        Q.    Okay.
11        A.    He did not tell me what the decision was.
12   He was just informing me of what the circumstances
13   were.
14        Q.    Did you ever tell Marty or anyone else who
15   was involved in the termination decision, prior to Mr.
16   Lehman actually being terminated, that you thought his
17   employment should be terminated?
18        A.    No.
19        Q.    So when Marty discussed what was going on,
20   he was just advising you what was happening, and you
21   were simply just listening to what he had to say?
22        A.    No.  I shared some thoughts about the
23   matter.
24        Q.    Okay.  And what were your thoughts?

Page 29

1         A.    I was concerned that we had our Security
2    Supervisor, who acknowledged sleeping during his shifts
3    and allowing other Security Officers to sleep, and I
4    thought that was a significant issue.  But as with all
5    conversations with Marty or Senior Vice Presidents, I
6    give thoughts, and I tell them very quickly when we're
7    done with our conversation, "You decide what you feel
8    is appropriate."  It's not my call.
9         Q.    So in terms of the initial termination
10   decision, you wouldn't say that you were the final --
11        A.    No.
12        Q.    -- decision on that?
13        A.    Absolutely not.
14        Q.    Ultimately, with respect to the grievance,
15   you were the last stop in the grievance; is that
16   correct?
17        A.    Yes.
18        Q.    Did Marty explain to you when Mr. Lehman
19   had witnessed other Security Officers sleeping, like
20   approximately how long before the investigation
21   occurred that that had happened?
22        A.    My first understanding of other officers
23   sleeping was as a result of the review of Mr. Lehman's
24   discharge decision -- or prior to the decision, in

8 (Pages 26 to 29)

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

---

Page 30

1  which those facts came out.
2      Q.    Now, John, I understand that you have over
3  7,000 employees, so I don't necessarily expect you to
4  remember all these people.  But what I'm trying to do
5  is make sure, to find out whether you do have any
6  recollection of any of these people and being involved
7  either in being apprised of their termination or
8  potentially in the grievance process for them.  Okay?
9      A.    Okay.
10     Q.    Were you involved at all in the decision
11  to discipline Amanda Rickey?
12     A.    I do not recall that.
13     Q.    Cinda Carmen?
14     A.    I do not recall that.
15     Q.    Donald Kannady?
16     A.    I do not recall that.
17     Q.    Robert Gordon Landers?
18     A.    I do not recall that.
19     Q.    Teresa Porter?
20     A.    I recall the name, but I don't recall the
21  grievance issue.
22     Q.    Emily Seibel?
23     A.    Emily, I know.  But again, I cannot recall
24  any type of decision -- conversations regarding

---

Page 31

1  decisions about any grievance or disciplinary action.
2      Q.    You knew Emily was in the Marketing
3  Department?
4      A.    Marketing Department, yes.
5      Q.    Just a few more.  Steve Hensley?
6      A.    Steve Hensley is a physician on our staff,
7  the Steve Hensley that I know.
8      Q.    Okay.  This is probably a different one.
9  This one is listed as a Security Officer.
10     A.    I do not recall anything related against
11  Steve.
12     Q.    Aldin Eugene Casson?
13     A.    I do not recall.
14     Q.    Robert Oswald?
15     A.    I do not recall.
16     Q.    Ryan Schmidt?
17     A.    I do not recall.
18     Q.    Robert Bayer?
19     A.    I do not recall.
20     Q.    James Allen Jackson?
21     A.    I do not recall.
22     Q.    Greg Allen Birch?
23     A.    I do not recall.
24     Q.    Danny Bridges?

---

Page 32

1      A.    I do not recall.
2      Q.    Allen Johnson?
3      A.    I do not recall.
4      Q.    Bobbie Winch?
5      A.    I do not recall.
6      Q.    James Gregory Coots?
7      A.    I do not recall.
8      Q.    Ken Rasor?
9      A.    I had conversations about Mr. Rasor with
10  Marty Oscadal, yes.
11     Q.    And was that related to Mr. Rasor's
12  termination?
13     A.    It was relating to his performance, his
14  behavioral problems in his performance.  There may have
15  been discussions about termination, but I can't recall
16  that specifically.
17     Q.    Were you aware that Mr. Rasor was
18  ultimately terminated because of falsification of a
19  timecard?
20     A.    Yes.
21     Q.    And prior to that, St. Elizabeth had some
22  issues with his behavior and performance at work?
23     A.    That's what I was advised of, yes.
24     Q.    Okay.  Did he file a grievance as far as

---

Page 33

1  you know?
2      A.    I believe so, but I don't know
3  specifically.
4      Q.    It didn't get up to you, though, that you
5  can remember?
6      A.    That I can remember.
7      Q.    Okay.  You're not aware of his termination
8  from St. Elizabeth being overturned during the
9  grievance process?
10     A.    No, I am not aware of that.
11     Q.    Ken Rasor was a Security Officer; is that
12  correct?
13     A.    That's my understanding.
14     Q.    Is it important for -- strike that.  At
15  the Edgewood location, there are a few Security
16  Officers that would work together for day shift and
17  night shift; is that correct?
18     A.    We had Security Officers 24 hours a day,
19  seven days a week.
20     Q.    Is it important, do you believe, for the
21  Security Officers to work as a team?
22     A.    Yes.
23     Q.    Are you aware that the Security Officers
24  will sometimes patrol around the campus?

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

Page 34

1      A.    Yes.
2      Q.    How big is the Edgewood campus?
3      A.    It's a fairly good-sized campus, at least
4  the developed part is, I am guessing, but I'm going to
5  suggest 50 acres or so, maybe more.  It's a large
6  campus.
7      Q.    And have you witnessed the Security
8  Officers patrolling outside?
9      A.    Yes, I have.
10     Q.    Do they usually do that in a car or
11 vehicle?
12     A.    Some type of vehicle, yes.
13     Q.    Do they also patrol within the hospital?
14     A.    Yes.
15     Q.    How many would you generally see?  I know
16 you're probably not in your office all the time.  But
17 when you are in your office, how many would you
18 typically see when you are there?
19     A.    In the course of a day?
20     Q.    Yes.
21     A.    I would typically see -- and this is
22 typical, not every day.  When I arrive to work, I
23 arrive fairly early, around 6:00 or 6:30.  I would see
24 Security Officers in their vehicles.  I would see the

