Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

-----------------------------------
                                   :
ROBERT LEHMAN,                     :
                                   :
              Plaintiff,           :
                                   :
          vs.                      :   CASE NO.
                                   :   2:11-cv-00165
ST. ELIZABETH HEALTHCARE,          :
                                   :
              Defendant.           :
                                   :
-----------------------------------


          DEPOSITION OF:   GERALD HYNKO

          TAKEN:           By the Plaintiff

          DATE:            August 13, 2012

          TIME:            Commencing at 1:45 p.m.

          PLACE:           Offices of:
                           DRESSMAN, BENZINGER,
                           LaVELLE, PSC
                           207 Thomas More Parkway
                           Crestview Hills, KY  41017

          BEFORE:          Barbara A. Thacker, RPR
                           Notary Public-State of Ohio
                           Jurisdiction of Notary Waived

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

---

Page 2

```
 1  APPEARANCES:
 2       On behalf of the Plaintiff:
 3          KATHERINE DAUGHTREY NEFF, ESQ
              of
 4          Freking & Betz, LLC
            525 Vine Street
 5          Sixth Floor
            Cincinnati, Ohio  45202
 6          Email: kneff@frekingandbetz.com
 7       On behalf of the Defendant:
 8          KELLY A. SCHOENING, ESQ.
              of
 9          Dressman, Benzinger, LaVelle, PSC
            207 Thomas More Parkway
10          Crestview Hills, KY  41017
            Email: kschoening@dbllaw.com
11
         Also Present:  Robert Lehman
12                      Lisa Blank (St. E. Rep)
13                         - - -
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 3

```
 1                 I N D E X
 2  GERALD HYNKO                          PAGE
 3  CROSS-EXAMINATION BY MS. NEFF           4
 4  EXAMINATION BY MS. SCHOENING            -
 5
 6
 7                  * * * *
 8           CONFIDENTIAL MATERIAL
             UNDER SEPARATE SEAL
 9        PURSUANT TO AGREEMENT OF COUNSEL
                   PAGE 9
10
                    * * * *
11
12               E X H I B I T S
13  HYNKO EXHIBITS      MARKED     REFERENCED
14       1          25
15       2          27
16       3          41
17       4          42
18       5          55
19
20  PREVIOUSLY MARKED      REFERENCED
21    Oscadal 1          22
22    Blank 3            48
23
24
```

---

Page 4

```
 1              GERALD R. HYNKO
 2  of lawful age, a witness herein, being first duly sworn
 3  as hereinafter certified, was examined and deposed as
 4  follows:
 5              CROSS-EXAMINATION
 6  BY MS. NEFF:
 7       Q.    Good afternoon.  I'm Kati Neff, and I
 8  represent Bob Lehman in his lawsuit against
 9  St. Elizabeth.  I appreciate you coming down here
10  today.
11            Could you please state your full name for
12  the record?
13       A.    Gerald, middle name Robert, last name
14  Hynko, H-Y-N-K-O.
15       Q.    Okay.  Have you ever been deposed before?
16       A.    Yes.
17       Q.    Approximately how many depositions have
18  you given?
19       A.    Probably around ten.
20       Q.    Okay.  And were any of those instances or
21  any of those depositions related to St. Elizabeth?
22       A.    No.
23       Q.    Have you ever given a deposition in an
24  employment discrimination lawsuit?
```

---

Page 5

```
 1       A.    No.
 2       Q.    All right.  Well, you are pretty
 3  experienced at this, but I'm going to go over some
 4  ground rules before we get started.  One of which is
 5  just a reminder to make sure you give a verbal
 6  response.  So, say "yes" or "no," as opposed to nodding
 7  your head or "um-hmm" or "huh-uh."
 8            One thing that's important is that you
 9  make sure to let me know if you don't understand my
10  question.  Otherwise, I'm going to assume that you
11  understand the question I'm asking.  Okay?
12       A.    Okay.
13       Q.    All right.  I don't think we're going to
14  be here for a very lengthy period of time today.  If
15  you do need a break, just let me know.  I just ask if
16  there's a question pending, you go ahead and answer
17  that and we can go ahead and take a break.
18       A.    Okay.
19       Q.    Did you do anything to prepare for your
20  deposition?
21       A.    Yes.
22       Q.    And what did you do?
23       A.    I met with Kelly and Lisa.
24       Q.    When did you meet with Kelly and Lisa?
```

2 (Pages 2 to 5)

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

Page 6

1       A.    That was last Thursday.
2       Q.    Okay.  And did you review any documents
3   during that meeting?
4       A.    Yes.
5       Q.    What documents did you review?
6       A.    Documents that I had participated in.
7   Reports and emails that I had participated in.
8       Q.    Were the e-mails all e-mails that you had
9   either drafted or received?
10      A.    Yes.
11      Q.    Okay.  And did they relate to anyone other
12  than Bob Lehman?
13      A.    I could have had some general conversation
14  about cases pending with HR.  But, specifically, I
15  believe most were Bob.
16      Q.    Okay.  Are you employed by St. Elizabeth?
17      A.    No.
18      Q.    Okay.  Were you a decision-maker in the
19  decision to terminate Bob's employment?
20      A.    No.
21      Q.    What did you discuss with Ms. Schoening
22  and Ms. Blank?
23            MS. SCHOENING:  Objection.  I think it's
24  attorney/client privilege.

Page 7

1             MS. NEFF:  So are you instructing him not
2   to answer?
3             MS. SCHOENING:  Um-hmm.
4             MS. NEFF:  Okay.
5       Q.    All right.  Have you hired Ms. Schoening
6   or her law firm to represent you?
7       A.    No.
8       Q.    Okay.  Counsel for St. Elizabeth has
9   instructed you not to answer a question based on
10  attorney/client privilege.  Are you going to listen to
11  her instruction or are you going to answer the
12  question?
13      A.    I'll listen to her instruction.
14            MS. NEFF:  Okay.  Let's take a quick break
15  to look up the Court's telephone number so we can
16  call the court on that.
17            MS. SCHOENING:  Okay.
18            MS. NEFF:  Off the record.
19            (At which time, a recess was taken from
20  1:53 p.m. until 1:55 p.m.)
21            MS. NEFF:  Back on the record.
22      Q.    All right.  When was the last day that you
23  worked for St. Elizabeth?
24      A.    June 18.

Page 8

1       Q.    Of this year?
2       A.    I'm sorry.  2012.
3       Q.    And when were you hired by St. Elizabeth?
4       A.    April 24, 2004.  I believe that's right.
5       Q.    All right.  And what position did you hold
6   at the time that you left on June 18?
7       A.    I was the System Director for Employee
8   Health, and Director for Business Health Services.
9       Q.    How long had you held those titles?
10      A.    The Employee Health Director, about three
11  years; and the Business Health Director was a little
12  over a year.
13      Q.    And why did you leave your employment with
14  St. Elizabeth?
15            MS. SCHOENING:  Objection.  I'm going to
16  go ahead and let him answer that question.
17      A.    We just decided to part ways.
18            * * * *
19            CONFIDENTIAL MATERIAL
            UNDER SEPARATE SEAL
20      PURSUANT TO AGREEMENT OF COUNSEL
            PAGE 9
21
            * * * *
22
23
24

Page 10

1       Q.    Okay.  And are you currently working?
2       A.    No.
3             MS. NEFF:  All right.  I'm sorry.  That
4   question can go normal.
5       Q.    Okay.  As the System Director for Employee
6   Health, what were your responsibilities?
7       A.    General healthcare of all employees of
8   St. Elizabeth.  Maintain immunizations.  Managing
9   Workers' Comp. relationships between the TPA and the
10  institution.  Anything related to medical care and
11  fitness-for-duty.
12      Q.    Okay.  Did that also include -- well,
13  strike that.  Did you have any responsibility for
14  St. Elizabeth's -- enforcing St. Elizabeth's
15  accommodation policy?
16      A.    No.
17      Q.    If an employee requested a reasonable
18  accommodation, would that come through your department?
19      A.    We would work with Human Resources to
20  provide consultation.
21      Q.    Okay.  And would that responsibility fall
22  under the Director for Employee Health position or the
23  other?
24      A.    Director of Employee Health, in that

3 (Pages 6 to 10)

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

| Page 11 |
|---|

1  office itself.  I had other staff that would help in
2  those processes.
3      Q.    Okay.  Have you received any training on
4  the Americans with Disabilities Act?
5      A.    Yes.
6      Q.    Okay.  And what type of training have you
7  received on that?
8      A.    Seminars from legal counsel.
9      Q.    Okay.
10     A.    Training from Doll & Greenbaum.  Personal
11 attorney from Doll & Greenbaum.
12     Q.    Okay.  And was that during your time with
13 St. Elizabeth?
14     A.    No.
15     Q.    Prior to St. Elizabeth?
16     A.    Yes.
17     Q.    You said one of the responsibilities of
18 your department was to work with HR to provide
19 consultation on reasonable accommodations?
20     A.    Yes.
21     Q.    Have you ever recommended to an employee
22 that they request a reasonable accommodation?
23     A.    Not recommended to them.
24     Q.    Okay.  Were you -- in your position, were

| Page 12 |
|---|

1  you permitted to provide advice on how an employee
2  could request a reasonable accommodation?
3      A.    As part of -- I'm not quite sure if you
4  are asking, was it part of my job description to
5  consult?
6      Q.    Well, say an employee was talking to you
7  about some concerns that they had regarding a
8  disability that they had.  What would you typically do
9  in that situation?
10     A.    I would advise them to read the Americans
11 with Disabilities Act and to ask if it was possible
12 that they might need a reasonable accommodation.
13     Q.    Who would they need to ask?
14     A.    Human Resources.
15     Q.    I know it's been a couple of years, but do
16 you remember meeting with Bob Lehman as a part of his
17 fitness-for-duty process?
18     A.    Yes.
19     Q.    Okay.  And do you remember discussing with
20 Mr. Lehman his diabetes?
21     A.    Yes.
22     Q.    Did you also discuss with Mr. Lehman his
23 sleep apnea?
24     A.    Initially, no, not in the first meeting,

| Page 13 |
|---|

1  because I was not aware.  But in further meetings --
2      Q.    Okay.
3      A.    -- further discussions.
4      Q.    Do you recall why Mr. Lehman was having to
5  go through the fit-for-duty process?
6      A.    Reportedly, he was found sleeping.
7      Q.    Okay.  And what did you discuss with
8  Mr. Lehman regarding that issue?
9      A.    Discussed with him a process of how
10 fitness-for-duty works at St. Elizabeth, and how we
11 take them through that process.
12     Q.    Okay.  Did you discuss during that meeting
13 why Mr. Lehman felt his medical condition was causing
14 him to fall asleep?
15     A.    I discussed with him parts of what I knew
16 of the medical condition, but we still had to see what
17 medical records would tell us, to decide.
18     Q.    What did you know regarding his -- or
19 regarding the condition of diabetes?
20     A.    Type II diabetes can give you general
21 overall fatigue.  But, typically, in cases, not seem to
22 cause people to fall asleep uncontrollably.
23     Q.    Did you have any further conversations
24 with Bob regarding his medical condition or conditions?

| Page 14 |
|---|

1      A.    I don't remember exact discussions, but
2  when we go to collect medical records we'll have
3  communication with the associate to make certain we
4  have all the physicians involved to get all the medical
5  records.
6      Q.    So in that process you might find out
7  about other medical conditions somebody might have?
8      A.    Correct.
9      Q.    For example, in this case, Bob informed
10 you that he had a sleep study performed, or he had a
11 sleep specialist, correct?
12     A.    Correct.
13     Q.    And were you updating HR regarding the
14 fit-for-duty process as Bob Lehman was going through
15 that process?
16     A.    As to how far along he was and where we
17 were collecting information, yes.  Not as to the
18 details of what we were finding.
19     Q.    Is there any reason why you were not
20 informing HR of the details of the findings?
21     A.    We, as a practice, would not give medical
22 information out due to HIPAA.
23     Q.    Okay.  Do you remember speaking with
24 Roxann Platek regarding, sort of updating her on where

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

Page 15

1   you were in the process?
2       A.    Um-hmm (nodding head affirmatively).
3       Q.    I'm sorry?
4       A.    Yes.
5       Q.    Thank you.  Do you remember ever telling
6   Roxann that you felt you had enough information,
7   typically, if there was a medical reason for Mr. Lehman
8   falling asleep on the job, which you tied to the ADA?
9       A.    I don't know if I would have said it that
10  way.  But I do know that I reported to her that we had
11  medical information, because he had more than one
12  comorbidity -- "comorbidity," being diagnosis -- that
13  could cause fatigue and sleepiness.
14      Q.    Okay.  Prior to becoming the Director of
15  Employee Health, did you have any responsibility in the
16  Employee Health Department?
17      A.    Yes.
18      Q.    And what did you do for St. Elizabeth in
19  the Employee Health Department prior to becoming a
20  Director?
21      A.    I was a part-time nurse, so I did direct
22  medical care.  And then I managed the Family Medical
23  Leave Act and did integrated disability case
24  management.

Page 16

1       Q.    What does that mean?
2       A.    That means, basically, if you're missing
3   work or have issues related to a medical condition, I
4   would research.  I might educate the associate.  Help
5   them during a medical leave, while they were off on a
6   medical leave.  If they needed an advocate with their
7   physician, to ask questions of the physician for care,
8   I would help counsel them there.
9           So, basically, it was a job of helping our
10  associates maintain a healthy lifestyle while they were
11  employed.
12      Q.    Okay.  What type of nurse are you?
13      A.    My specific background was neuro, and then
14  rehabilitation.  Sports medicine.
15      Q.    So are you an RN?
16      A.    Yes.
17      Q.    How long have you been an RN?
18      A.    Since 1986.
19      Q.    What was -- I know I asked you why
20  Mr. Lehman was going through fit-for-duty process, and
21  you indicated that he had fallen asleep at work, and
22  you were trying to see if that was caused by a medical
23  condition; is that correct?
