Lehman vs. St. Elizabeth          KRAFT                    7/24/2012

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

```
----------------------------------
                                :
ROBERT LEHMAN,                  :
                                :
          Plaintiff,            :
                                :
          vs.                   :   CASE NO.
                                :   2:11-cv-00165
ST. ELIZABETH HEALTHCARE,       :
                                :
          Defendant.            :
                                :
----------------------------------
```

        DEPOSITION OF:   MICHAEL KRAFT

        TAKEN:           By the Plaintiff

        DATE:            July 24, 2012

        TIME:            Commencing at 12:54 a.m.

        PLACE:           Offices of:
                         DRESSMAN, BENZINGER,
                         LaVELLE, PSC
                         207 Thomas More Parkway
                         Crestview Hills, KY  41017

        BEFORE:          Barbara A. Thacker, RPR
                         Notary Public-State of Ohio
                       (Jurisdiction of Notary Waived)

AMS DEPO
(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Lehman vs. St. Elizabeth                    KRAFT                          7/24/2012

---

Page 2

1    APPEARANCES:
2        On behalf of the Plaintiff:
3            KATHERINE DAUGHTREY NEFF, ESQ
                 of
4            Freking & Betz, LLC
             525 Vine Street
5            Sixth Floor
             Cincinnati, Ohio  45202
6            Email: kneff@frekingandbetz.com
7        On behalf of the Defendant:
8            KELLY A. SCHOENING, ESQ.
                 of
9            Dressman, Benzinger, LaVelle, PSC
             207 Thomas More Parkway
10           Crestview Hills, KY  41017
             Email: kschoening@dbllaw.com
11
         Also Present:  Robert Lehman
12                       Lisa Blank (St. E. Rep)
13                       - - -
14
15
16
17
18
19
20
21
22
23
24

---

Page 3

1                I N D E X
2    MICHAEL KRAFT                        PAGE
3    CROSS-EXAMINATION BY MS. NEFF             4
4    EXAMINATION BY MS. SCHOENING            91
5    FURTHER CROSS-EXAMINATION BY MS. NEFF    95
6    FURTHER EXAMINATION BY MS. SCHOENING     96
7
8            E X H I B I T S
9
10   KRAFT EXHIBITS           MARKED  REFERENCED
11       1              14
12       2              31       70
13       3              36       92
14       4              78
15       5              82
16
17
18
19
20
21
22
23
24

---

Page 4

1                    MICHAEL KRAFT
2    of lawful age, a witness herein, being first duly sworn
3    as hereinafter certified, was examined and deposed as
4    follows:
5                    CROSS-EXAMINATION
6    BY MS. NEFF:
7        Q.    Good afternoon.
8        A.    Good afternoon.
9        Q.    I know I introduced myself to you a little
10   bit ago.  My name is Kati Neff, and I represent Bob
11   Lehman in his lawsuit against St. Elizabeth.  I
12   appreciate you coming here today.  Could you just state
13   your full name for the record?
14       A.    Michael P. Kraft.
15       Q.    Do you go by "Mike?"
16       A.    I go by "Mike."
17       Q.    Do you mind if I call you "Mike?"
18       A.    That's fine.
19       Q.    Mike, have you ever had your deposition
20   taken before?
21       A.    Yes.
22       Q.    And how long ago was that?
23       A.    Six years ago was probably the last one.
24   I've had multiple.

---

Page 5

1        Q.    Did any of those depositions relate to an
2    employment matter?
3        A.    Yes.
4        Q.    Okay.  Were you employed by St. Elizabeth
5    at the time of any of those depositions?
6        A.    No.
7        Q.    Okay.  Have you ever had to give
8    deposition testimony in a case where an employee had
9    sued your employer for discrimination?
10       A.    No.
11       Q.    Okay.  Well, if you have given multiple
12   depositions you're probably pretty familiar with how
13   things are going to go today.  I'll be pretty quick
14   with the ground rules.  The first ground rule is very
15   easy.  You're doing well already.  Give verbal
16   responses instead of saying "um-hmm" or "huh-uh" or
17   nodding your head.  Please say "yes" or "no."  That way
18   Barb can record your testimony accurately.
19            Please wait until I'm finished with my
20   question before you start to answer.  That way you and
21   I are not talking over one another.  Also, it will
22   ensure that you're actually answering the correct
23   question I'm asking.  And if, for some reason, you are
24   still not finished with your answer, and I start to ask

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    KRAFT                        7/24/2012

| Page 6 | Page 8 |
|---|---|

**Page 6**

1   my next question, please let me know that I've cut you
2   off. It's not my intention to do so. Okay?
3        A.    Okay.
4        Q.    The only other thing that may come up, I
5   think from time to time, is that Ms. Schoening may
6   object. If she objects, you can go ahead and answer
7   the question, unless she instructs you not to answer
8   the question. If you need the question read back to
9   you, we can have Barb do that. Okay?
10       A.    Okay.
11       Q.    All right. I guess one last thing. If
12  you need a break, let me know. But I just ask that if
13  there's a question pending, you go ahead and answer the
14  question before we take a break. Okay?
15       A.    Okay.
16       Q.    All right. Did you do anything to prepare
17  for your deposition?
18       A.    Yes.
19       Q.    What did you do?
20       A.    I met with Kelly.
21       Q.    Okay. And when did you meet with Kelly?
22       A.    Yesterday.
23       Q.    And how long was your meeting?
24       A.    An hour and a half.

**Page 7**

1        Q.    Did you review any documents during your
2   meeting?
3        A.    Yes.
4        Q.    And the documents that you reviewed, were
5   they all documents you had seen before?
6        A.    No.
7        Q.    Okay. What can you remember reviewing?
8        A.    Kelly had some documents I had filled out
9   and then some document from Roxann, and a document from
10  Bob.
11       Q.    Obviously, the documents you had filled
12  out, those were the ones you had seen before?
13       A.    Yes.
14       Q.    And what can you remember from those
15  documents? Were they e-mails?
16       A.    An e-mail and some standard St. Elizabeth
17  documents that were filled out.
18       Q.    Like a termination form?
19       A.    Yes.
20       Q.    And then you said "document from Roxann."
21  Had you seen that document before, or those documents
22  before?
23       A.    No.
24       Q.    Okay. And what were those documents?

**Page 8**

1        A.    Well, I had seen one of them. I
2   apologize. It was a document that I had seen just
3   prior to our meeting with Bob. And then there was an
4   e-mail that I believe went to Marty and Lisa that I had
5   not seen.
6        Q.    Okay. And what was that e-mail about?
7   Just generally, if you can remember anything from it,
8   other than the fact it was sent to Marty and Lisa.
9        A.    I think it was just a summary of what was
10  happening in the case.
11       Q.    Okay. When you say, "what was happening
12  in the case," you're referring to the investigation?
13       A.    I'm sorry. The investigation, yes, at the
14  time.
15       Q.    Okay. And then you said that there was a
16  document from Bob. Was that something you had not seen
17  before?
18       A.    That's correct.
19       Q.    And was it addressed to -- who was it
20  addressed to, if anyone?
21       A.    I don't know.
22       Q.    Okay. Any other documents that you recall
23  reviewing in preparation for your deposition?
24       A.    No.

**Page 9**

1        Q.    Okay. Other than speaking with
2   Ms. Schoening, did you speak with anyone else about
3   your deposition?
4        A.    No.
5        Q.    Your direct supervisor, is that Doug
6   Chambers?
7        A.    Yes.
8        Q.    Were you aware that Doug has given
9   testimony in this case?
10       A.    I was.
11       Q.    Okay. And did you and Doug discuss his
12  testimony in this case?
13       A.    No.
14       Q.    Are you familiar with Roxann Platek?
15       A.    I am.
16       Q.    Were you aware that Roxann had given
17  deposition testimony in this case?
18       A.    No.
19       Q.    All right. What is your address?
20       A.    At the hospital?
21       Q.    Your personal address.
22       A.    ███████████, Independence,
23  Kentucky.
24       Q.    And the Zip?

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    KRAFT                         7/24/2012

---

Page 10

1    A.    41051.
2    Q.    How long have you lived at that address?
3    A.    Two Years.
4    Q.    And we have to ask for that information
5    just in case you leave employment with St. Elizabeth
6    and we need to track you down for a trial or something.
7    I'm not trying to pry.
8          When were you first hired by
9    St. Elizabeth?
10   A.    July of 2008.
11   Q.    Okay.  And what position were you hired
12   for?
13   A.    Director of Security.
14   Q.    And is that the position you still hold
15   today?
16   A.    They have added the title Safety to that
17   as well.  It's Director of Security and Safety now.
18   Q.    And did your job responsibilities change
19   between the Director of Security position and the
20   Director of Safety and Security position?
21   A.    Yes.
22   Q.    When did you become the Director of
23   Security and Safety?
24   A.    Around February-March of 2009.

---

Page 11

1    Q.    Okay.  And how did your job
2    responsibilities change between those two positions?
3    A.    Safety duties were added to my
4    responsibilities as well as system responsibilities.  I
5    was hired prior to the merger.
6    Q.    And when you say "Safety duties were
7    added," what do you mean by that?
8    A.    Fire, hazardous waste.
9    Q.    Okay.  And then what do you mean by
10   "system responsibilities?"
11   A.    I was hired prior to the merger so I was
12   hired just for what was then St. Elizabeth South and
13   North.  We then merged.  And then around February and
14   March I was given the responsibility of all hospitals
15   within the system.
16   Q.    Did St. Elizabeth South and North include
17   the Edgewood facility?
18   A.    Yes.
19   Q.    So when you were hired in July of 2008 as
20   the Director of Security, you were responsible for the
21   Edgewood facilities?
22   A.    Yes.
23   Q.    And did Bob Lehman report to you?
24   A.    Yes.

---

Page 12

1    Q.    And was he a supervisor at that point?
2    A.    Yes.
3    Q.    Was he on first shift, second shift --
4    A.    Second.
5    Q.    -- third shift?  I can't remember how many
6    you all have.
7    A.    Second.
8    Q.    Second?  Okay.  And then at some point he
9    moved to first shift?
10   A.    Yes.
11   Q.    And did you -- were you involved in
12   facilitating that move of Bob from the second to the
13   first?
14   A.    Yes.
15   Q.    Was that a promotion?
16   A.    No.
17   Q.    Approximately how long was he on first
18   shift before he was let go?
19   A.    I don't recall when he moved to first.
20   Q.    Okay.  Do you know whether he moved to
21   first before or after you became the Director of
22   Security and Safety?
23   A.    After.
24   Q.    After.  Okay.  And when you were the

---

Page 13

1    Director of Security in July of 2008, how many
2    positions reported directly to you?
3    A.    Direct, would have been three.
4    Q.    Okay.  And what were those three
5    positions?
6    A.    It would have been the Second Shift
7    Supervisor, the Third Shift Supervisor in Edgewood, and
8    the Security Manager from the North.
9    Q.    When you became the Director of Security
10   and Safety did you add any direct reports?
11   A.    Yes.
12   Q.    Okay.  How many direct reports report to
13   you now?
14   A.    Six.
15   Q.    Okay.  Do you still have a Second and
16   Third Shift Supervisor that reports to you?
17   A.    Yes.
18   Q.    Do you still have a Security Manager that
19   reports to you?
20   A.    Yes.
21   Q.    Okay.  What are the other positions?
22   A.    Assistant Director of Security, Assistant
23   Director of Safety, and my secretary -- and, actually,
24   that would have made the number four, previously.  I

---

4 (Pages 10 to 13)

Lehman vs. St. Elizabeth                    KRAFT                    7/24/2012

Page 14

1    apologize.
2        Q.    Who is the Assistant Director of Security?
3        A.    Dave Guethlein.
4        Q.    I'm sorry.  What's the last name?
5        A.    Guethlein, G-U-E-T-H-L-E-I-N.
6        Q.    And how long has -- strike that.  Have you
7    had an Assistant Director of Security reporting to you
8    since either February or March of 2009?
9        A.    That's when it occurred.
10       Q.    Okay.  Who is your secretary?
11       A.    Kim DiFilippo.
12             (Kraft Deposition Exhibit No. 1 was marked
13             for identification.)
14       Q.    All right.  Mike, you've been handed what
15    has been marked as Exhibit 1 to your deposition.  What
16    I'd like you to do is let me know if Exhibit 1
17    accurately reflects the positions that report to you.
18       A.    Within Edgewood, yes.
19       Q.    This is obviously the Edgewood Security
20    that reports to you?
21       A.    Yes.
22       Q.    And Kim is also located in Edgewood; is
23    that correct?
24       A.    Yes.

