Page 99

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

------------------------------------
                                    :
ROBERT LEHMAN,                      :
                                    :
            Plaintiff,              :
                                    :
        vs.                         :   CASE NO.
                                    :   2:11-cv-00165
ST. ELIZABETH HEALTHCARE,           :
                                    :
            Defendant.              :
                                    :
------------------------------------


         DEPOSITION OF:   MICHAEL KRAFT
                          (Volume II)
         TAKEN:           By the Plaintiff
         DATE:            August 13, 2012
         TIME:            Commencing at 1:00 p.m.
         PLACE:           Offices of:
                          DRESSMAN, BENZINGER,
                          LaVELLE, PSC
                          207 Thomas More Parkway
                          Crestview Hills, KY  41017
         BEFORE:          Barbara A. Thacker, RPR
                          Notary Public-State of Ohio
                          Jurisdiction of Notary Waived

Case: 2:11-cv-00165-WOB-JGW   Doc #: 32   Filed: 10/16/12   Page: 2 of 11 - Page ID#: 414

Lehman vs. St. Elizabeth   KRAFT (VOL.2)                                        8/13/2012

Page 100

1  APPEARANCES:
2     On behalf of the Plaintiff:
3        KATHERINE DAUGHTREY NEFF, ESQ
         of
4        Freking & Betz, LLC
         525 Vine Street
5        Sixth Floor
         Cincinnati, Ohio  45202
6        Email: kneff@frekingandbetz.com
7     On behalf of the Defendant:
8        KELLY A. SCHOENING, ESQ.
         of
9        Dressman, Benzinger, LaVelle, PSC
         207 Thomas More Parkway
10       Crestview Hills, KY  41017
         Email: kschoening@dbllaw.com
11
    Also Present:  Robert Lehman
12                 Lisa Blank (St. E. Rep)
13                 - - -

Page 101

1              I N D E X
2  MICHAEL KRAFT                               PAGE
3  CROSS-EXAMINATION BY MS. NEFF                102
4  EXAMINATION BY MS. SCHOENING                  -
5
6
7
8              E X H I B I T S
9  KRAFT EXHIBITS        MARKED     REFERENCED
10     6                  102          117
11     7                  110
12 PREVIOUSLY-MARKED                 REFERENCED
13  Kraft 5                             116

Page 102

1                MICHAEL KRAFT
2  of lawful age, a witness herein, being first duly sworn
3  as hereinafter certified, was examined and deposed as
4  follows:
5                CROSS-EXAMINATION
6  BY MS. NEFF:
7     Q.    Good afternoon.  Sorry to have to bring
8  you back here.  We should be fairly short today.
9           I understand that there were some
10 documents that you recently provided to either Lisa or
11 to counsel following your last deposition.  Do you
12 remember providing those documents?
13    A.    I do.
14          (Kraft Deposition Exhibit No. 6 was marked
15           for identification.)
16    Q.    Since your deposition wasn't that long
17 ago, obviously, I know you remember the ground rules
18 for the deposition today.  So just let me know if you
19 don't understand my question.  Okay?
20    A.    Okay.
21    Q.    All right.  Let's start with Exhibit 6 to
22 your deposition.  What is Exhibit 6?
23    A.    That is some timeline notes I kept back in
24 2010 of what was going on with Bob.

Page 103

1     Q.    Okay.  And did you actually provide this
2  information to Doug Chambers?
3     A.    I did not.  I titled it to Doug but it
4  never left my computer.
5     Q.    Okay.  Did anyone ask you to keep a record
6  of the events that you did on the 19th, the 20th and
7  23rd?
8     A.    No, I just chose to do that.
9     Q.    Okay.  Did you actually create this memo
10 on September 14?
11    A.    Yes.
12    Q.    Okay.  And why did you create it on
13 September 14, as opposed to either August 19, August
14 20, or August 23?
15    A.    I don't recall.  I believe I had notes
16 jotted down and it was just at that point in time I put
17 it into memo form.
18    Q.    Okay.  What happened to your handwritten
19 notes?
20    A.    I don't know.  I would assume I would have
21 thrown them away, since I typed it up.
22    Q.    Okay.  So, for example, on the first page
23 there, under August 20, did you take any notes during
24 your first conversation with Bob Lehman in which you

