Case: 2:11-cv-00165-WOB-JGW   Doc #: 33   Filed: 10/16/12   Page: 1 of 23 - Page ID#: 431

Lehman vs. St. Elizabeth                OSCADAL                     7/23/2012

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

----------------------------------
                                    :
ROBERT LEHMAN,                      :
                                    :
              Plaintiff,            :
                                    :
         vs.                        :   CASE NO.
                                    :   2:11-cv-00165
ST. ELIZABETH HEALTHCARE,           :
                                    :
              Defendant.            :
                                    :
----------------------------------


         DEPOSITION OF:   MARTIN OSCADAL

         TAKEN:           By the Plaintiff

         DATE:            July 23, 2012

         TIME:            Commencing at 9:00 a.m.

         PLACE:           Offices of:
                          DRESSMAN, BENZINGER,
                          LaVELLE, PSC
                          207 Thomas More Parkway
                          Crestview Hills, KY  41017

         BEFORE:          Barbara A. Thacker, RPR
                          Notary Public-State of Ohio
                        (Jurisdiction of Notary Waived)

Lehman vs. St. Elizabeth                    OSCADAL                    7/23/2012

---

Page 2

1   APPEARANCES:
2       On behalf of the Plaintiff:
3           KATHERINE DAUGHTREY NEFF, ESQ
            of
4       Freking & Betz, LLC
        525 Vine Street
5       Sixth Floor
        Cincinnati, Ohio  45202
6       Email: kneff@frekingandbetz.com
7       On behalf of the Defendant:
8           KELLY A. SCHOENING, ESQ.
            of
9       Dressman, Benzinger, LaVelle, PSC
        207 Thomas More Parkway
10      Crestview Hills, KY  41017
        Email: kschoening@dbllaw.com
11
        Also Present:  Robert Lehman
12              Lisa Blank (St. E. Rep)
13                  - - -
14
15
16
17
18
19
20
21
22
23
24

---

Page 3

1               I N D E X
2   MARTIN OSCADAL                      PAGE
3   CROSS-EXAMINATION BY MS. NEFF            4
4   EXAMINATION BY MS. SCHOENING             -
5
6               E X H I B I T S
7   OSCADAL EXHIBITS        MARKED    REFERENCED
8       1           23
9       2           26
10      3           29
11      4           31
12      5           32
13      6           35
14      7           45
15      8           51
16      9           53
17      10          55
18      11          72
19
20
21
22
23
24

---

Page 4

1                   MARTIN OSCADAL
2   of lawful age, a witness herein, being first duly sworn
3   as hereinafter certified, was examined and deposed as
4   follows:
5               CROSS-EXAMINATION
6   BY MS. NEFF:
7       Q.      Good morning.
8       A.      Good morning.
9       Q.      Could you please state your full name, for
10  the record?
11      A.      It's Martin Oscadal, O-S-C-A-D-A-L.
12      Q.      Okay.  And I know I just introduced myself
13  to you.  My name is Kati Neff.  I represent Bob Lehman
14  in his lawsuit against St. Elizabeth.  Have you ever
15  been deposed before?
16      A.      Yes.
17      Q.      More than one time?
18      A.      I think so, but I don't remember.
19      Q.      When was the last time that you were
20  deposed?
21      A.      Maybe eight or nine years ago.
22      Q.      Okay.  Well, you'll probably be somewhat
23  familiar with the format then, as well as I'm sure
24  St. Elizabeth's counsel has explained to you exactly

---

Page 5

1   what is going to happen today.
2           I'm going to ask a series of questions.  I
3   ask that you give a verbal response.  Please say "yes"
4   or "no," as opposed to nodding your head or saying
5   "um-hmm" or "huh-uh."  That way, Barb, our court
6   reporter here, can record your testimony accurately.
7           Please make sure to not start to answer
8   your question until -- to answer my question until I am
9   finished with my question.  That way you and I are not
10  talking over one another.
11          And, if for some reason, I start to ask
12  another question and you are not finished with your
13  answer, let me know you weren't finished.  It's not my
14  intention to cut you off.  Okay?
15      A.      Okay.
16      Q.      If you need a break at any time, please
17  just let me know.  I just ask if there's a question
18  pending, you go ahead and answer the question before we
19  take a break.  All right?
20      A.      Okay.
21      Q.      The previous deposition you said that you
22  gave, approximately eight years or so ago, was that
23  something related to your employment with
24  St. Elizabeth?

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    OSCADAL                    7/23/2012

## Page 6

1    A.    No.
2    Q.    Okay.  And when did you start working for
3  St. Elizabeth?
4    A.    August 1, 2005.
5    Q.    Okay.  And what position were you hired
6  for?
7    A.    At that time, it was Vice-President for
8  Human Resources.
9    Q.    Okay.  What is your current position?
10    A.    Senior Vice-President for Human Resources.
11    Q.    And have you held any other positions with
12  St. Elizabeth since August 1, 2005, other than VP of HR
13  and Senior VP of HR?
14    A.    No.
15    Q.    Did you do anything to prepare for your
16  deposition today?
17    A.    I had a prep meeting with Kelly.
18    Q.    And when was that meeting?
19    A.    Friday, I believe.
20    Q.    Approximately how long was that meeting?
21    A.    I think it was less than an hour.
22    Q.    Okay.  Did you review any documents during
23  that meeting?
24    A.    No.

## Page 7

1    Q.    Okay.  Had you reviewed any documents
2  prior to your meeting with Kelly, in preparation for
3  your deposition?
4    A.    No.
5    Q.    Other than speaking with Kelly, have you
6  spoken with anyone else about your deposition?
7    A.    No.
8    Q.    Okay.  All right.  What is your current
9  address?
10    A.    ███████████ -- that's one word -- Way,
11  Florence, Kentucky, 41042.
12    Q.    How long have you lived at that address?
13    A.    Since August, 2005.
14    Q.    Prior to working for St. Elizabeth, I
15  assume that you had some Human Resources experience?
16    A.    Yes.
17    Q.    Otherwise, you probably wouldn't have been
18  hired as VP of HR, right?
19    A.    Correct.
20    Q.    How long have you been in the Human
21  Resources field?
22    A.    Since October of 1977.
23    Q.    Okay.  And do you have any degrees in
24  Human Resources?

## Page 8

1    A.    Yes.  I have a Master's degree in Labor
2  and Industrial Relations from Michigan State
3  University.
4    Q.    When did you receive that?
5    A.    December, 1976.
6    Q.    What's your undergrad degree in?
7    A.    History.
8    Q.    And did you have experience in Human
9  Resources for hospitals or medical facilities prior to
10  coming to work for St. Elizabeth?
11    A.    Yes.
12    Q.    Now, since achieving your Master's in
13  December of 1976, have you taken any further courses or
14  training on Human Resources subjects?
15    A.    I have attended conferences and seminars,
16  and I also have the SHRM, Senior Professional Human
17  Resource certification.
18    Q.    When did you receive that?
19    A.    I think about six years ago.
20    Q.    Okay.
21    A.    I think in 2006.
22    Q.    And you're still certified as a Senior
23  Professional with SHRM?
24    A.    I'm waiting for the approval, because it

## Page 9

1  expired June 30, and I filed for the recertification,
2  and I haven't heard back yet.  As far as I know, I am.
3    Q.    Okay.  Do you have to take some courses in
4  order to obtain that recertification?
5    A.    Yes.  Every three years you have to have a
6  minimum of 60, basically, CEUs approved by the -- I
7  think it's the Institute for Human Resources, but it's
8  affiliated with SHRM.  And 15 of those have to be
9  strategic.
10    Q.    Okay.  And in the last three years, have
11  you taken any -- you said they are CEUs?
12    A.    Yeah, I think so.  I'm not sure how they
13  actually phrase them or call them.
14    Q.    Okay.  We'll just call them, like you
15  said.  60 hours?
16    A.    Yes.
17    Q.    Okay.  In the last three years, have you
18  accumulated any hours related to the
19  anti-discrimination laws?
20    A.    Yes.
21    Q.    Okay.  Have any of those related to the
22  Americans with Disabilities Act?
23    A.    Yes.
24    Q.    And in your position as a Senior

3 (Pages 6 to 9)

Lehman vs. St. Elizabeth                         OSCADAL                          7/23/2012

Page 10

1    Vice-President of HR, do you have any responsibility
2    for assisting employees with obtaining or requesting a
3    reasonable accommodation?
4        A.    Not on a daily basis.  There may be issues
5    that come up to me, but I don't have it on a day-to-day
6    basis.
7        Q.    Is Employee Health generally responsible
8    for that?
9        A.    They are responsible for identifying that
10   accommodations may be necessary.  But then, what the
11   accommodations are would be determined between Employee
12   Health and Human Resources.
13       Q.    Okay.  And as the Senior Vice-President of
14   HR, have you had occasions where you had to work with
15   Employee Health to determine whether or not the
16   hospital was going to accommodate an employee?
17       A.    If I got involved, it usually would
18   involve my working with Lisa.  And when I say "Lisa,"
19   Lisa Blank, or her staff, working with Employee Health.
20       Q.    Okay.  When did you become the Senior VP
21   of HR?
22       A.    February of 2009, I believe.
23       Q.    Okay.  And Lisa Blank reports to you?
24       A.    That's correct.

Page 11

1        Q.    Does anyone else report directly to you?
2        A.    Yes.
3        Q.    Who else?
4        A.    Marianne Tait, who's the Director of
5    Compensation and Benefits, and Tom Ottke, who's the
6    Director of  Education, and my assistant.
7        Q.    And I'm sorry, what was Tom's last name?
8        A.    Ottke, O-T-T-K-E.
9        Q.    You said he's the Director of Education?
10       A.    Education.
11       Q.    Do you have an Administrative Assistant
12   who reports to you?
13       A.    Yes.
14       Q.    Is Employee Health considered a Human
15   Resources function?
16       A.    No.  It does not report up through me.
17       Q.    Okay.  Do you know who it reports up
18   through?
19       A.    Yes.  It reports to Paula Roe.
20       Q.    And "Paula?"
21       A.    Paula.
22       Q.    What is Paula's position?
23       A.    I don't remember her exact title, but
24   she's over our Grant County facility, our Covington

Page 12

1    facility, Business Health, Employee Health, and EAP.
2        Q.    Okay.  Do you know what the difference is
3    between Employee Health and Business Health?
4        A.    Business Health is a service that we sell
5    to other clients, and Employee Health takes care of
6    only the associates of St. Elizabeth.
7        Q.    Got it.  Okay.  All right.  How have your
8    responsibilities changed between the Vice-President of
9    HR position and the Senior Vice-President of HR
10   position?
11       A.    They really haven't.
12       Q.    They haven't?  Okay.
13       A.    The title change occurred for a number of
14   Vice-Presidents after the merger with St. Luke's in
15   2008.  It basically had to do with more scope and a
16   larger number of associates and so on.
17       Q.    Got it.  Okay.  And are the HR employees
18   that report to you, are they located in Edgewood -- at
19   the Edgewood location?
20       A.    Most of them are.
21       Q.    Okay.  Do you have any responsibility for
22   ensuring that St. Elizabeth's managers are trained on
23   St. Elizabeth's anti-discrimination policies?
24       A.    Yes.

