Case: 2:11-cv-00165-WOB-JGW    Doc #: 34    Filed: 10/16/12    Page: 1 of 36 - Page ID#: 454

Lehman vs. St. Elizabeth         PLATEK                    7/13/2012

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

NORTHERN DIVISION AT COVINGTON


```
------------------------------------
                                  :
ROBERT LEHMAN,                    :
                                  :
            Plaintiff,            :
                                  :
       vs.                        :   CASE NO.
                                  :   2:11-cv-00165
ST. ELIZABETH HEALTHCARE,         :
                                  :
            Defendant.            :
                                  :
------------------------------------
```


            DEPOSITION OF:    ROXANN E. PLATEK
            TAKEN:            By the Plaintiff
            DATE:             July 13, 2012
            TIME:             Commencing at 11:10 a.m.
            PLACE:            Offices of:
                              Dressman Benzinger LaVelle
                              207 Thomas More Parkway
                              Crestview Hills, Kentucky  41017


            BEFORE:           Raymond E. Simonson
                              Registered Merit Reporter
                              Notary Public-State of Ohio

Case: 2:11-cv-00165-WOB-JGW    Doc #: 34    Filed: 10/16/12    Page: 2 of 36 - Page ID#: 455

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

Page 2

1    APPEARANCES:
2        On behalf of the Plaintiff:
3            KATHERINE DAUGHTREY NEFF, ESQ.
                 of
4            Freking & Betz
             525 Vine Street
5            Sixth Floor
             Cincinnati, Ohio  45202
6            Telephone:  (513) 721-1975
             Email:  kneff@frekingandbetz.com
7
         On behalf of the Defendant:
8
             KELLY A. SCHOENING, ESQ.
9                of
             Dressman Benzinger LaVelle psc
10           207 Thomas More Parkway
             Crestview Hills, Kentucky  41017
11           Telephone:  (513) 357-5284
             Email:  kschoening@dbllaw.com
12
         Also present:  Robert Lehman
13                       Lisa Blank
14                       - - -
15
16
17
18
19
20
21
22
23
24

Page 3

1                I N D E X
2    ROXANN E. PLATEK                              PAGE
3    CROSS-EXAMINATION BY MS. DAUGHTREY NEFF        4
4    EXAMINATION BY MS. SCHOENING                   -
5                E X H I B I T S
6    Platek Exhibit Number        Marked    Referenced
7         1              25        30, 89
8         2              29        89
9         3              32        -
10        4              40        57
11        5              53        -
12        6              89        -
13        7              95        -
14        8             101        -
15        9             104        -
16       10             106        -
17       11             108        -
18       12             110        -
19       13             121        -
20       14             121        -
21
22   Reference to Bates Number              Page
23        SEMC0818                          120
24        SEMC0999                          123

Page 4

1                ROXANN E. PLATEK
2    of lawful age, a witness herein, being first duly sworn
3    as hereinafter certified, was examined and deposed as
4    follows:
5                CROSS-EXAMINATION
6    BY MS. DAUGHTREY NEFF:
7        Q.    Could you state your full name for the
8    record?
9        A.    Roxann Elizabeth Platek.
10       Q.    Okay.  And I am Kati Neff.  Obviously, we
11   met at Mr. Lehman's deposition and again here today.
12   As you know, I represent Mr. Lehman.
13       Do you mind if I call you "Roxann"?
14       A.    I do not.
15       Q.    And you can call me "Kati" if you need to.
16   Okay?
17       A.    (Nodding head affirmatively).
18       Q.    Have you ever been deposed before, Roxann?
19       A.    Yes.
20       Q.    You obviously also have witnessed at least
21   one deposition, so you kind of know how things are
22   going to go today, right?
23       A.    Yes.
24       Q.    You're doing a good job already.  Make

Page 5

1    sure you give me verbal responses.  And then, if for
2    some reason you do not understand my question, it's
3    very important for you to tell me you don't understand
4    it.  Okay?
5        A.    All right.
6        Q.    Otherwise, I'm just going to go ahead and
7    assume you understood my question.  Okay?
8        A.    Okay.
9        Q.    If for some reason you need a break, let
10   me know.  I just ask that, if there is a question
11   pending, you go ahead and answer the question before we
12   take a break.  Okay?
13       A.    Okay.
14       Q.    The only other -- well, two things that
15   might come up.  One, Ms. Schoening may object.  Unless
16   she instructs you not to answer the question,
17   obviously, you can go ahead and answer.  If you need a
18   question repeated, we can ask Ray, our court reporter
19   here, to repeat the question for you.  Okay?
20       A.    Okay.
21       Q.    One other thing we need to be careful of
22   is making sure that you and I are not talking over one
23   another.  So please let me finish my question before
24   you start to answer.  And similarly, if you are not

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

---

Page 6

1  finished with your answer and I start to ask a
2  question, let me know.  It's not my intention to cut
3  you off.  Okay?
4        A.    Okay.
5        Q.    You said you have had your deposition
6  taken before.  How many depositions have you given?
7        A.    One.
8        Q.    One.  And did that have anything to do
9  with your employment with St. Elizabeth.
10       A.    It did not.
11       Q.    Did it have anything to do with your
12 employment with any other employer?
13       A.    Yes.
14       Q.    And who were you working for at the time?
15       A.    Huntington Bank.
16       Q.    Were you in a human resources position
17 with Huntington?
18       A.    I was.
19       Q.    What title did you have?
20       A.    It would probably have been Personnel
21 Administrator, or Human Resources Generalist.
22       Q.    And did that litigation where you had to
23 give the deposition, did that have anything to do with
24 employment discrimination?

---

Page 7

1        A.    I don't recall.
2        Q.    How long ago was it?
3        A.    Several years.
4        Q.    When were you hired by St. Elizabeth?
5        A.    November 5, 2007.
6        Q.    When did you work for Huntington Bank?
7        A.    November 25, '74 through October 22, 2007.
8        Q.    And were you in human resources your
9  entire career with Huntington Bank?
10       A.    No.
11       Q.    How long had you been in the human
12 resources position prior to your leaving there in
13 October of 2007?
14       A.    Since January of '79.
15       Q.    Did you do anything to prepare for your
16 deposition today?
17       A.    Met with Kelly Schoening.
18       Q.    Okay.  Was anyone else present?
19       A.    Lisa Blank.
20       Q.    And when was that meeting?
21       A.    Last week.
22       Q.    How long did you meet for?
23       A.    I don't recall.
24       Q.    Ten minutes?  An hour?

---

Page 8

1        A.    I would say it was probably an hour.
2        Q.    Okay.
3        A.    It's a guess.
4        Q.    Did you review any documents in
5  preparation for your deposition?
6        A.    Kelly presented some documents.
7        Q.    Could you just generally describe what
8  those documents were?
9        A.    I think there were some emails and a list
10 from a meeting preparation.
11       Q.    Okay.  Emails related to what?
12       A.    This case.
13       Q.    To Bob Lehman's termination?
14       A.    Correct.
15       Q.    Okay.  And you said a list from a meeting
16 preparation?
17       A.    Um-hmm (nodding head affirmatively).
18       Q.    What did that have to do with?  What was
19 that meeting?
20       A.    It was the meeting to indicate to Bob that
21 he was being terminated.
22       Q.    Was it a list that you had created?
23       A.    Yes.
24       Q.    And the emails that you reviewed, were

---

Page 9

1  those all emails that you were either the person
2  writing the email or you were a recipient of the email?
3        A.    I believe that's correct.
4        Q.    So these were emails you had seen before?
5        A.    Yes, I think so.
6        Q.    Okay.  You can't think of anything that
7  you reviewed in preparation for your deposition last
8  week that was something you had not seen before?
9        A.    There was something that I had not seen
10 before, but it wasn't an email now as I recall it; it
11 was a letter of some type.
12       Q.    Do you remember who wrote the letter?
13       A.    I believe that was Dr. Haskell.
14       Q.    Anything else that you reviewed in
15 preparation for your deposition last week that you had
16 not seen other than a letter from Dr. Haskell?
17       A.    I don't recall any at this point.
18       Q.    Other than what you reviewed during your
19 meeting with Kelly and Lisa last week, did you do
20 anything else to prepare for your deposition?
21       A.    No.
22       Q.    You didn't review any other documents?
23       A.    No.
24       Q.    And have you spoken with anyone else aside

---

3 (Pages 6 to 9)

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

Page 10

1  from Kelly and Lisa about your deposition?
2       A.    My husband.
3       Q.    Were you just telling him that your
4  deposition was being taken?
5       A.    Yes.
6       Q.    You didn't tell him anything about the
7  case?
8       A.    No.
9       Q.    What is your current address?
10      A.    ████████████████,
11  Independence, Kentucky, 41051.
12      Q.    And you mentioned that you had quite a few
13  years of human resources experience when you were with
14  Huntington Bank.
15      A.    Correct.
16      Q.    Did you ever complete any courses on human
17  resources?
18      A.    Yes.
19      Q.    And when did you do that?
20      A.    I completed many courses.  I would not be
21  able to list them all, but there were week-long
22  conferences that I attended.  I have also taken
23  specific courses in human resources through colleges.
24  I have also done the SHRM -- let me back up -- the

Page 11

1  Society for Human Resources Management certification to
2  obtain my Senior Professional in Human Resources
3  certification.  The college classes would have been
4  part of my Bachelor degree.  And throughout my
5  employment with Huntington, I was required to keep up
6  on my education.  So courses they might offer through
7  them, they would provide for all human resources
8  individuals in that organization.
9       Q.    When did you receive your Senior
10  Professional certification?
11      A.    The initial certification would have been
12  in 2007 or 2006.
13      Q.    Is that something where you have to get
14  re-certified?
15      A.    Correct.
16      Q.    How often?
17      A.    It's every three years.
18      Q.    And have you been re-certified since
19  either '06 or '07?
20      A.    Yes.
21      Q.    And are you currently certified?
22      A.    I am.
23      Q.    You mentioned that you took some human
24  resources courses in college, or through college?

Page 12

1       A.    Um-hmm (nodding head affirmatively).
2       Q.    And I think you said those courses counted
3  towards your Bachelor degree?
4       A.    Correct.
5       Q.    When did you receive your Bachelor's?
6       A.    1998.
7       Q.    What school did you receive that from?
8       A.    Thomas More college.
9       Q.    Since receiving your Bachelor's in 1998,
10  have you taken any other HR courses through a college?
11      A.    Let me think.  I have just started my
12  Master's degree.
13      Q.    Okay.
14      A.    The first course was -- I just completed
15  that a couple of months ago, and I'm on my second
16  class, and it is an MBA in human resources management.
17      Q.    What school are you going through for
18  that?
19      A.    It's an online school, and it's called
20  California Coast University.
21      Q.    Do you -- I'm sorry.  What were you going
22  to say?
23      A.    Nevermind.
24      Q.    Do you have any materials from either your

Page 13

1  SHRM certifications or any of your college courses that
2  you keep, that you maintain?
3       A.    Yes.
4       Q.    And do you maintain any of those in your
5  office at St. Elizabeth?
6       A.    No.
7       Q.    Does St. Elizabeth require you to continue
8  your education in human resources?
9       A.    Yes.
10      Q.    Does it offer any trainings or class for
11  you to take to achieve that?
12      A.    Yes.
13      Q.    And who would typically teach those
14  courses or trainings?
15      A.    It can be a variety of people.  If it's
16  offered by the organization, they may provide their own
17  trainer.  But if it's a Webinar, for instance, it might
18  be by the organization who is sponsoring that Webinar.
19      Q.    So St. Elizabeth can offer you those,
20  either trainings or classes, through either Webinars or
21  an actual, in-person class?
22      A.    Yes.
23      Q.    What is your current position with
24  St. Elizabeth?

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

Page 14

1      A.      Human Resources Advisor.
2      Q.      How long have you been a Human Resources
3  Advisor for St. Elizabeth?
4      A.      Since I was hired with them, to the
5  current time.
6      Q.      Who do you report to?
7      A.      Lisa Blank.
8      Q.      And she is the HR Director?
9      A.      She is, for Employee Relations and
10  Recruitment.
11      Q.      "Employee Relations and Recruitment," you
12  said?
13      A.      "Recruitment," um-hmm (nodding head
14  affirmatively).
15      Q.      As an HR Advisor, do you have any
16  responsibility for Recruitment?
17      A.      I do.
18      Q.      And do you have responsibility for
19  Employee Relations as well?
20      A.      I do.
21      Q.      Do you have any co-workers --
22      A.      Yes.
23      Q.      -- that also report to Lisa?
24      A.      I'm sorry.  I thought you were done.

Page 15

1      Q.      That's okay.
2      A.      Yes.
3      Q.      Who are those co-workers?
4      A.      Other HR Advisors and also Specialists, HR
5  Specialists, other --
6      Q.      How many -- sorry.  Go ahead.
7      A.      There are also -- "other people that
8  report to Lisa Blank," was your question, though.  The
9  Receptionist, so it's the support staff for us and the
10  HR Advisors.
11      Q.      How many HR Advisors are there?
12      A.      There are ten altogether, including me.
13      Q.      And they all report to Lisa?
14      A.      Yes.
15      Q.      How many HR Specialists are there?
16      A.      Five.
17      Q.      Who are the other Advisors?
18      A.      Are you asking for their names?
19      Q.      Yes.
20      A.      Lisa Edmonds.  Coree Sipp.  Erin Lageman.
21      Q.      Is that a woman or a man?
22      A.      Woman.
23      Q.      Okay.
24      A.      Trisha Rogers, Peggy Essert, Shauna Dines,

Page 16

1  Kerry Kleisinger, and we have one position vacant right
2  now.
3      Q.      How long has that position been vacant?
4      A.      It's a guess.  Month-and-a-half.
5      Q.      And did the person who had that position
6  before leave voluntarily or involuntarily?
7      A.      Voluntarily.
8      Q.      Now, do you have a specific area that you
9  provide advice for within the hospital?
10      A.      I do.
11      Q.      And what area or areas do you cover?
12      A.      There would be certain departments of the
13  hospital.  I probably won't remember them all, but that
14  would include Security.  It would also include Pastoral
15  Care, Foundation, Clinical Engineering, Maintenance,
16  Plant Engineering, Care Coordination, Social Services,
17  Risk Management, Medical Affairs, Physician Services,
18  Environmental Services, Credit Union.  I'm trying to
19  remember them all.
20              That's all I can recall.
21      Q.      Do you know approximately how many
22  employees are within your sort of HR group, I guess,
23  within Security, Pastoral, Foundation, and all the ones
24  that you listed?

Page 17

1      A.      I don't know the specific number.  I know
2  it's in the hundreds.
3      Q.      And similarly, do your Advisor co-workers
4  have specific departments that they cover from the HR
5  perspective?
6      A.      Correct.
7      Q.      Could you just describe your Employee
8  Relations responsibilities for those groups?
9      A.      The Employee Relations responsibilities
10  would include anything that comes to my attention that
11  involves their workplace and workplace issues.
12      Q.      Would that include if an employee needed
13  to request Family Medical Leave?
14      A.      It could.  But then there's a certain
15  point at which I would have to pass it to our Employee
16  Health Department.
17      Q.      At which point would you typically have to
18  pass that to Employee Health?
19      A.      If they are requesting approval for a
20  Family Medical Leave that's not within my authority to
21  provide, and I am also not the one to receive the
22  documentation that they would produce from the request,
23  so that would have to go to Employee Health.  But if
24  they had questions about the policy, then that would be

AMS DEPO
(513) 941-9464     amsdepo@fuse.net     Cincinnati, Ohio

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

---

Page 18

1    mine to answer.
2        Q.    If an employee was requesting a reasonable
3    accommodation, would that be something that you could
4    handle?
5        A.    I could get the request, but I would not
6    be able to do it all on my own.
7        Q.    Would that also go to Employee Health?
8        A.    Um-hmm (nodding head affirmatively).
9    Correct.
10       Q.    Have you had any employees request
11   reasonable accommodations?
12       A.    I have not.
13       Q.    Does St. Elizabeth have a policy with
14   respect to -- strike that.  If you had an employee
15   request a reasonable accommodation, is there any kind
16   of guidelines for you to follow?
17       A.    Um-hmm (nodding head affirmatively).  Yes.
18       Q.    And where are those guidelines located?
19       A.    In our policy.
20       Q.    And is it in a specific policy?
21       A.    They would probably be in the Family
22   Medical Leave Policy for the medical leaves.
23       Q.    Where is that policy located?
24       A.    It's on our Intranet.

