**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**


ROBERT LEHMAN                          :     Case No. 2:11-cv-00165
                                       :     J. Bertelsman
      Plaintiff,              :     Mag. J. Wehrman
                                       :
   vs.                             :
                                       :
ST. ELIZABETH HEALTHCARE               :
                                       :
      Defendant.             :

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

---

Katherine Daughtrey Neff (*Pro Hac Vice*)
Randolph H. Freking (23509)
Trial Attorneys for Plaintiff
FREKING & BETZ, LLC
525 Vine Street, Sixth Floor
Cincinnati, Ohio 45202
Phone: (513) 721-1975/Fax: (513) 651-2570
*kneff@frekingandbetz.com*
*randy@frekingandbetz.com*

## I.    INTRODUCTION

This case involves a thirty-four-year employee, Plaintiff Robert Lehman, whom Defendant St. Elizabeth Healthcare ("St. Elizabeth") terminated within weeks of learning that Lehman had diabetes and sleep apnea.  In addition to terminating Lehman's employment, Defendant refused to accommodate him and fought his application for unemployment benefits.  It is undisputed that at the time of his termination, Lehman was meeting all of his performance expectations.

At the time of his termination, Lehman, a diabetic born in 1954 who also suffered from sleep apnea, had worked for Defendant since November 1976.  In his nearly thirty-five years with St. Elizabeth, Lehman never received discipline.  Lehman also worked as a security supervisor for twenty-five years.  Lehman had a stellar performance record and was universally considered a good employee until a disgruntled subordinate, Ken Rasor, mentioned in passing that he had seen Lehman nodding off in his office.  Lehman's supervisor, Michael Kraft, Director of Security, initially did not believe Rasor's accusations about Lehman sleeping because Lehman had been performing his duties so well.  (Kraft Dep. at 10.)

When Kraft's secretary told Kraft that she had seen Lehman in his office with his eyes closed a few times, Kraft told Lehman that he was going to issue a Level 1 discipline (the lowest level).  Kraft and Lehman then discussed whether Lehman's diabetes could be causing daytime fatigue.

After Kraft talked to Human Resources ("HR"), Kraft told Lehman that he was going to issue him a Level 3 discipline (a final warning) instead.  Alarmed by the swift increase in the severity of the discipline, Lehman asked to meet with Lisa Blank, Director of Recruitment and Employee Relations.  (Blank Dep. at 8, 14.)  Blank told Lehman that he would have to submit to a fit for duty ("FFD") exam because he believed his daytime fatigue could be a symptom of his

1

diabetes. When Lehman expressed concern that he might be terminated as a result of the FFD exam, Blank assured him that the Level 3 discipline would stand.

Lehman fully cooperated with the FFD exam and told Dr. Brent Haskell about his significant trouble sleeping associated with sleep apnea as well as his diabetes. On September 9, 2010, Gerald Hynko, Registered Nurse and Director of Employee Health, initially told Roxann Platek, HR Advisor, that he believed Lehman had a *medical reason* for falling asleep on the job and *"tied it to the ADA."* (Blank Dep. at 10; Platek Dep. at 14, 16, 21; Dubis Dep. at 24.)

Nevertheless, six days later, Defendant decided to terminate Lehman. Kraft and Platek told Lehman he was being terminated because, according to Dr. Haskell, narcolepsy was the only medical excuse for falling asleep at work. When they made the decision to terminate Lehman, Doug Chambers, Senior Vice President of Facilities, and Martin Oscadal, Senior Vice President of HR, ignored Defendant's own guidelines for appropriate discipline which called for a Level 3 discipline, *not* termination. (Oscadal Dep. at 6, 10; Chambers Dep. at 8-9.) There is no evidence in the record to establish that anybody secured the approval of Defendant's Chief Executive Officer ("CEO") as required by its policy for deviating from the disciplinary guidelines.

Lehman grieved his termination and during that process, Lehman told Chambers and John Dubis, who was Chief Operating Officer ("COO") and ultimately responsible for security, that he had discovered a device used by truck drivers which would keep him from falling asleep during the day and asked to be returned to work using the device.[1] But Dubis denied Lehman this accommodation and upheld the termination which was finalized in December 2010.

---

[1] In moving for summary judgment, Defendant misidentified Dubis as CEO when he was undisputedly the COO at the time of Lehman's termination. (Def. MSJ at 6.) As described *infra* in Section III.C.1, Dubis' title at the time of Lehman's termination is critical as he did not have the authority when he was COO to authorize deviation from Defendant's disciplinary policies. Additionally, the identity of the decision maker(s) is not entirely clear as Chambers claims that Dubis helped to make the final decision, and Dubis disclaims any responsibility for the final decision. (Chambers Dep. at 19; Dubis Dep. at 28-29.)

2

Defendant's articulated reasons for the adverse treatment of Lehman reflect a bias against disabled and older employees, are contradicted by substantial evidence reflecting Lehman's excellent performance and are inconsistent with Defendant's own policies and practices with respect to other employees.

## II.    FACTS

### A.    Lehman, Who Worked For Defendant For More Than Thirty Years, Was An Outstanding Security Supervisor.

Lehman, who was 56 years old at the time, was a security supervisor for St. Elizabeth for almost 25 years and was a St. Elizabeth employee for nearly 35 years. (Lehman Dep. at 20.)  As supervisor, Lehman responded to security calls and maintained order in the hospital in addition to supervising staff. (Kraft Dep. at 20-21.)  According to Kraft, each shift had three security guards, (sometimes four on the day shift) including the supervisor; one guard patrolled the facility and grounds, and one stayed in the monitor room and dispatched guards to security issues. (Kraft Dep. at 21-22, 23, 25, 26.)  There was also a security guard stationed in the ER which represented the area of greatest concern for security. (Dubis Dep. at 35; Chambers Dep. at 47.)

St. Elizabeth allows security supervisors and guards to take two 15-minute breaks (one before lunch and one after) and an unpaid lunch. (Kraft Dep. at 27-28, 29; Chambers Dep. at 25.)  Security staff and supervisors decided together when the guards could take breaks. (Lehman Dep. at 29.)  Lunch breaks were set for employees, and Lehman made sure that security guards were not all taking their lunch at the same time. (Lehman Dep. at 30.)  Security officers were not required, however, to ask permission to use the restroom. (Kraft Dep. at 34; Oscadal Dep. at 57-58.)  The Security Department did not have any method for keeping track of where security officers were, but they were expected to ensure coverage before taking a break or lunch; only one guard could take a break at a time. (Kraft Dep. at 26, 28-29.)

When security guards were on lunch, they were permitted to go to the cafeteria which was on the floor below the security office and were only expected to respond to extremely severe situations.  (Kraft Dep. at 27-28, 32-33.)  They could also leave the facility and combine their breaks with lunch with Kraft's permission.  (Chambers Dep. at 25-26, 27-28.)  Prior to 2012, employees could leave the building on break to go to smoking huts.  (Chambers Dep. at 28-29.)  According to Chambers, from 2012 forward, smokers have to leave the facility's property to smoke.  (Chambers Dep. at 29.)

Lehman routinely received outstanding reviews, and Kraft believed that Lehman was performing all of his duties in a timely manner; Kraft had no concerns at all about Lehman's performance.  (Lehman Dep. at 17; Kraft Dep. at 25.)  Blank knew of no performance concerns on Lehman's part, and admits that she respected him very much.  (Blank Dep. at 32, 77-78.)  Platek likewise admits that Lehman was a good performer who was trustworthy and well-liked.  (Platek Dep. 94.)  Chambers also admits that Lehman's performance had always been "very good."  (Chambers Dep. at 42.)

