**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

| | |
|---|---|
| ROBERT LEHMAN | : Case No. 2:11-cv-00165 |
| | : J. Bertelsman |
| Plaintiff, | : Mag. J. Wehrman |
| | : |
| vs. | : |
| | : |
| ST. ELIZABETH HEALTHCARE | : |
| | : |
| Defendant. | : |

**PLAINTIFF'S SUPPLEMENTAL BRIEF TO HIS MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Katherine Daughtrey Neff (*Pro Hac Vice*)
Randolph H. Freking (23509)
Trial Attorneys for Plaintiff
FREKING & BETZ, LLC
525 Vine Street, Sixth Floor
Cincinnati, Ohio  45202
Phone:  (513) 721-1975/Fax:  (513) 651-2570
*kneff@frekingandbetz.com*
*randy@frekingandbetz.com*

I.  **INTRODUCTION**

Plaintiff, Robert Lehman, appreciates the Court allowing him to address the Court's concerns expressed on January 17, 2013 during the oral argument.

First, the Court indicated that unless Lehman can demonstrate that he timely requested an accommodation, his disability discrimination claim will fail. Lehman addresses the Court's concerns in *infra* section II. B. 2 at 12-14. However, it is important to note that Lehman has two separate disability discrimination claims: (1) Defendant, St. Elizabeth Medical Center, Inc., terminated Lehman on account of his disability in violation of the ADA and the Kentucky Civil Rights Act; and (2) Defendant failed to accommodate Lehman in violation of the ADA and the Kentucky Civil Rights Act. Thus, for a jury to conclude that Defendant terminated Lehman's employment on account of his disability, Lehman need not prove that his requests for accommodation were timely. Similarly, to prove that Defendant failed to accommodate him, Lehman need not prove that Defendant's termination decision was pretextual.

As to the comparator issue discussed during oral argument, the Court's decision in *Henry v. Delta Airlines, Inc.*, 2011 U.S. Dist. LEXIS 87673, No. 2:10-cv-00009-WOB-JGW (E.D. KY August 8, 2011) preceded the Sixth Circuit's decision in *Bobo v. UPS,* 665 F.3d 741, 751-752 (6th Cir. 2012) and *Bobo* is controlling. (*Infra* section II. A. 1. at 4-8.) Finally, Lehman addresses the Court's "commonsense" inquiry in *infra* section II. A. 2 at 9.

As the Court indicated that Lehman can satisfy his *prima facie* case of disability discrimination, the issue is whether Lehman presented evidence of pretext.

During the oral argument, the parties discussed one way to demonstrate pretext is by providing comparator evidence. The analysis for whether Amanda Rickey is a comparator is guided by *Bobo*, 665 F.3d 741. (*Infra* section II. A. 1. at 4-8.) As pretext evidence must be analyzed as a whole and can be presented in multiple ways, in his Memorandum in Opposition to Defendant's

1

Motion for Summary Judgment ("MIO") and in his Supplemental Brief, Lehman presents an array of evidence that would allow a reasonable jury to conclude that Defendant terminated him for discriminatory reasons.

Defendant's articulated reason that Lehman could not assure the safety of patients, staff and visitors if he was sleeping and therefore his termination was required raises a genuine issue of fact and is without merit because:

1. Lehman's actions in napping in his office with the door open while on breaks is akin to security officers smoking in outdoor smoking huts, using the restroom and eating lunch in the lunch room all of which Defendant permitted (MIO at 4-5, 20, 28-29; *infra* section II. A. 2. at 9);

2. Lehman's manager, Mike Kraft, admitted that Lehman *never* failed to answer a call and had been performing all duties assigned to him, even those above and beyond his regular duties during the period of time his fatigue caused him to nap during breaks demonstrating that Defendant's alleged concerns about the safety of patients, staff and visitors is unsupported by the evidence and insufficient to motivate termination and/or not the real reason for his termination (MIO at 5, 20);

3. At the time Lehman admitted to napping on breaks, Defendant tolerated Amanda Rickey, a non-disabled RN, sleeping. And Defendant admits, Rickey, like Lehman, was required to protect people on St. Elizabeth's premises (*infra* section II. A. 1. at 4-8);