Page 35

1  Security Officer who would normally stand in the
2  Emergency Room entrance.  And then, during the course
3  of the day, if I walk around the organization, I would
4  potentially interact or meet some of them in the
5  hallways.
6      Q.    Was there always a Security Officer posted
7  in the Emergency Room?
8      A.    There should be.
9      Q.    Right.  Obviously, you're not there every
10 moment of the day?
11     A.    No.
12     Q.    You don't know, but it's a requirement?
13     A.    Yes.
14     Q.    Or St. Elizabeth would like a Security
15 Officer at that post all day?
16     A.    Yes.
17     Q.    Is there a particular office for the
18 Security Officers?
19     A.    It's immediately adjacent to the Emergency
20 Department.
21     Q.    Since you've been there at the Edgewood
22 location, has there ever been an incident with somebody
23 bringing in a firearm?
24     A.    I believe so.  But again, I don't recall

Page 36

1  specifics about it.
2      Q.    Was there ever some incident at the
3  Florence location that was --
4      A.    I believe so as well.
5      Q.    Something like that?
6      A.    Yes.
7      Q.    Okay.  What, if anything, can you remember
8  about that?
9      A.    Just that.
10     Q.    Somebody brought in a firearm?
11     A.    Yes.
12     Q.    Do you know how many Security Officers are
13 at the Florence location?
14     A.    I do not.
15     Q.    How big is the Florence location?
16     A.    The Florence location is a 175-bed
17 facility.
18     Q.    How many beds does the Edgewood location
19 have?
20     A.    450.
21     Q.    I understand that -- strike that.  The
22 disciplinary policy that was in effect in the late
23 summer/early fall of 2010 referenced unauthorized
24 sleeping on work time.  Do you remember that?

Page 37

1      A.    Yes.
2      Q.    Has that policy changed?
3      A.    Yes.
4      Q.    Were you involved in the decision to
5  change that policy?
6      A.    Yes.
7      Q.    Approximately when did it change?  Were
8  you still COO, or were you the CEO?
9      A.    I was still the COO.
10     Q.    Okay.  So it changed sometime between,
11 probably, September of 2010, when Mr. Lehman was
12 terminated, and January of 2011?
13     A.    Yes.
14     Q.    Okay.
15     A.    Well, let me -- at least the discussions
16 happened.  Whether it was officially changed prior to
17 2011, I'm not sure.
18     Q.    There had been some discussions about
19 changing the policy --
20     A.    Yes.
21     Q.    -- prior to January of 2011?
22     A.    Yes.
23     Q.    Did you know you were going to become the
24 CEO prior to January of 2011?

10 (Pages 34 to 37)

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

---

Page 38

1    A.    Yes.
2    Q.    When did you learn that?
3    A.    Well, my original employment was to be the
4    successor to the current CEO.
5    Q.    Okay.
6    A.    It was announced in June or July of 2010.
7    Q.    And when it was announced in June or July
8    of 2010, was Joseph Gross still the CEO?
9    A.    Yes.
10   Q.    And he remained in that position until
11   January of 2011?
12   A.    Through January 1st, 2010.
13   Q.    Okay.
14        (Dubis Exhibit No. 1 was marked for
15        identification.)
16   A.    (Witness reviewing document).  I should
17   revise an answer.  I previously also reviewed this
18   yesterday.
19   Q.    Okay.
20   A.    So I did look at two documents rather than
21   just one.
22   Q.    I just wanted to clarify something.  This
23   is a document dated November 1, 2010.  And is that your
24   signature on the document?

---

Page 39

1    A.    Yes.
2    Q.    And could you just describe generally what
3    this document is?
4    A.    This is my response to Bob Lehman's
5    grievance, giving my decision regarding whether or not
6    I thought his termination from the hospital was
7    appropriate, which I agreed that it was, and denied his
8    appeal.
9    Q.    Okay.  And obviously, at the top, and then
10   just below your signature, it says you are the
11   Executive Vice President and Chief Operating Officer?
12   A.    Yes.
13   Q.    Can a grievant take their grievance up
14   through the Chief Executive Officer?
15   A.    It depended upon which departments
16   reported to Chief Operating Officer and which
17   departments report to the CEO.  So I was the final
18   executive in the position to offer the decision.
19   Q.    Okay.  Got it.  And that was because the
20   Security Department didn't report to the CEO?
21   A.    Correct.
22   Q.    And currently the Security Department does
23   not report to you?
24   A.    That's correct.

---

Page 40

1    Q.    And does it report to the COO still?
2    A.    Yes.
3    Q.    And I may have asked you this.
4    A.    Well, it reports to the COO through the
5    Senior Vice President, who reports to him.
6    Q.    And you, I think --
7    A.    Which was the same when I was in that
8    role.  I apologize.
9    Q.    That's okay.  You said the COO -- is it
10   Garren?
11   A.    Garren Colvin.
12   Q.    Colvin.  How long has Garren been in that
13   position?
14   A.    Since January 1st, 2011.
15   Q.    You mentioned before that you initially,
16   upon hire, received some kind of information and/or
17   training on the St. Elizabeth anti-discrimination
18   policies?
19   A.    Yes.  It's a requirement for every
20   employee to complete the computerized program
21   assessment, and test on those issues.
22   Q.    And did that computerized program or
23   test include information about reasonable
24   accommodations?

---

Page 41

1    A.    I can't recall specifically, but I'm
2    certain there were, from many years of working in
3    healthcare and dealing with these issues.
4    Q.    Do you know whether -- if an employee's
5    medical condition led to the behavior that created the
6    disciplinary issue, should HR look into that to
7    determine whether or not that employee needs to be
8    accommodated?
9    A.    That would be our practice, yes.
10   Q.    You mentioned earlier that the
11   disciplinary policy as it related to sleeping has been
12   changed.  What is the current policy?
13   A.    I cannot tell you specifically, but we did
14   ensure that sleeping was -- let me rephrase.  We did
15   make sure that an offense for sleeping is a much more
16   serious infraction of hospital policy than it was
17   previously.
18   Q.    Why?
19   A.    I haven't worked in any organization or
20   know of any organization that has not taken very strict
21   approaches to people sleeping on the job, particularly
22   my experience, and the standard is in certain areas,
23   there is a higher level of accountability for that not
24   occurring, areas such as Security.

---

11 (Pages 38 to 41)

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

---

Page 42

1       The Security Department is responsible for
2    the safety and protection of our employees, our
3    visitors, our patients, any individual who comes to the
4    organization.  It is responsible for monitoring our
5    fire systems, our disaster system, fights in the
6    Emergency Room, altercations that happen outside, which
7    have occurred since I've been there, and an individual
8    who literally shot himself to death on a bench right
9    outside my office one morning.
10       It is a major, significant position to
11   secure the safety of the organization.  And my primary
12   responsibility, quite frankly, is to ensure that no
13   harm comes to a patient and that they are safe.  That's
14   why it takes a much higher level.
15       Q.    But the policy doesn't really specifically
16   relate to the Security Department, right?
17       A.    No, but that stimulated the change.
18       Q.    The Security Department did?
19       A.    Well, the issue with Mr. Lehman sleeping.
20       Q.    How did the policy preceding that -- well,
21   I think I have it.
22       MS. DAUGHTREY NEFF:  Let's go off the
23   record for a second.
24       (Off-the-record discussion.)