24      A.    Correct.

Page 17

1       Q.    And you testified that you were aware that
2   Type II diabetes can give a general -- a person who has
3   Type II diabetes can have a general overall fatigue,
4   but that it would not cause someone to fall asleep
5   uncontrollably?
6       A.    Yes.
7       Q.    Was it your belief that you were looking
8   to find out whether or not that Mr. Lehman had a
9   condition that would cause him to fall asleep
10  uncontrollably?
11      A.    It was our belief or our practice to try
12  to determine what medical conditions someone has and
13  how can it impact them being at work.
14      Q.    And was Dr. Haskell the physician
15  responsible for reviewing Mr. Lehman's medical records
16  and meeting with him?
17      A.    Yes.
18      Q.    Is that typical any time an employee goes
19  through a fit-for-duty process that there is a
20  physician who evaluates the employee?
21      A.    When you say "evaluate," he may evaluate
22  medical records, might not see them in person
23  face-to-face, but that is a possibility.
24      Q.    Do you know whether Dr. Haskell met with

Page 18

1   Mr. Lehman?
2       A.    Yes.
3       Q.    Bad question.  Did Dr. Haskell meet with
4   Mr. Lehman?
5       A.    Yes.
6       Q.    Did you speak with Dr. Haskell about his
7   meeting with -- just specifically about his meeting
8   with Mr. Lehman?
9       A.    In what respect?
10      Q.    Did he tell you what he and Mr. Lehman
11  discussed?
12      A.    He produced a written report.
13      Q.    Okay.  And his written report included
14  information that he gleaned from the medical records as
15  well as his meeting with Mr. Lehman; is that correct?
16      A.    Yes.
17      Q.    Do you know approximately how long his
18  meeting was with Mr. Lehman?
19      A.    No.
20      Q.    Did you tell Mr. Lehman that he could not
21  be disciplined by St. Elizabeth if Employee Health
22  determined that his medical condition was causing him
23  to fall asleep?
24      A.    I don't think I would say that.  But I

5 (Pages 15 to 18)

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

Page 19

1  don't remember saying that.
2      Q.    Based on the experience that you had in
3  Employee Health, as well as the training that you
4  received on the ADA, do you know whether an employee
5  can be disciplined for behavior that was caused by
6  their disability?
7          MS. SCHOENING: Objection. You can
8      answer. Go ahead.
9      A.    Please restate.
10      Q.    Okay. Based on your experience in
11  Employee Health, and your training on the ADA, do you
12  know whether an employee can be disciplined for
13  behavior that is caused by their medical condition or
14  disability?
15      A.    I know that from past experience, with
16  past employers I've consulted with, they have
17  disciplined employees. But I do not advise them in a
18  legal manner. So I would not -- I wouldn't state what
19  someone can or can't do.
20      Q.    Okay. So the training that you've
21  received on the ADA hasn't taught you one way or the
22  other whether an employee can be disciplined for their
23  behavior caused by their disability?
24          MS. SCHOENING: Objection. Go ahead.

Page 20

1      A.    My experience and training has said, no,
2  it's not appropriate to discipline for a disability.
3      Q.    Okay. Did you mention to Roxann that
4  Mr. Lehman may have a condition protected under the
5  ADA, or words to that effect?
6      A.    In an e-mail, yes.
7      Q.    Okay. And do you know -- in doing that,
8  did you believe that Roxann would potentially follow up
9  on that to see whether or not Mr. Lehman needed an
10  accommodation?
11      A.    I didn't know either way that she would.
12  I just give them that information that it's a potential
13  issue.
14      Q.    Okay. Did you advise Mr. Lehman to speak
15  with HR about requesting an accommodation?
16      A.    No. I don't remember that I did.
17      Q.    Okay. Do you remember suggesting to
18  Roxann that HR consider a return-to-work agreement with
19  compliance with healthcare to continue to allow
20  Mr. Lehman to continue in his position?
21      A.    I believe I might have stated that as an
22  option to look at return-to-work.
23      Q.    Okay. And what did you mean by a
24  return-to-work agreement?

Page 21

1      A.    We, in the past, with fitness for duties,
2  we would sit down with an employee and outline what
3  would be the best way to return back to work, whether
4  it would be to seek more medical guidance.
5          In cases where we had people in the past
6  that may have had an issue with chemical dependency,
7  such as that, or medication management. They will
8  prescribe medications, then we would put together some
9  terms of how they would manage that, particularly, if
10  they had been referred to the EAP for ongoing
11  treatment.
12      Q.    Okay. And did Roxann ever follow up with
13  you on a potential return to work agreement for
14  Mr. Lehman?
15      A.    I don't remember seeing that.
16      Q.    Okay. Did you -- prior to getting
17  Dr. Haskell to report, did you form any opinion, based
18  on your conversations with Bob, and/or any documents
19  that you reviewed, whether or not he would be at risk
20  for falling asleep on the job in the future?
21      A.    I formed an internal opinion.
22      Q.    What was your internal opinion?
23      A.    Well, I'm not a doctor. My internal
24  opinion as a nurse was I did not see a reason for that he

Page 22

1  would fall asleep at work due to his medical
2  condition --
3      Q.    Okay.
4      A.    -- or conditions.
5      Q.    You formed that opinion before you
6  received Dr. Haskell's report?
7      A.    Generally, yes.
8          (Reference to previously-marked Oscadal
9          Deposition Exhibit No. 1.)
10      Q.    I'm going to hand you what was previously
11  marked as Oscadal Exhibit 1.
12          MS. NEFF: I do not have copies of it
13          though.
14          (Ms. Schoening reviewing document.)
15      Q.    What I'd like you to do is take a look
16  at -- essentially, it's the second e-mail on this page,
17  from Roxann, where it looks like she's describing her
18  conversation with you.
19      A.    Um-hmm (nodding head affirmatively).
20      Q.    Do you see that?
21      A.    Um-hmm (nodding head affirmatively).
22      Q.    And beginning with the second paragraph,
23  "he said he had" -- and it keeps going on from there.
24      A.    Um-hmm (nodding head affirmatively).

6 (Pages 19 to 22)

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

Page 23

1    Q.    I want you to just read through the ADA
2    part.  Okay?  Just that first part of that sentence.
3         In looking at that, does that refresh your
4    recollection as to what your opinion was, or at least
5    how you expressed your opinion to Roxann Platek as of
6    September 9, 2010?
7    A.    Um-hmm (nodding head affirmatively).
8    Q.    And do you believe that Roxann's e-mail
9    accurately reflects your conversation with her
10   regarding Mr. Lehman?  And you can take your time to
11   review both those paragraphs there.
12   A.    (Witness reviewing document).
13        So restate your question as to what?
14   Q.    My question to you is whether or not
15   Roxann's relation of her conversation with you, which
16   is mostly in that second paragraph on that e-mail, if
17   that appears to accurately reflect what you remember
18   from that conversation with Roxann.
19   A.    This is a synopsis of what she said I
20   discussed with her?
21   Q.    Um-hmm.
22   A.    I think it is evident that I saw it was a
23   medical condition.  Any time there's a medical
24   condition we would always say it would have a potential

Page 24

1    to be tied to an ADA issue.
2    Q.    Okay.
3    A.    So I think that reflects the gist of our
4    conversation.
5    Q.    Is there anything that's in there that you
6    think is inaccurate?
7    A.    Once we get the finish, the final -- from
8    a medical standpoint, the final information, which was
9    later on, there was not found to be a medical reason
10   for falling asleep.
11   Q.    Okay.  And my question to you --
12   A.    So that would make my information
13   inaccurate.
14   Q.    Okay.  My question to you, is there
15   anything in there that was inaccurate as of
16   September 9, 2010?  That she reflected inaccurately?
17   A.    I don't see anything.
18   Q.    Okay.  After you spoke with Roxann on or
19   around September 9, 2010, did you have any further
20   conversations with Roxann about your findings, or
21   Dr. Haskell's findings?
22   A.    I don't remember from the 9th to whenever
23   we came to a final decision.  I have, on average, eight
24   to ten hours of conversation.  I'm sorry.

Page 25

1    Q.    Do you know Marty Oscadal?
2    A.    Yes.
3    Q.    Did you ever speak with Marty Oscadal
4    about Mr. Lehman's fit-for-duty exam?
5    A.    I don't remember having a conversation,
6    per se, with him.
7    Q.    Okay.  And obviously you know Lisa Blank?
8    A.    Yes.
9    Q.    Did you have any communication with Lisa
10   regarding Mr. Lehman's fit-for-duty exam?
11   A.    Maybe.  I think, initially, she called me
12   to tell me that they were going to ask for one, I
13   believe.  I mean, again, I would have multiple
14   conversations with multiple parties.  So I don't
15   remember a specific for -- I remember a phone call for
16   a referral, but --
17   Q.    Okay.
18        (Hynko Deposition Exhibit No. 1 was marked
19        for identification.)
20   Q.    Do you go by Gerald?
21   A.    Um-hmm (nodding head affirmatively).
22   Q.    Can I call you Gerald?
23   A.    Yes.
24   Q.    Gerald, you have been handed what has been

Page 26

1    marked Hynko Exhibit 1 to your deposition, in which
2    appears to be an e-mail that you received from Brent
3    Haskell regarding two fit-for-duty exam reports.  Do
4    you -- and it looks like your name is at the top.  Do
5    you believe that you printed off this e-mail as part of
6    this litigation?
7    A.    For collection of records long ago, I
8    believe.
9    Q.    Okay.  All right.  And the subject line
10   states "Fit for Duty Carman and Lehman."  Do you see
11   that?
12   A.    Yes.
13   Q.    Were you -- you were aware that a
14   fit-for-duty exam was being performed on an employee
15   with the last name of Carman at the same time as Bob
16   Lehman; is that correct?
17   A.    Yes.
18   Q.    Was that similarly for sleeping on the
19   job?
20   A.    Yes.
21   Q.    Okay.  Do you remember what the medical
22   condition was that the Carman employee claimed he or
23   she had?
24        MS. SCHOENING:  Objection.  You can

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

---

Page 27

1    answer, if you know.
2        A.    I don't remember.
3        Q.    Do you believe it may have been sleep
4    apnea?  Does that sound familiar?
5        A.    It could have been.  I don't know.
6        Q.    Okay.  Mary Morris, is that somebody that
7    works in your department?
8        A.    One of the nurses.
9        Q.    And then Mary --
10       A.    Neuhaus.
11       Q.    Is that another nurse?
12       A.    Another nurse.
13       Q.    Did you provide either of these reports to
14   HR after receiving them from Dr. Haskell?
15       A.    I don't believe we ever turned over those
16   reports to HR because of the medical information.  I
17   would do a summary e-mail, or I would be asked to
18   summarize what Dr. Haskell's last or final impression
19   would be.
20       Q.    Okay.
21             (Hynko Deposition Exhibit No. 2 was marked
22             for identification.)
23       Q.    Gerald, does this appear to be the summary
24   that you provided of Dr. Haskell's report regarding

---

Page 28

1    Mr. Lehman?
2        A.    Yes.
3        Q.    And it looks like you provided it to
4    Roxann on September 28; is that correct?
5        A.    Yes.
6        Q.    Okay.  Did you discuss with Dr. Haskell --
7    strike that.
8             At some point -- my understanding is that
9    you relayed to HR that narcolepsy is the only medical
10   condition that would cause an employee to fall asleep
11   uncontrollably?
12       A.    That was an opinion rendered by
13   Dr. Haskell.
14       Q.    Did you and Dr. Haskell discuss that
15   opinion prior to him issuing it?
16       A.    "Issuing?"
17       Q.    Yeah.  Meaning, did you have a
18   conversation with -- (knock at the door)
19       MS. NEFF:  Let's go off the record.
20       MS. SCHOENING:  Judge Wehrman, this is
21   Kelly Schoening.  I'm here with Kati Neff.  We
22   were in the middle of a deposition, and Kati has
23   an issue.
24       THE COURT:  Okay.

---

Page 29

1        MS. NEFF:  Hi, Judge.
2        THE COURT:  Hi Kati.
3        MS. NEFF:  We have a subpoenaed witness
4    here who is no longer employed by St. Elizabeth.
5    He is not represented by Kelly or her law firm is
6    what he's testified to.  And he was not a
7    decision-maker in the employment decision that
8    led to Mr. Lehman's termination.  He has
9    testified that he met with Kelly and with HR from
10   St. Elizabeth last week, and I asked him what
11   they discussed, and Kelly instructed him not to
12   answer based on attorney/client privilege.
13            Since he's no longer employed there, he
14   wasn't a manager who made a decision about
15   Mr. Lehman's terminations.  He's not represented
16   by Ms. Schoening or her law firm.  I don't
17   believe this information is attorney/client
18   privilege.
19       THE COURT:  Okay.
20       MS. SCHOENING:  And your Honor, our
21   position would be that he was employed by
22   St. Elizabeth until just in June.  So he was
23   employed throughout this process of Mr. Lehman's
24   termination, which occurred in September of 2010.

---

Page 30

1    And he was asked to be deposed in this case as,
2    basically, a representative of St. Elizabeth, and
3    what occurred during his employment at
4    St. Elizabeth.
5             I believe that my pre-deposition meeting
6    with him as counsel for St. Elizabeth and
7    preparing him for his deposition should be
8    protected by attorney/client privilege.
9             I allowed him to testify to the fact that
10   he met with me, how long that meeting was, what
11   documents he reviewed.  But any discussions
12   between me and him, I believe, are privileged,
13   based on the fact that he is here as a
14   St. Elizabeth representative.  He's testifying
15   about things that occurred at St. Elizabeth while
16   he was employed there.
17       THE COURT:  And he has not been with
18   St. Elizabeth for how long?
19       MS. SCHOENING:  He left in June of 2012.
20   So pretty recent.
21       THE COURT:  Okay.  And was he involved --
22   when he was at St. E, was he involved in the
23   decision-making process, as far as this
24   termination was concerned?