Page 15

1        Q.    And then do you have an office in
2    Edgewood?
3        A.    Yes.
4        Q.    Okay.  Does Mr. Smith report to you?
5        A.    Yes.
6        Q.    And then is Mr. Denham still the Second
7    Shift Supervisor?
8        A.    Yes.
9        Q.    And then is it Charles Johnson?
10       A.    Yes.
11       Q.    Is he still the Third Shift Supervisor?
12       A.    Yes.
13       Q.    Okay.  Now, if you take a look at the
14    officers who are listed under Mr. Smith, are any of
15    those officers no longer employed by St. Elizabeth?
16       A.    Under Mr. Smith?  Yes.  One.
17       Q.    Which one?
18       A.    Osborne.
19       Q.    What is Osborne's first name?
20       A.    Dave.
21       Q.    And did Dave Osborne leave his employment
22    voluntarily or involuntarily?
23       A.    Voluntarily.
24       Q.    Were you involved in hiring any of the

Page 16

1    Security Officers listed under Smith?
2        A.    Yes.
3        Q.    Okay.  And which ones?
4        A.    Sandel, B. Burch, and Ransdell.
5        Q.    What is Sandel's first name?
6        A.    Greg.
7        Q.    And Ransdell, what is Ransdell's first
8    name?
9        A.    Ki, K-I.
10       Q.    What is Burch's first name?
11       A.    Brian.
12       Q.    All right.  Under -- is it Jack Denham?
13       A.    Yes.
14       Q.    Under Jack Denham, are any of those
15    Security Officers no longer employed by St. Elizabeth?
16       A.    Yes.
17       Q.    Okay.  Which one or ones?
18       A.    Craig Burch.
19       Q.    Did Craig leave voluntarily or
20    involuntarily?
21       A.    Voluntarily.  Also Chris Dees.
22       Q.    Which one?  Oh, Dees.  Sorry.
23       A.    He left voluntarily.
24       Q.    And then there is, obviously, a box that

Page 17

1    has nobody in it.  Is that a position that has since
2    been filled, or is that still open?
3        A.    I currently have one open position.
4        Q.    All right.  Now, did you hire any of the
5    Security Officers listed under Jack Denham?
6        A.    Yes.
7        Q.    Which ones?
8        A.    Gilvin, Burch, Zurborg, Taylor, Stivers,
9    and Dees.
10       Q.    All right.  Now, are any of the officers
11    listed under Mr. Johnson no longer employed by
12    St. Elizabeth?
13       A.    Capps.
14       Q.    That's it?
15       A.    That's it.
16       Q.    Did Capps leave voluntarily or
17    involuntarily?
18       A.    Voluntarily.
19       Q.    All right.  Did you hire any of the folks
20    listed under Mr. Johnson?
21       A.    Wietholter, Helton, Muse, Holstein,
22    Luersen, Stevens, and Fuller.
23       Q.    All right.  Now, you mentioned that there
24    are a couple of people on here who are no longer

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    KRAFT                          7/24/2012

---

Page 18

1  working with St. Elizabeth.  Are there any folks that
2  currently are working for the Edgewood facility in the
3  Security Department that are not listed on this chart?
4       A.    Yes.
5       Q.    Okay.  What are their names?
6       A.    Ron Johnson -- I'm trying to think.
7  That's all I can think of at this point.
8       Q.    Okay.  Which shift is Mr. Johnson on?
9       A.    PRN.  He works multiple shifts.
10      Q.    Okay.  And the PRN folks, are they mostly
11 under 40 hours?
12      A.    Yes.
13      Q.    Okay.  And you hired Mr. Johnson?
14      A.    Yes.
15      Q.    Do you know whether any of the men
16 listed -- I assume they are all men, except Kim; is
17 that right?
18      A.    No.
19      Q.    Okay.  Sorry.  Any of the folks listed
20 here as Security Officers, are you aware whether any of
21 them have disabilities?
22      A.    I'm not aware.
23      Q.    Now did you have experience in Security
24 prior to July of 2008?

---

Page 19

1       A.    Security?  No.
2       Q.    Who did you work for prior to
3  St. Elizabeth?
4       A.    Covington Police Department.
5       Q.    What was your position?
6       A.    When I retired, I was Assistant Chief.
7       Q.    So you have police experience?
8       A.    Yes.
9       Q.    Okay.  How many years?
10      A.    23.
11      Q.    Now, as the Director of Security, did you
12 have any responsibility for responding to emergency
13 situations?
14      A.    Yes.
15      Q.    Okay.  Is that the same for your current
16 position?
17      A.    That is my current position.
18      Q.    I just said "Director of Security."  You
19 said your new position is Director of Security and
20 Safety.
21      A.    Oh, okay.
22      Q.    In both positions, do you have that
23 responsibility?
24      A.    Yes.

---

Page 20

1       Q.    Okay.  Other than the addition of the
2  responsibilities with respect to Safety, as well as the
3  additional facilities, are your day-to-day
4  responsibilities pretty much the same between those two
5  positions?
6       A.    Yes.
7       Q.    Okay.  Have you been involved in either
8  revising or creating a job description for the Security
9  Officers?
10      A.    Yes.
11      Q.    Okay.  And which one have you done?
12 Created or revised?
13      A.    Revised.
14      Q.    And have you been involved in revising the
15 Security Supervisor job description?
16      A.    Yes.
17      Q.    Has the Security Supervisor job
18 description, has that changed since September of 2010?
19      A.    No.
20      Q.    What are the general responsibilities of a
21 Security Supervisor?
22      A.    Supervise staff.
23      Q.    Okay.
24      A.    Respond to calls, maintain order within

---

Page 21

1  the hospital.
2       Q.    Now, during the time that you have worked
3  for St. Elizabeth, is it your recollection that the
4  hospital tried to have a Security Supervisor, and three
5  Security Officers on duty during the first shift?
6       A.    No.
7       Q.    Okay.  How many Security Officers would
8  there be?
9       A.    Three per shift.
10      Q.    Three total?
11      A.    Three total.
12      Q.    Including the supervisor?
13      A.    Yes.
14      Q.    And would you have a Security Officer in
15 the Monitor Room?
16      A.    Yes.
17      Q.    Would there be a Security Officer
18 patrolling?
19      A.    Yes.
20      Q.    So what other responsibilities are there
21 of a Security Officer besides attending the monitoring
22 room and patrolling?
23      A.    Answering calls for service, assisting
24 guests, patients, staff.  Assisting all of them.

---

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                     KRAFT                        7/24/2012

---

Page 22

1      Q.     When you say "patrolling," is that
2  something that is within the hospital or outside of the
3  hospital and the hospital grounds?
4      A.     Both.
5      Q.     Are there Security Officers that will sit
6  in a security truck and watch the shift change?
7      A.     Yes.
8      Q.     If there are only three Security Officers
9  total on the shift, what are the other Security
10 Officers doing when that Security Officer is watching
11 the shift change?
12     A.     One would be in the Monitor Room.
13     Q.     Okay.
14     A.     The other, various things.  They may be
15 patrolling inside, they could be doing reports.  It
16 just varies.
17     Q.     Do you have any responsibility for
18 scheduling the Security Officers?
19     A.     I oversee it.
20     Q.     Is the supervisor the primary scheduler?
21     A.     Yes.
22     Q.     When you were first hired as a Director of
23 Security, how many Security Officers would be on the
24 first shift at the Edgewood unit?

---

Page 23

1      A.     Three.
2      Q.     Okay.  And did you ever change that to
3  increase it to three Security Officers and one Security
4  Supervisor?
5      A.     I make an attempt, where possible, to have
6  a fourth one there during the day and the week, because
7  of volume.  But not always able to do so.
8      Q.     Okay.  And so what percentage of the time
9  would you say there are a total of three Security
10 Officers and one Security Supervisor on your staff on
11 the first shift?
12     A.     15 to 20 percent of the time.
13     Q.     And if Bob Lehman said that more often
14 than not there were three Security Officers and one
15 supervisor on the first shift, would he be lying?
16          MS. SCHOENING:  Objection.  Answer if you
17 can.
18     A.     I would say that I don't believe it's that
19 often.  Most of the time, no.
20     Q.     Okay.  Are you always at the Edgewood
21 facility?
22     A.     No.
23     Q.     Are there times when you have to go visit
24 the other facilities?

---

Page 24

1      A.     Yes.
2      Q.     As a Security Supervisor, did you ever ask
3  Bob Lehman to go to other St. Elizabeth facilities,
4  aside from the Edgewood facility?
5      A.     Yes.
6      Q.     Okay.  And during the time that Mr. Lehman
7  reported to you, other than changing from second shift
8  to first shift, had his responsibilities changed at
9  all?
10     A.     I don't know all his responsibilities
11 under the previous Director.  I know what his
12 responsibilities are under me.
13     Q.     Okay.  And I'm sorry, I didn't clarify my
14 question well enough, I guess.  What I'm asking you is
15 during the time he reported to you, other than the
16 change from second to first shift, did you change any
17 of his responsibilities?
18     A.     At this time, I would have to say yes.
19     Q.     And what, if anything, can you remember
20 changing from his responsibilities?
21     A.     I guess the changes that I'm thinking
22 about would be that he had developed a security report
23 for me.  And then previously -- you know, he had
24 computer skills and he offered to do that.

---

Page 25

1          Then, because he had developed that
2  report, he did go to the other hospitals to show them
3  that.  So out of being a system, and making some
4  changes, there were additional duties.
5      Q.     Okay.  Had you asked him to purchase
6  equipment?
7      A.     He assisted with that, yes.
8      Q.     Okay.  Did you ask him to assist other
9  Security Managers from the other St. Elizabeth
10 facilities with issues that arose out of the
11 dispatching system?
12     A.     Yes.
13     Q.     And since assigning these additional
14 responsibilities, did you believe that he was
15 performing them in a timely manner?
16     A.     Yes.
17     Q.     Did you have any concerns at all about his
18 performance?
19     A.     No.
20     Q.     Why are Security Officers assigned to the
21 Monitor Room?
22     A.     The main reason is to monitor the fire
23 alarm.
24          Okay.  Are there security cameras at the

---

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    KRAFT                        7/24/2012

---

Page 26

1   hospital?
2       A.   Yes.
3       Q.   Does the Monitor Room include a view from
4   those security cameras?
5       A.   Yes.
6       Q.   So could a Security Officer see something
7   suspicious on one of the monitors?
8       A.   Yes.
9       Q.   Is that possible?
10      A.   Yes.
11      Q.   And if a Security Officer sees something
12  suspicious on one of the monitors, what is he supposed
13  to do?
14      A.   He is supposed to dispatch an officer to
15  that location.
16      Q.   Okay.  And do the Security Officers know
17  pretty much where -- strike that.  Would the Security
18  Officer in the Monitoring Room pretty much know where
19  the other Security Officers are?
20      A.   Not necessarily.
21      Q.   Okay.  Is there anything that the Security
22  Department used to try to keep track of where the
23  Security Officers were?
24      A.   No.

---

Page 27

1       Q.   Okay.  And as Security Supervisor would
2   Bob Lehman have always been contacted if there was
3   something suspicious that the Security Officer saw in
4   the monitor?
5       A.   It depends on what it is.  Not always.
6       Q.   And the Security Supervisors that report
7   to you, are they permitted to take breaks?
8       A.   Yes.
9       Q.   And are the Security Officers they
10  supervise also permitted to take breaks?
11      A.   Yes.
12      Q.   How many breaks do they get in a day?
13      A.   Two.
14      Q.   All right.  Do they also get a lunch
15  break?
16      A.   Yes.
17      Q.   Okay.  And where are the Security Officers
18  permitted to go if they want to take their lunch break?
19      A.   The cafeteria.
20      Q.   Okay.
21      A.   Or our office.
22      Q.   And when the Security Officers are on a
23  lunch break, they are not paid for that time, isn't
24  that correct?