Case: 2:11-cv-00165-WOB-JGW   Doc #: 32   Filed: 10/16/12   Page: 3 of 11 - Page ID#: 415

Lehman vs. St. Elizabeth   KRAFT (VOL.2)                    8/13/2012

Page 104

1  advised him that you had learned of a complaint that he
2  had been sleeping?
3       A.   Not that I recall.
4       Q.   So when do you believe that you jotted
5  down notes relating to that conversation?
6       A.   I don't recall.  I would say probably at
7  the end of the day or later on.
8       Q.   Okay.  And did you attempt to record word
9  for word what happened during that conversation?
10      A.   No.  Absolutely not.
11      Q.   Okay.  I think you said this memo didn't
12 leave your computer.  So you didn't provide it to HR as
13 a part of their investigation?
14      A.   I thought I had.
15      Q.   Okay.
16      A.   I just meant, it didn't leave my computer
17 to go to Doug.  I thought I provided it to HR.
18      Q.   Who in HR do you think you provided it to?
19      A.   Either Roxann or Lisa.  That's who I dealt
20 with on all this.
21      Q.   Right.  And if you had provided it to
22 Roxann or Lisa, do you believe you would have e-mailed
23 it to them?
24      A.   Yes.

Page 105

1       Q.   Okay.  And you would have e-mailed it to
2  them, obviously, after you typed it up on September 14?
3       A.   I wouldn't have e-mailed it to them until
4  it had to be provided as part of this legal.
5       Q.   Okay.  All right.  That's what I was
6  trying to figure out.  So prior to Bob's termination,
7  do you believe that you e-mailed these notes to either
8  Roxann or Lisa?
9       A.   No.
10      Q.   All right.  So if you provided it to
11 Roxann or Lisa, I think it was after the litigation had
12 been filed?
13      A.   Yes.
14      Q.   And did you use anything else to refresh
15 your recollection when you were typing up this
16 memorandum, other than your handwritten notes?
17      A.   Not that I recall, no.
18      Q.   Did you review any e-mails or anything
19 like that to create this memo?
20      A.   Possibly.
21      Q.   And do you know whether you spoke with
22 either Roxann or Lisa to get their recollection of the
23 events in order to create this memo?
24      A.   No.  These are my recollections.

Page 106

1       Q.   All right.  On the second page.  In
2  your -- in your previous deposition you discussed you
3  had a conversation with Doug Chambers after you learned
4  that HR was advising that Mr. Lehman would receive a
5  Level 3.  Do you remember that testimony?
6       A.   Yes.
7       Q.   So on the top here, it looks like you are,
8  essentially, just creating a note here that you spoke
9  with Doug, as you testified in your last deposition.
10           What I'd like to ask you is whether or
11 not, in reviewing this, if you can recollect anything
12 that Doug said to you in response?
13      A.   Doug did say that Bob was a good employee;
14 however, discipline was handled through HR and I would
15 have to -- everything would have to go through HR.
16      Q.   Anything else you can remember him saying?
17      A.   No.
18      Q.   All right.  And then your next note states
19 that you left Doug's office and responded to HR
20 speaking to Roxann and Lisa?
21      A.   Yes.
22      Q.   Was that in person or over the phone?
23      A.   No, that was in person.
24      Q.   And they both were present?

Page 107

1       A.   Yes.
2       Q.   All right.  So is it your testimony that
3  you believe at the end of the day, on August 20, you
4  reported you took some handwritten notes to record all
5  of the information that you have on here for that date?
6       A.   Yes.
7       Q.   Okay.  But again, you didn't, obviously,
8  record your conversation with Lisa and Roxann word for
9  word; is that correct?
10      A.   That's correct.
11      Q.   You didn't actually take any notes during
12 your conversation with Lisa or Roxann?
13      A.   That's correct.
14      Q.   Similarly, you didn't take any notes
15 during your conversation with Doug?
16      A.   That's correct.
17      Q.   And then -- I know you testified
18 previously about essentially witnessing the
19 communication between Bob and Lisa?
20      A.   Yes.
21      Q.   And you didn't take any notes during that
22 meeting; is that correct?
23      A.   That's correct.
24      Q.   You had -- I believe you previously

Case: 2:11-cv-00165-WOB-JGW   Doc #: 32   Filed: 10/16/12   Page: 4 of 11 - Page ID#: 416