Page 13

1        Q.    And can you describe what your
2    responsibility is, as it relates to that?
3        A.    Again, coordinating through Lisa Blank and
4    Tom Ottke on the education side, they would ensure that
5    it would be a component of the management education.
6        Q.    Okay.  Do you have any -- strike that.
7              You were involved in Bob Lehman's
8    termination; is that correct?
9        A.    Yes.
10       Q.    How often would you say that you are
11   involved in termination decisions at St. Elizabeth?
12       A.    I am involved in all of them.
13       Q.    Okay.  And has that been consistent since
14   you started in August of '05?
15       A.    It has.
16       Q.    Okay.  And what was your involvement in
17   Bob's termination?
18       A.    I was involved in making that decision.
19       Q.    Okay.  And was anyone else involved in
20   making that decision, besides yourself?
21       A.    Yes.
22       Q.    Who else was involved?
23       A.    John DuBis, Doug Chambers, Mike Kraft,
24   Lisa Blank, and myself all had input.

4 (Pages 10 to 13)

Lehman vs. St. Elizabeth                    OSCADAL                    7/23/2012

Page 14

1    Q.    And did you meet specifically with John
2  DuBis prior to making the termination decision, to
3  discuss whether he was going to get a Level 3 or he was
4  going to be terminated?
5    A.    I had a discussion with John, yes.
6    Q.    What did John say during that discussion?
7    A.    I don't recall specifically what he said.
8  We discussed the fact that Bob had been sleeping on
9  duty.  At that point, I believe we had the information
10  back from Employee Health indicating that there was no
11  medical reason that would cause him to fall asleep at
12  work.
13        And we discussed the fact that -- the
14  seriousness of the fact was exacerbated or compounded
15  by the fact that Bob is a Security Officer.  And he's a
16  Supervisor in Security, and that there were no medical
17  mitigating factors.
18        The only thing that we potentially
19  discussed as a mitigating factor was his length of
20  service.  John felt very strongly that sleeping on the
21  job was not an acceptable behavior, for any associate,
22  but more importantly for a Security Officer and a
23  Supervisor in Security.
24    Q.    Okay.  And so you believe this

Page 15

1  conversation occurred after receiving the information
2  from Employee Health, and it was made -- this
3  conversation occurred prior to telling Bob that his
4  employment was being terminated?
5    A.    I know it occurred prior to Bob being
6  informed of the decision -- of him being told of the
7  decision of being terminated.  And I believe -- yes, I
8  strongly believe it occurred after we had the Employee
9  Health information.
10    Q.    Okay.  So is it your testimony that John
11  DuBis was the ultimate decision-maker on this
12  termination?
13    A.    No.  After my discussion with John, I had
14  a discussion with Doug Chambers, and after considering
15  all of the circumstances, I told Doug that it was my
16  very strong belief and opinion that we needed to move
17  forward and terminate Bob's employment.
18    Q.    Okay.  Did you tell him that John DuBis
19  agreed with you?
20    A.    I believe I did, yes.
21    Q.    Okay.  Now, when you first spoke with
22  John, did you give him your own recommendation for what
23  to do with Mr. Lehman?
24    A.    During the discussion that I just

Page 16

1  referenced, no.  We were just discussing the facts of
2  the case, and he was giving me his opinion as to what
3  he thought should occur.
4    Q.    Okay.  Had you formed your own opinion at
5  that point?
6    A.    Not totally, no.
7    Q.    All right.  And then, when you told Doug
8  Chambers that it was your strong belief that Mr. Lehman
9  should be terminated, what did he say?
10    A.    He agreed.
11    Q.    Okay.  All right.  You also mentioned that
12  Mike Kraft was involved in the termination decision?
13  Did you have any direct conversations with Mike Kraft
14  about the decision?
15    A.    None that I recall, at this time.
16    Q.    Okay.  And did you find out about the
17  accusation that Mr. Lehman had been sleeping from Lisa
18  Blank?
19    A.    I believe I did, yes.
20    Q.    Okay.  So I assume you had some
21  conversations with Lisa about the circumstances?
22    A.    Yes.
23    Q.    Okay.  Did Lisa give you her opinion as to
24  whether or not she thought Bob should be terminated?

Page 17

1    A.    I don't recall specifically her providing
2  her opinion.  I know we talked about the facts and the
3  circumstances surrounding it, and Lisa kept me
4  up-to-date as things were occurring.  And then, for
5  example, that Bob was going to a fitness-for-duty exam
6  with Employee Health.  And then, after the results came
7  back, Lisa shared the results with me.
8    Q.    Okay.  Is it your understanding that you
9  found out about the allegation regarding Bob Lehman
10  before he went through Employee Health or the
11  fit-for-duty exam?
12    A.    Yes.
13    Q.    Okay.  And was that through a telephone
14  conversation with Lisa or was there an e-mail that she
15  sent you?  If you can remember.
16    A.    I don't remember specifically.  But
17  normally, Lisa will just come into my office and talk
18  to me.
19    Q.    Okay.  And what can you remember, if
20  anything, from your initial conversation with Lisa
21  regarding the allegations?
22    A.    I believe when I first learned of it, Lisa
23  advised me that it had been reported that Rob had been
24  sleeping.  I believe she told me that it had been

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                           OSCADAL                              7/23/2012

Page 18

1    reported by Ken Rasor, but that it also -- and I don't
2    remember if this was in the first or second
3    conversation, but I know she told me that there was
4    another witness -- I am drawing a blank on her name,
5    but the department secretary.
6          And that she actually did confirm that she
7    had seen Bob sleeping, and I want to say on two
8    occasions, but at least one occasion.
9          Q.    Okay.  Did Lisa tell you, at that point,
10   whether or not Bob had admitted to sleeping?
11         A.    I don't recall.
12         Q.    Okay.  Did Lisa ever indicate to you -- at
13   some point, did you learn that Bob had been spoken to
14   and that he had admitted to sleeping while on break?
15         A.    I don't recall specifically.  I do have
16   some recollection that at one point, Bob claimed that
17   it was on break.  So if he did, then he must have
18   said -- at some point, I do remember getting told, but
19   I don't remember the sequence that he did claim that he
20   was sleeping, but it was on break.
21         Q.    Okay.  And do you know whether anyone was
22   able to disprove that?
23         A.    I don't recall.
24         Q.    Okay.  Were you aware that there had been

Page 19

1    some performance issues with Ken Rasor, prior to him
2    reporting the allegation about Bob?
3          A.    Yes.
4          Q.    How had you become aware of that?
5          A.    Through Lisa Blank, and I don't recall if
6    I specifically had a conversation with Roxann Platek,
7    but I know she was working with Mike Kraft and Ken
8    Rasor on those issues.  But again, most of my
9    information comes from Lisa Blank.
10         Q.    Okay.  Do you have, like, a weekly meeting
11   with Lisa to kind of discuss what is going on in the
12   areas that she manages?
13         A.    It's not weekly, but we have a regular
14   meeting.  But we also just do things ad hoc, too.  Our
15   offices are almost right next to each other.
16         Q.    At the time that you spoke with
17   John DuBis, were you aware that there had been some
18   other employees around the same period of time who had
19   been accused of sleeping, or witnessed sleeping?
20         A.    I don't recall.
21         MS. SCHOENING:  Okay.  We can move to
22   conference room two.  It's a little smaller, but
23   the air is working.  It's up to you guys.
24         MS. NEFF:  Let's do a little bit more.

Page 20

1          We'll take a break and then we'll move in there.
2          Q.    And you mentioned that Lisa and/or Roxann
3    Platek had made you aware that there had been some
4    concerns with Ken Rasor's performance.  What was your
5    understanding of his performance issues at that time?
6          A.    I don't recall specifically what they
7    were.  But I know that there were regular meetings
8    occurring with Ken, Mike, and Roxann regarding those
9    issues.
10         Q.    Okay.  Are you familiar with a former
11   St. Elizabeth employee by the name of Gerald Hynko?
12         A.    Yes.
13         Q.    And Mr. Hynko, his last job with
14   St. Elizabeth, was he Director of Employee Health?
15         A.    He was over both Business Health and
16   Employee Health.
17         Q.    Okay.  And were you aware that during the
18   fit-for-duty process, that Mr. Hynko met with
19   Mr. Lehman to discuss his medical issues?
20         A.    I wasn't aware of that until Friday.
21         Q.    Okay.  You mentioned that you have had at
22   least some -- I don't know if "class" is the right
23   word, but some kind of training on the Americans with
24   Disabilities Act.