---

Page 19

1        Q.    If I were to go to St. Elizabeth and look
2    at your Intranet, is it just a completely separate
3    policy, or is it within another larger policy?
4        A.    It is within our entire policy section.
5        Q.    Okay.
6        A.    It's referred to as Compliance 360.  If
7    you thought I said "Internet," it's "Intranet."
8        Q.    Right.
9        A.    I just wanted to make sure.
10       Q.    Right.  It's not on the -- people who
11   don't work for St. Elizabeth can't access your
12   policies, correct?
13       A.    Correct.  And that's what I wanted to
14   clarify if that was misunderstood.
15       Q.    Have you -- and I know, obviously, with
16   your Bachelor's, as well as the course that you took
17   for your Master's and these other courses you've taken,
18   you've gone through quite a bit of studying on
19   employment issues, right, as an HR professional?
20       A.    Correct.
21       Q.    Have you taken any courses specifically
22   related to accommodating employees with disabilities?
23       A.    Yes.
24       Q.    Was that through your Bachelor's or

---

Page 20

1    through something else?
2        A.    Both the Bachelor and also through the
3    ongoing continuing education for my certification.
4    Through Webinars, we're provided updates to that.  I
5    don't know that it would be exactly every year, but on
6    an annual basis, there's usually updates about changes.
7        Q.    Do you have any understanding as to what
8    St. Elizabeth's responsibility would be with respect to
9    an employee who notifies his or her manager that he may
10   need an accommodation?
11       A.    Sure.
12       Q.    And what is St. Elizabeth supposed to do
13   when an employee does that?
14       A.    Well, we would need to look at that and
15   see can we accommodate that and what needs to be done,
16   work with them, have an interactive process.
17       Q.    Does St. Elizabeth require the employee to
18   put that request in writing?
19       A.    Yes.
20       Q.    And once the employee puts their request
21   in writing, I think based on what you were saying
22   earlier, Employee Health would evaluate the
23   accommodation?
24       A.    Correct.

---

Page 21

1        Q.    Would HR also be involved in that
2    evaluation?
3        A.    Also if we needed to work with a manager
4    about making the accommodation.
5        Q.    Do you know who the current Director of
6    Employee Health is?
7        A.    Tina Ellis.
8        Q.    Did she replace Gerald Hynko?
9        A.    She did.
10       Q.    Do you know whether Mr. Hynko left
11   voluntarily or involuntarily?
12            MS. SCHOENING:  Objection.  You may
13   answer.
14       A.    I don't know.
15       Q.    How much interaction did you have with Mr.
16   Hynko?
17       A.    As needed.
18       Q.    Other than Bob Lehman in this case, are
19   you aware of any other -- strike that.  Have you been
20   involved in instructing any other employees to go
21   through a fitness-for-duty exam in any other instances
22   besides Mr. Lehman?
23       A.    Yes.
24       Q.    And what types of instances have caused

---

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    PLATEK                      7/13/2012

Page 22

1   you to have an employee seek a fitness-for-duty exam?
2       A.    The ones that I was involved in, they had
3   actually been out on a medical leave, so I wasn't at
4   the beginning of the process, but during the action for
5   return-to-work and seeing what they could do, then
6   Employee Health was involved, and then they pulled me
7   into the process about working with the associates.
8       Q.    Are associates who go out on medical leave
9   for their own serious health condition required to go
10  through a fit-for-duty exam when they come back?
11      A.    They have to be evaluated for the
12  return-to-work.
13      Q.    And employees who are hired by
14  St. Elizabeth must go through a physical with Employee
15  Health as well; is that correct?
16      A.    The new hires you're referring to?
17      Q.    Yes.
18      A.    Yes.
19      Q.    And are those physicals updated throughout
20  the employee's employment at St. Elizabeth?
21      A.    No, only like a situation that's changed.
22      Q.    Were you aware that Mr. Lehman took Family
23  Medical Leave in 2010?
24      A.    Not specifically.

Page 23

1       Q.    If an employee doesn't have any questions
2   necessarily about the Family Medical Leave process at
3   St. Elizabeth, could they go directly to Employee
4   Health and you would never know about it?
5       A.    Yes.
6       Q.    And that's including employees who are
7   within your HR gamut, I guess?
8       A.    Right.
9       Q.    You mentioned that you didn't have, or
10  have not been aware of any employees within your HR
11  realm, I guess, the employees in the departments that
12  you listed, of requesting accommodation; is that
13  correct?
14      A.    I don't recall any.
15      Q.    Do you know why Mr. Lehman was required to
16  go through a fit-for-duty exam?
17      A.    Yes.
18      Q.    Why was that?
19      A.    When the investigation occurred around
20  sleeping, he had explained that his sleeping was due to
21  a medical condition, and to evaluate whether that was
22  true, that's the process in Employee Health; we're
23  allowed to do the fit-for-duty.
24      Q.    Why did you need to evaluate whether that

Page 24

1   was true?
2       A.    He was giving that as his explanation for
3   why he was sleeping.
4       Q.    And if he had had a medical condition that
5   was causing him to sleep at work, would that have
6   changed whether or not he would have been disciplined?
7       A.    Possibly.
8       Q.    Do you know what the medical condition was
9   that he thought was causing him to be fatigued?
10      A.    I was told diabetes.
11      Q.    When Mr. Lehman said that he thought his
12  medical condition was causing him to be fatigued, did
13  anyone -- or did you consider that to be requesting an
14  accommodation?
15      A.    I wasn't the one who spoke to Bob about
16  that.
17      Q.    You were aware that Bob was having to go
18  through this fit-for-duty exam because he believed his
19  sleeping was caused by a medical condition, right?
20      A.    I was told that that was what he was going
21  to be doing.
22      Q.    Okay.  Do you know who was told that Bob
23  believed his fatigue related to a medical condition?
24      A.    Repeat that.

Page 25

1       Q.    You said you weren't the one that was
2   initially told that Bob believed his fatigue was
3   related to his medical condition.  Who was initially
4   told that?
5       A.    His manager.
6       Q.    Was Lisa Blank also told that?
7       A.    Correct.
8       Q.    Do you know whether Ms. Blank assisted Mr.
9   Lehman in drafting an accommodation request?
10      A.    I do not know if that was done.
11      Q.    Do you know if she gave him any advice on
12  how to request an accommodation?
13      A.    I do not know.  I wasn't present when they
14  met.
15      Q.    Were you aware that Gerald Hynko initially
16  recommended that Mr. Lehman be accommodated?
17      A.    I don't think so.
18      Q.    Okay.
19      A.    I don't recall that.
20            (Platek Exhibit No. 1 was marked for
21            identification.)
22      A.    (Witness reviewing document.)
23      Q.    Roxann, you have been handed what has been
24  marked Exhibit 1 to your deposition.  What I would like

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

Page 26

1  you to do is focus on the, I guess, second-in-line
2  email, but this is actually the first email from you on
3  September 9th, 2010 at 10:02 a.m.
4      A.    (Witness reviewing document).
5      Q.    And it looks like you're relaying to, at
6  least, Marty Oscadal, and potentially Roxann Platek, a
7  conversation that you had with Gerald Hynko.  Do you
8  see that?
9      A.    You're talking about this section right
10 here (indicating)?
11     Q.    Correct.
12     A.    I see.
13     Q.    And according to Mr. Hynko, he told you
14 that "he had enough information to believe there is a
15 medical reason for him," meaning Bob Lehman, "falling
16 asleep on the job;" is that correct?
17     A.    I see that sentence.
18     Q.    Okay.  And you go on to state that "he,"
19 meaning Gerald, "tied it to the ADA"?
20     A.    Correct, Gerald.
21     Q.    You go on to state that "Gerald plans to
22 put him," meaning Bob, "immediately on STD for the
23 medical situation that he's in right now," right?
24     A.    (Witness reviewing document).  Correct,

Page 27

1  "him" being "Bob," yes.
2      Q.    "STD" is that "short-term disability"?
3      A.    It is.
4      Q.    Was Mr. Lehman put on short-term
5  disability as far as you know?
6      A.    Yes.  That's the way I recall it.
7      Q.    And who would typically process STD?
8  Would that be Employee Health?
9      A.    Correct.
10     Q.    You go on to state just a little bit
11 further down that "He," I think meaning Gerald, "is
12 suggesting perhaps we consider a Return to Work
13 Agreement with compliance with health care to continue
14 in position;" is that correct?
15     A.    Yes, that's what it says.
16     Q.    And was he referring to specifically Bob's
17 situation or other situations as far as you know?
18     A.    The best I can recall, this is Bob's
19 situation.
20     Q.    Okay.  And he further states that there
21 was not a previous precedent set, so this could be a
22 potential approach; is that correct?
23     A.    Right.
24     Q.    After you relayed this information -- and

Page 28

1  I think -- it's kind of hard to tell because it
2  doesn't  -- this email train does not show exactly who
3  you sent it to, but obviously Martin Oscadal responded,
4  right?
5      A.    Yes.
6      Q.    And, Roxann, obviously, he responded to
7  you and then Lisa Blank was copied; is that correct?
8      A.    That's what it shows.
9      Q.    So do you believe that you sent this email
10 at 10:02 a.m. to both Martin and Lisa?
11     A.    (Witness reviewing document).  That seems
12 reasonable.
13     Q.    After sending this email to Lisa and
14 Marty, did you have any follow-up conversation with
15 either of them about Gerald's recommendations?
16     A.    I don't recall.
17     Q.    Did you have any communication with Gerald
18 beyond this about his recommendations that you were
19 relaying to Marty and Lisa?
20     A.    I don't recall having any further
21 conversations with Gerald.
22     Q.    Do you know whether either Lisa or Marty
23 communicated with Gerald about these recommendations
24 that you relayed?

Page 29

1      A.    I do not.
2      Q.    Okay.
3            (Platek Exhibit No. 2 was marked for
4            identification.)
5            MS. SCHOENING:  Before you question her on
6      this, could we take a rally quick break?
7            MS. DAUGHTREY NEFF:  Sure.
8            (At which time, a recess was taken from
9            11:48 a.m. until 11:49 a.m.)
10           MS. DAUGHTREY NEFF:  Okay.  Let's go back
11     on the record.
12     Q.    Roxann, you've been handed what has been
13 marked as Exhibit 2 to your deposition.
14     A.    (Witness reviewing document).
15     Q.    And it has your name at the top, so I
16 assume that you printed this out; is that correct?
17     A.    (Witness reviewing document).
18     Q.    At the very top?
19     A.    Probably.
20     Q.    And it looks like the top email is an
21 email from Marty to you and to Lisa, in which he
22 says, "Lisa, we need to get that meeting scheduled with
23 Lisa ASAP."
24     A.    I see that.

8 (Pages 26 to 29)

Lehman vs. St. Elizabeth                 PLATEK                        7/13/2012

Page 30

1    Q.    And it's also dated September 9th, 2010 at
2  8:04 a.m.
3    A.    I see that also.
4    Q.    Again, do you know whether either Lisa or
5  Marty met with Gerald?
6    A.    I do not.
7          (Reference to previously-marked Platek
8          Exhibit No. 1.)
9    Q.    Did you do anything, once you initially
10 spoke with Gerald -- if you want to refer back to
11 Exhibit 1 -- once you initially spoke with Gerald and
12 he relayed his position so far after meeting with Bob,
13 did you do anything to contact Bob about potentially
14 requesting a filing and a reasonable accommodation
15 request or anything?
16   A.    No.  I understood Gerald was already
17 working with Bob.
18   Q.    Do you know whether that request was ever
19 put in writing?
20   A.    I don't know.  That would have been
21 handled on Gerald's side of things, and I wouldn't have
22 been present.
23   Q.    Okay.  Are you aware of any impact
24 allowing Mr. Lehman to sleep during his lunch break

Page 31

1  would have on the ability of other employees within the
2  Security Department to perform their job duties?
3    A.    The impacts if he's on his lunch break?
4    Q.    Yes.
5    A.    And if he was sleeping?
6    Q.    Yes.
7    A.    He would not be available, not be
8  conscious.
9    Q.    And how would that impact the other
10 employees in the performance of their duties?
11   A.    Would they be able to ask him questions?
12 Would they be able to have him respond to situations?
13 Those would be the kinds of things I think would be
14 difficult for associates.
15   Q.    And would allowing Bob to leave the
16 hospital premises on his lunch break have a similar
17 impact on other employees in his department?
18   A.    I believe he would be required to take his
19 pager or his cell phone to make himself accessible to
20 them.
21   Q.    Do you know whether Bob was able to
22 respond to his pager or cell phone at any of the times
23 that he was sleeping while he was on a break?
24   A.    I don't know.

Page 32

1    Q.    You mentioned earlier that at some point
2  you became aware, either through Bob or through
3  somebody else, that Bob said he had diabetes; is that
4  correct?
5    A.    Um-hmm (nodding head affirmatively).
6    Q.    I'm sorry?
7          MS. SCHOENING:  You have to say "yes."
8    A.    Oh, I'm sorry.  "Yes."
9    Q.    Did you also become aware that he had
10 severe sleep apnea?
11   A.    That came to light sometime later in the
12 whole process of this situation.  I was not aware of it
13 early.
14   Q.    Were you aware of that prior to Bob's
15 termination?
16   A.    No.  I think it came out when I heard his
17 deposition.
18         (Platek Exhibit No. 3 was marked for
19         identification.)
20   A.    (Witness reviewing document).
21   Q.    Roxann, you have been marked what has been
22 marked Exhibit 3 to your deposition.  I'd like you to
23 focus initially on the email from you to Lisa and Marty
24 at the bottom.

Page 33

1    A.    (Witness reviewing document).
2    Q.    Because that is the first email in the
3  chain, right?
4    A.    Right.
5    Q.    It looks like you are relaying a
6  conversation that you had with Bob to Lisa and Marty;
7  is that correct?
8    A.    I am.
9    Q.    And you said during your conversation that
10 Bob asked how he could be disciplined or given a
11 Level III if it was determined that his sleeping was a
12 result of a medical condition?
13   A.    Um-hmm (nodding head affirmatively).
14   Q.    And you told Bob you weren't sure of the
15 answer, but you would check on it; is that correct?
16   A.    Correct.
17   Q.    Did you ever get back to him?
18   A.    I did not.
19   Q.    Why not?
20   A.    I was instructed not to.
21   Q.    Who instructed you not to?
22   A.    Lisa Blank.
23   Q.    Did she tell you why you shouldn't get
24 back with him on that?