### B.    The Subordinate Who Accused Lehman Of Falling Asleep On The Job Was A Poor Performer Who Liked To Cause Trouble.

Lehman contributed to an unfavorable performance evaluation of a security guard, Ken Rasor, in April 2009.  (Blank Dep. at 13, 14; see also, Oscadal Dep. at 38.)  As Blank admits, Rasor "did not care for" Lehman, and Kraft was concerned that Rasor may maliciously attempt to ruin Lehman's career.  (Blank Dep. at 25; Kraft Dep. at 38, 48-49; see also, Oscadal Dep. at 38.)

Among other performance deficiencies, Rasor stayed in the security office too much and returned to it too quickly when he should have been patrolling instead.  (Kraft Dep. at 38.)  Rasor's early returns to the security office were a safety concern because it meant that there was no patrolling guard who could quickly respond to security issues.  (Oscadal Dep. at 61, 62; Kraft

Dep. at 39.)  Oscadal admits that refusing to patrol could be considered insubordination which is grounds for immediate termination.  (Oscadal Dep. at 61.)

Kraft, Lehman and Platek held a follow-up disciplinary meeting with Rasor on August 19, 2010.  (Kraft Dep. Ex. 3; Kraft Dep. at 37.)  Platek reported to Blank that Rasor left this disciplinary meeting feeling "unsatisfied" and listed in an email a litany of Rasor's false complaints including allegations that Lehman had not provided backup to him in emergency situations.  (Kraft Dep. Ex. 3; Platek Dep. at 42.)  She expressed concern that Rasor (who had access to weapons) "ha[d] so much anger" and could "not see things clearly."  (Platek Dep. Ex. 4; Platek Dep. at 47.)

Kraft never heard Rasor complain that Lehman failed to offer proper backup before this meeting and he never received a report that Lehman failed to respond to a call.  (Kraft Dep. Ex. 3; Kraft Dep. at 41, 76; see also, Chambers Dep. at 46.)  Rasor's claims about Lehman's backup thus did not cause Kraft any concern and he does not recall following up with Rasor on the issue. (Kraft Dep. at 41.)

Rasor also made an off-hand comment to Platek that he thought Lehman was sleeping in the office which Platek reported to Blank.  (Kraft Dep. Ex. 3.)  Blank responded that the sleeping complaint "worrie[d]" her and instructed Platek to investigate to placate Rasor and so that they could "document that [they] looked into that."  (Blank Dep. at 26-27; Platek Dep. at 38, 48; Kraft Dep. at 42; Kraft Dep. Ex. 3.)  Blank admits that Rasor was unhappy with "being held accountable" and she was "not surprised" that he complained about Lehman.  (Blank Dep. at 24-25.)

Kraft, who typically worked the day shift (the same shift as Lehman), assured Blank and Platek that Lehman was meeting all of his expectations and timely performing the many duties he had assigned to Lehman in addition to his primary responsibilities.  (Kraft Dep. Ex. 3; Blank

5

Dep. at 27; Platek Dep. at 49; Oscadal Dep. at 49; see also, Chambers Dep. at 42-43.)  Kraft also reiterated Rasor's unwillingness to take constructive criticism and attempts to create discord in the department.  (Kraft Dep. Ex. 3.)  And Kraft noted the concern Rasor's supervisors had expressed about his performance for many years prior.  (Kraft Dep. Ex. 3; Kraft Dep. at 43.)

Kraft wrote Blank and Platek a second time on August 19 to report that his secretary, Kim Difilippo, told him that Rasor had pointed out to her on a few occasions that Lehman had been sleeping.  (Kraft Dep. Ex. 3; Platek Dep. at 51.)  Kraft emphasized that his secretary was concerned about talking to him because she feared Rasor.  (Blank Dep. at 87; Kraft Dep. Ex. 3; Kraft Dep. at 44-45; Platek Dep. at 52: Chambers Dep. at 62-63.)  In that same email, Kraft wondered if Lehman's nodding off was the result of his diabetes.  (Kraft Dep. Ex. 3; Kraft Dep. at 45-46.)

Despite Kraft's clear satisfaction with Lehman's performance, Blank assigned Platek to investigate Rasor's complaint that Lehman was sleeping.  (Blank Dep. at 27.)  Difilippo told Platek on three occasions that Rasor or Mike Borman, another security guard, pointed out to her that Lehman had his eyes closed.  (Blank Dep. at 28; Platek Dep. at 40, 54-55; Platek Dep. Ex. 5.)  Difilippo told Platek that Lehman might have been on break at the time, but Platek made no further effort to determine this.  (Blank Dep. at 28-29; Platek Dep. Ex. 5; Platek Dep. at 55, 57.) Difilippo also told Platek that she did not know how long Lehman had his eyes closed and that Rasor told her about it as a way to create trouble in the department.  (Platek Dep. Ex. 5.) Difilippo also speculated that Lehman might have medical issues causing his daytime fatigue. (Platek Dep. at 55; Platek Dep. Ex. 5.)

**C.    The Level 1 Discipline That Kraft Told Lehman He Would Receive Escalated To A Level 3 Discipline Within Hours After Lehman Told Kraft That His Sleeping May Be Related To His Diabetes.**

When Lehman admitted to Platek that he had fallen into a light sleep during some of his breaks or while he was on lunch in his office *with his door open*, Platek did not investigate the issue any further.  (Lehman Aff. ¶ 2; Blank Dep. at 28, 65; Lehman Dep. at 28-29, 30-31; Oscadal Dep. at 58; Chambers Dep. at 45.)  Lehman had previously reviewed Defendant's disciplinary policies to determine whether sleeping on break violated them.  (Lehman Dep. Ex. 8.)  He found nothing to indicate that it did.  (Lehman Dep. Ex. 8.)

Lehman admitted to Kraft he had slept lightly (as in "nodding off") a handful of times.  (Kraft Dep. at 50, 76; see also, Platek Dep. at 86.)  Lehman asked Kraft if sleeping on breaks was against policy because Lehman had not found any policy prohibiting it; Kraft did not know.  (Lehman Dep. at 32, 64.)  During the initial discussion, Kraft told Lehman that he planned to give Lehman a Level 1 discipline.  (Lehman Dep. at 64; Chambers Dep. at 53.)  Kraft was not disciplined for promising Lehman a lesser discipline than outlined in the disciplinary policy. (Chambers Dep. at 53-54.)  Lehman agreed with Kraft that his fatigue could be related to his diabetes and fluctuating blood sugars.  (Lehman Dep. at 63-64; Platek Dep. at 24-25.)  Kraft indicated that he would have to call HR.

Approximately three hours later, Kraft told Lehman that the Level 1 was changed to a Level 3.  (Lehman Dep. at 64.)  The only events that occurred between Kraft's statement to Lehman that he was going to receive a Level 1 and the decision to issue the Level 3, were Lehman's conversations with Kraft about his diabetes and Kraft's conversation with HR. (Lehman Dep. at 64; Kraft Dep. at 51.)

According to Kraft, he checked with Platek about the discipline to issue Lehman.  (Kraft Dep. at 51.)  Platek told Kraft that she would have to check with Blank.  (Kraft Dep. at 51-52.)