4. Defendant failed to follow its own policy on sleeping, escalating Lehman's discipline from a Level III to termination after it learned of his diabetes and sleep apnea and after St. Elizabeth's head of Employee Health, Gerald Hynko linked Lehman's medical conditions "to the ADA" and expressed concern about being "audited" by the EEOC (MIO at 28-29);

5. Defendant tolerated for years the actions of at least one other non-disabled security officer, Ken Rasor, who endangered the safety of others by being insubordinate (MIO at 4-5); and

6. Despite Lehman's requests for reasonable accommodations, Defendant failed to accommodate him. (*infra* section II. B. 1. at FN 2; *Maley v. EMH Regional Health Care Center*, 2010 U.S. Dist. LEXIS 22523, No. 1:09-cv-896 (N.D. Ohio March 11, 2010) (evidence that a defendant failed to accommodate the plaintiff's disability is evidence of pretext).

These facts, when taken as a whole, allow a reasonable jury to conclude that Defendant terminated Lehman because of his disability.

2

## II. ARGUMENT

### A. Lehman Established A *Prima Facie* Case Of Disability Discrimination And Pointed To An Array Of Evidence That, When Taken As A Whole, Would Allow A Reasonable Jury To Conclude That Defendant Terminated Him For Discriminatory Reasons.

Lehman has established that he is disabled, he was qualified for the job he held, he suffered an adverse employment action and he was replaced by a non-disabled employee. (MIO at 14-21.) Because Lehman has succeeded in establishing a *prima facie* case of disability discrimination, Defendant must present some legitimate, nondiscriminatory reason for its actions. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Defendant claims that it terminated Lehman because he fell asleep at work. (Def. MSJ at 11.)

To establish that Defendant's explanation for the termination is unworthy of belief, Lehman may show that it had no basis in fact, did not actually motivate it, or was insufficient to motivate the termination decision. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The Sixth Circuit has cautioned, however, that the courts should "avoid formalism" in the application of this test, "lest one lose the forest for the trees." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400, n. 4 (6th Cir. 2009). "Pretext is a 'commonsense inquiry' and at the summary judgment stage Plaintiff need only produce evidence from which the jury could reasonably doubt the employer's explanation." *Adkison v. P&G*, 2011 U.S. Dist. LEXIS 145785, 35-36, No. 1:10-cv-85 (S.D. Ohio Dec. 19, 2011) citing *Chen*, 580 F.3d at 400, n. 4. Pretext evidence must be analyzed *as a whole*. *Thurman v. Yellow Freight Sys.*, 90 .3d 1160,1166 (6th Cir. 1996); *Pastura v. CVS Caremark*, 2012 U.S. Dist. LEXIS 182991, 25-26, No. 1:11-cv-400 (S.D. Ohio Dec. 31, 2012).

In his MIO, Lehman has pointed to an array of evidence that, when taken as a whole, establishes a question of fact as to the motivations of the decision makers at the time of his termination and would allow a reasonable jury to conclude that he was actually terminated for

3

discriminatory reasons. (MIO at 28-32.) One such piece of evidence is that Defendant treated a non-disabled nurse, Amanda Rickey, more favorably than him.

> 1. **Given That Defendant Accused Rickey And Lehman, Who Both Had The Responsibility For Protecting People On St. Elizabeth's Premises, Of Violating The Same Policy By Engaging In The Same Conduct One Day Apart Yet Rickey Received A Level III And Defendant Terminated Lehman, A Jury Could Easily Conclude that Rickey Is A Comparator.**

In support of its argument that Amanda Rickey is not similarly situated to Lehman for purposes of pretext, Defendant relies on *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992). (Reply Brief at 7-8.) To determine whether the plaintiff's proposed comparator was truly a comparator, the *Mitchell* Court looked to specific factors including whether the proposed comparator reported to the plaintiff's same supervisor, whether the employee was subject to the same standards and whether the employee engaged in the same conduct. *Mitchell*, 964 F.2d at 583. However, six years after the *Mitchell* decision, the Sixth Circuit decided *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998), and instructed that courts should *not* assume "the specific factors discussed in *Mitchell* are relevant factors" in every case. (Emphasis added.)