Page 43

1       (Reference to previously-marked Chambers
2    Exhibit No. 1.)
3       Q.    I'm going to hand you what was previously
4    marked as Chambers Exhibit No. 1.
5       A.    (Witness reviewing document).
6       Q.    What I'd like you to do is to turn to -- I
7    think what is the ninth page of that exhibit, BL000246.
8       A.    (Witness reviewing document).
9       Q.    Are you there?
10       A.    I am there.
11       Q.    Now, earlier, when we were discussing the
12   disciplinary policy, I asked you about whether or not
13   St. Elizabeth included some guidelines regarding
14   specific offenses and how a manager could determine the
15   appropriate action for that offense.
16       A.    It's in the guidelines, yes.
17       Q.    And at the top it says, "Guidelines for
18   Determining Level of Discipline."  There's "Level I,"
19   "Level II," "Level III," and "Discharge" listed there.
20   Do you see that?
21       A.    (Witness reviewing document).  Yes.
22       Q.    And if you turn to the next page, seven
23   lines down where it says "Unauthorized sleeping on work
24   time."

Page 44

1       A.    I see that.
2       Q.    What was the guideline for the first
3    offense at the time this policy was in place?
4       A.    Level III.
5       Q.    And for the second offense?
6       A.    Discharge.
7       Q.    Does the new policy have a similar
8    guideline like this?
9       A.    I cannot tell you.  I've not really seen
10   it.
11       Q.    Okay.
12       A.    I offered the input, and the committee
13   made its decision and moved forward.
14       Q.    Do you know what that policy meant, this
15   one you were just looking at, with respect to the word
16   "unauthorized"?
17       A.    (Witness reviewing document).
18       Q.    Where it says "Unauthorized sleeping on
19   work time"?
20       A.    We do allow some individuals to sleep
21   during work time, specifically our family-practice
22   residents.  So they are authorized to do that because
23   they have 24-hour shifts.  They have call rooms.
24   That's the only reference I can give in terms of what

Page 45

1    would be authorized.
2       Q.    And who authorizes that?
3       A.    The hospital does.
4       Q.    Are those employees still authorized to
5    sleep even after the policy changed?
6       A.    Yes.  It's standard practice for
7    physicians in training to do that.  They're residents.
8       Q.    How about nurses?  Are there any nurses
9    authorized to sleep during work time?
10       A.    Not that I'm aware of.
11       Q.    Do you consider lunch break work time?
12       A.    No.
13       Q.    I think you may have said this earlier,
14   but I wanted to make it clear.  The current policy with
15   respect to sleeping is discharge on first offense; is
16   that correct?
17       A.    True.  I do not know if that's the case.
18       Q.    Okay.
19       A.    That was my strong input to make that
20   modification.
21       Q.    If you had your way, that would be the
22   policy; is that what you're saying?
23       A.    Yes.
24       Q.    How would automatic termination of a

12 (Pages 42 to 45)

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

Page 46

1   Security Officer impact patient safety?
2       A.   I'm sorry.  I don't think I understand.
3       Q.   Sure.  Well, you said earlier that the
4   Security Department is held to higher standards because
5   they are charged with ensuring patient safety,
6   obviously, as well as employee safety.  What I'm trying
7   to figure out is how changing the policy from a
8   Level III to automatic termination -- how does that
9   impact -- or why would you do that as it relates to
10  that?
11      A.   It was something in force with the
12  Security staff, that prior episodes of sleeping --
13  which occurred with Bob, which occurred with other
14  officers under his supervision -- was not going to be
15  acceptable performance for all the reasons I mentioned
16  earlier about the heightened requirements of our
17  Security staff and the responsibilities to the patients
18  and the employees and everyone else's safety in the
19  organization.
20      Q.   Who were the other officers you were
21  referring to?
22      A.   I don't remember specifically their names,
23  but I was told there were other officers who Bob
24  acknowledged were sleeping, and he allowed it to

Page 47

1   happen.
2       Q.   Could a nurse sleeping, falling asleep
3   in the -- strike that.  Would a Marketing employee
4   falling asleep during the meeting impact patient safety
5   at all?
6       A.   In my opinion, no.
7       Q.   How about a physical therapist sleeping
8   during a therapy session with a patient?
9       A.   My honest response would be yes, but I'd
10  have to have the full context of what transpired to
11  make a final decision about that.
12      Q.   How about a Registered Nurse sleeping in
13  the pre-op area?
14      A.   Once again, I would have to have the full
15  context of what the situation was, but in general no
16  employee should be sleeping during work time.
17      Q.   Is it your understanding that Mr. Lehman
18  slept during work time?
19      A.   His information -- his conversation with
20  me was that he slept during his lunchtime and break
21  times.  But others have commented that that was not
22  necessarily the case; it was at all different kind of
23  times.
24      Q.   And who said that?

Page 48

1       A.   That was what was related to me during my
2   conversations with the HR Department.
3       Q.   With Roxann?
4       A.   I can't remember if it was Roxann or
5   Marty.
6       Q.   Or Marty?
7       A.   Yeah.
8       Q.   Do you know whether there was any kind of
9   eyewitness to Mr. Lehman sleeping outside of the break
10  times?
11      A.   Once again, that's Mr. Lehman's
12  contention.  I have no firm facts to know if that was
13  truly his break time or lunchtime or whatever.  So I
14  don't know the answer to your question.
15      Q.   Okay.  He's permitted to take a lunch
16  break, right?
17      A.   Absolutely.
18      Q.   And break times as well?
19      A.   Yes.
20      Q.   Mr. Lehman, as far as you know, did not go
21  to a patrol car and sleep there, did he?
22      A.   I'm not aware of hearing about that.
23      Q.   He didn't go to his own car and fall
24  asleep; is that correct?

Page 49

1       A.   I have not heard anything like that.
2       Q.   He didn't hide in any kind of unused room
3   at the hospital to sleep?
4       A.   I do not know that.
5       Q.   Is it your belief, based on what you heard
6   either from Mr. Lehman or Human Resources, that any of
7   the times he was sleeping, he was in his office with
8   the door open?
9       A.   I was informed that that was the location
10  where typically it occurred, but I do not know of a
11  door being opened or closed.
12      Q.   Okay.  Did you have any conversations with
13  Mr. Lehman's manager, Michael Kraft, about this issue
14  of Mr. Lehman sleeping?
15      A.   Not that I can recall.
16      Q.   Were you aware at the time that Mr. Lehman
17  was accused of sleeping that he was completing his
18  tasks in a timely manner and his work had met his
19  manager's expectations?
20      A.   No.
21      Q.   Were you aware that at the time that Mr.
22  Lehman was accused of sleeping that he had taken on
23  some additional responsibilities that Mike Kraft had
24  given him?