---

8 (Pages 27 to 30)

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

Page 31

1    MS. SCHOENING: What happened here was,
2    Mr. Lehman was submitted to a fitness-for-duty
3    examination, and the witness, who we're talking
4    about today, was the Director of that department
5    and he facilitated that fitness-for-duty
6    examination. So that was all done as part of the
7    termination process.
8        So he provided information that was used
9    as part of the decision-making.
10    THE COURT: Okay.
11    MS. NEFF: Your Honor the only thing I
12    would add -- this is Kati -- is that, you know,
13    we did have to subpoena him to get him to testify
14    here today. And, you know, Kelly informed me
15    last week that we would need to issue him a
16    subpoena because she didn't have control over
17    him, obviously, because he's no longer an
18    employee.
19    MS. SCHOENING: It wasn't that I didn't
20    have control. He agreed to the deposition, but
21    if he doesn't show up, there's no recourse
22    because he's not an employee. So I said to be on
23    the safe side, he's a former employee, to send
24    him a subpoena. But I don't think that changes

Page 32

1    whether or not my meeting with him is privileged
2    or not.
3        THE COURT: Kati, are you asking questions
4    of this witness for the time period when he was
5    employed?
6    MS. NEFF: Yes.
7    THE COURT: And not when Kelly met with
8    him last week?
9    MS. NEFF: I asked him -- I did ask him
10    initially about his meeting with Kelly and what
11    they discussed. Other than that question, the
12    focus of the deposition has primarily been on the
13    fit-for-duty exam, which was conducted while
14    Mr. Lehman was employed and while Mr. Hynko was
15    employed.
16    THE COURT: These questions, issues
17    involving former employees are always a fairly
18    close case, and more so in this case. I'm in the
19    middle of a jury trial so I don't have much time.
20        My understanding is once an employee is no
21    longer with the company, that the privilege no
22    longer exists, and the question can be asked.
23        But in this instance -- what Kelly is
24    saying is that this witness, the information he

Page 33

1    provided -- was the information, Kelly, provided
2    to you, or was it provided to someone else? As
3    far as the termination of the Plaintiff was
4    concerned?
5    MS. SCHOENING: No. The information that
6    this witness provided was to Human Resources at
7    the time Mr. Lehman was still employed at the
8    hospital. But what Ms. Neff is specifically
9    asking questions about would be my meeting with
10    him last week to prepare him for deposition.
11        It's my understanding, even as a former
12    employee, if he's testifying about facts that
13    occurred at St. Elizabeth, and I represent
14    St. Elizabeth, I can meet with him and have a
15    privileged meeting.
16        That has always been my understanding with
17    former employees. I believe, you know, based on
18    some case law and some ethical opinions in
19    Kentucky, Ms. Neff can contact him ex parte,
20    without me, because he's a former employee. But
21    if I have a meeting with him to prepare him for a
22    deposition, about facts he's going to testify
23    about St. Elizabeth, that my meeting with him
24    should be privileged.

Page 34

1    THE COURT: Okay. And I misunderstood
2    then, Kati. I thought you were asking questions
3    about his input as far as the termination was
4    concerned.
5    MS. SCHOENING: She is, and we have
6    allowed that to go forward. That's not an issue.
7    MS. NEFF: The only issue, your Honor, is
8    the question about what he discussed with
9    Ms. Schoening last week. I have a different
10    understanding, I, obviously, don't have cases or
11    anything like that in front of me. My
12    understanding is, unless it's somebody who is,
13    essentially, an executive of the company, that's
14    the only -- or somebody who's hired the law firm
15    to represent them, that's the only time that it's
16    privileged.
17    MS. SCHOENING: That's not my
18    understanding from previous research I have done.
19    THE COURT: Well, I guess, Kelly, you're
20    going to have to give me a case on this. Because
21    if you're going to invoke the attorney/client
22    privilege, you cannot invoke it as to every
23    witness who testifies at St. E. So you have to
24    invoke it. And when you invoke the privilege, I

9 (Pages 31 to 34)

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

Page 35

1    do agree with Kati, it's usually as to an
2    executive or someone in the decision-making
3    process.
4         Here's what I'll do.  I'll rule that Kati
5    can ask the question, but he does not have to
6    answer.  However, until I see the case law that
7    you're citing, that you're giving to me, Kelly.
8    If I don't rule that way, then you'll have to
9    make this witness available for completion of the
10   deposition.
11        MS. SCHOENING:  That's fine.  So would you
12   prefer that we submit just a brief -- file a
13   brief with the Court on this?
14        THE COURT:  No.  I really just want you to
15   e-mail the case.  And Kati, you can respond.  Get
16   something to me today.  I have got to go back on
17   the bench now.  Get something to me today I'll
18   try to get you something by tomorrow.  Finish the
19   deposition is what I'm saying.
20        MS. NEFF:  Right.
21        THE COURT:  Okay.  You have got my e-mail,
22   don't you?  You both should have my e-mail.
23        MS. SCHOENING:  Yes.
24        MS. NEFF:  I believe so.

Page 36

1         THE COURT:  I have got to go.
2         MS. NEFF:  Thank you.
3         THE COURT:  All right.  Bye.
4         (Conversation concluded.)
5         MS. NEFF:  Let's go off the record for a
6    minute.
7    Q.    All right.  Gerald, you testified earlier
8    that it was Dr. Haskell's opinion that narcolepsy was
9    the only medical condition that could cause an employee
10   to fall asleep uncontrollably; is that correct?
11   A.    Correct.
12   Q.    My question to you is whether or not you
13   spoke with Dr. Haskell, as he was forming the opinion
14   about narcolepsy, did you kind of discuss it -- or
15   about falling asleep uncontrollably, did you discuss it
16   with him where you both came up with that as the only
17   possible medical condition for falling asleep
18   uncontrollably?
19   A.    We discussed sleep apnea, narcolepsy, and
20   other sleep issues as a medical discussion, where he
21   gave me information on -- somewhat of how narcolepsy
22   works, and the differences between the diagnoses.
23   General medical conversations.
24   Q.    Okay.  Have you, during the time that you

Page 37

1    were -- strike that.
2         During this period of time, which would
3    have been August to October of 2010 time frame, did you
4    have any other employees who were going through the
5    fit-for-duty process because they were falling asleep
6    as a result of narcolepsy?
7    A.    As a result of narcolepsy?
8    Q.    Yes.
9    A.    No.
10   Q.    Did you explain to HR Dr. Haskell's
11   opinion regarding narcolepsy?
12   A.    This is the only explanation, which really
13   wasn't an explanation, it was a regurgitation of his
14   synopsis of his report.  So, no, we didn't get into the
15   medical aspects of narcolepsy.
16   Q.    Do you know whether you had a conversation
17   prior to September 28, 2010, with anyone in HR, in
18   which you informed them that, according to Dr. Haskell,
19   narcolepsy was going to be the only medical condition
20   which would cause an employee to fall asleep
21   uncontrollably?
22   A.    I believe so.
23   Q.    Okay.  After you informed HR of that, did
24   you have any other employees who went through the

Page 38

1    fit-for-duty process for medical conditions that caused
2    them to sleep on the job?
3    A.    For medical conditions that caused them to
4    sleep?  I think we established the discussion.  The
5    physician said the only medical condition that caused
6    you to sleep was narcolepsy.
7    Q.    After Dr. Haskell expressed that opinion,
8    do you know whether any other employees had to go
9    through the fit-for-duty process because they believed
10   a medical condition was causing them to sleep?
11   A.    Yes.
12   Q.    Okay.  And were fit-for-duty exams
13   actually performed on those employees?
14   A.    Yes.
15   Q.    And were any of those employees claiming
16   that narcolepsy was the medical condition causing them
17   to sleep?
18   A.    No.
19   Q.    And why would fit-for-duty exams need to
20   be performed on the employees if they weren't alleging
21   that they were narcoleptic?
22   A.    Repeat that again.
23   Q.    Why would an employee need to go through a
24   fit-for-duty exam for sleeping on the job, if they

10 (Pages 35 to 38)

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

Page 39

1    didn't have narcolepsy?
2        A.    We don't suppose someone's self-proclaimed
3    diagnosis to be their diagnosis.  We get medical
4    records and review, because we have had people in the
5    past tell us they have a diagnosis that never had been
6    documented by a physician, hence they didn't have a
7    diagnosis.
8            So we don't take someone's lay opinion of
9    their healthcare, and so we do a full fit-for-duty.
10       Q.    Okay.  Based on your understanding of
11   narcolepsy as Dr. Haskell described the condition to
12   you, do you believe a nurse could perform her duties if
13   she was had narcolepsy?
14       A.    It would depend on what duties they were.
15   You could perform, perhaps, case management duties,
16   such as I do, where there's not patient safety
17   issues --
18       Q.    Right.
19       A.    -- or a safety issue to your ownself.  So
20   a nurse is not a nurse, and therefore I couldn't
21   determine -- it would have to be a case by case to
22   determine whether or not you could be fit for duty, and
23   how a diagnosis can impact you.
24       Q.    Okay.  So you would want to look at -- if

Page 40

1    you were assisting in that determination you would want
2    to look at what the specific job responsibilities of
3    the employee were and whether or not there could be
4    some kind of safety issue, both either to the patient
5    or to the employee, right?
6        A.    Correct.
7        Q.    At St. Elizabeth does an employee have to
8    request a reasonable accommodation in writing?
9        A.    I would defer that issue to Ms. Blank.
10   I'm not -- I do not represent Human Resources.
11       Q.    Did you ever inform anyone in HR that Bob
12   Lehman had sleep apnea?
13       A.    I don't remember if I did or I didn't.  I
14   would have to review e-mails.
15       Q.    Do you -- would that be something you
16   would typically inform HR of if it was a condition you
17   learned about through the fit-for-duty process?
18       A.    I wouldn't -- probably not.
19       Q.    If you look at Hynko Exhibit No. 2, you
20   don't reference his sleep apnea; is that correct?
21       A.    I don't see it mentioned in here.
22       Q.    Okay.  Like, for example, in the, I think
23   fifth sentence, starting with, "There is a possibility
24   that the fatigue may be exacerbated."  Do you see that?

Page 41

1        A.    Yes.
2        Q.    You state, "May be exacerbated by an
3    inadequately treated diagnosed medical condition not
4    mentioned by Mr. Lehman upon his initial meetings with
5    his supervisor and HR."  Were you referring to sleep
6    apnea?
7        A.    I was copying word for word what
8    Dr. Haskell wrote.
9        Q.    Okay.
10            (Hynko Deposition Exhibit No. 3 was marked
11       for identification.)
12       Q.    You have been handed what has been marked
13   Exhibit 3 to your deposition.  Is this the report that
14   you were copying when you drafted your e-mail to
15   Roxann?
16       A.    Yes.
17       Q.    Did you underline on the report?
18       A.    I don't remember if I underlined.  I may
19   have.
20       Q.    Okay.  If you look at the recommendation
21   section, that looks like where you took Dr. Haskell's
22   wording and put it in your e-mail to Roxann?
23       A.    Correct.
24       Q.    And obviously, Dr. Haskell states, "there

Page 42

1    is a possibility that the fatigue may be exacerbated by
2    inadequately treated sleep apnea," right?
3        A.    Correct.
4        Q.    Whereas, when you told Roxann, you said
5    "medical condition not mentioned by Mr. Lehman upon his
6    initial meeting," correct?
7        A.    Yes.
8        Q.    So you specifically took out "sleep apnea"
9    from his report when you were reporting it to Roxann?
10       A.    Correct.
11       Q.    And you believe that you did that because
12   you were --
13       A.    Not to give a diagnosis.
14       Q.    Because of HIPAA concerns?
15       A.    Right.
16            (Hynko Deposition Exhibit No. 4 was marked
17       for identification.)
18       Q.    All right.  Gerald, you have been handed
19   what has been marked Exhibit 4 to your deposition.  Do
20   you recollect sending this e-mail to Dr. Haskell?
21       A.    Yes.
22       Q.    Okay.  And you specifically note or
23   explained to Dr. Haskell that HR primarily wants to
24   know if Bob Lehman can perform the essential functions

11 (Pages 39 to 42)

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

---

Page 43

1    of the job of a Safety Security Supervisor.  And is
2    that typical for a fit-for-duty exam, that that's what
3    HR wants to know?
4        A.    Correct.
5        Q.    And you attach his job description.  And
6    then you state, "This may lead to FCEs of all Security
7    personnel."  Is that fitness for duty exams for all
8    Security personnel?  What does that mean?
9        A.    Functional Capacity Evaluations.
10       Q.    Okay.  Why did you believe that?
11       A.    It's a possibility we might test people.
12       Q.    For what?
13       A.    To see if they can perform essential
14   functions of their job.
15       Q.    Why would you need to do that for all
16   Security personnel?
17       A.    If you were to have a job that might be
18   presumed a difficult job to do, you might start setting
19   the standard of doing functional capacity evals.  On
20   the other side of my business, where I was a business
21   director of those services to outside companies.  They
22   call them "JPAs."  They are job assessments.  It's like
23   a physical agility test, that you might give for a
24   whole class of jobs.

---

Page 44

1        Q.    And you were advising Dr. Haskell of that
2    possibility simply because of Bob Lehman saying that he
3    was having trouble sleeping on the job?
4        A.    No.  The reason I made a comment about
5    FCEs is being a Security person can be a physically
6    demanding job, and we had presented, on several
7    occasions, to the hospital about doing functional
8    capacity evals for nurses, for different categories of
9    employees who had physically strenuous jobs.  So this
10   was a comment related to doing FCEs for Security
11   personnel.
12       Q.    Bob didn't have to go through a functional
13   capacity evaluation though, did he?
14       A.    I don't believe so.
15       Q.    Okay.  When you met with Bob did he
16   explain to you that he had been told by HR he would be
17   disciplined, whether his medical conditions caused him
18   to fall asleep or not?