---

Page 28

1       A.   That's correct.
2       Q.   So if something were to happen while they
3   were on a lunch break, what is the Security Officer
4   supposed to do?
5       A.   Respond --
6       Q.   All right.
7       A.   -- depending on the severity.
8       Q.   Okay.  If it's something extremely severe
9   you would expect a Security Officer to respond?
10      A.   Yes.
11      Q.   If it's just somebody yelling, it doesn't
12  appear to be -- have weapons or anything like that, the
13  Security Officer may not respond if he knows that his
14  fellow Security Officer is not on a break and can
15  respond; is that correct?
16      A.   It depends.  Yelling is not a very good
17  example.  They may have to respond.
18      Q.   Okay.  And the Security Officers, as far
19  as you know, attempt to cover their breaks?  Meaning,
20  they need to make sure that there are enough Security
21  Officers available so that they can actually take a
22  break?
23      A.   Yes.
24      Q.   And you wouldn't want more than one

---

Page 29

1   Security Officer taking a break at the same time; is
2   that correct?
3       A.   That's correct.
4       Q.   And what -- if it's changed, I don't know
5   what it's changed to.  But at least at the time --
6   focus on the time when Bob Lehman was working there on
7   first shift.  What was the shift time?  Like, what time
8   would the officers arrive and what time would they
9   leave?
10      A.   They would start at 6:30 a.m. and leave at
11  3:00 p.m.
12      Q.   And could the -- again, assuming that
13  their lunch break was covered by another Security
14  Officer, could they take a break at any time between
15  that 6:30 a.m. and 3:00 p.m. time period?
16      A.   No.
17      Q.   What time were they supposed to take
18  breaks?
19      A.   One morning and one afternoon.  Paid
20  break.  And then lunch in the middle.
21      Q.   Okay.  And were the Security Officers'
22  lunch breaks typically scheduled?
23      A.   They got into a routine where they were
24  normally taking them around the same time.

---

8 (Pages 26 to 29)

Lehman vs. St. Elizabeth                    KRAFT                         7/24/2012

Page 30

1    Q.   Do you know when Bob would typically take
2  his lunch break?
3    A.   No, I do not.
4    Q.   Do you know if the Security Department
5  kept a record of that at all, when the officers would
6  take lunch breaks?
7    A.   They are supposed to call out on them,
8  yes.
9    Q.   I'm sorry.  They are supposed to what?
10   A.   They are supposed to call out on them,
11 yes.
12   Q.   But you're not aware of any written
13 records when the officers would take a break?
14   A.   They would be put in the log.  They are
15 supposed to call out and it's logged.
16   Q.   Do they call out to the person in the
17 Monitor Room?
18   A.   Yes.
19   Q.   And there's some log in there?
20   A.   Supposed to be, yes.
21   Q.   Supposed to be where the Security Officer
22 in the Monitor Room can record that the other Security
23 Officer's taking a lunch break?
24   A.   Yes.

Page 31

1          (Kraft Deposition Exhibit No. 2 was marked
2           for identification.)
3    Q.   Mike, you've been handed what has been
4  marked as Exhibit 2 to your deposition.  What I'd
5  actually like you to do is turn to -- if you see at the
6  bottom, there are some numbers, "SEMC," and then 0999.
7  If you could turn to that page for me, please.
8    A.   (Witness complied).
9    Q.   Now, do you recognize this document?
10   A.   Yes.
11   Q.   What is this?
12   A.   It's a copy of the dispatch log.
13   Q.   Dispatch log?
14   A.   Monitor log.  Whatever you want to call
15 it.
16   Q.   What would typically be put into a
17 dispatch log?
18   A.   Officers activities.
19   Q.   Okay.  Would that include lunch?
20   A.   Yes.
21   Q.   And this one appears to be computerized.
22   A.   Yes.
23   Q.   Is this information maintained on the
24 computer in the Monitor Room?

Page 32

1    A.   Yes.
2    Q.   All right.  This particular one we're
3  looking at, I think was provided in a series of
4  documents regarding the investigation into allegations
5  that Andrew Caple was sleeping.  Did you print this
6  out, the dispatch log, or ask someone to do that?
7    A.   Yes.
8    Q.   And why did you do that?
9    A.   To verify his activity.
10   Q.   Okay.  Was the dispatch log in existence
11 at the time that Bob Lehman was terminated?
12   A.   Yes.
13   Q.   And did you review any dispatch log for
14 Bob Lehman prior to his termination?
15   A.   No.
16   Q.   The lunch breaks that we were talking
17 about earlier, are those typically a half-hour lunch
18 break?
19   A.   Yes.
20   Q.   Where is the cafeteria in relation to the
21 Security Office?
22   A.   The floor below.
23   Q.   The cafeteria is below the Security
24 Office?

Page 33

1    A.   Well, on the ground floor.  We're on the
2  first.
3    Q.   Okay.  Is it directly below?
4    A.   No.
5    Q.   Do you know -- where is your office?
6    A.   Right next to the Security Office.
7    Q.   Okay.  And do you eat lunch in the
8  cafeteria?
9    A.   Yes.
10   Q.   How long does it generally take you to get
11 down there?
12   A.   A minute.
13   Q.   Okay.  And how do you get down there?
14 Stairs?  Elevator?
15   A.   Stairs.
16   Q.   In addition to watching a shift change,
17 you mentioned that a Security Officer may patrol both
18 inside the hospital, as well as outside on the campus;
19 is that correct?
20   A.   That's correct.
21   Q.   Okay.  Is the Security Office located near
22 the Emergency Room?
23   A.   Yes.
24   Q.   Okay.  And are there ever any Security

AMS DEPO
(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Lehman vs. St. Elizabeth                    KRAFT                         7/24/2012

## Page 34

1  Officers that are assigned just to stand in the
2  Emergency Room?
3      A.    No.
4      Q.    Okay. If any of the Security Officers
5  needed to take care of something on their lunch break,
6  could they ask for permission to leave the premises?
7      A.    It would require -- it's not common, no.
8  For someone to leave the campus it would require enough
9  manpower, and they would have to clock out. Very
10 uncommon.
11     Q.    Okay. Do Security Officers have to ask to
12 use the restroom?
13     A.    No.
14     Q.    Where is the restroom located in
15 conjunction with their office?
16     A.    There are multiple. There's one within 30
17 feet, by the ED.
18     Q.    By the what?
19     A.    ED. Emergency Department.
20     Q.    Okay. And do all the Security Officers
21 carry guns?
22     A.    No.
23     Q.    Is there a gun located in the Security
24 Office?

## Page 35

1      A.    Yes.
2      Q.    Where is it located?
3      A.    In the supervisor's office.
4      Q.    Who has access to that?
5      A.    Only those officers who have previous
6  police or military training.
7      Q.    Okay. Did Bob Lehman have police
8  training?
9      A.    Yes.
10     Q.    How about Ken Rasor, did he have police
11 training?
12     A.    No.
13     Q.    How about Mike Borman?
14     A.    No.
15     Q.    How about Mr. Rehkamp?
16     A.    No.
17     Q.    Mr. P. Taylor?
18     A.    No. Not to my knowledge.
19     Q.    I know I'm assuming all these are men and
20 I know they are not.
21     A.    P. Taylor is not.
22     Q.    Okay. S. Schmidt?
23     A.    Yes.
24     Q.    Somebody with the last name of Smith?

## Page 36

1      A.    Somebody with the last name of Smith?
2      Q.    Yeah. Potentially was a Security Officer
3  at the time that Bob Lehman was working there.
4      A.    Oh. Okay. Yes.
5      Q.    That person has -- what was the first
6  name?
7      A.    Rick.
8      Q.    Rick. I'm sorry. Rick had either police
9  or military training?
10     A.    Police.
11     Q.    And then Mr. or Ms. Sparks?
12     A.    Yes.
13     Q.    Okay. With your police training, would
14 you have the ability to take the gun out of the
15 supervisor's office, if necessary?
16     A.    Yes.
17     Q.    Okay. And does -- okay. Rick Smith is
18 the current First Shift Supervisor, right?
19     A.    Yes.
20     Q.    And were you -- did you make the decision
21 to promote Rick Smith to the supervisor position?
22     A.    Yes.
23          (Kraft Deposition Exhibit No. 3 was marked
24          for identification.)

## Page 37

1      Q.    Okay. Mike, you've been handed what has
2  been marked as Exhibit 3 to your deposition. Which is
3  a series of e-mails. What I'd like you to do is start
4  with the last e-mail in this document, which was the
5  first e-mail in the series, so I think it's on Page 3
6  of 4. An e-mail from Roxann Platek to you and Lisa
7  Blank.
8      A.    Okay.
9      Q.    Where she's describing a meeting she had
10 with Ken Rasor. Did you know that Roxann was planning
11 on meeting with Ken after you had just met with him?
12     A.    Yes.
13     Q.    Okay. And what were you meeting with Ken
14 about?
15     A.    Performance issues.
16     Q.    And Bob Lehman was also present for that
17 meeting; is that correct?
18     A.    Some, but not all.
19     Q.    Okay. How long had you been meeting with
20 Ken regarding performance issues at this time, in
21 August of 2010?
22     A.    Maybe six months.
23     Q.    Okay. What were Ken's performance issues?
24     A.    I was concerned about his attitude.

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Case: 2:11-cv-00165-WOB-JGW    Doc #: 31    Filed: 10/16/12    Page: 11 of 29 - Page ID#: 394

Lehman vs. St. Elizabeth                    KRAFT                    7/24/2012

Page 38

1  Spending too much time in the office.  About his
2  treatment of staff and visitors.
3      Q.    Okay.
4      A.    He needed to be more customer friendly.
5      Q.    What was it about his attitude that you
6  were concerned about?
7      A.    I felt he needed to be more customer
8  friendly and more cooperative with people.
9      Q.    You mentioned that he was staying, I think
10  too much in the office?
11     A.    Yes.
12     Q.    Was he refusing to patrol?
13     A.    He didn't refuse.  He would just return to
14  the office and spend too much time in the office.  He
15  didn't see it that way.  I did.
16     Q.    Did Bob Lehman agree with you that Ken was
17  spending too much time in the office?
18     A.    Yes.
19     Q.    How did Ken treat Bob?
20     A.    He didn't care for Bob.
21     Q.    Did he call both you and Bob liars?
22     A.    Yes.
23     Q.    And how did that make you feel?
24     A.    I just didn't think Ken had a very good

Page 39

1  grasp on things.  I've been in management a long time,
2  I didn't take it personal.  I just had a difference of
3  opinion on Ken with his ability and how he was doing
4  things.  He and I disagreed.
5      Q.    Okay.  If Ken was in the office too much
6  and not getting out to patrol, could that potentially
7  cause some safety concerns?
8      A.    It caused me concerns.  I mean, if you
9  could be more specific with what you are saying is
10  "safety concerns."
11     Q.    You generally would like one Security
12  Officer in the Monitor Room, right?
13     A.    Has to be.
14     Q.    Okay.  And you generally like one Security
15  Officer out, whether they are patrolling or they are
16  watching the shift change; but being present out in the
17  facility to potentially respond to issues, right?
18     A.    Yes.
19     Q.    And if Ken is remaining in the Security
20  Office longer than he should, then that can limit the
21  amount of Security who's out patrolling the facility?
22     A.    Absolutely.  Yes.
23     Q.    That could cause a safety concern, right?
24     A.    Yes.