Lehman vs. St. Elizabeth    KRAFT (VOL.2)                              8/13/2012

Page 108

1  testified, but you can correct me if I'm wrong, that
2  you had some conversation with Bob Lehman while he was
3  on administrative leave?
4      A.   Yes.
5      Q.   After August 23?
6      A.   Yes.
7      Q.   And before the termination decision
8  occurred?
9      A.   Yes.
10     Q.   Okay. Why didn't you record in this memo
11 that conversation or conversations?
12     A.   That was just Bob keeping me updated on,
13 "Okay. I'm waiting to hear back from Employee Health."
14 Or, "Employee Health is waiting to get records from my
15 doctor." So it was just kind of a status update that
16 Bob was keeping me in the loop.
17     Q.   Okay. So you didn't feel like those
18 needed to be recorded in this timeline?
19     A.   That's correct.
20     Q.   Did you create any other memo related to
21 Bob Lehman or his termination, other than this
22 document?
23     A.   Yes. But you have them.
24     Q.   Are you talking about the questions for

Page 109

1  the meeting?
2      A.   You showed them to me last time, the
3  various --
4      Q.   I think the only -- so one is previously
5  marked as Kraft Exhibit No. 5, regarding the dispute
6  resolution?
7      A.   Yes. I created that.
8      Q.   Then there was something you typed up
9  reflecting the termination meeting; is that correct,
10 with Bob?
11     A.   What are you talking about?
12     Q.   This is for -- Exhibit 5 --
13     A.   Yes.
14     Q.   -- is your memo --
15     A.   Yes.
16     Q.   -- regarding the -- to Bob, regarding your
17 decision on the dispute resolution process, correct?
18     A.   Yes.
19     Q.   And then you also drafted another memo
20 reflecting what occurred during the termination
21 meeting; is that correct?
22     A.   I'd have to be shown that. I don't
23 recall.
24     Q.   Okay. All right. Any other memos, that

Page 110

1  you can recall creating, relating to this incident?
2      A.   Just the ones you have.
3      Q.   And you know what I have?
4      A.   You showed them to me the last time.
5      Q.   Okay. All right. I just want to make
6  sure there isn't anything else that you have on your
7  computer that --
8      A.   No.
9      Q.   Okay.
10          (Kraft Deposition Exhibit No. 7 was marked
11          for identification.)
12     Q.   All right. Mike, you've been handed what
13 has been marked as Exhibit Number 7 --
14     A.   Yes.
15     Q.   -- to your deposition. Is this a document
16 that you created?
17     A.   Myself and HR.
18     Q.   And would that be Roxann or somebody else
19 in HR?
20     A.   I don't know.
21     Q.   When did you and HR create this document?
22     A.   Prior to the meeting.
23     Q.   And when you say HR was involved in it,
24 did you have a discussion with HR and use some of their

Page 111

1  input to create this?
2      A.   I sent in a list of questions that I
3  think -- over to Roxann, and then questions come back,
4  and sometimes there's additional questions, sometimes
5  there's not.
6      Q.   All right. So do you believe that you
7  sent a list of questions over to HR, via e-mail?
8      A.   Yes.
9      Q.   Okay. And then you received something
10 back from HR, either adding or subtracting from your
11 questions -- adding to or subtracting from your
12 questions?
13     A.   Yes.
14     Q.   And you would have received that revised
15 questions via e-mail, correct?
16     A.   To my belief yes.
17     Q.   Okay.
18          MS. NEFF: Kelly, if that exists I don't
19     know if we have that.
20          MS. SCHOENING: I haven't seen anything
21     like that.
22          MS. NEFF: Right. Okay.
23          MS. SCHOENING: It wasn't in the files
24     that I received.

Case: 2:11-cv-00165-WOB-JGW   Doc #: 32   Filed: 10/16/12   Page: 5 of 11 - Page ID#: 417

Lehman vs. St. Elizabeth   KRAFT (VOL.2)                               8/13/2012

Page 112

1     MS. NEFF: Okay.
2   Q.   Is it more likely than not it would have
3  been in an e-mail with Roxann as opposed to somebody
4  else in HR, or could it possibly have been somebody
5  else?
6   A.   More likely Roxann. That's who I deal
7  with.
8   Q.   Okay. All right. Can you identify which
9  questions on here were the ones that you created?
10  A.   No.
11  Q.   Okay. All right. Now, did you take this
12 document, or your own copy of this document in with you
13 to the dispute resolution meeting with Bob Lehman?
14  A.   Yes.
15  Q.   And did you ask him each one of these
16 questions?
17  A.   I don't recall.
18  Q.   Okay. Do you recall asking him any of
19 these questions?
20  A.   I recall asking him questions, yes. Then,
21 based on his answer, I may not have to ask other ones
22 because he's already answered them.
23  Q.   Okay. And then did you take notes
24 reflecting his answers to your questions?