Page 21

1          If Gerald Hynko had told Bob Lehman that
2    he could not be disciplined if his diabetes had caused
3    his sleeping, would you agree with that statement?
4          MS. SCHOENING:  Objection.  You can
5          answer, if you can.
6          A.    I would be hesitant to accept that without
7    a physician's determination to that situation.  I'm not
8    a doctor, but there's a lot of people with diabetes,
9    actually, that we employ, and we don't have that issue
10   with them.
11         So, you know, that's one reason why we
12   sent Bob to the physician to be examined, because he
13   claimed that -- the reason we sent Bob for the
14   fitness-for-duty exam was because he claimed that his
15   medical condition or conditions caused him to fall
16   asleep.
17         Until that point in time, we had no reason
18   to believe that there were any issues, and that's why
19   we sent him to the physician.  And then, based on the
20   physician's determination, that none of his medical
21   conditions would cause him to fall asleep.  That's the
22   determination we took, as opposed to whatever Gerald
23   may or may not have said to Bob.
24         Q.    Dr. Haskell is the one who examined Bob;

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    OSCADAL                    7/23/2012

---

Page 22

1   is that correct?
2        A.    That's my understanding, yes.
3        Q.    He is employed by St. Elizabeth, or at
4   least was at that time?
5        A.    He was.  And I believe still is.
6        Q.    Okay.  And do you know approximately how
7   long Dr. Haskell examined Bob?
8        A.    I do not.
9        Q.    Okay.  Have you ever read Dr. Haskell's
10  report?
11       A.    I don't believe I have.
12       Q.    You said that you became aware that Gerald
13  Hynko had met with Bob Lehman to discuss his medical
14  issues on Friday.  If you became aware of that through
15  something that Ms. Schoening told you, you know,
16  obviously, I mean, I'm going to ask you that, and she
17  can decide if she wants to object.  Is that how you
18  became aware of it?
19       MR. SCHOENING:  Objection.  You know, it's
20       attorney/client privilege.  I'm going to instruct
21       him not to answer that.
22       Q.    The only reason I ask that is because
23  there might be some documents that may have given that
24  impression to you.  Earlier, you said you hadn't

---

Page 23

1   reviewed any documents.  I guess what I'm trying to
2   determine is -- I'll ask this first.  Okay.  Did you
3   become aware of Gerald Hynko meeting with Bob Lehman
4   initially to discuss his medical issues through a
5   document that you have seen in the last week or so?
6        A.    No.
7        Q.    Okay.  And this information -- did you
8   learn that information last Friday during your meeting
9   with counsel?
10       MS. SCHOENING:  Objection.  I'm going to
11       instruct him not to answer that.
12       Q.    Okay.  Did you learn this information on
13  your own?
14       A.    No.
15       Q.    Okay.  Did you learn this information from
16  speaking with anyone who works for St. Elizabeth?  Is
17  an employee at St. Elizabeth?
18       A.    No.
19       Q.    Okay.
20             (Oscadal Deposition Exhibit No. 1 was
21             marked for identification.)
22       Q.    You pronounce your name "Oscadal?"
23       A.    Yes.
24       Q.    Mr. Oscadal, you have been handed what was

---

Page 24

1   marked as Exhibit 1 to your deposition.  What I'd like
2   to do is focus on the first e-mail, which is actually
3   the bottom e-mail, dated September 9, 2010, at 10:02
4   a.m., from Roxann to you.  Do you remember receiving
5   this e-mail from Roxann?
6        A.    No, I don't have a specific recollection
7   of receiving it.
8        Q.    Okay.  At the top, it says, "Thanks.
9   Marty.  Sent from iPhone."  As of September of 2010,
10  did you have an iPhone?
11       A.    Yes.
12       Q.    Do you have any reason to doubt that you
13  responded to this e-mail from Roxann?
14       A.    No, I don't have any reason to doubt it.
15       Q.    Okay.  And in Roxann's e-mail to you, she
16  notes that she has spoken with Gerald Hynko about Bob
17  Lehman and his visit to Employee Health, and that
18  Gerald Hynko believed at that time that there was a
19  medical reason for Mr. Lehman falling asleep on his
20  job, and that he tied it to the ADA.
21             Did you have any follow-up conversation
22  with Mr. Hynko about what Roxann told you in this
23  September 9, 2010 e-mail?
24       A.    I don't recall having any conversations

---

Page 25

1   with Mr. Hynko about this.  It does say that Bob is
2   being sent to see Dr. Haskell on Monday.  But I don't
3   have a recollection of receiving the e-mail, and I
4   don't have a recollection of what, if anything, I did
5   as a follow-up to it.
6        Q.    Okay.  Do you know -- there's a reference
7   here that Gerald plans to put Bob immediately on
8   short-term disability.  Do you know whether he was
9   placed on short-term disability?
10       A.    I don't recall if he was or not.
11       Q.    Okay.  And then Roxann, who's relaying
12  what Gerald has told her, goes on to state that, "He
13  said the question will be how HR wants to handle these
14  situations, as he has three like this.  He's suggesting
15  perhaps we consider an alternative work agreement with
16  compliance with healthcare to continue in position."
17             Do you know what the other situations
18  Gerald was referring to were?
19       A.    I don't have a recollection as to what
20  those were, no.
21       Q.    Okay.  Do you believe that you discussed
22  the information that was included in Roxann's e-mail to
23  you -- and it looks like Lisa Blank was also copied, do
24  you believe you discussed the information with Lisa?

AMS DEPO
(513) 941-9464     amsdepo@fuse.net     Cincinnati, Ohio

Lehman vs. St. Elizabeth                    OSCADAL                        7/23/2012

Page 26

1      A.    I may have, but I don't have a
2  recollection of doing so.
3      Q.    Okay.  So sitting here today, you can't
4  remember what, if anything, you did to follow up on
5  this information that you received from Roxann?
6      A.    No.  I don't have a recollection what, if
7  anything, I did.
8      Q.    Okay.
9            (Oscadal Deposition Exhibit No. 2 was
10           marked for identification.)
11     Q.    All right.  Mr. Oscadal, you've been
12  handed what has been marked as Exhibit 2 to your
13  deposition.  I'd like you to focus on the top e-mail to
14  you -- from you to Roxann and to Lisa.  In which it
15  appears that you say, "Lisa, we need to get that
16  meeting scheduled with Gerald ASAP.  Thanks, Marty."
17  Do you remember sending the e-mail to Lisa?
18     A.    No, I don't.
19     Q.    And based on this e-mail, does that help
20  refresh your recollection at all as to whether or not
21  you and/or Lisa spoke with Gerald Hynko?
22     A.    It doesn't, but this e-mail is prior to
23  the first e-mail that you gave me.  So based on the
24  information I got from Roxann in Exhibit 1 -- I don't

Page 27

1  know.  We may or may not have decided that meeting with
2  Gerald wasn't necessary until we heard from
3  Dr. Haskell.  But I can't say that with specificity.
4            MS. NEFF:  Okay.  All right.  Why don't we
5        go ahead and take a break?
6            (At which time, a recess was taken from
7        9:37 a.m. until 9:56 a.m.)
8            MS. NEFF:  Back on the record.
9      Q.    Mr. Oscadal, earlier, you testified that
10  the hospital has several employees who are diabetic.
11  Do you know whether diabetes affects everyone the same?
12     A.    No.  I'm not medical.  I don't know.  I
13  just know we have a lot of diabetic associates, or at
14  least people that are covered under our health plan,
15  because I'm responsible for our health plan.
16     Um-hmm (nodding head affirmatively).  How
17  do you know that they are diabetic?
18     A.    I don't know who they specifically are,
19  but in aggregate numbers, we know we have a number of
20  people that have that diagnosis.  And, for example,
21  this year, we made some plan design changes to reduce
22  copays and prescription costs for that specific
23  diagnosis.
24     Q.    Are you self-insured?

Page 28

1      A.    Yes.
2      Q.    Okay.  Do you also have employees who have
3  sleep apnea?
4      A.    Yes, but I don't know how many.  That's
5  not a specific diagnosis that we've looked at.  It is
6  not in the higher end of number of employees or covered
7  lines, I should say.
8      Q.    All right.  You are familiar with
9  St. Elizabeth's disciplinary policy?
10     A.    Yes.
11     Q.    Okay.  And the disciplinary policy that
12  was in effect at the time Mr. Lehman was terminated
13  indicated that for the first offense for sleeping while
14  on duty, an employee would receive a Level 3; is that
15  correct?
16     A.    That's my recollection, yes.
17     Q.    And what is a Level 3?
18     A.    It's a final notice, where if anything
19  further happens within a specified period of time, any
20  level of discipline, the person would be terminated.
21  And if it's performance-related, they may be put on a
22  specific work improvement plan.
23     Q.    Okay.  Would a manager need to speak with
24  Human Resources prior to issuing a Level 3 to an

Page 29

1  employee?
2      A.    Generally speaking, that's my
3  understanding, that they would speak with an HR Advisor
4  and/or Lisa, depending on the circumstances.
5      Q.    Okay.  All right.  Are you familiar with a
6  former employee who's a registered nurse, by the name
7  of Amanda Rickey?
8      A.    No, not that I recall.
9      Q.    I know there's quite a few employees
10  within St. Elizabeth.  So what I'll do is I'm going to
11  show you -- let's mark this.
12           (Oscadal Deposition Exhibit No. 3 Was
13           marked for identification.)
14     Q.    You've been handed what has been marked as
15  Exhibit 3 to your deposition.  Are you familiar with
16  this e-mail at all?  And take as much time as you need.
17     A.    (Witness reviewing document).  I mean, I
18  don't remember the situation specifically.
19     Q.    Do you have any reason to doubt that you
20  received this e-mail from Shauna Dynes?
21     A.    No, I don't have any reason.
22     Q.    Okay.  Shauna Dynes is listed as a Human
23  Resources Advisor?
24     A.    Yes.

8 (Pages 26 to 29)

Lehman vs. St. Elizabeth                    OSCADAL                    7/23/2012

Page 30

1    Q.    Is she still working for St. Elizabeth?
2    A.    Yes.
3    Q.    Does she have a specific department or
4  area that she provides Human Resources advice for?
5    A.    Yes.
6    Q.    And what is that?
7    A.    I don't recall.  She has responsibility
8  for specific nursing units.
9    Q.    Okay.
10   A.    There are four HR Advisors that are
11 responsible for the Nursing Division, and then there's
12 four HR Advisors that are responsible for the Allied
13 Health Departments and the non-nursing.
14   Q.    Does Shauna report to Lisa Blank?
15   A.    She does.
16   Q.    In the last paragraph of this e-mail
17 Shauna notes that -- she states, "Recently, our
18 disciplinary policy changed and now unauthorized
19 sleeping, grounds for termination on the first
20 offense."  When did the policy change?
21   A.    I don't recall specifically.  I'd have to
22 actually see the policy to know the effective date of
23 the change.  But I believe it was late 2010 or early
24 2011.