9 (Pages 30 to 33)

Lehman vs. St. Elizabeth                PLATEK                        7/13/2012

Page 34

1    A.    Because she thought the information would
2 be forthcoming, so we could give him a final answer
3 about his employment rather than just answering this
4 question; just take care of everything all at once.
5    Q.    And then Lisa responds to you just a
6 little bit later and states, "Well, based on what
7 Gerald said, Dr. Haskell said sleep apnea is not going
8 to be considered a valid medical excuse for sleeping on
9 the job." Do you see that?
10    A.    I do.
11    Q.    So at least at this point, as of September
12 15th, 2010, Lisa was letting you know that sleep apnea
13 was a potential medical condition Bob had, right?
14    A.    (Witness reviewing document).  That
15 appears that way.
16    Q.    And Lisa goes on to state that "only
17 narcolepsy would be something that we would have to
18 look at." Do you see that?
19    A.    (Witness reviewing document).  Yes.
20    Q.    Did you have any conversations directly
21 with either Dr. Haskell or Gerald Hynko about how they
22 came up with narcolepsy as the only medical condition
23 that would be justified?
24    A.    No.

Page 35

1    Q.    You don't know what they relied on in
2 coming up with that conclusion?
3    A.    No.
4    Q.    Gerald Hynco is not a doctor; is that
5 correct?
6    A.    I don't know his background.
7    Q.    Okay.  Lisa goes on further to state in
8 her email to you -- she asks you to "wait until we get
9 the report back from Dr. Haskell." Did you ever see
10 Dr. Haskell's report prior to Mr. Lehman's termination?
11    A.    No.
12    Q.    In response to Lisa, you tell her that you
13 didn't relay anything from Dr. Haskell's information,
14 and then you go on to state, "He, meaning Bob, thought
15 he had already been 'punished' by having to be off work
16 without pay and it seems he thinks he's off the hook if
17 medical." What did you mean about by that?
18    A.    What part are you asking about?
19    Q.    "It seems he thinks he's off the hook if
20 about medical."
21    A.    That he would retain employment and no
22 discipline.
23    Q.    If what?
24    A.    If medical.

Page 36

1    Q.    What did you mean by "if medical"?
2    A.    If medical -- if it was connected to a
3 medical condition, as in any medical condition.
4    Q.    Did he tell you that that was his belief
5 based on what both Gerald Hynko and Dr. Haskell had
6 told him?
7    A.    I don't recall whether he connected the
8 conversation to what Gerald had told him.  I just
9 remember that was part of this phone call that I wrote
10 about.
11    Q.    And did he say anything to you about the
12 fact that he understood that to be the case because of
13 ADA, or Americans with Disabilities Act?
14    A.    I don't recall that being part of the
15 conversation, only that he was concerned about this
16 question that is mentioned at the bottom of the email.
17    Q.    Do you know whether Mr. Lehman's sleep
18 apnea was in control at the time of his fit-for-duty
19 exam?
20    A.    No, I do no know.
21    Q.    Do you know whether his diabetes was in
22 control at the time of his fit-for-duty exam?
23    A.    I do not know.
24    Q.    In putting Mr. Lehman through the

Page 37

1 fit-for-duty exam, was the purpose to find out if Mr.
2 Duty -- Mr. Duty, sorry -- Mr. Lehman was capable of
3 performing his job?
4    A.    Can you rephrase that, please?
5    Q.    Yes.
6    A.    It didn't sound like a question.
7    Q.    Was the purpose of the fit-for-duty exam
8 to determine whether he was capable of performing his
9 job?
10    A.    My understanding of the fit-for-duty was
11 to find out if what Bob was saying was correct, that he
12 fell asleep without any control due to a medical
13 condition.
14    Q.    Have you reviewed Mr. Lehman's job
15 description?
16    A.    Have I reviewed it?
17    Q.    Yes.
18    A.    At any point during my employment with
19 St. Elizabeth?
20    Q.    Sure.
21    A.    No.
22    Q.    You didn't look at it during the time that
23 Mr. Lehman, this issue regarding Mr. Lehman sleeping on
24 the job came about?

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

Page 38

1      A.    I had no reason to do so.
2      Q.    Did you provide a copy of the job
3   description to Gerald Hynko?
4      A.    Gerald has access to those himself, so
5   there would be no need for me to send him one.
6      Q.    How did you learn about the allegation
7   that Mr. Lehman was sleeping?
8      A.    I learned it from one of his subordinates.
9      Q.    Who was that?
10     A.    Ken Rasor.
11     Q.    And was that during a follow-up discussion
12  with Ken regarding Ken's own performance?
13     A.    Yes.
14     Q.    What happened after you learned about the
15  allegation from Ken Rasor?
16     A.    I shared that with Lisa Blank.
17     Q.    What, if anything, did Lisa do or tell you
18  to do?
19     A.    That we would have to investigate it.
20     Q.    What specifics did Ken give you with
21  respect to Bob's sleeping?
22     A.    I don't remember the details of it, but he
23  talked about observing Bob sleeping on the job.
24     Q.    Did you have any follow-up conversations

Page 39

1   with Ken after you began your investigation?
2      A.    I may have.
3      Q.    Did you take any notes during that?
4      A.    Usually, I do, so I would -- I probably
5   did.
6      Q.    Would you typically -- if you met with Ken
7   and talked to him specifically about the allegations,
8   would you have relayed that information to Lisa Blank?
9      A.    Usually, I do that as well.  She likes to
10  know about what's going on in the department and the
11  hospital.
12     Q.    Would you have relayed that to her likely
13  in an email?
14     A.    Yes, probably.
15     Q.    Would you also have relayed that
16  information to Mike Kraft?
17     A.    Yes.
18     Q.    Again, probably in an email?
19     A.    It could have been email; it could have
20  been phone.
21     Q.    Okay.
22     A.    It just depends.
23     Q.    Okay.
24     A.    Both methods are used in communicating

Page 40

1   about things, and he would have needed to have known
2   about the situation, and he would have been involved in
3   the investigation.
4      Q.    Other than speaking with Ken Rasor about
5   his observations, did you talk with anyone else about
6   whether or not they observed Bob sleeping?
7      A.    I did.
8      Q.    Who did you speak with?
9      A.    Kim Difilippo.
10     Q.    What is Kim's position?
11     A.    She's the secretary for the Security
12  Department.
13     Q.    Did you speak with anyone else besides Ken
14  and Kim?
15     A.    Those were the two I spoke to.
16     Q.    How long was your conversation with Kim?
17     A.    I don't recall how long it was.
18     Q.    Why did you approach Kim?
19     A.    Because, supposedly, she observed Bob
20  sleeping also, and to find out if that was correct, and
21  also to get information about that.
22          (Platek Exhibit No. 4 was marked for
23          identification.)
24     A.    (Witness reviewing document).

Page 41

1          MS. DAUGHTREY NEFF:  I think the last
2      email might not supposed to be included on here.
3      Let's just pull off the last one, SEMC0150.  Is
4      that on yours?
5          MS. SCHOENING:  Yes.
6          MS. DAUGHTREY NEFF:  Okay.
7          MS. SCHOENING:  It's not a correct
8      timeline.
9      Q.    Roxann, you have been handed what is
10  marked Exhibit 4 to your deposition?
11     A.    Yes.
12     Q.    Obviously, it's an email train which ends
13  on Thursday, August 19th, 2010 at 3:03 p.m. and begins
14  Thursday, August 19th at 8:36 a.m.?
15     A.    Yes.
16     Q.    Okay.  And this is, if you look at the
17  first email which is actually on the second-to-last
18  page, which is the one to you and to Lisa and Mike, why
19  did you go back and meet with Ken in the first place?
20     A.    After Bob and Mike and I and Ken met
21  regarding his performance, the end of the meeting
22  appeared that Ken left and he was not content, but he
23  was also not speaking any further.  And I thought that
24  it would be helpful if I met with Ken alone to see if

11 (Pages 38 to 41)

Lehman vs. St. Elizabeth                    PLATEK                                7/13/2012

---

Page 42

1   we could work through whatever he was feeling, get a
2   better understanding, see if I could assist with the
3   group.
4        Q.    So you were present for the meeting
5   between Bob, Mike, and Ken?
6        A.    Yes.
7        Q.    And were either Bob or Mike bullying Ken?
8        A.    No.
9        Q.    Were they harassing him?
10       A.    No.
11       Q.    Were they describing some of his
12   performance deficiencies?
13       A.    Yes.
14       Q.    Were they also talking about the things
15   that he was doing well?
16       A.    Yes.
17       Q.    Was this some kind of a disciplinary
18   meeting with him?
19       A.    Yes.
20       Q.    And was it like an action type thing?
21       A.    Yes, it was part of a work improvement
22   plan.
23       Q.    Work improvement plan?
24       A.    (Nodding head affirmatively).

Page 43

1        Q.    How was Ken Rasor's performance at this
2   time?
3             MS. SCHOENING:  Objection.  Go ahead and
4        answer.
5        A.    It was borderline.
6        Q.    Did you assist Mike and Bob in creating
7   the work improvement plan?
8        A.    I did.
9        Q.    Do you remember what it was about Ken's
10   performance that needed improved at the time?
11       A.    I probably will not recall everything, but
12   I remember that his reports were incomplete, and he had
13   been reminded of it several times; spelling errors,
14   which he had been reminded of several times and
15   provided resources and training to address; not being
16   where he should be.  Those are the things that come to
17   mind immediately.
18       Q.    And you say "not being where he should
19   be."  What was the issue with that?
20       A.    The Security Officers are to be rounding
21   the hospital and patrolling, and he was spending too
22   much time in the office and not out doing the rounding
23   and the patrolling.
24       Q.    And why do the Security Officers round and

Page 44

1   patrol?
2        A.    It's for them to be doing their jobs,
3   making sure we're providing a safe and secure
4   environment for the patients and visitors, be ready to
5   address issues that come up.  Also be visible so the
6   people see that there is Security near if they need
7   assistance.  So it would be for those reasons.
8        Q.    So by not rounding or patrolling, could
9   that be impacting the safety and Security of the
10   facility?
11       A.    Yes.
12       Q.    Was this the first work improvement plan
13   for Ken that you were aware of?
14       A.    It's the first one that I was involved in.
15   It was structured that way.  There may have been
16   others.  I don't recall any others.
17       Q.    Is a working plan similar to like a
18   performance improvement plan?
19       A.    Yes.
20       Q.    Was it like a specific time plan he had to
21   complete at the time?
22       A.    Yes.
23       Q.    What was it?
24       A.    I think we gave him 90 days because of the

Page 45

1   number of things that needed to be addressed.
2        Q.    And this was your first meeting with him
3   on that work improvement plan?
4        A.    No.
5        Q.    What meeting was this?
6        A.    He had been meeting with Mike and I, and
7   sometimes Bob when he could attend, on a monthly basis
8   since probably the beginning of that year -- one of the
9   early months of that year.
10       Q.    Okay.  Did Ken's performance ever improve?
11       A.    At times.
12       Q.    Okay.  You were involved in Ken's
13   termination; is that correct?
14       A.    Yes.
15       Q.    Why was he terminated?
16             MS. SCHOENING:  I'm going to object.  But
17        go ahead and answer.
18       A.    I feel -- if I remember this correctly, he
19   failed to meet the performance standards.
20       Q.    Okay.  Do you know whether there was ever
21   an accusation that he also falsified his time records?
22       A.    I don't recall.
23       Q.    When you met with Ken and he told you that
24   Bob was sleeping in his office, he was also expressing

12 (Pages 42 to 45)

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

Page 46

1  to you that he felt like Mike and Bob were bullies and
2  harassed him and things like that, right?
3       A.    Correct.
4       Q.    Did the initial conversation with Ken that
5  you are relaying here to Lisa and Mike -- did anything
6  Ken tell you raise any red flags for you?
7       A.    As in?
8       Q.    Something you should follow up on.
9       A.    Obviously, anything that he would discuss
10 that would raise a flag, I would need to follow up on.
11 The -- well, shall I refer to this (indicating) --
12      Q.    Sure.
13      A.    -- specifically?
14      Q.    Sure.
15      A.    Let me read it again.
16      Q.    Okay.
17      A.    (Witness reviewing document). Clearly,
18 from this situation, I felt we needed to follow up,
19 because I have this email trail of reporting what I
20 took in my conversation with Ken and forwarding it on
21 to the other individuals.
22      Q.    If you could turn to the last page of the
23 exhibit.
24      A.    Um-hmm (nodding head affirmatively).

Page 47

1  (Witness reviewing document).
2       Q.    In the last paragraph there, a couple
3  sentences in, beginning with, "I know he is
4  exasperating when he can't get over an issue and makes
5  a small issue into a big one," and you say further,
6  that "he has so much anger." Did the Security Officers
7  have any kind of weapons?
8       A.    They do.
9       Q.    Were you concerned at all about having a
10 Security Officer with so much anger working at the
11 facility with weapons?
12      A.    Sure. You can always be concerned about
13 anybody who would have anger issues. His anger was
14 directed at Bob and Mike for them holding him
15 accountable for doing his job.
16      Q.    You weren't concerned at all about either
17 Bob or Mike's safety?
18      A.    I had spoken to Mike on other occasions
19 about the fact that people with anger have weapons
20 available to them in the Security Department, and he
21 did not believe that Ken would have -- would have taken
22 advantage in that way.
23      Q.    Okay. In response to your email, if you
24 turn to the second page of this exhibit, which at the

Page 48

1  bottom it says SMC0466.
2       A.    Um-hmm (nodding head affirmatively).
3       Q.    Lisa responds to you and says, "He,"
4  meaning Ken, "is never going to agree on anything with
5  you, Mike" -- you know, directing that directly at
6  Mike -- "and doesn't feel supported at meetings." And
7  then she goes on. And she further states that she does
8  "worry about the sleeping complaint," and says that
9  "we" -- I'm assuming meaning you and Mike and Lisa --
10 "need to document that we actually looked into that."
11 Do you see that?
12      A.    (Witness reviewing document).
13      Q.    It's right above the end there
14 (indicating). "I do worry."
15      A.    Let me read the whole thing. (Witness
16 reviewing document). Okay. I see it.
17      Q.    Is that the reason why you looked into
18 whether Mr. Lehman was sleeping?
19      A.    Correct.
20      Q.    In response to both you and Lisa, Mike
21 responds just a short while later, stating that he can
22 assure you that Bob is not sleeping in the office; is
23 that correct?
24      A.    Yes.

Page 49

1       Q.    And if you want to take your time to read
2  it, you can. But essentially, Mike bases his
3  assurances on the fact that Bob has been performing his
4  work in a timely manner and has been meeting his
5  expectations; is that correct?
6       A.    I recall that, yes.
7       Q.    Okay.
8       A.    And he didn't know that Mike -- that Bob
9  was sleeping.
10      Q.    Right. He had never seen him sleeping?
11      A.    Correct.
12      Q.    And --
13      A.    No one had ever told him he was sleeping.
14      Q.    Mike, would he typically work day shift?
15      A.    As far as I know.
16      Q.    And he is the Director of all of Security?
17      A.    Correct.
18      Q.    Does he have an office located in each
19 facility or just in the Edgewood office?
20      A.    I know of his Edgewood office. I don't
21 know if he has something else.
22      Q.    Okay. Actually, before you move to the
23 first page -- sorry.
24      A.    Okay.