7

Kraft admits that, at some point during their conversations, he raised the issue of Lehman's diabetes. (Kraft Dep. at 51-52.) According to Blank, when Kraft called her about the "diabetes issue," and told her that it might be the cause of his fatigue, she told Kraft that they needed to do an FFD exam. (Blank Dep. at 30, 34, 37; see also, Platek Dep. at 23.) Platek admits that if Lehman had a medical condition that was causing him to sleep at work, it could have changed whether he was disciplined. (Platek Dep. at 24.) But when she followed up with Kraft, she told him it "would be a Level 3" and that Lehman would have to submit to an FFD exam. (Kraft Dep. at 52, 53.)

Kraft was very angry about the Level 3 as he believed it too harsh for an employee with a good record. (Kraft Dep. at 52-53; Blank Dep. at 31.) Lehman was likewise alarmed by the swift escalation in disciplinary action and asked for a meeting with Blank. (Lehman Dep. at 65; see also, Platek Dep. at 87.) Blank told Lehman that the policy required a Level 3 discipline for sleeping and that four employees had previously received a Level 3 for sleeping. (Blank Dep. at 33, 35; Lehman Dep. at 65.)

In response to Blank's inquiry, Lehman told her that he had previously seen security guards sleeping on the job. (Lehman Dep. at 26, 65, 74-75; Blank Dep. at 31; Kraft Dep. at 56.) Lehman told Blank that he had ordered them to stop sleeping and told his supervisor at the time, Greg Popham about it. (Lehman Dep. at 65; Kraft Dep. at 86.) But Popham just laughed it off. (Lehman Aff. ¶ 3; see also Dubis Dep. at 54-55; Chambers Dep. at 15; Chambers Dep. Ex. 1.)

Blank also told Lehman about the required FFD exam, and that he would be terminated if he did not submit to it. (Lehman Dep. Ex. 3; Blank Dep. at 34-35; Lehman Dep. at 41, 65.) When Lehman expressed his concern that he might be fired based on the result of the FFD exam, Blank told him he would receive a Level 3 regardless of the results. (Lehman Dep. at 66.) Kraft

8

and Blank admit that Lehman ultimately agreed to go through the FFD exam and accept his Level 3 and move on.  (Kraft Dep. at 57; Blank Dep. at 64.)

Dr. Haskell, who conducted the FFD exam, noted that Lehman only slept approximately four and a half to five hours per night and that Lehman suffered from sleep apnea.  (Lehman Dep Ex. 3; Lehman Dep. at 39; Hynko Dep. at 17.)  Lehman talked about his fatigue with Dr. Haskell, who surmised that Lehman's obstructive sleep apnea could have caused his daytime sleepiness and recommended that Lehman be examined by a sleep expert. (Hynko Dep. at 41-42; Lehman Dep. at 38-39, 43; Lehman Dep. Exs. 3, 4.)

When Lehman talked about his diabetes with Hynko, the head of Employee Health, and mentioned that he was going to get a Level 3 regardless of the outcome of his FFD exam, Hynko responded that diabetes is protected under the Americans with Disabilities Act ("ADA"). (Lehman Dep. at 67; Hynko Dep. at 12.)  Dr. Haskell also gave Lehman these assurances. (Lehman Dep. at 68-69.)  Lehman and Hynko discussed Lehman's sleep apnea and his participation in a sleep study in a later meeting.  (Hynko Dep. at 12-13, 14.)

   **D.   Despite Kraft's Assurances To Lehman That He Would Only Receive A Level 1 Discipline, And Blank's Pronouncement Before The FFD Exam That He Would Receive A Level 3, Defendant Terminated Him.**

On September 9, 2010, Platek told Oscadal that Hynko believed Lehman had a medical reason for falling asleep on the job and "tied it to the ADA."  (Platek Dep. Ex. 1; Platek Dep. at 26-27, 28; Hynko Dep. at 23-24; Oscadal Dep. at 24.)  Platek also reported that Hynko planned to put Lehman on short-term disability leave "immediately" for his medical situation.  (Platek Dep. Ex. 1; Platek Dep. at 26-27, 28; Oscadal Dep. at 25.)  Additionally, Platek passed along Hynko's suggestion that Lehman and others in similar situations receive a "return to work" agreement requiring compliance with health care to remain in the position.  (Platek Dep. Ex. 1.)

9

Two minutes after receiving this message from Platek, Oscadal told Blank that they needed to schedule a meeting with Hynko "ASAP." (Oscadal Dep. Exs. 1-2.)

Even after learning that the head of Employee Health concluded that Lehman had a health condition which implicated the ADA, Platek did not talk to Lehman about a possible need for an accommodation. (Platek Dep. at 30.) She claims Hynko was working with Lehman on it, and does not know whether any request was put in writing. (Platek Dep. at 30.) But Hynko did not speak to Lehman about the possibility of requesting accommodations either. (Lehman Aff. ¶ 4.)

On September 14, 2010, Platek emailed Blank and Oscadal to tell them that Hynko--who apparently had done an about face on his conclusions about Lehman--and Dr. Haskell had decided to recommend that there was no medical excuse for falling asleep as the fatigue Lehman experienced was allegedly controllable. (Blank Dep. at 37, 39-40; Blank Dep. Exs. 2, 3; Platek Dep. Exs. 3, 6, 8; Platek Dep. at 34, 90, 92; Hynko Dep. at 24.) Platek opined in that email that Lehman thought "he's off the hook if its medical" and that she still did not believe Lehman was "owning it." (Platek Dep. Ex. 3; Plate Dep. at 35-36.)

In September 2010, *sleeping on the job was still a Level 3 offense* and the same policies applied to security as everyone else. (Oscadal Dep. at 28, 31; Platek Dep. at 72, 92-93.) But on September 22, 2010, Lehman was called into a meeting with Kraft and Platek who told Lehman that he was terminated because there "was no acceptable reason for falling asleep at work other than narcolepsy." (Blank Dep. at 37, 39-40; Blank Dep. Exs. 2, 3; Platek Dep. Exs. 3, 6, 8; Platek Dep. at 34, 90, 92, 97; Lehman Dep. at 69, 70; Oscadal Dep. at 45-46.)

On September 28, 2010, after Lehman's termination, Hynko reported the FFD recommendation to Platek. (Hynko Dep. Ex. 2; Hynko Dep. at 27-28.) According to Hynko, Lehman's sleeping at work "was likely due to chronic fatigue resulting from inadequate sleep time." (Hynko Dep. Ex. 2.) Hynko reported in that email that there also might be other

10

undiagnosed medical conditions exacerbating his daytime fatigue. (Hynko Dep. Ex. 2; Hynko Dep. at 40-41.)

Lehman grieved his termination through Defendant's dispute resolution procedure and at the meeting expressed that he had learned that the ADA covers diabetes and that he now knew (but did not before) that he could ask Employee Health for an accommodation. (Lehman Dep. at 37, 97; Lehman Dep. Ex. 10; Blank Dep. at 63; Kraft Dep. at 82; Platek Dep. at 103-104.) Lehman also told Chambers that he had purchased a special alarm used by truck drivers to keep them awake and was prepared to ask his doctors for additional assistance. (Lehman Aff. ¶ 5.) Chambers estimates that 10 to 20 percent of employees grieve the termination but admits he has *never* reversed a termination as a result of a grievance. (Chambers Dep. at 40.) Predictably, Lehman's grievance was denied by Chambers and Kraft. (Lehman Dep. at 85, 95; Lehman Dep. Exs. 9, 11, 12.) Lehman met with Dubis at the end of October to appeal the termination. (Dubis Dep. at 50.) Dubis, as COO, was the final decision maker on the grievance and denied Lehman's appeal. (Lehman Dep. Ex. 9.)