Finding that courts continued to rely on the stringent factors listed in *Mitchell* despite the *Ercegovich* Court's instruction, in *Bobo,* 665 F.3d at 751-752, the Sixth Circuit again stressed the importance of reviewing the specific facts of the case to determine what factors may be relevant for evaluating comparator evidence. According to the *Bobo* Court, a plaintiff need not demonstrate an "exact correlation between himself and others similarly situated," instead, he must show that he and his proposed comparator were similar in all *relevant* respects and he and his proposed comparator engaged in conduct of comparable seriousness. *Id*. citing *Ercegovich*, 154 F.3d at 353 and *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (citing

4

*Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (conduct must be similar in kind and severity).

Moreover, *Bobo* reiterated the instruction from *Ercegovich* that the plaintiff need not show that he and his proposed comparator dealt with the same supervisor. *Id*. citing *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (whether the employees dealt with the same supervisor "does not automatically apply in every employment discrimination case" and the relevancy of the supervisor criterium depends on the facts presented); *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 479-80 (6th Cir. 2003) (the criteria that the employees dealt with the same supervisor is not an inflexible requirement). Rather, the relevant factor in many instances may be whether both employees' situations were handled by the same decision-maker. *See McMillan*, 405 F.3d at 414; *Guerra v. Convergys Customer Management Group, Inc.*, 2010 U.S. Dist. LEXIS 92584, 24, No. C-1-08-666 (S.D. Ohio Sept. 7, 2010) ("two employees who are directly supervised by different individuals are not necessarily dissimilar if the same member of management disciplined both the plaintiff and the comparable employee.")

The facts in *Bobo* support this Court finding that a jury could easily conclude that Rickey is a comparator to Lehman. UPS terminated Bobo, a feeder supervisor, allegedly due to a violation of UPS's integrity policy after he falsified safety ride forms. *Bobo*, 665 F.3d at 747. Six high-level managers were involved in the decision to discharge Bobo. *Id*. Bobo identified four other feeder supervisors from different UPS facilities as having falsified safety ride forms. *Id*. Although these employees reported to different supervisors, the Court found that a jury could determine that they were comparators because they engaged in the exact same conduct as Bobo and two of the six high-level managers involved in Bobo's discharge were aware of their conduct. *Id*. at 747.

In arguing pretext for disability discrimination, Lehman has identified Rickey, an RN with no known disability, as a comparator. On August 21, 2010, one day *after* Lehman admitted to Kraft and Lisa Blank, Director of Recruitment and Employee Relations, that he had napped during breaks, a House Supervisor found Rickey sleeping in an empty patient room during her scheduled shift. (Blank Dep. Ex. 4.) According to Defendant, "the Security and Nursing departments are required to protect people on the St. Elizabeth premises and should not be sleeping while on duty." (Def. Mot. at 6.) Both Rickey and Lehman were subject to the same disciplinary policy relating to unauthorized sleeping during work time. (Chambers Dep. Ex. 1.) Like the proposed comparators in *Bobo*, Lehman and Rickey, who were both required to protect people on St. Elizabeth's premises, were accused of engaging in the same activity: sleeping during work time. However, Rickey, despite being caught sleeping in an empty patient room at 12:30 in the morning, was given a Level III, while Lehman was terminated. Considering that Lehman's manager, Mike Kraft, was not involved in the decision to terminate his employment (Kraft Dep. at 64), the fact that Lehman and Rickey reported to different managers is irrelevant for evaluating whether they are comparators. *See Bobo*, 665 F.3d at 747; *McMillan*, 405 F.3d at 414.

In its Reply in Support of Motion for Summary Judgment of Defendant, St. Elizabeth Medical Center, Inc. ("Reply Brief"), Defendant argues that Rickey is not a suitable comparator because Lehman's "offense occurred *after* Dubis expressed that St. Elizabeth take this no-tolerance position." (Reply Brief at 8.) (Emphasis added.) Defendant's allegation is simply not true and is further evidence of its attempt to cover up its discriminatory actions. (See also MIO at 31.) Not only did Defendant catch Rickey sleeping *after* Lehman admitted to napping on breaks, but Blank, who was involved in the decisions to discipline Rickey and to terminate Lehman, knew on August 25, 2010, the same day Defendant drafted Rickey's Level III

6

discipline, that John Dubis, COO, was "very intolerant of anyone sleeping on paid time." (Blank Dep. at 44-45; Ex. 4.) Despite this knowledge, Blank permitted Rickey to receive the Level III. (Blank Dep. at 44-45, 47, 49.)