13 (Pages 46 to 49)

Lehman vs. St. Elizabeth                    DUBIS                          7/13/2012

Page 50

1      A.    No.
2      Q.    You said that, in preparation for your
3  deposition, you reviewed notes taken by Roxann Platek
4  describing your meeting with Mr. Lehman; is that
5  correct?
6      A.    Yes, briefly.
7      Q.    Did review the written notes, or was it
8  typed?
9      A.    It was a typed version.
10     Q.    And had you reviewed those prior to
11 reviewing for your deposition?
12     A.    No.  It was just yesterday.
13     Q.    So Roxann didn't give you an opportunity
14 to review them after your meeting with Mr. Lehman so
15 you could say, "Yeah, that's what happened," or, "No, I
16 don't remember it that way"?
17     A.    I don't recall.
18     Q.    And your meeting with Mr. Lehman occurred
19 on or around October 29th, 2010.  Does that sound
20 familiar?
21     A.    Yes.
22     Q.    And obviously, what you reviewed in
23 Exhibit No. 1 to your deposition, your decision, you
24 sent him on November 1st?

Page 51

1      A.    Yes.
2      Q.    Do you remember telling Mr. Lehman that
3  you were going to get more details and respond back to
4  him after he relayed to you his side of the story?
5      A.    Yes.
6      Q.    What additional details did you get after
7  your meeting?
8      A.    I talked with Roxann after our meeting,
9  and she relayed to me what she believed were
10 inconsistencies of what Mr. Lehman was saying, and
11 reinforced that his sleeping was, you know, not
12 authorized and was very much a routine activity.
13     Q.    What were the inconsistencies?
14     A.    I can't recall offhand.
15     Q.    Roxann didn't take notes during your
16 follow-up meeting with her?
17     A.    Not that I'm aware of.
18     Q.    And you didn't, obviously, as well?
19     A.    No.
20     Q.    Okay.  And after your meeting, you relied
21 on Roxann to keep track of what was discussed during
22 your meeting with Bob Lehman; you didn't make your own
23 notes?
24     A.    No, I did not.

Page 52

1      Q.    Is that correct?  You did not?
2      A.    To answer your question, yes.  I did not.
3  Sorry.
4      Q.    It was kind of a multi-question.  I
5  apologize for that.
6            Were you aware through your conversations
7  with either Marty or Roxann that Bob had undergone a
8  fitness-for-duty exam?
9      A.    Yes.
10     Q.    And did you get an opportunity to review
11 the results of that exam?
12     A.    We do not get direct results from those
13 type of exams.  Those are confidential exams that are
14 held by Employee Health.  Even the HR Department
15 doesn't get a written report.  We get feedback as to
16 whether or not the results were negative or positive.
17 And the information I was given was that there was no
18 medical issue for Bob's sleeping.
19     Q.    If a medical condition is uncovered during
20 the fit-for-duty exam, should HR know about that
21 medical condition?
22     A.    Yes.
23     Q.    Okay.
24     A.    Well, let me be clear again.  That direct

Page 53

1  report's detail, but the conclusions of the evaluating
2  physician, yes.
3      Q.    You understood prior to meeting with Bob
4  that he believed his fatigue related to his diabetes;
5  is that correct?
6      A.    That's what I was told, yes.
7      Q.    And did you also learn that through the
8  fit-for-duty process, Mr. Lehman -- or they uncovered
9  that Mr. Lehman also had sleep apnea?
10     A.    I was told there was a testing for sleep
11 apnea.  I don't recall the results of that.  The only
12 result that I had was that there was no medical
13 condition which would confirm his sleeping episodes.
14     Q.    The only medical condition St. Elizabeth
15 recognizes as a cause of sleeping is narcolepsy; is
16 that correct?
17     A.    I do not know.  I don't know the answer.
18     Q.    In making termination decisions at
19 St. Elizabeth, is it common for the managers and HR to
20 communicate via email?
21     A.    Yes.
22     Q.    And is it common, at different meetings
23 between HR and the employee who is potentially going to
24 be terminated, for those to be recorded in writing in

14 (Pages 50 to 53)

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

Page 54

1   some way?
2       A.    My understanding would be yes.
3       Q.    Did you review any documents prior to
4   meeting with Mr. Lehman in relation to his termination?
5       A.    Whatever Roxann had available, yes, I
6   would have reviewed those.
7       Q.    So other than speaking with Roxann after
8   your meeting with Bob Lehman, in which you believe you
9   gathered some more details, did you do anything else to
10  try to get more information before you made your
11  decision?
12      A.    I didn't feel the need that there was any
13  more information needed.
14      Q.    Bob told you during the grievance meeting
15  that his previous supervisor had laughed when he
16  brought to the supervisor's attention that an employee
17  was sleeping; isn't that correct?
18      A.    Yes.
19      Q.    And the previous supervisor was Greg
20  Popham?
21      A.    That's my understanding, yes.
22      Q.    Do you have any reason to believe that
23  that was untrue?
24      A.    No, but Greg Popham was not -- his

Page 55

1   performance as a manager was not acceptable, and he was
2   terminated from the organization much prior to this
3   episode happening.
4       Q.    He was his manager immediately prior to
5   Mike Kraft; is that correct?
6       A.    Yes.
7       Q.    And he also told you that Mr. Putnam (sic)
8   was also -- was he Greg Popham's manager as far as you
9   know?
10      A.    He was the Vice President before I
11  arrived.  I never knew him.
12      Q.    Did he explain to you that these incidents
13  of other employees sleeping occurred when Greg Popham
14  and Mr. Putnam (sic) were in their positions?
15           MS. SCHOENING:  Just for clarification,
16       it's "Puthoff."
17           MS. DAUGHTREY NEFF:  Oh, I'm sorry.
18           THE WITNESS:  I understood.
19      Q.    Okay.  I'm sorry.
20      A.    That's okay.
21      Q.    Did Mr. Lehman explain to you that the
22  employees in the Security Department he witnessed
23  sleeping occurred when Greg Popham and Mr. Puthoff were
24  the managers?