19       A.    Did he tell me?
20       Q.    Yeah.
21       A.    I know -- I remember a discussion about
22   whether or not he would participate in a
23   fitness-for-duty.  Because our policy says if you do
24   not participate in a fitness-for-duty that has been

---

Page 45

1    requested, you can be disciplined.
2        Q.    But that's all you can remember him
3    discussing discipline?
4        A.    Correct.
5        Q.    Okay.  You stated earlier that your
6    department was involved in consulting with HR regarding
7    reasonable accommodations.  Do you know whether Bob was
8    accommodated?
9        A.    I'm not aware.
10       Q.    Okay.  Have you ever been a part of the
11   process for accommodating an employee who has diabetes?
12   Strike that.
13              You testified earlier that your
14   understanding of diabetes could cause fatigue; is that
15   correct?
16       A.    Yes.
17       Q.    And are you aware that -- did Bob tell you
18   that he slept at work while he was on a break or on his
19   lunch break?
20       A.    I don't remember if he told me exactly
21   when he did it or if I got the information of when he
22   did it.  To be honest with you, I don't remember.
23       Q.    Okay.  Did you take notes when Bob was
24   meeting with you?

---

Page 46

1        A.    No.
2        Q.    Okay.  Did you actually review Bob's
3    medical records?
4        A.    I reviewed some of them, yes.  Not all.
5        Q.    It's typical for you to review them?
6        A.    Make certain they are complete, to try to
7    determine the completeness.
8        Q.    And then once you are confident that you
9    have all of the medical records, you pass them along to
10   Dr. Haskell?
11       A.    Correct.
12       Q.    Was he -- at that time, was he the only
13   physician who was performing the fit-for-duty exams?
14       A.    On behalf of St. Elizabeth?
15       Q.    Yes.
16       A.    Yes.
17       Q.    You mentioned that another one of your
18   responsibilities, as the Director of Employee Health,
19   was to manage Workers' Comp. relationships between the
20   TPA and St. Elizabeth.  I think you may have said
21   something about FMLA.  I wasn't sure if that was prior
22   to becoming the Director.  Did your department also
23   have responsibility for participating in the FMLA
24   process for employees?

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

Page 47

1    A.    Yes.  Our department administered Family
2  Medical Leave and short-term disability pay.
3    Q.    Okay.  And as a part of that process, if
4  an employee -- an employee's physician filled out FMLA
5  paperwork, what was St. Elizabeth's responsibility as
6  it related to that -- or what was your department's
7  responsibility as it related to that, once the
8  employee's physician filled out the paperwork?
9    A.    We would process it.  Put them off on a
10  leave in our IS system.  And manage their leave and
11  manage their being paid, while they were off.
12    Q.    And it's similar to short-term disability?
13    A.    That is our short-term disability.
14    Q.    Got it.  Short-term disability -- how long
15  was your short-term disability?  Was it six months?
16    A.    12 weeks.
17    Q.    Okay.  And when an employee returned, did
18  they have to go through a fit-for-duty exam?
19    A.    They may.  They would always come in for a
20  return to work appointment.
21    Q.    And who makes the decision as to whether
22  or not the employee would have to go through a
23  fit-for-duty exam?
24    A.    Usually the physicians.

Page 48

1    Q.    Exhibit No. 4, which you have in front of
2  you, which was your e-mail to Dr. Haskell regarding
3  HR's primary concern with respect to Bob Lehman?
4    A.    Um-hmm (nodding head affirmatively).
5    Q.    Do you know if that was the day that
6  Dr. Haskell actually met with Bob Lehman?
7    A.    I know that, according to his note, here,
8  it says, "Mr. Lehman was examined on 9/13."  This
9  e-mail was addressed on 9/13.
10    Q.    Okay.  So according to Dr. Haskell's
11  report, he met with Bob on the 13th, and then on the
12  14th he created this report that he gave to you --
13    A.    Correct.
14    Q.    -- correct?  Okay.  And had you provided
15  Dr. Haskell with Bob's medical records prior to
16  September 13?
17    A.    I believe so.
18          (Reference to previously-marked Blank
19  Deposition Exhibit No. 3.)
20    Q.    All right.  I'm going to show you what was
21  previously marked as Blank Exhibit No. 3.  And I just
22  want you to take a look at that.
23    A.    Okay.  (Witness reviewing document).
24    Q.    Just let me know whether or not you've

Page 49

1  ever seen that e-mail.
2    A.    I don't -- I mean, it wasn't addressed to
3  me or copied to me.
4    Q.    Okay.  All right.  Again, it looks like
5  this is another e-mail where Roxann is describing a
6  conversation that she had with you to -- it looks like
7  Lisa and to Marty Oscadal.  Is that what it appears to
8  be?
9    A.    Yes.
10    Q.    Okay.  And does reviewing this e-mail help
11  refresh your recollection as to what you and Roxann
12  discussed some time around the 14th of September,
13  regarding Mr. Lehman?
14    A.    Restate it, please.
15    Q.    Yeah.  I just want to know if it helps
16  refresh your recollection with Roxann regarding
17  Mr. Lehman on or around September 14?
18    A.    It helps me remember we had a conversation
19  and she called me.
20    Q.    Do you know -- in reviewing her e-mail
21  where she's relaying -- essentially, she's relaying
22  what you told her.  What I want you to do is look at it
23  to see if there's anything inaccurate, as far as you
24  can recall, in that e-mail.  Meaning, something you

Page 50

1  didn't actually tell her.
2    A.    I'm not following your question.
3    Q.    Sure.  Is there anything that's in that
4  e-mail that you believe you didn't actually tell
5  Roxann?
6    A.    I told her that Dr. Haskell and I met to
7  discuss the case.
8    Q.    Okay.  You remember that.
9    A.    I see it here, but I would imagine that's
10  what I told her.
11    Q.    Okay.  That's fine.  I just want to make
12  sure she's relaying a conversation she had with you in
13  an e-mail.  And I just want to make sure there isn't
14  anything in that e-mail that you think she relayed
15  inaccurately.  Like, you look at it and say, "I know
16  for sure I never said that."  That kind of thing.
17    A.    Okay.  No.
18    Q.    The last sentence in the second paragraph
19  refers to an audit by the EEOC?
20    A.    Um-hmm (nodding head affirmatively).
21    Q.    Do you know what you were referring to
22  there?
23    A.    In past times I had been involved with
24  EEOC coming in on a case where they would look to see

13 (Pages 47 to 50)

Lehman vs. St. Elizabeth                    HYNKO                         8/13/2012

---

Page 51

1    whether or not we had documented appropriately.
2        Q.    Okay.  Like an accommodation-type of case
3    or what kind of a case?
4        A.    Anything related to ADA.
5        Q.    Okay.  What were they looking for in terms
6    of documentation?
7        A.    Whether or not we had kept a log of making
8    accommodations at Toyota.
9        Q.    Okay.  So this is where you experienced it
10   at Toyota?
11       A.    Yes.
12       Q.    Okay.  So how long were you at Toyota?
13       A.    I was a consultant there from 1992 in some
14   capacity or another, until 2003.
15       Q.    Okay.  And as part of your job there at
16   some point you had responsibility for the ADA or
17   accommodations issues?
18       A.    I worked on returning injured workers back
19   to work with Toyota.  And then later, Claims Management
20   from the Workers' Comp. standpoint.
21       Q.    Okay.  Did either Roxann or Lisa or Marty
22   follow-up with you to find out what you meant by the
23   audit by the EEOC?
24       A.    No.

---

Page 52

1        Q.    Did you have any knowledge as to what form
2    of discipline HR was planning on giving Mr. Lehman as
3    of September 14, 2010?
4        A.    No.
5        Q.    And that would not typically be your area
6    to know that, right?
7        A.    Correct.
8        Q.    So do you recall why you are referring to
9    light duty, and maybe some changes needed, in the job
10   description in that second paragraph?
11       A.    It was just a casual comment on job
12   descriptions.  I, through part of my job duties, would
13   review job descriptions for the hospital, as we would
14   go through -- through the merger, we brought two
15   different organizations together that had vastly
16   different job descriptions.  So I was kind of the
17   housekeeper with someone else in Human Resources.  So
18   that was just a common comment.
19       Q.    Did anyone in HR follow-up with you
20   regarding revising the job description as you were
21   suggesting in this e-mail, or in your conversation with
22   Roxann?
23       A.    It probably would not have been Roxann.
24   And to be honest with you, there's over a thousand job

---

Page 53

1    descriptions, and I reviewed more than half of them in
2    my time at St. Elizabeth.  I couldn't see specifically
3    whether they did or didn't on this one.  Because we
4    take them and adapt them as they need to be changed or
5    whatever.  Rewritten and then reformatted.
6        Q.    Okay.  Do you know whether Mr. Lehman's
7    diabetes medications were in control at the time of his
8    fit-for-duty exam?
9        A.    I would have to review his medical records
10   to answer correctly at this time.  I can see in the
11   report here from Dr. Haskell that there was some
12   instability in his medical conditions related to
13   diabetes.
14       Q.    Do you know whether that can impact
15   fatigue?
16       A.    No.
17       Q.    Okay.  In terms of the Employee Health
18   Department assisting HR with reasonable accommodations,
19   would your department have made any determination as to
20   what type of an accommodation an employee might need?
21       A.    Would we determine?
22       Q.    Yeah.
23       A.    We would help consult.
24       Q.    Okay.

---

Page 54

1        A.    For instance, I may go out and take a
2    measurement of what a push-and-pull would be.  I have
3    the equipment to test, say, for instance, how much it
4    would take to push a cart.
5        Q.    HR and the employee's management are the
6    ones who determine whether or not the accommodation is
7    reasonable for that particular department; is that
8    correct?  That's not something you guys, Employee
9    Health, would determine, right?
10       A.    Right.
11       Q.    And if an employee's physician recommended
12   a particular accommodation, would it be your department
13   that would look at that, whether or not that makes
14   sense, based on the employee's actual disability?
15       A.    We would be a collector of the
16   information.  And then perhaps through, as I said
17   earlier, like an experiment to test to see if that
18   could be done.  Maybe measurements.
19             We would then defer to HR.  All the time
20   we defer to HR.  We would defer to HR to see whether or
21   not the department -- they would make the final
22   decision, the department -- the job site would make the
23   final decision.  We were just a helper.
24       Q.    Okay.  And in the times when your

---

14 (Pages 51 to 54)

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

Page 55

1   department consulted on reasonable accommodations, did
2   those employees have to go through fit-for-duty exams?
3       A.    If they were not performing their job
4   through, like, for instance, the policy that we had for
5   fitness-for-duty, if they are not performing their job,
6   or if they came to us and said, "I might need help,"
7   then we would possibly perform a fit-for-duty.
8       Q.    Okay.  I just want you to identify this.
9           (Hynko Deposition Exhibit No. 5 was marked
10          for identification.)
11      Q.    You mentioned the fit-for-duty policy a
12  couple of times.  Does Exhibit 5 appear to be the
13  fitness-for-duty policy as it was in effect at the time
14  that you worked for St. Elizabeth?
15      A.    It looks to be it.
16      Q.    Okay.  Did anyone from HR indicate to you
17  during the time that Mr. Lehman was going through the
18  fit-for-duty process, and the other employee, Carman,
19  was going through the fit-for-duty process, that the
20  hospital wanted to make sure that they had a consistent
21  message with respect to whether it would allow sleeping
22  on the job?
23      A.    Did someone ask me that?
24      Q.    Did anyone in HR discuss that with you?

Page 56

1   Their concern about making sure to be consistent?
2       A.    We had several cases at that time, and
3   ongoing cases, and had cases of sleeping on the job.
4   So that was our general discussion.  We had several
5   cases.
6       Q.    Is it your understanding that prior to --
7   strike that.
8           Do you know whether, prior to September
9   14, 2010, if Dr. Haskell had ever expressed to you,
10  from other cases, that he felt narcolepsy was the only
11  medical condition that would cause an employee to fall
12  asleep uncontrollably?
13      A.    No.
14      Q.    Do you recall any cases, prior to
15  September of 2010, in which your department performed a
16  fit-for-duty exam for somebody who was alleging that a
17  medical condition had caused them to sleep?
18      A.    I do not remember dates that we've had --
19  we had fitness-for-duty related to sleep.  I believe
20  during these cases, it was the first time we looked at
21  narcolepsy.
22      Q.    Okay.  When you say "we looked at
23  narcolepsy," you're referring to?
24      A.    Employee Health Department.

Page 57

1       Q.    And you're not aware of any employee,
2   during the time that you worked for St. Elizabeth,
3   claiming that they had narcolepsy?
4       A.    No.
5           MS. NEFF:  All right.  Let's take a quick
6   break.
7           (At which time, a recess was taken from
8           3:17 p.m. until 3:28 p.m.)
9           MS. NEFF:  Let's go back on the record.
10          After the discussion with the Court, do
11  you still want to make the same objection?
12          MS. SCHOENING:  Yes.
13          MS. NEFF:  I was going to ask the question
14  again, but if that's the case, that's fine.
15      Q.    All right.  Gerald, I believe you received
16  a subpoena in this case; is that correct?
17      A.    Yes.
18      Q.    Can you just confirm for me, again, your
19  current home address?
20      A.    ████████████████, Florence,
21  Kentucky, 41042.
22      Q.    Do you have any plans on moving any time
23  soon?
24      A.    No.

Page 58

1           MS. NEFF:  Well, I'm going to conclude the
2   deposition, but hold it open pending the Judge's
3   decision on the attorney/client privilege.
4           MS. SCHOENING:  Okay.  I do not have any
5   questions.
6           MS. NEFF:  All right.  You are done.
7   Obviously, I know, as you heard, there's a
8   possibility that, you know, the Court may allow
9   me to ask the questions about what you discussed
10  with Kelly and with Lisa.  And if that's the
11  case, then we may have to subpoena you again.
12          If so, it's probably going to be fairly
13  quickly.  Like within the next week.  Okay?
14          THE WITNESS:  That's fine.
15          MS. NEFF:  All right.  I appreciate you
16  coming down here today.