Page 40

1      Q.    I think you mentioned that you did not
2  like the way he was treating customers.  Was he also
3  not treating his fellow coworkers very well?
4      A.    Some.
5      Q.    Okay.  So when you -- and you received a
6  copy of this first e-mail from Roxann to you, in which
7  she's describing her meeting with Ken; is that correct?
8      A.    Yes.
9      Q.    And what was your opinion after reading
10  this?  And take as much time as you need, if that helps
11  refresh your recollection.
12     A.    My reaction was that once again, Ken's
13  grasp of things and his ideas were different than what
14  I felt were reality.
15     Q.    Did you feel like you were bullying him?
16     A.    Not at all, no.
17     Q.    Did you ever see Bob either bully or
18  harass Ken?
19     A.    No.
20     Q.    Had Ken ever indicated to you in the past,
21  that he had concerns about Bob not giving him proper
22  backup?
23     A.    Yes.
24     Q.    Okay.

Page 41

1      A.    Wait a minute.  I guess, what do you mean
2  by "backup?"  I apologize.
3      Q.    That's okay.  I'm just looking at -- it's
4  the sixth paragraph down, second to last sentence.  "He
5  also doesn't believe Bob gives proper backup when there
6  is an emergency."
7      A.    No.
8      Q.    He had never brought that up to you?
9      A.    No.  By "backup" I thought you meant --
10     Q.    Like, backing Ken up, like, defending him?
11     A.    Yes.
12     Q.    Okay.
13     A.    Or giving him what he needed, as far as
14  help with reports.  That he wasn't giving him backup in
15  that arena.  I never received a complaint that Bob
16  wasn't on a call.
17     Q.    Okay.  When you read this, did you have
18  any concerns at all about Ken's allegation in this
19  e-mail, that Bob wasn't giving him proper backup when
20  there was an emergency?
21     A.    No.
22     Q.    Did you ever follow-up with Ken to ask him
23  what instances he was referring to?
24     A.    I don't recall.

11 (Pages 38 to 41)

Lehman vs. St. Elizabeth                    KRAFT                          7/24/2012

Page 42

1      Q.    Okay.  All right.  And in response, it
2    looks like Lisa responded first, which is on Page 2 of
3    4, at 8:44 a.m.  And she notes that she's worried about
4    the sleeping complaint, and states, "I think we need to
5    document we looked into that."
6          At the time that she indicated that, were
7    you concerned at all about the sleeping complaint that
8    was in Ken Rasor's comments to Roxann?
9      A.    No.
10     Q.    And that's because, as you indicated in
11   your e-mail to Lisa and Roxann and Doug Chambers, on
12   August 19, at 9:18 a.m., you believed that Bob was
13   performing his job?
14     A.    Correct.
15     Q.    And didn't feel that he could possibly be
16   sleeping on the job because he was able to get all of
17   his work done, right?
18     A.    Yes.
19     Q.    And in the second paragraph in your e-mail
20   to Lisa, Roxann, and then copied to Doug Chambers, kind
21   of midway through, starting with, "This pattern has
22   been used by Ken with management for many years."  Do
23   you see that sentence?
24          Take your time.  It's about -- it starts

Page 43

1    six sentences down, kind of in the middle of the
2    paragraph.
3      A.    Okay.
4      Q.    Is it your understanding that -- I know
5    you had indicated that you may have been talking
6    with -- meeting with Ken to talk about his performance
7    issues for about six months.  But had there been
8    concerns about his performance for many years, as of
9    August of 2010?
10     A.    What I'm referring to there is documents
11   from -- that I have read that were in his file.
12     Q.    Okay.  So there had been some concern
13   about Ken from other supervisors or managers?
14     A.    Yes.
15     Q.    And then you go on to state, "His anger
16   and actions are clearly a detriment to the Security
17   Department and the hospital."  What did you mean by
18   that?
19     A.    I was -- I am and was trying to create an
20   atmosphere of cooperation and customer-friendly service
21   and security.  And I didn't feel as though Ken's
22   actions led to that atmosphere.
23     Q.    Did you feel, and do you still feel that
24   it's important for the Security Officers to act as a

Page 44

1    team?
2      A.    Yes.
3      Q.    And why is it important for that?
4      A.    Functioning -- I mean, you have to count
5    on the person next to you.  We have to be part of a
6    larger team of the hospital.  We all have to work
7    together, and we need to work toward the betterment of
8    our patients and our customers.  So it's very
9    important.
10     Q.    All right.  So after you sent this e-mail
11   to Lisa, Roxann, and copied Doug Chambers, what, if
12   anything, did you do?
13     A.    I spoke with Kim, my secretary.
14     Q.    Where did you have your conversation with
15   Kim?
16     A.    In my office.
17     Q.    What did you ask her?
18     A.    I asked her how things were going in the
19   office, and if she had witnessed Bob sleeping or
20   anything going on in the office.
21     Q.    Okay.  And what did she tell you?
22     A.    She did witness on several occasions that
23   Bob had fallen asleep, and that Ken had pointed it out
24   to her.

Page 45

1      Q.    Okay.  Did she also tell you of her
2    concerns about getting on Ken's bad side?
3      A.    Yes.
4      Q.    Did that bother you?
5      A.    I was already aware of that.
6      Q.    Okay.  Was this something that you were
7    working on with Ken, regarding his performance?
8      A.    Yes.
9      Q.    And according to your e-mail to Lisa,
10   Roxann, and Doug at 2:28 p.m., Kim also told you that
11   "Ken is someone who creates problems and who will not
12   stop until he wins?"
13     A.    That's correct.
14     Q.    And she was worried about him coming after
15   her, right?
16     A.    Yes.
17     Q.    And these were things that you were
18   already aware of?
19     A.    Yes.
20     Q.    And she further told you that she had
21   witnessed what he has done to people for the last 15
22   years.  Is that something you were already aware of?
23     A.    Yes.
24     Q.    Okay.  Now, in the second paragraph, you

12 (Pages 42 to 45)

Lehman vs. St. Elizabeth                    KRAFT                        7/24/2012

---

Page 46

1   note that you're not sure if Bob's nodding off is a
2   result of his diabetes or low blood sugar or what. Had
3   you already discussed with Bob his diabetes?
4       A.    Bob would discuss it with me, yes.
5       Q.    What had he told you?
6       A.    That he had diabetes and at times he had
7   to check himself and give himself shots and make sure
8   he was eating properly.
9       Q.    Um-hmm. Did he tell you that if his blood
10  sugar was low that he got fatigued?
11      A.    Yes.
12      Q.    Okay. Did you tell him if there -- well,
13  strike that.
14          What, if anything, did you say in response
15  when he told you about, you know, potentially becoming
16  fatigued if his blood sugar was low?
17      A.    I don't recall.
18      Q.    Okay. Did you -- you're familiar with
19  Employee Health?
20      A.    Yes.
21      Q.    And are you aware that Employee Health is
22  the department that is responsible for processing
23  reasonable accommodation requests?
24      A.    Yes.

---

Page 47

1       Q.    Did you tell Bob that maybe he needed to
2   speak with Employee Health about his concerns with his
3   diabetes?
4       A.    I don't recall.
5       Q.    Okay. In your last paragraph here --
6   well, I guess second to last paragraph here. The last
7   large paragraph here, you indicate that you were
8   concerned when you had employees telling you of their
9   concerns about an officer retaliating against them for
10  telling their boss the truth. And they felt like you
11  had a problem that you had to deal with.
12          Did you ever follow up with Ken regarding
13  the retaliation concerns that you had?
14      A.    I followed up with Ken on many things.
15      Q.    Okay. Do you remember following up with
16  him specifically about that issue?
17      A.    I don't recall.
18      Q.    Okay. And Ken was not terminated due to
19  his retaliation against other employees; is that
20  correct?
21      A.    That's correct.
22      Q.    He was terminated for falsification of
23  timecard?
24      A.    Yes.

---

Page 48

1       Q.    Okay. You mentioned that the Security
2   Officers don't have guns. Do they have any other
3   weapons?
4       A.    Yes.
5       Q.    What do they have?
6       A.    They have tasers and they have OC spray.
7       Q.    OC spray? What is that?
8       A.    The letters O and C. It's pepper spray.
9       Q.    All right. And then in response to your
10  e-mail, Lisa warns you that you can't retaliate against
11  Ken for reporting this sleeping. Did you have any
12  further discussion with Lisa about that?
13      A.    About retaliation?
14      Q.    About not retaliating against Ken?
15      A.    No.
16      Q.    Now, at the last part of her -- of Lisa's
17  e-mail to you, with Roxann and Doug, she asks whether
18  Kim actually witnessed sleeping. And she goes on to
19  say, "She was definitely told about it, and why would
20  Ken do this if she didn't see it? Maliciously?"
21          Do you think it was possible that Ken
22  would maliciously attempt to ruin Bob's career?
23      A.    Yes.
24      Q.    Did you have any further conversation with

---

Page 49

1   Kim about what she witnessed after August 19, 2010?
2       A.    I'm sure I did.
3       Q.    Okay. Can you remember anything from
4   that?
5       A.    No.
6       Q.    Okay. Is it your understanding that at
7   some point Roxann Platek interviewed Kim about what she
8   witnessed regarding Bob sleeping?
9       A.    Yes.
10      Q.    Did Roxann report that information to you?
11      A.    No.
12      Q.    Did you speak with anyone else, other than
13  HR -- other than maybe Lisa and Roxann, about the
14  allegations that Bob was sleeping?
15      A.    Yes. I spoke with Doug Chambers.
16      Q.    Did you speak with any of Bob's other
17  direct reports about whether or not they had witnessed
18  Bob sleeping?
19      A.    No.
20      Q.    Did you review any kind of surveillance
21  tape to determine whether and if Bob was sleeping?
22      A.    No.
23      Q.    All right. You spoke with Bob about the
24  allegations; is that correct?

13 (Pages 46 to 49)

Lehman vs. St. Elizabeth                          KRAFT                          7/24/2012

Page 50

1      A.    Yes.
2      Q.    And that was soon after Lisa had indicated
3  that St. Elizabeth, whether it was HR or you, needed to
4  look into this further?
5      A.    Yes.
6      Q.    What can you remember from that
7  conversation with Bob?
8      A.    Bob admitted to falling asleep several
9  times.
10     Q.    Did he say that he fell asleep at all
11  times during the day, or did he tell you that he fell
12  asleep on his breaks?
13     A.    I don't recall him being specific at that
14  point.
15     Q.    Okay.  And did you tell him -- did he ask
16  you whether or not it was appropriate to sleep on a
17  break?
18     A.    I don't recall.
19     Q.    Okay.  At the time that you had a
20  conversation with him, did you know whether it was
21  appropriate to sleep on a break?
22     A.    It was my opinion it was not appropriate
23  to sleep on a break, because it was paid.  But it was
24  okay to sleep on your unpaid lunch.

Page 51

1      Q.    Okay.  All right.  And at the time --
2  during that conversation that you had with Bob, did you
3  indicate to him what discipline he might receive?
4      A.    I told him that I thought that he would
5  receive a Level 1 discipline.  However, I had to call
6  HR and that HR handles discipline, and I had to work
7  with them.
8      Q.    Okay.  And during that conversation, did
9  you guys discuss Bob's diabetes as a potential cause of
10  his fatigue?
11     A.    Yes.
12     Q.    All right.  So how did you leave the
13  conversation with Bob?
14     A.    I told him that I would -- you know, that,
15  like I said, I thought that with no previous discipline
16  it would be a Level 1, but I'd have to check with HR.
17  He then left my office and then I began checking with
18  HR.
19     Q.    Okay.  Did you check with Roxann?
20     A.    Yes.
21     Q.    And what did Roxann tell you?
22     A.    She had to check with Lisa.
23     Q.    Okay.  And the question you asked Roxann
24  was what level of discipline it would be?

Page 52

1      A.    Yes.
2      Q.    Okay.  Did you raise anything with Roxann
3  about Bob's diabetes?
4      A.    At some point.  I don't know if it was
5  during this first conversation or subsequent
6  conversations.
7      Q.    Okay.  So Roxann indicated to you that
8  she'd have to check with Lisa.  Did Roxann get back to
9  you?
10     A.    Yes.
11     Q.    What did she tell you?
12     A.    That it would be a Level 3, and that Bob
13  would have to submit to a fitness-for-duty because of
14  the medical issue that was raised.
15     Q.    Okay.  All right.  And how did you react
16  when you found out it was going to be a Level 3?
17     A.    I wasn't happy.
18     Q.    And when you say you weren't happy -- I
19  mean, did you raise your voice?  Did you -- what did
20  you say?
21     A.    I had private conversations with both my
22  boss and with Roxann and Lisa.
23     Q.    Okay.  Your boss, Doug Chambers?
24     A.    Yes.