Page 113

1   A.   This was two years ago. I don't recall.
2  I would think I would have.
3   Q.   Okay. You know, the only reason --
4  obviously, this particular document has large spaces
5  after each question. Do you recall writing in notes to
6  the questions that you asked him?
7   A.   I don't recall. I knew the answers to
8  most of these.
9   Q.   You knew the answer to most of those
10 before the meeting?
11  A.   Bob had answered several of these already.
12  Q.   Okay. What can you -- do you know whether
13 or not you asked him to answer the question in No. 2,
14 "Do you understand that sleeping is a violation of
15 St. Elizabeth Disciplinary Policy 635.03?"
16  A.   I don't recall.
17  Q.   Do you recall what his answer was, if any?
18  A.   I don't recall.
19  Q.   Okay. You had already discussed with Bob
20 Question No. 3 there, right? He had already admitted
21 to you sleeping?
22  A.   Yes.
23  Q.   And then did you ask him how many times he
24 fell asleep, and for how long of a period of time he

Page 114

1  was sleeping?
2   A.   My memo reflects that it appears that I
3  did.
4   Q.   Okay. And he didn't -- what is your
5  recollection in terms of what his response to that was?
6   A.   That he had nodded off several times.
7   Q.   Okay. And did he indicate how long he was
8  sleeping?
9   A.   Not that I recall.
10  Q.   Okay. Second page here, did you ask him
11 whether or not he shut the door when he fell asleep?
12  A.   I don't recall.
13  Q.   Okay. And do you remember whether or
14 not -- through the investigation, you learned whether
15 Bob shut the door when he slept?
16  A.   He had previously advised me that the door
17 was open.
18  Q.   Okay. Because he previously advised you
19 of that, is it possible you didn't ask him that
20 question during the dispute resolution meeting?
21  A.   It's possible I asked it. That meeting
22 was two years ago. I don't remember what all -- like I
23 said, depending on when I asked him one question what
24 his answer was. He may cover several of these, so then

Page 115

1  I don't ask it again.
2   Q.   Okay. And I just -- you know, I'm not
3  trying to -- I just want to exhaust your recollection,
4  okay? There might be one on here that might refresh
5  your recollection. I'm going to go through each one,
6  okay?
7   A.   Okay.
8   Q.   So Question No. 6, the question is, "Did
9  you report to your supervisor that you were having
10 problems of any type that were making you fall asleep?"
11     Now, did you ask him that question?
12  A.   I don't recall.
13  Q.   Okay. Obviously, you were his supervisor,
14 right?
15  A.   Yes.
16  Q.   Would you have known as of October 4,
17 2010, any problems he would have had about falling
18 asleep?
19  A.   I would have known, and he didn't.
20  Q.   He did address with you some problems he
21 was having with his diabetes; is that correct?
22  A.   Yes. That they were trying to regulate
23 his medicine.
24  Q.   All right. And then in terms of Questions

Case: 2:11-cv-00165-WOB-JGW   Doc #: 32   Filed: 10/16/12   Page: 6 of 11 - Page ID#: 418

Lehman vs. St. Elizabeth   KRAFT (VOL.2)                    8/13/2012

### Page 116

1   7 and 8, regarding the other two employees, Charlie and
2   Mike, that he had seen sleeping, did he indicate to you
3   when that happened during that meeting?
4       A.   I believe I referred to that in my memo.
5       Q.   Okay.  I'll hand you your memo.  Which was
6   Kraft Exhibit No. 5.
7            (Reference to previously-marked Kraft
8            Deposition Exhibit No. 5.)
9       A.   In the first paragraph I referenced that
10  he stated there was one incident that occurred many
11  years ago.
12      Q.   Okay.
13      A.   "And you felt as though you had done your
14  job in an appropriate manner at the time."
15      Q.   Do you believe that was something that you
16  actually talked about during the resolution meeting or
17  was that something that you recalled from the
18  conversation with Lisa and Bob?
19      A.   I believe that was from the meeting.  But
20  I also previously was aware of that.
21      Q.   Okay.  All right.  So he also addressed
22  then, based on your memorandum regarding the dispute
23  resolution meeting, what actions he took.  Which was to
24  warn both Charlie and Mike of the sleeping; is that