Page 31

1    Q.    Okay.  Now, this e-mail is dated January
2  13, 2011.  So is it safe to assume that the policy
3  changed by January 13?
4    A.    I would assume that, based on this e-mail.
5    Q.    And the policy -- I believe you testified
6  earlier, at the time that Mr. Lehman was terminated,
7  the discipline for the first offense was a Level 3?
8    A.    That's what was in the policy.
9    Q.    Right.
10   A.    Yes.
11   Q.    And it looks like according to Shauna's
12 e-mail, that Amanda Rickey had been -- had received a
13 Level 3 counseling for unauthorized sleeping at work in
14 August of 2010; is that correct?
15   A.    Yes, it says that.
16   Q.    Other than what's included in this
17 e-mail, can you remember anything else about the
18 decision to terminate Amanda Rickey?
19   A.    Not that I recall at this time.
20   Q.    Okay.
21         (Oscadal Deposition Exhibit No. 4 was
22         marked for identification.)
23   Q.    All right.  Mr. Oscadal, you have been
24 handed what has been marked as Exhibit 4 to your

Page 32

1  deposition.  What I'd like for you to do is tell me if
2  you know who, in Human Resources, may have assisted
3  Sandra McCormick in providing Amanda Rickey this Level
4  3 counseling, if you know?
5    A.    Unless the areas of responsibilities
6  switched between this time and August of 2010, and
7  January 13, it would have been Shauna Dynes.
8    Q.    Okay.  And do you have any recollection of
9  discussing with either Lisa Blank or Shauna, giving
10 Amanda Rickey a Level 3 counseling in August of 2010?
11   A.    I do not.
12   Q.    Okay.  And according to -- and take as
13 much time as you need.  According to this document,
14 Amanda was found sleeping in a -- I think an empty
15 patient room.  She was found by the House Supervisor;
16 is that correct?
17   A.    That's what it says, yes.
18   Q.    Okay.  And does that indicate anywhere
19 that Amanda was sleeping during her break time?
20   A.    No.
21   Q.    Okay.
22         (Oscadal Deposition Exhibit No. 5 was
23         marked for identification.)
24   Q.    All right.  You've been handed what has

Page 33

1  been marked as Exhibit 5 to your deposition.  Do you
2  remember the circumstances related to Robert Gordon
3  Landers being accused of sleeping?
4    A.    I think I do recall this one, yes.  This
5  occurred at Florence.  I do have some recollection of
6  this one.
7    Q.    Okay.  And according to Roxann's e-mail,
8  it appears that some nurses had initially reported him
9  sleeping, and then later, Mike went to Florence and
10 actually found him sleeping; is that correct?
11   A.    That's what this says, yes.
12   Q.    And do you know whether -- this refers to
13 him sleeping in his car and/or his truck.  Do you know
14 whether that was the security truck or his own personal
15 truck?
16   A.    It's my recollection it was the security
17 vehicle.
18   Q.    Okay.  And do you recollect as to whether
19 Robert was supposed to be patrolling in the security
20 vehicle at the time that he was observed sleeping?
21   A.    My understanding is that he's either
22 supposed to be patrolling, or being parked where he
23 was, was not in itself inappropriate, because it was
24 change of shift.  At Florence, they are supposed to be

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                          OSCADAL                              7/23/2012

Page 34

1    visible in the parking lot.  At least as much as they
2    can be, if they don't have some other call or something
3    of that nature, and were being called away.
4        So being parked in the parking lot, in and
5    of itself, is my understanding is not an issue.  It was
6    the fact that he was sleeping in the vehicle.
7        Q.    Okay.  Was Robert Gordon Landers on a
8    break when he was in the security vehicle?
9        A.    Not that I'm aware of, no.
10       Q.    Could he take a break in the security
11   vehicle?
12       A.    That, I don't know.  If that would be
13   appropriate for him to get approval for that or not.  I
14   would think not, but I don't know for a fact.
15       Q.    Is it your understanding that Security
16   Officers, when they are in the security vehicle, should
17   either be patrolling or watching shift change?
18       A.    That's my understanding.
19       Q.    Okay.  And is it your understanding that
20   there should be a Security Officer doing -- strike
21   that.  Is it your understanding that there should be a
22   Security Officer always watching a shift change?
23       A.    I can't say that, no.
24       Q.    Okay.

Page 35

1        (Oscadal Deposition Exhibit No. 6 was
2        marked for identification.)
3        Q.    All right.  Mr. Oscadal, you have been
4    handed what has been marked as Exhibit 6 to your
5    deposition.  Are you familiar with the termination of
6    Cynda Carman?  And take as much time as you need.
7        A.    (Witness reviewing document).  I don't
8    remember the name, but I have some recollection of the
9    situation, simply because I was unfamiliar with a mayo
10   machine, so it kind of stuck out with me at the time.
11       Q.    You were unfamiliar with a what?
12       A.    It's in, like, the sixth line, "falling
13   asleep at the mayo," and that just kind of stuck out
14   with me.
15       Q.    What is a "mayo machine?"
16       A.    I still don't know.
17       Q.    Is it part of the surgery process?
18       A.    Apparently.
19       Q.    Okay.  And after that, Kerry Kleisinger --
20   she's another Human Resources Advisor?
21       A.    Correct.
22       Q.    And according to her e-mail, she indicates
23   that during the time that she was falling asleep, Cynda
24   was unable to give the surgeon what he needed.

Page 36

1        A.    That's what it says, yes.
2        Q.    And would that concern you for the safety
3    of the patient?
4        A.    Yes.
5        Q.    Okay.  And obviously, if Cynda was in the
6    middle of a surgery case, she was not on a break; is
7    that correct?
8        A.    That was my understanding, correct.
9        Q.    Okay.  And do you remember ever discussing
10   with Gerald Hynko, Cynda's either diagnosis or what his
11   recommendation was with respect to her?
12       A.    No.  I don't remember having a discussion
13   with Gerald.
14       Q.    Okay.  According to this document, Cynda
15   also completed a fit-for-duty evaluation.  And it looks
16   like she was actually asked to go through a sleep
17   study.  Does St. Elizabeth provide employees with the
18   ability to go through a sleep study?
19       A.    We do have a sleep study program.  I don't
20   know if she went through ours or not.
21       Q.    Okay.  I believe you testified earlier
22   that you generally would not be involved in the
23   discussions regarding whether an employee needs an
24   accommodation.  That often, if anyone from your

Page 37

1    department was involved, it would probably be Lisa
2    Blank?
3        A.    Normally.  Depending on the circumstances,
4    Lisa might run it by me.  But I can't say that I'm
5    involved in every situation that comes up where a
6    person may need some kind of accommodation.
7        Q.    Does St. Elizabeth have a policy related
8    to reasonable accommodations?
9        A.    I don't know that we have a specific
10   policy, but we look at them on a case-by-case basis.
11   Based on what the medical conditions are, what the
12   recommendation of the physician is, what the person
13   asked for.  You know, it has to be done with
14   consultation with the individual.
15       Q.    Okay.  Do you know whether -- if an
16   employee requests an accommodation, does he or she have
17   to go through a fit-for-duty exam?
18       A.    My understanding would be, yes, to
19   determine what the specific limitations are, unless
20   there's very specific documentation from their own
21   physician.  And if they have very specific information
22   from their own physician, then we may accept that.  We
23   may ask for a second opinion, or we may put them
24   through a fitness-for-duty, to determine specifically

10 (Pages 34 to 37)

Lehman vs. St. Elizabeth         OSCADAL         7/23/2012

Page 38

1 what the restrictions are, and then what the possible
2 accommodations would need to be.
3      Q.     Are you aware of any situations when a
4 physician's recommendation does not match the
5 recommendation of the doctor who performed the
6 fit-for-duty exam?
7      A.     Not that I recall.
8      Q.     Okay. I believe that you testified
9 earlier with respect to Ken Rasor and his performance
10 issues, that Mike Kraft and Roxann Platek were meeting
11 with Ken and attempting to address his performance
12 issues; is that correct?
13      A.     Yes.
14      Q.     Do you know whether Bob Lehman was also
15 attempting to address Ken's performance issues?
16      A.     I believe Bob was in those meetings, at
17 least initially.
18      Q.     Okay. Do you know whether Ken Rasor had
19 any ill will towards Bob Lehman?
20      A.     My understanding is the two of them did
21 not get along well.
22      Q.     Okay. Earlier, you testified about --
23 kind of described what a Level 3 was in the
24 disciplinary policy. What other levels are there?

Page 39

1      A.     There's informal counseling, there's Level
2 1, Level 2, Level 3 and termination.
3      Q.     Does St. Elizabeth use a progressive
4 discipline policy or practice?
5      A.     Generally speaking, yes. But there are,
6 of course, certain actions that can result in
7 termination on first offense, or a Level 3 on a first
8 offense, or a Level 2 on a first offense.
9      Q.     And prior to working for St. Elizabeth,
10 were you familiar with progressive discipline policies?
11      A.     Yes.
12      Q.     And do you think progressive discipline
13 policies are a good method or a good practice for
14 disciplining employees?
15      A.     Generally speaking, yes.
16      Q.     And why is that?
17      A.     Depending on the circumstances, if it's an
18 attendance issue or job performance issue, you want to
19 give the person an opportunity to improve.
20      Q.     When can -- I'm sorry. St. Elizabeth has
21 a dispute resolution or grievance process; is that
22 correct?
23      A.     Yes.
24      Q.     When can an employee grieve a disciplinary

Page 40

1 action?
2      A.     I don't have a recollection of that. Lisa
3 had talked about this all the time, but I don't always
4 remember. I know you can grieve a Level 2. I know you
5 can grieve a Level 3. I know you can grieve a
6 termination. I don't know if you can grieve a Level 1.
7 I don't recall. And at a certain level within the
8 organization -- and I don't recall exactly what level
9 it is, you can only go the administrative route of the
10 appeal process, as opposed to the Appeal Committee.
11      Q.     Okay. But you don't know when that is?
12      A.     I don't recall. I know Directors and
13 above. But Lisa and I always go back and forth as to
14 what level of management is included in that, in order
15 to go to the administrative level, as opposed to
16 committee.
17      Q.     And what is HR's role in the grievance
18 process?
19      A.     They put the binders together and they
20 explain the associate's rights under the process. They
21 attend committee meetings and/or the administrative
22 meetings. My recollection and understanding is at the
23 committee meetings, they do not have a vote. They are
24 there really to answer questions and to facilitate the

Page 41

1 process. I believe that once the committee gives
2 them -- identifies what their decision is, then they
3 actually write up the decision based on what they are
4 told. And then, I believe the same thing is true on
5 the administrative side.
6      Q.     Okay. When you say "administrative,"
7 you're talking --
8      A.     When I say "administrative," I'm
9 talking -- if they go the administrative -- if they go
10 the committee route, then once the committee makes a
11 decision, their recommendation, that recommendation,
12 goes up to the CEO, who's delegated to the senior
13 level.
14      The administrative route would mean that
15 you start with your Administrative Supervisor. You go
16 to your department head and then the VP/Senior
17 Vice-President, and then Chief Operating Officer.
18      So the administrative route, they would
19 attend those meetings, and the person can waive -- if I
20 recall correctly, the person can waive the meeting with
21 their immediate Supervisor and skip that step and go to
22 the next one.
23      Q.     Okay. Committee would be -- is that a
24 Peer Review Committee?