13 (Pages 46 to 49)

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

---

Page 50

1    Q.    Okay.  In the second paragraph of Mike's
2  email to you and to Lisa, he also says that -- just a
3  couple sentences in, so if you need to, take your
4  time" -- "In our last meeting, Ken accused both Bob and
5  I of lying."  Do you see that?
6    A.    Um-hmm (nodding head affirmatively).
7    Q.    Do you have any concerns about an employee
8  accusing his supervisor and the next-up manager of
9  lying?
10   A.    Sure.
11   Q.    Did you do anything to further discipline
12 Ken for that?
13   A.    For accusing his manager online?
14   Q.    Yes.
15   A.    He was coached on that many times, and
16 Mike and Bob thought Ken did that frequently.
17   Q.    Okay.  Now, back to the first page.  Mike
18 emails again both you and Lisa, and it looks like, I
19 guess, Doug Chambers has been copied on a couple of
20 these.  And he explains to you some concerns after
21 speaking with Kim, correct?  And take your time.
22   A.    (Witness reviewing document).
23   Q.    He explained to both you and Lisa that Kim
24 was reluctant to talk because she is afraid to get on

Page 51

1  Ken's bad side?
2    A.    Yes.
3    Q.    Okay.  And Kim also said that Ken was
4  someone who creates problems and will not stop until he
5  wins, right?
6    A.    Yes, she said that.
7    Q.    And she did not want him coming after her,
8  right?
9    A.    (Witness reviewing document).
10   Q.    It's right after that (indicating).
11   A.    Yeah.  Whatever I put in here is what she
12 told me.
13   Q.    Did that concern you that an employee
14 is -- you say Kim is a secretary?
15   A.    She is.
16   Q.    And would that be a position that is below
17 Ken Rasor?
18   A.    I don't know if we would consider it
19 below.
20   Q.    Okay.
21   A.    So I would have to say possibly equal.
22   Q.    Did Ken have any supervisory
23 responsibility over her?
24   A.    No, not unless he was charged.

Page 52

1    Q.    Were you concerned that Kim was afraid of
2  Ken coming after her?
3    A.    Sure.  I'm always concerned if an employee
4  is fearful of somebody else.
5    Q.    Did you follow up with Kim about her
6  concern regarding Ken?
7    A.    Yes.
8    Q.    When did you do that?
9    A.    I don't know.
10   Q.    Okay.
11   A.    I don't recall the date.
12   Q.    Do you believe that you spoke with her
13 about that when you spoke with her about the accusation
14 against Bob?
15   A.    Probably then, or it could have been as a
16 follow-up.
17   Q.    Okay.  Did you take any notes during that
18 meeting with Kim, or meetings?
19   A.    I probably did.
20   Q.    Okay.
21   A.    I probably put it in an email.
22   Q.    Do you know if you followed up with Ken
23 Rasor regarding Kim's concerns about being threatened?
24   A.    I don't recall.

Page 53

1    Q.    Did Lisa Blank ask you to investigate that
2  further, the concern of Kim being threatened by Ken?
3    A.    I don't recall.
4    Q.    In response to this email from Mike,
5  Lisa's response is at the top, and she instructs Mike
6  that "St. Elizabeth needs to address any allegations
7  about Bob sleeping and that the company can't retaliate
8  against Ken because it's important to treat him just
9  like all of our other associates."  Why is it important
10 not to retaliate against an employee?
11   A.    That's our policies.  That's our culture.
12 They need to be free to express their concerns and have
13 them addressed.
14   Q.    Okay.  After Lisa sent this email to both
15 you and Mike, did you then set up a time to try to
16 speak with Kim?
17   A.    I know I spoke with her after this.  I
18 believe, though, that she first spoke with Mike.
19        (Platek Exhibit No. 5 was marked for
20        identification.)
21   A.    (Witness reviewing document).
22   Q.    Roxann, you've been handed what has been
23 marked as Exhibit 5 to your deposition.
24   A.    Um-hmm (nodding head affirmatively).

14 (Pages 50 to 53)

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

---

Page 54

1      Q.    It looks like you emailed Kim on September
2  1, 2010, requesting for her to relay what she witnessed
3  in terms of Bob sleeping at work; is that correct?
4      A.    Correct.
5      Q.    And then asked to meet with you in person?
6      A.    Correct.
7      Q.    Okay.  And if you turn to the second page,
8  it looks like you're relaying your in-person meeting
9  with Kim to Lisa and Marty; is that correct?
10      A.    Correct.
11      Q.    How did that meeting with Kim go?  Did you
12  pepper her with questions, or did she just simply relay
13  what she witnessed to you, and you just wrote down what
14  she said?
15      A.    It's not my practice to pepper people with
16  questions, so it's unlikely that that happened.
17      Q.    Okay.
18      A.    I probably would have asked her simply to
19  explain about had she ever seen him sleeping, and then
20  explain what and when and how many times, and just give
21  me the details.
22      Q.    Okay.  And she explained to you that, on
23  two occasions, Ken Rasor made her -- I think it sounds
24  like she turned her chair around to look in Bob's

---

Page 55

1  office to see that his eyes were closed, right?
2      A.    Correct.
3      Q.    And then, on another time, Mike Boarman,
4  who is another Security Officer; is that correct?
5      A.    Yes.
6      Q.    Asked her to do the same thing?
7      A.    Correct.
8      Q.    And you can take your time, obviously, if
9  you need to read this.  But about three-quarters of the
10  way down, you noted that Kim felt Bob had some medical
11  issues that could be contributing to these times she
12  saw him sleeping.  It starts with, "She also feels Bob
13  has some medical issues."
14      A.    (Witness reviewing document).  Okay.  I
15  see it.
16      Q.    Did you ask her specifically about that,
17  or did she just bring that up to you?
18      A.    I did not ask her about that.
19      Q.    And in the next sentence, you state that
20  "She," again Kim, "also said she wasn't sure if he
21  might have been on a break either."  Did you ask Kim
22  whether or not she knew if Bob was on a break, or did
23  she just bring that up?
24      A.    I don't recall whether I asked her or if

---

Page 56

1  she just brought it up.
2      Q.    Okay.
3      A.    I recounted the situation here as best
4  from the meeting.
5      Q.    Would Kim have had any reason to know when
6  the different officers were on breaks?
7      A.    I'm not sure if she would have needed to
8  be informed or not.
9      Q.    Okay.
10      A.    She sits in the office with them.
11      Q.    Okay.  Do you know how the Security
12  Officers notify one another that they're going to be
13  taking a break?
14      A.    I do not.
15      Q.    Do you know if there is some kind of log
16  showing when a Security Officer is taking a break?
17      A.    I know they do keep a log.  I don't know
18  if it puts them -- if they have to put their breaks on
19  that.
20      Q.    Okay.  Is that log electronic?
21      A.    I recall seeing some in writing when we
22  were dealing with Ken's performance review.  I don't
23  recall, though, if that was printed from something they
24  kept electronic or just handwritten.

---

Page 57

1      Q.    Okay.  During the investigation into the
2  allegations that Mr. Lehman was sleeping, did you do
3  anything to try to determine whether Mr. Lehman was in
4  fact sleeping on a break?
5      A.    Besides gather the information from Ken
6  and Kim, no.
7      Q.    Okay.
8      A.    Not that I recall.
9      Q.    And Kim told you she wasn't sure; in fact,
10  she said he might have been on a break, right?
11      A.    (Witness reviewing document).  Yes.
12      Q.    Okay.  What did Ken tell you?
13      A.    I don't recall.
14      Q.    With respect to whether or not he was on a
15  break?
16      A.    I don't recall.
17          (Reference to previously-marked Platek
18          Exhibit No. 4.)
19      Q.    Okay.  I know you said you reviewed a few
20  emails.  I'm not sure if any of these were ones that
21  you reviewed in preparation for your deposition, but
22  I'd actually like you to refer back to Exhibit 4 for a
23  second here.
24      A.    (Witness reviewing document).

---

15 (Pages 54 to 57)

Lehman vs. St. Elizabeth                    PLATEK                         7/13/2012

Page 58

1    Q.    And to your initial email to Lisa and Mike
2  on August 19th at 8:36 a.m.
3    A.    (Witness reviewing document).
4    Q.    Okay. Can you remember any other
5  documentation that you created describing your
6  communication with Ken Rasor regarding Mr. Lehman's
7  sleeping other than this email?
8    A.    I have no idea.
9    Q.    Okay.
10   A.    It's a long time ago, lots of people
11 between.
12   Q.    Did you review this email exchange in
13 preparation for your deposition?
14   A.    I don't know if this is one of them or
15 not.
16   Q.    Approximately how many emails would you
17 say that you reviewed in preparation for your
18 deposition?
19   A.    It seems like it was only about four or
20 five.
21   Q.    Okay. Did you take notes that you used to
22 relay the meeting you had with Ken to Lisa and Mike?
23   A.    Usually, I do take notes.
24   Q.    And what do you do with those notes?

Page 59

1    A.    Once I type the information up, then the
2  notes are not necessary.
3    Q.    So what do you do with them?
4    A.    Oh, I'm sorry. We have a burn barrel
5  where we discard confidential information.
6    Q.    Do you know if you typed your notes up
7  from that initial meetings anywhere else other than in
8  this email to Lisa and to Mike?
9    A.    I don't recall.
10   Q.    Are there occasions when you type up notes
11 from meetings regarding Employee Relations issues where
12 you just keep the note on your computer system and
13 don't actually email it to somebody?
14   A.    Sure.
15   Q.    Are there different folders that you have
16 to keep those notes in?
17   A.    Yes.
18   Q.    How are they typically maintained?
19   A.    They're maintained in calendar year,
20 advisor initials, employee name, something of that
21 nature, so they're easy to get back to.
22   Q.    So if you had typed something up from that
23 meeting, it would probably be in 2010 calendar year and
24 then under whose name? Ken Rasor's?

Page 60

1    A.    No, it would be my initials.
2    Q.    Oh, your initials?
3    A.    The Advisors. We have several Advisors.
4    Q.    Is that something saved on a server or is
5  it just saved on your desktop?
6    A.    It's a server.
7          MS. SCHOENING: Whenever you get to a good
8  breaking point, it's 12:30.
9          MS. DAUGHTREY NEFF: Let me check just a
10 second.
11         Just a couple more questions before we
12 take a break.
13   Q.    Roxann, during the time that you were
14 investigating the allegations that Mr. Lehman was
15 sleeping, did Mike ever lose control with you?
16   A.    Yes.
17   Q.    And what happened?
18   A.    On a phone call with him regarding
19 policies, he was not happy with the answer about the
20 policy.
21   Q.    And what specific policy was he asking you
22 about or were you discussing?
23   A.    Probably the disciplinary action policy.
24   Q.    Do you remember what answer you gave him

Page 61

1  that he was unhappy about?
2    A.    I don't remember the specifics, but it was
3  around the action that would be taken for associates
4  who sleep on the job.
5    Q.    Did you tell him what level of discipline
6  an employee was to receive for sleeping on the job?
7    A.    I believe I referenced the grid in our
8  discipline policy that says, "First offense, Level III;
9  second offense, a discharge," and I believe that was
10 the issue he didn't want to hear.
11   Q.    Were you surprised that he was not aware
12 of that?
13   A.    I think he -- that wasn't really my
14 response. I wasn't thinking that. My response and
15 surprise was around his response to that.
16   Q.    And he was calling you about the
17 disciplinary policy as it related to sleeping because
18 of the accusation that Bob had been sleeping, right?
19   A.    Right.
20   Q.    Did you speak with Mike's boss about him
21 losing control with you?
22   A.    I don't recall speaking to his boss about
23 that.
24   Q.    I'm sorry. His boss is Doug Chambers,

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                          PLATEK                          7/13/2012

Page 62

1   right?
2       A.   Right.
3       Q.   And you didn't in any way discipline Mike
4   for his reaction?
5       A.   It would not have been my place to
6   discipline Mike.
7       Q.   Okay.
8       A.   It's not HR's job to discipline, but to
9   advise.  I shared with Lisa and Mike as I remember.
10      Q.   Did Lisa say anything about his reaction?
11      A.   I don't recall what she said.  I know in
12  my case, I get yelled at when I deliver a message that
13  managers don't want to hear.  So I just assumed it was
14  the same with him.  He apologized for it later.
15          MS. DAUGHTREY NEFF:  Okay.  All right.
16      Let's go off the record.
17          (Off-the-record discussion.)
18          (At which time, a luncheon recess was
19          taken from 12:37 p.m. until 01:38 p.m.)
20          MS. DAUGHTREY NEFF:  Let's go back on the
21      record.
22      Q.   Roxann, if you need to refer back to
23  Platek Exhibit No. 4 for assistance, that's fine.  I'm
24  just wanting to know whether you followed up on Ken

Page 63

1   Rasor's allegation that Bob didn't give him proper
2   backup when there was an emergency.  And if you need
3   to, refer to your initial email on August 19th, 2010,
4   8:36 a.m., to Lisa and to Mike.
5       A.   (Witness reviewing document).  I don't
6   recall.
7       Q.   Okay.  Did he explain what he was
8   referring to that you can recall?
9       A.   I believe that had to do with, like, a
10  dispatch call, and Bob was called and Ken was called.
11  And I think that Bob wasn't able to get there soon
12  enough, or wasn't able to deal with the situation.
13  Something on that order.  I just don't recall all the
14  details on that.  Sorry.
15      Q.   That's Okay.  Did you talk with Bob about
16  that allegation?
17      A.   I don't remember if I did.
18      Q.   And in this emergency situation that you
19  described, was that a situation where only Ken and Bob
20  were on duty at the same time, but nobody else was on
21  duty?
22      A.   I don't recall.
23      Q.   Do you know whether it's common for only
24  two Security Officers at the Edgewood location to be on

Page 64

1   duty at a time?
2       A.   I don't know.
3       Q.   Did you do anything to investigate as to
4   whether there would ever have been an occasion in a
5   time period close to August 19th of 2010 where only two
6   Security Officers would be on duty?
7       A.   I don't recall.
8       Q.   Do you know approximately how many
9   Security Officers are on duty at the Edgewood location?
10      A.   I don't know that number.
11      Q.   You mentioned earlier that your job
12  responsibilities as an HR Advisor include Employment
13  Relations responsibilities, I think, and also some
14  Recruiting.  In terms of your Employee Relations
15  functions, do you often assist with termination
16  decisions?
17      A.   I would prepare information and make a
18  recommendation with the assistance of the manager.  The
19  manager would have had a situation that they think that
20  that warrants termination, and so I assist in that
21  process, yes, but it's not my final decision; I'm just
22  a part of the process.
23      Q.   Whose final decision would it be?
24      A.   It's a collaborative effort.  The

Page 65

1   recommendations would go to Marty Oscadal, who is
2   Senior VP of Human Resources; also to Lisa Blank; and
3   then, on the function side of the chain, the reporting
4   chain, it would be -- it would go all the way up to
5   their SVP.
6       Q.   And for the departments that are within
7   your -- I don't know how to phrase that, but just
8   "within your area of responsibility," I guess, is the
9   best way to say it.
10      A.   Okay.
11      Q.   For the departments that are within your
12  area of responsibility, do you expect the managers to
13  get you involved in every decision?
14      A.   They're required to.  They're not
15  permitted to terminate without HR involvement.
16      Q.   And similarly, for the -- and I'm just
17  focusing on the departments that are within your area
18  of responsibility.  If the manager wanted to give an
19  employee a Level III of discipline, would they need to
20  get your advice?
21      A.   Not only my advice, but they would also --
22  we are the ones who prepare the documentation for that.
23      Q.   Okay.
24      A.   So they can't issue one without HR being

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    PLATEK                        7/13/2012

Page 66

1    involved.
2        Q.    Is there any level of discipline that a
3    manager can issue without having HR involvement?
4        A.    Yes.
5        Q.    What is that?
6        A.    In our disciplinary process, it's called a
7    Level I.  Discussion planners are something also they
8    can issue without HR involvement.
9        Q.    Okay.
10       A.    But Level IIs, Level IIIs, and
11   terminations require HR involvement.
12       Q.    Discussion planners and Level I are two
13   separate things, right?
14       A.    Correct.
15       Q.    What is a Level I?
16       A.    That would be the first.  That's written,
17   but it's in their personnel file at the manager level,
18   and does not come to the Human Resources level.
19       Q.    Okay.
20       A.    So we would not even know about it at
21   times.
22       Q.    Then what is a Level II?
23       A.    Another written form of discipline and
24   their reaction.  There are consequences attached to

Page 67

1    that, and they lose the monetary benefit that they
2    have, and it is in place for a year.  It does require
3    HR involvement before that is prepared, and it is in
4    their personnel file in the HR Department.
5        Q.    What is the monetary benefit that is lost
6    if you're placed on a Level II?
7        A.    They would lose their Gainsharing bonus.
8        Q.    And what is a Gainsharing bonus?
9        A.    It's a bonus that has -- it's a program
10   that we have on an annual basis.  And based on the
11   performance of all the associates together at the
12   hospital, there's a monetary amount determined that
13   they would receive if all the goals are met and so on.
14   Calculation is involved, and the person who receives a
15   Level II would lose that for that plan year.
16       Q.    Does each employee receive the same
17   amount, or is it based on something like their years of
18   service or salary?
19       A.    There's an amount determined for a
20   full-time person.
21       Q.    Okay.
22       A.    And then for those who are not full time,
23   it's prorated.
24       Q.    And since you've been employed with -- are

Page 68

1    you also eligible for Gainsharing bonuses?
2        A.    Yes.
3        Q.    Since you've been employed with
4    St. Elizabeth, have there been any years where you as
5    an employee have not received one?
6        A.    No.
7        Q.    Do you have any responsibility for
8    benefits?
9        A.    No.
10       Q.    Is there another HR Department that
11   handles benefits, employee benefits?
12       A.    Yes.
13       Q.    And what's the name of that department?
14       A.    Compensation and Benefits.
15       Q.    Okay.
16       A.    My role would be just helping people get
17   to the right people, answering general questions.
18       Q.    Do you have any knowledge as to what
19   benefits St. Elizabeth offers to its full-time
20   employees?
21       A.    Yes.
22       Q.    And what benefits does it offer?
23       A.    Are you asking me to list them all?
24       Q.    Yes.