Rick Smith, who has no known disability, replaced Lehman after his termination. (Lehman Dep. at 57-58; Chambers Dep. at 55; Kraft Dep. at 18; Kraft Dep. Ex. 1.)

### E.   As Defendant Admits, A Significantly Younger Nurse Received A Level 3 Discipline For Sleeping At Approximately The Same Time That Lehman Was Terminated.

Shuana Dynes, an HR Advisor for Nursing who reported to Blank, emailed Blank and Oscadal to tell them that Amanda Rickey, an RN, born in 1978, received a Level 3 counseling on August 25, 2010 when she was caught sleeping on the job in an empty patient room and a supervisor had to wake her up. (Oscadal Dep. at 30, 32; Oscadal Dep. Ex. 4; Blank Dep. Ex. 4; Blank Dep. at 45-46, 47, 49.) Blank claims that Rickey had reported feeling ill to her supervisor and had asked to lie down. (Blank Dep. at 46.) But the written discipline does not include these

alleged facts. (Blank Dep. at 47; Blank Dep. Ex. 4.) Blank does not know whether Rickey was on break when she fell asleep and the discipline does not indicate that she was. (Oscadal Dep. Ex. 4; Oscadal Dep. at 32; Blank Dep. at 49.) Rickey was not terminated until she was caught sleeping a second time and tested positive for alcohol in her system. (Blank Dep. at 49-50; Blank Dep. Ex. 4.)

## III.   **ARGUMENT**

### A.   **Summary Judgment Standard**

Summary judgment may only be granted if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. As the party moving for summary judgment, Defendant bears the burden of showing the absence of a genuine issue of material fact as to at least one element of Lehman's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If Defendant meets its burden, Lehman must then present evidence that reveals a genuine issue for trial. *Id.*

This Court must accept Lehman's evidence as true and draw all reasonable inferences in his favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), viewing all facts and inferences drawn therefrom in the light most favorable to him. *DePiero v. City of Macedonia*, 180 F.3d 770, 776 (6th Cir. 1999). When deciding a Rule 56 motion, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 151 (2000). Therefore, disputes over facts that might affect the outcome of the suit will preclude entry of summary judgment. *Anderson*, 477 U.S. at 248; *Landefeld v. Marion General Hospital*, 994 F.2d 178, 181 (6th Cir. 1993).

**B.    Lehman Can Establish A *Prima Facie* Case Of Age And Disability Discrimination.**

Lehman has established, with circumstantial evidence, a genuine issue of material fact regarding the possible existence of age and disability discrimination.  Under the circumstantial or indirect evidence approach, Lehman must first establish a *prima facie* case of discrimination by showing that: (1) he was in a protected class; (2) he was qualified for the job he held; (3) he suffered an adverse employment action; and, *inter alia*, (4) he was replaced by a someone outside the protected class, or he was treated differently than similarly situated employees outside the protected class.  *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253-54 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998); *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky 2003) (Kentucky courts interpret the provision of the Kentucky Civil Rights Act consistent with federal law).

**1.    Lehman Has Established a *Prima Facie* Case Of Disability Discrimination.**

Federal and state law prohibit discrimination against employees on the basis of a disability.  ADA, 42 U.S.C. § 12111 as amended;  O.R.C. §4112.02(A).  In enacting the ADA, "Congress intended that [it] 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' and 'provide broad coverage.'" ADA Restoration Act 110 P.L. 325, Sec. 2(a)(1).

Further, Congress recognized that people with physical or mental disabilities are "frequently precluded from [full participation in all aspects of society] because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers." 110 P.L. 325 Sec.2(a)(2).  Thus, "the thesis of the [ADA] is simply this: that people with disabilities ought to

13

be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant medical evidence and the abilities they have." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (citations omitted).

### a.    Lehman Was Disabled.

Defendant's lengthy argument that Lehman cannot establish that he is disabled is without merit and ignores the expansive definition of disability required by the amendments to the ADA (which Congress adopted to correct the law from cases upon which Defendant relies).  (Def. MSJ at 15, 16.)

As noted by the ADA Restoration Act, "Congress expected that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973."  110 P.L. 325, Sec. 2, (a)(3).  Thus, Congress explicitly rejected the narrow protection for disabled individuals announced in *Sutton v. United Air Lines, Inc.*,  527 U.S. 471, 483 (1999) and *Toyota Motor Manufacturing, Kentucky, Inc., v. Williams*, 534 U.S. 184 (2002).

Specifically, Congress rejected *Sutton's* requirement that the court must consider the ameliorative effects of mitigating measures when determining whether an individual is disabled pursuant to the ADA. 110 P.L. 325, Sec. 2, (b)(2).  Congress further rejected the  "demanding standard for qualifying as disabled" created by the Supreme Court's holding in *Toyota Manufacturing Kentucky* admonishing courts to strictly interpret the terms "substantially" when considering the question of limitations and "major" when considering the question of life activities.  110 P.L. 325, Sec. 2, (b)(4).

The primary question in cases brought under the ADA "should be whether entities covered under the ADA have complied with their obligations."  110 P.L. 325, Sec. 2, (b)(5).

14

Thus, the "question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." 110 P.L. 325, Sec. 2, (b)(5). The ADA defines a "disability" as:

(A)     a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B)     a record of such an impairment; or

(C)     being regarded as having such an impairment.

42 U.S.C. § 12102(2). The definition includes "[d]iseases and conditions, including, but not limited to, orthopedic, visual, speech, and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, *diabetes*, human immunodeficiency virus infection, mental retardation, emotional illness, drug addiction, and alcoholism") (emphasis supplied.)

"Major life activities" include, but are not limited to, walking, *eating*, *sleeping*, standing, lifting, bending, thinking, communicating, reading, concentrating, seeing, hearing, speaking, breathing, learning, caring for oneself, performing manual tasks, and working. 29 C.F.R. § 1630.2(I), 110 P.L. 325, Sec. 3, (2)(A)(1). (Emphasis supplied.) Major life activities also include the operation of major bodily functions including functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, *endocrine*, and reproductive functions. 110 P.L. 325, Sec. 2, (b)(2) (emphasis supplied.) "Substantially limits" means:

(i)     Unable to perform a major life activity that the average person in the general population can perform; or

(ii)     Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

*Id.*

15

To claim that Lehman's diabetes does not make him disabled Defendant erroneously considers only the effect of his diabetes on his work life. But Lehman is not limited to establishing substantial limitations in his work life and he can establish substantial limitations in other major life activities. Because of his diabetes, Lehman's diet is significantly restricted and he has to constantly monitor his blood sugar. (Lehman Dep. at 75-76.) Because he must constantly monitor his blood sugar, Lehman always carries medical equipment with him. (Lehman Dep. at 76.) Lehman's diabetes causes him to become easily fatigued, limiting his ability to participate in sports and negatively impacting his social life. (Lehman Dep. at 76.) Lehman informed Kraft that any trouble with his blood sugar could result in profuse sweating or strange behavior and fatigue. (Lehman Dep. at 71-72; Kraft Dep. at 46; Platek Dep. at 32.) Lehman also had to take unanticipated breaks at work to attend to his blood sugar. (Lehman Dep. at 72.) Finally, Lehman's diabetes causes him tingling in his arms and legs. (Lehman Dep. at 75.)