Defendant also argues that Rickey's conduct was dissimilar to Lehman's because Rickey allegedly informed her supervisor that she needed to lie down because she was ill. (Reply Brief at 7.) However, the disciplinary documents do not establish this fact. (Blank Dep. Ex. 4.) Even if this were true, under *Bobo*, Rickey's conduct is sufficiently similar to Lehman's. Bobo identified three employees who had violated UPS's integrity policy through various acts of dishonesty, which did not include falsifying safety ride forms, but were not discharged. *Bobo*, 665 F.3d at 752. Because similar decision makers found that the employees violated the integrity policy, the same policy Bobo was accused of violating, the court considered them possible comparators. *Id*. In this case, both Lehman and Rickey were accused of violating the same policy. A jury could easily conclude that a nurse, responsible for direct patient care, hiding in an empty patient room to sleep on duty presented a safety risk at least as severe as any alleged safety risk from a security supervisor napping with his office door open on his break or lunch. Indeed, a jury could conclude that the sleeping nurse created a much more severe safety risk because she hid in a patient room, making her inaccessible.

The fact that Lehman and Rickey held different positions does not preclude Lehman from using Rickey as a comparator. Bobo identified Myles Spears as a potential comparator. Spears held a completely different upper management position than him at another UPS facility. *Bobo*, 665 F.3d at 747-748. Instead of terminating Spears's employment, UPS demoted him. *Id*. at 747-748. Although Spears held a different position than Bobo, the Court focused the relevancy question on the similarity in conduct, both Spears and Bobo violated UPS's integrity policy, and

the involvement of a majority of the same decision makers in their disciplinary actions. *Id*. at 752.

While *Bobo* controls the analysis of the comparator evidence identified by Lehman, *Henry*, 2011 U.S. Dist. LEXIS 87673, cited by this Court during oral argument, does not because it is distinguishable. First, this Court's decision, which focused on the *Mitchell* factors, preceded *Bobo*. Second, Henry failed to establish that her supervisor, Gergits, engaged in acts of "comparable seriousness" as the only misconduct Gergits engaged in, asking retiring employees to work as gate agents, was of a very different nature than Henry's conduct, manipulating the boarding process so Gergits could fly first class.[1] *Id*. at 23-24. In this case, Rickey and Lehman were both accused of unauthorized sleeping during work time.

In Defendant's final attempt to escape this crucial evidence that Rickey was treated more favorably than Lehman, Defendant asserts that neither Martin Oscadal, Senior Vice President of HR, nor John Dubis, COO, was aware of Rickey's discipline. (Reply Brief at 8.) However, according to Dubis, he was not involved in the decision to terminate Lehman until the final step of the grievance process; therefore his knowledge is irrelevant. (Dubis Dep. at 26.) Oscadal admits that Blank, who was undisputedly involved in Rickey's Level III discipline, was involved in the decision to terminate Lehman. (Oscadal Dep. at 13.) And Defendant's own documents support that Blank was intimately involved in the decision to terminate Lehman. (Oscadal Dep. Ex. 11.) Finally, Blank knew of Dubis's intolerance at the time Rickey was issued the Level III. (Blank Dep. at 44-45, 47, 49, Ex. 4.)

---

[1] After noting that the "Sixth Circuit has indicated that 'same supervisor' can be interpreted" as the same decision maker, the Court did not evaluate the "same supervisor" issue because it found that Henry failed to prove that Gergits's conduct was of "comparable seriousness." *Id*. at n 11.

8

When combining Lehman's evidence regarding Defendant's differential treatment of Rickey with the array of evidence Lehman presented in his MIO, Lehman has established a question of fact as to the motivations of the decision makers at the time of his termination and a reasonable jury to conclude that he was actually terminated for discriminatory reasons.