Page 56

1       A.    He said he saw it then and he saw it past
2   that time as well.
3       Q.    Of Security Officers?
4       A.    Security Officers and other individuals.
5       Q.    Bob had no supervisory authority over
6   nurses; is that correct?
7       A.    No.
8       Q.    And I'm sorry.  That was a bad question.
9   Is it correct that he did not have -- sorry.  Let's
10  start from the beginning there.
11           Mr. Lehman was not a supervisor of nurses;
12  is that correct?
13      A.    That's correct.
14      Q.    Okay.  Thanks.  Mr. Lehman also told you
15  that, either the individuals that he witnessed
16  sleeping, that he never saw them sleeping again; is
17  that correct?
18      A.    I don't recall that.
19      Q.    At least the Security Officers?
20      A.    I don't recall him saying that.
21      Q.    Okay.
22      A.    I did ask him if he talked to these
23  people, and he said no.
24      Q.    Okay.  With respect to the Security

Page 57

1   Officers or with --
2       A.    Yes.
3       Q.    -- respect to anyone?
4       A.    No.  Security Officers.
5       Q.    Obviously, as the Chief Operating Officer,
6   you were not present when Mr. Lehman initially met with
7   Mike Kraft and Lisa Blank to discuss his potential
8   discipline?
9       A.    I was not involved, no.
10      Q.    Okay.  And you weren't present to know one
11  way or the other if he was told he was going to get a
12  Level I disciplinary action?
13      A.    I had no contact until towards the end of
14  the decision, where termination was being recommended
15  by HR and the Senior Vice President.
16      Q.    Right.  And the Senior Vice President was
17  Doug Chambers?
18      A.    Doug Chambers.
19      Q.    All right.  So your understanding, based
20  on what either Roxann and or Marty told you, was that
21  Mr. Lehman was not just sleeping on breaks, that he was
22  sleeping during work time as well?
23      A.    I was told that he was sleeping at all
24  times.

15 (Pages 54 to 57)

Lehman vs. St. Elizabeth                    DUBIS                      7/13/2012

Page 58

1    Q.   Okay.
2    A.   Not any specific time.
3    Q.   And you didn't know what his schedule was,
4  did you?
5    A.   I knew at one point he was the evening --
6  or the night supervisor, and at another point he
7  shifted to the day, the day shift.
8    Q.   Do you know what times that shift
9  encompasses?
10   A.   The night shift?
11   Q.   The day shift.
12   A.   The day shift?  I don't know specifically.
13  It would be somewhere between 7:00 and 3:00.
14   Q.   Ultimately, why did you uphold the
15  termination decision?
16   A.   Not to be repetitive, but again, when I
17  spoke with Bob, I wanted to make sure he understood how
18  significant and how serious his responsibilities were
19  as both a Security Officer and as a Security
20  Supervisor.  And I explained to him that the importance
21  of Security is extraordinary when it comes to the
22  safety of our patients and our family members.
23        His explanations of sleeping during
24  breaks, during lunch, was just his comment.  I had no

Page 59

1  way to verify whether that was true or not.  He
2  admitted to sleeping.  He admitted to sleeping numerous
3  times.  He admitted to seeing his officers sleep, or
4  other officers sleep.  He did nothing about it.  He
5  failed to understand the significance of what his
6  position was about, both as a manager and as a Security
7  Officer.  And it's just not the performance that is
8  expected or permitted in the organization, not when it
9  comes to the safety of our people.
10   Q.   Did he tell you that he was not aware that
11  he was prohibited from sleeping while he was on a
12  break?
13   A.   I don't recall that.  But, you know, there
14  are certain things that people who work anywhere
15  understand:  You don't sleep at work.  You don't steal
16  from work.  You don't take drugs at work.  It's not
17  like it's something that is unusual that a normal
18  individual wouldn't understand.  So I had a hard time
19  believing and understanding that he found this to be
20  acceptable.
21   Q.   Did you review -- and I know you said you
22  may have received some documents from Roxann, but you
23  can't remember.  Do you know whether you reviewed the
24  decisions of the previous grievance process?

Page 60

1    A.   Yes, I did.
2    Q.   Because those were written decisions as
3  well?
4    A.   Um-hmm (nodding head affirmatively).
5    Q.   Okay.
6    A.   That's "yes."
7    Q.   Did you have any conversations with either
8  Doug Chambers or Mike Kraft, either right before you
9  met with Bob or immediately after you met with Bob,
10  before you made your decision?
11   A.   I mean, Doug and I conversed once the
12  issue was brought to my level for being part of the
13  grievance process, but it was basically to review what
14  had happened during the various steps along the
15  grievance process.
16   Q.   Did you have any conversations with -- and
17  I apologize if I asked you this earlier.  But did you
18  have any conversations with Gerald Hynko about Bob's
19  seeing the Employee Health Department?
20   A.   No.
21   Q.   Do you know Dr. Haskell?
22   A.   I know of him.
23   Q.   Is he still a St. Elizabeth employee?
24   A.   I do not know.

Page 61

1    Q.   Did you have any conversations with Dr.
2  Haskell about his review of Mr. Lehman?
3    A.   No.
4    Q.   Do you know how much time Dr. Haskell
5  spent with Mr. Lehman reviewing his medical
6  information?
7    A.   No.  It would not be privy for me to have
8  that information.
9    Q.   Right.  How much time would you expect
10  Dr. Haskell to spend with him?
11   A.   I think that's an individual type of
12  circumstance.  It depends on what the issues and how
13  much time the physician feels is necessary.
14   Q.   Does every employee have to go through a
15  fit-for-duty exam?
16   A.   Yes.
17   Q.   And is that upon --
18   A.   Excuse me.  Let me clarify.  There is a
19  requirement for a physical prior to employment.
20   Q.   Okay.  Why is that?
21   A.   We want to make sure that we don't have
22  individuals who are abusing illegal substances and to
23  find out any other history for the individual, to make sure
24  their knowledge as well, but primarily to make sure

16 (Pages 58 to 61)

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

Page 62

1  that we don't have individuals who are alcohol or
2  drug-dependent.
3      Q.    And Employee Health is the department
4  responsible for keeping that information?
5      A.    Yes.
6      Q.    And they do not share that information?
7      A.    They will share the results.
8      Q.    Okay.
9      A.    But none of the detailed analyses and the
10 doctor notes and things of that nature.
11     Q.    I think you said employees have to go
12 through a physical prior to employment.  Do they have
13 to go through a physical at any other time during to
14 this employment, other than like in this situation?
15     A.    Not to my knowledge, no.
16     Q.    If Employee Health was reporting
17 information about the employee's physical to anyone,
18 would it be just to HR?
19     A.    Typically, that would be the conduit, yes.
20         MS. DAUGHTREY NEFF:  All right.  Let's
21 take a quick break.
22         (At which time, a recess was taken from
23         10:16 a.m. until 10:42 a.m.)
24         MS. DAUGHTREY NEFF:  Let's go back on the

Page 63

1      record.
2      Q.    John, you mentioned earlier that there was
3  a serious incident at the Edgewood location where a
4  person shot himself on the bench?
5      A.    Committed suicide.
6      Q.    Who ran that scene?
7      A.    I do not know.
8      Q.    Do you remember if Mr. Lehman was there?
9      A.    I do not know.
10     Q.    Through your conversations with HR and
11 your process prior to meeting with Bob and after
12 meeting with Bob, in deciding the grievance, did you
13 ever hear anyone say that Bob missed any calls?
14     A.    No.  No one ever talked about his
15 performance with me on a general basis.
16     Q.    How about during the times that he was
17 allegedly sleeping that weren't on his breaks?
18     A.    It never came up in conversation.
19     Q.    No one told you that he failed to respond
20 to anything?
21     A.    It never came up in conversation.
22     Q.    Okay.  You were aware during your
23 grievance meeting with Bob that he was a long-term
24 employee of St. Elizabeth; is that correct?