17
18
19          _____
                    GERALD HYNKO
20
21          (DEPOSITION CONCLUDED AT 3:30 P.M.)
22
23
24

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    HYNKO                        8/13/2012

Page 59

```
 1            C E R T I F I C A T E
 2   STATE OF OHIO      :
                        : ss
 3   COUNTY OF HAMILTON    :
 4        I, Barbara A. Thacker, RPR, the
 5   undersigned, a duly qualified and commissioned notary
 6   public within and for the State of Ohio, do hereby
 7   certify that, before giving of the aforesaid
 8   deposition, GERALD HYNKO, was by me first duly sworn to
 9   depose the truth, the whole truth, and nothing  but the
10   truth; that the foregoing is the deposition given at
11   said time and place by GERALD HYNKO; that said
12   deposition was taken in all respects pursuant to
13   stipulations of counsel hereinbefore set forth; that I
14   am neither a relative of nor employee of any of their
15   counsel, and have no interest whatever in the result of
16   the action.  I further certify that I am not, nor is
17   the court reporting firm with which I am affiliated,
18   under a contract as defined in Civil Rule 28(D).
19        IN WITNESS WHEREOF, I hereunto set my hand
20   and official seal of office at Cincinnati, Ohio, this
21   _____ day of _____, 2012.
22
                 _____
23   My Commission Expires:   BARBARA A. THACKER, RPR
     May 17, 2013          Notary Public - State of Ohio
24
```

16 (Page 59)

Lehman vs. St. Elizabeth                          HYNKO                          8/13/2012

Page 60

**A**

accommodated...
45:8
accommodatin...
45:11
accommodatio...
10:15,18 11:22
12:2,12 20:10,15
40:8 53:20 54:6
54:12
accommodatio...
11:19 45:7 51:8
51:17 53:18 55:1
accommodatio...
51:2
accurately (2)
23:9,17
act (3) 11:4 12:11
15:23
action (1) 59:16
actual (1) 54:14
ada (9) 15:8 19:4
19:11,21 20:5
23:1 24:1 51:4
51:16
adapt (1) 53:4
add (1) 31:12
address (1) 57:19
addressed (2)
48:9 49:2
administered (1)
47:1
advice (1) 12:1
advise (3) 12:10
19:17 20:14
advising (1) 44:1
advocate (1) 16:6
affiliated (1)
59:17
affirmatively (8)
15:2 22:19,21,24
23:7 25:21 48:4
50:20
aforesaid (1)
59:7
afternoon (1) 4:7
age (1) 4:2
agility (1) 43:23
ago (1) 26:7
agree (1) 35:1
agreed (1) 31:20
agreement (5)

3:9 8:20 20:18
20:24 21:13
ahead (5) 5:16,17
8:16 19:8,24
alleging (1) 38:20
56:16
allow (3) 20:19
55:21 58:8
allowed (2) 30:9
34:6
americans (2)
11:4 12:10
answer (10) 5:16
7:2,9,11 8:16
19:8 27:1 29:12
35:6 53:10
apnea (8) 12:23
27:4 36:19 40:12
40:20 41:6 42:2
42:8
appear (2) 27:23
55:12
appearances (1)
2:1
appears (3) 23:17
26:2 49:7
appointment (1)
47:20
appreciate (2)
4:9 58:15
appropriate (1)
20:2
appropriately (1)
51:1
approximately ...
4:17 18:17
april (1) 8:4
area (1) 52:5
asked (6) 16:19
27:17 29:10 30:1
32:9,22
asking (5) 5:11
12:4 32:3 33:9
34:2
asleep (18) 13:14
13:22 15:8 16:21
17:4,9 18:23
21:20 22:1 24:10
28:10 36:10,15
36:17 37:5,20
44:18 56:12
aspects (1) 37:15

assessments (1)
43:22
assisting (2) 40:1
53:18
associate (2)
14:3 16:4
associates (1)
16:10
assume (1) 5:10
attach (1) 43:5
attorney (8) 6:24
7:10 11:11 29:12
29:17 30:8 34:21
58:3
audit (2) 50:19
51:23
august (2) 1:15
37:3
available (1) 35:9
average (1) 24:23
aware (6) 13:1
17:1 26:13 45:9
45:17 57:1

**B**

back (5) 7:21
21:3 35:16 51:18
57:9
background (1)
16:13
bad (1) 18:3
barbara (3) 1:20
59:4,23
based (9) 7:9
19:2,10 21:17
29:12 30:13
33:17 39:10
54:14
basically (3) 16:2
16:9 30:2
becoming (3)
15:14,19 46:22
beginning (1)
22:22
behalf (3) 2:2,7
46:14
behavior (3) 19:5
19:13,23
belief (2) 17:7,11
believe (24) 6:15
8:4 20:8,21 23:8
25:13 26:5,8

27:3,15 29:17
30:5,12 33:17
35:24 37:22
39:12 42:11
43:10 44:14
48:17 50:4 56:19
57:15
believed (1) 38:9
bench (1) 35:17
benzinger (2)
1:18 2:9
best (1) 21:3
betz (1) 2:4
blank (7) 2:12
3:22 6:22 25:7
40:9 48:18,21
bob (20) 4:8 6:12
6:15 12:16 13:24
14:9,14 21:18
26:15 40:11
42:24 44:2,12,15
45:7,17,23 48:3
48:6,11
bobs (3) 6:19
46:2 48:15
break (6) 5:15,17
7:14 45:18,19
57:6
brent (1) 26:2
brief (2) 35:12,13
brought (1) 52:14
business (4) 8:8
8:11 43:20,20
bye (1) 36:3

**C**

call (4) 7:16 25:15
25:22 43:22
called (2) 25:11
49:19
cant (1) 19:19
capacity (5) 43:9
43:19 44:8,13
51:14
care (3) 10:10
15:22 16:7
carman (4) 26:10
26:15,22 55:18
cart (1) 54:4
case (20) 1:8
14:9 15:23 30:1
32:18,18 33:18

34:20 35:6,15
39:15,21,21 50:7
50:24 51:2,3
57:14,16 58:11
cases (11) 6:14
13:21 21:5 34:10
56:2,3,3,5,10,14
56:20
casual (1) 52:11
categories (1)
44:8
cause (9) 13:22
15:13 17:4,9
28:10 36:9 37:20
45:14 56:11
caused (9) 16:22
19:5,13,23 38:1
38:3,5 44:17
56:17
causing (4) 13:13
18:22 38:10,16
certain (1) 14:3
46:6
certified (1) 4:3
certify (2) 59:7
59:16
changed (1) 53:4
changes (2)
31:24 52:9
chemical (1) 21:6
cincinnati (2) 2:5
59:20
citing (1) 35:7
civil (1) 59:18
claimed (1) 26:22
claiming (2)
38:15 57:3
claims (1) 51:19
class (1) 43:24
client (7) 6:24
7:10 29:12,17
30:8 34:21 58:3
close (1) 32:18
collect (1) 14:2
collecting (1)
14:17
collection (1)
26:7
collector (1)
54:15
com (2) 2:6,10
come (2) 10:18

Case: 2:11-cv-00165-WOB-JGW    Doc #: 30    Filed: 10/16/12    Page: 18 of 25 - Page ID#: 376

Lehman vs. St. Elizabeth                          HYNKO                          8/13/2012

Page 61

47:19
**coming (3)** 4:9
 50:24 58:16
**commencing (1)**
 1:16
**comment (4)**
 44:4,10 52:11,18
**commission (1)**
 59:23
**commissioned ...**
 59:5
**common (1)**
 52:18
**communication...**
 14:3 25:9
**comorbidity (2)**
 15:12,12
**comp (3)** 10:9
 46:19 51:20
**companies (1)**
 43:21
**company (2)**
 32:21 34:13
**complete (1)**
 46:6
**completeness (...**
 46:7
**completion (1)**
 35:9
**compliance (1)**
 20:19
**concern (2)** 48:3
 56:1
**concerned (3)**
 30:24 33:4 34:4
**concerns (2)** 12:7
 42:14
**conclude (1)** 58:1
**concluded (2)**
 36:4 58:21
**condition (27)**
 13:13,16,19,24
 16:3,23 17:9
 18:22 19:13 20:4
 22:2 23:23,24
 26:22 28:10 36:9
 36:17 37:19 38:5
 38:10,16 39:11
 40:16 41:3 42:5
 56:11,17
**conditions (8)**
 13:24 14:7 17:12

22:4 38:1,3
 44:17 53:12
**conducted (1)**
 32:13
**confident (1)**
 46:8
**confidential (2)**
 3:8 8:19
**confirm (1)** 57:18
**consider (1)**
 20:18
**consistent (2)**
 55:20 56:1
**consult (2)** 12:5
 53:23
**consultant (1)**
 51:13
**consultation (2)**
 10:20 11:19
**consulted (2)**
 19:16 55:1
**consulting (1)**
 45:6
**contact (1)** 33:19
**continue (2)**
 20:19,20
**contract (1)**
 59:18
**control (3)** 31:16
 31:20 53:7
**conversation (...**
 6:13 22:18 23:9
 23:15,18 24:4,24
 25:5 28:18 36:4
 37:16 49:6,18
 50:12 52:21
**conversations ...**
 13:23 21:18
 24:20 25:14
 36:23
**copied (1)** 49:3
**copies (1)** 22:12
**copying (1)** 41:7
 41:14
**correct (25)** 14:8
 14:11,12 16:23
 16:24 18:15
 26:16 28:4 36:10
 36:11 40:6,20
 41:23 42:3,6,10
 43:4 45:4,15
 46:11 48:13,14

52:7 54:8 57:16
**correctly (1)**
 53:10
**couldnt (2)** 39:20
 53:2
**counsel (8)** 3:9
 7:8 8:20 11:8
 16:8 30:6 59:13
 59:15
**county (1)** 59:3
**couple (2)** 12:15
 55:12
**court (22)** 1:1
 7:16 28:24 29:2
 29:19 30:17,21
 31:10 32:3,7,16
 34:1,19 35:13,14
 35:21 36:1,3
 57:10,20 58:8
 59:17
**courts (1)** 7:15
**covington (1)** 1:3
**created (1)** 48:12
**crestview (2)**
 1:19 2:10
**crossexaminati...**
 3:3 4:5
**current (1)** 57:19
**currently (1)** 10:1

─── **D** ───
**date (1)** 1:15
**dates (1)** 56:18
**daughtrey (1)** 2:3
**day (3)** 7:22 48:5
 59:21
**dbllaw (1)** 2:10
**decide (1)** 13:17
**decided (1)** 8:17
**decision (8)** 6:19
 24:23 29:7,14
 47:21 54:22,23
 58:3
**decisionmaker ...**
 6:18 29:7
**decisionmakin...**
 30:23 31:9 35:2
**defendant (2)**
 1:10 2:7
**defer (4)** 40:9
 54:19,20,20
**defined (1)** 59:18

**demanding (1)**
 44:6
**department (18)**
 10:18 11:18
 15:16,19 27:7
 31:4 45:6 46:22
 47:1 53:18,19
 54:7,12,21,22
 55:1 56:15,24
**departments (1)**
 47:6
**depend (1)** 39:14
**dependency (1)**
 21:6
**depose (1)** 59:9
**deposed (3)** 4:3
 4:15 30:1
**deposition (26)**
 1:13 4:23 5:20
 22:9 25:18 26:1
 27:21 28:22 30:7
 31:20 32:12
 33:10,22 35:10
 35:19 41:10,13
 42:16,19 48:19
 55:9 58:2,21
 59:8,10,12
**depositions (2)**
 4:17,21
**described (1)**
 39:11
**describing (2)**
 22:17 49:5
**description (4)**
 12:4 43:5 52:10
 52:20
**descriptions (4)**
 52:12,13,16 53:1
**details (2)** 14:18
 14:20
**determination ...**
 40:1 53:19
**determine (7)**
 17:12 39:21,22
 46:7 53:21 54:6
 54:9
**determined (1)**
 18:22
**diabetes (9)**
 12:20 13:19,20
 17:2,3 45:11,14
 53:7,13

**diagnosed (1)**
 41:3
**diagnoses (1)**
 36:22
**diagnosis (7)**
 15:12 39:3,3,5,7
 39:23 42:13
**didnt (11)** 20:11
 31:16,19 37:14
 39:1,6 40:13
 44:12 50:1,4
 53:3
**differences (1)**
 36:22
**different (4)** 34:9
 44:8 52:15,16
**difficult (1)** 43:18
**direct (1)** 15:21
**director (13)** 8:7
 8:8,10,11 10:5
 10:22,24 15:14
 15:20 31:4 43:21
 46:18,22
**disabilities (2)**
 11:4 12:11
**disability (12)**
 12:8 15:23 19:6
 19:14,23 20:2
 47:2,12,13,14,15
 54:14
**discipline (3)**
 20:2 45:3 52:2
**disciplined (7)**
 18:21 19:5,12,17
 19:22 44:17 45:1
**discrimination ...**
 4:24
**discuss (10)** 6:21
 12:22 13:7,12
 28:6,14 36:14,15
 50:7 55:24
**discussed (10)**
 13:9,15 18:11
 23:20 29:11
 32:11 34:8 36:19
 49:12 58:9
**discussing (2)**
 12:19 45:3
**discussion (5)**
 36:20 38:4 44:21
 56:4 57:10
**discussions (3)**

Case: 2:11-cv-00165-WOB-JGW    Doc #: 30    Filed: 10/16/12    Page: 19 of 25 - Page ID#: 377

Lehman vs. St. Elizabeth                    HYNKO                         8/13/2012

Page 62

13:3 14:1 30:11
**district (2)** 1:1,2
**division (1)** 1:3
**doctor (1)** 21:23
**document (3)**
22:14 23:12
48:23
**documentation...**
51:6
**documented (2)**
39:6 51:1
**documents (4)**
6:2,5,6 21:18
30:11
**doesnt (1)** 31:21
**doing (4)** 20:7
43:19 44:7,10
**doll (2)** 11:10,11
**dont (31)** 5:9,13
14:1 15:9 18:24
19:1 20:16 21:15
24:17,22 25:5,14
27:2,5,15 29:16
31:24 32:19
34:10 35:8,22
39:2,8 40:13,20
40:21 41:18
44:14 45:20,22
49:2
**door (1)** 28:18
**dr (33)** 17:14,24
18:3,6 21:17
22:6 24:21 27:14
27:18,24 28:6,13
28:14 36:8,13
37:10,18 38:7
39:11 41:8,21,24