Page 53

1      Q.    What did you speak with Doug about?
2      A.    I just felt as though Bob had been a good
3  employee with a clean record, and I was concerned that
4  a Level 1 might have been -- I'm sorry, a Level 3 may
5  have been a little too harsh.
6      Q.    What did Doug tell you?
7      A.    Doug told me I needed to work with HR.  So
8  that's when I went to speak with Lisa and Roxann.
9      Q.    Was that in person?
10     A.    In person, yes.
11     Q.    Okay.  And what did Lisa and/or Roxann say
12  during that meeting?
13     A.    That the policy needed to be adhered to
14  and that they understood my concerns and they
15  appreciated that I was trying to stand up for my
16  officer, but that it would be a Level 3, and he needed
17  to submit to a fitness-for-duty.
18     Q.    Did they show you a copy of the policy at
19  that time?
20     A.    I don't recall.
21     Q.    Okay.  All right.  After speaking with
22  Doug, Lisa, and Roxann, what did you do with that
23  information?
24     A.    I met with Bob.

14 (Pages 50 to 53)

Lehman vs. St. Elizabeth                    KRAFT                    7/24/2012

Page 54

1    Q.    Okay.  And what do you remember from that
2  conversation?
3    A.    Bob was not happy.  He wanted to file a
4  grievance, and he wanted to speak with HR and Lisa
5  immediately.  So I put in a phone call to Lisa.
6    Q.    Okay.  And did you guys meet with Lisa?
7    A.    We did, yes.
8    Q.    And was that the same day?
9    A.    Yes.
10    Q.    Okay.  And what can you remember from the
11  meeting between you, Lisa, and Bob?
12    A.    Most of the conversation was between Bob
13  and Lisa.  I was more there.  He asked that I come as a
14  witness.  Bob was speaking his peace to Lisa and felt
15  as though the Level 3 wasn't fair, and questioned as to
16  why he needed to submit to a fitness-for-duty.
17    Q.    Do you remember what, if anything, Lisa
18  said in response to that, as to why he needed to submit
19  for a fit-to-duty exam?
20    A.    Because he raised a medical issue and at
21  that point they had a requirement to do a
22  fitness-for-duty exam.
23    Q.    Okay.  Can you remember anything else from
24  that meeting?

Page 55

1    A.    There was quite a bit said.
2    Q.    Did Bob raise the issue of filing a
3  grievance with Lisa?
4    A.    Yes.
5    Q.    And did she tell him whether or not it was
6  a grievable offense?
7    A.    She said at that point it wasn't because
8  there still haven't even been charges filed on it.
9    Q.    Okay.  And did Lisa indicate to him that
10  the discipline for sleeping was a Level 3?
11    A.    Yes.
12    Q.    Okay.  And did she say anything else about
13  other employees receiving Level 3s for the same
14  conduct, during that meeting?
15    A.    I believe she did.
16    Q.    Okay.  Did Bob agree to go into the
17  fit-for-duty exam?
18    A.    Not initially, but ultimately, yes.
19    Q.    Did he tell you -- just you, personally,
20  after you guys met with Lisa, that he would be willing
21  to go through the fit-for-duty exam and accept his
22  discipline?
23    A.    Yes.
24    Q.    Did Lisa ask Bob anything about other --

Page 56

1  witnessing other employees sleeping?
2    A.    There was talk about that, yes.
3    Q.    Did Bob identify who those employees were?
4    A.    Yes.
5    Q.    Okay.  And who did he say?
6    A.    He said Charlie and Mike and then also, at
7  some point, Ben Harney.
8    Q.    Who was Charlie?
9    A.    Charlie is Charlie Johnson.
10    Q.    Charlie Johnson?  And Mike?
11    A.    Borman.
12    Q.    Borman.  Charlie Johnson and Mike Borman,
13  obviously, were employed by the hospital as of
14  September, 2010?
15    A.    Yes.
16    Q.    And they are still employed there?
17    A.    Yes.
18    Q.    Ben Harney was no longer employed by the
19  hospital at that time?
20    A.    That's correct.
21    Q.    He's actually passed away; is that
22  correct?
23    A.    Yes.
24    Q.    Did you ever manage Ben?

Page 57

1    A.    No.
2    Q.    So he was prior to your time?
3    A.    Yes.
4    Q.    When he identified those three employees,
5  what, if anything, did Lisa say in response?
6    A.    I don't remember her exact response.  I
7  know that Bob stated that all of that had been done
8  years before, and prior to me coming to the hospital.
9    Q.    All right.  Is there anything else
10  you can remember?  I know you said there was a lot
11  said.  I'm trying to exhaust your memory.  Is there
12  anything else you can remember from that conversation?
13    A.    Not offhand, no.
14    Q.    Okay.  All right.  So after the
15  conversation ended, as you indicated earlier, you and
16  Bob spoke and he said to you that he would go through
17  the fit-for-duty, he would accept his Level 3, and move
18  on, right?
19    A.    Yes.
20    Q.    Okay.  And then I think there might have
21  been some kind of vacation that Bob had scheduled.  Do
22  you remember that?
23    A.    I know he ultimately was put on vacation,
24  but, I don't remember, no.

15 (Pages 54 to 57)

Case: 2:11-cv-00165-WOB-JGW    Doc #: 31    Filed: 10/16/12    Page: 16 of 29 - Page ID#: 399

Lehman vs. St. Elizabeth                    KRAFT                        7/24/2012

Page 58

1    Q.    Were you responsible for ensuring that Bob
2  went to Employee Health and got the fit-for-duty exam?
3    A.    Yes.
4    Q.    During the time -- he was essentially
5  placed on some kind of paid suspension; is that
6  correct?
7    A.    He was placed on administrative leave.
8  Whether or not he ultimately was paid, I'm not sure.
9    Q.    Okay.  I'm sorry.  He was on an
10 administrative leave for some time.  Did you ever have
11 any conversations with Bob during his administrative
12 leave?
13   A.    Yes.
14   Q.    Okay.  And what, if anything, can you
15 remember from those conversations?
16   A.    Bob was just keeping me in tune with what
17 was going on, you know.  That he was meeting with
18 Employee Health, or that they were still waiting on
19 records from doctors, and just kind of keeping me
20 somewhat in the loop as to where he was.
21   Q.    Okay.  Now, during that period of time,
22 were you involved in any further investigation into the
23 allegations against Bob?
24   A.    I was involved in several discussions.  I

Page 59

1  didn't interview anyone else.
2    Q.    What discussions were you involved?
3    A.    With HR.
4    Q.    And what can you remember from those
5  discussions?
6    A.    Just discussing whether or not -- what the
7  ultimate outcome was going to be.  Whether it would be
8  a Level 3, or -- because I was made aware that
9  administration felt as though Security and Nursing
10 falling asleep, could put people in danger.  And so
11 that was looked upon very seriously.
12   Q.    Okay.  Who made you aware of that?
13   A.    I don't recall whether it was HR or my
14 boss.
15   Q.    Okay.  And when you said somebody told you
16 that administration felt as though Security and
17 Nursing -- that there could be some safety risks?
18   A.    Yes.
19   Q.    Do you know who in administration they
20 were referring to?
21   A.    I believe everyone.
22   Q.    Okay.
23   A.    I mean, I don't.  I know that my boss had
24 some concerns.  I know that Marty Oscadal, Senior

Page 60

1  Vice-President of HR.  I know John DuBis had some
2  concerns.  So that's pretty much everyone that is
3  involved in this and would be in my chain of command,
4  so-to-speak, that had concerns.
5    Q.    Okay.  Now, when you initially spoke with
6  Doug about the Level 3 -- you know, when you found out
7  from Roxann that Bob was going to receive a Level 3
8  discipline for sleeping on the job, and you said you
9  went to Doug to find out what this is, basically.  Did
10 he say anything to you during that conversation, about
11 his concerns about Bob sleeping?
12   A.    Not that I recall.
13   Q.    Okay.  That conversation was primarily on
14 what is the deal with this Level 3, and him saying you
15 need to talk to HR?
16   A.    Primarily, yes.
17   Q.    All right.  So you indicated that you
18 learned during this time that -- well, Bob was on an
19 administrative leave, that there had been some concerns
20 from the administration, and you may have learned that
21 from either your boss, or you may have learned that
22 from HR, right?
23   A.    Yes.
24   Q.    Anything else that you learned while Bob

Page 61

1  was on his leave of absence, regarding the allegations
2  against him?
3    A.    Not that I can recall, no.
4    Q.    Okay.  All right.  Did you eventually find
5  out that the results from the fit-for-duty exam had
6  come back?
7    A.    They don't share that with me.  I was
8  never privy to that.
9    Q.    Right.  Obviously, you weren't privy to
10 the actual results, but did you find out that there had
11 been some results that had been shared?
12   A.    I was made aware that we were ready to
13 proceed forward.
14   Q.    Okay.  Who told you that the hospital was
15 ready to proceed forward?
16   A.    That would have been HR.  That's who I was
17 dealing with.
18   Q.    Okay.  All right.  At that time had HR
19 given you any information about some additional
20 information they had uncovered during their
21 investigation?
22   A.    I don't recall.
23   Q.    Okay.  Do you know whether the -- other
24 than the administration feeling as though Security and

16 (Pages 58 to 61)

Lehman vs. St. Elizabeth                          KRAFT                          7/24/2012

Page 62

1   Nursing -- I'm going to say was held to a higher
2   standard. Is that kind of what you were told, that
3   Security and Nursing should be held to a higher
4   standard, because of safety concerns?
5        A.   Yes.
6        Q.   Okay. So other than finding that out
7   during the -- between your last conversation with Bob,
8   while he was still on the premises at the hospital,
9   working for the hospital, and when you were told that
10  the hospital was ready to make a decision, do you know
11  whether there was any additional information that was
12  learned by either HR or you about the allegations that
13  Bob was sleeping?
14       A.   I do believe that Roxann was able to
15  verify, through other officers, that they had witnessed
16  it as well.
17       Q.   Okay. Do you know which officers?
18       A.   I believe she talked -- well, I believe
19  she talked to Ken.
20       Q.   Okay.
21       A.   And she may have talked to Mike Borman, I
22  believe.
23       Q.   Did you ever see any kind of e-mail or
24  documentation noting Roxann speaking with either Mike

Page 63

1   or Ken?
2        A.   I don't recall.
3        Q.   And do you know what, if anything, Roxann
4   learned from Ken or Mike?
5        A.   That they were able to verify that they
6   had witnessed Bob sleeping.
7        Q.   Okay. And do you know if either of them
8   were able to verify whether they knew he was on a break
9   or not?
10       A.   I don't know.
11       Q.   Okay. Did you feel that Ken was
12  trustworthy?
13       A.   No.
14       Q.   Okay. How about Mike Borman?
15       A.   Yes.
16       Q.   Did you speak with Mike directly?
17       A.   No.
18       Q.   Was Mike friends with Ken?
19       A.   Hard to say.
20       Q.   Okay.
21       A.   I don't think they socialized. I don't
22  know that. That's a question for Mike.
23       Q.   You mentioned that during the meeting with
24  Lisa, in which you were sort of a spectator, that Bob

Page 64

1   had identified Mike Borman and Charlie Johnson as two
2   officers he had seen sleeping. Did you ever follow up
3   with Mike or Charlie about that allegation?
4        A.   No.
5        Q.   Why not?
6        A.   It had been years before and I was not
7   even employed by the hospital.
8        Q.   Okay. You indicated that HR, at some
9   point, notified you that the hospital was ready to
10  proceed with disciplining Bob. Did HR tell you, at
11  that time, that the decision had been made to terminate
12  his employment?
13       A.   Yes.
14       Q.   So you were not really involved in that
15  decision?
16       A.   That's correct.
17       Q.   Did HR give you any indication as to who
18  made that decision?
19       A.   No.
20       Q.   Okay. Did you agree with that decision?
21       A.   Given what I new at the time, no.
22       Q.   Okay. Did HR indicate to you, in any way,
23  whether Bob's diabetes or any other medical condition
24  had contributed to his fatigue or sleeping?