### Page 117

1   correct?
2       A.   Yes.
3       Q.   Okay.  And that was something -- was that
4   something you knew, from the previous meeting with Lisa
5   as well?
6       A.   Yes.
7       Q.   All right.  Question No. 10, can you
8   recall whether or not that was a question that you
9   drafted or that Roxann drafted?
10      A.   I can't recall.
11      Q.   Okay.  The quote, "it's a human thing and
12  I have the discretion to act on it or not," was that a
13  quote you ever heard Bob make?
14      A.   I don't know if it's that exact quote.
15      Q.   Okay.
16      A.   I know that I recall Bob saying something
17  like, "people" -- "it's human.  People have problems
18  and they do fall asleep.  It's a human thing."  I don't
19  recall if he also went on to say, "I have the
20  discretion to act on it or not."  I just don't recall.
21           (Reference to previously-marked Kraft
22           Deposition Exhibit No. 6.)
23      Q.   Okay.  If you refer back to Kraft Exhibit
24  No. 6.

### Page 118

1       A.   Okay.
2       Q.   Sorry to make you jump around.
3       A.   No.  That's okay.
4       Q.   I think it starts on the second page with,
5   "Both Bob and I responded to Lisa Blank's office,"
6   where you are noting the meeting that you attended with
7   Bob and Lisa.
8       A.   Yes.
9       Q.   In this particular note, you don't
10  reference this quote, "it's a human thing, and I have
11  the discretion to act on it or not."  Do you believe
12  that was -- words to that effect were -- Bob said words
13  to that effect during the meeting with Lisa on
14  September -- or excuse me, August 20?
15      A.   What I recall, from what I just told you,
16  that Bob said, "it's human.  People do fall asleep," I
17  believe occurred in that meeting, yes.
18      Q.   Okay. All right.  But you just didn't
19  reflect it in your September 14 memo?
20      A.   That's correct.
21      Q.   Okay.  Any reason why you would have left
22  that out?
23      A.   As I stated, I wasn't writing things down
24  word for word.  I was just paraphrasing what was going

### Page 119

1   on with the whole situation.
2       Q.   Okay.  Question No. 11, do you know
3   whether you asked Bob why he felt his termination was
4   wrongful, excessive and unsubstantiated?
5       A.   I don't recall.
6       Q.   Do you know whether you asked Bob how he
7   wanted his name cleared and what conclusion he was
8   looking for in the matter?
9       A.   I do believe we did ask him that one, yes.
10      Q.   What did he say?
11      A.   Because there was some confusion.  I
12  thought that Bob was grieving, but didn't want his job
13  back.  And the grievance process is, you get your job
14  back.  So there was some confusion as to why Bob was
15  grieving, if he wasn't looking to come back.  So I
16  believe we did ask that question.
17      Q.   Okay.  And can you recall what Bob said in
18  response?
19      A.   No, not exactly.
20      Q.   Okay.  So when you attended the dispute
21  resolution meeting with Bob Lehman, it was -- you were
22  not clear at that point whether Bob wanted to return to
23  St. Elizabeth; is that a correct statement?
24      A.   It is my understanding he didn't want to

Case: 2:11-cv-00165-WOB-JGW  Doc #: 32  Filed: 10/16/12  Page: 7 of 11 - Page ID#: 419

Lehman vs. St. Elizabeth    KRAFT (VOL.2)                            8/13/2012

### Page 120

```
 1   return to St. Elizabeth.
 2       Q.   Okay.
 3       A.   And that's why the question -- you know,
 4   the grievance process has you returning.  There was
 5   some confusion as to why Bob was filing the grievance
 6   when he was previously stating he didn't want to return
 7   to St. Elizabeth.
 8       Q.   Who told you that Bob didn't want to
 9   return to St. Elizabeth?
10       A.   I believe it was Roxann.
11       Q.   Okay.  Did Bob, during that dispute
12   resolution meeting, indicate in any way whether he
13   wanted to return to St. Elizabeth?
14       A.   I don't recall.
15       Q.   So if you did take notes on these
16   questions during the dispute resolution meeting on
17   October 4, do you believe you used those notes to
18   create Kraft Exhibit No. 5?
19       A.   Yes.
20       Q.   And then what did you do with your notes,
21   if anything?
22       A.   I would have thrown them away.
23       Q.   Okay.  Was Roxann also taking notes during
24   that meeting?
```