Case: 2:11-cv-00165-WOB-JGW    Doc #: 33    Filed: 10/16/12    Page: 12 of 23 - Page ID#: 442

Lehman vs. St. Elizabeth                  OSCADAL                      7/23/2012

Page 42

1   A.    Yes.  It's made up of a certain number of
2   managers and a certain number of staff level
3   associates.
4   Q.    Okay.  And you mentioned that HR would put
5   together the binders.  What do the binders include?
6   A.    The binders include all the relevant
7   documentation related to that specific situation and
8   would include previous discipline for the individual,
9   the documentation regarding the specific incident
10  that's being appealed.  Relevant information to what's
11  going to the committee, that the committee should know
12  in order to make a decision.
13  Q.    Okay.  Why does St. Elizabeth have either
14  the grievance or -- well, we'll use the grievance
15  process.
16  A.    That's fine.  In an effort to allow
17  associates to resolve specific types of situations
18  internally.
19  Q.    And you mentioned the role of HR -- you
20  said something about attending the committee, also the
21  administrative meetings.  And what would HR's function
22  be during those actual meetings?
23  A.    Mostly, to answer technical questions,
24  regarding either the process itself or whatever type of

Page 43

1   HR questions come up.  If there's a question, you know,
2   let's say the person was appealing a discipline for
3   violating the attendance policy, they would be there to
4   answer questions regarding attendance policy.  They
5   might answer questions about how other people have been
6   handled in similar situations.  It's really to answer
7   technical questions and provide technical support at
8   that point.
9   Q.    Okay.  And I think you indicated that HR
10  shouldn't provide their opinion during that process?
11  A.    That's my understanding.  Again, Lisa
12  Blank oversees that process fully on a day-to-day
13  basis.  She would be the better person to answer that.
14  But that's my understanding, that's not their
15  role.
16  Q.    Okay.  And would you expect the HR
17  employee to record by taking notes what was discussed
18  during the different meetings?
19  A.    I honestly don't know whether they take
20  notes during those meetings or not.
21  Q.    Okay.  And do you know whether the HR
22  employee involved in the grievance process is the same
23  HR employee who was involved in either the
24  investigation that led to the termination, or in the

Page 44

1   termination itself?
2   A.    I believe it generally is.  It may not
3   always be, depending on scheduling and the person might
4   be on vacation.  They might have another conflict.  But
5   my understanding is that it generally is the same
6   person --
7   Q.    Okay.
8   A.    -- since they are familiar with the
9   circumstances.
10  Q.    Should HR discourage employees from filing
11  a grievance?
12  A.    No, they shouldn't encourage them or
13  discourage them.  They should simply provide them with
14  what their options are.
15  Q.    Would you be concerned at all if you
16  learned that HR was influencing the grievance process?
17  A decision one way or the other?
18  A.    That's a difficult question to answer.  I
19  guess if they were inappropriately influencing, yes, I
20  would be concerned about that.  But again, their role
21  in the meeting, as I understand it, is supposed to be
22  neutral.
23  Q.    Okay.
24      (Oscadal Deposition Exhibit No. 7 was

Page 45

1       marked for identification.)
2   Q.    All right.  You've been handed what has
3   been marked as Deposition Exhibit 7.  Please take a
4   moment and review Exhibit 7, and let me know whether or
5   not you recognize it.
6   A.    (Witness reviewing document).  I don't
7   recall the e-mail.  I do recall the subject matter of
8   the e-mail.
9   Q.    Okay.  Do you have any reason to doubt
10  that you actually received this e-mail?
11  A.    No.
12  Q.    In Roxann's e-mail to you, the part in
13  parenthesis, she notes "to discuss Lehman and other
14  similar situations."  Can you recall, sitting here
15  today, what the other similar situations were?
16  A.    No, I don't.
17  Q.    Okay.  She goes on to note that it appears
18  "they'll" -- which is referring to Gerald Hynko and
19  Dr. Haskell -- "be recommending that no medical excuse
20  will be acceptable for falling asleep on the job except
21  narcolepsy."  What did you take that to mean?
22  A.    And that's -- I have a recollection of the
23  subject matter, because I remember being told -- well,
24  it must have been through this e-mail, but I remember

12 (Pages 42 to 45)

Case: 2:11-cv-00165-WOB-JGW    Doc #: 33    Filed: 10/16/12    Page: 13 of 23 - Page ID#: 443

Lehman vs. St. Elizabeth                    OSCADAL                    7/23/2012

Page 46

1    learning that Dr. Haskell was of the opinion that there
2    would be no medically acceptable reason for falling
3    asleep on the job, other than narcolepsy.
4        Q.    And did you have any discussions with
5    either Dr. Haskell or Gerald Hynko with respect to why
6    they were recommending that?
7        A.    I don't recall having discussions with
8    them. I do believe I discussed it with Lisa Blank.
9        Q.    Do you know whether any of the situations
10   that they were reviewing, as of September, 2010,
11   related to an employee falling asleep at work due to
12   narcolepsy?
13       A.    My recollection is that none of the
14   situations that we dealt with around that time involved
15   anybody suffering from narcolepsy.
16       Q.    In terms of how this recommendation
17   applies to this case, is it your understanding that had
18   Mr. Lehman been diagnosed with narcolepsy, that he
19   would not have been terminated?
20       A.    That's a reasonable assumption. That we
21   would have looked for some type of accommodation --
22   reasonable accommodation that would have allowed him to
23   perform the essential functions of his job, whether it
24   be some type of medication or some other type of

Page 47

1    accommodation. This would have provided -- had Bob
2    Lehman been diagnosed with narcolepsy, it would have
3    provided a medical reason for him falling asleep. Then
4    the next question would have been, "Okay. Can he
5    perform the essential functions of the job with
6    reasonable accommodations? If so, what are those
7    accommodations?"
8            So if we were able to accommodate him with
9    a diagnosis of narcolepsy, I would say, no, he would
10   not have been terminated.
11       Q.    Okay. Is it your understanding that
12   Dr. Haskell determined that there was no medical
13   condition that was causing Mr. Lehman to sleep?
14       A.    That's my understanding, yes.
15       Q.    Okay. The second part of the second
16   paragraph in this e-mail refers to the Security
17   Supervisor job description. Do you know whether the
18   Security Supervisor job description was ever changed
19   after September 14, 2010?
20       A.    I do not recall whether it was or wasn't.
21       Q.    Would that have been something you would
22   have been involved in?
23       A.    Not normally, no.
24       Q.    Okay. And the last sentence states,

Page 48

1    "Gerald said the actual duties would overrule the job
2    description, even if not current, if we were being
3    audited by the EEOC." Do you know why Gerald was
4    referring to potential audit by the EEOC?
5        A.    I don't.
6        Q.    Did you ever have any conversations with
7    Gerald to discuss his concerns about that?
8        A.    Not that I recall, no.
9        Q.    Okay. Do you know what he's referring to
10   in terms of "audited by the EEOC?"
11       A.    No. We were not being audited by the
12   EEOC, and we haven't been audited by the EEOC.
13       Q.    Did you speak with either Roxann or Lisa
14   about following -- about them following up with Gerald
15   regarding his concern about that?
16       A.    Not that I recall, no.
17       Q.    Okay. Do you know whether there's ever --
18   strike that.
19           Do you know if, during the time that Bob
20   Lehman worked at the Edgewood facility as a First Shift
21   Supervisor, if there have ever been any occasions where
22   there were only two Security Officers on duty?
23       A.    No. I'm not familiar with the staffing of
24   the Security Department.

Page 49

1        Q.    Okay. Do you know whether Bob Lehman ever
2    failed to respond to a call?
3        A.    No. I don't know that.
4        Q.    Were you aware that Mike Kraft believed,
5    at the time that Mr. Lehman was accused of sleeping,
6    that Mr. Lehman was performing all of his duties in a
7    timely manner, and he was satisfied with his
8    performance?
9        A.    That's my understanding, yes.
10       Q.    Okay. You mentioned earlier that at some
11   point, whether it was your first discussion with Lisa
12   or a subsequent discussion with Lisa, you learned that
13   both Ken Rasor and the secretary in the Security Office
14   had witnessed Mr. Lehman sleeping?
15       A.    Yes.
16       Q.    Do you know if anybody else was
17   interviewed about -- if they witnessed it?
18       A.    I don't recall, at this time, if other
19   people were interviewed or not.
20       Q.    Okay. Do you know whether Ken or -- I
21   think the secretary's name is Kim?
22       A.    Yes. That sounds right.
23       Q.    Do you know whether Ken or Kim were able
24   to identify Bob as sleeping at a time that was not his

13 (Pages 46 to 49)

Lehman vs. St. Elizabeth                    OSCADAL                    7/23/2012

---

Page 50

1    break time?
2        A.    I don't know if they were, and I don't
3    recall why, but our belief and understanding was that
4    he was not on break.
5        Q.    Okay.  But you don't know where that came
6    from?
7        A.    I don't know -- I don't recall why that
8    was my belief and understanding.
9        Q.    Okay.  Do you believe that you knew that
10   at the time?  Meaning, you had some basis for that
11   understanding, at the time that you were having
12   termination discussions with John DuBis and Doug
13   Chambers?
14       A.    At the time the decision was made to
15   terminate Bob, it's my recollection that we did not
16   believe -- let me personalize it.  I did not believe --
17   and it was not my understanding that Bob was sleeping
18   during an authorized or approved break period.
19       Q.    Okay.  Can you recall who may have told
20   that to you?
21       A.    I don't have a recollection as to why I
22   had that belief and understanding at that time.
23       Q.    Okay.  Did you have any involvement in
24   Bob's grievance that he filed?