Page 69

1        A.    This may not include everything because
2    there's quite a bit.
3        Q.    Right.
4        A.    So I'll do my best.  We have health plans,
5    dental plans, vision plans, pension, 403(b), life
6    insurance, short-term disability, long-term disability,
7    PTO, which also includes paid vacation and paid
8    holidays.  Those all go into that same bucket.  Tuition
9    reimbursement program.  We have discounts in our
10   cafeteria, child care, sick child care.  Those are all
11   that come to my mind immediately.
12       Q.    What is 403(b)?
13       A.    It's like a 401(k).
14       Q.    Does St. Elizabeth contribute to that?
15       A.    Yes.
16       Q.    Is there a certain percentage that
17   St. Elizabeth will contribute up to?
18       A.    There are rules about that.  It depends on
19   the person's date of hire about how all that works.
20       Q.    And with short-term disability, is that
21   something -- is it automatically given to a full-time
22   employees, or do they have to pay into it?
23       A.    They do not have to pay into it.
24       Q.    Okay.

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

---

Page 70

1      A.    But the employees do have an option to
2  waive it too.
3      Q.    How about long-term disability?  Is that
4  something that the employees have to purchase?
5      A.    No.
6      Q.    Is it similar to short-term disability
7  where an employee can opt out of it?
8      A.    Yes.
9      Q.    If you know, how is PTO determined, how
10  much PTO an employee gets?
11      A.    It's a factor of their worked hours.
12      Q.    Okay.  So it's not based on how many years
13  of service they have?
14      A.    It correlates to that, but it's based on
15  how many hours they actually worked.
16      Q.    In a year?
17      A.    Over the life of their employment.
18      Q.    Oh, okay.  And then vacation, how is that
19  determined?
20      A.    It is part of PTO.
21      Q.    Okay.
22      A.    And so is the sick and holidays.
23      Q.    So similarly, it's based on the hours
24  worked over the life of their career?

---

Page 71

1      A.    Correct.
2      Q.    Did you say there's also a pension plan?
3      A.    Yes.
4      Q.    Are all full-time employees eligible for
5  that?
6      A.    Yes.
7      Q.    The St. Elizabeth Hospital has a
8  disciplinary policy, correct?
9      A.    Yes.
10      Q.    And you were discussing earlier that there
11  is Level I discipline, Level II, Level III, and Level
12  IV, right?
13      A.    No.
14      Q.    Sorry.  Level IV would be termination?
15      A.    Well, we don't refer to it as a Level IV.
16      Q.    Right.  Discharge?
17      A.    So it's a Level I, II, III, termination.
18      Q.    All right.  Okay.  And that is outlined in
19  the disciplinary policy?
20      A.    Yes.
21      Q.    And I understand that at some point
22  recently St. Elizabeth changed its disciplinary policy
23  as it relates to sleeping at work?
24      A.    Yes.

---

Page 72

1      Q.    Is that correct?  And what is the new
2  policy?
3      A.    It's dischargeable on first offense.
4      Q.    And when did that policy change?
5      A.    I don't have the precise date.
6      Q.    Do you know whether it was in 2010?
7      A.    I don't know without looking.
8      Q.    How would you be able to tell what year it
9  was changed?
10      A.    If I were looking for a specific change
11  made to our policies, I would probably call the person
12  in our office to find out the date.
13      Q.    And who would you call?
14      A.    I would probably call Tony Bell.
15      Q.    Who is Tony Bell?
16      A.    He's the person who assists with making
17  the changes on the system.
18      Q.    At the time of Mr. Lehman's discharge, the
19  policy as it related to sleeping on the job was
20  not termination on the first offense; is that correct?
21      A.    Correct.
22      Q.    And he was terminated sometime in
23  September of 2010?  Does that sound familiar?
24      A.    I don't know the precise date.

---

Page 73

1      Q.    Okay.
2      A.    It would appear -- it might be close to
3  that by the emails and the conversations we were
4  having.
5      Q.    Do you know whether John Dubis was the CEO
6  at the time the policy was changed?
7      A.    Yes.
8      Q.    He was?
9      A.    Yes.
10      Q.    That helps us maybe narrow down when it
11  occurred, right?
12      A.    Sure.
13      Q.    Because he has only been a CEO since
14  January of 2010.  Does that sound right?
15      A.    Perhaps.
16      MS. SCHOENING:  If you don't know, just
17  say you don't know.
18      A.    Yeah, I don't know.
19      Q.    Okay.  Why was the policy changed?
20      A.    (No response).
21      Q.    If you know.
22      A.    Sleeping -- I understood the policy was
23  changed because sleeping was a problem with several
24  associates.

19 (Pages 70 to 73)

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

Page 74

1    Q.    Okay.  And do you know the reason why
2  you're aware of it?
3    A.    No.
4    Q.    Were you involved in the decision to --
5  strike that.  Were you involved in either
6  investigating -- I'm going to start over from the very
7  beginning.  Okay.  Sorry about that.  Were you involved
8  in investigating any other allegation of sleeping on
9  the job other than Bob Lehman's?
10    A.    Yes.
11    Q.    Approximately how many have you been
12  involved in since you started working with
13  St. Elizabeth?
14    A.    There have been probably four.
15    Q.    Can you remember any of the employees that
16  were accused of sleeping other than Mr. Lehman?
17    A.    Robert Landers, Robert Gordon Landers.
18  Joe Edelbroich.  And there's another one.  I don't
19  recall his name.
20    Q.    And Robert Landers and Joe Edelbroich,
21  were they both Security Officers?
22    A.    Yes.
23    Q.    In which facility were they Security
24  Officers at?

Page 75

1    A.    Landers was at Lawrence and Edelbroich at
2  Edgewood.
3    Q.    Was Edelbroich on first or second shift,
4  or day or night shift?
5    A.    I believe he was day.
6    Q.    Were you involved in investigating an
7  allegation of sleeping on behalf of Teresa Porter?
8    A.    No.
9    Q.    How about Emily Seibel?
10    A.    No.  I don't recall being involved in
11  hers.
12    Q.    Sinda Carmen?
13    A.    No.
14    Q.    Donald Kannady?
15    A.    No.
16    Q.    Amanda Rickey?
17    A.    No.
18    Q.    Would Registered Nurses be within your
19  group of employees that are within your responsibility?
20    A.    No, not usually.
21    Q.    Marketing, would a Marketing employee
22  would be within your responsibility?
23    A.    No.
24    Q.    Joe Edelbroich -- is it "Edelbroich"?  Is

Page 76

1  that you pronounce it?
2    A.    I'm not sure I pronounced it correctly.
3    Q.    But that's what we'll go by today, since
4  he's not here, right?
5    A.    "Joe" might be better.
6    Q.    Joe, you said, was a Security Officer at
7  Florence?
8    A.    No.
9    Q.    I'm sorry.  Where was he?
10    A.    Edgewood.
11    Q.    And he was terminated recently in February
12  of 2012; is that correct?
13    A.    He was terminated recently.  I don't know
14  the date.
15    Q.    Do you know whether -- when Joe was
16  accused of sleeping while at work, was that after the
17  policy had changed?
18    A.    It was.
19    Q.    Okay.  And what can you remember from the
20  allegations regarding his sleeping?
21    A.    The allegations were that he was sleeping
22  in one of the offices, that he was paged on his pager,
23  he wasn't responding, and one of the co-workers went to
24  find him, found him sleeping, observed it, took his own

Page 77

1  pager, called Joe, got it to click to indicate that
2  they were communicating, and then he reported it
3  afterwards.
4    Q.    Okay.  Did you conduct the investigation?
5    A.    Mike Kraft and I did.
6    Q.    And did Joe deny the allegation?
7    A.    He was never able to provide an
8  explanation for what he was doing during that time
9  period, so he did not deny, he did not confirm.
10    Q.    Okay.  And what, if anything, can you
11  remember from the incident, the sleeping incident
12  relating to Robert Landers?
13    A.    It was reported by a couple nurses from
14  the parking lot walking by him in his company vehicle
15  while on duty sleeping.  They waved at him.  He did not
16  respond.  And at a different night, Mike Kraft went out
17  in his own vehicle, waited in the parking lot to see if
18  he observed that behavior, and he did.
19    Q.    The nurses that reported seeing Mr.
20  Landers, was that all on the same occasion or different
21  occasions?
22    A.    The two people?
23    Q.    Yes.
24    A.    Same.

20 (Pages 74 to 77)

Lehman vs. St. Elizabeth                    PLATEK                         7/13/2012

---

Page 78

1    Q.    Did Mr. Landers deny sleeping?
2    A.    I don't recall.
3    Q.    Okay.  Were you also involved in the
4 investigation into whether Andrew Caple was sleeping?
5    A.    Yes.
6    Q.    And what, if anything, can you remember
7 about that investigation?
8    A.    I don't recall the situation.
9    Q.    And do you recall that the accusations
10 regarding Mr. Caple occurred in early 2012?
11    A.    I wouldn't be able to provide the day
12 without checking back on the records.
13    Q.    Do you know whether the allegations
14 regarding Mr. Caple -- did that occur after the policy
15 had changed?
16    A.    I believe it did.
17    Q.    Okay.  And was Mr. Caple terminated?
18    A.    He was.
19    Q.    Are there any other investigations that
20 you can think of, other than Robert Landers, Joe
21 Edelbroich, Andrew Caple, and Bob Lehman, that you were
22 involved in relating to accusations of sleeping?
23    A.    No.
24    Q.    Were you involved at all in investigating

Page 79

1 allegations against Connie Smoot?
2    A.    No.
3    Q.    Were you involved in any allegations
4 involving Laura Kruthoffer?
5    A.    No.
6    Q.    Were you involved in any allegations
7 against Teresa Porter?
8    A.    No.
9    Q.    Are you ever involved in any hiring
10 decisions for employees that are within the departments
11 that you have responsibility for?
12    A.    Yes.
13    Q.    And what kind of involvement would you
14 have in those hiring decisions?
15    A.    The managers and I would talk about the
16 candidates, and it's the manager's decision in the end,
17 but they appreciate the feedback we provide them,
18 because I interview them separately.
19    Q.    Okay.  So you do interview them?
20    A.    Um-hmm (nodding head affirmatively).
21    Q.    Okay.  When Mr. Lehman filed a grievance
22 grieving his termination from St. Elizabeth, were you
23 involved in the grievance meetings?
24    A.    Yes.

Page 80

1    Q.    Were you present for all of the grievance
2 meetings?
3    A.    I believe I was.
4    Q.    What was your responsibility during those
5 grievance meetings?
6    A.    To make sure the process followed
7 according to our grievance policies.
8    Q.    Did you take notes during those meetings?
9    A.    Yes.
10    Q.    Handwritten notes?
11    A.    Yes.
12    Q.    And then did you later type them up?
13    A.    Yes.
14    Q.    We've already gone through some of these
15 emails regarding your involvement in at least part of
16 the investigation here into the allegations that Mr.
17 Lehman was violating the disciplinary policy.  Were you
18 involved in the decision to actually terminate Mr.
19 Lehman?
20    A.    I would have been involved from the
21 standpoint of getting the documentation together and
22 producing it for the individuals who had to weigh in on
23 that decision, and then I would have also collected
24 those decisions back.

Page 81

1    Q.    Did you ever make a recommendation that
2 Bob be terminated?
3    A.    That would be the manager's job to do.
4    Q.    So no?
5    A.    No.
6    Q.    Okay.  Thank you.
7    A.    I wrote a recommendation, because that's
8 part of my job, to take what the manager says and write
9 it as a recommendation.
10    Q.    So you mean you wrote it on behalf of Mike
11 Kraft?
12    A.    Correct.
13    Q.    Okay.  Is there any protection that
14 St. Elizabeth puts into their grievance process to keep
15 HR employees who are also involved in the termination
16 decision out of the grievance process?
17    A.    To keep them out of the grievance process?
18    Q.    Yes.
19    A.    No.
20    Q.    And is there different types of grievance,
21 I guess, that an employee can file?
22    A.    Well, it's one grievance, but there's
23 different processes that they can go through.
24    Q.    Is there like an administrative process or

21 (Pages 78 to 81)

Lehman vs. St. Elizabeth                PLATEK                    7/13/2012

Page 82

1    a peer-review process?
2        A.    Correct.
3        Q.    What employees can go through peer-review
4    processes?
5        A.    The associates who -- they have to have
6    been there over their period of adjustment to go
7    through that process.  Also, the management level
8    people would not go through that level.
9        Q.    What do you mean by "period of
10   adjustment"?
11       A.    "Period of adjustment" is commonly called
12   "probationary period" with other employees.  It's
13   "period of adjustment" at St. Elizabeth.  It's the
14   first six months of employment.
15       Q.    Okay.  So they have to at least have gone
16   through that?
17       A.    Um-hmm (nodding head affirmatively).
18       Q.    Right?
19       A.    Right.
20       Q.    And they can't be a manager?
21       A.    Right.
22       Q.    Is a supervisor considered a manager?
23       A.    It depends on the level of position.
24       Q.    Okay.  Could Mr. Lehman have gone through

Page 83

1    the peer-review process?
2        A.    We checked that, and he was not at a level
3    to go through that.
4        Q.    And that was because of the particular
5    position he had?
6        A.    Correct.
7        Q.    Is there some kind of policy or document
8    that describes which employees are allowed to go
9    through that process?
10       A.    It's stipulated in our dispute-resolution
11   policy which is our grievance.  That's what we call a
12   dispute resolution.
13       Q.    Okay.  And does it actually describe the
14   specific positions that can go through or --
15       A.    No, because it's -- there's just too many
16   positions --
17       Q.    Right.
18       A.    -- in the hospital to put them all in
19   there.  So it talks about the managerial level.
20       Q.    Okay.  So when an employee goes through
21   the administrative process, who are generally the folks
22   who would be conducting the grievance meetings?
23       A.    The levels that they would go through
24   would be their immediate director and then just

Page 84

1    continuing up the chain to the CEO or COO.
2        Q.    Depending on who had responsibility for
3    that department?
4        A.    Right.
5        Q.    So the first level would be with their
6    immediate supervisor?
7        A.    Like in Bob's case, it would have been
8    Mike Kraft.  He's the director.  And then above Mike is
9    his boss, who would be Doug Chambers, and above Doug is
10   John Dubis.
11       Q.    Obviously, we talked about it earlier,
12   that Ken Rasor was terminated, right?
13       A.    Um-hmm (nodding head affirmatively).
14       Q.    And if he were to have filed a grievance,
15   would the Security Supervisor be the first level, or
16   would it have been Mike Kraft?
17       A.    It would have been the director.
18       Q.    So the director is the first level.  It's
19   just in this case with Bob, Mike Kraft just happened to
20   be his immediate manager, right?
21       A.    Right.
22       Q.    Okay.  Was there any other Human Resources
23   employee involved in the grievance process that
24   Mr. Lehman went through?