At the time of his termination, Lehman was getting no more than five hours of (restless) sleep per night and there were times that Lehman felt fatigued at work. (Lehman Dep. at 34; Hynko Dep. Ex. 3.) Lehman talked to his general practitioner, and his endocrinologist, Dr. Michael Canos, about the work-related problems his fatigue was causing and upon Dr. Canos' recommendation, Lehman saw Dr. Patricia Miles for his sleep issues. (Lehman Dep. at 38, 44-45, 47; Lehman Dep. Ex. 5.) By December 2008, Dr. Miles diagnosed Lehman with severe sleep apnea which caused repeated awakenings during the night. (Lehman Dep. Ex. 5.) Lehman's poor sleep pattern has continued and his diabetes exacerbates his daytime fatigue. (Lehman Dep. at 40, 46; Hynko Dep. at 13.) Lehman also took medication for depression while he worked for Defendant. (Lehman Dep. at 49-50.) Finally, this Court must consider the effect Lehman's diabetes would have on Lehman without the ameliorative effects of the medication he takes to

16

control it and the effect on Lehman if his diabetes was "active." As Lehman's doctors have explained to him, if his diabetes went unchecked, he would risk amputation of his feet, organ damage, substantial damage to his eyesight, and eventually, death. (Lehman Aff. ¶ 6.)

Defendant's argument that, as a matter of law, Lehman's sleep apnea is not a disability is likewise without merit. Defendant relies on a single unpublished case to establish that a plaintiff's sleep apnea was not sufficiently severe to rise to the level of a disability. (Def. MSJ at 16) citing *Cartwright v. Lockheed Martin Utility Services, Inc.*, 40 Fed. Appx. 147, 153-154 (6th Cir. 2002). But that case, decided before the amendments to the ADA, considered, *inter alia*, the ameliorative effects of the plaintiff's breathing machine to conclude that the plaintiff was not disabled. This Court must consider Lehman's sleep apnea in light of the expansive definition of disability without the mitigating effects of any treatment he is receiving for his apnea and allow the jury to determine whether he is limited in the major life activity of sleeping.

A jury could also reject Defendant's claim that Lehman did not have a record of a disability. (Def. MSJ at 17.) It is without dispute that Kraft knew that Lehman was diabetic and that he would suffer significant side effects if he experienced uncontrolled blood sugar. In fact, Kraft raised the issue of Lehman's diabetes when they discussed his falling asleep at work. Kraft, in turn, raised the issue with Blank and Platek when he reported Lehman's admission to them. See *supra* Section II.C. Indeed, as Blank admits, it was the possible connection between Lehman's diabetes and his falling asleep at work that resulted in the decision to send him for an FFD exam. See *supra* Section II.C. It is likewise clear that Blank and Oscadal knew of Lehman's sleep apnea diagnosis at least by September 15, 2010 from their email conversation

17

about Dr. Haskell's conclusion.  (Platek Dep. Ex. 3; see also, Blank Dep. at 38; Blank Dep. Ex. 2.)[2]

Defendant's attempt to escape the importance of this crucial evidence by claiming that the decision makers had no knowledge of Lehman's disabilities until after he had been seen falling asleep at work is without merit.  The relevant event here is not when one of the side effects of Lehman's disabilities manifested themselves at work (i.e., the disability left him so fatigued during the day that he started falling asleep at work).  The relevant event is the decision to terminate him and a jury could easily conclude that at least two of the individuals participating in the termination decision knew of Lehman's disability before the termination decision was made.[3]

A jury could also conclude that the decision makers regarded him as disabled.  In arguing that Lehman offered no evidence that he was regarded as disabled, Defendant relies on Blank's false statement that he "did not ask for any accommodation whatsoever."  (Def. MSJ at 18.)  This is not true.  A jury could consider Lehman's conversations about the fatigue caused by his disabilities with Hynko--the Director of Defendant's Employee Health Department--as an attempt to initiate an interactive process about accommodating his disability.  (Lehman Dep. at 67-68.)  In fact, this is one of the ways Blank described for an accommodation request, with Employee Health receiving notice of a restriction which was supposed to trigger a call to HR to determine whether it could be accommodated.  (Blank Dep. at 21.)  There is no evidence in the record that this happened.  Moreover, before the termination decision was finalized, Lehman told Dubis about an alarm he found that truck drivers use to keep themselves awake and asked to be

---

[2] According to Hynko, HR should *not* have known about Lehman's sleep apnea due to HIPAA protections; yet clearly someone from Employee Health informed Blank and Oscadal about Lehman's sleep apnea before his employment was terminated on September 22, 2010.  (Hynko Dep. at 14, 42; Blank Dep. Ex. 2.)

[3] Curiously, Defendant claims that Lehman does not have a record of a disability because he "can work and drive."  (Def. MSJ at 17.)  It is axiomatic that working and driving are not the only major life activities considered when determining whether an individual is disabled.  See *supra* Section III.B.1.a.

returned to work using that device.  (Lehman Aff. ¶ 5.)  A jury could easily consider this a request for a reasonable accommodation which is fatal to Defendant's argument that Lehman was not regarded as disabled.  (Def. MSJ at 18.)

> **b.    Lehman Was Qualified.**

Under the ADA, a "qualified individual with a disability" is an individual who, with or without reasonable accommodation, can perform the essential functions of the job at issue.  42 U.S.C. § 12111(8).  A trial court is required to make a highly fact-specific and individualized inquiry as to what constitutes the essential functions of a job.  *Hoskins v. Oakland County Sheriff's Dep't.*, 227 F.3d 719, 726 (6th Cir.  2000).  Moreover, "[t]he determination of whether a given function is 'essential' within the meaning of the ADA and regulations promulgated thereunder is typically a question of fact and thus not suitable for resolution through a motion for judgment as a matter of law . . . ."  *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998).

The burden is on the Defendant to prove that a particular job duty is an essential function.  *Id.*; *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996).  The term essential functions means the fundamental job duties of the employment position in question, but does not include marginal functions.  29 C.F.R. § 1630.2(n)(1).  Factors to consider when determining whether a particular job function is essential include:

1)    the reason the job exists is to perform the function;

2)    the number of employees available to perform the function is limited; and/or

3)    the function is so highly specialized that the employee is hired for his or her expertise in performing that function.

29 C.F.R. § 1630.2(n)(2).

To claim that it is entitled to judgment as a matter of law that Lehman was not qualified for his position "because he was unable to stay awake," Defendant ignores statements by more

19

than one of its own witnesses that falling asleep *was under Lehman's control*.  (Blank Dep. at 74; Platek Dep. Ex. 6; Platek Dep. at 89-92.)  In fact, this is allegedly why Hynko and Dr. Haskell determined that narcolepsy was the only acceptable medical excuse for falling asleep at work.  Moreover, Defendant ignores Kraft's unequivocal testimony that at the time of the sleeping accusation, Lehman was meeting all of his expectations and timely performing the many duties he had assigned to Lehman in addition to his primary responsibilities.  (Kraft Dep. Ex. 3; Blank Dep. at 27; Platek Dep. at 49; Oscadal Dep. at 49; see also, Chambers Dep. at 42-43.)  Thus, despite Lehman's napping during breaks, he was able to perform the essential functions of his job according to his own supervisor.  These admissions are fatal to Defendant's claim that Lehman was unqualified and prohibit summary judgment on this issue.