> 2. **A Reasonable Jury Could Infer From The Evidence Presented By Lehman And From Commonsense That Lehman's Response Time Would Be No Different Than Any Other Officer Permitted To Smoke On Break Or Permitted To Use The Restroom.**

During oral argument, the Court asked whether a commonsense inference could be made that an employee sleeping would take additional time to wake-up before he could adequately respond to an emergency situation. As this Court must accept Lehman's evidence as true and draw all reasonable inferences in his favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), the Court must reject this as an impermissible inference in Defendant's favor. Moreover, a reasonable jury could easily conclude based on commonsense, that a security officer smoking on his break at the smoking hut outside of the building, or located in a bathroom stall using the restroom, would take just as long, if not longer, to respond to an emergency as Lehman would from his office. Moreover, the unequivocal evidence in this case, which the Court must accept as true, is that Lehman never failed to respond to a call and had been performing all duties above and beyond what his regular security officer duties required during the period of time he took naps during his breaks. (MIO at 20.)

> B. **Genuine Issues Of Material Fact Exist Warranting A Jury Trial On Lehman's Claim That Defendant Violated The ADA By Failing To Accommodate His Disability.**

Lehman has established that he is disabled and that he was qualified for the job he held. (MIO at 14-21.) Lehman can also establish that he timely requested a reasonable accommodation on two occasions and Defendant failed to accommodate him.

9

### 1.  A Reasonable Jury Could Conclude That Lehman Requested Accommodations On Two Separate Occasions.

Blank admitted that the hospital's accommodation policy was very interactive and it did not require an employee to submit a formal request for an accommodation. (Blank Dep. at 21, 22; see also Platek Dep. at 20.) Defendant's interactive accommodation process involved both the Employee Health Department as well as Human Resources. (Blank Dep. at 21.) On August 19, 2010, after learning that someone had observed Lehman with his eyes closed in his office, Kraft, Lehman's manager, asked Blank and Roxann Platek, HR Advisor, whether Lehman's nodding off may relate to his "diabetes and low blood sugar." (Platek Dep. Ex. 4.) On August 23, 2010, after learning that Defendant considered his napping on breaks to be a violation of policy, Lehman met with Gerald Hynko, the Director of Defendant's Employee Health Department, and explained his belief that his diabetes caused his fatigue, which led to him napping. (Lehman Dep. at 67, Ex. 8, Ex. 10; Hynko Dep. at 13.) During their conversation, Hynko explained to Lehman that he could not be disciplined if it was determined that his diabetes caused his napping as Lehman was protected by the ADA, which allowed for accommodations. (Lehman Dep. at 67, Ex. 8, Ex. 10.)

On September 9, 2010, Hynko informed Roxann Platek that "he had enough information to believe there is a medical reason for [Lehman] falling asleep on the job" which he tied to the ADA. (Platek Dep. Ex. 1.) Platek passed this information on to Oscadal and Blank, but did not talk to Lehman about a possible need for an accommodation. (Platek Dep. at 30.) She claims Hynko was working with Lehman on it, and does not know whether any request was put in writing. (Platek Dep. at 30.) But Hynko did not speak to Lehman about the possibility of requesting accommodations either. (Lehman Aff. ¶ 4.)

When Lehman met with Dr. Brent Haskall on September 13, 2010, Lehman mentioned that Blank had told him he would receive a Level III discipline no matter what Dr. Haskall

10

concluded. (Lehman Dep. at 69.) In response, Dr. Haskall stated that he did not believe Lehman should receive a Level III if his disability caused his sleeping and recommended that Lehman contact Human Resources. (Lehman Dep. Ex. 10.) On September 15, 2010, Lehman contacted Platek and asked whether he could receive a Level III if his disability caused his sleeping. (Lehman Dep. Ex. 10, Platek Dep. Ex. 3.) Platek responded that she would need to investigate his question and promised to get back with him. (Lehman Dep. Ex. 10, Platek Dep. Ex. 3.) However, Platek never responded to Lehman. (Lehman Dep. Ex. 10.) Instead, in an email to Blank and Oscadal, Platek accused Lehman of not "'owning' it.'" (Platek Dep. Ex. 3.) A jury could consider Lehman's conversations with Hynko, Dr. Haskall and Platek about the fatigue caused by his disabilities and Hynko's conversations with Platek about linking Lehman's medical conditions "to the ADA" as an attempt to initiate an interactive process about accommodating Lehman's disability. This type of interactive process was precisely how Blank stated an employee could request an accommodation. Instead of accommodating Lehman, Defendant determined that narcolepsy was the only justifiable reason for sleeping. (Blank Dep. at 37, 39-40; Blank Dep. Exs. 2, 3; Platek Dep. Exs. 3, 6, 8; Platek Dep. at 34, 90, 92, 97; Lehman Dep. at 69, 70; Oscadal Dep. at 45-46.)