Page 64

1      A.    Yes.
2      Q.    And as far as you had heard or witnessed
3  prior to meeting with him, was there any reason to
4  doubt Bob's truthfulness?
5      A.    I've never had an extended conversation
6  with Bob until the grievance.  But let me say this.  I
7  liked Bob.  Bob is a good person.  On a personal level,
8  he is what I would call a good person.  And because he
9  had been there for 30 years, quite frankly, I was
10 trying to find a way in which to help this situation,
11 because I do have respect for people with long tenure.
12 I have that very, very high in my thinking.
13         But the issue got down to performance.  He
14 failed in his duties as a Security Officer when he was
15 sleeping.  He failed in his duties as a supervisor, as
16 a manager, by not dealing with other Security Officers
17 he saw sleeping.  He put the risk at too high a level
18 for the organization to accept.
19     Q.    Are the Security Officers the only
20 employees that are charged with ensuring the safety of
21 either patients or employees?
22     A.    They're the primary ones.
23     Q.    If they are the primary ones, are there
24 any secondary ones?

Page 65

1      A.    Well, everyone has an obligation.  I mean,
2  even our housekeepers would have an obligation.  If we
3  have a tornado come through the area, everyone has part
4  of some function to help ensure that employees are
5  safe, but there are others that have -- I have a higher
6  accountability and responsibility for ensuring safety.
7  I mentioned to you earlier in my deposition that is my
8  primary, number-one issue, is to keep patients safe
9  from no harm.  I do a lot of other things, but that is
10 my primary role.
11     Q.    You mentioned the hospital authorizes
12 residents to sleep?
13     A.    Yes.
14     Q.    Would the residents who are sleeping ever
15 have to respond to codes, like if a patient was
16 crashing or anything like that?
17     A.    Potentially.  But we also have other
18 caregivers at the site when those situations happen.
19 And having residents sleep is a standard practice in
20 the healthcare industry.  I've worked at two academic
21 medical centers in my career.  It's nothing unusual.
22 It's something where you have other physicians around.
23 We have Emergency Room physicians Who respond to codes.
24 And typically, the residents aren't the primary people

17 (Pages 62 to 65)

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

---

Page 66

1   who respond to the codes.  They are still doctors in
2   training.
3       Q.    Right.
4       A.    But they would participate.  That would
5   not be their primary responsibility.
6       Q.    They would participate, and there could
7   still be some safety concerns with respect to them
8   participating, having just woken up?
9       A.    Typically, they are not woken up for
10  code-type situations, because, again, there are
11  Emergency Room physicians and others who would respond.
12  What they would be wakened up for is if a patient's
13  condition -- if a nurse needed physician direction
14  because a patient's condition had changed in some way,
15  then they would be awakened to give some type of order,
16  come see the patient and so on and so forth, just as
17  they would call the attending doctors at their homes at
18  3:00 in the morning.
19      Q.    And they would be the primary -- either
20  doctors at home sleeping or the residents who were
21  woken up by the nurses, they have the responsibility
22  for authorizing that treatment that they're allowing
23  the nurse to do, right?
24      A.    Depending upon who is the -- or which

Page 67

1   practitioner is needed to give direction.  But in
2   emergencies, that's why we have a 24-hour-a-day staffed
3   Emergency Room with physicians and nurse practitioners
4   respond to codes in immediate life-threatening
5   situations.
6       Q.    Would you consider it a Security concern
7   for a Security Officer to be disruptive with members of
8   his team by threatening them, spending his time,
9   instead of watching monitors, conspiring to get rid of
10  management?
11      A.    I would consider any employee who does
12  that as not being an employee that should be in our
13  organization.  If I knew and examined all the specifics
14  of what had transpired, then what you said, that would
15  be my answer, yes.
16      Q.    And you would expect, if HR found out an
17  employee was threatening other employees, that would be
18  a pretty serious offense, wouldn't it?
19      A.    Yes.
20      Q.    That they should certainly look into
21  further?
22      A.    Yes.
23      Q.    You said that you were aware Mr. Lehman
24  had worked for St. Elizabeth for 30 or more years and

Page 68

1   that you felt like he was a nice person.  When you were
2   considering the grievance, did you consider the fact
3   that the hospital had just terminated an employee who
4   is in his 50s, a 30-plus-year employee, about to go out
5   and try to find another job in one of the worst job
6   markets that the country had seen?
7             MS. SCHOENING:  Objection.  You can go
8       ahead and answer it.
9       A.    We have done a very fine job at
10  St. Elizabeth Healthcare in ensuring our employees keep
11  their jobs.  When we did the merger with St. Luke
12  Hospitals, we guaranteed that no one would lose their
13  job.  When the economy hit badly and we had to cut back
14  in positions and we had to consolidate services, we
15  guaranteed no employee lost their job.  So as a general
16  philosophy, that has been St. Elizabeth's position for
17  many years -- not just since I've been there, but for
18  many years.
19            This issue, as I mentioned earlier, was
20  not how nice Bob is.  Everyone acknowledges Bob is a
21  nice guy.  I like Bob personally.  This is about his
22  performance.  And no employee is guaranteed a job,
23  whether you've been there 30 years or 30 days, unless
24  you perform.  And I did try to find out in my own

Page 69

1   thinking how to help a 30-year employee.  And I just
2   saw these issues as too egregious, as well as I
3   mentioned earlier, Bob did not seem to grasp the
4   significance of what I was telling him as to how
5   important these issues were.
6       Q.    But you had the opportunity under the
7   policy to reduce his termination to a Level III, as
8   opposed to termination, right?
9       A.    I did.
10      Q.    At any point, in either your meetings with
11  Marty or Roxann, did you ever take any notes regarding
12  Mr. Lehman?
13      A.    I may have during the time, but I've
14  discarded them since.
15      Q.    And if Roxann and/or Marty did provide you
16  with any documents related to the investigation that
17  led to Mr. Lehman's termination, would they have done
18  so in person or via email?
19      A.    Typically, I would get a packet of
20  information, not through the email system.  Typically,
21  it would be a pack of information they prepared, and
22  again, outlining all their steps and discussions and
23  conclusions.
24      Q.    Okay.