42:20,23 44:1
46:10 48:2,6,10
48:15 50:6 53:11
56:9
**drafted (2)** 6:9
41:14
**dressman (2)**
1:18 2:9
**due (2)** 14:22
22:1
**duly (3)** 4:2 59:5
59:8
**duties (5)** 21:1
39:12,14,15
52:12

**duty (4)** 26:10
39:22 43:7 52:9

— E —

**eap (1)** 21:10
**earlier (4)** 36:7
45:5,13 54:17
**eastern (1)** 1:2
**educate (1)** 16:4
**eeoc (3)** 50:19,24
51:23
**effect (2)** 20:5
55:13
**eight (1)** 24:23
**either (5)** 6:9
20:11 27:13 40:4
51:21
**elizabeth (32)**
1:9 4:9,21 6:16
7:8,23 8:3,14
10:8 11:13,15
13:10 15:18
18:21 29:4,10,22
30:2,4,6,14,15
30:18 33:13,14
33:23 40:7 46:14
46:20 53:2 55:14
57:2
**elizabeths (3)**
10:14,14 47:5
**email (26)** 2:6,10
20:6 22:16 23:8
23:16 26:2,5
27:17 35:15,21
35:22 41:14,22
42:20 48:2,9
49:1,5,10,20,24
50:4,13,14 52:21
**emails (4)** 6:7,8,8
40:14
**employed (11)**
6:16 16:11 29:4
29:13,21,23
30:16 32:5,14,15
33:7
**employee (49)**
8:7,10 10:5,17
10:22,24 11:21
12:1,6 15:15,16
15:19 17:18,20
18:21 19:3,4,11
19:12,22 21:2

26:14,22 28:10
31:18,22,23
32:20 33:12,20
36:9 37:20 38:23
40:3,5,7 45:11
46:18 47:4,17,22
53:17,20 54:8
55:18 56:11,24
57:1 59:14
**employees (18)**
10:7 19:17 32:17
33:17 37:4,24
38:8,13,15,20
44:9 46:24 47:4
47:8 54:5,11,14
55:2
**employers (1)**
19:16
**employment (5)**
4:24 6:19 8:13
29:7 30:3
**enforcing (1)**
10:14
**equipment (1)**
54:3
**esq (2)** 2:3,8
**essential (2)**
42:24 43:13
**essentially (3)**
22:16 34:13
49:21
**established (1)**
38:4
**ethical (1)** 33:18
**evals (2)** 43:19
44:8
**evaluate (2)**
17:21,21
**evaluates (1)**
17:20
**evaluation (1)**
44:13
**evaluations (1)**
43:9
**evident (1)** 23:22
**ex (1)** 33:19
**exacerbated (3)**
40:24 41:2 42:1
**exact (1)** 14:1
**exactly (1)** 45:20
**exam (11)** 25:4
25:10 26:3,14

32:13 38:24 43:2
47:18,23 53:8
56:16
**examination (3)**
3:4 31:3,6
**examined (2)** 4:3
48:8
**example (2)** 14:9
40:22
**exams (5)** 38:12
38:19 43:7 46:13
55:2
**executive (2)**
34:13 35:2
**exhibit (15)** 22:9
22:11 25:18 26:1
27:21 40:19
41:10,13 42:16
42:19 48:1,19,21
55:9,12
**exhibits (1)** 3:13
**exists (1)** 32:22
**experience (4)**
19:2,10,15 20:1
**experienced (2)**
5:3 51:9
**experiment (1)**
54:17
**expires (1)** 59:23
**explain (2)** 37:10
44:16
**explained (1)**
42:23
**explanation (2)**
37:12,13
**expressed (3)**
23:5 38:7 56:9

— F —

**facetoface (1)**
17:23
**facilitated (1)**
31:5
**fact (2)** 30:9,13
**facts (2)** 33:12,22
**fairly (2)** 32:17
58:12
**fall (12)** 10:21
13:14,22 17:4,9
18:23 22:1 28:10
36:10 37:20
44:18 56:11

**fallen (1)** 16:21
**falling (6)** 15:8
21:20 24:10
36:15,17 37:5
**familiar (1)** 27:4
**family (2)** 15:22
47:1
**far (5)** 14:16
30:23 33:3 34:3
49:23
**fatigue (7)** 13:21
15:13 17:3 40:24
42:1 45:14 53:15
**fces (3)** 43:6 44:5
44:10
**felt (3)** 13:13 15:6
56:10
**fifth (1)** 40:23
**file (1)** 35:12
**filled (2)** 47:4,8
**final (6)** 24:7,8,23
27:18 54:21,23
**find (3)** 14:6 17:8
51:22
**finding (1)** 14:18
**findings (3)** 14:20
24:20,21
**fine (4)** 35:11
50:11 57:14
58:14
**finish (2)** 24:7
35:18
**firm (5)** 7:6 29:5
29:16 34:14
59:17
**first (5)** 4:2 12:24
23:2 56:20 59:8
**fit (2)** 26:10 39:22
**fitforduty (28)**
13:5 14:14 16:20
17:19 25:4,10
26:3,14 32:13
37:5 38:1,9,12
38:19,24 39:9
40:17 43:2 46:13
47:18,23 53:8
55:2,7,11,18,19
56:16
**fitness (2)** 21:1
43:7
**fitnessforduty ...**
10:11 12:17

Lehman vs. St. Elizabeth                    HYNKO                                    8/13/2012

Page 63

13:10 31:2,5
44:23,24 55:5,13
56:19
**floor (1)** 2:5
**florence (1)**
57:20
**fmla (3)** 46:21,23
47:4
**focus (1)** 32:12
**follow (2)** 20:8
21:12
**following (1)**
50:2
**follows (1)** 4:4
**followup (2)**
51:22 52:19
**foregoing (1)**
59:10
**form (2)** 21:17
52:1
**formed (2)** 21:21
22:5
**former (5)** 31:23
32:17 33:11,17
33:20
**forming (1)** 36:13
**forth (1)** 59:13
**forward (1)** 34:6
**found (2)** 13:6
24:9
**frame (1)** 37:3
**freking (1)** 2:4
**frekingandbetz...**
2:6
**front (2)** 34:11
48:1
**full (2)** 4:11 39:9
**functional (4)**
43:9,19 44:7,12
**functions (2)**
42:24 43:14
**further (5)** 13:1,3
13:23 24:19
59:16
**future (1)** 21:20

**G**

**general (7)** 6:13
10:7 13:20 17:2
17:3 36:23 56:4
**generally (1)**
22:7

**gerald (14)** 1:13
3:2 4:1,13 25:20
25:22,24 27:23
36:7 42:18 57:15
58:19 59:8,11
**getting (1)** 21:16
**gist (1)** 24:3
**give (8)** 5:5 13:20
14:21 17:2 20:12
34:20 42:13
43:23
**given (3)** 4:18,23
59:10
**giving (3)** 35:7
52:2 59:7
**gleaned (1)** 18:14
**go (24)** 5:3,16,17
8:16 10:4 13:5
14:2 19:8,24
25:20 28:19 34:6
35:16 36:1,5
38:8,23 44:12
47:18,22 52:14
54:1 55:2 57:9
**goes (1)** 17:18
**going (22)** 5:3,10
5:13 7:10,11
8:15 14:14 16:20
22:10,23 25:12
33:22 34:20,21
37:4,19 48:20
55:17,19 57:13
58:1,12
**good (1)** 4:7
**greenbaum (2)**
11:10,11
**ground (1)** 5:4
**guess (1)** 34:19
**guidance (1)** 21:4
**guys (1)** 54:8

**H**

**half (1)** 53:1
**hamilton (1)** 59:3
**hand (2)** 22:10
59:19
**handed (3)** 25:24
41:12 42:18
**happened (1)**
31:1
**haskell (26)**
17:14,24 18:3,6

21:17 26:3 27:14
28:6,13,14 36:13
37:18 38:7 39:11
41:8,24 42:20,23
44:1 46:10 48:2
48:6,15 50:6
53:11 56:9
**haskells (8)** 22:6
24:21 27:18,24
36:8 37:10 41:21
48:10
**hasnt (1)** 19:21
**head (9)** 5:7 15:2
22:19,21,24 23:7
25:21 48:4 50:20
**health (17)** 8:8,8
8:10,11 10:6,22
10:24 15:15,16
15:19 18:21 19:3
19:11 46:18
53:17 54:9 56:24
**healthcare (4)**
1:9 10:7 20:19
39:9
**healthy (1)** 16:10
**heard (1)** 58:7
**held (1)** 8:9
**help (6)** 11:1 16:4
16:8 49:10 53:23
55:6
**helper (1)** 54:23
**helping (1)** 16:9
**helps (2)** 49:15
49:18
**hereinafter (1)**
4:3
**hereinbefore (1)**
59:13
**heres (1)** 35:4
**hereunto (1)**
59:19
**hes (10)** 29:6,13
29:15 30:14
31:17,22,23
33:12,20,22
**hi (2)** 29:1,2
**hills (2)** 1:19 2:10
**hipaa (2)** 14:22
42:14
**hired (3)** 7:5 8:3
34:14
**hold (2)** 8:5 58:2

**home (1)** 57:19
**honest (2)** 45:22
52:24
**honor (3)** 29:20
31:11 34:7
**hospital (4)** 33:8
44:7 52:13 55:20
**hours (1)** 24:24
**housekeeper (1)**
52:17
**hr (29)** 6:14 11:18
14:13,20 20:15
20:18 27:14,16
28:9 29:9 37:10
37:17,23 40:11
40:16 41:5 42:23
43:3 44:16 45:6
52:2,19 53:18
54:5,19,20,20
55:16,24
**hrs (1)** 48:3
**huhuh (1)** 5:7
**human (5)** 10:19
12:14 33:6 40:10
52:17
**hynko (17)** 1:13
3:2,13 4:1,14,14
25:18 26:1 27:21
32:14 40:19
41:10 42:16 55:9
58:19 59:8,11

**I**

**id (1)** 22:15
**identification (5)**
25:19 27:22
41:11 42:17
55:10
**identify (1)** 55:8
**ii (3)** 13:20 17:2,3
**ill (4)** 7:13 35:4,4
35:17
**im (20)** 4:7 5:3,10
5:11 8:2,15 10:3
12:3 15:3 21:23
22:10 24:24
28:21 32:18
35:19 40:10 45:9
48:20 50:2 58:1
**imagine (1)** 50:9
**immunizations ...**
10:8

**impact (3)** 17:13
39:23 53:14
**important (1)** 5:8
**impression (1)**
27:18
**inaccurate (4)**
24:6,13,15 49:23
**inaccurately (2)**
24:16 50:15
**inadequately (2)**
41:3 42:2
**include (1)** 10:12
**included (1)**
18:13
**indicate (1)** 55:16
**indicated (1)**
16:21
**inform (2)** 40:11
40:16
**information (17)**
14:17,22 15:6,11
18:14 20:12 24:8
24:12 27:16
29:17 31:8 32:24
33:1,5 36:21
45:21 54:16
**informed (4)** 14:9
31:14 37:18,23
**informing (1)**
14:20
**initial (2)** 41:4
42:6
**initially (3)** 12:24
25:11 32:10
**injured (1)** 51:18
**input (1)** 34:3
**instability (1)**
53:12
**instance (4)**
32:23 54:1,3
55:4
**instances (1)**
4:20
**institution (1)**
10:10
**instructed (2)** 7:9
29:11
**instructing (1)**
7:1
**instruction (2)**
7:11,13
**integrated (1)**

Lehman vs. St. Elizabeth                                    HYNKO                                    8/13/2012

Page 64

15:23
**interest (1)** 59:15
**internal (3)** 21:21
  21:22,23
**invoke (4)** 34:21
  34:22,24,24
**involved (5)** 14:4
  30:21,22 45:6
  50:23
**involving (1)**
  32:17
**isnt (1)** 50:13
**issue (10)** 13:8
  20:13 21:6 24:1
  28:23 31:15 34:6
  34:7 39:19 40:4
**issues (5)** 16:3
  32:16 36:20
  39:17 51:17
**issuing (2)** 28:15
  28:16
**ive (1)** 19:16

——————
**J**
**job (29)** 12:4 15:8
  16:9 21:20 26:19
  38:2,24 40:2
  43:1,5,14,17,18
  43:22 44:3,6
  51:15 52:9,11,12
  52:13,16,20,24
  54:22 55:3,5,22
  56:3
**jobs (2)** 43:24
  44:9
**jpas (1)** 43:22
**judge (2)** 28:20
  29:1
**judges (1)** 58:2
**june (4)** 7:24 8:6
  29:22 30:19
**jurisdiction (1)**
  1:21
**jury (1)** 32:19

——————
**K**
**katherine (1)** 2:3
**kati (10)** 4:7
  28:21,22 29:2
  31:12 32:3 34:2
  35:1,4,15
**keeps (1)** 22:23

**kelly (15)** 2:8
  5:23,24 28:21
  29:5,9,11 31:14
  32:7,10,23 33:1
  34:19 35:7 58:10
**kentucky (3)** 1:2
  33:19 57:21
**kept (1)** 51:7
**kind (5)** 36:14
  40:4 50:16 51:3
  52:16
**kneff (1)** 2:6
**knew (1)** 13:15
**knock (1)** 28:18
**know (40)** 5:9,15
  12:15 13:18 15:9
  15:10 16:19
  17:24 18:17 19:4
  19:12,15 20:7,11
  25:1,7 27:1,5
  31:12,14 33:17
  37:16 38:8 42:24
  43:3 44:21 45:7
  48:5,7,24 49:15
  49:20 50:15,21
  52:6 53:6,14
  56:8 58:7,8
**knowledge (1)**
  52:1
**kschoening (1)**
  2:10
**ky (2)** 1:19 2:10

——————
**L**
**lavelle (2)** 1:18
  2:9
**law (6)** 7:6 29:5
  29:16 33:18
  34:14 35:6
**lawful (1)** 4:2
**lawsuit (2)** 4:8,24
**lay (1)** 39:8
**lead (1)** 43:6
**learned (1)** 40:17
**leave (7)** 8:13
  15:23 16:5,6
  47:2,10,10
**led (1)** 29:8
**left (2)** 8:6 30:19
**legal (2)** 11:8
  19:18
**lehman (45)** 1:6

2:11 4:8 6:12
  12:16,20,22 13:4
  13:8,13 14:14
  15:7 16:20 17:8
  18:1,4,8,10,15
  18:18,20 20:4,9
  20:14,20 21:14
  23:10 26:10,16
  28:1 31:2 32:14
  33:7 40:12 41:4
  42:5,24 44:2
  48:3,6,8 49:13
  49:17 52:2 55:17
**lehmans (7)**
  17:15 25:4,10
  29:8,15,23 53:6
**lengthy (1)** 5:14
**lifestyle (1)** 16:10
**light (1)** 52:9
**line (1)** 26:9
**lisa (8)** 2:12 5:23
  5:24 25:7,9 49:7
  51:21 58:10
**listen (2)** 7:10,13
**litigation (1)** 26:6
**little (1)** 8:11
**llc (1)** 2:4
**log (1)** 51:7
**long (8)** 8:9 16:17
  18:17 26:7 30:10
  30:18 47:14
  51:12
**longer (5)** 29:4
  29:13 31:17
  32:21,22
**look (12)** 7:15
  20:22 22:15
  39:24 40:2,19
  41:20 48:22
  49:22 50:15,24
  54:13
**looked (2)** 56:20
  56:22
**looking (3)** 17:7
  23:3 51:5
**looks (7)** 22:17
  26:4 28:3 41:21
  49:4,6 55:15
**lunch (1)** 45:19

——————