Page 65

1        A.   No. We didn't discuss medical.
2        Q.   Okay. And did HR -- so obviously -- I may
3   have said this before. I apologize. Obviously, the
4   decision, that you were told by HR, is that his
5   employment was going to be terminated. Were you given
6   any explanation as to why that was the decision as
7   opposed to a Level 3?
8        A.   Because that was the -- that the hospital
9   took a serious stance on sleeping, and that was their
10  concern. And like I previously said, that Security and
11  Nursing have a requirement to protect people and should
12  not be sleeping.
13       Q.   Okay. Now, you said at the time you did
14  not agree with that decision. Have you learned
15  something since, that has changed your opinion?
16       A.   It is the hospital's stance to terminate
17  for sleeping, and that is what they have been
18  consistent with. So now -- and I've had instances
19  since then. My recommendation is termination.
20       Q.   And the hospital actually changed its
21  policy just a few months after Bob's termination, where
22  employees are to be terminated on the first offense; is
23  that correct?
24       A.   Yes.

17 (Pages 62 to 65)

Lehman vs. St. Elizabeth                    KRAFT                    7/24/2012

---

Page 66

1    Q.    Okay.  Were you aware that there's at
2    least one other employee, who was a nurse, who was not
3    terminated on the first offense, around the same time
4    that Bob was terminated?
5    A.    I was not.
6    Q.    Okay.  You've had some other Security
7    Officers who have either been accused by other
8    employees, or you have actually witnessed sleeping on
9    the job; is that correct?
10   A.    That's correct.
11   Q.    Okay.  And those Security Officers that
12   you have terminated for sleeping, two of them were in
13   the security truck; is that correct?
14   A.    Yes.
15   Q.    Okay.  And then was there another Security
16   Officer who was kind of missing in action, not
17   responding to calls?  Things like that?
18   A.    He was in the office.
19   Q.    In the Monitor Room?
20   A.    No.  He was in -- the other three were all
21   in Florence.
22   Q.    Okay.  Does Florence not have a Monitor
23   Room?
24   A.    No.

---

Page 67

1    Q.    So there's a Security Office in Florence?
2    A.    Yes.
3    Q.    And he was asleep in the office?
4    A.    Yes.
5    Q.    Did he admit to sleeping?
6    A.    No.
7    Q.    Okay.  How did you find out about that
8    gentleman?
9    A.    It was reported to us by another Security
10   Officer.
11   Q.    What was the name of that Security
12   Officer?
13   A.    Which one?
14   Q.    The one who was sleeping in the office?
15   A.    Edelbroich.
16   Q.    Officer Edelbroich had not responded to
17   some calls; is that correct?
18   A.    That's correct.
19   Q.    Had there been other concerns that the
20   Security Officer or Officers had raised to you about
21   Edelbroich's performance, other than not responding to
22   calls and sleeping in the office?
23   A.    No.
24   Q.    Okay.  Was he frequently hanging out in

---

Page 68

1    some other part of the hospital, instead of doing his
2    duties?
3    A.    In talking to him he said that he would
4    spend some time down at Plant Engineering.  Prior to
5    speaking to him during that investigation, there were
6    no complaints.
7    Q.    Okay.  So that was something that had come
8    up during the investigation?
9    A.    Yes.
10   Q.    And he had admitted to that himself,
11   right?
12   A.    Yes.
13   Q.    Officer Edelbroich was terminated this
14   year; is that correct?  In early 2012?
15   A.    Time flies, so it could be.
16   Q.    It was some time after the policy was
17   changed though, right?
18   A.    Yes.
19   Q.    Okay.  Officer Landers was one of the
20   other Florence Officers who was terminated for
21   sleeping --
22   A.    Yes.
23   Q.    -- is that correct?  And he was found
24   sleeping in the security truck?

---

Page 69

1    A.    Yes.
2    Q.    And you first learned about it through
3    some complaints from some nurses; is that correct?
4    A.    Yes.
5    Q.    And then you went out to Florence and you
6    actually witnessed him sleeping again, yourself, right?
7    A.    Yes.
8    Q.    Now, when an officer is in the security
9    truck, what are they supposed to be doing?
10   A.    Patrolling.  Observing for things.  Making
11   sure that people are getting safely to their
12   destination.
13   Q.    Was Officer Landers on a break when he was
14   sleeping?
15   A.    No.
16   Q.    Should he be in the security truck if he's
17   taking his lunch break?
18   A.    No.
19   Q.    Okay.  Should he be in the security truck
20   if he's just taking a 15 minute break?
21   A.    No.
22         MS. NEFF:  Okay.  Just a little bit more
23   and then we'll take a break.  If you're okay with
24   that.

18 (Pages 66 to 69)

Lehman vs. St. Elizabeth                    KRAFT                    7/24/2012

Page 70

1    THE WITNESS:  I'm fine.
2    Q.    All right.  I can't seem to find my paper.
3  Do you remember who the other -- oh, I think it's this
4  guy.  Andrew Caple, was he one of the other Security
5  Officers from Florence that was sleeping in the
6  security truck?
7    A.    Yes.
8          (Reference to previously-marked Kraft
9          Deposition Exhibit No. 2.)
10   Q.    Okay.  And Kraft Exhibit No. 2, I think
11 included some investigation information regarding what
12 led up to his termination; is that correct?
13   A.    Yes.
14   Q.    Okay.  And again, Caple was terminated, it
15 looks like, in January of 2012.  So this was after the
16 policy changed?
17   A.    Yes.
18   Q.    Okay.  Caple also denied sleeping; is that
19 right?
20   A.    Yes.
21   Q.    Now, you didn't actually witness him
22 sleeping; is that correct?
23   A.    That's correct.
24   Q.    But you reviewed some surveillance tape

Page 71

1  and saw that he had been parked for a significant
2  period of time?
3    A.    That's correct.
4    Q.    Longer than what he should have been
5  parked; is that correct?
6    A.    That's correct.
7    Q.    Okay.  And you also, as you testified
8  earlier, reviewed the dispatch log for him?
9    A.    That's correct.
10   Q.    And actually interviewed him, right?
11   A.    That's correct.  Yes.
12   Q.    Since he was in a security truck could
13 Caple have been on either a break or his lunch break?
14   A.    No.
15   Q.    Through your investigation of the
16 surveillance, as well as the dispatch log, you learned
17 that Caple had actually lied to you in his response; is
18 that correct?
19          You can take your time.
20   A.    (Witness reviewing document).
21   Q.    Like he indicated to you that he had only
22 been sitting there for ten or 15 minutes, or something.
23 And you learned it was more like 45?
24   A.    I am going to have to read it.

Page 72

1    Q.    Yeah.  Take your time.
2    A.    It sounds familiar.  (Witness reviewing
3  document).  He states he was normally only there 15 to
4  20 minutes, but he thought maybe he was there 30
5  minutes.  And he was, in fact, there longer.
6    Q.    Okay.  Does the Florence Security Office,
7  do they have a Security Supervisor?
8    A.    They have a manager, yes.
9    Q.    Okay.  And Mr. Caple was not a manager; is
10 that correct?
11   A.    That's correct.
12         MS. NEFF:  Let's go ahead and take a
13 break.
14         (At which time, a recess was taken from
15         2:35 p.m. until 2:49 p.m.)
16         MS. NEFF:  Back on the record.
17   Q.    Okay.  Did Bob Lehman, when he was the
18 Security Supervisor at Edgewood, and you were his
19 manager, did he keep the schedule for the Security
20 Officers on an Excel spreadsheet?
21   A.    Yes.
22   Q.    Okay.  And was that something that was on
23 his computer in his office?
24   A.    It was something that I had -- actually,

Page 73

1  everybody had access to.
2    Q.    Everybody who worked for --
3    A.    In Edgewood.
4    Q.    In Edgewood.  All right.  And when an
5  emergency situation happens, and a Security Officer is
6  supposed to respond to it, is the Security Officer
7  allowed to run to the emergency situation?
8    A.    Yes.
9    Q.    Okay.  Aren't there safety concerns with a
10 Security Officer running -- potentially running over
11 patients or doctors or people in the hallways?
12   A.    Well, we don't normally run down the
13 hallways.  However, I wouldn't tell you they can't run
14 to an emergency.  You see somebody down outside in the
15 parking lot, and you're between here and there, and
16 there's nobody in between you, it would be quite
17 appropriate to run.
18   Q.    The parking lot.  That's outside, right?
19   A.    Yes.
20   Q.    Okay.  If a Security Officer had to
21 respond to a situation in the Emergency Room and the
22 officer was in the Psychiatric Unit, how long would it
23 take for that Security Officer to respond, assuming
24 they did not run?

19 (Pages 70 to 73)

Lehman vs. St. Elizabeth                    KRAFT                      7/24/2012

Page 74

1      A.    That's hard to say.
2      Q.    Okay.  Could it take up to five minutes?
3      A.    It could.
4      Q.    Okay.  There are facilities at the
5  Edgewood location that are also outside of the main
6  hospital; is that correct?
7      A.    Yes.
8      Q.    Like one of them could be the Family
9  Practice Center?
10     A.    Yes.
11     Q.    If somebody had to respond to something
12 going on at the Family Practice Center, would they
13 typically have to take the security truck to get there?
14     A.    Yes.
15     Q.    Okay.  How far away is it from the
16 Security Office?
17     A.    It's on South Loop, so it's within the
18 loop, but it's a distance that it's better to drive
19 than walk.
20     Q.    Okay.  I'm not familiar with the facility
21 at all.  So is it, like, hundreds of yards?  Could it
22 be up to a mile?
23     A.    No, it's not a mile.
24     Q.    Okay.

Page 75

1      A.    It depends on where you are.  What part of
2  the hospital you're responding from.
3      Q.    Say you're in the Security Office.
4      A.    You would probably take the vehicle and
5  then just cut down and you could cut through the
6  employee lot or you could go out on the street.  There
7  are multiple ways to get there.
8      Q.    You indicated that -- strike that.
9            Mr. Lehman admitted to sleeping in his
10 office; is that correct?
11     A.    Yes.
12     Q.    And when you spoke with Kim, did she
13 indicate that she had seen him sleeping in his office?
14     A.    Yes.
15     Q.    And is it your understanding that Ken and
16 Mike also indicated that Bob had been sleeping in his
17 office?
18     A.    Yes.
19     Q.    Okay.  With the door open?
20     A.    Yes.
21     Q.    Okay.  Do you know whether any of the
22 witnesses indicated as to whether they tried to wake
23 him up and he wouldn't wake up?
24     A.    I don't know.

Page 76

1      Q.    Did you and Bob discuss anything about how
2  soundly he was sleeping on the occasions that he slept?
3      A.    I believe he just said that he had nodded
4  off several times.  He had fallen asleep and nodded off
5  several times.
6      Q.    Okay.  And I think you said earlier that
7  you were not aware of any occasions in which Bob had
8  not responded to a call; is that correct?  At least
9  during the time you managed him?
10     A.    That's correct.
11     Q.    Okay.  Were you aware of any situations
12 where he -- well, strike that.
13           Is there any other type of situation where
14 he would have to respond to something other than
15 getting a call?
16     A.    I guess no.
17     Q.    Okay.
18     A.    I mean, you're either patrolling or you're
19 responding to calls for service.  So it's either self
20 initiated or you're sent to it.
21     Q.    And then a call, is that something that's,
22 like, on a radio?
23     A.    Yes.
24     Q.    Okay.  And if there was a situation where

Page 77

1  the gun from the gun case was needed -- well, strike
2  that.
3            Have there ever been any situations, since
4  you have been there, where somebody had to access the
5  gun case?
6      A.    Yes.
7      Q.    How often has that happened?
8      A.    Two or three.
9      Q.    Two or three?  Since July of '08?
10     A.    Yes.
11     Q.    Okay.  And what were those incidents?
12     A.    Report of someone armed.
13     Q.    And do you know who retrieved the gun from
14 the gun case?
15     A.    I know the particular one I'm thinking
16 about, someone was coming to the Emergency Department
17 and had a shotgun, and Jack Denham retrieved it.
18     Q.    Was Jack on -- what shift was he on?
19     A.    Second.
20     Q.    Okay.
21     A.    I retrieved it on one occasion, where we
22 had a report of a male black subject armed, in the area
23 of X-ray.
24     Q.    And when did that happen?