### Page 121

```
 1       A.   I believe so, yes.
 2       Q.   Did you use any of her notes to create the
 3   Kraft Exhibit No. 5?
 4       A.   Her notes, no.  We obviously discussed the
 5   meeting, but I didn't take any of her notes.
 6       Q.   Okay.  You just -- when you say "discussed
 7   the meeting," was that immediately following the
 8   dispute resolution meeting with Bob, or was that at a
 9   later time?
10       A.   Immediately following.
11            MS. NEFF:  Okay.  All right.  If we can
12       take a quick break, I don't know if I'm going to
13       have much more.
14            MS. SCHOENING:  Okay.
15            (At which time, a recess was taken from
16            1:29 p.m. until 1:39 p.m.)
17            MS. NEFF:  Just a couple more questions.
18       Q.   Mike, is it possible that Lisa Edmonds,
19   from HR, was in the dispute resolution meeting with you
20   and Bob, as opposed to Roxann?
21       A.   It is possible.  Some of these run
22   together and at some point Roxann was on vacation and
23   Lisa was covering.
24            MS. NEFF:  Okay.  So maybe we should check
```

### Page 122

```
 1   Lisa's e-mails, just in case.
 2       A.   I think it was Lisa.
 3       Q.   Okay.  All right.  In Question No. 7,
 4   regarding Bob Lehman seeing Charlie and Mike sleeping
 5   in the past, was that Charlie Johnson?
 6       A.   Yes.
 7       Q.   Charlie Johnson is -- or was, at least at
 8   this time, a supervisor; is that correct?
 9       A.   Yes.
10       Q.   Bob never supervised Charlie Johnson, as
11   far as you know, correct?
12       A.   That's correct.
13       Q.   Mike Borman, is that the Mike you think
14   this is referring to?
15       A.   Yes.
16       Q.   And Mike had previously been supervised by
17   Charlie Johnson prior to Bob's move to day shift; is
18   that correct?
19       A.   That's my understanding.  I was not
20   employed with St. Elizabeth at that time.
21       Q.   Is it your understanding that Bob had only
22   been supervising Mike Borman since he had moved to day
23   shift?
24       A.   Yes.
```

### Page 123

```
 1       Q.   Okay.  Is it possible that Bob had
 2   previously indicated, during the meeting with you and
 3   Lisa, that Charlie had witnessed Mike Borman sleeping
 4   and had not disciplined him for that?
 5       A.   Not that I recall.
 6       Q.   Okay.  I don't remember exactly at what
 7   point in time you came on board with his transition
 8   into first shift.  Was he on second shift when you came
 9   on board as his supervisor?
10       A.   Yes.
11       Q.   And was Mike Borman on first shift?
12       A.   Yes.
13       Q.   Okay.  What shift was Charlie Johnson on?
14       A.   Third.
15       Q.   Okay.  Does first shift and third shift
16   overlap?
17       A.   Half an hour.
18       Q.   Okay.  You never spoke with Charlie
19   Johnson or Mike Borman about any allegation that they
20   were sleeping; is that correct?
21       A.   That's correct.
22       Q.   So just to clear this up a little bit.  If
23   you now recall that Lisa Edmonds was the one present
24   from HR, for the dispute resolution meeting, do you
```

Case: 2:11-cv-00165-WOB-JGW    Doc #: 32    Filed: 10/16/12    Page: 8 of 11 - Page ID#: 420

Lehman vs. St. Elizabeth    KRAFT (VOL.2)                             8/13/2012

Page 124

1  believe Lisa was taking notes during that meeting?
2      A.   I don't recall.
3      Q.   Okay. All right. Is it possible that you
4  and Lisa exchanged e-mails regarding Kraft Exhibit
5  No. 7, questions for dispute resolution meeting, as
6  opposed to Roxann?
7      A.   Yes, that's possible.
8          MS. NEFF: Okay. All right. That's all
9  the questions I have.
10         MS. SCHOENING: Okay. I don't have any
11 questions.
12
13             _____
               MICHAEL KRAFT
14
15             - - -
16         DEPOSITION CONCLUDED AT 1:43 P.M.
17             - - -