Page 51

1        A.    Not that I recall, no.
2        Q.    The Employee Health Department, should
3    they be sharing the medical information that they
4    obtain through a fit-for-duty exam with Human
5    Resources?
6        A.    Normally, when a person goes through a
7    fitness-for-duty, they sign a release.  And assuming
8    that person signs a release, then it would be
9    appropriate for them to share.  And if the person
10   hasn't signed a release, then I'm not sure why they
11   would pursue the fitness-for-duty without signing the
12   release.  If they did for some reason, then it would be
13   appropriate for them to share whether the person needs
14   accommodation or has specific restrictions without
15   getting into the specific medical diagnosis.
16       Q.    Okay.
17             (Oscadal Deposition Exhibit No. 8 was
18             marked for identification.)
19       Q.    Before you start to look at Exhibit 8.
20   Why should Employee Health not share the specific
21   diagnosis?
22       A.    Confidentiality reasons.
23       Q.    Okay.  And because the employee signed a
24   release, are there no HIPAA concerns with Employee

Page 52

1    Health sharing the medical diagnosis?
2        A.    I'm not familiar with the specific release
3    they have the person sign, but I'm assuming that if the
4    person signs a release, then Employee Health will
5    release the information that's authorized by the
6    release and not more than that.
7        Q.    Okay.  All right.  You have been handed
8    what has been marked as Exhibit 8 to your deposition,
9    which appears to be a series of e-mails between Roxann,
10   you, and then Mike Kraft, Doug Chambers and Lisa Blank
11   are copied on these e-mails.  If you take a look at the
12   first e-mail, it appears that Roxann is letting you
13   know that Bob would like to initiate the dispute
14   resolution process.
15             Do you remember Roxann informing you about
16   that?
17       A.    I don't.
18       Q.    Okay.  And then it appears that you
19   responded with, "Remember that he is limited to the
20   administrative process."  How did you know at that
21   point that he was limited to the administrative
22   process?
23       A.    As I mentioned earlier, Lisa and I discuss
24   whenever there's an issue with a person in management,

Page 53

1    or termination of someone in management, you know,
2    who's eligible and who isn't for the committee level
3    and the administrative process.  So based on this -- I
4    don't have a specific recollection, but based on this,
5    I may have had a discussion with Lisa about what route
6    Bob would be able to pursue in the process, and based
7    on this, I would say that it was determined that he
8    would have the administrative process available to him.
9        Q.    And is it typical for you to be notified
10   when an employee has filed a grievance?
11       A.    Normally, Lisa will update me on them as
12   to whether we have something pending or not, because
13   they are not all that common.  So normally, she would
14   update me and let me know if we've gotten an appeal
15   filed or not.
16       Q.    Okay.
17             (Oscadal Deposition Exhibit No. 9 was
18             marked for identification.)
19       Q.    All right.  You've been handed what is
20   Exhibit 9 to your deposition.  Which appears to be
21   further e-mails, this time between you, Roxann, and it
22   looks like Mike Kraft and Lisa Blank, regarding Bob's
23   dispute request.  And if you start at the bottom, it
24   looks like an e-mail from you, dated September 27,

14 (Pages 50 to 53)

Lehman vs. St. Elizabeth                    OSCADAL                      7/23/2012

Page 54

1 2010, in which you ask Roxann to clarify if Bob is
2 seeking reinstatement, "as that is not clear from his
3 identified remedy." Do you think you were actually
4 looking at his written dispute request -- or dispute
5 resolution request?
6         A.    I think I did, because there were some
7 questions regarding the policy and whether -- sometimes
8 there's technical issues regarding the policy, in terms
9 of, is what the person is asking for in the appeal, can
10 it even be granted by the committee or can it be
11 granted under the policy? So there's some technical
12 questions. When those types of things come up, Lisa
13 will come to me to discuss them. And I think there was
14 a question regarding this, and I think Lisa passed me
15 his appeal.
16        Q.    Okay. And then in your later e-mail,
17 which you were just discussing, you go on to ask
18 whether or not Bob can proceed with the complaint if
19 the remedy requested is not one that can be provided
20 under the policy. Is it your understanding that Bob
21 changed his grievance to reflect that he was requesting
22 reinstatement?
23        A.    I don't recall.
24        Q.    Okay. Do you know whether he could have

Page 55

1 continued on with the grievance had he not changed it?
2         A.    I don't recall, because that's why I asked
3 the question. Again, Lisa oversees the implementation
4 of that policy. And I don't recall what we -- whether
5 there was additional communication or what we
6 ultimately decided. And this chain of e-mails doesn't
7 respond to my question. So I don't know what -- I
8 don't recall what was ultimately decided.
9         Q.    Okay.
10              (Oscadal Deposition Exhibit No. 10 was
11              marked for identification.)
12        Q.    I would like you to review Exhibit 10 and
13 specifically your e-mail at the top. Do you recollect
14 an issue regarding Bob not being able to meet on the
15 initially scheduled date for the first grievance step?
16        A.    My recollection is that there was some
17 difficulty in getting the meeting scheduled. I don't
18 recall if it was the first meeting or what meeting it
19 was, but my recollection is, there was some difficulty
20 getting the meeting scheduled. And we started
21 discussing the policy in general, and the fact that
22 there was no language about a timeline in which
23 meetings need to be held. And I said that we need to
24 address that in the future.

Page 56

1         Q.    Did you change the policy to address this
2 issue?
3         A.    I don't recall. I do have a recollection
4 of discussing with Lisa that I thought we should do so.
5 I don't recall if we have modified it or not.
6         Q.    Why did you think that the policy needed
7 to be changed?
8         A.    Because I think there should be specific
9 timelines for meetings to be held and answers to be
10 given, unless there is mutually agreed extensions to
11 those, or if there's, you know, extenuating
12 circumstances that need to be addressed. But generally
13 speaking, I think there should be specific timelines.
14        Q.    Okay. Why was Mr. Lehman terminated as
15 opposed to receiving a Level 3?
16              MS. SCHOENING: Objection. Asked and
17 answered. Go ahead.
18        A.    Because I and we believe that the
19 seriousness of the offense in terms of sleeping on the
20 job, during work time -- in fact, he was a Security
21 Officer and a Security Supervisor and carried a heavier
22 burden and a heavier weight, and it was a very serious
23 offense.
24        Q.    So do you believe Security Officers are

Page 57

1 held to a higher standard than other employees?
2         A.    Not all of the employees. You know, for
3 example, the nurse sleeping in the surgery suite is as
4 serious, if not more serious.
5         Q.    Is break time work time?
6         A.    It's paid time, so a person does need to
7 be available if something occurs.
8         Q.    Would the person need to be immediately
9 available if something occurs while they are on break
10 time?
11        A.    My understanding, in Security, the answer
12 to that is yes.
13        Q.    Okay. Could there be any circumstances in
14 which a Security Officer is within the hospital grounds
15 and is not immediately available?
16        A.    I guess if they are on another emergent
17 call or they are doing something else that they can't
18 get away from, that's related to their position, that's
19 a possibility.
20        Q.    Okay. Are Security Officers permitted to
21 use the restroom?
22        A.    Yes.
23        Q.    Okay. And if a Security Officer was in
24 the restroom, is it possible they wouldn't be

15 (Pages 54 to 57)

Lehman vs. St. Elizabeth                    OSCADAL                    7/23/2012

Page 58

1    immediately available?
2         A.    We would expect they would try to get
3    finished as quickly as possible and move on, yes.
4         Q.    Okay.  What is your understanding of where
5    Mr. Lehman was sleeping?
6         A.    In the Security Office on the Edgewood
7    campus.
8         Q.    And was his door open?
9         A.    I believe so.
10        Q.    Okay.  So you wouldn't characterize
11   Mr. Lehman's sleeping incidents as him attempting to
12   hide the fact that he was sleeping?
13        A.    No.
14        Q.    So your understanding, at the time that
15   Mr. Lehman was terminated, the majority of his workday
16   was spent in his office?
17        A.    I don't know if the majority of his duties
18   required him to do that.
19        Q.    You testified earlier that you believed,
20   at the time of your discussions with John DuBis and
21   Doug Chambers, that Mr. Lehman was sleeping at times
22   other than his break time?  Do you remember that
23   testimony?
24        A.    That's correct.

Page 59

1         Q.    Had Mr. Lehman only been sleeping while on
2    breaks, would that have impacted your decision?
3         A.    Yes.
4         Q.    And how would it have impacted your
5    decision?
6         A.    People are not allowed to sleep.  Unless
7    they are authorized to sleep, they are not allowed to
8    sleep in work areas, in public areas, during work time.
9    And even though when people get ten, 15 minute breaks,
10   it is paid time and they are expected to be available
11   if we need them.  Then we can reschedule the break if
12   they are interrupted.
13        Q.    Okay.  So I think you testified that that
14   would have impacted your decision.  Would it have made
15   you change your decision?
16        A.    I don't believe so, no.
17        Q.    Would you have concerns if you learned
18   that a Security Officer was threatening his fellow
19   employees?
20        A.    Yes.
21        Q.    Does St. Elizabeth have any policy related
22   to -- strike that.
23              Within St. Elizabeth's disciplinary
24   policy, does it refer to employees threatening other

Page 60

1    employees?
2         A.    There is language that I think would be
3    related to that, yes.
4         Q.    Okay.  And what form of discipline would
5    result if you learned that an employee was threatening
6    another employee?
7         A.    Depending on the level of it -- I'm not
8    sure what the guidelines are under the discipline
9    policy for that.  But if it was truly a legitimate
10   threat to the individual, then it would be my opinion
11   the person should be terminated.
12        Q.    Okay.  When you say "a legitimate threat,"
13   are you referring to, like, a physical threat?
14        A.    I'm referring to a meaningful threat.
15   Something that's not just said flippantly, but is said
16   with malice, and the person has the wherewithal to
17   carry out the threat.  And we make a determination that
18   it is a legitimate threat, and the behavior is
19   inappropriate.
20        Q.    Okay.  Would you consider a Security
21   Officer refusing to patrol as requested by his
22   supervisor as engaging in insubordination?
23              MS. SCHOENING:  Objection.  You can
24   answer.