Page 85

1        A.    Well, Lisa Blank would be aware of the
2    processes that are going on.  She's kept informed of
3    all of that, so she would have been the person
4    involved.  But as far as the person attending the
5    meetings, she would not have attended those.
6        Q.    We looked through those email exhibits, 1
7    through 5 earlier, which mostly focused -- well, maybe
8    not all of them, but some of them focused on how you
9    found out about the allegation and then what happened
10   leading up to your investigation.  Did you start to
11   investigate the allegation immediately after August
12   19th, or did you wait for a period of time?
13       A.    I believe it was immediate.
14       Q.    And you were aware based on -- I think you
15   testified earlier that Mike Kraft contacted you
16   regarding the level of discipline that Bob would
17   receive because of the sleeping.  Do you remember that
18   conversation, where he kind of lost control?
19       A.    Actually, there was a call before that.
20   He called, and we just talked through what he found.
21       Q.    Okay.
22       A.    And I know he wanted something -- to do
23   something lower.
24       Q.    Okay.

22 (Pages 82 to 85)

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

---

Page 86

1      A.    And it was later that that conversation
2  happened.
3      Q.    What did he tell you that he found?
4      A.    That Bob admitted to sleeping.
5      Q.    Did he tell you that Bob admitted to only
6  sleeping on breaks, or did he just say, "Bob admitted
7  to sleeping"?
8      A.    I don't recall there being any mention
9  about breaks.
10     Q.    Did he say anything to you about Bob's
11 diabetes at that time?
12     A.    I don't recall.
13     Q.    Anything else that you can remember Mike
14 relaying to you other than Bob admitting to sleeping?
15     A.    Probably he said something about being
16 surprised.
17     Q.    Anything else that you can remember?
18     A.    No.
19     Q.    Do you believe -- this conversation, I
20 think you said, occurred prior to Mike losing control
21 with you when you relayed what the level of discipline
22 was, right?
23     A.    Um-hmm (nodding head affirmatively).
24     Q.    What was your next conversation with Mike

Page 87

1  then regarding this issue?
2      A.    I don't recall when we next talked,
3  because I think that was when Mike was informed about
4  the need to do fitness-for-duty, that Bob said
5  something that was medical, and he had said so before.
6  Whether Mike communicated that, I don't remember at
7  which point, and he was angry.  He was just angry about
8  hearing that.
9      Q.    Who was angry?
10     A.    Mike.
11     Q.    Is it your understanding that Mike and Bob
12 discussed the discipline with Lisa Blank?
13     A.    I did find out that they had talked.
14     Q.    And during that conversation, is it your
15 understanding that Lisa directed Mike to make sure Bob
16 went to the fitness-for-duty exam?
17     A.    Yes.
18     Q.    You weren't present for that
19 communication, right?
20     A.    I was not.
21     Q.    And did Lisa report to you what had
22 occurred?
23     A.    Yes.
24     Q.    Did she do so verbally or in writing?

Page 88

1      A.    Verbally.
2      Q.    Did Mike tell during any of your
3  conversations regarding this issue that he had
4  initially told Bob he would get a Level I?
5      A.    I think there was some mention about a
6  Level I.  Where in the process, I'm not sure I recall
7  where that fell.
8      Q.    Did Lisa Blank ever tell you in either
9  relaying her conversation with Bob or at any other time
10 that there had been four other employees who had
11 received Level IIIs for sleeping on the job?
12     A.    I don't recall.
13     Q.    Is a Level III a non-grievable offense?
14     A.    It's grievable.
15     Q.    It is grievable?
16     A.    Um-hmm (nodding head affirmatively).
17     Q.    Is it your understanding -- well, strike
18 that.  After Lisa and Mike met with Bob and Lisa
19 directed Mike to ensure that Bob went through the
20 fit-for-duty exam, what did you do next to conduct your
21 investigation?
22     A.    Wait.
23     Q.    Okay.  For the conclusion of the
24 fit-for-duty exam?

Page 89

1      A.    Right, and a decision.
2      Q.    And approximately -- well, actually, I'm
3  just -- we looked at -- mine are all of order.  I
4  apologize.  Let me see this for a second.
5          (Reference to previously-marked Platek
6          Exhibit Nos. 1 and 2.)
7      Q.    If you look back to Exhibits 1 and 2,
8  there was some communication with you and Gerald Hynko
9  and Marty and Lisa regarding the fit-for-duty exam, or
10 at a minimum Bob's conversation with Gerald.  Do you
11 remember that?  Exhibits 1 and 2?
12     A.    (Witness reviewing document).  I've seen
13 these, yes.
14     Q.    And those were from September 9th, it
15 looks like?
16     A.    (Witness reviewing document).  Yes.
17     Q.    Approximately how long after that
18 communication did you learn that the fit-for-duty exam
19 had been completed?
20     A.    Sorry.  I don't know.
21          (Platek Exhibit No. 6 was marked for
22          identification.)
23     Q.    Roxann, you've been handed what has ban
24 marked as Exhibit 6 to your deposition.  Please take a

23 (Pages 86 to 89)

Lehman vs. St. Elizabeth                 PLATEK                        7/13/2012

Page 90

1  moment, and let me know whether or not you recognize
2  Exhibit 6.
3      A.    (Witness reviewing document).  It appears
4  to be an email that I wrote.
5      Q.    And in the, I guess, second sentence after
6  "FYI," when you state, "When Gerald called me back
7  about the Flor Sec Ofcr," is that "Florence Security
8  Officer"?
9      A.    Yes.
10     Q.    You say that "Gerald told me that he and
11 Dr. Haskell had met (to discuss Lehman and other
12 similar situations) and that it appears they'll be
13 recommending that no medical excuse will be acceptable
14 for falling asleep on the job except narcolepsy."  Do
15 you know what other situations he was referring to?
16     A.    I was reading ahead, so -- let me find
17 what you're --
18     Q.    Sure.  In parentheses, you state, "To
19 discuss Lehman and other situations."
20     A.    Oh.  (Witness reviewing document).
21     Q.    Do you know what the "other similar
22 situations" were referring to?
23     A.    There were several other associates
24 outside of my groups that had sleeping issues.

Page 91

1      Q.    Do you know whether those other associates
2  were also referred to Employee Health for fit-for-duty
3  exams?
4      A.    I do not know.
5      Q.    You go on to state, "Other conditions may
6  contribute to sleeping but do not result in
7  uncontrollable sleeping."  Were you just relaying what
8  Gerald told you?
9      A.    Yes.
10     Q.    Okay.  And in the next paragraph, you
11 discuss the Security Supervisor job description and
12 referencing light duty.  Why were you bringing that up
13 to Lisa and Marty?
14     A.    That is also something Gerald mentioned,
15 and I again was referring that on to them.
16     Q.    In the last sentence, it states, "Gerald
17 said the actual duties would overrule the job
18 description even if not current if we were being
19 audited by EEOC."  Do you know why Gerald was concerned
20 about that?
21     A.    No.
22     Q.    So you're simply just relaying what Gerald
23 told you, and that's it?
24     A.    Correct.

Page 92

1      Q.    You don't know what he meant by any of
2  those things, regarding EEOC or monitoring or light
3  duty or anything like that?
4      A.    Only what it says here.
5      Q.    Okay.  You didn't ask him for any further
6  explanation?
7      A.    I did not.
8      Q.    And you don't know whether anyone else was
9  involved in the decision to recommend that no medical
10 excuse will be acceptable for falling asleep on the job
11 except narcolepsy other than what Gerald told you,
12 correct?
13     A.    Dr. Haskell.
14     Q.    Okay.  And he told you that he and Dr.
15 Haskell had met and decided that, right?
16     A.    That is what he told me.
17     Q.    What is your understanding as to why Mr.
18 Lehman received a discharge as opposed to Level III?
19     A.    Multiple incidents of sleeping and he was
20 a supervisor and it was believed that the Security
21 Department should be held to a higher standard since
22 they are in Patient Care and Patient Safety, employed
23 in Safety as well.
24     Q.    Are there different disciplinary policies

Page 93

1  for employees in the Security Department?
2      A.    The same policies apply to them.
3      Q.    And who, as far as you know, made the
4  decision to terminate Bob, as opposed to giving him a
5  Level III?
6      A.    John Dubis.
7      Q.    Did you have any communication directly
8  with John Dubis about that decision?
9      A.    No.
10     Q.    How did you know John Dubis made that
11 decision?
12     A.    Well, I believe it was Marty who told me.
13     Q.    Did Mike Kraft want to terminate Bob
14 Lehman?
15     A.    No.
16     Q.    Did you know that Bob had worked for
17 St. Elizabeth Hospital for over 30 years?
18     A.    Yes.
19     Q.    And obviously, in addition to meeting with
20 him and Mike during your conversations with Ken Rasor,
21 had you had other interactions with Bob prior to that?
22     A.    Yes, I think so.
23     Q.    And were you aware of any concerns about
24 his performance prior to Ken initially raising this

24 (Pages 90 to 93)

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

---

Page 94

1 issue of sleeping?
2      A.    No.  Overall, I think Bob had good
3 performance.  He was well-liked.
4      Q.    Did you believe that Bob was a trustworthy
5 employee?
6      A.    Um-hmm (nodding head affirmatively).  Yes.
7      Q.    At the time that Bob admitted to sleeping,
8 St. Elizabeth knew that he was already -- obviously,
9 St. Elizabeth already knew he was a -- it's been a long
10 day.  I'm sorry.  He was a supervisor, right?
11     A.    Yes.
12     Q.    Okay.  And he admitted that he had taken
13 naps on breaks on more than one occasion; is that
14 correct?
15     A.    I don't recall the breaks part, but yes,
16 that was my understanding.  He admitted sleeping --
17     Q.    Right.
18     A.    -- multiple times.
19     Q.    And I apologize.  You weren't the one who
20 initially talked to him about it, right?
21     A.    Right.
22     Q.    In fact, you never actually talked to Bob
23 about the allegations; is that correct?
24     A.    I believe that he spoke to Mike and Lisa,

---

Page 95

1 and they were the ones who talked to him.
2      Q.    Okay.  You were present for the
3 termination meeting --
4      A.    Yes.
5      Q.    -- is that correct?
6      A.    Yes.
7            (Platek Exhibit No. 7 was marked for
8            identification.)
9      A.    (Witness reviewing document).
10     Q.    Roxann, if you could for me just look at
11 this first page of Exhibit 7, and let me know if this
12 is something you created.
13     A.    It was.
14     Q.    Okay.  Is that your handwriting at the
15 top?
16     A.    It is.
17     Q.    And it states "Talking points I prepared
18 for Mike Kraft for term meeting"?
19     A.    Yes.
20     Q.    And that's your initials?
21     A.    Yes.
22     Q.    And then you prepared those bullet points:
23 Thanks, Timeframe, Medical, Policy, Factors, Decision,
24 right?

---

Page 96

1      A.    Yes.
2      Q.    Why did you prepare that for Mike Kraft?
3      A.    We were meeting with Bob to let him know
4 the decision.  A lot of time had passed, and I wanted
5 to make sure that we were thoroughly in touch on all
6 those items for Bob.
7      Q.    Did you actually have a meeting with Mike
8 where you discussed these different bullet points prior
9 to the conversation with Bob?
10     A.    I don't believe I ever provided this to
11 Mike.  I think it was something that I ended up just
12 talking to him about.
13     Q.    Okay.
14     A.    "Make sure you cover these things because
15 these are things that we should discuss with the
16 associate who is being terminated."
17     Q.    If you turn to the second page of Exhibit
18 7, please.
19     A.    (Witness reviewing document).  Um-hmm
20 (nodding head affirmatively).
21     Q.    Is this something you prepared?
22     A.    It is.
23     Q.    And again, was this something that you
24 prepared for Mike?

---

Page 97

1      A.    No.
2      Q.    What is it?
3      A.    It was -- in case Mike was not comfortable
4 conducting the meeting, I prepared this for myself.
5      Q.    Who ended up conducting the meeting?
6      A.    Mike communicated the decision initially,
7 and then I followed up with information about benefits,
8 and then reiterated anything else that Mike had said
9 that seemed to need clarity.
10     Q.    Are you the one who told Bob that,
11 according to the medical opinion, the only diagnosis --
12 the only -- sorry -- "only the diagnosis of narcolepsy
13 would be the acceptable diagnosis for a medical
14 condition," or did Mike tell him that?
15     A.    I believe that Mike said it first.
16     Q.    Okay.
17     A.    And then I believe it was repeated, and I
18 think that it was me that did that.
19     Q.    Okay.  The last paragraph there, beginning
20 with, "Your situation," do you know who relayed that to
21 Bob?  Was that you or was that Mike?
22     A.    Mike again, and I would have reiterated
23 it.
24     Q.    It states that, beginning with the --

25 (Pages 94 to 97)

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

Page 98

1  "Because you slept multiple times" -- do you see that,
2  where it begins there?
3       A.    (Witness reviewing document).
4       Q.    Middle of that last paragraph.
5       A.    I'm looking.  (Witness reviewing
6  document).
7            Oh, here we go.  I was looking in the
8  center.  It's off to the left.  I found it.
9       Q.    It says, "Because you slept multiple times
10  it wasn't just the first occurrence and it's been
11  witnessed by multiple people."  Who were the multiple
12  people that witnessed it?
13      A.    The people were Kim and Ken and Mike
14  Boarman.
15      Q.    Mike, is it Boarman, you said?
16      A.    I believe he pronounces it "Boarman," with
17  a "R" near that "B."
18      Q.    Did you ever speak with Mike Boarman about
19  his witnessing Bob sleeping?
20      A.    I did not.
21      Q.    Do you know if anyone did?
22      A.    I don't know.
23      Q.    And it goes on to say, "Because you
24  observed others on your staff do it without enforcing

Page 99

1  the policy you in essence were saying it was okay."
2  Who did Bob witness sleeping?
3       A.    He had -- this was told to me, that he
4  witnessed and admitted to observing his own staff
5  sleeping.
6       Q.    Who told you that?
7       A.    Lisa Blank, I believe.
8       Q.    Did Lisa tell you what timeframe that
9  occurred?
10      A.    No, I don't recall --
11      Q.    Did she --
12      A.    -- any of that conversation.
13      Q.    I'm sorry.  Did she tell you whether or
14  not she investigated with Bob further who those
15  employees were?
16      A.    No, I don't recall that being part of the
17  conversation either.
18      Q.    Had you heard from Bob Lehman that he had
19  witnessed other Security Officers sleeping, would you
20  have asked Bob the names of those Security Officers?
21      A.    Quite possibly.
22      Q.    Because similar to what happened when Ken
23  claimed that Bob was sleeping, that was something you
24  felt like you needed to follow up and investigate,

Page 100

1  right?
2       A.    Yes.
3       Q.    So if he had actually seen any employees,
4  any Security Officer employees sleeping, you would have
5  said, "Who are those employees? so I can follow up and
6  maybe investigate those people," right?
7       A.    Yes.
8            MS. SCHOENING:  Objection.  Answer if you
9  can.
10      A.    Yes.
11      Q.    Okay.  But you're not aware of whether or
12  not that was done; is that correct?
13      A.    Correct.
14      Q.    Was Mr. Lehman offered a severance?
15      A.    Not to my knowledge.
16      Q.    Would that be something that you would
17  typically be involved if an employee -- if you were the
18  HR advisor to the employment termination decision,
19  would you typically be involved in whether or not the
20  employee is going to get offered a severance?
21      A.    I would assume I would.
22      Q.    Okay.  Are you aware of any situations
23  that you have been involved in, in which an employee
24  has been offered severance?