Moreover, Defendant's reliance on the two security guards terminated after Lehman's termination does not salvage their claim.  It is undisputed that both of those security guards were found sleeping in St. Elizabeth vehicles while on patrol in the parking lot and could not be roused by several witnesses attempting to catch their attention.  (Kraft Dep. at 68-69, Kraft Dep. Ex. 2; Platek Dep. at 77-79.)  Lehman, on the other hand, never missed a call and, as he was in his office, was easily accessible when necessary.  See *supra* Section II.B.  Defendant is also asking this Court to make an inference in its favor that guards were terminated because they were unqualified for the position.  But this Court should allow the jury to draw the inference in Lehman's favor that the guards were terminated because the policy changed to automatic termination for sleeping on the job.

Defendant's claim that Lehman was unqualified for his position also fails because this Court must evaluate Lehman's qualifications and performance *before* the events that prompted his discharge.  *Cline*, 206 F.3d at 662-63.  Thus, Lehman's qualifications must be evaluated *objectively*, by determining whether he presented evidence that he met at least the minimum

objective criteria required for employment in his field. *Wexler*, 317 F.3d at 575-76. This inquiry should focus on Lehman's education, experience in the relevant industry, and demonstrated possession of the required general skills. *Id.* at 576.

Therefore, Defendant's argument that Lehman is not qualified because he fell asleep is fatally flawed. This is Defendant's articulated non-discriminatory reason for terminating Lehman, which must be analyzed in the third, or pretext, stage of the *McDonnell Douglas* process, not the *prima facie* case. *Wexler*, 317 F.3d at 574-75; *Cline*, 206 F.3d at 660-61.

### c.   Defendant Replaced Lehman With A Non-Disabled Individual.

Defendant admits that Lehman can establish a *prima facie* case of disability discrimination by establishing that he was replaced by a non-disabled employee. (Def. MSJ at 9, 14.) It is undisputed that Smith, who has no known disability, replaced Lehman, establishing the replacement prong of Lehman's *prima facie* disability case.

Lehman can also establish a question of fact as to whether another non-disabled employee was treated more favorably than him. In September 2009, Defendant issued a non-disabled nurse a Level 3 disciplinary action for sleeping on the job while she was supposed to be taking care of patients. (Neff Aff. Ex. 1.) This non-disabled nurse had been disciplined several times prior to and after her Level 3 discipline for sleeping on the job for not timely returning from break, refusing to accept reasonable job assignments and excessive absenteeism. (Neff Aff. Ex. 1.)

### d.   Defendant Refused To Accommodate Lehman.

Lehman can also establish a question of fact as to whether Defendant refused to accommodate his disability. When, as here, the defendant claims that it relied on the plaintiff's disability in making an adverse employment decision, the plaintiff may establish a *prima facie* case of disability discrimination under the ADA by showing that his proposed accommodation was "objectively reasonable." *Blanton v. Inco Alloys Int'l*, 123 F.3d 916, 917 (6th Cir. 1997)

(supplemental opinion); *Hoskins*, 227 F.3d at 724, *citing Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996). Once the plaintiff establishes the reasonableness of his accommodation, the defendant must prove that the challenged job function is essential, or that a proposed accommodation will impose an undue hardship. *Blanton*, 123 F.3d at 917; *Hopkins*, 227 F.3d at 724.

An undue hardship is defined as "an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B)." 42 U.S.C. § 12111(10) (A). These factors include: the nature and cost of the accommodation needed; the overall financial resources of the facility involved in providing the accommodation; the overall financial resources of the covered entity; and the type of operation of the covered entity, including the composition, structure and functions of its workforce. 42 U.S.C. § 12111(10)(B).

Federal courts have recognized that an employer, when faced with a request for reasonable accommodation by an employee, has a duty to interact with an employee in a good faith effort to seek a reasonable accommodation. *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996), *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 951-952 (8th Cir. 1999). *See also, Shaver v. Wolske & Blue*, 138 Ohio App. 3d 653, 664 (2000). A jury can consider an employer's failure to engage in an "interactive process" to find a reasonable accommodation when an employee requests one as evidence supporting the plaintiff's *prima facie* case proof that the employer may have been acting in bad faith or in reckless indifference to the plaintiff's federally protected rights. *Lovejoy-Wilson v. Noco Motor Fuels*, Inc., 242 F. Supp.2d 236, 244 (S.D. NY 2003). As part of the interactive process, Defendant was "required to make a reasonable effort to determine the appropriate accommodation." *White v. Honda of Am. Mfg., Inc.,* (S.D. Ohio 2002) 191 F.Supp.2d 933, 950.

22

Blank, who is involved in decision making on accommodations, admits that there are several ways to request an accommodation and could be made through a manager, or through "other routes." (Blank Dep. 21, 22; see also Platek Dep. at 20.) These include verbal or written requests to Employee Health, or notes from doctors telling Employee Health that an employee has restrictions. (Blank Dep. at 21.) According to Blank, Dr. Haskell was charged with determining Lehman's restrictions from his medical condition. (Blank Dep. at 38-39.) Employee Health is supposed to then ask HR if the restrictions can be accommodated. (Blank Dep. at 21.) Blank admits that this process, which did not happen with Lehman, is supposed to be interactive. (Blank Dep. at 21.)

Given Blank's admissions, Defendant's claim that Lehman *never* asked for an accommodation while he was employed with Defendant is without merit. Lehman told Kraft and Blank that he took short naps during his breaks to alleviate his fatigue caused by his diabetes. Lehman had the same conversation with Hynko who explained to Lehman that his diabetes was protected by the ADA. (Lehman Dep. at 37.) A jury should be allowed to determine whether Defendant could have accommodated Lehman by permitting him to take short naps on break or lunch to alleviate his fatigue and that his conversation with Hynko should have triggered a discussion of an accommodation like this. See *supra* Section II.C. Such an accommodation would have no different results than allowing an employee to combine breaks with lunch and leave Defendant's property, something Defendant's own witnesses admit a security employee could do with Kraft's permission. See *supra* Section II.A. Further, Lehman told Dubis about the truck driver alarm during the pendency of his grievance and asked to return to work using it to keep him from falling asleep. See *supra* Section II.D. This alarm was readily available and cost approximately $30. (Lehman Aff. ¶ 5.) Lehman even offered to pay for the alarm himself. (Lehman Aff. ¶ 5.) A jury should be allowed to decide if Lehman's request, which would present

23

minimal cost to Defendant was a reasonable accommodation which Defendant rejected. Summary judgment on this basis is thus inappropriate.

    2.    **Lehman Has Established A *Prima Facie* Case Of Age Discrimination.**

It is undisputed that Lehman is a member of the protected class and subject to an adverse job action. (Def. MSJ at 9-11.) And as described above, Lehman has established that he meets the objective qualifications for the position he had been performing so well for decades. See *supra* Section II.A.

Lehman can also demonstrate a question of fact as to the fourth prong of the *prima facie* case by demonstrating more favorable treatment of one or more similarly situated, significantly younger employees. In moving for summary judgment, Defendant admits that a significantly younger nurse was caught sleeping on the job at almost the same time that Rasor accused Lehman of falling asleep in his office.