Lehman grieved his termination through Defendant's dispute resolution procedure and at grievance meetings with Doug Chambers and John Dubis explained that he had purchased a special alarm used by truck drivers to keep them awake and was prepared to ask his doctors for additional assistance to address his fatigue. (Chambers Dep. at 57; Lehman Aff. ¶ 5.) Lehman asked to be returned to work using that device. (Chambers Dep. at 57; Lehman Aff. ¶ 5.) However, Chambers and Dubis did not permit Lehman to return to work with the device.

An employee is not required to mention the ADA or use the phrase "reasonable accommodation" in order to request a reasonable accommodation. *Linder v. John E. Potter,*

*Postmaster General, U.S.P.S.*, 2009 U.S. Dist. LEXIS 72941, No. CV-05-0062-FVS (E.D. WA August 18, 2009) citing *Barnett v. U.S. Air Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000).  However, once an employee puts his employer on notice of a need for a reasonable accommodation, the employer has a duty to interact with an employee in a good faith effort to seek a reasonable accommodation.  *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996), *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 951-952 (8th Cir. 1999).  *See also, Shaver v. Wolske & Blue*, 138 Ohio App. 3d 653, 664 (2000).  A jury can consider an employer's failure to engage in an "interactive process" to find a reasonable accommodation when an employee requests one as evidence supporting the plaintiff's *prima facie* case proof that the employer may have been acting in bad faith or in reckless indifference to the plaintiff's federally protected rights *Lovejoy-Wilson v. Noco Motor Fuels*, Inc., 242 F. Supp.2d 236, 244 (S.D. NY 2003), and as evidence of pretext for disability discrimination.  *See Maley*, 2010 U.S. Dist. LEXIS 22523 at 10-11 (the plaintiff's evidence that her employer failed to accommodate her disability can be used as evidence of pretext for disability discrimination.)[2]  As part of the interactive process, Defendant was "required to make a reasonable effort to determine the appropriate accommodation."  *White v. Honda of Am. Mfg., Inc.,* 191 F.Supp.2d 933, 950 (S.D. Ohio 2002).  Defendant simply failed to do so.

### 2. A Reasonable Jury Could Conclude That Lehman's Accommodation Requests Were Timely.

Defendant asserts that by failing to mention any health concerns until after he was informed that sleeping during breaks violated Defendant's policies, "it was too late for Plaintiff

---

[2] Maley, a radiological technologist at EMH Regional Medical Center for 26 years, was terminated for sleeping while on duty.  *Id*. at 1.  Maley, who suffered from migraine headaches, asserted that she rested her eyes to help treat her migraines.  *Id*. at 2.  The court determined that the defendant's action in terminating Maley's employment for allegedly sleeping on the job, created a genuine issue of material fact as to whether the termination was due to Maley's disability permitting her disability discrimination claim to proceed to a jury.  *Id*. at 8.  Moreover, Maley's evidence that the defendant failed to accommodate her disability "could also enable the jury to conclude that the reason for termination was pretextual and that Plaintiff's disability was the actual reason."  *Id*. at 10-11.

to request an accommodation." (Reply Brief at 4.) In support of its argument, Defendant relies on *Melange v. City of Center Line*, 2012 U.S. App. LEXIS 11175, No. 11-1053 (6th Cir. May 31, 2012). Defendant is wrong to rely on *Melange* to establish that both of Lehman's requests for an accommodation were untimely. While the facts of *Melange* are materially distinguishable from the case before this Court, its reasoning actually requires that this Court find a jury question regarding the timeliness of Lehman's accommodation requests. In *Melange*, the plaintiff, a custodian, was placed on short-term disability leave after he suffered head injuries in 2006 and 2007. In January 2008, the plaintiff was automatically placed on long-term disability pursuant to his collective bargaining agreement ("CBA"). *Id.* at *1-2.