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

Page 70

1      A.    I don't recall us getting things
2  necessarily through email.
3      Q.    If you had taken any notes, when would you
4  have destroyed them?
5      A.    Oh, it was probably fairly soon after I
6  sent Bob the letter.
7      Q.    Okay.
8      A.    My notes were for my own questions that I
9  wanted to ask Bob, responses I gave to him.  After the
10 decision was made, I saw no need to keep them.
11     Q.    Do you know whether you saw Bob's
12 grievance that he actually filed?
13     A.    Excuse me?  I'm sorry.
14     Q.    Did you see the grievance, the written
15 grievance that Bob filed?
16     A.    I did.
17     Q.    And were you aware that he, in the
18 grievance, said that he believed his termination was
19 wrongful?
20     A.    Not only then, but he told me that
21 personally.
22     Q.    Okay.  And did he also tell you that he
23 thought his diabetes and/or some other medical
24 condition was contributing to his fatigue?

Page 71

1      A.    That was his contention, yes.
2      Q.    Did that information raise any concerns
3  with you as to whether or not Mr. Lehman may
4  potentially either file an EEOC charge against
5  St. Elizabeth and/or file a lawsuit?
6      A.    I don't make decisions based on what
7  potentials may happen in that regard.  My
8  responsibility is to ensure that we do the right things
9  for the benefit of our patients.  And I don't want to
10 overstate this, but that is what I look at first and
11 foremost.  Whether someone wants to file a lawsuit, go
12 to the EEOC, go to OSHA, whatever they want to do after
13 a decision is made is their prerogative.  That does not
14 enter into my thinking.
15     Q.    You said you've been deposed potentially a
16 dozen times, right?
17     A.    Over the course of 34 years, yes.
18     Q.    Right.  And you understand that as a part
19 of the litigation process, the Defendant, obviously, in
20 this case, your employer, St. Elizabeth, has some
21 responsibility for maintaining records related to
22 potential litigation; is that correct?
23     MS. SCHOENING:  Objection.  You can answer
24 it if you can.

Page 72

1      A.    I had no reason to believe that there was
2  going to be potential litigation.
3      Q.    Okay.
4      A.    The records that were kept are the records
5  that the HR Department routinely keeps.
6      Q.    And no one from HR asked for your notes?
7      A.    No.  Bob certainly did not indicate to me
8  during our conversation he was going to seek
9  litigation.
10     Q.    Do you have any responsibility for
11 responding to -- I'm sorry -- reviewing or responding
12 to charges of discrimination filed with the EEOC?
13     A.    That's primarily handled by Marty.
14     Q.    Okay.
15     A.    If there is something significant, he'll
16 bring it to my attention.
17     Q.    In your time as either the COO or CEO, are
18 you aware of any other St. Elizabeth employees who
19 filed EEOC charges against the hospital besides Mr.
20 Lehman?
21     A.    Yes.  I don't know specifically
22 individuals.  But yes, they're filed.  They are filed
23 routinely in any organization I've worked for.
24     Q.    Are you aware of any other employees who

Page 73

1  have alleged disability discrimination against St.
2  Elizabeth besides Mr. Lehman during the time you've
3  been COO or CEO?
4      A.    I cannot recall.
5      Q.    Are you aware of any other employees who
6  have alleged age discrimination against the hospital
7  since you've been employed there, besides Mr. Lehman?
8      A.    I recall Marty raising one or two to my
9  attention, but I cannot recall the individuals who made
10 those issues.
11     Q.    And if you can't recall the individuals,
12 do you know which facility they may have worked in?
13     A.    No, I don't.
14     Q.    Do you know what department they were
15 working in?
16     A.    No, I don't.
17     Q.    Do you remember anything other than the
18 fact that Marty may have raised an issue about one or
19 two individuals alleging age discrimination?
20     A.    No.  Again, that is one of his primary
21 responsibilities.  As I'm sure you can imagine, being a
22 CEO, or even a COO, in a hospital system as large as
23 St. Elizabeth, that's not humanly possible, to know
24 every detail that occurs in the system.

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

---

Page 74

1    Q.    Right.  You mentioned that the Edgewood
2  facility is quite a large facility; is that correct?
3    A.    It is a large facility, yes.
4    Q.    And you also testified earlier that you're
5  aware that the Security Officers may either patrol on
6  the outside of the campus or may walk around on the
7  inside of the hospital as well; is that correct?
8    A.    Yes.
9    Q.    If a serious incident occurred similar to
10 the gun issue you talked about with the gentleman
11 outside of the hospital on the bench, and a Security
12 Officer was patrolling on another completely other side
13 of the hospital, isn't possible that it would take
14 approximately 10 to 15 minutes for that Security
15 Officer to respond?
16   A.    I mean, I really don't know what -- I
17 don't know if it would be that long or not.  It depends
18 on where they're at and how far they're away and how
19 traffic is and all those kind of things.  So no, I
20 don't know how long it would take, but it would take
21 some minutes.
22   Q.    Right.  It wouldn't be, like, if the
23 person was at the ER and the Security Officer was
24 patrolling -- I don't know the hospital, so I don't

---

Page 75

1  know -- but maybe at the complete opposite side, okay,
2  it wouldn't be that that Security Officer could get to
3  that situation within a minute?
4    A.    Oh, sure.  I agree with that.
5    Q.    Okay.  Would you say that -- obviously,
6  security concerns can happen anywhere in the hospital;
7  is that right?
8    A.    In the hospital and on the grounds of the
9  hospital.
10   Q.    Have the serious incidents that you've
11 learned about at either Edgewood and/or any of your
12 other facilities occurred mainly around the Emergency
13 Room?
14   A.    No, I would not say primarily.
15      MS. DAUGHTREY NEFF:  Just one second.
16   Q.    All right.  John, I believe I asked you
17 earlier whether or not you had a reason to doubt Mr.
18 Lehman's version of events, and you talked about the
19 fact that he was a nice guy and you talked about your
20 own concerns about the safety of the hospital, but I
21 don't think you actually answered the question.  Was
22 there anything that had occurred prior to either August
23 or September of 2010 that gave you cause to doubt Mr.
24 Lehman's truthfulness?