**M**
**maintain (2)** 10:8

16:10
**making (2)** 51:7
  56:1
**manage (4)** 21:9
  46:19 47:10,11
**managed (1)**
  15:22
**management (5)**
  15:24 21:7 39:15
  51:19 54:5
**manager (1)**
  29:14
**managing (1)**
  10:8
**manner (1)** 19:18
**marked (12)** 3:13
  3:20 22:11 25:18
  26:1 27:21 41:10
  41:12 42:16,19
  48:21 55:9
**marty (4)** 25:1,3
  49:7 51:21
**mary (2)** 27:6,9
**material (2)** 3:8
  8:19
**mean (5)** 16:1
  20:23 25:13 43:8
  49:2
**meaning (2)**
  28:17 49:24
**means (1)** 16:2
**meant (1)** 51:22
**measurement (…**
  54:2
**measurements…**
  54:18
**medical (55)**
  10:10 13:13,16
  13:17,24 14:2,4
  14:7,21 15:7,11
  15:22,22 16:3,5
  16:6,22 17:12,15
  17:22 18:14,22
  19:13 21:4 22:1
  23:23,23 24:8,9
  26:21 27:16 28:9
  36:9,17,20,23
  37:15,19 38:1,3
  38:5,10,16 39:3
  41:3 42:5 44:17
  46:3,9 47:2
  48:15 53:9,12

16:10
**medication (1)**
  21:7
**medications (2)**
  21:8 53:7
**medicine (1)**
  16:14
**meet (3)** 5:24
  18:3 33:14
**meeting (19)** 6:3
  12:16,24 13:12
  17:16 18:7,7,15
  18:18 30:5,10
  32:1,10 33:9,15
  33:21,23 42:6
  45:24
**meetings (2)**
  13:1 41:4
**mention (1)** 20:3
**mentioned (5)**
  40:21 41:4 42:5
  46:17 55:11
**merger (1)** 52:14
**message (1)**
  55:21
**met (9)** 5:23
  17:24 29:9 30:10
  32:7 44:15 48:6
  48:11 50:6
**middle (3)** 4:13
  28:22 32:19
**minute (1)** 36:6
**missing (1)** 16:2
**misunderstood…**
  34:1
**months (1)** 47:15
**morris (1)** 27:6
**moving (1)** 57:22
**multiple (2)**
  25:13,14

——————
**N**
**name (5)** 4:11,13
  4:13 26:4,15
**narcolepsy (19)**
  28:9 36:8,14,19
  36:21 37:6,7,11
  37:15,19 38:6,16
  39:1,11,13 56:10
  56:21,23 57:3
**narcoleptic (1)**
  38:21

Lehman vs. St. Elizabeth                                    HYNKO                                    8/13/2012

Page 65

need (10) 5:15
  12:12,13 31:15
  38:19,23 43:15
  53:4,20 55:6
needed (3) 16:6
  20:9 52:9
neff (31) 2:3 3:3
  4:6,7 7:1,4,14,18
  7:21 10:3 22:12
  28:19,21 29:1,3
  31:11 32:6,9
  33:8,19 34:7
  35:20,24 36:2,5
  57:5,9,13 58:1,6
  58:15
neither (1) 59:14
neuhaus (1)
  27:10
neuro (1) 16:13
never (2) 39:5
  50:16
nodding (9) 5:6
  15:2 22:19,21,24
  23:7 25:21 48:4
  50:20
normal (1) 10:4
northern (1) 1:3
notary (4) 1:21
  1:21 59:5,23
note (2) 42:22
  48:7
notes (1) 45:23
number (1) 7:15
nurse (8) 15:21
  16:12 21:24
  27:11,12 39:12
  39:20,20
nurses (2) 27:8
  44:8

O

objection (6)
  6:23 8:15 19:7
  19:24 26:24
  57:11
obviously (5)
  25:7 31:17 34:10
  41:24 58:7
occasions (1)
  44:7
occurred (4)
  29:24 30:3,15

33:13
october (1) 37:3
office (2) 11:1
  59:20
offices (1) 1:17
official (1) 59:20
ohio (6) 1:21 2:5
  59:2,6,20,23
okay (98) 4:15,20
  5:11,12,18 6:2
  6:11,16,18 7:4,8
  7:14,17 10:1,5
  10:12,21 11:3,6
  11:9,12,24 12:19
  13:2,7,12 14:23
  15:14 16:12
  18:13 19:10,20
  20:3,7,14,17,23
  21:12,16 22:3
  23:2 24:2,11,14
  24:18 25:7,17
  26:9,21 27:6,20
  28:6,24 29:19
  30:21 31:10 34:1
  35:21 36:24
  37:23 38:12
  39:10,24 40:22
  41:9,20 42:22
  43:10 44:15 45:5
  45:10,23 46:2
  47:3,17 48:10,14
  48:23 49:4,10
  50:8,11,17 51:2
  51:5,9,12,15,21
  53:6,17,24 54:24
  55:8,16 56:22
  58:4,13
once (4) 24:7
  32:20 46:8 47:7
ones (1) 54:6
ongoing (2)
  21:10 56:3
open (1) 58:2
opinion (14)
  21:17,21,22,24
  22:5 23:4,5
  28:12,15 36:8,13
  37:11 38:7 39:8
opinions (1)
  33:18
opposed (1) 5:6
option (1) 20:22

organizations (1)
  52:15
oscadal (6) 3:21
  22:8,11 25:1,3
  49:7
outline (1) 21:2
outside (1) 43:21
overall (2) 13:21
  17:3
ownself (1) 39:19

P

page (4) 3:2,9
  8:20 22:16
paid (1) 47:11
paperwork (2)
  47:5,8
paragraph (4)
  22:22 23:16
  50:18 52:10
paragraphs (1)
  23:11
parkway (2) 1:19
  2:9
part (13) 8:17
  12:3,4,16 23:2,2
  26:5 31:6,9
  45:10 47:3 51:15
  52:12
parte (1) 33:19
participate (2)
  44:22,24
participated (2)
  6:6,7
participating (1)
  46:23
particular (2)
  54:7,12
particularly (1)
  21:9
parties (1) 25:14
parts (1) 13:15
parttime (1)
  15:21
pass (1) 46:9
patient (2) 39:16
  40:4
pay (1) 47:2
pending (3) 5:16
  6:14 58:2
people (4) 13:22
  21:5 39:4 43:11

perform (5) 39:12
  39:15 42:24
  43:13 55:7
performed (5)
  14:10 26:14
  38:13,20 56:15
performing (3)
  46:13 55:3,5
period (3) 5:14
  32:4 37:2
permitted (1)
  12:1
person (3) 17:2
  17:22 44:5
personal (1)
  11:10
personnel (4)
  43:7,8,16 44:11
phone (1) 25:15
physical (1)
  43:23
physically (2)
  44:5,9
physician (10)
  16:7,7 17:14,20
  38:5 39:6 46:13
  47:4,8 54:11
physicians (2)
  14:4 47:24
place (2) 1:17
  59:11
plaintiff (4) 1:7
  1:14 2:2 33:3
planning (1) 52:2
plans (1) 57:22
platek (2) 14:24
  23:5
please (3) 4:11
  19:9 49:14
point (2) 28:8
  51:16
policy (5) 10:15
  44:23 55:4,11,13
position (5) 8:5
  10:22 11:24
  20:20 29:21
possibility (6)
  17:23 40:23 42:1
  43:11 44:2 58:8
possible (2)
  12:11 36:17
possibly (1) 55:7

potential (3)
  20:12 21:13
  23:24
potentially (1)
  20:8
practice (2) 14:21
  17:11
predeposition (...
  30:5
prefer (1) 35:12
prepare (3) 5:19
  33:10,21
preparing (1)
  30:7
prescribe (1)
  21:8
present (1) 2:11
presented (1)
  44:6
presumed (1)
  43:18
pretty (2) 5:2
  30:20
previous (1)
  34:18
previously (3)
  3:20 22:10 48:21
previouslymar...
  22:8 48:18
primarily (2)
  32:12 42:23
primary (1) 48:3
printed (1) 26:5
prior (11) 11:15
  15:14,19 21:16
  28:15 37:17
  46:21 48:15 56:6
  56:8,14
privilege (9) 6:24
  7:10 29:12,18
  30:8 32:21 34:22
  34:24 58:3
privileged (5)
  30:12 32:1 33:15
  33:24 34:16
probably (4) 4:19
  40:18 52:23
  58:12
process (24)
  12:17 13:5,9,11
  14:6,14,15 15:1
  16:20 17:19

Lehman vs. St. Elizabeth                                      HYNKO                                       8/13/2012

Page 66

29:23 30:23 31:7
35:3 37:5 38:1,9
40:17 45:11
46:24 47:3,9
55:18,19
**processes (1)**
11:2
**produced (1)**
18:12
**protected (2)**
20:4 30:8
**provide (4)** 10:20
11:18 12:1 27:13
**provided (8)**
27:24 28:3 31:8
33:1,1,2,6 48:14
**psc (2)** 1:18 2:9
**public (2)** 59:6,23
**publicstate (1)**
1:21
**pursuant (3)** 3:9
8:20 59:12
**push (1)** 54:4
**pushandpull (1)**
54:2
**put (3)** 21:8 41:22
47:9

_____

**Q**
**qualified (1)** 59:5
**question (19)**
5:10,11,16 7:9
7:12 8:16 10:4
18:3 23:13,14
24:11,14 32:11
32:22 34:8 35:5
36:12 50:2 57:13
**questions (7)**
16:7 32:3,16
33:9 34:2 58:5,9
**quick (2)** 7:14
57:5
**quickly (1)** 58:13
**quite (1)** 12:3

_____

**R**
**read (2)** 12:10
23:1
**really (2)** 35:14
37:12
**reason (5)** 14:19
15:7 21:24 24:9

44:4
**reasonable (10)**
10:17 11:19,22
12:2,12 40:8
45:7 53:18 54:7
55:1
**recall (4)** 13:4
49:24 52:8 56:14
**received (8)** 6:9
11:3,7 19:4,21
22:6 26:2 57:15
**receiving (1)**
27:14
**recess (2)** 7:19
57:7
**recollect (1)**
42:20
**recollection (3)**
23:4 49:11,16
**recommendati...**
41:20
**recommended ...**
11:21,23 54:11
**record (6)** 4:12
7:18,21 28:19
36:5 57:9
**records (12)**
13:17 14:2,5
17:15,22 18:14
26:7 39:4 46:3,9
48:15 53:9
**recourse (1)**
31:21
**reference (3)**
22:8 40:20 48:18
**referenced (2)**
3:13,20
**referral (1)** 25:16
**referred (1)**
21:10
**referring (4)** 41:5
50:21 52:8 56:23
**refers (1)** 50:19
**reflect (1)** 23:17
**reflected (1)**
24:16
**reflects (2)** 23:9
24:3
**reformatted (1)**
53:5
**refresh (3)** 23:3
49:11,16

**regarding (17)**
12:7 13:8,18,19
13:24 14:13,24
23:10 25:10 26:3
27:24 37:11 45:6
48:2 49:13,16
52:20
**regurgitation (1)**
37:13
**rehabilitation (1)**
16:14
**relate (1)** 6:11
**related (9)** 4:21
10:10 16:3 44:10
47:6,7 51:4
53:12 56:19
**relation (1)** 23:15
**relationships (2)**
10:9 46:19
**relative (1)** 59:14
**relayed (2)** 28:9
50:14
**relaying (3)**
49:21,21 50:12
**remember (25)**
12:16,19 14:1,23
15:5 19:1 20:16
20:17 21:15
23:17 24:22 25:5
25:15,15 26:21
27:2 40:13 41:18
44:21 45:2,20,22
49:18 50:8 56:18
**reminder (1)** 5:5
**rendered (1)**
28:12
**rep (1)** 2:12
**repeat (1)** 38:22
**report (12)** 18:12
18:13 21:17 22:6
27:24 37:14
41:13,17 42:9
48:11,12 53:11
**reported (1)**
15:10
**reportedly (1)**
13:6
**reporting (2)**
42:9 59:17
**reports (4)** 6:7
26:3 27:13,16
**represent (5)** 4:8

7:6 33:13 34:15
40:10
**representative ...**
30:2,14
**represented (2)**
29:5,15
**request (4)** 11:22
12:2 40:8,9
**requested (2)**
10:17 45:1
**requesting (1)**
20:15
**research (2)** 16:4
34:18
**resources (5)**
10:19 12:14 33:6
40:10 52:17
**respect (3)** 18:9
48:3 55:21
**respects (1)**
59:12
**respond (1)** 35:15
**response (1)** 5:6
**responsibilities...**
10:6 11:17 40:2
46:18
**responsibility (7)**
10:13,21 15:15
46:23 47:5,7
51:16
**responsible (1)**
17:15
**restate (3)** 19:9
23:13 49:14
**result (3)** 37:6,7
59:15
**return (3)** 21:3,13
47:20
**returned (1)**
47:17
**returning (1)**
51:18
**returntowork (3)**
20:18,22,24
**review (9)** 6:2,5
23:11 39:4 40:14
46:2,5 52:13
53:9
**reviewed (4)**
21:19 30:11 46:4
53:1
**reviewing (6)**

17:15 22:14
23:12 48:23
49:10,20
**revising (1)** 52:20
**rewritten (1)**
53:5
**right (25)** 5:2,13
7:5,22 8:4,5
10:3 26:9 35:20
36:3,7 39:18
40:5 42:2,15,18
48:20 49:4 52:6
54:9,10 57:5,15
58:6,15
**risk (1)** 21:19
**rn (2)** 16:15,17
**robert (3)** 1:6
2:11 4:13
**roxann (23)**
14:24 15:6 20:3
20:8,18 21:12
22:17 23:5,18
24:18,20 28:4
41:15,22 42:4,9
49:5,11,16 50:5
51:21 52:22,23
**roxanns (2)** 23:8
23:15
**rpr (3)** 1:20 59:4
59:23
**rule (3)** 35:4,8
59:18
**rules (1)** 5:4

_____

**S**
**safe (1)** 31:23
**safety (4)** 39:16
39:19 40:4 43:1
**saw (1)** 23:22
**saying (4)** 19:1
32:24 35:19 44:2
**says (2)** 44:23
48:8
**schoening (27)**
2:8 3:4 6:21,23
7:3,5,17 8:15
19:7,24 22:14
26:24 28:20,21
29:16,20 30:19
31:1,19 33:5
34:5,9,17 35:11
35:23 57:12 58:4

Case: 2:11-cv-00165-WOB-JGW    Doc #: 30    Filed: 10/16/12    Page: 24 of 25 - Page ID#: 382

Lehman vs. St. Elizabeth                    HYNKO                    8/13/2012

Page 67

se (1) 25:6
seal (3) 3:8 8:19
    59:20
second (5) 22:16
    22:22 23:16
    50:18 52:10
section (1) 41:21
security (6) 43:1
    43:6,8,16 44:5
    44:10
see (19) 13:16
    16:22 17:22 20:9
    21:24 22:20
    24:17 26:10 35:6
    40:21,24 43:13
    49:23 50:9,24
    53:2,10 54:17,20
seeing (1) 21:15
seek (1) 21:4
seen (1) 49:1
selfproclaimed ...