20 (Pages 74 to 77)

Lehman vs. St. Elizabeth                    KRAFT                    7/24/2012

Page 78

1    A.    I don't recall.
2    Q.    Was it while Bob was still working there?
3    A.    I don't recall.
4    Q.    Okay.  So some time since July of '08?
5    A.    Yes.
6    Q.    You can remember those two incidents for
7    sure.  Can you remember the third?
8    A.    Not offhand, no.
9    Q.    All right.  You learned from HR that the
10   hospital had made the decision to terminate Bob's
11   employment.  What happened after that?
12   A.    We filled out the proper documentation and
13   called Bob in for a meeting.
14   Q.    Okay.  When you say "proper
15   documentation," are you referring to the termination
16   report?
17   A.    Yes.
18         (Kraft Deposition Exhibit No. 4 was marked
19         for identification.)
20   Q.    All right.  Mike, you've been handed what
21   has been marked Exhibit 4 to your deposition.  Does
22   this appear to be an accurate copy of the termination
23   report filled out for Bob?
24   A.    Yes.

Page 79

1    Q.    And did you fill this out?
2    A.    Yes.
3    Q.    Okay.  And then did you fill out the part
4    on the final evaluation?
5    A.    Yes.
6    Q.    Okay.  You rated Bob more than
7    satisfactory in all but two categories it appears.  One
8    was for attendance and one was for ability to learn.
9         Why did you rate him a satisfactory on
10   attendance as opposed to more than satisfactory?
11   A.    In order to be more than satisfactory I
12   think something needs to stand out and I don't know
13   that anything stood out on his attendance.  And he
14   didn't have any PTO, he used it all up.  And, actually,
15   took some time unpaid.
16         In my mind, it would be hard to rate him
17   more than satisfactory when he was taking time off
18   without pay.
19   Q.    All right.  And then ability to learn, why
20   did you give him a satisfactory as opposed to more than
21   satisfactory?
22   A.    I don't know.  Honestly, again, you know,
23   something really has to stand out.  You have to be
24   doing something more than just the norm.

Page 80

1    Q.    Okay.  Under primary reasons for
2    termination, you checked "SEM, requested by the Medical
3    Center."  Which required a comment.  Did HR help you
4    fill that out?
5    A.    Yes.
6    Q.    Under the comment you wrote, "Sleeping on
7    duty and failing to enforce sleeping policy?"
8    A.    Yes.
9    Q.    When did Bob fail to enforce the sleeping
10   policy?
11   A.    As a supervisor previously, with Mike and
12   Charlie and Ben.
13   Q.    Okay.  And according to what Bob had told
14   you, the incidents of sleeping with Mike, Charlie, and
15   Ben had been years before and you weren't even employed
16   by the hospital at that time; is that right?
17   A.    That's correct.
18   Q.    All right.  So after you filled out the
19   termination report, which is Kraft Exhibit No. 4, what
20   happened after that?
21   A.    We had a meeting with Bob, Roxann and I.
22   Q.    Okay.  And what can you remember from that
23   meeting?
24   A.    We explained to Bob that as a result of

Page 81

1    our investigation, we felt as though we had reason to
2    believe that he had been sleeping on duty while
3    working, and that was in violation of our policy.  And
4    as a result, he was going to be terminated.
5    Q.    Okay.  Did Roxann talk at all during the
6    termination meeting, or did you do most of the talking?
7    A.    I did most of the talking.
8    Q.    Had you and Roxann gone over, generally,
9    what you should say prior to the meeting?
10   A.    We discussed how the meeting was going to
11   go, yes.
12   Q.    Okay.  And did you tell Bob, during that
13   meeting, that the hospital had determined that the only
14   justifiable reason for sleeping was narcolepsy?
15   A.    I don't recall.
16   Q.    Okay.  All right.  Anything else that you
17   can remember from the termination meeting?
18   A.    I know that Roxann explained the grievance
19   policy, the procedure to them at that point.  And I
20   believe talked to them about benefits as well.
21   Q.    That's pretty much consistent with what
22   she does whenever she's involved in terminations that
23   you're involved in?
24   A.    Yes.

21 (Pages 78 to 81)

Lehman vs. St. Elizabeth                    KRAFT                    7/24/2012

Page 82

1    Q.    And Bob ended up filing a grievance; is
2  that correct?
3    A.    Yes.
4    Q.    And his first step in the grievance
5  process was to have a meeting with you; is that
6  correct?
7    A.    Yes.
8    Q.    And Roxann was also present for that
9  meeting?
10   A.    Yes.
11   Q.    All right.
12         (Kraft Deposition Exhibit No. 5 was marked
13         for identification.)
14   Q.    All right.  You've been handed what has
15  been marked as Exhibit 5 to your deposition.
16   A.    Yes.
17   Q.    Do you recognize Exhibit 5?
18   A.    Yes.
19   Q.    And is this something you drafted?
20   A.    Yes.
21   Q.    All right.  Did anyone review this prior
22  to you giving it to Bob?
23   A.    Yes.
24   Q.    Who reviewed it?

Page 83

1    A.    I always send it to HR --
2    Q.    Okay.
3    A.    -- for their review.
4    Q.    Whoever you sent it to in HR, did she
5  suggest any changes?
6    A.    I don't recall.  If so, it would have just
7  been minor.  A word here or there.  The gist of it
8  remained the same.
9    Q.    Okay.  In the fourth paragraph, beginning
10  with, "The investigation determined that you were
11  sleeping while on duty."
12   A.    Yes.
13   Q.    You state, "Not all times" -- I think it's
14  supposed to be, "you were" -- sorry -- "sleeping, were
15  you on a lunch or break times."
16   A.    Yes.
17   Q.    How did you know that?  Or what did you
18  base that on?
19   A.    Based on conversations with Bob and
20  conversations with HR.
21   Q.    And who in HR?
22   A.    Roxann.
23   Q.    And do you believe this was something
24  Roxann shared with you, with respect to what she had

Page 84

1  learned from Ken or Mike?
2    A.    Must have been, yes.
3    Q.    Okay.  And what do you mean -- when you
4  said conversations with Bob, did Bob tell you --
5    A.    My original conversation with Bob.
6    Q.    Did Bob tell you during that original
7  conversation that he was sleeping at times other than
8  break or lunch times?
9    A.    He told me that he had fallen asleep
10  several times, and I don't recall him ever mentioning
11  lunch or break time.
12   Q.    Okay.  It's Charlie Johnson?
13   A.    Yes.
14   Q.    Charlie Johnson is a supervisor; is that
15  correct?
16   A.    Yes.
17   Q.    How long has he been a supervisor?
18   A.    I don't know the exact number of years.
19   Q.    Was he a supervisor prior to you starting
20  with St. Elizabeth in July of '08?
21   A.    Yes.
22   Q.    And do you know if Mr. Johnson has any
23  disabilities?
24   A.    No, I don't know.

Page 85

1    Q.    Okay.  All right.  You go on to state,
2  "Further you admitted that you found staff sleeping but
3  did not discipline them in accordance with disciplinary
4  policy 635.03.09."
5          And then you state, "As a supervisor, you
6  are required to be aware of the policies and enforce
7  them."
8          When you first spoke with Bob, you were
9  not familiar with the disciplinary policy as it related
10  to sleeping; is that correct?
11   A.    No, that's not correct.
12   Q.    Okay.  You were familiar with it?
13   A.    I know that you aren't permitted to sleep.
14   Q.    Okay.  But you believe that an employee
15  was to receive a Level 1 for that?
16   A.    In my brief time at St. Elizabeth, this
17  was -- actually, this was the first time I ever dealt
18  with sleeping; however, on other issues, the majority
19  of the time we had done progressive discipline.
20         So, you know, I was aware that it was in
21  violation of policy, and as a result I made an
22  assumption that I thought it would be a Level 1 based
23  on previous disciplines I had been involved in.  But I
24  also was aware that -- and as I told Bob, I would have

22 (Pages 82 to 85)

Lehman vs. St. Elizabeth                     KRAFT                        7/24/2012

---

Page 86

1  to call HR, because I do not make that final
2  determination and discipline. Everything goes through
3  HR.
4      Q.    What is a Level 1?
5      A.    A Level 1 is counseling and it's written
6  and it's in your file.
7      Q.    Okay. And had Bob ever indicated to you
8  either during the grievance meeting or during your
9  conversation with Bob and Lisa Blank, that he had
10 provided counseling to the employees that he had seen
11 sleeping?
12     A.    Yes.
13     Q.    Okay.
14     A.    He stated --
15     Q.    Verbally counseled them?
16     A.    He verbally talked to them and told Greg
17 Popham, the previous Director.
18     Q.    Did he tell you what Popham said in
19 response?
20     A.    I don't recall.
21     Q.    Okay. If Bob had told you that he had
22 witnessed somebody sleeping -- if he had brought that
23 to your attention, let's say prior to September of
24 2010, what would you have done?

---

Page 87

1          MS. SCHOENING: Objection, speculation.
2      You can answer if you can.
3      A.    Given the policy, I would have called HR
4  to find out what the discipline is and would have
5  assumed it was a Level 1.
6      Q.    So you would have either called HR or
7  would you have told Bob to potentially call HR?
8      A.    No. I would have.
9      Q.    You would have. Okay.
10         When you were considering the grievance
11 that Bob had filed, did you talk about his grievance
12 with anyone other than Roxann?
13     A.    I don't recall. I might have. Maybe
14 Lisa. I honestly don't recall.
15     Q.    As of October 4, 2010, did you still feel
16 like Bob shouldn't have been terminated?
17     A.    Given that the stance by administration is
18 that they feel that sleeping is an offense that they
19 should be terminated for. Then, had I known that, I
20 would have recommended termination. However,
21 originally, like I said, I felt as though it was not.
22 I was not in agreement with it originally.
23     Q.    Did you feel that you had the power to
24 overturn his termination when he came to you with his

---

Page 88

1  dispute resolution or grievance?
2      A.    No.
3      Q.    And prior to meeting with Bob for his
4  grievance, did you have any documents that you
5  reviewed?
6      A.    I don't recall if I reviewed any
7  documents. I did have a set of questions I asked him.
8  And so I would have taken from his answers on that.
9      Q.    Okay. Was this set of questions something
10 that you had prepared or something that HR had
11 prepared?
12     A.    Both.
13     Q.    Okay. Do you still have a copy of those
14 questions?
15     A.    Yeah. I assume I do, yes.
16     Q.    Is this something that was essentially
17 created on your computer?
18     A.    Yes.
19         MS. NEFF: Okay. I don't think we have
20     that.
21         MS. SCHOENING: I don't know.
22         MS. NEFF: So maybe we can check into
23     that.
24         MS. SCHOENING: I'll have to look to see

---

Page 89

1  if I have it.
2          MS. NEFF: It's possible, but I don't
3      think so.
4          THE WITNESS: I thought I produced
5      everything.
6      Q.    You attended the Unemployment hearing --
7  strike that.
8          Bob filed for Unemployment; is that
9  correct?
10     A.    Yes.
11     Q.    You attended the hearing?
12     A.    Yes.
13     Q.    Okay. And it was a telephone hearing; is
14 that correct?
15     A.    Yes.
16     Q.    Do you know whether -- strike that.
17         And ultimately, were you aware that Bob
18 successfully was able to get his Unemployment?
19         MS. SCHOENING: Objection.
20     Q.    Do you know?
21         MS. SCHOENING: Answer, if you can.
22     A.    Yes.
23     Q.    Okay. That's a bad question. "Do you
24 know" is always a bad question.