Page 125

1          C E R T I F I C A T E
2  STATE OF OHIO       :
                       : ss
3  COUNTY OF HAMILTON  :
4          I, Barbara A. Thacker, RPR, the
5  undersigned, a duly qualified and commissioned notary
6  public within and for the State of Ohio, do hereby
7  certify that, before giving of the aforesaid
8  deposition, MICHAEL KRAFT, was by me first duly sworn
9  to depose the truth, the whole truth, and nothing but
10 the truth; that the foregoing is the deposition given
11 at said time and place by MICHAEL KRAFT; that said
12 deposition was taken in all respects pursuant to
13 stipulations of counsel hereinbefore set forth; that I
14 am neither a relative of nor employee of any of their
15 counsel, and have no interest whatever in the result of
16 the action. I further certify that I am not, nor is
17 the court reporting firm with which I am affiliated,
18 under a contract as defined in Civil Rule 28(D).
19         IN WITNESS WHEREOF, I hereunto set my hand
20 and official seal of office at Cincinnati, Ohio, this
21 _____ day of _____, 2012.
22
              _____
23 My Commission Expires:   BARBARA A. THACKER, RPR
   May 17, 2013        Notary Public - State of Ohio
24

# ADDENDUM

TO THE REPORTER: I have read the entire transcript of my deposition taken on the _____ day of _____, 2____, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

**PAGE**      **LINE**                              **CORRECTION**

_9/12/12_
(Date)                                                   (Signature of Deponent)
ROBERT LEHMAN vs. ST. ELIZABETH HOSPITAL    MICHAEL KRAFT    8-13-12    BT
                                                         VOLUME II

**ORIGINAL**

AMS DEPO
P.O. Box 58641 · Cincinnati, Ohio 45258-8641
(513) 941-9464

Case: 2:11-cv-00165-WOB-JGW   Doc #: 32   Filed: 10/16/12   Page: 10 of 11 - Page ID#: 422

Lehman vs. St. Elizabeth        KRAFT (VOL.2)                    8/13/2012

Page 124

1  believe Lisa was taking notes during that meeting?
2       A.    I don't recall.
3       Q.    Okay. All right. Is it possible that you
4  and Lisa exchanged e-mails regarding Kraft Exhibit
5  No. 7, questions for dispute resolution meeting, as
6  opposed to Roxann?
7       A.    Yes, that's possible.
8             MS. NEFF: Okay. All right. That's all
9       the questions I have.
10            MS. SCHOENING: Okay. I don't have any
11  questions.

_____
MICHAEL KRAFT

- - -

DEPOSITION CONCLUDED AT 1:43 P.M.

- - -

Case: 2:11-cv-00165-WOB-JGW   Doc #: 32   Filed: 10/16/12   Page: 11 of 11 - Page ID#: 423

Lehman vs. St. Elizabeth            KRAFT (VOL.2)            8/13/2012

Page 125

1                    C E R T I F I C A T E

2    STATE OF OHIO            :
                              : ss
3    COUNTY OF HAMILTON       :

4              I, Barbara A. Thacker, RPR, the
5    undersigned, a duly qualified and commissioned notary
6    public within and for the State of Ohio, do hereby
7    certify that, before giving of the aforesaid
8    deposition, MICHAEL KRAFT, was by me first duly sworn
9    to depose the truth, the whole truth, and nothing but
10   the truth; that the foregoing is the deposition given
11   at said time and place by MICHAEL KRAFT; that said
12   deposition was taken in all respects pursuant to
13   stipulations of counsel hereinbefore set forth; that I
14   am neither a relative of nor employee of any of their
15   counsel, and have no interest whatever in the result of
16   the action.  I further certify that I am not, nor is
17   the court reporting firm with which I am affiliated,
18   under a contract as defined in Civil Rule 28(D).
19              IN WITNESS WHEREOF, I hereunto set my hand
20   and official seal of office at Cincinnati, Ohio, this
21   _2ND_ day of _September_, 2012.

22                              _Barbara A. Thacker_
23   My Commission Expires:    BARBARA A. THACKER, RPR
     May 17, 2013              Notary Public - State of Ohio
24