Page 61

1         A.    Generally speaking, without knowing all
2    the circumstances, but generally speaking, yes, it
3    would be a level of insubordination.
4         Q.    And does St. Elizabeth have any kind of
5    guideline in their disciplinary policy on what type of
6    discipline an employee should receive for
7    insubordination?
8         A.    I believe we do.
9         Q.    What is that?
10        A.    I don't recall specifically what the
11   guidelines are in the discipline policy.  If it is
12   truly insubordination, to me, that would be grounds for
13   termination.
14        Q.    Okay.  Is it a potential safety risk if a
15   Security Officer is frequently disappearing for long
16   periods of time?
17              MS. SCHOENING:  Objection.  Go ahead and
18   answer.
19        A.    If we don't know where the person is?
20        Q.    Right.
21        A.    I would say yes.
22        Q.    How about if a -- is it a safety concern
23   if a Security Officer's not responding to calls?
24        A.    Yes.

16 (Pages 58 to 61)

Case: 2:11-cv-00165-WOB-JGW    Doc #: 33    Filed: 10/16/12    Page: 17 of 23 - Page ID#: 447

Lehman vs. St. Elizabeth                    OSCADAL                    7/23/2012

Page 62

1    Q.    Okay.  And would that -- a Security
2  Officer disappearing for long periods of time, and the
3  department doesn't know where he is, how would you
4  compare that safety risk to a Security Officer sleeping
5  while he's on a break?
6        MS. SCHOENING:  Objection.  Go ahead.
7    A.    May I ask a clarifying question?
8    Q.    Sure.
9    A.    Are they not in contact with the
10  individual?  They can't contact the individual?
11    Q.    Sure.
12    A.    Okay.  In my mind, they would equate to
13  the same, because a person's not able to respond.
14    Q.    Okay.  Are you familiar with an incident
15  that occurred at the Edgewood facility where a man
16  committed suicide in front of the hospital?
17    A.    I do have some recollection of that.
18    Q.    Okay.  Were you aware that Bob Lehman was
19  the Security Officer who responded to that incident?
20    A.    No, I don't recall being aware of that.
21    Q.    Okay.  You mentioned that you and
22  Mr. DuBis discussed Bob's history with St. Elizabeth.
23  Were you aware, at the time that you were speaking with
24  Mr. DuBis, that Mr. Lehman had been employed with

Page 63

1  St. Elizabeth since 1976?
2    A.    My recollection is that when I had the
3  conversation with John DuBis, I knew that Bob had been
4  employed around 30 plus years.
5    Q.    Okay.  And had you reviewed Bob's file at
6  any time prior to making the decision to terminate his
7  employment?
8    A.    I don't recall reviewing his personnel
9  file.  I believe I discussed his work history with Lisa
10  Blank.
11    Q.    Okay.  What was your understanding of his
12  work history, other than the fact that he had been a 30
13  plus year employee?
14    A.    I believe I was told that his performance
15  reviews were good, and that there were no previous
16  infractions identified -- were provided or identified
17  within his file.
18    Q.    Now, in the instances in which you have
19  been involved in terminations of employees, is looking
20  at an employee's work history something that you would
21  typically do?
22    A.    Yes, we would.  And how much consideration
23  is given depends on what they're alleged to have done.
24  And depending on the seriousness of the infraction, it

Page 64

1  may bear weight.  It may not.  If it's an infraction
2  that warrants termination on the first offense, it's
3  going to bear a lot less weight than if it's a
4  tardiness issue or a work performance issue where
5  possible education or adjusting the person's schedule,
6  you know, by ten or 15 minutes or a half-hour will
7  eliminate the issue or assist them.
8        So it depends on how much weight it's
9  given depending on the infraction that's alleged to
10  have occurred.
11    Q.    Did you ever discuss with any
12  St. Elizabeth employee the possibility of adjusting
13  Bob's schedule to accommodate him for his fatigue?
14    A.    I don't believe so.  I believe I was told
15  that Bob had worked the night shift until -- I don't
16  know, 12, 15 months prior to the incident occurring.  I
17  do recall that one of the things that Dr. Haskell
18  identified was that Bob's issue was more of a -- these
19  are not his words, but my words -- more of a lifestyle,
20  in terms of going to bed, or at least going to sleep
21  late.  Getting up early, and not getting sufficient
22  sleep.  Getting somewhere in the area of five hours of
23  sleep a night, or four-and-a-half hours of sleep a
24  night, and that was more the issue with him falling

Page 65

1  asleep at work than any medical reasons.
2        MS. NEFF:  Okay.  Let's take a quick
3    break.
4        (At which time, a recess was taken from
5        11:13 a.m. until 11:20 a.m.)
6        MS. NEFF:  Back on the record.
7    Q.    Did you take any notes during your
8  conversation with John DuBis?
9    A.    No.
10    Q.    Okay.  Did you record in any way what you
11  and John discussed after your meeting?
12    A.    No.
13    Q.    You didn't e-mail Lisa about your
14  conversation or anything?
15    A.    Not that I recall, no.
16    Q.    Similarly, did you take any notes during
17  your meeting with Doug Chambers?
18    A.    No.  I believe that was a phone call
19  conversation.
20    Q.    Okay.  And did you record in any way your
21  conversation with Doug?
22    A.    No, not that I recall.
23    Q.    Okay.  I know you indicated that you had
24  at least two conversations with Lisa, but do you

17 (Pages 62 to 65)

Lehman vs. St. Elizabeth                    OSCADAL                    7/23/2012

---

Page 66

1  remember ever taking any notes during any of your
2  conversations with Lisa regarding the allegations
3  against Bob?
4      A.    No, not that I recall.
5      Q.    Okay.  And do you remember recording in
6  any way what you and Lisa discussed?  Either via e-mail
7  or some other method?
8      A.    Not that I recall, if you don't have them.
9      Q.    Okay.  Was Bob required to go through the
10 fit-for-duty exam?
11     A.    I don't recall if he was required.  I
12 think -- I'm not sure I would phrase it that way.  Once
13 Bob made the claim that his sleeping was caused by
14 medical conditions, we -- I then felt it was
15 appropriate to determine whether that was, in fact, the
16 case, and then to have him go through the fit-for-duty.
17         Had he refused, I think -- at least from
18 my perspective, I would have made the assumption that
19 the claims were not valid.  But I don't recall whether,
20 once he made the claim and we identified the need to go
21 through the fitness-for-duty, whether we made it a
22 requirement or not.
23     Q.    Okay.  Does an employee of St. Elizabeth
24 have to request a reasonable accommodation in writing?

---

Page 67

1      A.    I would say no.
2      Q.    Okay.  Does St. Elizabeth have a practice
3  of disciplining each employee consistently with how
4  others are disciplined?
5          MS. SCHOENING:  Objection.  You can
6  answer.
7      A.    We certainly do our best, at least in my
8  opinion, to try and be as consistent as possible,
9  depending on the specific circumstances regarding each
10 individual case.
11     Q.    Okay.  You testified earlier that you were
12 aware that Bob Lehman has diabetes; is that correct?
13     A.    I was made aware of that during the
14 investigation process.
15     Q.    Okay.  And were you also made aware that
16 Bob has some sleep apnea?
17     A.    I believe I was made aware of that also
18 during the investigation process.
19     Q.    Okay.  And were you aware that neither his
20 sleep apnea nor his diabetes were in control at the
21 time of his fit-for-duty exam?
22     A.    I don't recall having that information or
23 being given that.  I don't recall.
24     Q.    Did you have any discussions with anyone

---

Page 68

1  at the hospital that at the time Mr. Lehman and some
2  other employees were going through the fit-for-duty
3  related to sleeping on the job, that it was important
4  for the hospital to establish a consistent policy as to
5  whether one condition was going to be accommodated and
6  one condition was not?
7      A.    I don't recall having discussions of that
8  nature.  But again, it would be on a case-by-case
9  basis, depending on what the accommodation needs were.
10 I don't know how we could say that we're going to
11 accommodate diabetes and we're not going to accommodate
12 X, Y.  Again, it would depend on specific circumstances
13 and what the accommodation would need to be.
14     Q.    However -- I don't remember which exhibit
15 it was, but an earlier exhibit in which you learned
16 that Gerald Hynko and Dr. Haskell were recommending
17 that the only disability that would be accommodated for
18 sleeping is narcolepsy; isn't that correct?
19     A.    That's correct.
20     Q.    Okay.  Are you familiar with any employees
21 who have been accommodated by the hospital as -- strike
22 that.  That's a bad way to phrase that question.
23         Are you familiar with any employees
24 receiving rest periods from work as an accommodation?

---

Page 69

1      A.    Not that I recall.
2      Q.    Okay.  And I think you testified earlier
3  that employees are given 15 minute breaks; is that
4  correct?
5      A.    That's my recollection.
6      Q.    And they also can take a lunch break?
7      A.    Unpaid 30 minute lunch, yes.
8      Q.    Okay.  How about a salaried employee, are
9  they paid for their lunch?
10     A.    No.
11     Q.    Okay.
12     A.    Can I ask a clarifying question to your
13 last question?
14     Q.    Sure.
15     A.    When you say "salaried," you mean salaried
16 exempt, under the Fair Labor Standards Act?
17     Q.    Do you have salaried employees that aren't
18 exempt?
19     A.    I don't know, but I want to be clear.
20     Q.    Were you aware whether Bob Lehman was a
21 salaried or hourly employee?
22     A.    I don't recall specifically.
23     Q.    Do you know if there's any difference
24 between a salaried exempt and a salaried nonexempt as

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    OSCADAL                      7/23/2012

Page 70

1    to whether or not they are paid for the 30 minute
2    lunch?
3        A.    I don't think we have any salary people
4    that are nonexempt.  I think all our salaried people
5    are exempt.  I just wanted to clarify that.
6        Q.    Okay.  All right.  So based on the
7    exhibits that you've reviewed, your understanding was
8    that Bob was terminated sometime in late September; is
9    that correct?
10       A.    I don't remember the exact date, but I
11   don't have any reason to disagree with that.
12       Q.    Okay.  So then, sometime between late
13   September and January 13, 2011, is when the
14   disciplinary policy changed as it relates to sleeping?
15           MS. SCHOENING:  Objection.  You can
16   answer.
17       A.    I believe so.  But again, to identify the
18   specific date, I need to see the current policy --
19       Q.    Okay.
20       A.    -- or the policy that was changed in that
21   time.
22       Q.    I don't have it, so I can't show it to
23   you.
24           Why was the policy changed?