Page 101

1       A.    No, I can't think of any.
2       Q.    You also prepared a separate termination
3  meeting document; is that correct?
4       A.    Say that again.
5       Q.    Did you prepare another termination
6  meeting document other than Exhibit 7?
7       A.    As in?  To prepare for the meeting with
8  Bob?
9       Q.    No, to describe what occurred.
10      A.    Oh, yes.
11           MS. DAUGHTREY NEFF:  Okay.  Will you mark
12  that, please?
13           (Platek Exhibit No. 8 was marked for
14           identification.)
15      A.    (Witness reviewing document).
16      Q.    You've been handed what has been marked as
17  Exhibit 8 to your deposition.  Do you recognize this
18  document?
19      A.    Yes.
20      Q.    Okay.  Does this appear to be your notes
21  from the termination meeting with Mike Kraft and Bob
22  Lehman?
23      A.    Yes.
24      Q.    And it's dated September 22nd, 2010?

26 (Pages 98 to 101)

Lehman vs. St. Elizabeth                        PLATEK                        7/13/2012

| Page 102 | Page 104 |
|---|---|

Page 102

1    A.    Yes.
2    Q.    That was the date of his termination; is
3  that correct?
4    A.    I don't have anything in front of me to
5  tell me what his date was, but if not that day, close
6  to that day.
7    Q.    Did you also take handwritten notes during
8  the termination meeting?
9    A.    Probably.
10    Q.    Did you use those handwritten notes to
11  create this document?
12    A.    That's usually what I do.
13    Q.    And then did you destroy your handwritten
14  notes?
15    A.    Um-hmm (nodding head affirmatively).
16  Yes, if I had them, I would have destroyed them after
17  typing them.
18    Q.    Was Bob upset during the termination
19  meeting?
20    A.    Yes, he was very surprised.
21    Q.    And did Bob still feel like his -- or
22  express that he felt his medical conditions had been
23  the cause of his fatigue?
24    A.    I don't recall that being in the

Page 103

1  conversation. I'd have to read this over again. What
2  I do recall was he was surprised. He thought he had
3  already been issued a Level III, and that had never
4  happened.
5    Q.    How do you know that it never happened?
6    A.    There would have been a document. I would
7  have been responsible to create and be part of
8  providing that to the manager to issue it. Bob would
9  have read it, signed it, and they would have met. None
10  of that occurred.
11    Q.    Were you aware he had already been told by
12  Mike Kraft and Lisa Blank that he was going to receive
13  a Level III?
14    A.    I was aware that there had been a meeting
15  where Lisa Blank informed him that it could be a
16  Level III.
17    Q.    So Lisa told you that she told Bob it
18  could be a Level III?
19    A.    Right.
20    Q.    Okay. But you weren't at the meeting,
21  right?
22    A.    I was not present.
23    Q.    How did you learn that Bob had filed a
24  grievance?

Page 104

1    A.    Bob would fill out a form. That's part of
2  the process, to fill out a form. And I believe he did
3  so.
4    Q.    And it was submitted to you?
5    A.    Yes.
6    Q.    St. Elizabeth's dispute-resolution policy,
7  I think, is what you called it earlier. The
8  St. Elizabeth dispute-resolution policy does not permit
9  an employee to have legal counsel during any of the
10  grievance meetings; is that correct?
11    A.    Correct.
12    Q.    Did Bob ever give you the impression that
13  he was seeking legal counsel while he was going through
14  the grievance process?
15    A.    I don't recall him saying that.
16    Q.    Were you concerned about whether the email
17  address Bob gave you was his or somebody else's?
18    A.    I'm trying to think why I even asked for
19  that. If there was something I communicated to him and
20  I wanted to make sure it was going to him, then I may
21  have expressed concern over that and to confirm that it
22  is indeed Bob's email address.
23        (Platek Exhibit No. 9 was marked for
24        identification.)

Page 105

1    A.    (Witness reviewing document).
2    Q.    Roxann, you have been handed what has been
3  marked Exhibit 9 to your deposition, which, again, this
4  is a couple of emails that were exchanged between you
5  and Lisa Blank regarding Dr. Haskell's fitness-for-duty
6  report. Did you ever receive a copy of that
7  fitness-for-duty report?
8    A.    No, and I wouldn't.
9    Q.    Okay.
10    A.    It would have been a detail -- it would
11  not have the details in it. It would have been
12  a summary if I was asking for it as part of a
13  documentation to an employee file.
14    Q.    Is it typical that Gerald Hynko when he
15  was the Director of Employee Health would summarize Dr.
16  Haskell's, or whatever doctor was performing the
17  fitness-for-duty, to HR?
18    A.    I very seldom had a situation where that
19  was needed. So if it was, probably it would have gone
20  through Lisa Blank or Marty.
21    Q.    Did you ever see Dr. -- sorry. Did you
22  ever see Gerald Hynko's summary of the fit-for-duty?
23    A.    (Witness reviewing document). I'm
24  thinking he did send something.

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

Page 106

1     Q.    Okay.  This may help you refresh your
2  recollection.
3           (Platek Exhibit No. 10 was marked for
4           identification.)
5     Q.    Roxann, you have been handed what has been
6  marked Exhibit 10 to your deposition.  Please let me
7  know whether or not you recognize Exhibit 10.
8     A.    (Witness reviewing document).  It looks
9  like an email from Gerald to me.
10    Q.    And the subject line is "FFD
11  Recommendation."
12    A.    Um-hmm (nodding head affirmatively).
13    Q.    Do you believe "FFD" stands for "fitness
14  for duty"?
15    A.    Yes.
16    Q.    The date of this email is September 28th,
17  2010.  That was after Mr. Lehman had been terminated;
18  is that correct?
19    A.    I don't have the date in front of me for
20  his termination.
21    Q.    Well, the date that you put on your notes
22  from the termination meeting was September 22nd?
23    A.    Yes.
24    Q.    Okay.  So this is at least after the

Page 107

1  termination meeting?
2     A.    Yes.
3     Q.    Why would you need the fitness-for-duty
4  recommendation after the termination had occurred?
5     A.    I recall asking Gerald to do that prior
6  to.  He had given it verbally over the phone, and I
7  emailed and passed it on to Lisa Blank and Marty, which
8  is on one of the other exhibits we had reviewed
9  earlier.  And I had asked him to follow up with a
10  written, so it could be printed off to put in the file.
11    Q.    So you put this in Bob's personnel file?
12    A.    Yes, I believe so.
13    Q.    Did you provide this information to anyone
14  other than placing it in his personnel file?
15    A.    No, I don't believe I provided it to
16  anybody else, his personnel file.
17    Q.    You didn't use it as a part of the
18  grievance process or anything?
19    A.    No, I don't believe so.
20    Q.    Did Bob request a copy of Dr. Haskell's
21  report?
22    A.    I don't recall.  But if he had, it would
23  have needed to have gone to Gerald or Dr. Haskell.  It
24  wouldn't have been for me to provide.

Page 108

1           (Platek Exhibit No. 11 was marked for
2           identification.)
3     Q.    Roxann, you've been handed what has been
4  marked as Exhibit 11 to your deposition.  I want you to
5  look at just the top email there.  Do you recognize
6  that email as an email sent to you from Bob Lehman?
7     A.    I couldn't guarantee that that is his
8  email, but that is an email I received, and it's signed
9  from Bob.
10    Q.    Well, if you look down to just the next
11  two emails that are on this first page, it looks like
12  you are corresponding with the same email address.  And
13  take as much time as you need to tell me whether or not
14  you think you are corresponding with Bob.
15    A.    (Witness reviewing document).  Yes, it
16  looks like this is correspondence with Bob.
17    Q.    And then, in Bob's email to you, which is
18  the top email, which is dated September 28, 2010, he
19  states that he has received nothing and would like to
20  have a copy of the medical report from Dr. Haskell.
21  Did you forward this to Mr. Hynko?
22    A.    I don't know.
23    Q.    He also asked for the policies used, I
24  assume, regarding his termination.  Did you ever

Page 109

1  forward him any policies?
2     A.    I actually believe I gave those to him
3  during his termination meeting.
4     Q.    He also requested evidence that led to his
5  termination.  Did you forward him any information that
6  you had collected during your investigation?
7     A.    I don't recall.
8     Q.    Did you forward him any information that
9  either Lisa Blank or Mike Kraft had collected during
10  the investigation?
11    A.    I don't recall.
12    Q.    After Bob was terminated, he would not
13  have had access to any St. Elizabeth information that
14  was on St. Elizabeth's server; is that correct?
15    A.    That should be correct, yes.
16    Q.    Hopefully, right?
17    A.    Right.
18    Q.    Terminated employees aren't supposed to
19  have access to that, right?
20    A.    Right.
21    Q.    And if there had been a log maintained
22  that would show when Bob had taken breaks, that
23  wouldn't have been something he would have had access
24  to after his termination; isn't that correct?

28 (Pages 106 to 109)

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

---

Page 110

1    A.   Well, I would assume that he wouldn't, but
2  it wouldn't have been in my possession.
3    Q.   Right.  It would have been in the
4  possession of the Security Department; is that correct?
5    A.   Right.  I would assume so.
6    Q.   So if you needed to access that
7  information, you could have gone down to the Security
8  Department, requested it, and probably gotten it,
9  assuming that it existed, right?
10   A.   I guess.
11   Q.   Okay.  Or you could have asked Mike Kraft
12  to get it, right?
13   A.   Correct.
14       MS. DAUGHTREY NEFF:  Let's go ahead and
15   mark this.
16       (Platek Exhibit No. 12 was marked for
17       identification.)
18   Q.   All right.  Roxann, you have been handed
19  what has been marked Exhibit 12 to your deposition.
20   A.   Yes.
21   Q.   And I would like you to identify Exhibit
22  12.
23   A.   (Witness reviewing document).  This looks
24  like handwritten notes I made of the dispute that Bob

---

Page 111

1  and I attended with John Dubis.
2    Q.   Did you use these notes to also create a
3  typewritten document?
4    A.   Well, the fact that it's in handwriting
5  would make me say that I didn't get to type them up and
6  that is why they are retained in the file.
7    Q.   Throughout this document you have "Js" and
8  "Bs."  Is it save to assume any time there is a "J"
9  next to a sentence that is John Dubis saying something
10  and any time there is a "B," that is Bob's response; is
11  that correct?
12   A.   Yes, that was my intention.
13   Q.   Did you say anything during this grievance
14  meeting?
15   A.   If I did, it would have been around
16  process.  It would have been to make sure this they
17  each knew the timeframe and the closing to say that a
18  decision will be rendered and communicated back within
19  the timeframe according to policy.
20   Q.   After this dispute-resolution meeting
21  between Mr. Dubis and Mr. Lehman, did you have any
22  communication with Mr. Dubis about his decision?
23   A.   It seems he was going to check on
24  something else after the meeting.  I don't recall what

---

Page 112

1  that was.  It just seems like there was something else
2  he was going to look into, and then he would get a
3  decision to me.
4    Q.   Did you have a follow-up meeting with Mr.
5  Dubis immediately after Bob left the meeting?
6    A.   That's what I was referencing.  I'm sorry.
7    Q.   Okay.
8    A.   Yeah.
9    Q.   So during that conversation, he indicated
10  to you that he intended to look something else up?
11   A.   Look up or check back on something.  I
12  don't recall what it was, but it seemed there was
13  something he was going to do before he rendered his
14  decision, and then he would get back to me with that.
15   Q.   What else can you remember from just your
16  conversation with John after the grievance meeting with
17  Bob?
18   A.   It was really short.  I don't recall
19  anything else.
20   Q.   When you say it was really short,
21  approximately how long was it?  Less than ten minutes?
22   A.   Probably.  It wasn't long after Bob left.
23   Q.   Did he ask you to get any documents for
24  him that he could review?

---

Page 113

1    A.   I don't recall being asked for additional
2  information that I would be providing.
3    Q.   And did you take any notes during your
4  conversation with John?
5    A.   No.
6    Q.   During that conversation with John Dubis,
7  did you tell him that there had been inconsistencies in
8  Bob Lehman's story as he related to John Dubis during
9  the grievance meeting?
10   A.   I don't recall.
11   Q.   Did you believe there had been
12  inconsistency in Bob Lehman's story as he related
13  during the grievance meeting?
14   A.   During the dispute?
15   Q.   Yes.
16   A.   The information was different, in that he
17  provided more details than I had heard earlier.
18   Q.   Okay.  He provided more details to John
19  Dubis than you had earlier?
20   A.   Actually, I think it was at Doug Chambers
21  meeting.
22   Q.   Correct me if I'm wrong.  So what you're
23  saying is that Bob had provided more details at the
24  Doug Chambers grievance process meeting than he had to

---

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                     PLATEK                        7/13/2012

Page 114

1    John Dubis?
2        A.    Than I had heard prior to Doug Chambers
3    meeting.
4        Q.    Okay.
5        A.    And John's was after Doug Chambers
6    meeting.
7        Q.    Right.  And did you relay any of those
8    details that you had heard Bob relay during the Doug
9    Chambers meeting to John Dubis?
10       A.    I don't recall.
11       Q.    When Bob relayed those additional details
12   that you had not previously heard during the Doug
13   Chambers meeting, did you do anything to investigate
14   whether or not any of those comments that he had made
15   were true?
16       A.    I did not.
17       Q.    And what details did he relay during the
18   Doug Chambers meeting that you thought was more than
19   what you had previously heard?
20       A.    I had not heard names of those associates
21   that he had disciplined or addressed for sleeping, and
22   I had heard that he didn't address those associates and
23   their sleeping and then later he did.
24       Q.    When did he say that he had not addressed

Page 115

1    those employees who were sleeping?
2        A.    I heard that early in the investigation.
3        Q.    Did he tell you that directly?
4        A.    No.
5        Q.    Who told you that?
6        A.    That would have been either Mike or Lisa,
7    because that's where I got information about that early
8    stage.
9        Q.    So you believe that may have been relayed
10   to either Mike or Lisa during your initial meeting?
11       A.    Right.
12       Q.    Okay.  Did you do anything to follow up as
13   to whether or not those individuals were still working
14   for St. Elizabeth once you heard their names?
15       A.    No.
16       Q.    Were you familiar with any of the
17   individuals that he identified?
18       A.    I don't recall their names at this point.
19       Q.    Okay.  Did you talk to Lisa about it --
20   I'm sorry.  Did you talk to either Lisa or Mike Kraft
21   about it once you heard Bob reference these employees
22   during the Doug Chambers meeting?
23       A.    I don't recall.
24       Q.    Is there anything that you could review

Page 116

1    that would help refresh your recollection on that?
2        A.    Maybe if it were in the notes from the
3    Doug Chambers dispute meeting.
4        Q.    Have you ever heard of an employee by the
5    name of Ben Harvey?
6        A.    No.
7        Q.    Have you ever heard of an employee by the
8    last name of Hoffman?
9        A.    No.
10       Q.    Greg Popham?
11       A.    Yes.
12       Q.    Jack Denham?
13       A.    Yes.
14       Q.    Was Jack Denham still employed at
15   St. Elizabeth at the time that Bob was meeting with
16   Doug Chambers for his grievance process?
17       A.    I believe that he would have been.
18       Q.    Is he still employed now?
19       A.    Yes.
20       Q.    Joe Tuemler, T-U-E-M-L-E-R, have you ever
21   heard of him?
22       A.    No.
23       Q.    Are you familiar with the employees who
24   are in the Security Department?