In *Martin v. Toledo Cardiology Consultants, Inc.,* (decided after all of the cases Defendant cites in its recitation of the *prima facie* case burden) the Sixth Circuit clarified the proper framing of the similarly situated analysis, reversing a district court's grant of summary judgment to the employer. 548 F.3d 405, 412 (2008) (Def. MSJ at 13-14). The district court in *Martin* made impermissible findings of fact to distinguish a comparator from the plaintiff and framed the similarly situated standard too narrowly by necessitating an exact correlation "not required by the law of this circuit." *Id.* Instead, the *Martin* Court stressed the need for similarity in all the relevant aspects and emphasized that the "*prima facie* showing is not intended to be onerous." *Id.* The "relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees' conduct. But the weight to be given to each factor can vary depending upon the

particular case." *Johnson v. The Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003) citing *Ercegovich*, 154 F.3d at 352.

Like the decision in Martin, the Sixth Circuit in *Bobo v. United Parcel Service, Inc.*, reiterated the limits of *Mitchell v. Toledo Hosp*. 665 F.3d 741 (2012). The Bobo Court noted "[w]e long ago clarified that Courts should not assume 'the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances but should make an independent determination as to the relevancy of a particular aspect of the Plaintiff's employment status and that of the non protected employee.'" *Id*. at 751 citing *Ercegovich v. Goodyear Tire and Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). According to the *Bobo* Court, "the key word in Ercegovich is 'relevant' and the case instructs that the factors listed in *Mitchell* or other cases are only apposite where they are meaningful to the particular claim of discrimination presented." *Id*. The *Bobo* Court further noted the limitations of the *Mitchell* analysis with its reminder that "the focus of the litigation is not on a comparison of 'the employment status of the Plaintiff and other employee in every single aspect of their employment.'" *Id*. citing *Ercegovich*, 154 F.3d at 352. Finally, the *Bobo* Court noted the Supreme's Court emphasis on "'the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the Plaintiff was the victim of intentional discrimination.'" *Id*. citing *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 153 (2000).

Given this, Defendant's attempt to distinguish this employee, to whom it issued a Level 3 discipline instead of terminating her, fails. To do this, Defendant relies on Blank's uncorroborated testimony that Rickey asked permission to sleep before doing so. (Def. MSJ at 11.) But the disciplinary documents do not establish this fact and the conflicting accounts illustrate the factual disputes which should be decided by the jury. (Blank Dep. Ex. 4.) Defendant likewise cannot explain the more favorable treatment based on the severity of the

infraction.  A jury could easily conclude that a nurse, responsible for direct patient care, hiding in an empty patient room to sleep on duty presented a safety risk at least as severe as any alleged safety risk from a security supervisor napping in his office on his break or lunch.  See *supra* Section II.E.  Indeed, a jury could conclude that the sleeping nurse created a much more severe safety risk because she hid in a patient room, making her inaccessible.  (Blank Dep. Ex. 4.)  The jury could consider, in contrast, the undisputed fact that Lehman never missed a call, which reinforces that he was always available, and conclude that Defendant treated the significantly younger nurse more favorably than Lehman.

Defendant's attempt to escape this crucial evidence that Rickey was treated more favorably than Lehman by citing to Blank's testimony to claim that neither Oscadal nor Dubis was aware of Rickey's discipline is without merit. (Def. MSJ at 11.)  Oscadal himself admits that Blank, who was undisputedly aware of Rickey's first incident of sleeping, was involved in the decision to terminate Lehman.  (Oscadal Dep. at 13.)  And a jury, considering Oscadal's position as Senior Vice President of HR, could infer that he knew or should have investigated the disciplinary measures taken against other employees for the same infraction, especially when Defendant allegedly took the infraction so seriously.  *Wexler v. White's Fine Furniture*, 317 F.3d 564, 578 (6th Cir. 2003) (en banc) citing *Smith v. Chryslar Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) (a jury is allowed to question the so-called reasonable business judgment of an employer which does not make a reasonably informed decision).  In fact, he undisputedly received an email when Rickey was caught sleeping the second time outlining her first Level 3 discipline. (Oscadal Dep. Ex. 3.)  Dubis, as COO at the time of Rickey's Level 3 discipline would not have been involved in it, and his knowledge or lack thereof does not entitle Defendant to summary judgment.  (Dubis Dep. at 10-11.)

A jury could also consider Kraft's claim that Lehman was terminated in part because he did not know and properly enforce the sleeping policy.  (Def. Ans. to Pl. Int., attached as Pl. Ex. A; Kraft Dep. at 85.)  But the significantly younger Kraft did not know that sleeping was a Level 3 violation when he first talked to Lehman, yet Kraft faced no discipline for not knowing the policy.  (Def. Ans. To Pl. Int., attached as Pl. Ex. A; Kraft Dep. at 85.)  And a jury could consider this another example of more favorable treatment of significantly younger employees.

### C.    Lehman Can Establish That Defendant's Asserted Reason For Termination Was Pretext For Discrimination.

Because Lehman has succeeded in establishing a *prima facie* case for each of his claims, Defendant must present some legitimate, nondiscriminatory reason for its actions.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  Defendant claims that it terminated Lehman because he fell asleep at work.  (Def. MSJ at 11.)

Lehman can refute the legitimate, nondiscriminatory reason Defendant offers to justify his termination "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate Defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).  The Sixth Circuit has stressed the importance of analyzing all of the evidence of pretext together.  *Thurman v. Yellow Freight Sys.*, 90 .3d 1160,1166 (6th Cir. 1996).

As a preliminary matter, Defendant's claim that Lehman cannot prove pretext because he does not have any direct evidence of age-related comments must be rejected as Lehman can establish his discrimination claims with circumstantial evidence.  (Def. MSJ at 12-13.)  And contrary to Defendant's assertions, Lehman does not have to present personal knowledge of evidence of discrimination to establish a question of pretext.  (Def. MSJ at 13.)  Moreover, Defendant cannot rely on its so-called reasonable business judgment to establish, as a matter of

law, that its articulated reason was not pretext for discrimination.  (Def. MSJ at 13.)  *Wexler*, 317 F.3d at 578.

### 1.    Lehman Has Raised A Question As To The Factual Basis For His Termination.

Defendant claims that the policy calling for a Level 3 discipline for falling asleep at work "was only a guideline," and that the policy allowed for the escalation to termination in Lehman's case.  (Def. MSJ at 6.)  In making this argument, Defendant ignores its own policy which requires approval from the CEO or his designee to deviate from the disciplinary grid.  (Chambers Dep. Ex. 1 at BL245.)  In Lehman's case, however, the CEO at the time was Joseph Gross, and there is no evidence that Gross approved of the escalation in discipline or designated anybody else to approve it.  The factual questions raised by this unauthorized escalation in discipline is reinforced by Defendant's attempt at summary judgment to imply falsely that Dubis was CEO at the time of Lehman's termination.  (Def. MSJ at 6.)  In fact, Dubis admits that he participated in Lehman's termination in his role as COO, ultimately in charge of security, not CEO.  (Dubis Dep. at 11, 28-29, 39; see also Dubis Dep. Ex. 1.)  And according to Dubis, after he shared his thoughts about Lehman's discipline, he made clear to Oscadal that it was *Oscadal's* decision to make, not his.  (Dubis Dep. at 28-29.)  These admissions, and Defendant's attempt to avoid them, demonstrates questions as to factual basis for Lehman's termination.