In May 2008, the plaintiff had surgery and his neurosurgeon recommended that he not return to work until further evaluation. *Id.* The defendant sent the plaintiff a letter on July 7, 2008 directing him to attend follow up appointments and informing him that he could not return to work until he received doctor's authorization. *Id.* at *3. The CBA required termination of employees who are unable to return to work after receiving 26 weeks of long-term disability benefits, thus on July 14, 2008, the CBA triggered Melanges's termination. On July 31, 2008, the day after it received an evaluation from one of the plaintiff's doctors that he would not be able to safely operate large equipment at work, the defendant sent a letter to the plaintiff notifying him that he was terminated. *Id.* at *4.

Unlike the facts before this Court (where Lehman asked for an accommodation during the fitness for duty process, before the decision to terminate him had been made[3] and during the grievance process, before the termination decision was final) two weeks *after* sending the plaintiff his termination letter (and a month after the 26th week of long-term disability benefits

---

[3] Oscadal testified that Defendant made the decision to terminate Lehman after Oscadal spoke with Bob Hoffer, which was sometime after September 15, 2010 and after Lehman's conversations with Hynko, Dr. Haskall and Platek. (Oscadal Dep. at 72, 74-75, Ex. 11; see *supra* section II. B. 1.)

13

which triggered the plaintiff's termination), the defendant received a letter from another doctor who recommended that the plaintiff "be given an opportunity to return to work under supervision." *Id.*

While the *Melange* Court did not engage in extensive analysis of the plaintiff's reasonable accommodation claim, it held the defendant did not fail to engage in the interactive process because the plaintiff, who did not grieve his termination, did not provide the defendant with a request for accommodation until two weeks "*after* the *latest conceivable* termination date [July 31, 2008]." *Id.* at *15. The *Melange* holding does not entitle Defendant to judgment as a matter of law as it claims, however. Instead it prohibits summary judgment. When it considered the timeliness of the plaintiff's accommodation request, the *Melange* Court, viewing the facts in the light most favorable to the plaintiff, properly assumed that the plaintiff *was employed as late as July 31, 2008*, the *latest conceivable* termination date.

Here, it is undisputed that Defendant has a process for grieving termination decisions and that Lehman engaged in that process. This Court must consider this fact in the light most favorable to Lehman and assume that Defendant created this grievance process to actually review termination decisions before they are final. This Court must therefore find a jury question as to whether Lehman was employed until the *end* of that grievance process and consider this as the latest conceivable termination date. It is undisputed that Lehman requested a reasonable accommodation before that date which would make his accommodation request timely and prohibit summary judgment.[4]

---

[4] While the Sixth Circuit did not consider the question as to whether the doctor's letter constituted a reasonable accommodation request, it noted that the district court's holding the letter was "akin to a 'try and see' plea" rather than an accommodation request. *Id.* at *6. In stark contrast, here, a jury could easily conclude that Lehman's requests to nap during breaks and to use the truck driver alarm were requests for reasonable accommodations.

### III.    CONCLUSION

Lehman has established a genuine issue of material fact as to each element of his claims. Further, a genuine issue of material fact exists as to whether Defendant's asserted rationale for terminating Lehman has any basis in fact, did not motivate it to terminate Lehman, or was sufficient to motivate its actions. Therefore, Lehman respectfully requests that this Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

/s/ *Katherine Daughtrey Neff*
Katherine Daughtrey Neff (*Pro Hac Vice*)
Randolph H. Freking (23509)
Trial Attorneys for Plaintiff
FREKING & BETZ, LLC
525 Vine Street, Sixth Floor
Cincinnati, Ohio 45202
Phone: (513) 721-1975/Fax: (513) 651-2570
*kneff@frekingandbetz.com*
*randy@frekingandbetz.com*

### CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. mail, e-mail and/or facsimile to those parties who are not served via the Court's electronic filing system. Parties may access this filing through the Court's System.

/s/ *Katherine Daughtrey Neff*