---

Page 76

1    A.    Bob gave his response without any
2  documentation, any verification from anybody else.  He
3  was taking his sleep time during break times or
4  lunchtimes.  I heard from the HR Department that other
5  Security Officers were stating that it was occurring at
6  all times during the day or night.  So I could not take
7  his comments at face value, just as anyone should take
8  his comments at face value when there is no absolute
9  way to prove whether they're accurate or not.
10   Q.    How would he have proven it?
11   A.    If he would have told his staff that he
12 was taking his lunchtime, that he's taking a break.  He
13 did done none of that.
14   Q.    I understand, obviously, you are not
15 directly managing the Security Department in any way.
16 But do you know how the Security Officers notify their
17 fellow officers when they are taking a break?
18   A.    I do not.
19   Q.    Do you know whether there is any record of
20 when an officer takes a break?
21   A.    I am not aware.  The typical process is
22 for an employee to either have a set time to take a
23 break or a lunchtime or at least notify -- and/or
24 notify their supervisor that they're leaving.

---

Page 77

1    Q.    And if an employee wanted to go grab lunch
2  somewhere and bring it back to eat at the hospital,
3  they're permitted to do that on their lunchtime as long
4  as they notify somebody, right?
5    A.    They're required to check out from the
6  time-clock system.
7    Q.    Right.
8    A.    As well as notify their supervisor that
9  they won't be on the hospital premises, because things
10 happen, and we need to contact people when we need to.
11   Q.    When an employee takes a break -- is there
12 like a cafeteria?
13   A.    Yes.
14   Q.    If an employee takes a break in the
15 cafeteria, do they have to clock out on the timecard
16 system?
17   A.    No, only if they leave the premises.
18      MS. DAUGHTREY NEFF:  All right.  That's
19   all the questions that I have.
20      MS. SCHOENING:  I have a couple quick
21   questions.
22          EXAMINATION
23 BY MS. SCHOENING:
24   Q.    John, was Mr. Lehman's age a factor in

---

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    DUBIS                    7/13/2012

Page 78

1    your decision when you reviewed his termination?
2         A.    Absolutely not.
3         Q.    Was his disability a factor when you
4    reviewed his decision, on the decision to terminate?
5         A.    Absolutely not.
6         Q.    Were you aware of any medical conditions
7    that Mr. Lehman had?
8         A.    As I've testified, the report of his
9    fitness for duty indicated there was no medical
10   problems that would cause the sleeping situations that
11   occurred.
12        MS. SCHOENING:  Okay.  That's all the
13   questions I have.
14        MS. DAUGHTREY NEFF:  I don't have any
15   questions.
16
17   _____
             JOHN S. DUBIS
18
19              - - -
20        (DEPOSITION CONCLUDED AT 11:05 A.M.)
21              - - -
22
23
24

Page 79

1              C E R T I F I C A T E
2    STATE OF OHIO        :
                          : ss
3    COUNTY OF HAMILTON   :
4         I, Raymond E. Simonson, RMR, the
5    undersigned, a duly qualified and commissioned notary
6    public within and for the State of Ohio, do hereby
7    certify that, before giving of the aforesaid
8    deposition, JOHN S. DUBIS, was by me first duly sworn
9    to depose the truth, the whole truth, and nothing  but
10   the truth; that the foregoing is the deposition given
11   at said time and place by JOHN S. DUBIS; that said
12   deposition was taken in all respects pursuant to
13   stipulations of counsel hereinbefore set forth; that I
14   am neither a relative of nor employee of any of their
15   counsel, and have no interest whatever in the result of
16   the action.
17        I further certify that I am not, nor is
18   the court reporting firm with which I am affiliated,
19   under a contract as defined in Civil Rule 28(D).
20        IN WITNESS WHEREOF, I hereunto set my hand
21   and official seal of office at Cincinnati, Ohio, this
22   _____ day of _____, 2012.
23   _____
     My commission expires:    RAYMOND E. SIMONSON, RMR
24   June 22, 2013         Notary Public - State of Ohio

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

# ADDENDUM

TO THE REPORTER: I have read the entire transcript of my deposition taken on the _13th_ day of _July_ , 20_12_, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 38 | 12 | Through December 31st 2010. |
| 52 | 24 | "That direct" changed to "Not the direct" |
| 60 | 11 | change "mean" to "met"; add "about" after "once" |
| 60 | 12 | change "was" to "when" |
| 65 | 4 | change "employee" to "patients" |
| 69 | 21 | change "pack" to "packet" |
| 70 | 9 | change "responses" to "questions" |
| 77 | 5 | change "check" to "clock" |

_9/8/12_
**(Date)**

**ROBERT LEHMAN vs ST. ELIZABETH HOSPITAL**

_(Signature of Deponent)_

**JOHN S. DUBIS    7-13-12    RS**

ORIGINAL

AMS DEPO
P.O. Box 58641 · Cincinnati, Ohio  45258-8641
(513) 941-9464

Page 78

1    your decision when you reviewed his termination?

2         A.    Absolutely not.

3         Q.    Was his disability a factor when you

4    reviewed his decision, on the decision to terminate?

5         A.    Absolutely not.

6         Q.    Were you aware of any medical conditions

7    that Mr. Lehman had?

8         A.    As I've testified, the report of his

9    fitness for duty indicated there was no medical

10   problems that would cause the sleeping situations that

11   occurred.

12        MS. SCHOENING:   Okay.   That's all the

13        questions I have.

14        MS. DAUGHTREY NEFF:   I don't have any

15        questions.

16

17   _____

     JOHN S. DUBIS

18

19        - - -

20   (DEPOSITION CONCLUDED AT 11:05 A.M.)

21        - - -

22

23

24

ORIGINAL

Lehman vs. St. Elizabeth          DUBIS                    7/13/2012

Page 79

1                    C E R T I F I C A T E

2  STATE OF OHIO          :
                          :  ss
3  COUNTY OF HAMILTON     :

4            I, Raymond E. Simonson, RMR, the

5  undersigned, a duly qualified and commissioned notary

6  public within and for the State of Ohio, do hereby

7  certify that, before giving of the aforesaid

8  deposition, JOHN S. DUBIS, was by me first duly sworn

9  to depose the truth, the whole truth, and nothing  but

10 the truth; that the foregoing is the deposition given

11 at said time and place by JOHN S. DUBIS; that said

12 deposition was taken in all respects pursuant to

13 stipulations of counsel hereinbefore set forth; that I

14 am neither a relative of nor employee of any of their

15 counsel, and have no interest whatever in the result of

16 the action.

17            I further certify that I am not, nor is

18 the court reporting firm with which I am affiliated,

19 under a contract as defined in Civil Rule 28(D).

20            IN WITNESS WHEREOF, I hereunto set my hand

21 and official seal of office at Cincinnati, Ohio, this

22 23rd day of _____July_____, 2012.

23                          Raymond C. Simonson, RMR

24 My commission expires:   RAYMOND E. SIMONSON, RMR
   June 22, 2013            Notary Public - State of Ohio