    39:2
seminars (1) 11:8
send (1) 31:23
sending (1) 42:20
sense (1) 54:14
sentence (3) 23:2
    40:23 50:18
separate (2) 3:8
    8:19
september (12)
    23:6 24:16,19
    28:4 29:24 37:17
    48:16 49:12,17
    52:3 56:8,15
services (2) 8:8
    43:21
set (2) 59:13,19
setting (1) 43:18
shes (4) 22:17
    49:21,21 50:12
shortterm (5)
    47:2,12,13,14,15
show (2) 31:21
    48:20
side (2) 31:23
    43:20
similar (1) 47:12
similarly (1)
    26:18
simply (1) 44:2
sit (1) 21:2

site (1) 54:22
situation (1) 12:9
six (1) 47:15
sixth (1) 2:5
sleep (18) 12:23
    14:10,11 27:3
    36:19,20 38:2,4
    38:6,10,17 40:12
    40:20 41:5 42:2
    42:8 56:17,19
sleepiness (1)
    15:13
sleeping (6) 13:6
    26:18 38:24 44:3
    55:21 56:3
slept (1) 45:18
somebody (5)
    14:7 27:6 34:12
    34:14 56:16
someones (2)
    39:2,8
somewhat (1)
    36:21
soon (1) 57:23
sorry (4) 8:2 10:3
    15:3 24:24
sort (1) 14:24
sound (1) 27:4
speak (3) 18:6
    20:14 25:3
speaking (1)
    14:23
specialist (1)
    14:11
specific (3) 16:13
    25:15 40:2
specifically (6)
    6:14 18:7 33:8
    42:8,22 53:2
spoke (2) 24:18
    36:13
sports (1) 16:14
ss (1) 59:2
st (38) 1:9 2:12
    4:9,21 6:16 7:8
    7:23 8:3,14 10:8
    10:14,14 11:13
    11:15 13:10
    15:18 18:21 29:4
    29:10,22 30:2,4
    30:6,14,15,18,22
    33:13,14,23

34:23 40:7 46:14
    46:20 47:5 53:2
    55:14 57:2
staff (1) 11:1
standard (1)
    43:19
standpoint (2)
    24:8 51:20
start (1) 43:18
started (1) 5:4
starting (1) 40:23
state (7) 4:11
    19:18 41:2 43:6
    59:2,6,23
stated (2) 20:21
    45:5
states (3) 1:1
    26:10 41:24
stipulations (1)
    59:13
street (1) 2:4
strenuous (1)
    44:9
strike (5) 10:13
    28:7 37:1 45:12
    56:7
study (1) 14:10
subject (1) 26:9
submit (1) 35:12
submitted (1)
    31:2
subpoena (5)
    31:13,16,24
    57:16 58:11
subpoenaed (1)
    29:3
suggesting (2)
    20:17 52:21
summarize (1)
    27:18
summary (2)
    27:17,23
supervisor (2)
    41:5 43:1
suppose (1) 39:2
sure (10) 5:5,9
    12:3 46:21 50:3
    50:12,13,16
    55:20 56:1
sworn (2) 4:2
    59:8
synopsis (2)

23:19 37:14
system (3) 8:7
    10:5 47:10

—————
T
take (12) 5:17
    7:14 13:11 22:15
    23:10 39:8 45:23
    48:22 53:4 54:1
    54:4 57:5
taken (4) 1:14
    7:19 57:7 59:12
talking (2) 12:6
    31:3
taught (1) 19:21
telephone (1)
    7:15
tell (9) 13:17
    18:10,20 25:12
    39:5 44:19 45:17
    50:1,4
telling (1) 15:5
ten (2) 4:19 24:24
terminate (1)
    6:19
termination (6)
    29:8,24 30:24
    31:7 33:3 34:3
terminations (1)
    29:15
terms (3) 21:9
    51:5 53:17
test (4) 43:11,23
    54:3,17
testified (5) 17:1
    29:6,9 36:7
    45:13
testifies (1) 34:23
testify (3) 30:9
    31:13 33:22
testifying (2)
    30:14 33:12
thacker (3) 1:20
    59:4,23
thank (2) 15:5
    36:2
thats (18) 5:8 8:4
    24:5 34:6,13,15
    34:17 35:11 43:2
    45:2 50:3,9,11
    54:8 57:14,14
    58:10,14

theres (7) 5:16
    23:23 31:21
    39:16 49:23
    52:24 58:7
thing (3) 5:8
    31:11 50:16
things (1) 30:15
think (12) 5:13
    6:23 18:24 23:22
    24:3,6 25:11
    31:24 38:4 40:22
    46:20 50:14
thomas (2) 1:19
    2:9
thought (1) 34:2
thousand (1)
    52:24
three (1) 8:10
thursday (1) 6:1
tied (2) 15:8 24:1
time (30) 1:16
    5:14 7:19 8:6
    11:12 17:18
    23:10,23 26:15
    32:4,19 33:7
    34:15 36:24 37:2
    37:3 46:12 49:12
    53:2,7,10 54:19
    55:13,17 56:2,20
    57:2,7,22 59:11
times (5) 50:23
    54:24 55:12
titles (1) 8:9
today (7) 4:10
    5:14 31:4,14
    35:16,17 58:16
told (6) 42:4
    44:16 45:20
    49:22 50:6,10
tomorrow (1)
    35:18
top (1) 26:4
toyota (4) 51:8
    51:10,12,19
tpa (2) 10:9 46:20
training (7) 11:3
    11:6,10 19:3,11
    19:20 20:1
treated (2) 41:3
    42:2
treatment (1)
    21:11

Lehman vs. St. Elizabeth                                         HYNKO                                         8/13/2012

Page 68

**trial (1)** 32:19
**trouble (1)** 44:3
**truth (3)** 59:9,9
  59:10
**try (3)** 17:11
  35:18 46:6
**trying (1)** 16:22
**turned (1)** 27:15
**two (2)** 26:3
  52:14
**type (6)** 11:6
  13:20 16:12 17:2
  17:3 53:20
**typical (3)** 17:18
  43:2 46:5
**typically (5)** 12:8
  13:21 15:7 40:16
  52:5

**U**

**umhmm (11)** 5:7
  7:3 15:2 22:19
  22:21,24 23:7,21
  25:21 48:4 50:20
**uncontrollably ...**
  13:22 17:5,10
  28:11 36:10,15
  36:18 37:21
  56:12
**underline (1)**
  41:17
**underlined (1)**
  41:18
**undersigned (1)**
  59:5
**understand (2)**
  5:9,11
**understanding ...**
  28:8 32:20 33:11
  33:16 34:10,12
  34:18 39:10
  45:14 56:6
**united (1)** 1:1
**updating (2)**
  14:13,24
**usually (2)** 35:1
  47:24

**V**

**valley (1)** 57:20
**vastly (1)** 52:15
**verbal (1)** 5:5

**vine (1)** 2:4
**vs (1)** 1:8

**W**

**waived (1)** 1:21
**want (11)** 23:1
  35:14 39:24 40:1
  48:22 49:15,22
  50:11,13 55:8
  57:11
**wanted (1)** 55:20
**wants (2)** 42:23
  43:3
**wasnt (5)** 29:14
  31:19 37:13
  46:21 49:2
**way (5)** 15:10
  19:21 20:11 21:3
  35:8
**ways (1)** 8:17
**week (6)** 29:10
  31:15 32:8 33:10
  34:9 58:13
**weeks (1)** 47:16
**wehrman (1)**
  28:20
**went (1)** 37:24
**weve (1)** 56:18
**whereof (1)**
  59:19
**whos (1)** 34:14
**witness (12)** 4:2
  23:12 29:3 31:3
  32:4,24 33:6
  34:23 35:9 48:23
  58:14 59:19
**wood (1)** 57:20
**word (2)** 41:7,7
**wording (1)**
  41:22
**words (1)** 20:5
**work (11)** 10:19
  11:18 16:3,21
  17:13 21:3,13
  22:1 45:18 47:20
  51:19
**worked (4)** 7:23
  51:18 55:14 57:2
**workers (4)** 10:9
  46:19 51:18,20
**working (1)** 10:1
**works (3)** 13:10

  27:7 36:22
**wouldnt (2)**
  19:18 40:18
**writing (1)** 40:8
**written (2)** 18:12
  18:13
**wrote (1)** 41:8

**X**

**Y**

**yeah (4)** 28:17
  44:20 49:15
  53:22
**year (2)** 8:1,12
**years (2)** 8:11
  12:15
**youll (1)** 35:8
**youre (7)** 16:2
  34:19,21 35:7,7
  56:23 57:1
**youve (2)** 19:20
  48:24

**Z**

**0**

**1**

**1 (9)** 1:16 3:14,21
  7:20,20 22:9,11
  25:18 26:1
**11cv00165 (1)**
  1:8
**12 (1)** 47:16
**13 (4)** 1:15 48:8,9
  48:16
**13th (1)** 48:11
**14 (3)** 49:17 52:3
  56:9
**14th (2)** 48:12
  49:12
**17 (2)** 57:8 59:23
**18 (2)** 7:24 8:6
**1986 (1)** 16:18
**1992 (1)** 51:13

**2**

**2 (4)** 1:8 3:15
  27:21 40:19
**2003 (1)** 51:14
**2004 (1)** 8:4
**2010 (9)** 23:6

  24:16,19 29:24
  37:3,17 52:3
  56:9,15
**2012 (4)** 1:15 8:2
  30:19 59:21
**2013 (1)** 59:23
**207 (2)** 1:19 2:9
**2176 (1)** 57:20
**22 (1)** 3:21
**24 (1)** 8:4
**25 (1)** 3:14
**27 (1)** 3:15
**28 (4)** 28:4 37:17
  57:8 59:18

**3**

**3 (9)** 3:16,22
  41:10,13 48:19
  48:21 57:8,8
  58:21
**30 (1)** 58:21

**4**

**4 (5)** 3:3,17 42:16
  42:19 48:1
**41 (1)** 3:16
**41017 (2)** 1:19
  2:10
**41042 (1)** 57:21
**42 (1)** 3:17
**45 (1)** 1:16
**45202 (1)** 2:5
**48 (1)** 3:22

**5**

**5 (3)** 3:18 55:9,12
**525 (1)** 2:4
**53 (1)** 7:20
**55 (2)** 3:18 7:20

**6**

**7**

**8**

**9**

**9 (7)** 3:9 8:20
  23:6 24:16,19
  48:8,9
**9th (1)** 24:22