23 (Pages 86 to 89)

Lehman vs. St. Elizabeth                     KRAFT                          7/24/2012

| Page 90 |
|---|
| 1        Was he able to get his Unemployment |
| 2  successfully? |
| 3        MS. SCHOENING: Objection. Go ahead and |
| 4  answer. |
| 5        A.    Yes. |
| 6        Q.    After the hearing; is that correct? |
| 7        MS. SCHOENING: Objection. Go ahead and |
| 8  answer. |
| 9        A.    Yes. |
| 10       Q.    Okay. And did you testify truthfully at |
| 11  the Unemployment hearing? |
| 12       MS. SCHOENING: Objection. Go ahead and |
| 13  answer. |
| 14       A.    Yes. |
| 15       Q.    Were there times that Bob would come to |
| 16  work and not do any duties of a regular Security |
| 17  Officer? |
| 18       A.    No. |
| 19       Q.    Okay. Were there times where he would be |
| 20  focusing primarily on the projects that you had given |
| 21  him? |
| 22       A.    Yes. |
| 23       Q.    And did you give him -- sorry. Did the |
| 24  amount of projects that you gave him increase over the |

| Page 91 |
|---|
| 1  last year that he was working there? |
| 2        A.    Could be. I would give him projects to |
| 3  do. |
| 4        MS. NEFF: Okay. Let's take a very quick |
| 5        break, just to make sure I don't have anything |
| 6        else. |
| 7        MS. SCHOENING: Okay. |
| 8        (At which time, a recess was taken from |
| 9        3:17 p.m. until 3:20 p.m.) |
| 10       Q.    Real quick. You mentioned earlier that |
| 11  you understood from Bob that he had raised the issue of |
| 12  some Security Officer sleeping with Greg Popham, and |
| 13  you couldn't remember if he told you what Greg's |
| 14  response was. Did Bob tell you that Greg's response |
| 15  was that he just laughed? |
| 16       A.    I don't recall. |
| 17       MS. NEFF: Okay. All right. That's all |
| 18       the questions I have. |
| 19       MS. SCHOENING: I do have a few follow-up |
| 20       questions. |
| 21       MS. NEFF: Okay. |
| 22       EXAMINATION |
| 23  BY MS. SCHOENING: |
| 24       Q.    Mike, I believe you testified that you |

| Page 92 |
|---|
| 1  made the decision to replace Bob Lehman's position with |
| 2  Rick Smith? |
| 3        A.    Yes. |
| 4        Q.    Why did you choose Rick Smith as a |
| 5  replacement? |
| 6        A.    Rick was a current PRN Officer, so he was |
| 7  familiar with St. Elizabeth, with Edgewood. So he had |
| 8  been working with Security. He had previous management |
| 9  experience. He had just retired as the Chief of Police |
| 10  in Park Hills, so he had management experience and |
| 11  experience within the Security Department. I felt he |
| 12  was the most qualified. |
| 13       Q.    At the time you promoted Rick Smith, did |
| 14  you know his age? |
| 15       A.    No. |
| 16       Q.    Do you happen to know, as you sit here |
| 17  today, if Rick Smith is older than Bob Lehman? |
| 18       A.    Yes. |
| 19       Q.    There's some testimony about Kim |
| 20  DiFilippo, D-I-F-I-L-I-P-P-O. |
| 21       (Reference to previously-marked Kraft |
| 22       Deposition Exhibit No. 3.) |
| 23       Q.    In Kraft Exhibit 3, there's an e-mail that |
| 24  you sent to Lisa Blank and Roxann Platek where you |

| Page 93 |
|---|
| 1  indicate that Kim told you she did not want him, |
| 2  meaning Ken Rasor, coming after her? |
| 3        A.    That's correct. |
| 4        Q.    What did you mean by that statement? |
| 5        A.    Kim was concerned that Ken would try -- if |
| 6  she got on his bad side, try to get her fired. Have |
| 7  her lose her job. |
| 8        Q.    Did Kim ever tell you she felt physically |
| 9  threatened by Ken Rasor? |
| 10       A.    No. It was more Ken -- if you got on |
| 11  Ken's bad side, he worked to get you fired. |
| 12       Q.    There was some previous testimony by you, |
| 13  that during the initial meeting with Mr. Lehman over |
| 14  this incident with him sleeping, that there was a |
| 15  discussion about Mr. Lehman's diabetes. Do you recall |
| 16  who initially brought that up in the meeting with |
| 17  Mr. Lehman? |
| 18       A.    Bob brought up that he was having problems |
| 19  regulating his medicine. And so he thought that that |
| 20  could have been why there was this issue with his |
| 21  diabetes, that it was regulating his medicine. |
| 22       Q.    So is it your testimony that you did not |
| 23  bring up his health condition initially, in that |
| 24  meeting? It was Mr. Lehman who brought it up? |

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    KRAFT                          7/24/2012

Page 94

1      A.    That's correct.  I was aware of his health
2  condition, but he brought it up in that meeting, and
3  the fact that he was having problems.  They were
4  changing his medicine, he was trying to regulate it.
5      Q.    You stated that you do not believe you had
6  the power to overturn Mr. Lehman's termination through
7  the grievance process.  Why did you believe you didn't
8  have the power to overturn that?
9      A.    At that point, number one, you're
10 overturning yourself.  And secondly, what you're
11 looking at is, was there a violation of policy.
12 Whether or not you agree whether it should have been a
13 Level 3 or termination is irrelevant.
14     At that point, Bob is grieving that -- you
15 know, in my opinion, he's grieving that he shouldn't
16 have been terminated, because it wasn't a violation of
17 policy.
18     As I read the policy, St. Elizabeth -- Bob
19 fell asleep.  He admitted it.  And St. Elizabeth has
20 the ability, under their discipline policy, to
21 terminate someone for doing that.
22     So, you know, as I read the grievance
23 policy, I am just, at that point, judging whether or
24 not there's a violation of policy.  And there, in fact,

Page 95

1  was a violation of policy, and St. Elizabeth has the
2  right to terminate.
3      Q.    There was also some testimony that
4  Mr. Lehman told you he had previously counseled some of
5  the employees who he found sleeping.  Do you know what
6  level of counseling he provided to them?
7      A.    I believe he told me he verbally counseled
8  them.
9      Q.    Do you know if he gave them a Level 3
10 discipline?
11     A.    Not to my knowledge.
12     Q.    If Mr. Lehman did, in fact, give them a
13 verbal counseling, would that have been in compliance
14 with St. Elizabeth's policy?
15     A.    Not at the time.  Not at the time I came.
16     MS. SCHOENING:  That's all the questions I
17 have.
18     MS. NEFF:  I just have a couple.
19     FURTHER CROSS-EXAMINATION
20 BY MS. NEFF:
21     Q.    Do you know what the policy was at the
22 time that Bob had seen these folks sleeping?
23     A.    No.
24     Q.    Okay.  You mentioned that under the policy

Page 96

1  St. Elizabeth could terminate an employee for sleeping;
2  is that correct?
3      A.    Yes.
4      Q.    It was discretionary; is that correct?
5      A.    Yes.
6      Q.    So the hospital could either give him a
7  Level 3, or could terminate him, right?
8      A.    Correct.
9      MS. NEFF:  Okay.  That's all the questions
10 I have.
11     MS. SCHOENING:  Okay.  I think I have one
12 follow-up question.  Sorry.  I'm not trying to
13 prolong your misery.
14     FURTHER EXAMINATION
15 BY MS. SCHOENING:
16     Q.    Did you ever see Mr. Lehman's medical
17 records?
18     A.    No.
19     Q.    Did anyone tell you what was found out
20 during his fitness-for-duty evaluation?
21     A.    No.
22     Q.    Did Mr. Lehman's disability have anything
23 to do with your decision to terminate?
24     A.    No.

Page 97

1      Q.    Did Mr. Lehman's age have anything to do
2  with his termination, that you are aware of?
3      A.    No.
4      MS. SCHOENING:  That's all I have.
5      MS. NEFF:  I don't have anything further.
6
7
                    _____

                           MICHAEL KRAFT

8
9                              - - -
10           DEPOSITION CONCLUDED AT 3:30 P.M.
11                             - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    KRAFT                    7/24/2012

Page 98

```
 1              C E R T I F I C A T E
 2   STATE OF OHIO       :
                         : ss
 3   COUNTY OF HAMILTON  :
 4            I, Barbara A. Thacker, RPR, the
 5   undersigned, a duly qualified and commissioned notary
 6   public within and for the State of Ohio, do hereby
 7   certify that, before giving of the aforesaid
 8   deposition, MICHAEL KRAFT, was by me first duly sworn
 9   to depose the truth, the whole truth, and nothing  but
10   the truth; that the foregoing is the deposition given
11   at said time and place by MICHAEL KRAFT; that said
12   deposition was taken in all respects pursuant to
13   stipulations of counsel hereinbefore set forth; that I
14   am neither a relative of nor employee of any of their
15   counsel, and have no interest whatever in the result of
16   the action.  I further certify that I am not, nor is
17   the court reporting firm with which I am affiliated,
18   under a contract as defined in Civil Rule 28(D).
19            IN WITNESS WHEREOF, I hereunto set my hand
20   and official seal of office at Cincinnati, Ohio, this
21   _____ day of _____, 2012.
22
                    _____
23   My Commission Expires:   BARBARA A. THACKER, RPR
     May 17, 2013          Notary Public - State of Ohio
24
```

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

# ADDENDUM

TO THE REPORTER:  I have read the entire transcript of my deposition taken on the _____ day of _____, 2____, or the same has been read to me.  I request that the following changes be entered upon the record for the reasons indicated.  I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

8/27/12
**(Date)**
**ROBERT LEHMAN vs ST. ELIZABETH HEALTHCARE**

_(signature)_
**(Signature of Deponent)**
**MICHAEL KRAFT      7-24-12      BT**

ORIGINAL

AMS DEPO
P.O. Box 58641 · Cincinnati, Ohio  45258-8641
(513) 941-9464

Lehman vs. St. Elizabeth              **KRAFT**                    7/24/2012

Page 97

1        Q.     Did Mr. Lehman's age have anything to do

2   with his termination, that you are aware of?

3        A.     No.

4               MS. SCHOENING:  That's all I have.

5               MS. NEFF:  I don't have anything further.

6

7                    _____

8               MICHAEL KRAFT

9                         -  -  -

10              DEPOSITION CONCLUDED AT 3:30 P.M.

11                       -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

**AMS DEPO**
**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

ORIGINAL

Lehman vs. St. Elizabeth                    **KRAFT**                    7/24/2012

Page 98

1                    C E R T I F I C A T E

2    STATE OF OHIO          :
                            : ss
3    COUNTY OF HAMILTON     :

4              I, Barbara A. Thacker, RPR, the

5    undersigned, a duly qualified and commissioned notary

6    public within and for the State of Ohio, do hereby

7    certify that, before giving of the aforesaid

8    deposition, MICHAEL KRAFT, was by me first duly sworn

9    to depose the truth, the whole truth, and nothing  but

10   the truth; that the foregoing is the deposition given

11   at said time and place by MICHAEL KRAFT; that said

12   deposition was taken in all respects pursuant to

13   stipulations of counsel hereinbefore set forth; that I

14   am neither a relative of nor employee of any of their

15   counsel, and have no interest whatever in the result of

16   the action.  I further certify that I am not, nor is

17   the court reporting firm with which I am affiliated,

18   under a contract as defined in Civil Rule 28(D).

19              IN WITNESS WHEREOF, I hereunto set my hand

20   and official seal of office at Cincinnati, Ohio, this

21   _13th_ day of _August_____, 2012.

22

23   My Commission Expires:    BARBARA A. THACKER, RPR
     May 17, 2013               Notary Public - State of Ohio

24

**AMS DEPO**
**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

ORIGINAL