Page 71

1        A.    I think we wanted to provide additional
2    clarification and we ended up having a lot of
3    discussion regarding this.  It was just a way to
4    clarify to people the seriousness that we put on
5    sleeping on the job.
6        Q.    Okay.  Do you know how long the previous
7    policy had been in effect, in which an employee would
8    receive a Level 3 for the first offense for sleeping?
9        A.    I don't.
10       Q.    Okay.  Are you aware of any employees,
11   other than Amanda Rickey, I guess, who we looked at
12   earlier -- are you aware of any other employees, prior
13   to September of 2010, receiving a Level 3 for sleeping?
14       A.    I don't recall.
15       Q.    Okay.  If an employee received a Level 3,
16   would that necessarily be something you would have been
17   involved in?
18       A.    Not normally, no.
19       Q.    Terminations you are involved in, though?
20       A.    Yes.  That's the process.
21       Q.    Is John DuBis typically involved in a
22   termination decision?
23       A.    Typically, no.  But it does happen on
24   occasion.

Page 72

1        Q.    Okay.  Is there any reason why in this
2    case, you decided to discuss Bob's discipline with
3    John?
4        A.    John was aware of it before I discussed it
5    with him.  How he became aware of it, I don't recall.
6    But he was aware of it before my discussion with him.
7        Q.    Who is Bob Hoffer?
8        A.    He's one of our attorneys.
9        Q.    Okay.  And did you seek advice from Bob
10   Hoffer regarding this issue?
11           MS. SCHOENING:  Objection.  You can
12   answer.
13       A.    I may have.  I don't recall specifically,
14   but I may have.
15       Q.    Okay.
16           (Oscadal Deposition Exhibit No. 11 was
17   marked for identification.)
18       Q.    When you say "one of our attorneys," is he
19   an employee of St. Elizabeth?
20       A.    No.  He works for DBL.  He works with
21   Kelly.
22       Q.    Okay.  All right.  What I would like you
23   to do is just look at the top e-mail, from you to Lisa
24   and to Roxann.  And just review that e-mail, the

Page 73

1    first -- just basically what you say, not what Lisa
2    says.  And let me know whether or not that refreshes
3    your recollection as to whether or not you spoke with
4    Bob Hoffer?
5        A.    You want me to look at the e-mail that
6    says "Sent from my iPhone?"
7        Q.    Yes.
8        A.    Not the one below it?
9        Q.    Right.
10       A.    I need to read it.  It says I agreed with
11   her.
12       Q.    That's fine.
13       A.    (Witness reviewing document).  I don't
14   remember the e-mail but I remember expressing what's in
15   the first paragraph.
16       Q.    Okay.  Because in the second paragraph,
17   you state, "Once we get the report I want to speak with
18   Bob Hoffer and John."  Is that John DuBis?
19       A.    I believe so, yes.
20       Q.    Okay.  Can you tell from this e-mail
21   whether, as of September 15, 2010, you had already
22   spoken with John DuBis about what the hospital was
23   going to do with respect to Bob Lehman's discipline?
24       A.    I don't recall whether I would have had my

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Case: 2:11-cv-00165-WOB-JGW    Doc #: 33    Filed: 10/16/12    Page: 20 of 23 - Page ID#: 450

Lehman vs. St. Elizabeth                    OSCADAL                    7/23/2012

Page 74

1  discussion with John before or after this e-mail.
2      Q.    Okay.  All right.  And based on this
3  e-mail, you still can't recall whether or not you spoke
4  with Bob Hoffer?
5      A.    I believe I did speak with Bob Hoffer, but
6  I don't recall when.
7      Q.    Okay.  Was Bob Hoffer involved at all in
8  the decision to terminate Bob Lehman?
9          MS. SCHOENING:  Objection.  I'm going to
10         instruct him not to answer.  I believe that's
11         attorney/client privilege.  Whether or not he
12         spoke with him is one thing.  As to Bob's
13         involvement is a problem.
14         MS. NEFF:  Let's go ahead.  Can you mark
15         that in the record that she's instructed him not
16         to answer it based on attorney/client privilege?
17         Correct?
18         MS. SCHOENING:  Yes.
19     Q.    I apologize if you already answered this.
20  I can't remember what you said.  I think you said that
21  you believe that you did speak with Bob, but you don't
22  remember whether it was before or after Bob was
23  terminated; is that correct?
24     A.    No.  You asked me if I spoke with John

Page 75

1  before or after this e-mail, and that's when I said I
2  don't recall whether I spoke with John about Bob before
3  or after this e-mail.  I'm sorry.  I spoke with John
4  before or after this e-mail.  I would have spoken Bob
5  after this e-mail, related to this issue.
6      Q.    And do you know whether you spoke with Bob
7  before or after -- Bob Hoffer before or after
8  Mr. Lehman was terminated?
9      A.    Can you tell me when Mr. Lehman was
10  terminated?
11     Q.    Can I see your exhibits?  They are in a
12  little better order than mine.
13         Thanks.
14         All right.  If you look at Exhibit No. 8.
15  It looks like Bob was -- Bob Lehman was submitting his
16  grievance on September 23, 2010.
17     A.    And my belief is I spoke with Bob Hoffer
18  prior to Bob Lehman being terminated.
19     Q.    Okay.  After speaking with Bob Hoffer, did
20  you change your opinion one way or the other about
21  whether or not Mr. Lehman was going to be terminated?
22         MS. SCHOENING:  Objection.  You can
23         answer, if you can.
24     A.    No.

Page 76

1          MS. NEFF:  All right.  That's all the
2  questions I have.
3          MS. SCHOENING:  No questions.
4
5          _____
6                  MARTIN OSCADAL
7
8                  - - -
9          DEPOSITION CONCLUDED AT 11:35 A.M.
10                 - - -

Page 77

1              C E R T I F I C A T E
2  STATE OF OHIO        :
3                       : ss
   COUNTY OF HAMILTON   :
4      I, Barbara A. Thacker, RPR, the
5  undersigned, a duly qualified and commissioned notary
6  public within and for the State of Ohio, do hereby
7  certify that, before giving of the aforesaid
8  deposition, MARTIN OSCADAL, was by me first duly sworn
9  to depose the truth, the whole truth, and nothing  but
10  the truth; that the foregoing is the deposition given
11  at said time and place by MARTIN OSCADAL; that said
12  deposition was taken in all respects pursuant to
13  stipulations of counsel hereinbefore set forth; that I
14  am neither a relative of nor employee of any of their
15  counsel, and have no interest whatever in the result of
16  the action.  I further certify that I am not, nor is
17  the court reporting firm with which I am affiliated,
18  under a contract as defined in Civil Rule 28(D).
19         IN WITNESS WHEREOF, I hereunto set my hand
20  and official seal of office at Cincinnati, Ohio, this
21  _____ day of _____, 2012.
22
                           _____
23  My Commission Expires:  BARBARA A. THACKER, RPR
    May 17, 2013           Notary Public - State of Ohio
24

# ADDENDUM

TO THE REPORTER: I have read the entire transcript of my deposition taken on the _____ day of _____, 2____, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| ~~WILL~~ 517 | 23 | CHANGE "ROB" TO "BOB" |
| 41 | 12 | DELETE "UP" - DELETE "THE SERVICE" |
| 41 | 13 | DELETE "LEVEL" - ADD "THE COO THIS RESPONSIBILITY" |
| 75 | 4 | ADD "TO" AFTER "SPOKEN" AND BECOME "BOB" |

THROUGHOUT THE DEPOSITION DOCUMENT THE NAME "DUBIS" IS MISSPELLED. IN THE DOCUMENT THE "B" IS CAPITALIZED AND OTHER THAN THE "D" ALL THE LETTERS SHOULD BE LOWER CASE.

_8/28/12_
**(Date)**

**ROBERT LEHMAN vs ST. ELIZABETH HEALTHCARE**

_(signature)_
**(Signature of Deponent)**

**MARTIN OSCADAL    7-23-12    BT**

ORIGINAL

AMS DEPO
P.O. Box 58641 · Cincinnati, Ohio  45258-8641
(513) 941-9464

Lehman vs. St. Elizabeth                OSCADAL                        7/23/2012

Page 76

1          MS. NEFF:  All right.  That's all the

2     questions I have.

3          MS. SCHOENING:  No questions.

4

5                    _Martin F. Oscadal_

                    MARTIN OSCADAL

6

7                    -  -  -

8          DEPOSITION CONCLUDED AT 11:35 A.M.

9                    -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORIGINAL

Lehman vs. St. Elizabeth                OSCADAL                        7/23/2012

Page 77

1                    C E R T I F I C A T E

2   STATE OF OHIO          :
                           :  ss
3   COUNTY OF HAMILTON      :

4               I, Barbara A. Thacker, RPR, the

5   undersigned, a duly qualified and commissioned notary

6   public within and for the State of Ohio, do hereby

7   certify that, before giving of the aforesaid

8   deposition, MARTIN OSCADAL, was by me first duly sworn

9   to depose the truth, the whole truth, and nothing  but

10  the truth; that the foregoing is the deposition given

11  at said time and place by MARTIN OSCADAL; that said

12  deposition was taken in all respects pursuant to

13  stipulations of counsel hereinbefore set forth; that I

14  am neither a relative of nor employee of any of their

15  counsel, and have no interest whatever in the result of

16  the action.  I further certify that I am not, nor is

17  the court reporting firm with which I am affiliated,

18  under a contract as defined in Civil Rule 28(D).

19               IN WITNESS WHEREOF, I hereunto set my hand

20  and official seal of office at Cincinnati, Ohio, this

21  6th day of August          , 2012.

22                          Barbara A. Thacker

23  My Commission Expires:   BARBARA A. THACKER, RPR
    May 17, 2013             Notary Public - State of Ohio

24

AMS DEPO
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

ORIGINAL

NOTARIAL SEAL
STATE OF OHIO