Page 117

1        A.    I'm familiar with them, but some I may
2    have never had interaction with.
3        Q.    Okay.
4        A.    And of the 800 people I support or however
5    many hundreds, it's impossible to know every single
6    name.
7        Q.    You were aware at the time that Bob was
8    explaining these incidents of sleeping to Doug Chambers
9    that Greg Popham was no longer employed by
10   St. Elizabeth; is that correct?
11       A.    Can you say that again?
12       Q.    Yeah.  At the time that Bob was relaying
13   the names of these individuals to Doug Chambers, Greg
14   Popham was no longer employed by St. Elizabeth; is that
15   correct?
16       A.    Correct.
17       Q.    In fact, Mike Kraft had replaced Greg
18   Popham, correct?
19       A.    Yes.
20       Q.    Do you know whether Bob had been asked
21   prior to the meeting with Doug Chambers, the grievance
22   meeting with Doug Chambers, who the employees he
23   witnessed in the Security Department sleeping were?
24       A.    I don't recall.

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

Page 118

1    Q.    Okay.  There have been quite a bit,
2  obviously, of emails that you reviewed here today.
3    A.    Um-hmm (nodding head affirmatively).
4    Q.    I'm sure there's a lot more of those
5  emails.  There's probably been an email exchange,
6  information exchanged between you, Lisa Blank, Mike
7  Kraft, and Marty Oscadal regarding this issue; is that
8  correct?
9    A.    Yes.
10    Q.    And at the time that Mr. Lehman was
11  terminated, you were either drafting these emails,
12  responding to these emails, copied on these emails,
13  and/or you were having conversations with Lisa Blank
14  about what was going on with the investigation; is that
15  correct?
16    A.    Yes.
17    Q.    Okay.  You were pretty much abreast of
18  what was going on in this whole investigation?
19    A.    As much as I was involved, yes.
20    Q.    Okay.
21    A.    I wasn't part of other things.  I mean, I
22  wasn't with Bob and Lisa in their meeting with Mike
23  Kraft.
24    Q.    Right.  But Lisa relayed what happened

Page 119

1  during that meeting to you?
2    A.    Correct.
3    Q.    And throughout that whole process, can you
4  think of any instances in which you were aware that
5  someone asked Bob Lehman who the employees in Security
6  were that were sleeping?
7    A.    No, I don't.
8    Q.    Okay.  Were you involved at all in
9  providing responses to the discovery requests in this
10  case?
11    A.    No.
12    Q.    Okay.  Did you provide documents to
13  counsel as a part of the litigation in this case?
14    A.    Policies, in Lisa Blank's vacation
15  absence.
16    Q.    So for the most part, it is your
17  understanding that Lisa was primarily responsible for
18  providing that information to counsel --
19    A.    Correct.
20    Q.    -- unless she was on vacation; you
21  assisted as well?
22    A.    Correct.
23    Q.    And there have been some charts produced
24  in this case that list the Security Officers of

Page 120

1  St. Elizabeth.  Were you involved at all in putting
2  together those charts?
3    A.    I don't recall doing any charts, so I have
4  to say no.
5    Q.    Like a spreadsheet or anything like that?
6    A.    No.
7        (Reference to Bates SEMC0818.)
8    Q.    Okay.  I think this is part of it.  I'm
9  not going to make this as an exhibit, but just to make
10  sure you weren't involved in this.  This is
11  Confidential Bates No. SEMC0818.  I'm just going to
12  show this to you just to request from you whether or
13  not this looks familiar as to something you put
14  together.
15        MS. DAUGHTREY NEFF:  Kelly, this is all it
16  is (indicating).
17    A.    No.
18    Q.    Okay.
19    A.    It doesn't look familiar.  Sorry.
20    Q.    Okay.
21        MS. SCHOENING:  Okay.  You just shortened
22  your deposition by about 15 minutes.
23        THE WITNESS:  I think you are all really
24  fine people, but (did not finish response) --

Page 121

1        (Platek Exhibit No. 13 was marked for
2        identification.)
3    Q.    Roxann, you've been handed what has been
4  marked as Exhibit 13 to your deposition.  I would just
5  like to identify whether or not this is something
6  that you created.
7    A.    Yes.
8    Q.    Okay.  And it has to do with a voicemail
9  message that you left for Bob Lehman?
10    A.    Let me see.  (Witness reviewing document).
11  Yes.
12    Q.    Why did you keep track of this
13  information?
14    A.    It's what we do.
15    Q.    Okay.  It's your standard practice to keep
16  track of this type of information during a grievance
17  process?
18    A.    We do try to be really timely in getting
19  back to associates and letting them know statuses and
20  information, so yes.
21        (Platek Exhibit No. 14 was marked for
22        identification.)
23    Q.    Roxann, you've been handed what has been
24  marked as Exhibit 14 to your deposition.  Do you

31 (Pages 118 to 121)

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

Page 122

1    recognize this document?
2        A.    (Witness reviewing document).  It looks
3    like an email from me to Mike Kraft.
4        Q.    In the second sentence, you state, "She
5    does not believe we will need notes from Doug, Marty,
6    or John for this step."  Do you know whether Doug,
7    Marty, or John actually kept notes?
8        A.    I do not.
9        Q.    And she was referring to Lisa Blank; is
10   that correct?
11       A.    (Witness reviewing document).
12       Q.    Did you look at the first sentence?
13       A.    (Witness reviewing document).  Yes.
14       Q.    And you were corresponding to Mike Kraft
15   in preparation for the first step of the grievance
16   process, in which Mike Kraft was going to be meeting
17   with Bob Lehman; is that correct?
18       A.    I actually cannot tell which of the steps
19   it was for.
20       Q.    Okay.
21       A.    Maybe it was because it's directed to
22   Mike.
23       Q.    Okay.  And he would have been the first
24   step in the grievance process?

Page 123

1        A.    Correct.
2             MS. DAUGHTREY NEFF:  Let's take a quick
3    break so I can review some stuff and make sure
4    we're done.
5             THE WITNESS:  Good.
6             (At which time, a recess was taken from
7             3:13 p.m. until 3:28 p.m.)
8             MS. DAUGHTREY NEFF:  Let's go back on the
9    record.
10            (Reference to Bates No. SEMC0999.)
11       Q.    Roxann, I'm going to hand you what has
12   been marked Confidential SEMC0999.
13            MS. DAUGHTREY NEFF:  I'll show it to you
14   first, Kelly.
15       A.    (Witness reviewing document).
16       Q.    Roxann, this was produced by St. Elizabeth
17   Hospital along with some other documents related to the
18   investigation leading to Andrew Caple's termination.
19   Have you seen one of these Security logs before?
20       A.    It doesn't look like something I've seen
21   before.
22       Q.    You were involved in investigating the
23   allegations that Mr. Caple was sleeping, correct?
24       A.    Yes.

Page 124

1        Q.    And Mike Kraft as the Director of Security
2    was also involved in that?
3        A.    Yes.
4        Q.    Do you remember Mike pulling a Security
5    log to determine what Andrew Caple was doing at various
6    times during -- it looks like it was on January 5th,
7    2012?
8        A.    He may have.
9        Q.    Did you ask him to do that as a part of
10   the investigation?
11       A.    Maybe.
12       Q.    Okay.  You don't remember?
13       A.    I don't recall.
14       Q.    Under the current disciplinary policy as
15   it relates to sleeping, is it a violation of the policy
16   to sleep while an employee is on a break?
17       A.    No.
18       Q.    And the previous disciplinary policy
19   regarding sleeping, is it a violation of the policy for
20   an employee to sleep while on a break?
21       A.    Yes.
22       Q.    Do you know the specific language of the
23   new policy?
24       A.    Not off the top of my head.

Page 125

1        Q.    The policy that was in effect at the time
2    that Mr. Lehman was terminated had a section regarding
3    guidelines for managers -- or sorry -- guidelines to
4    follow with respect to certain infractions; is that
5    correct?
6        A.    Yes.
7        Q.    And within that guideline, it listed the
8    "Unauthorized sleeping on work time" as a Level III on
9    the first offense; is that correct?
10       A.    Yes.
11       Q.    Does the new policy have a similar
12   guideline outline?
13       A.    Yes.
14       Q.    And does it say "Unauthorized sleep during
15   work time"?  Instead of "Level III," now it says
16   "discharge"?
17       A.    It would say "discharge" now.
18       Q.    But you don't know whether it says word
19   for word "Unauthorized sleep on work time"?
20       A.    Not unless I looked at it again.
21       Q.    All right.  The two employees who have
22   been terminated in 2012 -- I think that's Andrew Caple
23   and Joe Edelbroich -- for sleeping did you ask either employee
24   involved in investigating, did you ask either employee

AMS DEPO
(513) 941-9464    amsdepo@fuse.net    Cincinnati, Ohio

Lehman vs. St. Elizabeth                    PLATEK                    7/13/2012

---

Page 126

1  if they had narcolepsy?
2      A.    I don't recall asking them if they had
3  that.
4      Q.    Neither of them indicated to you that they
5  had narcolepsy?
6      A.    I don't recall them indicating that nor
7  indicating they had a medical condition.
8      Q.    Now that the -- or after Mr. Hynko and Dr.
9  Haskell recommended that narcolepsy be the only medical
10 condition that the hospital would consider as, I guess,
11 justified for sleeping while on duty, has -- I'm sorry.
12 I'm going to start over because I don't remember what
13 the question was going to be.
14         Are you aware of any employees at
15 St. Elizabeth Hospital who have narcolepsy?
16     A.    I believe I heard secondhand that there
17 had been one.
18     Q.    Okay.
19     A.    I don't know myself.
20     Q.    You don't know which department they're
21 in?
22     A.    No.
23     Q.    You said you heard secondhand.  Do you
24 remember who told you?

---

Page 127

1      A.    I don't.
2      Q.    And approximately when did you hear that
3  secondhand?
4      A.    I don't recall.
5      Q.    Okay.  Do you believe it was after Gerald
6  Hynko and Dr. Haskell made that recommendation?
7      A.    I don't recall.  Sorry.
8      Q.    Okay.  Do you remember how that came up?
9      A.    No.
10     Q.    Okay.  It's been a long day, so I may have
11 asked you this earlier, and I apologize if I did.  Do
12 you remember anyone telling you that Bob Lehman slept
13 during work time that was not his break time?
14     A.    I believe Ken said that.
15     Q.    Did he say that during the initial meeting
16 that you had with Ken where he raised the issue of Bob
17 sleeping?
18     A.    Yes.
19     Q.    Okay.  Security Officers are permitted to
20 leave the campus on their lunch break; is that correct?
21     A.    With permission, probably correct.
22     Q.    Who would they need permission from?
23     A.    Someone in their management ranks.
24         MS. DAUGHTREY NEFF:  That's all the

---

Page 128

1  questions that I have.
2          MS. SCHOENING:  Hold on a second.  I may
3  have some.
4          I don't have any questions.
5          MS. DAUGHTREY NEFF:  Okay.
6
7          _____

           ROXANN E. PLATEK
8
9                    - - -
10     DEPOSITION CONCLUDED AT 3:40 P.M.
11                   - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 129

1              C E R T I F I C A T E
2  STATE OF OHIO        :
                       : ss
3  COUNTY OF HAMILTON    :
4      I, Raymond E. Simonson, RMR, the
5  undersigned, a duly qualified and commissioned notary
6  public within and for the State of Ohio, do hereby
7  certify that, before giving of the aforesaid
8  deposition, ROXANN E. PLATEK, was by me first duly
9  sworn to depose the truth, the whole truth, and nothing
10 but the truth; that the foregoing is the deposition
11 given at said time and place by ROXANN E. PLATEK; that
12 said deposition was taken in all respects pursuant to
13 stipulations of counsel hereinbefore set forth; that I
14 am neither a relative of nor employee of any of their
15 counsel, and have no interest whatever in the result of
16 the action.
17         I further certify that I am not, nor is
18 the court reporting firm with which I am affiliated,
19 under a contract as defined in Civil Rule 28(D).
20         IN WITNESS WHEREOF, I hereunto set my hand
21 and official seal of office at Cincinnati, Ohio, this
22 _____ day of _____, 2012.
23
           _____
24 My commission expires:    RAYMOND E. SIMONSON, RMR
   June 22, 2013          Notary Public - State of Ohio

                        AMS DEPO
      (513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

# ADDENDUM

TO THE REPORTER:  I have read the entire transcript of my deposition taken on the _____ day of _____, 2____, or the same has been read to me.  I request that the following changes be entered upon the record for the reasons indicated.  I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 15 | 24 | spelling "Dines" → "Dynes" |
| 21 | 7 | Ellis ~ I sh have said LoGris |
| 50 | 13 | "online" sh be "of lying" |
| 51 | 24 | "Charged" sh be "in charge" |
| 75 | 1 | "lawrence" sh be "florence" |
| 82 | 12 | "employees" sh be "employers" |
| 87 | 4 | "that" sh be "because" |
| 96 | 5 | sh be "that we thoroughly touched on all items..." |
| 99 | 12 | "any of that in our conversation" |
| 111 | 16 | delete "this" |

8/22/12
_____
(Date)

**ROBERT LEHMAN vs ST. ELIZABETH HEALTHCARE**

Roxann E. Platek
_____
(Signature of Deponent)

ROXANN E. PLATEK    7-13-12    RS

ORIGINAL

AMS DEPO
P.O. Box 58641 · Cincinnati, Ohio  45258-8641
(513) 941-9464

Page 128

1    questions that I have.

2         MS. SCHOENING:  Hold on a second.  I may

3    have some.

4         I don't have any questions.

5         MS. DAUGHTREY NEFF:  Okay.

6

7         _____
          ROXANN E. PLATEK

8

9              - - -

10        DEPOSITION CONCLUDED AT 3:40 P.M.

11             - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

ORIGINAL

Lehman vs. St. Elizabeth                **PLATEK**                7/13/2012

Page 129

```
 1                    C E R T I F I C A T E

 2    STATE OF OHIO          :
                             :  ss
 3    COUNTY OF HAMILTON     :

 4              I, Raymond E. Simonson, RMR, the

 5    undersigned, a duly qualified and commissioned notary

 6    public within and for the State of Ohio, do hereby

 7    certify that, before giving of the aforesaid

 8    deposition, ROXANN E. PLATEK, was by me first duly

 9    sworn to depose the truth, the whole truth, and nothing

10    but the truth; that the foregoing is the deposition

11    given at said time and place by ROXANN E. PLATEK; that

12    said deposition was taken in all respects pursuant to

13    stipulations of counsel hereinbefore set forth; that I

14    am neither a relative of nor employee of any of their

15    counsel, and have no interest whatever in the result of

16    the action.

17              I further certify that I am not, nor is

18    the court reporting firm with which I am affiliated,

19    under a contract as defined in Civil Rule 28(D).

20              IN WITNESS WHEREOF, I hereunto set my hand

21    and official seal of office at Cincinnati, Ohio, this

22    _26th_ day of ____July____, 2012.

23    My commission expires:   RAYMOND E. SIMONSON, RMR

24    June 22, 2013            Notary Public - State of Ohio
```