Lehman's pretext argument is reinforced by the questions surrounding when Lehman fell asleep.  Kraft's letter to Lehman denying his grievance told him that the "investigation determined [y]ou were sleeping while on duty and not all times you were sleeping were you on lunch or break times."  (Kraft Dep. Ex. 5; Kraft Dep. at 83.)  However, neither Kraft nor any other witness could identify how he or she came to that conclusion.  (Kraft Dep. at 63; Oscadal Dep. at 49-5; Platek Dep. at 56-57.)  Platek testified that Difilippo did not know if Lehman was on break and Platek could not remember what Rasor said.  (Platek Dep. at 57.)  Kraft testified

28

that he did not know if anyone verified whether Lehman was on break.  (Kraft Dep. at 63.)
Platek also admitted she never attempted to find out if Lehman was on break, although the
Security Department kept a log detailing break times.  (Platek Dep. at 56-57; Kraft Dep. at 30.)
And Lehman denies ever falling asleep when he was not on break.  (Lehman Dep. at 73.)

### 2.   Defendant's Articulated Reason Was Insufficient To Motivate Termination.

Lehman can establish pretext by pointing to more favorable treatment of similarly
situated individuals outside his protected class who engaged in acts of comparable seriousness
but who were not similarly disciplined.

As described *supra* in Section III.B.1 and 2, Lehman has established a question of fact as
to whether a significantly younger nurse and a non-disabled nurse were treated more favorably
than him.  This is classic evidence of pretext and sufficient, by itself, to defeat summary
judgment.  As Lehman established *supra*, in Section III.B.1 and 2, Defendant cannot escape the
importance of such evidence with its attempt to distinguish Rickey from Lehman.

### 3.   Defendant's Articulated Reason Was Not The Real Reason For Termination.

A jury could additionally conclude that Defendant's articulated reason for Lehman's
termination was not the real reason for termination.  Defendant does not and cannot dispute that
Kraft first told Lehman that he would receive a Level 1 discipline, then once he told Blank about
his diabetes, Blank told him he would receive a Level 3 discipline and must submit to an FFD
exam.  Defendant further does not dispute that Lehman accepted this disciplinary outcome and
cooperated with the FFD process.  See *supra* Section II.C.  A jury could also accept Lehman's
testimony that Blank assured him that he would still receive the Level 3 after the FFD.  See *supra*
Section II.C.  A jury should be allowed to ask why Lehman's discipline escalated to termination
after Blank assured him it would not.  Defendant did not offer that explanation--perhaps because

the intervening events could allow a jury to draw an inference of discrimination.  (Def. MSJ at 5-7.)  Specifically, during the FFD process, Hynko, Defendant's head of Employee Health, concluded that Lehman had a health condition "tied to the ADA."  See *supra* Section II.D.  A jury could infer from the close timing between the revelation of Lehman's disability and his termination that his disability, and not sleeping on break, motivated his termination.

The Southern District of Ohio came to this very conclusion in a case with similar material facts where the defendant claimed that the plaintiff could not establish that his disability was the "but-for" reason for his discharge.  *Schrack v. R + L Carriers*, Case No. 1:10cv603, 2012 U.S. Dist. LEXIS 84171, *40-*41 (J. Litkovitz) (Rpt. and Rec. adptd by J. Weber at 2012 U.S. Dist. LEXIS 131180 (Sept. 2012).  The *Schrack* Court reasoned that the close temporal proximity between the revelation of the plaintiff's disability and his termination was sufficient to establish the fourth prong of his *prima facie* case of disability discrimination.  *Id.*  The *Schrack* Court coupled this evidence with the other evidence of pretext in the case to conclude that the plaintiff had demonstrated a genuine issue of material fact as to pretext for disability discrimination.  The same logic that the *Schrack* Court used applies here and makes summary judgment inappropriate.

Lehman has likewise presented evidence that his age, and not Defendant's articulated reason, was the real reason for his termination.  Defendant's reliance on other employees terminated for sleeping is completely without merit.  Instead of entitling it to summary judgment, the evidence of others terminated only establishes a question as to whether it has engaged in a *post hoc* justification for terminating Lehman.  In claiming that *10* other employees were terminated at the same time or sometime after Lehman was terminated and that *5* of these employees were younger than 40, Defendant cites only to Blank Deposition Exhibit 8.  (Def. MSJ at 7, 10.)  But that exhibit lists only *5* other employees terminated for sleeping on the job

prior to Defendant's policy change. (Blank Dep. Ex. 8.)[4]  And that chart lists only 1 employee who was younger than 40. (Blank Dep. Ex. 8.)  This employee was *already on a Level 3 for job performance* starting on September 20, 2010 when she was caught sleeping on September 30, 2010. (Blank Dep. Ex. 6; Blank Dep. at 58, 72.)  She hardly offers Defendant the cover for which it appears to have been looking when it cited to this chart.  Notably, 3 of the 5 employees terminated immediately for sleeping in or around the same time Lehman was terminated were actually older than him, offering a jury more evidence from which to draw an inference that age motivated Lehman's termination. (Blank Dep. Ex. 8.)[5]  This evidence of a cover up is reinforced by Defendant's failure to include Rickey's Level 3 on the chart submitted to the EEOC in its position statement. (Blank Dep. Ex. 9.)  Blank's explanation that Rickey's Level 3 for sleeping "wouldn't be relevant" for the EEOC's inquiry is without merit as she is clearly a comparator. (Blank Dep. at 70-72.)

Lehman anticipates that Defendant will try to explain away in its Reply these crucial misstatements of fact in their Motion For Summary Judgment with a citation to Blank Deposition Exhibit 5.  This exhibit does include the names of a few more employees immediately terminated for sleeping on the job and some of them were younger than 40 at the time of termination. (Blank Dep. Ex. 5.)  But each of these employees were undisputedly terminated *after Defendant escalated its policy to immediate termination for sleeping*. (Blank Dep. at 19-21; Chambers Dep. at 30; Dubis Dep. at 37.)  And each one of these employees, with the exception of Rickey, who was given a Level 3 for her first incident of sleeping, was terminated *after* Lehman filed his EEOC charge. (Lehman Dep. Ex. 7.)  Defendant is thus entitled to *no* inference in its favor

---

[4]Defendant also includes the comparator, Amanda Rickey, but as described *supra* in Section II.E, she was given a Level 3 for sleeping first and only terminated on her second offense of sleeping and for intoxication.

[5]The final employee on the chart, born in 1964, was a nurse who fell asleep at a tray next to an OR table *during surgery*, allowing a jury to reject any inference that Defendant could not have discriminated against Lehman because it terminated her. (Blank Dep. at 36, 40, 51-52; Blank Dep. Ex. 5.)

based on the termination of these employees. In fact, if there is any inference to be drawn, it must be drawn in Lehman's favor that the EEOC charge could have factored into the disciplinary action taken against possible significantly younger comparators to cover up the age discrimination in which it had already engaged.

## IV.   <u>CONCLUSION</u>

Lehman has established a genuine issue of material fact as to each element of his claims. Further, a genuine issue of material fact exists as to whether Defendant's asserted rationale for terminating Lehman has any basis in fact, did not motivate it to terminate Lehman, or was sufficient to motivate its actions. Therefore, Lehman respectfully requests that this Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

/s/ *Katherine Daughtrey Neff*
Katherine Daughtrey Neff (*Pro Hac Vice*)
Randolph H. Freking (23509)
Trial Attorneys for Plaintiff
FREKING & BETZ, LLC
525 Vine Street, Sixth Floor
Cincinnati, Ohio 45202
Phone: (513) 721-1975/Fax: (513) 651-2570
*kneff@frekingandbetz.com*
*randy@frekingandbetz.com*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 19, 2012, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. mail, e-mail and/or facsimile to those parties who are not served via the Court's electronic filing system. Parties may access this filing through the Court's System.

/s/ *Katherine Daughtrey Neff*